## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------x
:
In re:                                                      :    Chapter 11
:
Vertellus Specialties Inc., *et al.*,[1]                    :    Case No. 16-**11290** (___)
:
Debtors.                          :    (Joint Administration Requested)
---------------------------------------------------------------x

### MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION SECURED FINANCING, (II) AUTHORIZING POSTPETITION USE OF CASH COLLATERAL, (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF

The above-captioned debtors (the "Debtors"), by and through their proposed counsel,

DLA Piper LLP (US), hereby submit this motion (the "Motion"), pursuant to sections 105(a),

361, 362, 363, 364, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules

2002, 4001, 6003, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules"), and Rules 2002-1(b) and 4001-2 of the Local Rules of Bankruptcy Practice and

Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local

Rules"), for entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the

"Interim Order"):  (a) authorizing Debtor Vertellus Specialties Inc. ("VSI"), as borrower (the

"Borrower"), to obtain, and for certain other Debtors to guarantee (in such capacities, the

"Guarantors", and together with the Borrower, the "Loan Parties"), secured postpetition

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Vertellus Specialties Holdings Corp. (9569); Vertellus Specialties Inc. (7240); Vertellus Agriculture & Nutrition Specialties LLC (5687); Tibbs Avenue Company (9642); Vertellus Specialties PA LLC (0900); Vertellus Health & Specialty Products LLC (6325); Vertellus Specialties MI LLC (0398); Vertellus Performance Materials Inc. (7461); Rutherford Chemicals LLC (8878); Solar Aluminum Technology Services (d/b/a S.A.L.T.S.) (3632); and MRM Toluic Company, Inc. (0544).  The mailing address of each of the Debtors, solely for purposes of notices and communications, is 201 N. Illinois Street, Suite 1800, Indianapolis, IN 46204.

financing (the "DIP Financing") pursuant to the Debtor-in-Possession Credit Agreement, with the lenders signatory thereto (the "DIP Lenders") and Wilmington Trust, National Association ("Wilmington Trust"), as administrative agent and collateral agent (collectively, in such capacities, the "DIP Agent", and together with the DIP Lenders, the "DIP Secured Parties"), substantially in the form attached hereto as **Exhibit B** (as amended, supplemented or otherwise modified from time to time, the "DIP Credit Agreement," and collectively with the schedules and exhibits attached thereto, all agreements, documents, certificates, instruments and/or amendments executed by and/or delivered by or to any Loan Party in connection therewith and the DIP Orders, the "DIP Documents"); (b) authorizing postpetition use of cash collateral; (c) granting adequate protection to prepetition secured parties; (d) scheduling a final hearing for an order approving the Motion on a final basis (a "Final Order", and together with the Interim Order, the "DIP Orders"); and (e) granting related relief.  In support of the Motion, the Debtors rely upon and incorporate by reference the *Declaration of Philip R. Gillespie In Support of First Day Pleadings* (the "First Day Declaration"), filed with the Court concurrently herewith.  In further support of the Motion, the Debtors respectfully represent as follows:

## Jurisdiction and Venue

1.      The Court has jurisdiction over the Debtors, their estates, and this matter under 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware dated as of February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b).

2.      Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

3.      The Debtors consent to the entry of a final order on this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## Background

4.     On the date hereof (the "Petition Date"), each Debtor filed with this Court a voluntary petition for relief under the Bankruptcy Code.

5.     The Debtors continue in possession of their properties and to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.   No trustee, examiner, or official committee of unsecured creditors has been appointed in the Debtors' chapter 11 cases.

6.     With a history dating back more than 110 years, the Debtors are now a global leading provider of specialty chemicals for the agriculture, nutrition, pharmaceutical, fine chemicals, medical, personal care, plastics, coatings and many other industrial markets.  Finished goods containing specialty chemicals made by Vertellus' Debtor and non-Debtor affiliates (collectively, "Vertellus") include toothpaste, deodorants, vitamins, pharmaceuticals, detergents, plastics, adhesives, inks, tires, and thousands of other every-day products.  Vertellus employs over 1,000 people in 14 sites throughout the world, and in 2015, had revenue approaching $700 million.

7.     The Debtors' operations relate to two main product lines; the Vertellus Specialty Materials business unit (the "VSM Business Division" or "VSM") and the Vertellus Agriculture and Nutrition Specialties business unit (the "VAN Business Division" or "VAN").  The VSM Business Division comprises a broad basket of complex technologies, manufacturing biomaterials, CPC biocides, pyridine derivatives, DEET, sulfone monomers, EMA copolymers, alkenyl succinic anhydrides, reducing agents, and a host of natural and renewable chemistries based on castor and citrates.  Castor oil and citrates are primary ingredients in many of these products, which include pill encapsulation, deodorants and other personal care items.  Through the VAN Business Division, the Debtors provide intermediates for crop protection chemicals as

well as biocides, pharmaceuticals and many other applications, including vitamin B3 nutrition products for animal, human and pharmaceutical uses.

8.     Although certain of the Debtors' operations remain strong and their overall revenue growth continues to increase year-over-year, the Debtors have fallen victim to certain macroeconomic forces recently afflicting the chemical manufacturing industry.  Specifically, the Debtors' VAN Business Division operates in a highly competitive industry, and has faced a slowing of growth rates for its pyridine and picolines, coupled with significant increases in global capacity and production, primarily from Chinese manufacturers of VAN's primary products.    In addition, the Debtors continue to carry the burden of legacy environmental and pension liabilities.  Finally, the Debtors' capital structure and debt load has created additional strain on the Debtors' ability to operate in the ordinary course of their businesses.

9.     These, and other headwinds, led the Debtors to undertake a number of cost-saving and restructuring actions to address the rapid changes in the competitive economic environment and to manage their prepetition liabilities.   In December 2015, Vertellus began exploring potential sales of certain of their business assets, including the VSM Business Division.  With dwindling liquidity and the underperformance of the VAN Business Division, it became clear that the sale process could not be completed in sufficient time to offset the continued deterioration in the Debtors' liquidity or at a value that would permit the Debtors to address in full its debt obligations and liquidity needs.  Accordingly, the Debtors and their financial and legal advisors began the process of exploring a myriad of restructuring alternatives with their prepetition lenders.

10.     After carefully exploring and exhausting virtually all possibilities, the Debtors have determined, with the advice of their professional advisors, that commencement of these

4

chapter 11 cases, obtaining the proposed debtor-in-possession financing, and undertaking a sale of substantially all of the Debtors' assets represents the best available alternative for the Debtors to meet their immediate and ongoing liquidity needs, while continuing to operate in the ordinary course of business during this process for the benefit of the Debtors' customers, employees, vendors and other stakeholders.

11.    In doing so, and after careful evaluation and further negotiations with the Debtors' primary stakeholders, including (a) the Debtors' prepetition term loan administrative agent and collateral agent, Wilmington Trust (collectively, in such capacities, the "<u>Prepetition Term Facility Agent</u>") under that certain Credit Agreement dated as of October 31, 2014 (the "<u>Prepetition Term Facility Credit Agreement</u>"),[2] and an ad hoc group of the term lenders thereunder (as more fully described below, the "<u>Ad Hoc Group</u>", and together with the other term lenders thereunder, the "<u>Prepetition Term Lenders</u>", and together with the Prepetition Term Facility Agent, the "<u>Prepetition Term Facility Secured Parties</u>"); and (b) PNC Bank, National Association, as administrative and collateral agent (the "<u>Prepetition ABL Agent</u>") under that certain Amended and Restated Revolving Credit and Security Agreement, dated as of October 31, 2014 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Prepetition ABL Credit Agreement</u>"),[3] and lender parties thereunder (the "<u>Prepetition ABL Lenders</u>," and together with the Prepetition ABL Agent, the "<u>Prepetition ABL Secured Parties</u>", and together with the Prepetition Term Facility Secured Parties, the "<u>Prepetition Secured Parties</u>," and together with the DIP Secured Parties, the "<u>Secured Parties</u>"), including the Debtors' careful evaluation of the economic and other terms of competing debtor-in-possession financing proposals offered by the Prepetition ABL Secured Parties and the Ad Hoc Group

---

[2]    A true and correct copy of the Prepetition Term Facility Credit Agreement is attached hereto as **Exhibit C**.

[3]    A true and correct copy of the Prepetition ABL Credit Agreement is attached hereto as **Exhibit D**.

(including an evaluation of their respective rights under the Existing Agreements, including the Intercreditor Agreement[4]), the Debtors, in the sound exercise of their business judgment, and in consultation with their advisors in the discharge of their fiduciary duties, determined that the sizing, structure and financial support available under the $110 million in debtor-in-possession financing (the "DIP Facility") offered by the DIP Lenders would provide the Debtors with the liquidity, on the best available terms, required for a smooth transition in these chapter 11 cases and the continued operation by the Debtors of their businesses.  Moreover, the Prepetition Term Lenders' ability to consummate the purchase of substantially all of the Debtors' assets, as set forth in that certain asset purchase agreement dated May 31, 2016 between the Debtors and a special purpose entity established to hold and bid the secured claims of the Prepetition Term Lenders, presented the best option for the Debtors to maximize the value of their assets and, ultimately, provide the highest possible recovery to creditors, while protecting jobs and minimizing the impact to the substantial majority of the Debtors' vendors and customers.

### **Relief Requested**

12.    By this Motion, the Debtors seek entry of the DIP Orders granting, among other things, the following relief:

> a)  authorizing the Debtors to borrow funds under the DIP Facility in an aggregate principal amount of up to $110 million (the "DIP Loans"), pursuant to the terms and conditions of the DIP Documents, with up to $100 million available on an interim basis;
>
> b)  authorizing those certain Debtors who are borrowers or guarantors under the Prepetition ABL Credit Agreement (the "Prepetition ABL Loan Parties") to execute and deliver that certain Payoff Letter, substantially in the form attached hereto as **Exhibit F**, which was prepared by the Prepetition ABL Agent and approved by the DIP Secured Parties and the Prepetition Term Facility Agent (the "Payoff Letter"), and perform all such other and further acts as may be required in connection with the Payoff Letter;

---

[4]    A true and correct copy of the Intercreditor Agreement is attached hereto as **Exhibit E**.

c) authorizing the Loan Parties to immediately borrow and use the initial draw under the DIP Financing to repay in full, in cash (or otherwise cash collateralize) the outstanding obligations under the Prepetition ABL Credit Agreement (the "Prepetition ABL Obligations") in accordance with the Payoff Letter (the "ABL Facility Payoff", and the amounts required to be cash collateralized pursuant to the Payoff Letter referred to as the "Payoff Cash Collateral");

d) authorizing the Loan Parties to remit cash collateral to the Prepetition ABL Agent (the "Prepetition Letters of Credit")[5] issued under the Prepetition ABL Credit Agreement in an amount equal to 105% of the face amount of all undrawn Prepetition Letters of Credit, in accordance with the Payoff Letter, as security for the Letter of Credit Obligations (as defined in the Payoff Letter);

e) authorizing the use of Cash Collateral (as defined below) and all other Prepetition Term Facility Collateral (as defined below) and any proceeds thereof, following the ABL Facility Payoff, as described more fully and to the extent provided in the DIP Orders;

f) granting to the DIP Agent (for the benefit of the DIP Secured Parties) the DIP Liens and the DIP Superpriority Claims (each as defined below);

g) granting adequate protection to the Prepetition Secured Parties, including the ABL Adequate Protection Liens and the ABL Superpriority Claim (as each term is defined in the DIP Orders);

h) modifying the automatic stay to implement the terms of the DIP Financing and Payoff Letter; and

i) scheduling a final hearing on this Motion (the "Final Hearing").

### Summary of Principal Terms of DIP Facility

13. Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, the following is a concise summary of the proposed material terms of the DIP Documents and the DIP Orders.[6]

| Borrower | Vertellus Specialties Inc. |
|---|---|

---

[5] A schedule of the outstanding Prepetition Letters of Credit is attached hereto as **Exhibit G**.

[6] Capitalized terms used in this summary but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Documents or DIP Orders, as applicable. This statement is qualified in its entirety by reference to the applicable provisions of the DIP Documents or the DIP Orders. To the extent any inconsistency between this concise statement and the provisions of the DIP Documents or the DIP Orders, the provisions of the DIP Documents or the DIP Orders, as applicable, shall control.

| | |
|---|---|
| **Guarantors** | Vertellus Specialties Holding Corp.; Vertellus Agriculture & Nutrition Specialties LLC; Tibbs Avenue Company; Vertellus Specialties PA LLC; Vertellus Health & Specialty Products LLC; Vertellus Specialties MI LLC; Vertellus Performance Materials Inc.; Rutherford Chemicals LLC; Solar Aluminum Technology Services (d/b/a S.A.L.T.S.); and MRM Toluic Company, Inc. |
| **DIP Agent** | Wilmington Trust, National Association |
| **DIP Lenders**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | Initially, the following entities and/or funds managed by such entities (the "Ad Hoc Group"): Black Diamond Capital Management, Blackrock, BlueBay Asset Management, Brightwood Capital Advisors, and TPG Special Situations Partners.  Each Prepetition Term Lender shall be afforded the right to participate in the DIP Facility on a pro rata basis up to its pro rata share of the Prepetition Term Facility Obligations pursuant to procedures, terms and conditions and documentation acceptable to the Ad Hoc Group and the DIP Agent.  Any amount of the DIP Facility not so allocated shall be allocated to the Ad Hoc Group on a ratable basis.  The Ad Hoc Group is backstopping the DIP Facility. |
| **DIP Facility/Borrowing Limits**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | The DIP Facility comprises a term loan in an original principal amount equal to $110 million.  Amounts repaid or prepaid in respect of DIP Loans may not be re-borrowed.<br><br>On the Closing Date, the DIP Agent shall be authorized pursuant to a funding authorization letter of the Borrower to promptly disburse the proceeds of the DIP Loans to (i) the account(s) designated by the Prepetition ABL Agent in the Payoff Letter in an aggregate amount not greater than the amount specified in the Payoff Letter as the aggregate amount required to consummate (a) the repayment and payment (or cash collateralization) in full of all amounts outstanding under, or in respect of, and the termination of, the Prepetition ABL Credit Agreement and all Other Documents (as defined in the Prepetition ABL Credit Agreement) other than the ABL Surviving Obligations (as defined in the DIP Order), and the release and discharge of all Liens associated therewith other than with respect to the Payoff Cash Collateral and the adequate protection liens as set forth in the Payoff Letter and DIP Order; and (b) to the extent not otherwise covered by clause (a) hereof, the occurrence of the Discharge of ABL Obligations (as defined in the Intercreditor Agreement referred to (and as defined) in each of the Prepetition ABL Credit Agreement and the Prepetition Term Facility Credit Agreement on the Closing Date), including amounts required to cash collateralize 105% of the aggregate amount available to be drawn under the Prepetition Letters of Credit at such time, (ii) pay the Prepetition Term Facility Agent the sum of all accrued but unpaid reasonable and documented fees and expenses of counsel and financial advisors to (A) the Prepetition Term Facility Agent, (B) the Ad Hoc Group, and (C) the members of the Ad Hoc Group, subject to the Review Period (as defined in the DIP Order), (iii) pay the Debtors the sum of $1,630,000 (on account of the funding for Debtors' immediate needs on or about the Petition Date under the Budget), and (iv) as to all remaining amounts, the Funding Account.  The Debtors |

8

| | |
|---|---|
| | shall not have availability to receive advances from the Funding Account in excess of $100 million on an interim basis, for withdrawals or otherwise. |
| **Interest Rate**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | The Loans (including, for the avoidance of doubt, any Loans the proceeds of which are on deposit in the Funding Account, irrespective of whether such amounts are then unavailable or otherwise restricted for withdrawal or other utilization by the Loan Parties in accordance with the Loan Documents) comprising each ABR Borrowing, shall bear interest (computed on the basis of the actual number of days elapsed over a year of 360 days at all times and calculated from and including the date of such Borrowing to but excluding the date of repayment thereof) at a rate per annum equal to the Alternate Base Rate plus the Applicable Margin in effect from time to time.<br><br>The Loans (including, for the avoidance of doubt, any Loans the proceeds of which are on deposit in the Funding Account, irrespective of whether such amounts are then unavailable or otherwise restricted for withdrawal or other utilization by the Loan Parties in accordance with the Loan Documents) comprising each Eurodollar Borrowing shall bear interest (computed on the basis of the actual number of days elapsed over a year of 360 days) at a rate per annum equal to the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Margin in effect from time to time. |
| **Fees**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | The Borrower agrees to pay to the Administrative Agent, for its own account, (x) the fees set forth in that certain Fee Letter dated on or about May 31, 2016 among the Borrower and the DIP Agent, at the times and in the amounts specified therein and, (y) whether or not set forth in such Fee Letter, the fees payable to the Administrative Agent in connection with the transactions contemplated by the Syndication Procedures, in such amounts and at such times as agreed to between the Administrative Agent and the Borrower (the fees referred to in clauses (x) and (y) being referred to herein collectively as the "<u>Administrative Agent Fees</u>"). The Administrative Agent Fees will be in addition to reimbursement of the DIP Agent's reasonable and documented out of pocket expenses in accordance with Section 9.05(a) of the DIP Credit Agreement.  The Administrative Agent Fees shall be fully earned when due and shall not be refundable for any reason whatsoever.<br><br>Each prepayment or repayment of the Loans prior to the Latest Maturity Date for any reason whatsoever (including due to acceleration under Section 7.01 or otherwise) shall be accompanied by a premium payable by the Borrower equal to 5.0% of the principal amount of the Loans so prepaid; *provided* that no such premium shall be payable in connection with a prepayment or repayment made in connection with a sale pursuant to section 363 of the Bankruptcy Code.<br><br>The Borrower agrees to pay to each Initial Lender, for its own account, on the Closing Date, a backstop premium equal to 2.75% of the amount of its *pro rata* share of the Commitments on the Closing Date (immediately prior to the making of the Loans on the Closing Date). |

| | |
|---|---|
| **Budget**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | "Initial Budget" means the 13-week cash flow forecast for the 13-week period beginning on the Petition Date substantially in the form of Exhibit A attached to the DIP Credit Agreement, which budget shall be deemed modified to provide for the Permitted Adequate Protection Payments specified in the DIP Orders; *provided* that the Initial Budget shall not be amended to delete or modify the Permitted Adequate Protection Payments without the consent of the recipient thereof, unless such payments are no longer payable in accordance with the terms of the DIP Orders.<br><br>"Budget" means the Initial Budget, as modified pursuant to the definition thereof, and as the same may be further amended, supplemented, restated or otherwise modified from time to time with the written consent of the Required Lenders in their sole discretion, including any such amendment, supplement, restatement or other modification that extends the Budget to cover additional time periods beyond the initial 13-week period covered by the Initial Budget; *provided* that the Budget shall not be amended to delete or modify the Permitted Adequate Protection Payments without the consent of the recipient thereof, unless such payments are no longer payable in accordance with the terms of the DIP Orders. |
| **Closing Date**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | The first date upon which the Interim Order shall have been entered and all other conditions precedent to funding shall have been satisfied or waived by each Lender and the DIP Agent. |
| **Maturity**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | "Maturity Date" means the date which is the earliest of (i) the date that is 25 days after the date of entry of the Interim Order, if the Final Order has not been entered by the Bankruptcy Court on or prior to such date, (ii) the 363 Sale Effective Date, (iii) the Latest Maturity Date and (iv) such earlier date on which all Loans and other Obligations for the payment of money shall become due and payable in accordance with the terms of the DIP Documents. |
| **Collateral**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | Pursuant to the DIP Documents and the DIP Orders and in accordance with the terms thereof, as security for the full and timely payment and performance of all of the Obligations, each of the Loan Parties assigns, pledges and grants to the Collateral Agent, for the benefit of the DIP Secured Parties, a security interest in, and Lien on, all of the property, assets or interests in property or assets of such Person, of any kind or nature whatsoever, real or personal, tangible and intangible existing as of the Petition Date or thereafter acquired or created, including all property of the "estate" (within the meaning of the Bankruptcy Code) of the Loan Parties, and all accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights and licenses therefor, general intangibles, payment intangibles, letters of credit, letter-of-credit rights, supporting obligations, machinery and equipment, real property, fixtures, leases, all (or, in the case of a Foreign Subsidiary, the Pledged Foreign Voting Equity) of the issued and outstanding Equity Interests entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)) and all of the issued and outstanding Equity Interests not entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)) of each Subsidiary of the |

10

| | |
|---|---|
| | Borrower, all of the Equity Interests of all other Persons that are not Subsidiaries directly owned by the Borrower, money, investment property, deposit accounts, securities accounts, all commercial tort claims and other causes of action other than Avoidance Actions, the proceeds of all Avoidance Actions, all "Cash Collateral" (as defined in the Interim Order, but limited, in the case of the Payoff Cash Collateral, to the Debtors' right to reimbursement thereof in accordance with the Payoff Letter), all books, records, and other property related to or referring to any of the foregoing and all cash and non-cash proceeds, rents, products, substitutions, accessions and profits of any of collateral described above (all property of the Loan Parties subject to the security interest referred to in this paragraph being hereinafter, collectively, referred to as the "<u>Collateral</u>"; provided that, notwithstanding the foregoing, Collateral shall in no event include (i) any assets of any direct Foreign Subsidiary of any Loan Party (including any Equity Interests in any Subsidiary of such direct Foreign Subsidiary) or (ii) any Equity Interests in any Foreign Subsidiary of any Loan Party that do not constitute Pledged Foreign Equity).  Unless otherwise defined herein, the foregoing terms in this paragraph shall have the meanings ascribed to such terms in the UCC.  Upon the entry of the Final Order, Collateral shall include Avoidance Actions and the proceeds thereof. |
| **DIP Liens/Super Priority Administrative Claim Status**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | Pursuant to section 364(c)(1) of the Bankruptcy Code and the DIP Order, all Obligations and all other obligations of the Loan Parties under the Loan Documents at all times shall constitute allowed super-priority administrative expense claims against the Debtors in the Chapter 11 Cases having priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, and shall at all times be senior to the rights of Loan Parties, the estates of Loan Parties, and any successor trustee or estate representative in the Chapter 11 Cases or any subsequent proceeding or case under the Bankruptcy Code, subject only to the Carve-Out. |
| **Prepayments**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | <u>**Voluntary**</u>: The Borrower shall have the right at any time and from time to time to prepay any Borrowing, in whole or in part upon at least three (3) Business Days' prior written notice in the case of Eurodollar Loans, or written notice at least one (1) Business Day prior to the date of prepayment in the case of ABR Loans, to the Administrative Agent before 12:00 (noon), New York City time; provided that each partial prepayment shall be in a principal amount that is an integral multiple of $500,000 and not less than $1,000,000 (in each case determined without regard to the Prepayment Premium, if applicable).<br><br><u>**Mandatory**</u>: Subject to the limitations on the use of "Cash Collateral," customary for transactions of this type, including without limitation: 100% of the net cash proceeds of (i) non-ordinary course asset sales, (ii) insurance/condemnation events and other extraordinary receipts, (iii) any incurrence of indebtedness not otherwise permitted under the DIP Loan Documents and (iv) any issuance of equity. |

11

| | |
|---|---|
| **DIP Milestones**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | Milestones culminating in a "363 sale," including, without limitation:<br><br>(i)  The Debtors shall file a motion in form and substance acceptable to the DIP Agent in its sole discretion (the "<u>Bid Procedures</u>") by no later than 15 days after the Petition Date seeking approval of bid procedures for a sale, pursuant to section 363 of the Bankruptcy Code of all or a portion of the Debtors' assets with Valencia Bidco LLC, an entity controlled by the Prepetition Term Facility Lenders, as the proposed stalking horse bidder (the "<u>Stalking Horse</u>") with the ability to credit bid up to the full amount of its claims (whether arising from the DIP Facility or the Prepetition Term Facility and which credit bid may provide for the assignment of the right to purchase the acquired assets to a newly formed acquisition vehicle) (the "<u>363 Sale</u>");<br><br>(ii)  The Bid Procedures shall have been approved by the Bankruptcy Court no later than 30 days after the Petition Date (the "<u>Bid Procedures Order</u>"), which Bid Procedures Order shall provide for a stalking horse bid from the Stalking Horse pursuant to which the Stalking Horse may credit bid the full amount of its claims (whether arising from the DIP Facility or the Prepetition Term Facility) and otherwise be in form and substance acceptable to the Majority DIP Lenders and the Administrative Agent, in their respective sole discretion;<br><br>(iii)  An order approving the 363 Sale in form and substance acceptable to the Majority DIP Lenders (the "<u>363 Sale Order</u>") shall have been entered by no later than 85 days after the Petition Date; and<br><br>(iv)  The 363 Sale (the "<u>363 Sale Effective Date</u>") pursuant to the Bid Procedures shall have been consummated no later than 100 days following the entry of the Interim Order by the Bankruptcy Court. |
| **Events of Default**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | The DIP Loan Documents contain events of default customary for transactions and debtors of this type, including any failure to satisfy any of the milestones or other covenants described above. |
| **Parties with an Interest in Cash Collateral**<br><br>*Bankruptcy Rule 4001(b)(1)(B)(i)* | All proceeds of the Prepetition Collateral (including cash on deposit at the Depository Institutions as of the Petition Date, securities or other property, whether subject to control agreements or otherwise, in each case that constitutes Prepetition Collateral) are "cash collateral" of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code |
| **Purposes for Use of Cash Collateral**<br><br>*Bankruptcy Rule 4001(b)(1)(B)(ii)* | Proceeds of all Collateral received by the Debtors in the ordinary course of business shall be deposited into the Funding Account, but shall not be required to be applied to prepay the DIP Loans (other than in connection with a voluntary or mandatory prepayment of DIP Loans), and shall thereafter be available to be withdrawn from the Funding Account and used by the Debtors, in each case in accordance with the DIP Loan Documents, for working capital and to pay the costs of administration of their estates in |

| | |
|---|---|
| | accordance with the Budget (subject to Permitted Variances). |
| **Adequate Protection**<br><br>*Bankruptcy Rules 4001(b)(1)(B)(iv);4001(c)(1)(B)(ii)* | Until the indefeasible discharge or release of the Prepetition Term Facility Obligations, the Prepetition Term Facility Secured Parties are entitled to, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, adequate protection of their interests in the Prepetition Term Facility Collateral, including Cash Collateral, in an amount equal to the aggregate diminution in the value of the Prepetition Term Facility Secured Parties' valid, perfected and unavoidable prepetition security interests in the Prepetition Term Facility Collateral (including Cash Collateral) from and after the Petition Date, if any, for any reason provided for under the Bankruptcy Code, including, without limitation, any such diminution resulting from the sale, lease or use by the Loan Parties of the Prepetition Term Facility Collateral, payment of any amounts under the Carve-Out, the priming of the Prepetition Term Facility Agent's security interests and liens in the Prepetition Term Facility Collateral by the DIP Liens, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (the "<u>Prepetition Term Facility Adequate Protection Obligations</u>"). To secure the Prepetition Term Facility Adequate Protection Obligations, the Prepetition Term Facility Secured Parties are granted, among other things, the Prepetition Term Facility Adequate Protection Liens and the Prepetition Term Facility Superpriority Claim.<br><br>As adequate protection to secure the ABL Surviving Obligations, the Prepetition ABL Agent is granted valid and perfected replacement and additional security interests in, and liens on all of the Debtors' right, title and interest in, to and under all DIP Collateral, subject to and in accordance with the lien priorities otherwise set forth in this Interim Order and the Intercreditor Agreement (the "<u>ABL Adequate Protection Liens</u>"; together, with the Prepetition Term Facility Adequate Protection Liens, the "<u>Adequate Protection Liens</u>"). The ABL Adequate Protection Liens shall secure only the ABL Surviving Obligations and shall be senior in all respects to the Prepetition Term Facility Adequate Protection Liens on any DIP Collateral otherwise constituting ABL Priority Collateral. The ABL Adequate Protection Liens are and will be valid, binding enforceable and fully perfected as of the date hereof and subordinate and subject only to (i) the DIP Liens, (ii) the ABL Permitted Liens (as defined in the DIP Orders); (iii) the Prepetition Term Facility Adequate Protection Liens (only on any DIP Collateral otherwise constituting Term Priority Collateral), and (iv) the Carve Out. Notwithstanding the foregoing, to the extent that the Prepetition Term Facility Secured Parties and/or the DIP Secured Parties (or their respective designees) submit a credit bid in connection with the Sale (as defined below) and the Prepetition Term Facility Secured Parties and/or the DIP Secured Parties (or their respective designees) are selected as the winning bidder(s), the Prepetition ABL Secured Parties will not object to the purchase by the Prepetition Term Facility Secured Parties and/or the DIP Secured Parties (or any of their respective designees) of the property at issue in the Sale free and clear, pursuant to section 363(f) of the Bankruptcy Code, of any interest in such property of an entity other than the Debtors' estates, including, without limitation, the ABL Adequate Protection Liens; provided that, for the avoidance of doubt, (i) any such Sale shall not be free |

| | |
|---|---|
| | and clear of the Prepetition ABL Secured Parties' interests in the Payoff Cash Collateral except to the extent such Payoff Cash Collateral is remitted to the Debtors in accordance with the Interim Order and the Payoff Letter; and (ii) the ABL Adequate Protection Liens, if any, shall attach to the cash proceeds, if any, of such Sale. |
| **Carve Out**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Rule 4001-2(a)(ii)* | The "Carve-Out" shall mean an amount equal to the sum of (i) all fees required to be paid to the clerk of the Court (including the fees and expenses of the Debtors' noticing agent) and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $20,000 (without regard to the notice set forth in (iii) below); and (iii) to the extent ultimately allowed by Final Order of the Court, claims for Professional Fees incurred by persons or firms retained by the Loan Parties or any official committee of unsecured creditors appointed in these chapter 11 cases pursuant to sections 327 or 1103 of the Bankruptcy Code (the "Professional Persons"), subject to (A) the terms of any interim or final compensation order entered by the Court and (B) any limits to use of DIP Loan proceeds or Cash Collateral imposed by the Interim Order or Final Order, including the Budget, or otherwise on Professional Fees to be incurred in connection with any investigations of claims and defenses against any Prepetition Secured Parties, that are incurred (x) at any time before delivery by the DIP Agent at the direction of the Majority DIP Lenders of a Carve-Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice to the extent such Professional Fees do not exceed the amount projected therefor in the Budget, and (y) after the occurrence and during the continuance of an Event of Default and delivery by the DIP Agent at the direction of the Majority DIP Lenders of written notice (the "Carve-Out Trigger Notice") thereof (which may be by email) to the Debtors, the Debtors' bankruptcy counsel, the U.S. Trustee, and counsel for the Creditors' Committee, if any, in an aggregate amount not to exceed $150,000 (the sum of the amounts set forth in clauses (i), (ii) and (iii)(y) being the "Post-EoD Carve-Out Amount"); provided, that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described in clauses (i), (ii) or (iii) above, on any grounds. Fees and expenses of the Chief Restructuring Officer and his staff are excluded from the Post-EoD Carve-Out Amount. |
| **Modification of Automatic Stay**<br><br>*Bankruptcy Rule 4001(c) (1)(B)(iv)* | The automatic stay is to be modified to the extent necessary to permit the DIP Agent and the DIP Lenders to (a) take all actions necessary or desirable to implement the DIP Documents and the terms of the Interim Order and (b) unless the Court orders otherwise during the Remedies Notice Period (as defined below), and subject to the Carve-Out and the prior rights, remedies, claims and liens of the holders of the Permitted Prior Liens that were senior in priority to the Prepetition Term Facility Liens and the Prepetition ABL Liens as of the Petition Date, (i) immediately upon the occurrence of an Event of Default under (and as defined in) the DIP Credit Agreement, declare (A) the termination, reduction or restriction of any further Commitment (as defined in the DIP Credit Agreement) to the extent any |

| | |
|---|---|
| | such Commitment remains (subject to the obligation to fund the Post-EoD Carve-Out Amount), (B) all DIP Obligations to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Loan Parties, and (C) the termination of the DIP Documents as to any future liability or obligation of the DIP Agent and the DIP Lenders (but, for the avoidance of doubt, without affecting any of the DIP Liens or the DIP Obligations); and (ii) upon the occurrence of an Event of Default and the giving of five (5) days' prior written notice via email to counsel to the Debtors, counsel to the Creditors' Committee, Counsel to Prepetition ABL Agent and the U.S. Trustee (the "<u>Remedies Notice Period</u>") of the occurrence of an Event of Default, which shall run concurrently with any notice required to be provided under the DIP Documents, to (A) withdraw consent to the Loan Parties' continued use of Cash Collateral and (B) exercise all other rights and remedies provided for in the DIP Documents and under applicable law. During the Remedies Notice Period, the Loan Parties shall be permitted to continue to use Cash Collateral in the ordinary course of business (subject to the terms of the DIP Documents) and to fund the Carve-Out. The automatic stay provisions of section 362 of the Bankruptcy Code are hereby further vacated and modified to the extent necessary to permit the Prepetition ABL Agent to apply the Payoff Cash Collateral to the ABL Surviving Obligations in accordance with the Payoff Letter (and subject to the notice provisions set forth therein) without further order of Court and further to implement the terms and conditions of the Payoff Letter. |
| **Section 506(c) Waiver**<br><br>*Local Rule 4001-2(a)(i)(C)* | The Debtors shall seek approval at the Final Hearing of a waiver of any right to surcharge against the Collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise. |
| **Indemnification**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(ix)* | The Debtors shall, jointly and severally, be obligated to indemnify and hold harmless each of (w) the DIP Agent, (x) the DIP Lenders, (y) the DIP Secured Parties, and (z) the Prepetition Secured Parties, and each of their respective equityholders, managers, investors, fiduciaries, trustees, officers, directors (including directors or authorized signatories of the general partner of any Person), employees, agents, advisors, representatives, controlling persons, members, partners, successors and permitted assigns (each, an "<u>Indemnified Person</u>") from and against all losses, claims, liabilities, damages, and expenses (including, without limitation, as to (w) the DIP Secured Parties, (x) the Prepetition Term Facility Agent, and (y) the other Prepetition Secured Parties, in each case the reasonable and documented fees and out-of-pocket disbursements of one primary counsel, one local counsel in each relevant jurisdiction, and one special counsel for each relevant specialty and, in the case of other Indemnified Persons, the reasonable and documented fees and out-of-pocket disbursements of one primary counsel and one local counsel) incurred by, or asserted against, any Indemnitee arising out of, in any way connected with, or as a result of the DIP Facility, the Prepetition Term Facility, the Prepetition ABL Facility or any other transactions contemplated under the DIP Documents except to the extent arising from any dispute solely among Indemnified Persons which does not arise out of any act or omission of the Debtors (other than any |

|  | proceeding against any Indemnified Person solely in its capacity or in fulfilling its role as the DIP Agent, the Prepetition Term Agent, the Prepetition ABL Agent, or any similar role); provided that no Indemnified Person will be indemnified for any cost, expense or liability to the extent determined in the final, non-appealable judgment of a court of competent jurisdiction to have resulted from the bad faith, gross negligence or willful misconduct of such Indemnified Person. The Debtors shall further indemnify the Prepetition ABL Secured Parties pursuant to the Prepetition ABL Credit Agreement and the Payoff Letter. |
|---|---|
| **Lien on Avoidance Actions**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(xi)* | Subject to the entry of a Final Order, the DIP Liens shall attach to any proceeds or property recovery in respect of any avoidance actions. |
| **Waiver of Marshaling Doctrine and Equities of Case Exception**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(viii)* | Subject only to, and effective upon, entry of the Final Order, (a) in no event shall the DIP Agent, the DIP Lenders or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Prepetition Collateral or DIP Collateral; and (b) in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the secured claims of the Prepetition Secured Parties. |

## **Highlighted Provisions Under Local Rule 4001-2(a)(1)**

14.     The Interim Order includes certain terms that constitute material provisions requiring explicit disclosure under the Local Rules.[7]   The provisions described in Local Rule 4001-2(a)(i), to the extent applicable, are set forth at the following sections of the Interim Order:

a.      **Local Rule 4001-2(a)(i)(A) – Cross Collateralization.**   The Interim Order does not provide for cross collateralization, however the Interim Order does require the ABL Facility Payoff.   *See* Interim Order ¶ 6(f).

b.      **Local Rule 4001-2(a)(i)(B) – Validity, Perfection, and Amount of Prepetition Liens**.   The Debtors acknowledge, agree, admit, and stipulate to various matters, including, the validity, perfection, and priority of the liens securing the prepetition indebtedness.   *See* Interim Order ¶ 4, subject to the rights of third parties to challenge the same.   *See* Interim Order ¶ 21.

c.      **Local Rule 4001-2(a)(i)(C) – Section 506(c) Waiver.**   The Interim Order contains notice that the Debtors shall seek approval at the Final Hearing of a waiver of any right to surcharge against the Collateral pursuant to

---

[7]     While the Debtors have attempted to highlight the provisions required by the Bankruptcy Rules and Local Rules, as well as certain other material provisions, the Debtors reserve the right to supplement this list at the hearing to consider this Motion on an interim basis.

section 506(c) of the Bankruptcy Code or otherwise.  *See* Interim Order ¶ 36.

d.    **Local Rule 4001-2(a)(i)(D) – Liens on Avoidance Actions.**  Subject to the entry of a Final Order, the DIP Liens shall attach to any proceeds or property recovery in respect of any avoidance actions.  *See* Interim Order ¶ 7(a).

e.    **Local Rule 4001-2(a)(i)(E) – Provisions Deeming Prepetition Debt to be Postpetition Debt.**  The Interim Order contains no provisions deeming prepetition secured debt to be postpetition debt, however the Interim Order does require the ABL Facility Payoff.  *See* Interim Order ¶ 6(f).

f.    **Local Rule 4001-2(a)(i)(F) – Disparate Treatment of Professionals Retained by the Committee.** The Interim Order contains no provisions that provide for disparate treatment for professionals retained by a creditors' committee, if any, with respect to the Carve Out.

g.    **Local Rule 4001-2(a)(i)(G) – Non-Consensual Priming.**  The Interim Order does not provide for non-consensual priming of any existing secured lien.

h.    **Local Rule 4001-2(a)(i)(H) – Provisions Affecting the Court's Power to Consider Equities of the Case.**  Subject only to, and effective upon, entry of the Final Order, (i) in no event shall the DIP Agent, the DIP Lenders or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Prepetition Collateral or DIP Collateral; and (ii) upon the entry of the Final Order, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the secured claims of the Prepetition Secured Parties.  *See* Interim Order ¶ 10(d).

<u>Basis for Relief</u>

I.    **The DIP Facility Should be Approved.**

A.    **The Debtors Are Authorized to Incur the DIP Obligations Under 364(c) and 364(d)(1) of the Bankruptcy Code.**

15.    The Debtors propose to obtain financing under the proposed DIP Facility by providing security interests and liens as set forth above pursuant to sections 364(c) and 364(d)(1) of the Bankruptcy Code.  The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain

17

unsecured credit allowable under Section 503(b)(1) of the [the Bankruptcy Code]." 11 U.S.C. § 364(c); *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense); *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it made reasonable efforts to seek other sources of financing under §§ 364(a) and (b)); *In re Garland Corp.*, 6 B.R. 456, 461 (1st Cir. BAP 1980) (secured credit under § 364(c)(2) authorized, after notice and a hearing, upon showing that unsecured credit unobtainable); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (debtor seeking credit under § 364(c) of the Bankruptcy Code must prove that it cannot obtain unsecured credit pursuant to § 364(b)).

16.     The Debtors, together with their advisors, sought out and evaluated alternative sources of unsecured postpetition financing to determine whether the Debtors could obtain debtor-in-possession financing as an administrative expense.  The Debtors' advisors reached out to sixteen (16) potential third-party DIP Lenders (not including the Prepetition Secured Parties) and executed confidentiality agreements with five (5) parties.  In addition to establishing a virtual data room and providing access to those who executed confidentiality agreements, the Debtors' advisors held multiple diligence calls with prospective lenders.

17.     The Debtors received three (3) proposals, all of which involved participation from the Prepetition Secured Parties.  No parties were willing to provide postpetition financing on an unsecured, administrative priority basis.  Furthermore, and as further described in the First Day Declaration, the Debtors do not believe they can adequately protect, preserve and maximize the value of their estates without access to postpetition financing.

18.     Where, as here, a debtor is unable to obtain unsecured credit, section 364(c)(1) of the Bankruptcy Code provides that the debtor may obtain credit secured by an administrative expense claim having priority "over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]." 11 U.S.C. § 364(c)(1).  As described above, the Debtors are unable to obtain unsecured credit.  Therefore, approval of the DIP Superpriority Claims in favor of the proposed DIP Lenders is reasonable and appropriate.

19.     Similarly, the Debtors were unable to obtain postpetition financing on a junior or par priority basis under section 364(c)(2) or (3).

20.     In addition, section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of postpetition debt by senior or "priming liens," provides that the court may, after notice and a hearing,

> authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if –
>
> (A)     the trustee is unable to obtain credit otherwise; and
>
> (B)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. 364(d)(1).

21.     A debtor need only demonstrate by a good faith effort that credit was not available without the protections afforded to potential lenders by sections 364(c) or 364(d) of the Bankruptcy Code.  *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986).  Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."  *Id.*; *Ames*, 115 B.R. at 40 (holding that debtor made reasonable effort to secure financing when it selected the least onerous financing option from the remaining two lenders).  Moreover, where few lenders likely can or will extend the necessary credit to a debtor,

19

"it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom., Anchor Savings Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

22.    As mentioned above, the Debtors selected the DIP Financing provided by the DIP Lenders only after carefully examining all available options.  In the end, it was not feasible for the Debtors to obtain from any other party a loan on equal or better terms that afforded the Debtors sufficient liquidity to operate their businesses.  In consultation with their professionals, the Debtors determined, in the exercise of their business judgment, that the DIP Lenders provided the best source of funding under all the circumstances, especially because it (a) would minimize the costs and expenses associated with a contested priming fight; and (b) would enable the Debtors to pursue a sale process that would maximize the value of the Debtors' estates. Accordingly, the Debtors commenced vigorous, arms'-length and good faith negotiations with the DIP Lenders for the DIP Financing.

23.    The proposed DIP Liens sought herein are senior with respect to the first-priority liens held by the Prepetition Secured Parties who have consented to the priming of their liens, subject to the adequate protections and the ABL Facility Payoff described above, and are in accordance with the Intercreditor Agreement.

24.    The Prepetition ABL Agent has valid, enforceable, and perfected liens on substantially all of the Prepetition ABL Loan Parties' assets.  The Debtors and counsel have reviewed the security documents, the financing statements and the Intercreditor Agreement with respect to the Prepetition ABL Facility and such review demonstrates that the Prepetition ABL Agent has properly filed UCC-1 financing statements against the Prepetition ABL Loan Parties in each of the applicable jurisdictions, and holds a first-priority perfected security interest in the

ABL Priority Collateral and a second-priority perfected security interest in the Term Priority Collateral (each as defined in the Intercreditor Agreement).  A review of the Debtors' books and records reflects that the Prepetition ABL Secured Parties are owed not less than $82 million as of the Petition Date, and the ABL Priority Collateral has, based upon the Debtors' current calculations, a value in excess of the Prepetition ABL Obligations.  The willingness of the DIP Lenders to provide the DIP Financing secured by the ABL Priority Collateral in an amount that is approximately $28 million in excess of the Prepetition ABL Obligations is further evidence that the Prepetition ABL Obligations are oversecured.  The DIP Facility is sufficient to repay the Prepetition ABL Obligations in full and provide sufficient new money liquidity for the Debtors chapter 11 cases.

25.     As noted above, the Debtors suffer from severely constrained liquidity as a result of, among other things, decreasing availability under their Prepetition ABL Loan Documents.  The Debtors selected the DIP Facility because the terms and costs were comparable to the terms offered by the Prepetition ABL Secured Parties, but the DIP Facility provides the Debtors additional liquidity.  An immediate infusion of liquidity is required in order to permit the Debtors to stabilize their operations and cash flow, which will maximize the potential value of their assets to their estates and creditors.  Absent such an infusion, it is likely that the Debtors will suffer immediate and irreparable harm.  Therefore, the Debtors are seeking interim approval to borrow the  full amount of the DIP Facility under the Interim Order (with only $10 million blocked until entry of the Final Order) so that they may meet their working capital needs, including making payments to their employees.  In a recent case where a debtor required immediate access to the full amount of its debtor-in-possession financing, the Court permitted full funding of the loan under the interim order. *See In re Reichhold Holdings,* Case No. 14-

12237 (MFW) (Bankr. D. Del. Oct. 2, 2014) (permitting debtor to borrow full amount of DIP loan on first day to pay off prepetition secured loan). Here, the Debtors require the authority to borrow the full amount of the DIP Facility in order to implement the ABL Facility Payoff in accordance with the terms of the Payoff Letter and make other payments required to be made on or about the Petition Date, which liquidity would not otherwise be available to the Debtors.

26.     The ABL Facility Payoff is necessary to ensure the consent of the Prepetition ABL Secured Parties and to avoid an objection to the Motion, which could cause expensive, risky litigation and a potential delay in the Debtors' access to required liquidity. Any such litigation, in light of the Debtors' reliance on foreign vendors, could prove devastating to the Debtors' efforts to smoothly transition into bankruptcy, maintain vendor and customer confidences and maximize the Debtors' enterprise value. Other courts in this district have permitted the refinancing of prepetition loans as part of an interim financing order. *See, e.g.  In re Reichhold Holdings,* Case No. 14-12237 (MFW) (Bankr. D. Del. October 2, 2014) (permitting debtor to borrow full amount of DIP loan made by parent-affiliate on first day to pay off third-party prepetition secured loan); *In re Source Interlink Cos.,* Case No. 09-11424 (KG) (Bankr. D. Del., April 29, 2009) (authorizing immediate use of DIP proceeds to pay off $110 million prepetition revolver in full, but not prepetition term loans.); *In re Dayton Superior Corp.*, Case No 09-11351 (BLS) (Bankr. D. Del. Apr. 21, 2009) (authorizing roll up of $110 million in prepetition revolver and Letters of Credit, but not term loan.); *In re  Linens n' Things, et al.,* Case No. 08-10832 (CSS) (Bankr D. Del., May 02, 2008) (interim order permitting the immediate use of DIP Loan proceeds to "refinance" in full $430 million of "Prepetition Obligations" under "Prepetition Credit Agreement.").[8] Here too the Debtors seek to pay off the

---

[8]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

prepetition revolving facility and cash collateralize outstanding letters of credit.  The Debtors believe that the collateral securing the Prepetition ABL Facility Obligations exceeds the extent of the Prepetition ABL Facility Obligations as of the Petition Date and that the Prepetition ABL Secured Parties hold a fully secured claim, therefore, the Debtors, their estates and creditors will not be prejudiced by permitting the Debtors to obtain the DIP Facility and to execute and perform under the Payoff Letter.

27.     Likewise, the DIP Milestones are a crucial element of the terms of the DIP Financing, and their inclusion in the Interim Order is important to ensure that these chapter 11 cases proceed in a strategic, value-maximizing fashion.   In similar contexts, other courts in this district have entered interim financing orders that included express milestones for the progress of a debtor's case. *See, e.g. In re Horsehead Holding,* Case No. 16-10287 (CSS) (Bankr D. Del. Feb. 2, 2016) (approving case milestones in interim DIP financing order); *In re Verso Corporation*, Case No. 16-10163 (KG) (Bankr. D. Del Jan. 27, 2016); *In re Cal Dive International,* Case No. 15-10458 (CSS) (Bankr. D. Del March 9, 2015) (interim order approving DIP financing with case milestones); *In re RS Legacy Corporation (f/k/a RadioShack Corporation)*, Case No 15-10197 (BLS) (Bankr. D. Del Feb 10, 2015) (approving sale milestones in interim DIP financing order); *In re Altegrity, Inc.*, Case No. 15-10226 (LSS) (Bankr. D. Del Feb. 10, 2015) (interim order approving DIP financing with sale milestones); *In re ADI Liquidation, Inc. (f/k/a AWI Delmare, Inc.)*, Case No. 14-12092 (KJC) (Bankr. D. Del. Sept. 9, 2014) (interim DIP financing order with case milestones); *In re Coda Holdings, Inc.*, Case No. 13-11153 (CSS), 2013 WL 6840242, at *57 (Bankr. D. Del. May 3, 2013) (approving sale milestones in interim DIP financing order); *In re Handy Hardware Wholesale, Inc.*, Case No. 13-10060 (MFW) (Bankr. D. Del Jan. 14, 2013) (approving case milestones in interim DIP

23

financing order).  Thus, for these reasons and the reasons set forth above, the DIP Facility should be approved.

**B.      The Use of Cash Collateral is Warranted and Should be Approved.**

28.      Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2) provides that:

> The trustee may not use, sell or lease cash collateral . . .  unless –
>
> (A)      each entity that has an interest in such collateral consents; or
>
> (B)      the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).  Section 363(e) provides for adequate protection of interests in property when a debtor uses cash collateral.

29.      Substantially all of the Debtors' cash, including, without limitation, all cash and other amounts on deposit or maintained by the Debtors in any bank accounts, as well as any cash proceeds derived from the disposition of any Prepetition Collateral, constitute proceeds of the Prepetition Collateral and, therefore are cash collateral of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral").

30.      The Debtors rely on cash on hand and cash generated from their operations to fund working capital, capital expenditures, research and development efforts, and for other general corporate purposes. During these chapter 11 cases, the Debtors will need this operating revenue to satisfy payroll, pay suppliers, vendors, and utility providers, honor obligations to their customers, and make any other payments that are essential for the continued management, operation and preservation of the Debtors' businesses.  The ability to satisfy these expenses

when due is essential to the Debtors' smooth transition into the chapter 11 cases and continued operation of their businesses during the pendency of these chapter 11 cases.

31.     An inability to use funds during these chapter 11 cases could cripple the Debtors' business operations.  Indeed, without access to Cash Collateral, the Debtors and their estates would suffer immediate and irreparable harm.

32.     The Prepetition Secured Parties have consented to the Debtors' use of Cash Collateral, subject to the adequate protections described herein, and pursuant to the terms of the DIP Orders.  Accordingly, the Debtors' respectfully submit that the use of Cash Collateral is in the best interests of the Debtors' estates and should be approved.

### C.     The Prepetition Secured Parties Are Adequately Protected Under Sections 364(d) and 361 of the Bankruptcy Code.

33.     In connection with the DIP Financing, the Debtors propose providing the Prepetition Secured Parties with adequate protection in accordance with sections 364(d) and 361 of the Bankruptcy Code.[9]  To that end, the Debtors and the Prepetition Secured Parties have negotiated, and the Debtors request that the Court approve, as of the Petition Date, certain protections of the Prepetition Secured Parties' interests in the Prepetition Collateral from any diminution in value of each of their respective interests in the Prepetition Collateral resulting from the Debtors' use, sale or lease of such collateral, and the imposition of the automatic stay.

34.     Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor in possession may not use cash collateral without the consent of the secured party or court approval.  Section 363(e) provides that, upon request of an entity that has an interest in property to be used by a debtor, the court shall prohibit or condition such use as necessary to provide adequate protection of such

---

[9]     Bankruptcy Code section 364(d) requires that adequate protection be provided where the liens of secured creditors are being primed to secure the obligations under a debtor-in-possession financing facility.  *See* 11 U.S.C. § 364(d).

interest.  Under section 364(d), a debtor may obtain credit secured by a senior or equal lien if an existing secured creditor's interest in the collateral security is adequately protected.

35.     What constitutes adequate protection is decided on a case-by-case basis.  *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("[t]he determination of adequate protection is a fact-specific inquiry"); *In re Realty Southwest Assocs.*, 140 B.R. 360, 366 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); *see also In re O'Connor*, 808 F.2d 1393, 1396-97 (10th Cir. 1987); *In re Martin*, 761 F.2d 472, 474 (8th Cir. 1985).  By adequate protection, the Bankruptcy Code seeks to shield a secured creditor from diminution in the value of its interest in the particular collateral during the period of use.  *See In re 495 Central Park Avenue Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. at 736; *In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996).  When priming of liens is sought pursuant to section 364(d) of the Bankruptcy Code, courts also examine whether the prepetition secured creditors are provided adequate protection for the value of their liens.  *Beker*, 58 B.R. at 737.  Because all of these tests are satisfied here and the Debtors have met all of their obligations under section 364 of the Bankruptcy Code, among other bases as demonstrated by the consensual nature of the relief requested by this Motion, the Motion should be granted and the DIP Documents and the adequate protection set forth in the DIP Orders should be approved.

36.     Section 361(2)-(3) of the Bankruptcy Code expressly describes replacement liens and administrative claim status as appropriate forms of adequate protection.  Thus, the provision of these forms of adequate protection is appropriate.  Further, payment of reasonable and documented out-of-pocket fees, costs and expenses, subject to review by parties in interest, often serves as a form of adequate protection for secured creditors.  Agreeing to pay the reasonable

26

and documented out-of-pocket fees, costs and expenses offers meaningful additional protection to any diminution in the value of the Prepetition Collateral.  Accordingly, the Debtors believe that the adequate protection described above is fair, reasonable and sufficient to protect any diminution in the value of the Prepetition Secured Parties' interests in the Prepetition Collateral during the period their collateral is used by the Debtors.

**D.      The DIP Financing is Necessary to Preserve the Value of the Debtors' Estates.**

37.      The Debtors must immediately instill confidence in their employees, vendors, service providers and customers, reassuring them that these chapter 11 cases will not erode their relationships with the Debtors or the overall value of the Debtors' estates.  The Debtors believe they must provide to their constituents assurances as to their ability to seamlessly transition into chapter 11, operate in a "business as usual" fashion, but with increased liquidity, and ultimately sell their businesses in a successful and expedited manner.  The DIP Financing will provide the working capital necessary to allow the Debtors to, among other things, continue operating their businesses in the ordinary course, which in turn will help maintain value for the benefit of all creditors and parties in interest.

38.      The initial success of the chapter 11 cases at the outset depends on the comfort level of the Debtors' constituents, which in turn depends upon the Debtors' ability to minimize the disruption of the bankruptcy filings.  Approval and implementation of the DIP Financing ensures continued functioning of the Debtors, and together with approval of the Debtors' maintenance of their cash management system, will preserve the going concern value of their estates.

**E.      The Terms of the DIP Financing Are Fair, Reasonable and Appropriate.**

39.      After appropriate investigation and analysis, the Debtors, in consultation with their advisors, have concluded that the DIP Financing presents the best route available under the circumstances.   Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision fails the arbitrary and capricious standard.  *See Ames* 115 B.R. at 40 (courts should approve borrowings pursuant to 364(c) and (d) if the debtors was within its business judgment); *In re Mid-State Raceway, Inc.*, 323 B.R. 40, 58-59 (Bankr. N.D.N.Y. 2005) (same); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that approval of interim loan, receivables facility and asset-based facility "reflect[ed] sound and prudent business judgment...[was] reasonable under the circumstances and in the best interest of [the debtor] and its creditors").

40.      Indeed, "more exacting scrutiny [of the debtor's business decisions] would slow the administration of the Debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate and threaten the court's ability to control a case impartially."  *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

41.      The terms and conditions of the DIP Financing are fair and reasonable and were negotiated by the parties in good faith and at arms' length, as evidenced by the Debtors' ability to elect between the financing terms offered by the Prepetition Term Facility Secured Parties and the Prepetition ABL Secured Parties.   In the reasonable exercise of the Debtors' business judgment, the DIP Financing is the best financing option available under the present circumstances.  As discussed above, the Debtors, with the assistance of their advisors, assessed their financing needs and the DIP Financing proposal.  After fully considering the DIP Financing

proposals, and whether other more advantageous financing alternatives were available to the Debtors, and in consideration of the Prepetition Secured Parties' respective rights under the Intercreditor Agreement and the potential of significant disruption to the chapter 11 cases in the event of a non-consensual refinancing by the Prepetition Term Lenders of the Prepetition ABL Facility Obligations, the Debtors decided to accept the DIP Financing with the DIP Lenders. The Prepetition Secured Parties are party to the Intercreditor Agreement, which grants the parties certain rights that if exercised would have significantly disrupted the Debtors' chapter 11 cases. Accordingly, the Debtors determined to select a DIP financing based not only on an analysis of the competing economic terms but also with an eye toward which proposal would eliminate or minimize such potential disruption.

42.    Further, the proposed DIP Financing subjects the security interests and administrative expense claims of the DIP Lenders to the Carve-Out, thereby ensuring that in the event of a default under the DIP Credit Agreement, the Debtors' estates or other parties-in-interest are not directly or indirectly deprived of possible rights and powers by restricting the services for which professionals may be paid in these cases.  In *Ames Dept. Stores*, the court found such carve-outs for professional fees not only reasonable but necessary to ensure that official committees and debtors' estates can retain assistance from counsel.  *See Ames*, 115 B.R. at 38, 40 (observing that courts insist on carve-outs for professionals representing parties-in-interest because "absent such protection, the collective rights and expectation of all parties-in-interest are sorely prejudiced").

### F.    Modification of the Automatic Stay is Appropriate.

43.    Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition.  The Payoff Letter, DIP Credit Agreement and DIP Documents

require a modification of the automatic stay to implement the terms of the Payoff Letter and DIP Financing.

44.    Stay modification provisions of this kind are ordinary and standard features of post-petition debtor-in-possession financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances.  As noted above, the Debtors are unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code in an amount sufficient and readily available to maintain ongoing operations. Nor have the Debtors been able to obtain debtor-in-possession financing on terms more favorable than those proposed herein.  The terms and conditions of the DIP Financing, including the modification of the automatic stay described above, are fair and reasonable, and were negotiated extensively by well-represented parties in good faith and at arms' length.  In these circumstances, and importantly, in light of the material benefits afforded to the Debtors by the DIP Financing, the modification of the automatic stay is more than warranted.

## II.    Interim Approval of the DIP Financing and Use of Cash Collateral Should Be Granted Immediately.

45.    The Debtors bring this Motion to obtain authorization to use Cash Collateral and borrow under the DIP Credit Agreement on an expedited basis, due to the immediate and irreparable harm that would be suffered by the Debtors' estates were the Debtors unable to obtain the financing needed to sustain their businesses.  The Debtors have an immediate need to obtain the DIP Financing and use Cash Collateral to permit them, in addition to financing the administration of these chapter 11 cases and efforts toward a 363 sale of assets, to (a) operate the businesses, (b) maintain business relationships with vendors, suppliers and customers, including several foreign suppliers that are critical to the Debtors' uninterrupted continued operations, (c) pay employee wages in the ordinary course, (d) make necessary capital expenditures, and (e)

satisfy other working capital and operational needs, all of which are necessary to preserve the going-concern value of the Debtors.

46.     Without the use of Cash Collateral and access to the additional liquidity in the full amount of the $110 million made available under the DIP Facility, the Debtors will not be able to meet their day-to-day operational needs.  In such a scenario, the Debtors would have to halt their operations, which would drastically erode the overall value of their businesses.  Further, the Debtors must demonstrate to their customers and vendors that they have sufficient capital to ensure ongoing operations in the ordinary course – thereby assuaging any potential fears among their constituents that these chapter 11 cases will negatively impact them, resulting in material challenges to the Debtors' operations.  Therefore, the Debtors request approval of the DIP Financing on an expedited basis due to the immediate and irreparable harm that would be suffered by the Debtors' estates were they unable to obtain the postpetition financing.

47.     Rule 4001(c)(2) of the Bankruptcy Rules permits a court to approve a debtor's request for financing during the 14-day period following the filing of a motion requesting authorization to obtain post-petition financing "only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  Local Rule 4001-2(b) provides that the Court may grant interim relief pending review by interested parties of proposed debtor-in-possession financing arrangements, including use of cash collateral, provided that such relief is limited to what is necessary to avoid immediate and irreparable harm pending a final hearing.

48.     The Debtors request that the Court conduct an expedited preliminary hearing on the Motion and authorize the Debtors from and after the entry of the Interim Order until the Final Hearing to borrow funds in the full amount of the $110 million to be made available under the DIP Facility, which the Debtors shall use to, among other things, provide working capital for the

Debtors' ongoing business operations and pay expenses for these chapter 11 cases. This authority will allow the Debtors to maintain a stable business environment and avoid immediate and irreparable harm, pending the Court's final decision at the Final Hearing.

49.     Absent this Court's approval of the interim relief sought in this Motion, the Debtors face a substantial risk of severe disruption to their business operations and irreparable damage to their relationships with customers and vendors. The relief sought herein is critical to ensure the Debtors' businesses retain their highest and best going-concern value in advance of a 363 auction and sale.

**III.     A Final Hearing Should Be Set.**

50.     Pursuant to Rules 4001(b)(2) and 4001(c)(2) of the Bankruptcy Rules, the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable but in no event later than 25 days following the Petition Date.

51.     The Debtors request authorization to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, by first class mail upon the Notice Parties (defined below). The Debtors request that the Court consider such notice of the Final Hearing to be sufficient notice under Rule 4001 of the Bankruptcy Rules.

**The Requirements of Bankruptcy Rule 6003 Are Satisfied**

52.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm."

53.     For the reasons discussed above, (a) authorizing the Debtors to obtain postpetition secured financing under the DIP Facility, (b) authorizing the Debtors to use Cash Collateral, (c) granting adequate protection to the Prepetition Secured Parties, (d) scheduling a Final Hearing,

and (e) modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of the Interim Order, the DIP Financing and the Payoff Letter, as well as granting the other relief requested herein, is integral to the Debtors' ability to transition their operations into these chapter 11 cases.

54.     Failure to receive such authorization and other relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture. For the reasons discussed herein, the relief requested is necessary in order for the Debtors to operate their businesses in the ordinary course and preserve the ongoing value of their operations, maximizing the value of their estates for the benefit of all stakeholders.  Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

## Waiver of Bankruptcy Rule 6004(a)

55.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a).

56.     The Debtors further seek a waiver of any stay of the effectiveness of the order approving this Motion.   Pursuant to Rule 6004(h) of the Bankruptcy Rules, "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  As set forth above, the DIP Financing is essential to prevent potentially irreparable damage to the Debtors' operations, value and ability to reorganize.  Accordingly, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Rule 6004(h) of the Bankruptcy Rules, to the extent it applies.

## **Reservation of Rights**

57.     Nothing contained herein is intended or should be construed as an admission regarding the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim, or an approval or assumption of any agreement, contract, or policy under section 365 of the Bankruptcy Code.  The Debtors expressly reserve their right to contest any claim related to the relief sought herein.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to an order of the Court is not intended to be nor should it be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## **Notice**

58.     Notice of this Motion shall be provided to: (a) the Office of the United States Trustee for the District of Delaware, (b) each Debtor's twenty largest unsecured creditors as identified on their respective voluntary petitions, (c) counsel to the DIP Agent and the DIP Lenders, (d) counsel to the Prepetition Secured Parties and the Prepetition Term Facility Agent; (e) the United States Attorney's Office for the District of Delaware, (f) the Securities and Exchange Commission, and (g) the Internal Revenue Service.  As this Motion is seeking first-day relief, notice of this Motion and any order entered hereon will be served on all parties required by Local Rule 9013-1(m).  Due to the urgency of the circumstances surrounding this Motion and the nature of the relief herein, the Debtors respectfully submit that no further notice of this Motion is required.

*[Remainder of page left intentionally blank.]*

WHEREFORE, the Debtors respectfully request that the Court entry of the Interim Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein, and the Final Order, granting the relief requested herein, and granting such other and further relief as the Court may deem proper.

Dated:  May 31, 2016
       Wilmington, Delaware

Respectfully submitted,

*/s/ Stuart M. Brown*
Stuart M. Brown (DE 4050)
Kaitlin M. Edelman (DE 5924)
DLA PIPER LLP (US)
1201 North Market Street, Suite 2100
Wilmington, Delaware  19801
Telephone:  (302) 468-5700
Facsimile:   (302) 394-2341
Email: stuart.brown@dlapiper.com
      kaitlin.edelman@dlapiper.com

-and-

Richard A. Chesley (*pro hac vice* admission pending)
Daniel M. Simon (*pro hac vice* admission pending)
David E. Avraham (*pro hac vice* admission pending)
DLA PIPER LLP (US)
203 N. LaSalle Street, Suite 1900
Chicago, Illinois 60601
Telephone:  (312) 368-4000
Facsimile:   (312) 236-7516
Email: richard.chesley@dlapiper.com
      daniel.simon@dlapiper.com
      david.avraham@dlapiper.com

*Proposed Counsel to the Debtors*