**Exhibit C**

**(Prepetition Term Facility Credit Agreement)**

*EXECUTION VERSION*

CREDIT AGREEMENT

dated as of

October 31, 2014,

among

VERTELLUS SPECIALTIES INC.,

as Borrower,

VERTELLUS SPECIALTIES HOLDINGS CORP.,

as Holdings,

THE SUBSIDIARY GUARANTORS PARTY HERETO,

THE LENDERS PARTY HERETO

and

JEFFERIES FINANCE LLC,

as Administrative Agent and Collateral Agent

JEFFERIES FINANCE LLC,

as Sole Lead Bookrunner and Sole Lead Arranger

Table of Contents

Page

## ARTICLE I

## DEFINITIONS

SECTION 1.01. Defined Terms.................................................................................................1
SECTION 1.02. Terms Generally............................................................................................36
SECTION 1.03. Pro Forma Calculations................................................................................37
SECTION 1.04. Classification of Loans and Borrowings ......................................................38

## ARTICLE II

## THE CREDITS

SECTION 2.01. Commitments .................................................................................................38
SECTION 2.02. Loans .............................................................................................................38
SECTION 2.03. Borrowing Procedure ...................................................................................39
SECTION 2.04. Evidence of Debt; Repayment of Loans ......................................................39
SECTION 2.05. Fees ...............................................................................................................40
SECTION 2.06. Interest on Loans ..........................................................................................40
SECTION 2.07. Default Interest..............................................................................................41
SECTION 2.08. Alternate Rate of Interest .............................................................................41
SECTION 2.09. Termination of Commitments .......................................................................41
SECTION 2.10. Conversion and Continuation of Borrowings...............................................41
SECTION 2.11. Repayment of Borrowings ...........................................................................43
SECTION 2.12. Voluntary Prepayment ..................................................................................43
SECTION 2.13. Mandatory Prepayments................................................................................44
SECTION 2.14. Increased Costs; Capital Adequacy..............................................................46
SECTION 2.15. Change in Legality ........................................................................................47
SECTION 2.16. Breakage........................................................................................................48
SECTION 2.17. Pro Rata Treatment .......................................................................................48
SECTION 2.18. Sharing of Setoffs.........................................................................................49
SECTION 2.19. Payments .......................................................................................................49
SECTION 2.20. Taxes .............................................................................................................49
SECTION 2.21. Assignment of Loans under Certain Circumstances; Duty to Mitigate..........53
SECTION 2.22. Incremental Facilities ...................................................................................54

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

SECTION 3.01. Organization Status ........................................................................................56
SECTION 3.02. Power, Authority and Enforceability ...........................................................57
SECTION 3.03. No Violation...................................................................................................57
SECTION 3.04. Approvals.......................................................................................................57
SECTION 3.05. Financial Statements; Financial Condition; Undisclosed Liabilities; Projections ..........57

SECTION 3.06. Litigation ............................................................................................. 58
SECTION 3.07. True and Complete Disclosure ........................................................... 58
SECTION 3.08. Margin Regulations ............................................................................ 59
SECTION 3.09. Tax Returns and Payments ................................................................. 59
SECTION 3.10. Compliance with ERISA ..................................................................... 59
SECTION 3.11. Security Documents ............................................................................ 60
SECTION 3.12. Properties ............................................................................................ 61
SECTION 3.13. Subsidiaries ......................................................................................... 61
SECTION 3.14. Compliance with Statutes, etc. ........................................................... 61
SECTION 3.15. Investment Company Act .................................................................... 61
SECTION 3.16. Environmental Matters ....................................................................... 61
SECTION 3.17. Employment and Labor Relations ...................................................... 62
SECTION 3.18. Intellectual Property, etc. ................................................................... 62
SECTION 3.19. Economic Sanctions ........................................................................... 62
SECTION 3.20. Foreign Corrupt Practices Act ........................................................... 63
SECTION 3.21. Insurance ............................................................................................. 63
SECTION 3.22. Use of Proceeds .................................................................................. 63
SECTION 3.23. Solvency .............................................................................................. 63

## ARTICLE IV

## CONDITIONS OF LENDING

SECTION 4.01. Closing Date Credit Event .................................................................. 63

## ARTICLE V

## AFFIRMATIVE COVENANTS

SECTION 5.01. Information Covenants .......................................................................... 66
SECTION 5.02. Books, Records and Inspections .......................................................... 69
SECTION 5.03. Maintenance of Property; Insurance ................................................... 69
SECTION 5.04. Existence; Franchises .......................................................................... 70
SECTION 5.05. Compliance with Statutes, etc. ............................................................ 71
SECTION 5.06. Compliance with Environmental Laws ............................................... 71
SECTION 5.07. Business ............................................................................................... 71
SECTION 5.08. Payment of Taxes ................................................................................ 71
SECTION 5.09. Employee Benefits ............................................................................... 72
SECTION 5.10. Use of Proceeds ................................................................................... 72
SECTION 5.11. Further Assurances .............................................................................. 72
SECTION 5.12. Designation of Subsidiaries ................................................................. 73
SECTION 5.13. Ratings ................................................................................................. 74
SECTION 5.14. Post-Closing Matters ........................................................................... 74

## ARTICLE VI

## NEGATIVE COVENANTS

SECTION 6.01. Liens ..................................................................................................... 74

SECTION 6.02. Consolidation, Merger or Sale of Assets, Etc. ................................................ 78
SECTION 6.03. Restricted Payments ........................................................................................ 80
SECTION 6.04. Indebtedness ..................................................................................................... 82
SECTION 6.05. Investments ....................................................................................................... 85
SECTION 6.06. Transactions with Affiliates ............................................................................ 88
SECTION 6.07. Modifications of Certain Agreements; Limitations on Voluntary Payments, etc. .......... 89
SECTION 6.08. Financial Covenant............................................................................................ 90
SECTION 6.09. Limitation on Certain Restrictions on Restricted Subsidiaries ...................... 90
SECTION 6.10. Passive Holding Company ................................................................................ 91
SECTION 6.11. Change in Nature of Business .......................................................................... 91
SECTION 6.12. Compliance with Certain Laws ........................................................................ 91

## ARTICLE VII

## EVENTS OF DEFAULT AND REMEDIES

SECTION 7.01. Events of Default............................................................................................... 92

## ARTICLE VIII

## THE ADMINISTRATIVE AGENT AND THE COLLATERAL AGENT

SECTION 8.01. Appointment and Authority .............................................................................. 96
SECTION 8.02. Rights as a Lender............................................................................................. 97
SECTION 8.03. Exculpatory Provisions .................................................................................... 97
SECTION 8.04. Reliance by Administrative Agent ................................................................... 98
SECTION 8.05. Delegation of Duties ........................................................................................ 98
SECTION 8.06. Resignation of the Agent.................................................................................. 98
SECTION 8.07. Non-Reliance on Agents and Other Lenders................................................... 99
SECTION 8.08. No Other Duties, etc. ....................................................................................... 99
SECTION 8.09. Agent May File Proofs of Claim ..................................................................... 99
SECTION 8.10. Collateral and Guarantee Matters.................................................................. 100
SECTION 8.11. Enforcement .................................................................................................... 101

## ARTICLE IX

## MISCELLANEOUS

SECTION 9.01. Notices; Electronic Communications............................................................. 102
SECTION 9.02. Survival of Agreement .................................................................................... 104
SECTION 9.03. Binding Effect ................................................................................................. 105
SECTION 9.04. Successors and Assigns................................................................................... 105
SECTION 9.05. Expenses; Indemnity ...................................................................................... 111
SECTION 9.06. Right of Setoff ................................................................................................ 112
SECTION 9.07. Waivers; Amendment...................................................................................... 113
SECTION 9.08. Interest Rate Limitation.................................................................................. 114
SECTION 9.09. Entire Agreement ............................................................................................ 114
SECTION 9.10. WAIVER OF JURY TRIAL........................................................................... 114
SECTION 9.11. Severability ..................................................................................................... 115
SECTION 9.12. Counterparts .................................................................................................... 115

SECTION 9.13. Headings..............................................................................................115
SECTION 9.14. Applicable Law ..................................................................................115
SECTION 9.15. Jurisdiction; Consent to Service of Process ......................................115
SECTION 9.16. Electronic Execution of Assignments ...............................................116
SECTION 9.17. Confidentiality....................................................................................116
SECTION 9.18. Lender Action.....................................................................................117
SECTION 9.19. USA PATRIOT Act Notice ...............................................................117
SECTION 9.20. No Fiduciary Duty..............................................................................117

## ARTICLE X

## THE GUARANTY

SECTION 10.01. Guaranty............................................................................................118
SECTION 10.02. Additional Guarantors ......................................................................120

SCHEDULES

| Schedule 1.01(a) | - | Subsidiary Guarantors |
| Schedule 1.01(b) | - | Disqualified Institutions |
| Schedule 1.01(c) | - | Material Subsidiaries |
| Schedule 1.01(d) | - | Mortgaged Properties |
| Schedule 2.01 | - | Lenders and Commitments |
| Schedule 3.10 | - | ERISA |
| Schedule 3.12 | - | Properties |
| Schedule 3.13 | - | Subsidiaries |
| Schedule 3.21 | - | Insurance |
| Schedule 5.11(a) | - | Unrestricted Subsidiaries |
| Schedule 5.14 | - | Post-Closing Matters |
| Schedule 6.01(c) | - | Existing Liens |
| Schedule 6.04(b) | - | Existing Indebtedness |
| Schedule 6.05(c) | - | Existing Investments |
| Schedule 6.06(i) | - | Existing Affiliated Transactions |
| Schedule 6.09(c) | - | Existing Restrictive Agreements |

EXHIBITS

| Exhibit A | - | Form of ABL Intercreditor Agreement |
| Exhibit B | - | Form of Assignment and Acceptance |
| Exhibit C | - | Auction Procedures |
| Exhibit D | - | Form of Borrowing Request |
| Exhibit E | - | Form of Compliance Certificate |
| Exhibit F | - | Form of Guaranty Supplement |
| Exhibit G | - | Form of Interest Election Request |
| Exhibit H | - | [Reserved] |
| Exhibit I | - | Form of Note |
| Exhibit J | - | Form of Perfection Certificate |
| Exhibit K-1 | - | Form of U.S. Tax Compliance Certificate |
| Exhibit K-2 | - | Form of U.S. Tax Compliance Certificate |
| Exhibit K-3 | - | Form of U.S. Tax Compliance Certificate |

Exhibit K-4            -        Form of U.S. Tax Compliance Certificate

CREDIT AGREEMENT dated as of October 31, 2014 (this "*Agreement*"), among VERTELLUS SPECIALTIES INC., an Indiana corporation (the "*Borrower*"), VERTELLUS SPECIALTIES HOLDINGS CORP., a Delaware corporation ("*Holdings*"), the Subsidiary Guarantors party hereto, the Lenders (such term and each other capitalized term used but not defined in these introductory statements having the meaning given it in Article I) and JEFFERIES FINANCE LLC, as administrative agent (in such capacity, including any successor thereto in such capacity, the "*Administrative Agent*") for the Lenders and as collateral agent (in such capacity, including any successor thereto in such capacity, the "*Collateral Agent*") for the Secured Parties (as defined herein).

The Borrower has requested that, the Lenders extend credit in the form of Term Loans to the Borrower on the Closing Date, in an aggregate principal amount of $455,000,000. The proceeds of the Term Loans shall (i) consummate the Refinancing, (ii) distribute to Holdings funds sufficient for Holdings to consummate the Parent Note Repayment, (iii) fund the consideration for the Acquisition and (iv) pay the Transaction Costs relating to the foregoing.

The Lenders are willing to extend such credit to the Borrower, on the terms and subject to the conditions set forth herein.  Accordingly, the parties hereto agree as follows:

ARTICLE I

DEFINITIONS

SECTION 1.01. *Defined Terms*. As used in this Agreement, the following terms shall have the meanings specified below:

"*ABL Collateral Agent*" shall mean the "Agent" as defined in the ABL Credit Agreement.

"*ABL Credit Agreement*" shall mean the Amended and Restated Revolving Credit and Security Agreement, dated as of the date hereof (as amended, restated, amended and restated, supplemented, refinanced, replaced or otherwise modified from time to time in accordance with the terms thereof) among the Borrower, the other designated credit parties party thereto, the lenders party thereto and PNC Bank, National Association, as agent thereunder.

"*ABL Intercreditor Agreement*" shall mean the Amended and Restated Intercreditor Agreement substantially in the form of Exhibit A, dated as of the date hereof (as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof) among the Loan Parties, the Administrative Agent, the Collateral Agent and the ABL Collateral Agent.

"*ABL Loan Documents*" shall mean the ABL Credit Agreement and the "Loan Documents" as defined in the ABL Credit Agreement.

"*ABL Obligations*" shall mean the "Obligations" as defined in the ABL Credit Agreement.

"*ABL Priority Collateral*" shall mean the "ABL Priority Collateral" as defined in the ABL Intercreditor Agreement.

"*ABR Loan*" or "*ABR Borrowing*" shall mean a Loan or a Borrowing consisting of Loans bearing interest at a rate determined by reference to the Alternate Base Rate.

"*Acquired Entities*" shall mean the entities code-named "Buttermere".

"*Acquisition*" shall mean the acquisition by the Borrower and/or its Subsidiaries, funded in whole or in part with the proceeds of the Term Loans, of all of the issued and outstanding equity interest of the Acquired Entities pursuant to, and on the terms and conditions of, the Acquisition Agreement; it being understood, for the avoidance of doubt, that the Acquisition shall be a Permitted Acquisition (other than with respect to clause (ii) of Section 6.05(l)).

"*Acquisition Agreement*" shall mean that certain share purchase agreement, dated as of October 31, 2014, by and among Vertellus Specialties Holdings UK Limited, as buyer, and certain sellers party named therein, governing the Acquisition and in form and substance reasonably acceptable to the Administrative Agent.

"*Acquisition Closing Date*" shall mean the date on which the Acquisition is consummated.

"*Additional Credit Extension Amendment*" shall mean an amendment to this Agreement (which may, at the option of the Administrative Agent, be in the form of an amendment and restatement of this Agreement) providing for any Incremental Term Loan Commitments pursuant to Section 2.22, which shall be consistent with the applicable provisions of this Agreement and otherwise satisfactory to the parties thereto. Each Additional Credit Extension Amendment shall be executed by the Administrative Agent, the applicable Loan Parties and the other parties specified in the applicable Section of this Agreement (but not any other Lender).  Any Additional Credit Extension Amendment may include conditions for delivery of opinions of counsel and other documentation consistent with the conditions in Sections 4.01, all to the extent reasonably requested by the Administrative Agent or the other parties to such Additional Credit Extension Amendment.

"*Additional Lender*" shall mean, at any time, any Person that is not an existing Lender and that agrees to provide any portion of any Incremental Term Loans or Incremental Term Loan Commitments in accordance with Section 2.22 pursuant to an Additional Credit Extension Amendment; *provided* that such Additional Lender shall be (i) an Eligible Assignee, (ii) reasonably satisfactory to the Administrative Agent and (iii) in the case of any Affiliated Lender, subject to the same restrictions set forth in Section 9.04 as such Affiliated Lender would otherwise be subject to with respect to any purchase by or assignment to such Affiliated Lender of Loans.

"*Adjusted LIBO Rate*" shall mean, with respect to any Eurodollar Borrowing for any Interest Period, the greater of (a) (x) an interest rate per annum (rounded upward, if necessary, to the next 1/100th of 1%) determined by the Administrative Agent to be equal to the LIBO Rate for such Eurodollar Borrowing in effect for such Interest Period divided by (y) 1 *minus* the Statutory Reserves (if any) for such Eurodollar Borrowing for such Interest Period and (b) 1.00% per annum.

"*Administrative Agent*" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"*Administrative Agent Fees*" shall have the meaning assigned to such term in Section 2.05(a).

"*Administrative Questionnaire*" shall mean an Administrative Questionnaire in the form supplied from time to time by the Administrative Agent.

"*Affiliate*" shall mean, when used with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified; *provided* that (x) for purposes of this Agreement, Jefferies LLC and its Affiliates shall be deemed to be Affiliates of Jefferies Finance LLC and (y) for purposes of Section 6.06,

the term "*Affiliate*" shall also include any Person that directly or indirectly owns 10% or more of any class of the Equity Interests of the Person specified or that is an officer or director of the Person specified.

"*Affiliate Cap*" shall have the meaning set forth in Section 9.04(g)(iv).

"*Affiliated Lenders*" shall mean, collectively, Holdings, the Borrower, the Subsidiaries, Debt Fund Affiliates and Non-Debt Fund Affiliates.

"*Agents*" shall have the meaning assigned to such term in Article VIII.

"*Aggregate Incremental Amount*" shall mean, at any time, the sum of the aggregate principal amount of (a) Incremental Term Loans incurred at or prior to such time (assuming all Incremental Term Loan Commitments established at or prior to such time are fully drawn) and (b) Permitted Incremental Equivalent Debt incurred at or prior to such time.

"*Agreement*" shall have the meaning assigned to it in the introductory statement hereto.

"*Agreement Value*" shall mean, for each Hedging Agreement, on any date of determination, the maximum aggregate amount (giving effect to any netting agreements) that Holdings, the Borrower or the applicable Subsidiary would be required to pay if such Hedging Agreement was terminated on such date.

"*All-in Yield*" shall mean, as to any Indebtedness, the effective interest rate with respect thereto as reasonably determined by the Administrative Agent taking into account the interest rate margin, original issue discount, upfront fees and eurodollar rate floor or alternate base rate floor; *provided* that original issue discount and upfront fees shall be equated to interest rate assuming a four-year life to maturity of such Indebtedness (or, if less, the stated life to maturity at the time of the incurrence of such Indebtedness); *provided further* that "All-in Yield" shall not include amendment, arrangement, commitment, underwriting, structuring or similar fees paid to arrangers (or their affiliates) or any other fees, in each case that are not generally paid or shared ratably to lenders with respect to such Indebtedness.

"*Alternate Base Rate*" shall mean, for any day, a fluctuating rate per annum (rounded upward, if necessary, to the nearest 1/100th of 1%) equal to the greatest of (a) the Base Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1.00%, (c) the Adjusted LIBO Rate for a one-month Interest Period beginning on such day (or if such day is not a Business Day, on the immediately preceding Business Day) plus 1.00% and (d) 2.00% per annum. If the Administrative Agent shall have determined (which determination shall be conclusive absent manifest error) that it is unable to ascertain the Federal Funds Effective Rate for any reason, including the inability or failure of the Administrative Agent to obtain sufficient quotations in accordance with the terms of the definition thereof, the Alternate Base Rate shall be determined without regard to clause (b) of the preceding sentence until the circumstances giving rise to such inability no longer exist. Any change in the Alternate Base Rate due to a change in the Base Rate or the Federal Funds Effective Rate shall be effective on the effective date of such change in the Base Rate or the Federal Funds Effective Rate, respectively.

"*Anti-Money Laundering Laws*" shall mean any requirements of law related to money laundering, including the Bank Secrecy Act, 31 U.S.C. §§ 5311 et seq., as amended by the USA PATRIOT Act, and its implementing regulations, and the Money Laundering Control Act of 1986, 18 U.S.C. §§ 1956 and 1957.

"*Anticipated Cure Deadline*" shall have the meaning assigned to such term in Section 7.02.

"***Applicable Margin***" shall mean, for any day (a) with respect to any Eurodollar Loan, 9.50% per annum and (b) with respect to any ABR Loan, 8.50% per annum.

"***Approved Fund***" shall mean, any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"***Arranger***" shall mean Jefferies Finance LLC in its capacity as sole lead bookrunner and sole lead arranger.

"***Arsenal Note***" shall mean that certain Subordinated Promissory Note, dated as of December 10, 2007, by and between Borrower, as payor, and Arsenal Capital Management LP, as payee, in an original aggregate principal amount of $15,250,000, as in effect as of the date hereof.

"***Asset Sale***" shall mean any sale, transfer or other disposition by Holdings, Borrower or any of the Restricted Subsidiaries to any Person (including by way of redemption by such Person) other than to a Loan Party of any asset (including, without limitation any Equity Interests in another Person) but excluding (a) any sale or disposition (or series of related sales or dispositions) that generate net sale proceeds in the aggregate of less than $2,500,000 for such sale or disposition (or series of related sales or dispositions), (b) Recovery Events, (c) asset sales permitted by Section 6.02 (other than clauses (c), (r) and (u) thereof) and (d) so long as the ABL Obligations have not been satisfied in full, any sale, transfer or other disposition of ABL Priority Collateral; *provided* that any net proceeds from ABL Priority Collateral shall be used to pay down (x) the ABL Obligations or (y) if such proceeds are declined by the lenders under the ABL Credit Agreement, the Obligations, to the extent required by Section 2.13(b).

"***Asset Sale or Recovery Event Proceeds Pledged Account***" shall mean an account held at, and subject to the sole dominion and control of the Collateral Agent in which the proceeds from any Asset Sale or Recovery Event is held pending reinvestment pursuant to Section 2.13(b).

"***Assignment and Acceptance***" shall mean an assignment and acceptance entered into by a Lender and an Eligible Assignee, consented to by the Administrative Agent and/or the Borrower, as required under Section 9.04(b)(iii), and accepted by the Administrative Agent, in substantially the form of Exhibit B or such other form (including electronic documentation generated by MarkitClear or other electronic platform) as shall be approved by the Administrative Agent.

"***Auction Procedures***" shall mean the auction procedures with respect to Dutch Auctions set forth in Exhibit C.

"***Bankruptcy Code***" shall mean Title 11 of the United States Code titled "Bankruptcy", as now and hereafter in effect, or any successor statute.

"**Base Rate**" shall mean, for any day, the prime rate published in *The Wall Street Journal* for such day; *provided* that if *The Wall Street Journal* ceases to publish for any reason such rate of interest, "**Base Rate**" shall mean the prime lending rate as set forth on the Bloomberg page PRIMBB Index (or successor page) for such day (or such other service as determined by the Administrative Agent from time to time for purposes of providing quotations of prime lending interest rates); each change in the Base Rate shall be effective on the date such change is effective.  The prime rate is not necessarily the lowest rate charged by any financial institution to its customers.

"***Board***" shall mean the Board of Governors of the Federal Reserve System of the United States.

"***Board of Directors***" shall mean, with respect to any Person, (i) in the case of any corporation, the board of directors of such person, (ii) in the case of any limited liability company, the board of managers of such Person or, if there is none, the Board of Directors of the managing member of such Person, (iii) in the case of a partnership, the Board of Directors of the general partner of such Person and (iv) in the case of any other Person, the functional equivalent of any of the foregoing.

"***Borrower***" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"***Borrower Materials***" shall have the meaning assigned to such term in Section 9.01.

"***Borrower Notice***" shall have the meaning assigned to such term in the definition of Real Estate Collateral Requirements.

"***Borrowing***" shall mean Loans of the same Class and Type made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"***Borrowing Request***" shall mean a request by the Borrower in accordance with the terms of Section 2.03 and substantially in the form of Exhibit D, or such other form as shall be approved by the Administrative Agent.

"***Breakage Event***" shall have the meaning assigned to such term in Section 2.16.

"***Business Day***" shall mean any day other than a Saturday, Sunday or day on which banks in New York City are authorized or required by law to close; *provided* that, when used in connection with a Eurodollar Loan, the term "*Business Day*" shall also exclude any day on which banks are not open for dealings in Dollar deposits in the London interbank market.

"***Capital Expenditures***" shall mean, for any period the additions to property, plant and equipment and other capital expenditures of the Borrower and its consolidated Restricted Subsidiaries that are (or should be) set forth in a consolidated statement of cash flows of the Borrower for such period prepared in accordance with GAAP, but excluding in each case any such expenditure made to restore, replace or rebuild property to the condition of such property immediately prior to any damage, loss, destruction or condemnation of such property, to the extent such expenditure is made with any received insurance proceeds, condemnation awards or damage recovery proceeds relating to any such damage, loss, destruction or condemnation.

"***Capital Lease Obligations***" of any Person shall mean the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"***Cash Equivalents***" shall mean (a) any readily-marketable securities (i) issued by, or directly, unconditionally and fully guaranteed or insured by the United States federal government or (ii) issued by any agency of the United States federal government, the obligations of which are fully backed by the full faith and credit of the United States federal government, (b) any readily-marketable direct obligations issued by any other agency of the United States federal government, any state of the United States or any political subdivision of any such state or any public instrumentality thereof, in each case having a rating of at least "A-1" from S&P or at least "P-1" from Moody's, (c) any commercial paper rated at least "A-1"

by S&P or "P-1" by Moody's and issued by any Person organized under the laws of any state of the United States, (d) any Dollar-denominated time deposit, insured certificate of deposit, overnight bank deposit or bankers' acceptance issued or accepted by (i) any Lender or (ii) any commercial bank that is (A) organized under the laws of the United States, any state thereof or the District of Columbia, (B) "adequately capitalized" (as defined in the regulations of its primary federal banking regulators) and (C) has Tier 1 capital (as defined in such regulations) in excess of $250,000,000, (e) shares of any United States money market fund that (i) has substantially all of its assets invested continuously in the types of investments referred to in clause (a), (b), (c) or (d) above with maturities as set forth in the proviso below, (ii) has net assets in excess of $500,000,000 and (iii) has obtained from either S&P or Moody's the highest rating obtainable for money market funds in the United States (*provided however*, that the maturities of all obligations specified in any of clauses (a), (b), (c) or (d) above shall not exceed 365 days) and (f) investments by any Foreign Subsidiaries in any foreign equivalents of the investments described in clauses (a) through (d) above, *provided* that, (i) investments described in this clause (f) by any Foreign Subsidiary shall be limited to (1) securities issued by a country that is a member nation of the Organisation of Economic Cooperation and Development or by issuers formed under the laws of such a country, or (2) in the case of Foreign Subsidiaries operating in countries that are not member nations of the Organisation of Economic Cooperation and Development,  investments customarily used by corporations for cash management purposes in such jurisdictions in the ordinary course of business of such corporations and (ii) in the case of investments equivalent to clause (a), the issuer has an investment grade sovereign debt rating from S&P or Moody's.

"*Change in Law*" shall mean the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule or regulation, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority (whether or not having the force of law) or (c) the making or issuance of any request, rule guideline or directive (whether or not having the force of law) of any Governmental Authority; *provided* that, notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

A "*Change of Control*" shall be deemed to have occurred if (a)(i) prior to a Qualified Public Offering, the Sponsor and its Related Parties or a Permitted Group shall fail to own and control, directly or indirectly, beneficially and of record, at least the majority of the aggregate ordinary economic and voting power represented by the issued and outstanding Equity Interest of Holdings (determined on a fully diluted basis), and (ii) after a Qualified Public Offering, any "person" or "group" (within the meaning of Rule 13d-5 of the Exchange Act as in effect on the date hereof), other than the Sponsor and its Related Parties or a Permitted Group, shall own and control, directly or indirectly, beneficially and of record, shares representing at least 35% of the aggregate ordinary voting power represented by the issued and outstanding capital stock of Holdings (determined on a fully diluted basis), (b) the Sponsor and its Related Parties or a Permitted Group shall fail to, directly or indirectly, possess the right to elect (through contract, ownership of voting securities or otherwise) at all times a majority of the board of directors (or similar governing body) of Holdings and to direct the management policies and decisions of Holdings, (c) the Sponsor and its Related Parties or a Permitted Group shall own and control, directly or indirectly, beneficially and of record, shares of Holdings representing a lower percentage of such shares than such "person" or "group" (determined on a fully diluted basis), (d) a change of control or similar event shall occur as provided in the ABL Credit Agreement or any other credit agreement, indenture or other

6

agreement governing Indebtedness issued in respect of any Permitted Refinancing of any of the foregoing or any Permitted Incremental Equivalent Debt, in each case to the extent the aggregate principal amount of the Indebtedness evidenced thereby equals or exceeds the Threshold Amount, or (e) Holdings shall cease to directly own and control, beneficially and of record, 100% of the issued and outstanding Equity Interests of the Borrower.

"***Charges***" shall have the meaning assigned to such term in Section 9.08.

"***Class***" when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, is a Term Loan or, if applicable, an Incremental Term Loan and, when used in reference to any Commitment, refers to whether such Commitment is a Term Loan Commitment or, if applicable, an Incremental Term Loan Commitment. Incremental Term Loans that have different terms and conditions (together with the Commitments in respect thereof) shall be construed to be of different classes.

"***Closing Date***" shall mean the date on which the conditions set forth in Section 4.01 of this Agreement are satisfied or waived in accordance with Section 9.07 and this Agreement becomes effective pursuant to the provisions of Section 9.03, which date shall be October 31, 2014.

"***Closing Date Net Total Leverage Ratio***" shall mean a Net Total Leverage Ratio of 5.65:1.00.

"***Code***" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"***Collateral***" shall mean the "Collateral" as defined in the Collateral Agreement and the "Mortgaged Property" as defined in any Mortgage.

"***Collateral Agent***" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"***Collateral Agreement***" shall mean the Security Agreement, dated as of the date hereof, among Holdings, the Borrower, the Subsidiaries party thereto in favor of the Collateral Agent for the benefit of, among others, the Secured Parties.

"***Collateral Trustee***" shall mean U.S. Bank, National Association, in such capacity, pursuant to the Existing Indenture and the Existing Collateral Trust Agreement.

"***Commitment***" shall mean, with respect to any Lender, such Lender's Term Loan Commitment or, if applicable, Incremental Term Loan Commitments.

"***Communications***" shall have the meaning assigned to such term in Section 9.01.

"***Compliance Certificate***" shall mean a compliance certificate in the form of Exhibit E.

"***Confidential Information Memorandum***" shall mean the Confidential Information Memorandum of the Borrower dated July 2014.

"***Connection Income Taxes***" shall mean Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"*Consolidated EBITDA*" shall mean, with respect to any Person for any period, the Consolidated Net Income of such Person for such period: (1) increased (without duplication) by the following, in each case (other than clauses (l) and (n)) to the extent deducted (and not added back) in determining Consolidated Net Income for such period:

(a)        provision for taxes based on income or profits or capital, including, without limitation, federal, state, provincial, franchise, excise and similar taxes and foreign withholding taxes (including any future taxes or other levies which replace or are intended to be in lieu of such taxes and any penalties and interest related to such taxes or arising from tax examinations) and the net tax expense associated with any adjustments made pursuant to clauses (a) through (k) of the definition of "Consolidated Net Income"; *plus*

(b)        the amount of (x) any unrealized losses under Hedging Agreements entered into for the purpose of hedging interest rate risk,  and (y) Consolidated Interest Expense; *plus*

(c) the total amount of depreciation and amortization expense of such Person, including the amortization of deferred financing fees, debt issuance costs, commissions and fees and expenses of such Person and the Restricted Subsidiaries for such period on a consolidated basis and otherwise determined in accordance with GAAP; *plus*

(d) the amount of any restructuring charges, accruals or reserves; *provided* that the aggregate amount of add backs made pursuant to this clause (d) and clauses (j) and (n) for any period of four consecutive fiscal quarters shall not exceed in the aggregate an amount equal to 10% of Consolidated EBITDA for each period of four consecutive fiscal quarters (without giving effect to any adjustments pursuant to this clause (d)); *plus*

(e) any other non-cash charges (including (i) any write-offs or write-downs, (ii) equity-based awards compensation expense, (iii) losses on sales, disposals or abandonment of, or any improvement charges or asset write off related to, intangible assets, long-lived assets and investments in debt and equity securities and (iv) all losses from investments) (*provided* that if any such non-cash charges represent an accrual or reserve for potential cash items in any future period, the cash payment in respect thereof in such future period shall be subtracted from Consolidated EBITDA to such extent, and excluding amortization of a prepaid cash item that was paid in a prior period); *plus*

(f) the amount of any minority interest expense consisting of Subsidiary income attributable to minority equity interests of third parties in any non-Wholly Owned Subsidiary (except to the extent paid in cash); *plus*

(g) the amount of management, monitoring, consulting and advisory fees (including termination and transaction fees) and related indemnities and expenses paid or accrued in such period under the Management Agreement or otherwise to the Sponsors and including reimbursement of expenses of the Board of Directors of the Borrower, to the extent otherwise permitted hereunder; *provided* that the aggregate amount of add backs made pursuant to this clause (g) shall not exceed an amount equal to $3,500,000 in any fiscal year; *plus*

(h) any costs or expense incurred by Holdings, the Borrower or a Restricted Subsidiary pursuant to any management equity plan or stock option plan or any other

8

management or employee benefit plan or agreement or any stock subscription or shareholder agreement, to the extent that such cost or expenses are funded with cash proceeds contributed to the capital of the Borrower or net cash proceeds of an issuance of Equity Interest of the Borrower (other than Disqualified Equity Interests); *plus*

(i) any net loss from disposed or discontinued operations; *provided* that the aggregate amount of add backs made pursuant to this clause (i) for any period of four consecutive fiscal quarters shall not exceed an amount equal to (i) $5,000,000 plus (ii) any portion of the amount equal to 10% of Consolidated EBITDA for each period of four consecutive fiscal quarters that has not been utilized by clauses (d), (j) and (n) during such period; *plus*

(j) the amount of any integration costs or other business optimization expenses or reserves, including any one-time costs incurred in connection with the Acquisition and other acquisitions after the Closing Date and costs related to the closure and/or consolidation of facilities; *provided* that the aggregate amount of add backs made pursuant to this clause (j) and clauses (d) and (n) for any period of four consecutive fiscal quarters shall not exceed in the aggregate an amount equal to 10% of Consolidated EBITDA for each period of four consecutive fiscal quarters (without giving effect to any adjustments pursuant to this clause (j)); *plus*

(k) all fees and expenses incurred in connection with the entry into this Agreement, the ABL Credit Agreement and the consummation of the Acquisition and other acquisitions after the Closing Date and all non-cash purchase accounting adjustments resulting from the Acquisition and acquisitions after the Closing Date; *plus*

(l) any proceeds from business interruption, casualty or liability insurance received by such Person during such period, to the extent the associated losses arising out of the event that resulted in the payment of such business interruption insurance proceeds were included in computing Consolidated Net Income and such proceeds were not; *plus*

(m) to the extent actually reimbursed (and not otherwise included in arriving at Consolidated Net Income), expenses incurred to the extent covered by indemnification provisions in any agreement in connection with any acquisition or merger involving the Borrower or any of the Subsidiaries; *plus*

(n) the amount of net cost savings and synergies projected by the Borrower in good faith to be realized as a result of specified actions taken or with respect to which substantial steps have been taken and which are expected to be realized within 12 months of the date thereof in connection with the Acquisition, future acquisitions and cost saving, restructuring and other similar initiatives (which cost savings shall be added to Consolidated EBITDA until fully realized and calculated on a *pro forma* basis as though such cost savings had been realized during such period from such actions and shall be net of benefits actually realized); *provided* that such cost savings are reasonably identifiable and factually supportable; *provided* that the aggregate amount of add backs made pursuant to this clause (n) and clauses (d) and (j) for any period of four consecutive fiscal quarters shall not exceed in the aggregate an amount equal to 10% of Consolidated EBITDA for each period of four consecutive fiscal quarters (without giving effect to any adjustments pursuant to this clause (n)); and

(2) decreased (without duplication) by the following, in each case to the extent included in determining Consolidated Net Income for such period:

9

(a) non-cash gains increasing Consolidated Net Income of such Person for such period, excluding any non-cash gains to the extent they represent the reversal of an accrual or reserve for a potential cash item that reduced Consolidated EBITDA in any prior period; *plus*

(b) any non-cash gains with respect to cash actually received in a prior period unless such cash did not increase Consolidated EBITDA in such prior period; *plus*

(c) any net income from disposed or discontinued operations; *plus*

(d) extraordinary gains and unusual or non-recurring gains (less all fees and expenses relating thereto); *plus*

(e) the amount of any unrealized gains under Hedging Agreements entered into for the purpose of hedging interest rate risk; and

(3) increased or decreased (without duplication) by, as applicable, any adjustments resulting from the application of FASB Accounting Standards Codification 460, Guarantees.

Notwithstanding anything to the contrary herein, Consolidated EBITDA of the Borrower and the Restricted Subsidiaries on a consolidated basis for the fiscal quarters ended September 30, 2013, December 31, 2013, March 31, 2014 and June 30, 2014 shall be deemed to be $22,672,000, $23,332,000, $21,478,000 and $27,927,000, respectively.

Any amounts described in clauses (d), (j) or (n) above that are included in Consolidated EBITDA for any period shall be determined in good faith by the Borrower, as certified by a Financial Officer of the Borrower in the Compliance Certificate required by Section 5.01(e) to be delivered in connection with the financial statements for such period

"*Consolidated Fixed Charges*" shall mean, with respect to any Person, for any period, the sum of (a) Consolidated Interest Expense of such Person and its Restricted Subsidiaries for such period, (b) cash dividends or other distribution paid (excluding items eliminated in consolidation) on any series of Preferred Stock of such Person and its Restricted Subsidiaries during such period, (c) all dividends or other distributions paid or accrued (excluding items eliminated in consolidation) on any series of Disqualified Equity Interests of such Person and its Restricted Subsidiaries during such period, (d) the principal amount of Indebtedness of such Person and its Restricted Subsidiaries having a scheduled due date during such period (without regard to any voluntary prepayment of any such scheduled principal payment), and (e) the amount of management, monitoring, consulting and advisory fees (including termination and transaction fees) paid or accrued in such period under the Management Agreement.

"*Consolidated Interest Expense*" shall mean with respect to any Person for any period, without duplication, the sum of:

(a) consolidated interest expense in respect of Indebtedness of such Person and its Restricted Subsidiaries for such period, to the extent such expense was deducted (and not added back) in computing Consolidated Net Income (including (i) amortization of original issue discount resulting from the issuance of Indebtedness at less than par, (ii) all commissions, discounts and other fees and charges owed with respect to letters of credit or bankers acceptances, (iii) non-cash interest charges (but excluding any non-cash interest expense attributable to the movement in the mark to market valuation of Hedging Obligations or other derivative instruments pursuant to GAAP), (iv) the interest component of Capitalized Lease Obligations and (v) net payments, if any, made (less net payments, if any, received), pursuant to

10

interest rate Hedging Obligations with respect to Indebtedness, and excluding (A) any expense resulting from the discounting of any Indebtedness in connection with the application of recapitalization accounting or, if applicable, purchase accounting in connection with the Acquisition or any other acquisition, (B) penalties and interest relating to taxes, (C) any "additional interest" or "liquidated damages" with respect to other securities for failure to timely comply with registration rights obligations, (D) amortization of deferred financing fees, debt issuance costs, commissions, fees and expenses and discounted liabilities and (E) any accretion of accrued interest on discounted liabilities); *plus*

(b) consolidated capitalized interest of such Person and its Restricted Subsidiaries for such period, whether paid or accrued; *less*

(c) interest income of such Person and its Restricted Subsidiaries for such period.

For purposes of this definition, interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by such Person to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP.

"*Consolidated Net Income*" shall mean, with respect to any Person for any period, the aggregate of the Net Income of such Person for such period, on a consolidated basis, and otherwise determined in accordance with GAAP; *provided* that, without duplication,

(a) any net after-tax effect of extraordinary gains, losses or charges (including all fees and expenses relating thereto) determined in accordance with GAAP shall be excluded;

(b) any net after-tax effect of gains or losses attributable to asset dispositions or abandonments (including any disposal of abandoned or discontinued operations) or the sale or other disposition of any Equity Interests of any Person, in each case other than in the ordinary course of business as determined in good faith by the Borrower, shall be excluded;

(c) the Net Income for such period of any Subsidiary that is an Unrestricted Subsidiary or any Person that is not a Subsidiary or that is accounted for by the equity method of accounting shall be excluded; *provided* that the Consolidated Net Income of the Borrower and the Restricted Subsidiaries shall be increased by the amount of dividends or distributions or other payments that are actually paid in Cash Equivalents (or to the extent converted into Cash Equivalents) to the Borrower or a Restricted Subsidiary thereof in respect of such period and the net losses of any such Person shall only be included to the extent funded with cash from the Borrower or any Restricted Subsidiary;

(d) the Net Income for such period of any Restricted Subsidiary (other than any Guarantor) shall be excluded to the extent that the declaration or payment of dividends or similar distributions by such Restricted Subsidiary of its Net Income is not at the date of determination permitted in whole without any prior governmental approval (which has not been obtained) or, directly or indirectly, by the operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule, or governmental regulation applicable to such Restricted Subsidiary or its stockholders, unless such restriction with respect to the payment of dividends or similar distributions has been legally waived; provided that the Consolidated Net Income of the Borrower and the Restricted Subsidiaries shall be increased by the amount of dividends or other distributions or other payments actually paid in cash (or to the extent converted into cash) to the Borrower or a Restricted Subsidiary thereof in respect of such period, to the extent not already included therein;

(e) effects of adjustments (including the effects of such adjustments pushed down to the Borrower and the Restricted Subsidiaries) in the inventory, property and equipment, software, goodwill, other intangible assets, in-process research and development, deferred revenue, debt line items and other noncash charges in such Person's consolidated financial statements pursuant to GAAP resulting from the application of recapitalization accounting or, if applicable, purchase accounting in relation to the Acquisition or any other consummated acquisition or the amortization or write-off of any amounts thereof, net of taxes, shall be excluded;

(f) any net after-tax effect of income (loss) from the early extinguishment or conversion of (i) Indebtedness, (ii) obligations arising under Hedging Agreements or (iii) other derivative instruments shall be excluded;

(g) any impairment charge or asset write-off or write-down, including impairment charges or asset write-offs or write-downs related to intangible assets, long-lived assets, investments in debt and equity securities or as a result of a change in law or regulation, in each case, pursuant to GAAP, and the amortization of intangibles arising pursuant to GAAP shall be excluded;

(h) any non-cash compensation charge or expense, including any such charge or expense arising from the grants of stock appreciation or similar rights, stock options, restricted stock or other rights or equity incentive programs shall be excluded and any cash charges associated with the rollover, acceleration, or payout of Equity Interests by management of the Borrower or any of its direct or indirect parent companies in connection with the Acquisition, shall be excluded;

(i) any net unrealized gain or loss (after any offset) resulting in such period from obligations arising under Hedging Agreements and the application of FASB Accounting Standards Codification 815 shall be excluded;

(j) any net unrealized gain or loss (after any offset) resulting in such period from currency translation and transaction gains or losses including those related to currency remeasurements of Indebtedness (including any net loss or gain resulting from obligations arising under Hedging Agreements for currency exchange risk) and any other monetary assets and liabilities shall be excluded; and

(k) accruals and reserves that are established within 12 months after the Acquisition Closing Date that are so required to be established as a result of the Acquisition (or within 12 months after the closing of any acquisition that are so required to be established as a result of such acquisition) in accordance with GAAP shall be excluded.

"*Consolidated Net Indebtedness*" shall mean, as of any date, (a) all Indebtedness of the Borrower and the Restricted Subsidiaries (determined on a consolidated basis in accordance with GAAP) as would be required to be reflected as debt on the liability side of a consolidated balance sheet of the Borrower and the Subsidiaries *minus* (b) the lesser of (i) the aggregate amount of Unrestricted cash and Cash Equivalents of the Borrower and its domestic Restricted Subsidiaries as of such date and (ii) $20 million; *provided* that Indebtedness in respect of the Arsenal Note shall not constitute Consolidated Net Indebtedness. For the avoidance of doubt, prior to the redemption date in respect of the Existing Secured Notes, Indebtedness in respect of the Existing Secured Notes shall not constitute Consolidated Net Indebtedness so long as the Existing Secured Notes Satisfaction and Discharge has occurred.

"*Consolidated Net Tangible Assets*" means, with respect to the Borrower and its Restricted Subsidiaries at any date of determination, the aggregate amount of total assets included in the Borrower's most recent quarterly or annual consolidated balance sheet prepared in accordance with GAAP and

12

deducting therefrom the following amounts: (a) all current liabilities reflected in such balance sheet and (b) all goodwill, trademarks, patents and other like intangibles reflected in such balance sheet.

"*Contingent Obligation*" shall mean, at any time, any Obligation or any other obligation, including any Guarantee (or a portion of any of the foregoing) that is contingent in nature at such time.

"*Control*" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "*Controlling*" and "*Controlled*" shall have meanings correlative thereto.

"*Credit Event*" shall mean each Borrowing other than a conversion or a continuation of a Borrowing.

"*Credit Facilities*" shall mean the term loan facility and incremental term loan facilities provided for by this Agreement.

"**Cumulative Amount**" shall mean, on any date of determination (the "**Reference Date**"), the sum of (without duplication):

(a)    the portion of Excess Cash Flow, determined on a cumulative basis for all fiscal years of Borrower commencing with the fiscal year ended December 31, 2015, that was not required to be applied to prepay Term Loans pursuant to Section 2.13(c); *plus*

(b)    an amount determined on a cumulative basis equal to the Net Cash Proceeds received by Borrower after the Closing Date that have been contributed as a capital contribution to Borrower, or otherwise received by Borrower in respect of the issuance of Qualified Equity Interests by Borrower, but excluding (i) any Net Cash Proceeds received by Borrower and applied as a Cure Amount, (ii) the proceeds of any issuance of Qualified Equity Interests applied pursuant to Section 6.03(j) or 6.05(u) and (iii) any Net Cash Proceeds received by Borrower from any such sale or issuance by Borrower of its Equity Interests upon exercise of any warrant or option to directors, officers or employees of Holdings, the Borrower or any Subsidiary; *minus*

(c)    the aggregate amount of the Cumulative Amount that has been utilized in a manner permitted hereunder on or prior to the Reference Date (without taking account of the intended usage of the Cumulative Amount on such Reference Date).

"**Cumulative Amount Utilization Requirements**" shall mean, with respect to any use of the Cumulative Amount permitted hereunder, that:

(a)    immediately prior and after giving effect thereto, no Default or Event of Default then exists or would immediately result therefrom;

(b)    after giving effect to such transaction on a Pro Forma Basis, Borrower shall be in compliance with the financial covenant set forth in Section 6.08 as of the most recent Test Period; and

(c)    after giving effect to such transaction on a Pro Forma Basis, the Net Total Leverage Ratio of Borrower and its Restricted Subsidiaries shall not exceed (x) in the case of any use of the Cumulative Amount pursuant to Sections 6.03(e), 6.03(j) or 6.07(b), 4.50:1.00 and (y) for any other purpose permitted hereunder, 4.75:1.00.

13

"*Cure Amount*" shall have the meaning assigned to such term in Section 7.02.

"*Cure Right*" shall have the meaning assigned to such term in Section 7.02.

"*Current Assets*" shall mean, at any time, the consolidated current assets (other than cash and Cash Equivalents) of the Borrower and the Restricted Subsidiaries at such time.

"*Current Liabilities*" shall mean, at any time, the consolidated current liabilities of the Borrower and the Restricted Subsidiaries at such time, but excluding, without duplication, the current portion of any long-term Indebtedness and excluding the ABL Obligations or any other revolving credit facility.

"*Debt Fund Affiliate*" shall mean any Affiliate of Borrower or any Sponsor that is a bona fide debt fund or an investment vehicle that is engaged in the making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit in the ordinary course and with respect to which such Sponsor and the investment vehicles managed or advised by such Sponsor that are not engaged primarily in making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit in the ordinary course do not make investment decisions for such Person.

"*Debtor Relief Laws*" shall mean the Bankruptcy Code and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"*Declined Proceeds*" shall have the meaning assigned to such term in Section 2.13(g).

"*Default*" shall mean any event or condition which upon notice, lapse of time or both would constitute an Event of Default.

"*Default Rate*" means, with respect to the Loans or other Obligations which accrue interest at the Default Rate hereunder, a rate per annum equal to the sum of two percent (2%) plus the interest rate otherwise applicable thereto.

"*Disposition*" shall mean, with respect to any Person, (a) the sale, transfer, license, lease or other disposition (by way of merger, casualty, condemnation or otherwise) of any property or asset of such Person (including, without limitation, any sale and leaseback transaction and the sale of any Equity Interest owned by such Person) to any other Person and (b) the issuance of Equity Interests by a subsidiary of such Person to any other Person.

"*Disqualified Equity Interests*" shall mean any Equity Interest that, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable (other than as a result of a change of control or asset sale so long as any rights of holders thereof upon the occurrence of such change of control or asset sale are subject to the prior payment and satisfaction in full of the Obligations), pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, or requires the payment of any cash dividend or any other scheduled payment constituting a return of capital, in each case at any time on or prior to the first anniversary of the Maturity Date or (b) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) debt securities or (ii) any Equity Interest referred to in clause (a) above, in each case at any time prior to the first anniversary of the Maturity Date.

14

"***Disqualified Institution***" shall mean (a) any Person listed on Schedule 1.01(b) on the Closing Date and (b) any other Person that is a bona fide competitor of Holdings, the Borrower or any Restricted Subsidiary or an Affiliate of such a bona fide competitor (excluding any bank, financial institution or debt fund) that is in either case either (i) separately identified in writing (including by posting to the Platform) by the Borrower or any Sponsor prior to the date hereof or (ii) with respect to Affiliates, is readily identifiable as an Affiliate of a Person listed on Schedule 1.01(b) or identified pursuant to clause (i) solely on the basis of the similarity of such Affiliate's name.

"***Dollars***" or "***$***" shall mean the lawful money of the United States.

"***Domestic Subsidiaries***" shall mean any Subsidiary of the Borrower that is incorporated or organized under the laws of the United States, any state thereof or the District of Columbia.

"***Dutch Auction***" shall mean an auction conducted by Holdings, the Borrower or any Restricted Subsidiary in order to purchase Loans as contemplated by Sections 9.04(g) and (h), as applicable, in accordance with the Auction Procedures.

"***ECF Payment Date***" shall mean the date occurring five Business Days after the date on which the annual audited financial statements of the Borrower are required to be delivered pursuant to Section 5.01(c) (commencing with the fiscal year of the Borrower ending December 31, 2015).

"***ECF Percentage***" shall mean, with respect to any fiscal year of the Borrower, if the Net Total Leverage Ratio as of the end of such fiscal year is (a) greater than 4.75:1.00, 75%, (b) equal to or less than 4.75:1.00 but greater than 3.75:1.00, 50% and (c) equal to or less than 3.75:1.00, 25%.

"***ECF Period***" shall mean with respect to the repayment required on each ECF Payment Date, the immediately preceding fiscal year of the Borrower.

"***Eligible Assignee***" shall mean any Person that meets the requirements to be an assignee under Section 9.04(b).

"***Environmental Claim***s" shall mean any and all administrative, regulatory or judicial actions, suits, demands, demand letters, directives, claims, liens, notices of noncompliance, liability or violation, investigations and/or adjudicatory proceedings relating in any way to any Environmental Law or any permit issued, or any approval given, under any such Environmental Law (hereafter, "***Claims***"), including, without limitation, (a) any and all Claims by governmental or regulatory authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law and (b) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief arising out of or relating to any Environmental Law or to an alleged injury or threat of injury to human health or safety or the environment due to the presence of Hazardous Materials.

"***Environmental Laws***" shall mean all former, current and future federal, state, local, supranational, and foreign laws (including statutory and common law), treaties, regulations, rules, ordinances, codes, decrees, injunctions, judgments, governmental restrictions or requirements, directives, orders (including consent orders), permits, and agreements with any Governmental Authority in each case, relating to the indoor or outdoor environment, natural resources, human health and safety or the presence, Release of or exposure to pollutants, contaminants, wastes, chemicals or otherwise hazardous materials, or the generation, manufacture, processing, distribution, use, treatment, storage, transport, recycling,

disposal or handling of, or the arrangement for such activities, with respect to any pollutants, contaminants, wastes, chemicals or otherwise hazardous materials.

"*Environmental Liability*" shall mean all liabilities, obligations, damages, losses, claims, actions, suits, judgments, orders, fines, penalties, fees, indemnities, expenses and costs (including administrative oversight costs, natural resource damages and remediation costs), whether known or unknown, actual or potential, vested or unvested, or contingent or otherwise, arising out of or relating to (a) any Environmental Law, (b) the generation, manufacture, processing, distribution, use, treatment, storage, transport, recycling, disposal or handling of, or the arrangement for such activities, with respect to any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the presence or Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"*Equity Contribution*" shall mean the contribution by the direct parent of VSI to VSI in cash of at least $17.5 million to make the Parent Note Repayment.

"*Equity Interests*" shall mean shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity interests in any Person and any option, warrant or other right entitling the holder thereof to purchase or otherwise acquire any such equity interest.

"*ERISA*" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time.

"*ERISA Affiliate*" shall mean any person that for purposes of Title IV of ERISA or Section 412 of the Code would be deemed at any relevant time to be a single employer or otherwise aggregated with the Borrower or any Subsidiary under Section 414(b) or (c) of the Code or Section 4001 of ERISA.

"*ERISA Event*" shall mean (a) any "*reportable event,*" as defined in Section 4043(c) of ERISA or the regulations issued thereunder, with respect to a Plan (other than an event for which the 30-day notice period is waived by the applicable regulation or otherwise), (b) a determination that any Plan is in "*at risk*" status (within the meaning of Section 430 of the Code or Section 303 of ERISA), (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan, (d) the incurrence by the Borrower, any Subsidiary or any of their respective ERISA Affiliates of any liability under Title IV of ERISA (other than non-delinquent premiums payable to the PBGC under Sections 4006 and 4007 of ERISA), (e) the termination, or the filing of a notice of intent to terminate, any Plan pursuant to Section 4041(c) of ERISA, (f) the receipt by the Borrower, any Subsidiary or any of their respective ERISA Affiliates from the PBGC or a plan administrator of any notice relating to the intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan, (g) the cessation of operations at a facility of the Borrower, any Subsidiary or any of their respective ERISA Affiliates in the circumstances described in Section 4062(e) of ERISA, (h) conditions contained in Section 303(k)(1)(A) of ERISA for imposition of a lien on the assets of the Borrower, any Subsidiary or any of their respective ERISA Affiliates shall have been met with respect to any Plan, (i) the receipt by the Borrower, any Subsidiary or any of their respective ERISA Affiliates of any notice imposing Withdrawal Liability on a Loan Party or a determining that a Multiemployer Plan is "*insolvent*" (within the meaning of Section 4245 of ERISA), in "*reorganization*" (within the meaning of Section 4241 of ERISA), or in "*endangered*" or "*critical*" status (within the meaning of Section 432 of the Code or Section 304 of ERISA), (j) the occurrence of a non-exempt "*prohibited transaction*" with respect to which the Borrower or any of the Subsidiaries is a "*disqualified person*" (within the meaning of Section 4975 of the Code) or a "*party in interest*" (within the meaning of

Section 406 of ERISA) or with respect to which the Borrower, any such Subsidiary or their respective ERISA Affiliates could otherwise be liable or (k) any Foreign Benefit Event.

"*Eurodollar Loan*" or "*Eurodollar Borrowing*" shall mean a Loan or a Borrowing consisting of Loans bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"*Events of Default*" shall have the meaning assigned to such term in Section 7.01.

"*Excess Cash Flow*" shall mean, for any period, the excess of (a) the sum of (i) Consolidated EBITDA for such period, (ii) the decrease, if any, in Current Assets minus Current Liabilities from the beginning to the end of such period and (iii) all other income or gains deducted from Net Income in the calculation of Consolidated EBITDA, to the extent representing cash received by Holdings, the Borrower or any Restricted Subsidiary during such period; over (b) the sum, without duplication, of (i) any provision for taxes based on income, capital, or profits, including state, franchise and similar taxes and foreign withholding taxes paid in cash during such period, (ii) Consolidated Interest Expense paid in cash during such period, (iii) Capital Expenditures, Permitted Acquisitions and Investments in joint ventures permitted under Section 6.05 made or consummated during such period, in each case to the extent not funded with the proceeds of long-term Indebtedness or equity and in all cases not to exceed, in the aggregate, $30,000,000, (iv) permanent repayments of Indebtedness (other than (x) mandatory prepayments of Loans pursuant to Section 2.13 and (y) optional prepayments of Loans made pursuant to Sections 2.12) during such period to the extent not funded with the proceeds of long-term Indebtedness or equity and only to the extent that the Indebtedness so prepaid by its terms cannot be reborrowed or redrawn, (v) the increase, if any, in Current Assets minus Current Liabilities from the beginning to the end of such period, (vi) the aggregate consideration required to be paid in cash by Holdings, the Borrower or any of the Restricted Subsidiaries pursuant to binding contracts entered into during such period (the "*Contract Consideration*") relating to Permitted Acquisitions or Capital Expenditures to be consummated or made within 365 days following the end of such period; *provided* that to the extent the amount actually utilized to fund such Permitted Acquisition or Capital Expenditure during such 365-day period other than from proceeds of long-term Indebtedness or equity is less than the Contract Consideration, the amount of such shortfall shall be added to the calculation of Excess Cash Flow at the end of such period, (vii) Restricted Payments paid in cash during such period pursuant to Section 6.03(b) (except to the extent deducted in calculating Consolidated Net Income and not added back in calculating Consolidated EBITDA and except to the extent financed with the proceeds of long term Indebtedness or equity) and (viii) all other expenses, losses or charges added back to Net Income in the calculation of Consolidated EBITDA to the extent representing a cash payment by Holdings, the Borrower and the Restricted Subsidiaries during such period.

"*Exchange Act*" shall mean the Securities Exchange Act of 1934, as amended.

"*Excluded Subsidiary*" shall mean, (a) any Subsidiary that is not a Wholly Owned Subsidiary, (b) any Subsidiary that (i) is a Foreign Subsidiary, (ii) is a direct or indirect Subsidiary of a Foreign Subsidiary, or (iii) a U.S. Foreign Holdco, (c) any Immaterial Subsidiary, (d) any Unrestricted Subsidiary, (e) any captive insurance company, (f) any not-for-profit subsidiary, (g) any Subsidiary that is prohibited by applicable law or regulation from guaranteeing the Obligations or that would require governmental (including regulatory) consent, approval, license or authorization in order to guarantee the Obligations, to the extent such consent, approval, license or authorization is not obtained after use of all such Subsidiary's commercially reasonable efforts (without any requirement to pay money or make concessions), (h) any Subsidiary that is prohibited from guaranteeing the Obligations by (x) contracts existing on the Closing Date or (y) if the Subsidiary is acquired after the Closing Date, contracts existing on the date of such acquisition, in each case to the extent not entered into in contemplation of the Closing

Date or such acquisition, including any secured Indebtedness assumed in connection with a Permitted Acquisition and not incurred or modified in contemplation thereof, (i) any Subsidiary to the extent that the Borrower reasonably determines that a guarantee of the Obligations by such Subsidiary would result in material adverse tax consequences or (j) any Subsidiary with respect to which the Administrative Agent and the Borrower reasonably agree that the cost or burden of obtaining a guarantee of the Obligations would outweigh the benefit to the Lenders to be afforded thereby; *provided* that no Person shall be an Excluded Subsidiary to the extent it guarantees any ABL Obligation.

"***Excluded Taxes***" shall mean, any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes (or other similar taxes imposed in lieu of net income taxes), branch profits Taxes and other similar Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 2.21(a)) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.20, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 2.20(f) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"***Existing Collateral Trust Agreement***" shall mean the Collateral Trust Agreement, dated as of September 30, 2010, by and among the Borrower, the Guarantors (as defined in the Existing Indenture) from time to time party thereto and the Collateral Trustee, as amended, amended and restated, supplemented or otherwise modified prior to the date hereof.

"***Existing Credit Agreement***" shall mean the Revolving Credit and Security Agreement dated as of September 30, 2010 among PNC Bank, National Association, the lenders party thereto, the Borrower and certain subsidiaries of the borrower as amended to the date hereof.

"***Existing Indenture***" shall have the meaning assigned to such term in the definition of "Existing Secured Notes".

"***Existing Secured Notes***" shall mean the 9.375% senior secured notes due 2015 issued pursuant to the indenture dated as of September 30, 2010 (as amended, amended and restated, supplemented or otherwise modified prior to the date hereof, the "***Existing Indenture***") between the Borrower and U.S. Bank, National Association as Trustee (the "***Trustee***").

"***Existing Secured Notes Satisfaction and Discharge***" shall mean (x) funds sufficient to redeem the Existing Secured Notes shall have been irrevocably deposited with the Trustee in respect of the Existing Secured Notes and (y) the Trustee and Collateral Trustee, as applicable, shall have acknowledged the occurrence of each of (i) the satisfaction and discharge of the Existing Indenture with respect to the Existing Secured Notes pursuant to Section 12.01 of the Indenture, (ii) the release and relief of each Guarantor (as defined in the Existing Indenture) pursuant to Section 11.05 of the Existing Indenture and (iii) the release of liens on the Collateral (as defined in the Existing Indenture) pursuant to Section 10.06 of the Indenture and Section 4.1 of the Existing Collateral Trust Agreement.

"***FATCA***" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended version or successor provision that is substantively comparable and not materially more onerous to comply with), any agreement entered into under Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement entered into in connection with the implementation of such Sections of the Code (including such amended version and successor provisions) and, in each case, any current or future regulations promulgated thereunder or official interpretations thereof.

"***Federal Funds Effective Rate***" shall mean, for any day, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"***Fee Letter***" shall mean the Amended and Restated Fee Letter dated as of October 10, 2014, between the Borrower and the Administrative Agent.

"***Fees***" shall mean the Administrative Agent Fees, Prepayment Premium and all other fees payable by the Borrower pursuant to this Agreement (including fees payable under the Fee Letter).

"***Financial Officer***" of any Person shall mean the chief financial officer, principal accounting officer, treasurer or controller of such Person.

"***Flood Laws***" shall have the meaning assigned to such term in the definition of Real Estate Collateral Requirements.

"***Foreign Benefit Event***" shall mean, with respect to any Foreign Pension Plan, (a) the existence of unfunded liabilities in excess of the amount permitted under any applicable law, (b) the failure to make required contributions or payments, under any applicable law, on or before the due date for such contributions or payments, (c) the incurrence of any liability in excess of $1,000,000 by the Borrower or any Subsidiary under applicable law on account of the complete or partial termination of a Foreign Pension Plan or the complete or partial withdrawal of any participating employer therein, or (d) the occurrence of any transaction that is prohibited under any applicable law and that has resulted or could reasonably be expected to result in the incurrence of any liability by the Borrower or any of the Subsidiaries, or the imposition on the Borrower or any of the Subsidiaries of any fine, excise tax or penalty resulting from any noncompliance with any applicable law, in each case in excess of $1,000,000.

"***Foreign Lender***" shall mean a Lender that is not a U.S. Person.

"***Foreign Pension Plan***" shall mean any benefit plan that under applicable law other than the laws of the United States or any political subdivision thereof, is required to be funded through a trust or other funding vehicle other than a trust or funding vehicle maintained exclusively by a Governmental Authority.

"***Foreign Subsidiary***" shall mean any Subsidiary of a Loan Party that is not a Domestic Subsidiary.

"***Fund***" shall mean any Person (other than a natural Person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit in the ordinary course of its activities.

"***GAAP***" shall mean United States generally accepted accounting principles applied on a basis consistent with the financial statements delivered pursuant to Section 4.01(l).

"***Government Official***" shall have the meaning assigned to such term in Section 3.20.

"***Governmental Authority***" shall mean any federal, state, local, supranational or foreign court or governmental agency, registry, authority, instrumentality or regulatory body.

"***Granting Lender***" shall have the meaning assigned to such term in Section 9.04(f).

"***Guarantee***" of or by any Person shall mean any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "***primary obligor***") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment of such Indebtedness or other obligation, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment of such Indebtedness or other obligation or (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation; *provided* that, the term "***Guarantee***" shall not include endorsements for collection or deposit in the ordinary course of business.

"***Guaranty***" shall mean (a) the Guarantee of each of the Guarantors provided pursuant to Article X and (b) any other Guarantee of the Obligations of any other Person provided pursuant to a Guaranty Supplement or other documentation in form and substance reasonably acceptable to the Administrative Agent.

"***Guaranty Supplement***" shall mean a supplement to the Guaranty, substantially in the form of Exhibit F, signed and delivered to the Administrative Agent for the purpose of adding any Person as a Guarantor.

"***Guarantors***" shall mean Holdings and the Subsidiary Guarantors.

"***Hazardous Materials***" shall mean (a) any petroleum products, derivatives or byproducts and all other hydrocarbons, coal ash, radon gas, lead, asbestos and asbestos-containing materials, toxic mold, urea formaldehyde foam insulation, polychlorinated biphenyls, infectious or medical wastes and chlorofluorocarbons and all other ozone-depleting substances, (b) any pollutant, contaminant, waste or chemical or any toxic, radioactive, ignitable, corrosive, reactive or otherwise hazardous substance, waste or material, or any substance, waste or material having any constituent elements displaying any of the foregoing characteristics or (c) any substance, waste or material that is prohibited, limited or regulated by or pursuant to or which can form the basis for liability under any Environmental Law.

"***Hedging Agreement***" shall mean any interest rate protection agreement, foreign currency exchange agreement, commodity price protection agreement or other interest or currency exchange rate or commodity price hedging arrangement.

20

"***Holdings***" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"***Immaterial Subsidiaries***" shall mean, at any time, any Subsidiarity designated as an Immaterial Subsidiary in accordance with Section 5.12(b).

"***Incremental Cap***" shall mean (i) if borrowed on or prior to the six month anniversary of the Closing Date and used to fund a Permitted Acquisition, $165,000,000 and (ii) thereafter, $50,000,000.

"***Incremental Pro Forma Basis***" shall mean, with respect to any financial ratio test hereunder, that compliance with such test at any time shall be determined (a) on a *pro forma* basis giving effect to any Permitted Incremental Equivalent Debt or Incremental Term Loans incurred at or prior to such time, (b) assuming any Incremental Term Loan Commitments established at or prior to such time are fully drawn, and (c) without netting the proceeds of Permitted Incremental Equivalent Debt or Incremental Term Loans to be incurred at such time.

"***Incremental Term Loan***" shall mean the additional term loan of any Incremental Term Loan Lender, pursuant to its Incremental Term Loan Commitment.

"***Incremental Term Loan Commitment***" shall mean the commitment of any Incremental Term Loan Lender, established pursuant to Section 2.22, to make an Incremental Term Loan to the Borrower.

"***Incremental Term Loan Lender***" shall mean a Lender with an Incremental Term Loan Commitment or an outstanding Incremental Term Loan.

"***Indebtedness***" of any Person shall mean, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property or assets purchased by such Person, (e) all obligations of such Person issued or assumed as the deferred purchase price of property or services, including all earn-out obligations (excluding trade accounts payable and accrued obligations incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, (g) all Guarantees by such Person of Indebtedness of others, (h) all Capital Lease Obligations of such Person, (i) net obligations of such Person under any Hedging Agreements, valued at the Agreement Value thereof, (j) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interests of such Person or any other Person or any warrants, rights or options to acquire such equity interests, valued, in the case of redeemable preferred interests, at the greater of its voluntary or involuntary liquidation preference *plus* accrued and unpaid dividends, (k) all obligations of such Person as an account party in respect of letters of credit and (l) all obligations of such Person in respect of bankers' acceptances. The Indebtedness of any Person shall include the Indebtedness of any partnership in which such Person is a general partner.

"***Indemnified Taxes***" shall mean (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"***Indemnitee***" shall have the meaning assigned to such term in Section 9.05(b).

"**_Information_**" shall have the meaning assigned to such term in Section 9.17.

"**_Intercompany Debt_**" shall mean any Indebtedness, now existing or hereafter incurred, owed by Holdings, the Borrower or any Restricted Subsidiary to Holdings, the Borrower or any other Restricted Subsidiary.

"**_Intercompany Loan_**" shall have the meaning assigned to such term in Section 6.05(h).

"**_Intercompany Note_**" shall mean a promissory note evidencing an Intercompany Loan, duly executed and delivered in form reasonably satisfactory to the Administrative Agent in its reasonable discretion pursuant to which, among other things, the Intercompany Loan evidenced by such Intercompany Note owed by any Loan Party is subordinated to the Obligations.

"**_Intercreditor Agreements_**" shall mean, collectively, the ABL Intercreditor Agreement and any Pari Intercreditor Agreement.

"**_Interest Election Request_**" shall mean a request by the Borrower in accordance with the terms of Section 2.10 and substantially in the form of Exhibit G or such other form as shall be approved by the Administrative Agent.

"**_Interest Payment Date_**" shall mean (a) with respect to any ABR Loan the last Business Day of each March, June, September and December and (b) with respect to any Eurodollar Borrowing, the last day of the Interest Period applicable to such Borrowing and, in the case of a Eurodollar Borrowing with an Interest Period of more than three months' duration, each day that would have been an Interest Payment Date had successive Interest Periods of three months' duration been applicable to such Borrowing.

"**_Interest Period_**" shall mean, with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, two , three or six months (or, to the extent approved by all relevant Lenders, 12 months) thereafter, as the Borrower may elect; _provided_ that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (b) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall, subject to clause (c), end on the last Business Day of the calendar month at the end of such Interest Period and (c) no Interest Period for any Borrowing shall extend beyond the applicable Maturity Date. Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"**_Investment_**" shall mean, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or Indebtedness or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of Indebtedness of, or purchase or other acquisition of any other Indebtedness or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person or (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person. For purposes of compliance with Section 6.05,

the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment but giving effect to any returns or distributions of capital or repayment of principal actually received in cash by such Person with respect thereto, whether by disposition, return on capital, dividend or otherwise.

"***Investment Company Act***" shall mean the Investment Company Act of 1940, as amended from time to time.

"***IP Rights***" shall have the meaning assigned to such term in Section 3.18.

"***IRS***" shall mean the United States Internal Revenue Service or any successor entity thereto.

"***Junior Indebtedness***" shall mean Indebtedness of the Borrower and its Restricted Subsidiaries that is by its terms (i) unsecured, (ii) subordinated in right of payment to all or any portion of the Obligations or (iii) secured by a lien that is subordinated to the liens securing the Obligations.

"***Latest Maturity Date***" shall mean, at any time, the latest maturity or expiration date applicable to any Loan or Commitment (or, if so specified, applicable to the specified Loans or Commitments of the Class thereof) hereunder at such time.

"***Lenders***" shall mean (a) the Persons listed on Schedule 2.01 (other than any such Person that has ceased to be a party hereto pursuant to an Assignment and Acceptance) and (b) any Person that has become a party hereto as a Lender pursuant to an Assignment and Acceptance, Additional Credit Extension Amendment or otherwise in accordance with this Agreement.

"***LIBO Rate***" shall mean, with respect to any Eurodollar Borrowing for any Interest Period therefor, the rate per annum equal to the arithmetic mean (rounded to the nearest 1/100th of 1%) of the offered rates for deposits in Dollars with a term comparable to such Interest Period that appears on Reuters Screen LIBOR01 Page (or such other page as may replace such page on such service for the purpose of displaying the rates at which Dollar deposits are offered by leading banks in the London interbank deposit market as designated by the Administrative Agent from time to time) at approximately 11:00 a.m., London, England time, on the second full Business Day preceding the first day of such Interest Period; *provided*, *however*, that (i) if no comparable term for an Interest Period is available, the LIBO Rate shall be determined using the weighted average of the offered rates for the two terms most nearly corresponding to such Interest Period and (ii) if Reuters Screen LIBOR01 Page shall at any time no longer exist, "**LIBOR Rate**" shall mean, with respect to each day during each Interest Period pertaining to Eurodollar Borrowings comprising part of the same Borrowing, the rate per annum equal to the rate at which the Administrative Agent is offered deposits in Dollars at approximately 11:00 a.m., London, England time, two Business Days prior to the first day of such Interest Period in the London interbank market for delivery on the first day of such Interest Period for the number of days comprised therein and in an amount comparable to its portion of the amount of such Eurodollar Borrowing to be outstanding during such Interest Period. "**Reuters Screen LIBOR01 Page**" shall mean the display designated on the Reuters 3000 Xtra Page (or such other page as may replace such page on such service for the purpose of displaying the rates at which Dollar deposits are offered by leading banks in the London interbank deposit market).

"***Lien***" shall mean (a) with respect to any asset, (i) any mortgage, deed of trust, lien (statutory or other), pledge, hypothecation, assignment, deposit arrangement, encumbrance, license, charge preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever in or on such asset (including any conditional sale or other title retention agreement, capital lease, any easement,

right of way or other encumbrance on title to real property) and (ii) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same effect as any of the foregoing) relating to such asset and (b) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"**_Loan Documents_**" shall mean this Agreement, any amendments to this Agreement, the Security Documents, the Intercreditor Agreements, the Notes, the Fee Letter, any Additional Credit Extension Amendment and any other document executed in connection with the foregoing.

"**_Loan Parties_**" shall mean Holdings, the Borrower and the Subsidiary Guarantors.

"**_Loans_**" shall mean the Term Loans, any Incremental Term Loans and any other loan made hereunder.

"**_Management Agreement_**" shall mean the Professional Services Agreement, dated December 10, 2007, by and between the Borrower and the Sponsor, as amended to the date hereof.

"**_Margin Stock_**" shall have the meaning assigned to such term in Regulation U.

"**_Market Disruption Loans_**" shall mean Loans the rate of interest applicable to which is based upon the Market Disruption Rate, and the Applicable Margin with respect thereto shall be the same as the Applicable Margin applicable to Eurodollar Loans; _provided_ that, other than with respect to the rate of interest and Applicable Margin applicable thereto, Market Disruption Loans shall for all purposes hereunder and under the other Loan Documents be treated as ABR Loans.

"**_Market Disruption Rate_**" shall mean, for any day, a fluctuating rate _per annum_ (rounded upwards, if necessary, to the nearest 1/100th of 1.00%) equal to, in the reasonable discretion of the Administrative Agent, either (i) the Alternate Base Rate for such day or (ii) the rate for such day reasonably determined by the Administrative Agent to be the cost of funds of representative participating members in the interbank eurodollar market selected by the Administrative Agent (which may include Lenders) for maintaining loans similar to the relevant Market Disruption Loans.  Any change in the Market Disruption Rate shall be effective as of the opening of business on the effective day of any change in the relevant component of the Market Disruption Rate.  Notwithstanding the foregoing, if the "Market Disruption Rate" as determined in accordance with the immediately preceding sentences is less than the percentage specified in the proviso of the definition of "Adjusted LIBO Rate," then for all purposes of this Agreement and the other Loan Documents, the "Market Disruption Rate" shall be deemed equal to such percentage for such Interest Period.

"**_Material Adverse Effect_**" shall mean any event, change or condition that, individually or in the aggregate, has had, or would reasonably be expected to have (a) a material and adverse effect on the business, assets, financial condition or results of operations of the Borrower and the Restricted Subsidiaries, taken as a whole, (b) a material and adverse effect on the rights and remedies of the Administrative Agent, Collateral Agent and the Lenders under the Loan Documents, or (c) a material and adverse effect on the ability of the Borrower or any Guarantor to perform its material obligations under the Loan Documents.

"**_Material Subsidiary_**" shall mean the Subsidiaries set forth on Schedule 1.01(c) and each other Subsidiary other than an Immaterial Subsidiary.

"*Maturity Date*" shall mean October 31, 2019 (or if such day is not a Business Day, the next preceding Business Day).

"*Maximum Rate*" shall have the meaning assigned to such term in Section 9.08.

"*Moody's*" shall mean Moody's Investors Service, Inc., or any successor thereto.

"*Mortgaged Properties*" shall mean, initially, the real properties of the Loan Parties specified on Schedule 1.01(d), and shall include each other parcel of real property and improvements thereto with respect to which a Mortgage is granted pursuant to Section 5.11.

"*Mortgages*" shall mean the mortgages, deeds of trust, deeds to secure debt, leasehold mortgages, leasehold deeds of trust or leasehold deeds to secure debt and other similar security documents delivered pursuant to clause (f) of Section 4.01 or pursuant to Section 5.11, each in form reasonably acceptable to the Administrative Agent, including as may be required to account for local law matters.

"*Multiemployer Plan*" shall mean any multiemployer plan as defined in Section 4001(a)(3) of ERISA, which is contributed to by (or to which there is or may be an obligation to contribute of) the Borrower or any Subsidiary or with respect to which the Borrower or any Subsidiary has any liability (including on account of an ERISA Affiliate).

"*Net Cash Proceeds*" shall mean:

(a)        100% of the cash proceeds actually received by Holdings, the Borrower or any of the Restricted Subsidiaries (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise and including casualty insurance settlements and condemnation awards, but in each case only as and when received) from any Asset Sale or Recovery Event, net of (i) attorneys' fees, accountants' fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses and brokerage, consultant and other customary fees and expenses actually incurred in connection therewith, (ii) the principal amount of any Indebtedness that is secured by a Lien (other than a Lien on the Collateral that ranks *pari passu* with or is subordinated to the Liens securing the Obligations) on the asset subject to such Asset Sale or Recovery Event and that is required to be repaid in connection with such Asset Sale or Recovery Event (other than Indebtedness under the Loan Documents), together with any applicable premium, penalty, interest and breakage costs, (iii) in the case of any Asset Sale or Recovery Event by a non-Wholly Owned Restricted Subsidiary, the *pro rata* portion of the Net Cash Proceeds thereof (calculated without regard to this clause (iii)) attributable to minority interests and not available for distribution to or for the account of Holdings, the Borrower or any of the Wholly Owned Restricted Subsidiaries as a result thereof, (iv) Taxes paid or reasonably estimated to be payable as a result thereof, (v) the amount of any reasonable reserve established in accordance with GAAP against any adjustment to the sale price or any liabilities (other than any taxes deducted pursuant to clause (i) above) (x) related to any of the applicable assets and (y) retained by Holdings, the Borrower or any of the Restricted Subsidiaries including, without limitation, pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations (*provided however*, that the amount of any subsequent reduction of such reserve (other than in connection with a payment in respect of any such liability) shall be deemed to be Net Cash Proceeds of such Asset Sale or Recovery Event occurring on the date of such reduction) and (vi) any funded escrow established pursuant to the documents evidencing any such sale or disposition to secure any indemnification obligations or adjustments to the purchase price associated with any such sale or disposition (provided that to the extent that any amounts are released from such escrow to Holdings,

the Borrower or any Restricted Subsidiary, such amounts net of any related expenses shall constitute Net Cash Proceeds); and

(b)     100% of the cash proceeds from the incurrence, issuance or sale by Holdings, the Borrower or any of the Restricted Subsidiaries of any Indebtedness, net of all Taxes paid or reasonably estimated to be payable as a result thereof and fees (including investment banking fees and discounts), commissions, costs and other expenses, in each case incurred in connection with such incurrence, issuance or sale.

"*Net Income*" means, with respect to any Person, the net income (loss) of such Person, determined in accordance with GAAP and before any reduction in respect of Preferred Stock dividends.

"*Net Total Leverage Ratio*" shall mean, with respect to the Borrower and the Restricted Subsidiaries on a consolidated basis, as of any date, the ratio of (a) Consolidated Net Indebtedness of the Borrower on the last day of the most recently ended Test Period *to* (b) Consolidated EBITDA of the Borrower for the most recently ended Test Period.

"*No Undisclosed Information Representation*" shall mean a representation by a Person that such Person is not in possession of any Undisclosed Information.

"*Non-Contingent Obligation*" shall mean, at any time, any Obligation or any other obligation, including any Guarantee (or a portion of any of the foregoing) that is not a Contingent Obligation at such time.

"*Non-Debt Fund Affiliate*" shall mean any Sponsor and any other Affiliate of Holdings or the Borrower including Holdings, the Borrower or any of the Subsidiaries, but excluding (a) any Debt Fund Affiliate and (b) any natural person.

"*Notes*" shall mean any promissory notes evidencing the Loans, executed and delivered pursuant to Section 2.04(e) and in the form of Exhibit I.

"*Obligations*" shall mean all principal of all Loans, all interest (including Post-Petition Interest) on such Loans and all other amounts now or hereafter payable by the Borrower and the other Loan Parties pursuant to the Loan Documents.

"*Other Applicable Indebtedness*" shall have the meaning assigned to such term in Section 2.13(b).

"*Other Connection Taxes*" shall mean, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"*Other Taxes*" shall mean all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, recording, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.21(a)).

"*Parent*" shall mean VSI Holdings LLC, a Delaware limited liability company.

"*Parent Note Repayment*" shall mean the repayment and/or redemption in full of that certain promissory note, dated as of December 10, 2007, by and between VSI, as payor, and Ares Distressed Securities Fund, L.P., as payee, in an original aggregate principal amount of $5,000,000.

"*Pari Intercreditor Agreement*" shall mean any first lien intercreditor agreement or collateral trust agreement among the Loan Parties, the Collateral Agent, the Administrative Agent and an agent or a trustee (acting on behalf of the holders of any Indebtedness that is secured by the Collateral on a *pari passu* basis with the Liens securing the Obligations) reflecting the *pari passu* status of the Liens securing such Indebtedness (which may be in the form of a collateral trust agreement or the Collateral Agreement (including any joinder thereto)).

"*Participant*" shall have the meaning assigned to such term in Section 9.04(d).

"*Participant Register*" shall have the meaning assigned to such term in Section 9.04(d).

"*PBGC*" shall mean the Pension Benefit Guaranty Corporation referred to and defined in ERISA.

"*Perfection Certificate*" shall mean the Perfection Certificate substantially in the form of Exhibit J, prepared, signed and delivered by the Borrower to the Administrative Agent.

"*Permitted Acquired Debt*" shall have the meaning assigned to such term in Section 6.04(g)

"*Permitted Acquisition*" shall have the meaning assigned to such term in Section 6.05(l).

"*Permitted Encumbrances*" shall mean with respect to any Mortgaged Property, such exceptions to title as are set forth as exceptions in the title policy delivered in connection with the Mortgage delivered with respect to such Mortgaged Property, all of which exceptions must be reasonably acceptable to the Administrative Agent in its reasonable discretion.

"*Permitted Group*" means any group of investors that is deemed to be a "person" (as that term is used in Section 13(d)(3) of the Exchange Act) at any time prior to the Borrower's initial public offering of common stock, by virtue of the limited liability company agreement of the Parent, as the same may be amended, modified or supplemented from time to time; provided that the Sponsor and its Related Parties beneficially owns (together with its Affiliates) at least 50.1% of the Equity Interests of the Borrower that is beneficially owned by such group of investors.

"*Permitted Incremental Equivalent Debt*" shall mean any Indebtedness incurred by the Borrower in the form of one or more series of secured or unsecured debt securities or loans; *provided* that (a) the final maturity date of any such Indebtedness shall be no earlier than the date that is 91 days following the Latest Maturity Date, (b) the weighted average life to maturity of such Indebtedness shall be no shorter than the weighted life to maturity of the Term Loans, (c) such Indebtedness shall be either (i) solely in the case of debt securities, secured by the Collateral on a *pari passu* basis (but without regard to the control of remedies) with the Obligations and shall not be secured by any property or assets of Holdings, the Borrower or any Subsidiary other than Collateral, and a Senior Representative acting on behalf of the holders of such Indebtedness shall have become party to, or otherwise subject to the provisions of a Pari Intercreditor Agreement reasonably satisfactory to the Administrative Agent reflecting the *pari passu* status of the Liens securing such Indebtedness (it being understood that a joinder agreement to the Collateral Agreement in substantially the form of Annex 5 thereto is satisfactory), (ii) secured by the

Collateral on a junior basis (including with respect to the control of remedies) with the Obligations and shall not be secured by any property or assets of Holdings, the Borrower or any Subsidiary other than Collateral, and a Senior Representative acting on behalf of the holders of such Indebtedness shall have become party to, or otherwise subject to, the provisions of a junior lien intercreditor agreement or collateral trust agreement reasonably satisfactory to the Administrative Agent reflecting the second (or more junior) lien status of the Liens securing such Indebtedness or (iii) unsecured, and (d) none of the obligors or guarantors with respect to such Indebtedness shall be a Person that is not a Loan Party, (e) the terms and conditions (excluding any subordination, pricing, fees, rate floors, discounts, premiums and optional prepayment or redemption terms) of such Indebtedness, taken as a whole, shall not be materially less favorable to the Loan Parties than this Agreement or to the Persons providing such Indebtedness than those applicable to the Term Lenders, except for covenants or other provisions applicable only to periods after the Latest Maturity Date, and such Indebtedness shall not be entitled to share on a greater than *pro rata* basis in any mandatory prepayments required hereunder.

"*Permitted Liens*" shall have the meaning assigned to such term in Section 6.01.

"*Permitted Refinancing*" shall mean, with respect to any Person, any modification, refinancing, refunding, renewal or extension of any Indebtedness of such Person; *provided* that (a) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, refunded, renewed or extended except by an amount equal to any interest capitalized in connection with, any premium or other reasonable amount paid, and fees and expenses reasonably incurred, in connection with such modification, refinancing, refunding, renewal or extension, (b) such modification, refinancing, refunding, renewal or extension has a final maturity date equal to or later than the final maturity date of, and has a weighted average life to maturity equal to or longer than the weighted average life to maturity of, the Indebtedness being modified, refinanced, refunded, renewed or extended, (c) if the Indebtedness being modified, refinanced, refunded, renewed or extended is subordinated in right of payment to the Obligations, such modification, refinancing, refunding, renewal or extension is subordinated in right of payment to the Obligations on terms, taken as a whole, that are not more favorable to the Persons providing such Indebtedness being modified, refinanced, refunded, renewed or extended, (d) at the time thereof, no Default shall have occurred and be continuing, (e) if such Indebtedness being modified, refinanced, refunded, renewed or extended is secured, the terms and conditions relating to collateral of any such modified, refinanced, refunded, renewed or extended Indebtedness, taken as a whole, are not more favorable to the Persons providing such Indebtedness than those applicable to the Lenders with respect to the Collateral for the Indebtedness being modified, refinanced, refunded, renewed or extended (and the Liens on any Collateral securing any such modified, refinanced, refunded, renewed or extended Indebtedness shall have the same (or lesser) priority relative to the Liens on the Collateral securing the Obligations), (f) the terms and conditions (excluding any subordination, pricing, fees, rate floors, discounts, premiums and optional prepayment or redemption terms) of any such modified, refinanced, refunded, renewed or extended Indebtedness, taken as a whole, shall not be materially less favorable to the Loan Parties than this Agreement, except for covenants or other provisions applicable only to periods after the Latest Maturity Date, (g) such modification, refinancing, refunding, renewal or extension is incurred and guaranteed only by the Persons who are the obligors on the Indebtedness being modified, refinanced, refunded, renewed or extended and (h) such modification, refinancing, refunding, renewal or extension is, in the case of any ABL Obligations, permitted by the ABL Intercreditor Agreement.

"*Person*" shall mean any natural person, corporation, business trust, joint venture, association, company, limited liability company, partnership, Governmental Authority or other entity.

28

"***Plan***" shall mean an "employee benefit plan" as defined in Section 3(3) of ERISA (other than a Multiemployer Plan) that is subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA and is maintained or contributed to by the Borrower or any Subsidiary or with respect to which the Borrower or any Subsidiary has any liability (including on account of an ERISA Affiliate).

"***Platform***" shall have the meaning assigned to such term in Section 9.01.

"***Post-Petition Interest***" shall mean any interest that accrues after the commencement of any case, proceeding or other action relating to the bankruptcy, insolvency or reorganization of any one or more of the Grantors (or would accrue but for the operation of applicable Debtor Relief Laws), whether or not such interest is allowed or allowable as a claim in any such proceeding.

"***Preferred Stock***" means any Equity Interest with preferential rights of payment of dividends or upon liquidation, dissolution, or winding up.

"***Prepayment Premium***" shall mean the premium payable pursuant to Section 2.05(b).

"***Pro Forma Basis***" shall mean, for purpose of calculating any financial ratio or tests such calculation shall be made in accordance with Section 1.03.

"***Pro Forma Transaction***" shall mean any Investment that results in a Person becoming a Subsidiary, any Permitted Acquisition, any Disposition that results in a Subsidiary ceasing to be a Subsidiary, any Investment constituting an acquisition of assets constituting a business unit, line of business or division of another Person or a Disposition of a business unit, line of business or division of the Borrower or any Subsidiary, in each case whether by merger, consolidation, amalgamation or otherwise and any other transaction that by the terms of this Agreement requires a financial ratio or test to be determined on a "Pro Forma Basis" or to be given "*pro forma* effect".

"***Projections***" shall mean the projections, estimates or other forward looking statements of consolidated balance sheet, related statement of income and cash flow of the Borrower made available to the Administrative Agent and the Lenders on or prior to the Closing Date.

"***Public Lender***" shall have the meaning assigned to such term in Section 9.01.

"***Qualified Equity Interests***" shall mean any Equity Interests that are not Disqualified Equity Interests.

"***Qualified Public Offering***" shall mean the initial underwritten public offering of common Equity Interests of Holdings or any direct or indirect parent company of Holdings pursuant to an effective registration statement filed with the Securities and Exchange Commission in accordance with the Securities Act.

"***Real Estate Collateral Requirements***" shall mean the requirement that on the Closing Date, with respect to the Mortgaged Properties listed on Schedule 1.01(d) and thereafter as required by Section 5.11, the Administrative Agent shall have received a Mortgage for each Mortgaged Property in form and substance reasonably acceptable to the Administrative Agent and suitable for recording or filing, together, with respect to each Mortgage for any property located in the United States, the following documents: (a) a fully paid policy of title insurance  (i) in a form approved by the Administrative Agent insuring the Lien of the Mortgage encumbering such property as a valid first priority Lien, subject only to exceptions to

title reasonably acceptable to the Administrative Agent, (ii) in an amount reasonably satisfactory to the Administrative Agent, (iii) issued by a nationally recognized title insurance company reasonably satisfactory to the Administrative Agent (the "***Title Company***") and (iv) that includes (A) such coinsurance and direct access reinsurance as the Administrative Agent may deem necessary or desirable and (B) such endorsements or affirmative insurance reasonably required by the Administrative Agent and available in the applicable jurisdiction (including, if applicable without limitation, endorsements on matters relating to usury, zoning, variable rate, address, separate tax lot, subdivision, tie in or cluster, contiguity, access and so-called comprehensive coverage over covenants and restrictions), (b) with respect to any property located in any jurisdiction in which a zoning endorsement is not available (or for which a zoning endorsement is not available at a premium that is not excessive), if requested by the Administrative Agent, a zoning compliance letter from the applicable municipality or a zoning report from Planning and Zoning Resource Corporation (or another person acceptable to the Administrative Agent), in each case satisfactory to the Administrative Agent, (c) upon the request of the Administrative Agent, a survey certified to Administrative Agent and the Title Company in form and substance satisfactory to the Administrative Agent, (d) upon the request of the Administrative Agent, an appraisal complying with the requirements of the Financial Institutions Reform, Recovery and Enforcement Act of 1989, by a third-party appraiser selected by the Administrative Agent, (e) an opinion of local counsel reasonably acceptable to the Administrative Agent and in form and substance satisfactory to the Administrative Agent, (f) if requested by any Lender, no later than three Business Days prior to the delivery of the Mortgage, the following documents and instruments, in order to comply with the National Flood Insurance Reform Act of 1994 and related legislation (including the regulations of the Board of Governors of the Federal Reserve System) ("***Flood Laws***"): (A) a completed standard flood hazard determination form and (B) if the improvement(s) to the improved real property is located in a special flood hazard area, a notification to the Borrower ("***Borrower Notice***") and, if applicable, notification to the Borrower that flood insurance coverage under the National Flood Insurance Program ("***NFIP***") is not available because the community does not participate in the NFIP, documentation evidencing the Borrower's receipt of the Borrower Notice and (C) if the Borrower Notice is required to be given and flood insurance is available in the community in which the property is located, a copy of the flood insurance policy, the Borrower's application for a flood insurance policy plus proof of premium payment, a declaration page confirming that flood insurance has been issued, or such other evidence of flood insurance satisfactory to the Administrative Agent, (g) upon the reasonable request of the Administrative Agent, Phase I environmental site assessment reports prepared in accordance with the current ASTM E1527 standard ("***Phase Is***") (to the extent not already provided) and reliance letters for such Phase Is (which Phase Is and reliance letters shall be in form and substance reasonably acceptable to the Administrative Agent) and any other environmental information as the Administrative Agent shall reasonably request and (h) such other instruments and documents (including subordination or *pari passu* confirmations, consulting engineer's reports and lien searches) as the Administrative Agent shall reasonably request and with respect to each Mortgage for any property located outside the United States, equivalent documents available in the applicable jurisdiction and required by the Administrative Agent.

"***Recipient***" shall mean (a) the Administrative Agent and (b) any Lender.

"***Recovery Event***" shall mean any event that gives rise to the receipt by Holdings, Borrower or any Restricted Subsidiary of any cash insurance proceeds or condemnation awards payable by reason of casualty, theft, loss, physical destruction, damage, taking, condemnation or any other similar event with respect to any property or assets of Holdings, the Borrower or any Restricted Subsidiary; *provided* in each case that each Recovery Event shall be deemed to occur only if the Net Cash Proceeds therefrom is greater than or equal to $2,500,000; *provided further* that so long as the ABL Obligations have not been

satisfied in full, Net Cash Proceeds received with respect to any property or assets comprising the ABL Priority Collateral shall be excluded.

"*Refinancing*" shall mean the repayment in full of all amounts due or outstanding under, or in respect of, and the termination of (or, in the case of the Existing Credit Agreement, the amendment or amendment and restatement of), the Existing Secured Notes and Existing Credit Agreement.

"*Register*" shall have the meaning assigned to such term in Section 9.04(c).

"*Registered Equivalent Notes*" shall mean, with respect to any note originally issued in a Rule 144A or other private placement transaction under the Securities Act, substantially identical notes (having the same guarantees) issued in a dollar-for-dollar exchange therefore pursuant to an exchange offer registered with the SEC.

"*Regulation U*" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"*Rejection Notice*" shall have the meaning assigned to such term in Section 2.13(g).

"*Related Agreements*" shall mean the Acquisition Agreement, the Loan Documents, the ABL Loan Documents, the Management Agreement and documentation relating to Permitted Incremental Equivalent Debt (and Permitted Refinancing thereof).

"*Related Parties*" shall mean, with respect to any specified Person, such Person's Affiliates and the respective officers, directors (including directors or authorized signatories of the general partner of any Person), employees, agents, advisors, representatives, controlling persons, members, partners, successors and permitted assigns of such Person and such Person's Affiliates.

"*Release*" shall mean any actual or threatened release, spill, emission, leaking, dumping, injection, pouring, pumping, deposit, disposal, discharge, dispersal, leaching or migration into or through the indoor or outdoor environment, including the air, soil and ground and surface water or into, through, within or upon any building, structure, facility or fixture.

"*Release Conditions*" shall mean the following conditions (a) all Commitments under this Agreement shall have expired or been terminated, (b) all Non-Contingent Obligations shall have been paid in full and (c) no Contingent Obligation (other than contingent indemnification and expense reimbursement obligations as to which no claim shall have been asserted) shall remain outstanding.

"*Repayment Date*" shall have the meaning assigned to such term in Section 2.11(a).

"*Repricing Transaction*" shall mean (a) any voluntary or mandatory prepayment of all or a portion of the Loans from the proceeds of Indebtedness (including any additional term loans incurred hereunder) incurred by Holdings, the Borrower or any Subsidiary having a lower All-in Yield than the Loans, (b) any amendment hereto (including, for the avoidance of doubt, any Additional Credit Extension Amendment) that has the effect of reducing the All-in Yield then applicable to all or any portion of the Loans and (c) any assignment permitted under Section 2.21(a) of all or any portion of the Loans of any Lender in connection with any amendment under clause (b) of this definition; *provided*, in each case, that in no event shall any such voluntary or mandatory prepayment of the Loans, or amendment hereto in connection with a Change of Control or an acquisition, Investment or other transaction, in each case permitted by the Loan Documents, constitute a Repricing Transaction.

"***Required Lenders***" shall mean, at any time, Lenders having Loans and Commitments representing more than 50% of the sum of all Loans outstanding and unused Commitments at such time; *provided* that Section 9.04(i) shall apply to Loans held by Non-Debt Fund Affiliates and Loans held by Debt Fund Affiliates.

"***Resignation Effective Date***" shall have the meaning assigned to such term in Section 8.06.

"***Responsible Officer***" of any Person shall mean any executive officer or Financial Officer of such Person and any other officer or similar official thereof responsible for the administration of the obligations of such Person in respect of this Agreement.

"***Restricted***" shall mean, when referring to cash or Cash Equivalents of the Borrower or any Restricted Subsidiary, that such cash or Cash Equivalents appears (or would be required to appear) as "restricted" on a consolidated balance sheet of the Borrower or such Restricted Subsidiary.

"***Restricted Payment***" shall mean any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in Holdings, the Borrower or any Restricted Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Equity Interests in Holdings, the Borrower or any Restricted Subsidiary.

"***Restricted Proceeds***" shall have the meaning assigned to such term in Section 2.13(h).

"***Restricted Subsidiary***" shall mean any Subsidiary other than an Unrestricted Subsidiary.

"***Returns***" shall have the meaning assigned to such term in Section 3.09.

"***RMB***" shall mean *renminbi*, the lawful money of the People's Republic of China.

"***S&P***" shall mean Standard & Poor's Ratings Service or any successor thereto.

"***Sale of Guarantor***" shall have the meaning assigned to such term in Section 10.01(e).

"***Sanctioned Person***" shall mean any person that (i) (x) is publicly identified on the most current list of "Specially Designated Nationals and Blocked Persons" published by OFAC, (y) is publicly identified on the most current list of "Foreign Sanctions Evaders List" published by OFAC or (z) is a national of or resides, is organized or chartered, or has a place of business in a country or territory that is subject to any Sanctions (including Cuba, Iran, North Korea, Sudan and Syria), (ii) is otherwise subject to or the target of any Sanctions, or (iii) is owned or controlled by (including by virtue of such person being a director or owning voting securities), or acts, directly or indirectly, for or on behalf of, any person described in clause (i) or (ii) above or a foreign government that is the subject or target of Sanctions.

"***Sanctions***" shall mean sanctions administered or enforced by the U.S. Department of the Treasury's Office of Foreign Assets Control or the U.S. State Department, the United Nations Security Council, the European Union, Her Majesty's Treasury, or other relevant sanctions authority.

"***Sanctions Laws***" shall mean any requirements of law related to counter-terrorism and economic sanctions, including the USA PATRIOT Act, The Currency and Foreign Transactions Reporting Act (31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951-1959), the Trading With the Enemy

Act (50 U.S.C. §§ 1 et seq.), the International Emergency Economic Powers Act (50 U.S.C. §§ 1701 et seq.), any Sanctions and, in each case, their implementing rules and regulations.

"*SEC*" shall mean the Securities and Exchange Commission or any successor entity thereto.

"*Secured Parties*" shall mean (a) the Administrative Agent, (b) the Lenders and (c) the other holders from time to time of the Obligations.

"*Securities Act*" shall mean the Securities Act of 1933, as amended.

"*Security Documents*" shall mean the Mortgages, the Collateral Agreement (including any joinder agreements thereto), any Guaranty Supplement, the Perfection Certificate and each of the security agreements, mortgages and other instruments and documents executed and delivered pursuant to any of the foregoing or pursuant to Section 5.11.

"*Senior Representative*" shall mean, with respect to any Indebtedness, the trustee, administrative agent, collateral agent, security agent or similar agent under the indenture or other agreement pursuant to which such Indebtedness is issued, incurred or otherwise obtained, as the case may be, and each of their successors in such capacities.

"*Solvent*" shall mean, (a) the sum of the liabilities (including contingent liabilities) of the Borrower and the Subsidiaries, on a consolidated basis, does not exceed the present fair saleable value of the assets (on a going concern basis) of the Borrower and the Subsidiaries, on a consolidated basis, (b) the present fair saleable value of the assets (on a going concern basis) of the Borrower and the Subsidiaries, on a consolidated basis, is greater than the total amount that will be required to pay the probable liabilities (including contingent liabilities) of the Borrower and the Subsidiaries as they become absolute and matured, (c) the capital of the Borrower and the Subsidiaries, on a consolidated basis, is not unreasonably small in relation to their business as contemplated on the date hereof and (d) the Borrower and the Subsidiaries, on a consolidated basis, have not incurred and do not intend to incur, or believe that they will incur, debts or liabilities, including current obligations beyond their ability to pay such debts or other liabilities as they become due (whether at maturity or otherwise) in the ordinary course of business.

"*Specified Default*" shall mean a Default or Event of Default arising under clause (a) or (e) of Section 7.01.

"*Sponsor*" shall mean, individually and collectively, Wind Point Partners VI, L.P., a Delaware limited partnership, and other funds controlled by or under common control with Wind Point Partners VI, L.P. (and excluding, for the avoidance of doubt, any portfolio company of the foregoing).

"*Sponsor Affiliate*" shall mean, with respect to any Sponsor, (a) any fund or investment vehicle, that (i) is organized, administered or managed by such Sponsor, or an Affiliate of such Sponsor, or any entity that administers or manages such Sponsor or (ii) has the same principal fund advisor as such Sponsor, but, in each case, not including such Sponsor's portfolio companies and (b) any other Person directly or indirectly controlling (including, but not limited to, all directors and officers of Sponsor), controlled by, or under direct or indirect common control with, such Sponsor (but excluding any portfolio company of such Sponsor); *provided* that any Sponsor shall be deemed to control another Person if such Sponsor possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, by contract or otherwise.

"*SPV*" shall have the meaning assigned to such term in Section 9.04(f).

"*Statutory Reserves*" shall mean, for any day during any Interest Period for any Eurodollar Borrowing, the average maximum rate at which reserves (including any marginal, supplemental or emergency reserves) are required to be maintained, during such Interest Period under regulations issued from time to time (including "Regulation D," issued by the Board of Governors of the Federal Reserve Bank of the United States (the "**Reserve Regulations**") by member banks of the United States Federal Reserve System in New York City with deposits exceeding one billion Dollars against Eurocurrency funding liabilities (currently referred to as "Eurocurrency liabilities" (as such term is used in Regulation D)).  Eurodollar Borrowings shall be deemed to constitute Eurodollar liabilities and to be subject to such reserve requirements without benefit of or credit for proration, exceptions or offsets which may be available from time to time to any Lender under the Reserve Regulations.

"*subsidiary*" shall mean, with respect to any Person (herein referred to as the "*parent*"), any corporation, partnership, limited liability company, association or other business entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or more than 50% of the general partnership interests are, at the time any determination is being made, owned, Controlled or held, or (b) that is, at the time any determination is made, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"*Subsidiary*" shall mean any subsidiary of the Borrower.

"*Subsidiary Guarantor*" shall mean (a) each Subsidiary listed on Schedule 1.01(a) and (b) each other Subsidiary that becomes a Guarantor pursuant to a Guaranty Supplement or other documentation in form and substance reasonably acceptable to the Administrative Agent. Subject to the proviso in the definition of the term "Excluded Subsidiary", no Foreign Subsidiary, direct or indirect Subsidiary of a Foreign Subsidiary or U.S. Foreign Holdco shall be required to become a Subsidiary Guarantor.

"*Taxes*" shall mean any and all present or future taxes, levies, imposts, duties, deductions, assessments, fees, charges or withholdings (including backup withholding) imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"*Term Lender*" shall mean a Lender with a Term Loan Commitment or an outstanding Term Loan.

"*Term Loan Commitment*" shall mean, with respect to each Lender, the commitment of such Lender to make Term Loans hereunder as set forth on Schedule 2.01, or in the Assignment and Acceptance pursuant to which such Lender assumed its Term Loan Commitment, as applicable, as the same may be (a) terminated pursuant to Section 2.09 and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 9.04.

"*Term Loans*" shall mean the term loans made by the Lenders to the Borrower pursuant to Section 2.01.

"*Test Period*" shall mean, on any date, the most recently ended four consecutive fiscal quarters for which financial statements have been delivered to the Administrative Agent and the Lenders pursuant to Section 5.01(b) or (c).

"*Threshold Amount*" shall mean $10,000,000.

"**Title Company**" shall have the meaning assigned to such term in the definition of Real Estate Collateral Requirements.

"**Transaction Costs**" shall mean the fees, costs and expenses incurred in connection with the Transactions.

"**Transactions**" shall mean collectively, (a) the execution and delivery of, and the performance under, the Loan Documents, in each case by the Loan Parties party thereto (as of the Closing Date or the date set forth on Schedule 5.14), (b) the making of the Borrowings of Term Loans hereunder, (c) the consummation of the Refinancing, (d) the consummation of the Parent Note Repayment, (e) the funding of consideration for the Acquisition, (f) the execution and delivery and performance of the amendment to the ABL Credit Agreement and (g) the payment of Transaction Costs related to the foregoing.

"**Trustee**" shall have the meaning assigned to such term in the definition of "Existing Secured Notes".

"**Type**" when used in respect of any Loan or Borrowing, shall refer to the Rate by reference to which interest on such Loan or on the Loans comprising such Borrowing is determined. For purposes hereof, the term "**Rate**" shall mean the Adjusted LIBO Rate and the Alternate Base Rate.

"**U.S. Foreign Holdco**" shall mean a Domestic Subsidiary substantially all of the assets of which consist of Equity Interests or debt of one or more direct or indirect Foreign Subsidiaries and assets incidental thereto.

"**U.S. Person**" shall mean any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"**U.S. Tax Compliance Certificate**" shall have the meaning assigned to such term in Section 2.20(f).

"**Undisclosed Information**" shall mean any non-public information with respect to Holdings, the Borrower or the Subsidiaries or any of their respective securities to the extent such information (a) could have a material effect upon, or otherwise be material to, an assigning Lender's decision to assign Loans to a Non-Debt Fund Affiliate or (b) is otherwise material to Holdings, the Borrower or the Subsidiaries or any of their respective securities for the purpose of United States federal or state securities laws.

"**Unfunded Pension Liability**" of any Plan shall mean the excess of such Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of such Plan's assets, determined in accordance with the assumptions used by the Plan's actuaries for funding the Plan pursuant to Section 412 of the Code for the applicable plan year and as set forth in Schedule SB to the most recent Form 5500 filed for such plan.

"**United States**" and "**U.S.**" shall mean the United States of America.

"**Unrestricted**" shall mean, when referring to cash or Cash Equivalents of the Borrower or any Restricted Subsidiary, any such cash or Cash Equivalents that is not Restricted.

"**Unrestricted Subsidiary**" shall mean any Subsidiary designated by the Board of Directors of the Borrower as an Unrestricted Subsidiary pursuant to Section 5.12(a) subsequent to the date hereof.

"*USA PATRIOT Act*" shall mean The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)).

"*VSI*" shall mean VSI Acquisition Corp.

"*Wholly Owned Subsidiary*" of any Person shall mean a subsidiary of such Person of which securities (except for directors' qualifying shares) or other ownership interests representing 100% of the Equity Interests are, at the time any determination is being made, owned, Controlled or held by such Person or one or more wholly owned subsidiaries of such Person or by such Person and one or more wholly owned subsidiaries of such Person.

"*Withdrawal Liability*" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"*Withholding Agent*" shall mean any Loan Party and the Administrative Agent.

"*Yield Differential*" shall have the meaning assigned to such term in Section 2.22(c).

SECTION 1.02. **Terms Generally**. The definitions in Section 1.01 shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "*include*", "*includes*" and "*including*" shall be deemed to be followed by the phrase "*without limitation*". The word "*will*" shall be construed to have the same meaning and effect as the word "*shall*", and the words "*asset*" and "*property*" shall be construed as having the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights. The words "herein", "hereto", "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof. All references herein to Articles, Sections, Exhibits and Schedules shall be deemed references to Articles and Sections of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require. Except as otherwise expressly provided herein, (a) any reference in this Agreement to any Loan Document or any other agreement, instrument or document shall mean such document as amended, restated, amended and restated, supplemented or otherwise modified from time to time, but only to the extent that such amendment, restatements, supplements or modifications are not prohibited by this Agreement, (b) references to any law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing, modifying or interpreting such law, (c) all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; *provided* that if the Borrower notifies the Administrative Agent that the Borrower wishes to amend any provision of this Agreement or the other Loan Documents to eliminate the effect of any change in GAAP occurring after the date of this Agreement on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders wish to amend any provision of this Agreement or any other Loan Document) regardless of whether any such notice is given before or after such change in GAAP, then such provision shall be interpreted on the basis of GAAP as in effect immediately before the relevant change in GAAP became effective, until either such notice is withdrawn or such provision is amended in a manner satisfactory to the Borrower and the Required Lenders, (d) all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made (i) without giving effect to any election under Accounting Standards Codification 825-10-25 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of the Borrower or

any Subsidiary at "fair value", as defined therein, (ii) without giving effect to any treatment of Indebtedness in respect of convertible debt instruments under Accounting Standards Codification 470-20 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof and (iii) in a manner such that any obligations relating to a lease that was accounted for by a Person as an operating lease as of the Closing Date and any similar lease entered into after the Closing Date by such Person shall be accounted for as obligations relating to an operating lease and not as Capital Lease Obligations, (e) for purposes of determining compliance with any provision of this Agreement, the determination of whether a lease is to be treated as an operating lease or capital lease shall be made without giving effect to any change in accounting for leases pursuant to GAAP resulting from the implementation of proposed Accounting Standards Update (ASU) Leases (Topic 840) issued August 17, 2010 and (f) where the permissibility of a transaction or determinations of any representations, warranties, covenants, required actions or circumstances under any Loan Document depends upon compliance with, or are determined by reference to, amounts stated in Dollars, such amounts shall be the Dollar equivalent thereof to the extent any component of such amount is then denominated in a currency other than Dollars, based on the relevant exchange rate in effect on the date of such transaction or determination and shall not be affected by subsequent fluctuations in exchange rate.

SECTION 1.03. ***Pro Forma Calculations*** (a) Notwithstanding anything to the contrary herein, the Net Total Leverage Ratio  shall be calculated in the manner prescribed by this Section 1.03 (except as otherwise prescribed pursuant to the definition of Incremental Pro Forma Basis); *provided* that notwithstanding anything to the contrary herein, when calculating any such ratio for the purpose of any mandatory prepayment provision hereunder the events set forth in clause (b), (c) and (d) below that occurred subsequent to the end of the applicable Test Period shall not be given *pro forma* effect.

(b)     For purposes of calculating the Net Total Leverage Ratio and compliance with the provisions of Section 6.08 (including all relevant definitions used therein or for such purposes), Pro Forma Transactions (and the incurrence or repayment of any Indebtedness in connection therewith) that have been consummated (i) during the applicable Test Period or (ii) subsequent to such Test Period and prior to or simultaneously with the event for which the calculation of any such ratio is made shall be calculated on a *pro forma* basis assuming that all such Pro Forma Transactions (and any increase or decrease in Consolidated EBITDA and the component financial definitions used therein attributable to any Pro Forma Transaction) had occurred on the first day of the applicable Test Period.

(c)     If *pro forma* effect is to be given to a Pro Forma Transaction, the *pro forma* calculations shall be made in good faith by a Financial Officer of the Borrower and include only those adjustments that would be permitted or required by Regulation S-X together with those adjustments that (i) have been certified by a Financial Officer of the Borrower as having been prepared in good faith based upon reasonable assumptions and (ii) are (A) directly attributable to the Pro Forma Transactions with respect to which such adjustments are to be made, (B) expected to have a continuing impact on the Loan Parties, (C) factually supportable and reasonably identifiable and (D) based on reasonably detailed written assumptions reasonably acceptable to the Administrative Agent. For the avoidance of doubt, all *pro forma* adjustments shall be consistent with, and subject to, the caps and limits set forth in the applicable definitions herein.

(d)     In the event that the Borrower or any Restricted Subsidiary incurs (including by assumption or guarantees) or repays (including by redemption, repayment, retirement or extinguishment) any Indebtedness included in the calculations of the Net Total Leverage Ratio (other than Indebtedness

incurred or repaid under any revolving credit facility in the ordinary course of business for working capital purposes) subsequent to the end of the applicable Test Period and prior to or simultaneously with the event for which the calculation of any such ratio is made, then the Net Total Leverage Ratio shall be calculated giving *pro forma* effect to such incurrence or repayment of Indebtedness, to the extent required, as if the same had occurred on the last day of the applicable Test Period.

SECTION 1.04. *Classification of Loans and Borrowings*

For purposes of this Agreement, Loans may be classified and referred to by Class (e.g., a "Term Loan") or by Type (e.g., a "Eurodollar Loan"). Borrowings also may be classified and referred to by Class (*e.g.*, a "*Borrowing of Term Loans*") or by Type (*e.g.*, a "*Eurodollar Borrowing*").

# ARTICLE II

## THE CREDITS

SECTION 2.01. *Commitments*. Subject to the terms and conditions hereof and relying upon the representations and warranties set forth herein and in the other Loan Documents, each Term Lender agrees, severally and not jointly, to make a Term Loan to the Borrower, in Dollars, on the Closing Date in a principal amount not to exceed its Term Loan Commitment. Amounts repaid or prepaid in respect of Term Loans may not be reborrowed.

SECTION 2.02. *Loans*.

(a)     Each Loan shall be made as part of a Borrowing consisting of Loans made by the applicable Lenders ratably in accordance with their applicable Commitments; *provided* that the failure of any Lender to make any Loan shall not in itself relieve any other Lender of its obligation to lend hereunder (it being understood, however, that no Lender shall be responsible for the failure of any other Lender to make any Loan required to be made by such other Lender).

(b)     Subject to Sections 2.08 and 2.14, each Borrowing shall be comprised entirely of ABR Loans or Eurodollar Loans as the Borrower may request pursuant to Section 2.03. Each Lender may at its option make any Eurodollar Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; *provided* that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement. Borrowings of more than one Type may be outstanding at the same time; *provided however,* that the Borrower shall not be entitled to request any Borrowing that, if made, would result in more than five Eurodollar Borrowings outstanding hereunder at any time.

(c)     Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to request, or elect to convert or continue, any Borrowing of any Class if the Interest Period requested or elected with respect thereto would end after the maturity date of such Class.

(d)     Each Lender shall make each Term Loan to be made by it hereunder on the Closing Date by wire transfer of immediately available funds to such account in New York City as the Administrative Agent may designate not later than 12:00 (noon), New York City time, and the Administrative Agent shall promptly credit the amounts so received to an account as directed by Borrower in the applicable Borrowing Request maintained with the Administrative Agent or, if a Borrowing shall not occur on such date because any condition precedent herein specified shall not have been met, return the amounts so received to the respective Lenders.

(e)    Unless the Administrative Agent shall have received notice from a Lender at least two hours prior to the time of the Borrowing on the Closing Date that such Lender will not make available to the Administrative Agent such Lender's portion of such Borrowing, the Administrative Agent may assume that such Lender has made such portion available to the Administrative Agent at the time of such Borrowing in accordance with paragraph (d) above, and the Administrative Agent may, in reliance upon such assumption, make available to Borrower on such date a corresponding amount.    If the Administrative Agent shall have so made funds available, then, to the extent that such Lender shall not have made such portion available to the Administrative Agent, each of such Lender and Borrower severally agrees to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to Borrower until the date such amount is repaid to the Administrative Agent at (i) in the case of Borrower, the interest rate applicable to ABR Loans and (ii) in the case of such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.    If such Lender shall repay to the Administrative Agent such corresponding amount, such amount shall constitute such Lender's Term Loan, as applicable, as part of such Borrowing for purposes of this Agreement, and Borrower's obligation to repay the Administrative Agent such corresponding amount pursuant to this Section 2.02(e) shall cease.

SECTION 2.03. **Borrowing Procedure**. In order to request a Borrowing, the Borrower shall notify the Administrative Agent of such request in writing by delivering a Borrowing Request or by telephone (a) in the case of a Eurodollar Borrowing, not later than 11:00 a.m., New York City time, three Business Days before the proposed Borrowing and (b) in the case of an ABR Borrowing, not later than 11:00 a.m., New York City time, one Business Day before the proposed Borrowing. Each such notice shall be irrevocable, and any telephonic notice shall be confirmed promptly by delivery of a written Borrowing Request and shall specify the following information: (i) whether the Borrowing then being requested is to be a Eurodollar Borrowing or an ABR Borrowing; *provided* that, until the Administrative Agent shall have notified the Borrower that the primary syndication of the Commitments has been completed (which notice shall be given as promptly as practicable and, in any event, within 30 days after the Closing Date), the Borrower shall not be permitted to request a Eurodollar Borrowing with an Interest Period in excess of one month; (i) the date of such Borrowing (which shall be a Business Day); (ii) the number and location of the account to which funds are to be disbursed; (iii) the amount of such Borrowing and (iv) if such Borrowing is to be a Eurodollar Borrowing, the Interest Period with respect thereto; *provided* that, notwithstanding any contrary specification in any Borrowing Request, each requested Borrowing shall comply with the requirements set forth in Section 2.02(c). If no election as to the Type of Borrowing is specified in any such notice, then the requested Borrowing shall be an ABR Borrowing. If no Interest Period with respect to any Eurodollar Borrowing is specified in any such notice, then the Borrower shall be deemed to have selected an Interest Period of one month's duration. The Administrative Agent shall promptly advise the Lenders of any notice given pursuant to this Section 2.03 (and the contents thereof), and of each Lender's *pro rata* share of the requested Borrowing.

SECTION 2.04. **Evidence of Debt; Repayment of Loans**.

(a)    The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the principal amount of each Term Loan of such Lender as provided in Section 2.11.

(b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such

Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(c)      The Administrative Agent shall, in accordance with its customary practice, maintain accounts in which it will record (i) the amount of each Loan made hereunder, the Class and Type thereof and, if applicable, the Interest Period applicable thereto, the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (ii) the amount of any sum received by the Administrative Agent hereunder from the Borrower or any Guarantor and each Lender's share thereof.

(d)      The entries made in the accounts maintained pursuant to paragraphs (b) and (c) above shall be *prima facie* evidence of the existence and amounts of the obligations therein recorded; *provided* that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligations of the Borrower to repay the Loans in accordance with their terms.

(e)      Any Lender may request that Loans made by it hereunder be evidenced by a Note. In such event, the Borrower shall execute and deliver to such Lender a Note payable to such Lender and its registered assigns. Notwithstanding any other provision of this Agreement, in the event any Lender shall request and receive such a Note, the interests represented by such Note shall at all times (including after any assignment of all or part of such interests pursuant to Section 9.04) be represented by one or more Notes payable to the payee named therein or its registered assigns.

SECTION 2.05. *Fees*.

(a)      The Borrower agrees to pay to the Administrative Agent, for its own account, the administrative fees set forth in the Fee Letter at the times and in the amounts specified therein (the "*Administrative Agent Fees*").

(b)      Each prepayment pursuant to Section 2.12 or Section 2.13 for any reason (including any prepayment of Loans in connection with (x) any Repricing Transaction or (y) any amendment of this Agreement resulting in a Repricing Transaction), other than a prepayment required by Section 2.13(c), shall be accompanied by a premium payable by Borrower equal to (i) if such prepayment or payment is made on or prior to the first anniversary of the Closing Date, 4% of the principal amount of the Loans so prepaid, (ii) if such prepayment or payment is made after the first anniversary of the Closing Date but on or prior to the second anniversary of the Closing Date, 2.5% of the principal amount of the Loans so prepaid, (iii) if such prepayment or payment is made after the second anniversary of the Closing Date but on or prior to the third anniversary of the Closing Date, 1% of the principal amount of the Loans so prepaid and (iv) at par thereafter.

(c)      The Borrower agrees to pay to the Administrative Agent the respective fees in the amounts and on the dates as set forth in the Fee Letter and any other fee agreements with the Administrative Agent or any other Lender and to perform any other obligations contained therein.

(d)      All Fees shall be paid on the dates due, in immediately available funds, to the Administrative Agent for distribution, if and as appropriate, among the Lenders.  Once paid, none of the Fees shall be refundable under any circumstances.

SECTION 2.06. *Interest on Loans*.

(a)     Subject to the provisions of Section 2.07, the Loans comprising each ABR Borrowing shall bear interest (computed on the basis of the actual number of days elapsed over a year of 360 days at all times and calculated from and including the date of such Borrowing to but excluding the date of repayment thereof) at a rate per annum equal to the Alternate Base Rate plus the Applicable Margin in effect from time to time.

(b)     Subject to the provisions of Section 2.07, the Loans comprising each Eurodollar Borrowing shall bear interest (computed on the basis of the actual number of days elapsed over a year of 360 days) at a rate per annum equal to the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Margin in effect from time to time.

(c)     Interest on each Loan shall be payable on the Interest Payment Dates applicable to such Loan except as otherwise provided in this Agreement. The applicable Alternate Base Rate or Adjusted LIBO Rate for each Interest Period or day within an Interest Period, as the case may be, shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

SECTION 2.07. *Default Interest*. During the period when any Event of Default shall have occurred and be continuing, the outstanding principal balance of the Loans and all other Obligations shall automatically bear interest at the Default Rate.

SECTION 2.08. *Alternate Rate of Interest*. If prior to the commencement of any Interest Period for a Eurodollar Borrowing:

(a)     the Administrative Agent determines (which determination shall be final and conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBOR Rate for such Interest Period; or

(b)     the Administrative Agent determines or is advised in writing by the Required Lenders that the Adjusted LIBO Rate for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period;

then the Administrative Agent shall give written notice thereof to Borrower and the Lenders as promptly as practicable thereafter and, until the Administrative Agent notifies Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, (i) any Eurodollar Borrowing requested to be made on the first day of such Interest Period shall be made as a Market Disruption Loan, (ii) any Borrowing that were to have been converted on the first day of such Interest Period to a Eurodollar Borrowing shall be continued as a Market Disruption Loan and (iii) any outstanding Eurodollar Borrowing shall be converted, on the last day of the then-current Interest Period, to a Market Disruption Loan.

SECTION 2.09. *Termination of Commitments*. The Term Loan Commitments shall automatically terminate upon the making of the Term Loans on the Closing Date. Notwithstanding the foregoing, all unfunded Term Loan Commitments shall automatically terminate at 5:00 p.m., New York City time, on the Closing Date if the proposed Borrowing on such date shall not have occurred by such time.

SECTION 2.10. *Conversion and Continuation of Borrowings*. The Borrower shall have the right at any time upon written or telephonic notice to the Administrative Agent (a) not later than 11:00 a.m., New York City time, one Business Day prior to conversion, to convert any Eurodollar Borrowing into an ABR Borrowing, (b) not later than 11:00 a.m., New York City time, three Business Days prior to

conversion or continuation, to convert any ABR Borrowing into a Eurodollar Borrowing or to continue any Eurodollar Borrowing as a Eurodollar Borrowing for an additional Interest Period and (c) not later than 11:00 a.m., New York City time, three Business Days prior to conversion, to convert the Interest Period with respect to any Eurodollar Borrowing to another permissible Interest Period, subject in each case to the following:

(i)        until the Administrative Agent shall have notified the Borrower that the primary syndication of the Commitments has been completed (which notice shall be given as promptly as practicable and, in any event, within 30 days after the Closing Date), no ABR Borrowing may be converted into a Eurodollar Borrowing with an Interest Period in excess of one month;

(ii)        each conversion or continuation shall be made *pro rata* among the Lenders in accordance with the respective principal amounts of the Loans comprising the converted or continued Borrowing;

(iii)        if less than all the outstanding principal amount of any Borrowing shall be converted or continued, then each resulting Borrowing shall satisfy the limitations specified in Sections 2.02(a) and (b) regarding the principal amount and maximum number of Borrowings of the relevant Type;

(iv)        each conversion shall be effected for each Lender by the Administrative Agent recording for the account of such Lender the new Borrowing of such Lender resulting from such conversion and reducing the Borrowing (or portion thereof) of such Lender being converted by an equivalent principal amount; accrued interest on any Eurodollar Loan (or portion thereof) being converted shall be paid by the Borrower at the time of conversion;

(v)        if any Eurodollar Borrowing is converted at a time other than the end of the Interest Period applicable thereto, the Borrower shall pay, upon demand, any amounts due to the Lenders pursuant to Section 2.16;

(vi)        any portion of a Borrowing maturing or required to be repaid in less than one month may not be converted into or continued as a Eurodollar Borrowing;

(vii)        any portion of a Eurodollar Borrowing that cannot be continued as a Eurodollar Borrowing by reason of the immediately preceding clause (vi) shall be automatically converted at the end of the Interest Period in effect for such Borrowing into an ABR Borrowing;

(viii)        no Interest Period may be selected for any Eurodollar Borrowing that would end later than a Repayment Date occurring on or after the first day of such Interest Period if, after giving effect to such selection, the aggregate outstanding amount of (x) the Eurodollar Borrowings with Interest Periods ending on or prior to such Repayment Date and (y) the ABR Borrowings comprised of Loans would not be at least equal to the principal amount of Borrowings to be paid on such Repayment Date; and

(ix)        after the occurrence and during the continuance of a Default or Event of Default, no outstanding Loan may be converted into, or continued as, a Eurodollar Loan.

Each such telephonic notice shall be irrevocable and shall be confirmed promptly by delivery of an Interest Election Request pursuant to this Section 2.10 and shall specify (a) the identity and amount of

42

the Borrowing that the Borrower requests be converted or continued, (b) whether such Borrowing is to be converted to or continued as a Eurodollar Borrowing or an ABR Borrowing, (c) if such notice requests a conversion, the date of such conversion (which shall be a Business Day) and (d) if such Borrowing is to be converted to or continued as a Eurodollar Borrowing, the Interest Period with respect thereto. If no Interest Period is specified in any such notice with respect to any conversion to or continuation as a Eurodollar Borrowing, the Borrower shall be deemed to have selected an Interest Period of one month's duration. The Administrative Agent shall promptly advise the Lenders of any notice given pursuant to this Section 2.10 and of each Lender's *pro rata* share of any converted or continued Borrowing.  If the Borrower shall not have given notice in accordance with this Section 2.10 to continue any Borrowing into a subsequent Interest Period (and shall not otherwise have given notice in accordance with this Section 2.10 to convert such Borrowing), such Borrowing shall, at the end of the Interest Period applicable thereto (unless repaid pursuant to the terms hereof), automatically be converted into an ABR Borrowing.

SECTION 2.11. ***Repayment of Borrowings***.

(a)        Commencing with the fiscal quarter ending on December 31, 2014, the Borrower shall pay to the Administrative Agent, for the account of the Term Lenders, on the last Business Day of each March, June, September and December occurring prior to the Maturity Date (each, a "***Repayment Date***"), a principal amount of the Term Loans (as adjusted from time to time pursuant to Sections 2.12(b) and 2.13(d)) equal to 0.25% of the original principal amount of the Term Loans, together in each case with accrued and unpaid interest on the principal amount to be paid to but excluding the date of such payment.

(b)        To the extent not previously paid, all Term Loans shall be due and payable on the Maturity Date together with accrued and unpaid interest on the principal amount to be paid to but excluding the date of payment.

(c)        All repayments pursuant to this Section 2.11 shall be subject to Section 2.16, but shall otherwise be without premium or penalty.

SECTION 2.12. ***Voluntary Prepayment***.

(a)        The Borrower shall have the right at any time and from time to time to prepay any Borrowing, in whole or in part, upon at least three Business Days' prior written notice (or telephonic notice promptly confirmed by written notice) in the case of Eurodollar Loans, or written notice (or telephonic notice promptly confirmed by written notice) at least one Business Day prior to the date of prepayment in the case of ABR Loans, to the Administrative Agent before 12:00 (noon), New York City time; *provided* that each partial prepayment shall be in an amount that is an integral multiple of $1,000,000 and not less than $5,000,000.

(b)        Voluntary prepayments of Loans shall be applied as directed by the Borrower to the remaining scheduled installments of principal due in respect of the Loans under Section 2.11.

(c)        Each notice of prepayment shall specify the prepayment date and the principal amount of each Borrowing (or portion thereof) to be prepaid, shall be irrevocable and shall commit the Borrower to prepay such Borrowing by the amount stated therein on the date stated therein; *provided* that a notice of prepayment for all of the then outstanding Loans may state that such notice is conditioned upon the effectiveness of other financing arrangements, in which case such notice may be revoked or extended by the Borrower (by notice to the Administrative Agent prior to 12:00 (noon), New York City time (or such

later time as the Administrative Agent may agree in its sole discretion) on the specified effective date) if such condition is not satisfied; *provided further* that the provisions of Section 2.16 shall apply with respect to any such revocation or extension. All prepayments under this Section 2.12 shall be subject to Sections 2.05(b) and 2.16 but otherwise without premium or penalty. All prepayments under this Section 2.12 shall be accompanied by accrued and unpaid interest on the principal amount to be prepaid to but excluding the date of payment.

SECTION 2.13. *Mandatory Prepayments*.

(a)       In addition to any other mandatory prepayment pursuant to this Section 2.13, within five Business Days after each date on or after the Closing Date upon which Holdings, the Borrower or any of the Restricted Subsidiaries receives any proceeds from any issuance or incurrence by Holdings, the Borrower or any Restricted Subsidiary of Indebtedness (other than Indebtedness permitted to be issued or incurred pursuant to Section 6.04 (excluding clause (n) thereof)), an amount equal to 100% of the Net Cash Proceeds of the respective incurrence of Indebtedness shall be applied on such date as a mandatory repayment in accordance with the requirements of Sections 2.13(f) and (g).

(b)       In addition to any other mandatory prepayment pursuant to this Section 2.13, within 15 days after each date on or after the Closing Date upon which Holdings, the Borrower or any Restricted Subsidiary receives any proceeds from any Asset Sale or Recovery Event, an amount equal to 100% of the Net Cash Proceeds therefrom (excluding any Net Cash Proceeds constituting ABL Priority Collateral (as defined in the ABL Intercreditor Agreement) to the extent such Net Cash Proceeds are required to be applied to prepay loans under the ABL Credit Agreement (as in effect as of the date hereof)) shall be applied on such date as a mandatory repayment in accordance with the requirements of Sections 2.13(f) and (g); *provided however*, that such Net Cash Proceeds shall not be required to be so applied on such date so long as no Event of Default then exists and such Net Cash Proceeds shall be reinvested (or committed to be reinvested) to purchase assets used or to be used in the businesses of the Borrower and the Restricted Subsidiaries (including Permitted Acquisitions) within 365 days following the date of such Net Cash Proceeds (or, if the Borrower or the applicable Restricted Subsidiary enters into a legally binding commitment to reinvest such Net Cash Proceeds within 365 days following the receipt thereof, within 180 days after such original 365 day period); *provided*, that any Net Cash Proceeds from the sale of Term Priority Collateral (as defined in the ABL Intercreditor Agreement) shall be reinvested in assets that also constitute Term Priority Collateral; *provided further*, that upon receipt of any such Net Cash Proceeds, Holdings, the Borrower or the applicable Restricted Subsidiary shall deposit such Net Cash Proceeds into the Asset Sale or Recovery Event Proceeds Pledged Account and such Net Cash Proceeds shall remain in the Asset Sale or Recovery Event Proceeds Pledged Account until reinvested or applied to prepay the Loans, in each case in accordance with this Section 2.13(b); *provided further*, that if all or any portion of such Net Cash Proceeds are not so reinvested within the time period indicated (or such earlier date, if any, as the Borrower or the applicable Restricted Subsidiary determines not to reinvest the Net Cash Proceeds from such Asset Sale or Recovery Event as set forth above), such remaining portion shall be applied on the last day of such period (or such earlier date, as the case may be) as provided above in this Section 2.13(b) without regard to the preceding proviso; *provided further,* that if at the time that any such prepayment would be required, the Borrower is required to offer to repurchase Permitted Incremental Equivalent Debt or any Permitted Refinancing thereof, in each case that is secured on a *pari passu* basis with the Obligations pursuant to the terms of the documentation governing such Indebtedness with the Net Cash Proceeds of such Asset Sale or Recovery Event (such Permitted Incremental Equivalent Debt or Permitted Refinancing thereof required to be offered to be so repurchased, "***Other Applicable Indebtedness***"), then the Borrower may apply such Net Cash Proceeds on a *pro rata* basis (determined on the basis of the aggregate outstanding principal amount of the Loans and Other

44

Applicable Indebtedness at such time; *provided* that the portion of such Net Cash Proceeds allocated to the Other Applicable Indebtedness pursuant to the terms thereof, and the remaining amount, if any, of such Net Cash Proceeds shall be allocated to the Loans in accordance with the terms hereof) to the prepayment of the Loans and to the repurchase of Other Applicable Indebtedness, and the amount of prepayment of the Loans that would have otherwise been required pursuant to this Section 2.13(b) shall be reduced accordingly; *provided further,* that to the extent the holders of Other Applicable Indebtedness decline to have such Indebtedness repurchased, the declined amount shall promptly (and in any event within 15 days after the date of such rejection) be applied to prepay the Loans in accordance with the terms hereof.

(c)     In addition to any other mandatory prepayment pursuant to this Section 2.13, on each ECF Payment Date, an amount equal to the applicable ECF Percentage of the Excess Cash Flow for the related ECF Period shall be applied as a mandatory prepayment in accordance with the requirements of Sections 2.13(f) and (g); *provided* that (i) repayments of principal of Terms Loans or Incremental Term Loans made as a voluntary prepayment pursuant to Section 2.12 and (ii) the amount of cash paid for Loans acquired by Holdings, the Borrower or a Subsidiary pursuant to a Dutch Auction open to all Lenders and cancelled in accordance with Section 9.04(g) (other than with the proceeds of long-term Indebtedness or equity) during the applicable ECF Period shall reduce on a dollar-for-dollar basis the amount of such mandatory prepayment otherwise required on the applicable ECF Payment Date pursuant to this Section 2.13(c).

(d)     The amount of each principal prepayment of Loans made in accordance with this Section 2.13 shall be applied to principal repayment installments of the Loans in direct order of maturity.

(e)     With respect to each prepayment of Loans required by this Section 2.13, such prepayments shall be applied on a *pro rata* basis to the then outstanding Loans being prepaid irrespective of whether such outstanding Loans are ABR Loans or Eurodollar Loans; *provided however*, that any proceeds from any issuance or incurrence of any Indebtedness permitted to be incurred pursuant to Section 6.04(n) shall be required to be applied only to the repayment of the refinanced Loans; *provided further* that if no Lenders exercise the right to waive a given mandatory prepayment of the Loans pursuant to Section 2.13(g), then, with respect to such mandatory prepayment, the Borrower may designate the Types of Loans of the respective Class which are to be prepaid and, in the case of Eurodollar Loans, the specific Borrowing or Borrowings of the respective Class pursuant to which such Eurodollar Loans were made; *provided further* that (i) if prepayment of Eurodollar Loans pursuant to this Section 2.13 are made on the last day of an Interest Period applicable thereto, the Borrower shall make payments to Lenders in accordance with Section 2.16; (ii) no prepayment of Eurodollar Loans made pursuant to a single Borrowing shall reduce the outstanding Eurodollar Loans made pursuant to such Borrowing to less than $5,000,000; and (iii) each prepayment shall be made (x) *pro rata* across all Classes of Loans, unless a particular Class shall have agreed to participate on a less than *pro rata* basis in mandatory prepayments and except for mandatory prepayments from External Refinancing Indebtedness, which shall be directed to the Class of Loans being refinanced and (y) to Lenders within each Class of Loans on a *pro rata* basis. In the absence of a designation by the Borrower as described in the preceding sentence, the Administrative Agent shall, subject to the above, make such designation in its sole discretion with a view, but not an obligation, to minimize a loss resulting from a Breakage Event under Section 2.16.

(f)     The Borrower shall deliver to the Administrative Agent, at the time of each prepayment required under this Section 2.13, (i) a certificate signed by a Financial Officer of the Borrower setting forth in reasonable detail the calculation of the amount of such prepayment and (ii) at least three Business Days prior written notice of such prepayment. Each notice of prepayment shall specify the prepayment

date, the Type of each Loan being prepaid and the principal amount of each Loan (or portion thereof) to be prepaid. All prepayments of Borrowings under this Section 2.13 shall be subject to Section 2.16 and Section 2.05(b), but shall otherwise be without premium or penalty, and shall be accompanied by accrued and unpaid interest on the principal amount to be prepaid to but excluding the date of payment.

(g)    Each Term Lender may reject all (but not less than all) of its applicable share of any mandatory prepayment (such declined amounts, the "*Declined Proceeds*") of Loans required to be made pursuant to this Section 2.13 by providing written notice (each, a "*Rejection Notice*") to the Administrative Agent no later than 5:00 p.m., New York City time, one Business Day after the date of such Lender's receipt of notice from the Administrative Agent regarding such prepayment. If a Lender fails to deliver a Rejection Notice to the Administrative Agent within the time frame specified above, such failure will be deemed an acceptance of the total amount of such mandatory prepayment of Loans. Any Declined Proceeds shall first be offered on a *pro rata* basis to each Lender that has not rejected such prepayment, and thereafter any remaining Declined Proceeds shall be retained by the Borrower.

(h)    Notwithstanding any other provisions of this Section 2.13, (i) to the extent that any of or all the Net Cash Proceeds of any Asset Sale or Recovery Event by any Foreign Subsidiary or Excess Cash Flow attributable to any Foreign Subsidiary would be prohibited or delayed by (x) the applicable local law or (y) the applicable certificate or articles of incorporation (or comparable organizational document) due to a third-party minority ownership of any Person in such Foreign Subsidiary from being repatriated to the United States, an amount equal to the portion of such Net Cash Proceeds or such Excess Cash Flow that would be so affected (any such portion, "*Restricted Proceeds*") will not be required to be applied to prepay Loans at the times provided in Section 2.13(b) or (c) as applicable, but may be retained by the applicable Foreign Subsidiary so long, but only so long, as the applicable local law or applicable document would not permit repatriation to the United States (Holdings and the Borrower hereby agree to cause the applicable Foreign Subsidiary to promptly take all actions required by or necessary under the applicable local law or applicable document to permit such repatriation), and once such repatriation of any of such Restricted Proceeds is permitted under the applicable local law, such repatriation will be immediately effected and such repatriated Restricted Proceeds will be promptly (and in any event not later than two Business Days after such repatriation) applied (net of costs, expenses or additional taxes payable or reserved against as a result thereof) to the prepayment of Loans pursuant to this Section 2.13 and (ii) to the extent that the Borrower has determined in its reasonable business judgment that repatriation of any of or all such Net Cash Proceeds or Excess Cash Flow would have material adverse tax consequences, then after Holding, the Borrower and the Restricted Subsidiaries' use of commercially reasonable efforts to (A) eliminate such tax consequences and (B) apply amounts under other cash resources that are available to Holdings, the Borrower and the Restricted Subsidiaries to make such prepayments, the amount of such Net Cash Proceeds or such portion of the Excess Cash Flow, as the case may be, such Net Cash Proceeds or Excess Cash Flow, as the case may be, so affected may be retained by the applicable Foreign Subsidiary.

SECTION 2.14. *Increased Costs; Capital Adequacy*. (a) If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of or credit extended by any Lender (except any such reserve requirement which is reflected in the Adjusted LIBO Rate);

(ii)    subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C)

46

Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)        impose on any Lender or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender or such other Recipient of making or maintaining any Loan or to reduce the amount of any sum received or receivable by such Lender or such other Recipient hereunder (whether of principal, interest or otherwise) then the Borrower will pay to such Lender or such other Recipient, as the case may be, upon demand such additional amount or amounts as will compensate such Lender or such other Recipient, as the case may be, for such additional costs incurred or reduction suffered.

(b)        If any Lender shall have determined that any Change in Law regarding capital adequacy or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made or purchased by such Lender pursuant hereto to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy or liquidity) then from time to time the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)        A certificate of a Lender or such other Recipient setting forth the amount or amounts necessary to compensate such Lender or such other Recipient or the holding company, as applicable, as specified in paragraph (a) or (b) above shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay such Lender or such other Recipient the amount shown as due on any such certificate delivered by it within 10 days after its receipt of the same.

(d)        Failure or delay on the part of any Lender or other such Recipient to demand compensation pursuant to this Section 2.14 shall not constitute a waiver of such Lender's or such other Recipient's right to demand such compensation; *provided* that the Borrower shall not be required to compensate any Lender or other such Recipient under paragraph (a) or (b) above pursuant to this Section 2.14 for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender or other Recipient, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions, and of such Lender's or other such Recipient's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

SECTION 2.15. *Change in Legality*. (a) Notwithstanding any other provision of this Agreement, if any Change in Law shall make it unlawful for any Lender to make or maintain any Eurodollar Loan or to give effect to its obligations as contemplated hereby with respect to any Eurodollar Loan, then, by written notice to the Borrower and to the Administrative Agent:

(i)        such Lender may declare that Eurodollar Loans will not thereafter (for the duration of such unlawfulness) be made by such Lender hereunder (or be continued for additional Interest Periods) and ABR Loans will not thereafter (for such duration) be converted into Eurodollar Loans, whereupon any request for a Eurodollar Borrowing (or to convert an ABR Borrowing to a Eurodollar Borrowing or to continue a Eurodollar Borrowing for an additional

47

Interest Period) shall, as to such Lender only, be deemed a request for an ABR Loan (or a request to continue an ABR Loan as such or to convert a Eurodollar Loan into an ABR Loan, as the case may be), unless such declaration shall be subsequently withdrawn; and

(ii)    such Lender may require that all outstanding Eurodollar Loans made by it be converted to ABR Loans, in which event all such Eurodollar Loans shall be automatically converted to ABR Loans as of the effective date of such notice as provided in paragraph (b) below.

In the event any Lender shall exercise its rights under paragraph (i) or (ii) above, all payments and prepayments of principal that would otherwise have been applied to repay the Eurodollar Loans that would have been made by such Lender or the converted Eurodollar Loans of such Lender shall instead be applied to repay the ABR Loans made by such Lender in lieu of, or resulting from the conversion of, such Eurodollar Loans.

(b)    For purposes of this Section 2.15, a notice to the Borrower by any Lender shall be effective as to each Eurodollar Loan made by such Lender, (i) if lawful, on the last day of the Interest Period then applicable to such Eurodollar Loan and (ii) in all other cases, on the date of receipt by the Borrower.

SECTION 2.16. *Breakage*. The Borrower shall indemnify each Lender against any loss or expense that such Lender may sustain or incur as a consequence of (a) any event, other than a default by such Lender in the performance of its obligations hereunder, which results in (i) such Lender receiving, or being deemed to receive, any amount on account of the principal of any Eurodollar Loan prior to the end of the Interest Period in effect therefor, (ii) the conversion of any Eurodollar Loan to an ABR Loan, or the conversion of the Interest Period with respect to any Eurodollar Loan, in each case other than on the last day of the Interest Period in effect therefor or (iii) any Eurodollar Loan to be made by such Lender (including any Eurodollar Loan to be made pursuant to a conversion or continuation under Section 2.10) not being made after notice of such Loan shall have been given by the Borrower hereunder (any of the events referred to in this clause (a) being called a "*Breakage Event*") or (b) any default in the making of any payment or prepayment required to be made hereunder. In the case of any Breakage Event, such loss shall include an amount equal to the excess, as reasonably determined by such Lender, of (i) its cost of obtaining funds for the Eurodollar Loan that is the subject of such Breakage Event for the period from the date of such Breakage Event to the last day of the Interest Period in effect (or that would have been in effect) for such Loan over (ii) the amount of interest likely to be realized by such Lender in redeploying the funds released or not utilized by reason of such Breakage Event for such period. A certificate of any Lender setting forth any amount or amounts which such Lender is entitled to receive pursuant to this Section 2.16 shall be delivered to the Borrower and shall be conclusive absent manifest error.

SECTION 2.17. *Pro Rata Treatment*. Except as otherwise expressly provided herein, each Borrowing, each payment or prepayment of principal of any Borrowing, each payment of interest on the Loans, each reduction of the Commitments and each conversion of any Borrowing to or continuation of any Borrowing as a Borrowing of any Type shall be allocated *pro rata* among the Lenders in accordance with their respective applicable Commitments (or, if such Commitments shall have expired or been terminated, in accordance with the respective principal amounts of their outstanding Loans). Each Lender agrees that in computing such Lender's portion of any Borrowing to be made hereunder, the Administrative Agent may, in its discretion, round each Lender's percentage of such Borrowing to the next higher or lower whole Dollar amount.

SECTION 2.18. ***Sharing of Setoffs***. If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or other Obligations hereunder resulting in such Lender receiving payment of a proportion of the aggregate amount of its Loans and accrued interest thereon or other such obligations greater than its *pro rata* share thereof as provided herein, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact and (b) purchase (for cash at face value) participations in the Loans and such other obligations of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and other amounts owing them; *provided* that:

> (i)        if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

> (ii)        the provisions of this Section 2.18 shall not be construed to apply to (x) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans or Commitments to any assignee or participant, other than to Holdings or any of its Affiliates (as to which the provisions of this paragraph shall apply unless such assignment is made through Dutch Auctions and in accordance with Sections 9.04(g) and (h)).

Holdings and the Borrower hereby consent to the foregoing and agree, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against each Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of each Loan Party in the amount of such participation.

SECTION 2.19. ***Payments***.

(a)        The Borrower shall make each payment (including principal of or interest on any Borrowing or any Fees or other amounts) hereunder or under any other Loan Document not later than 12:00 (noon), New York City time, on the date when due in immediately available Dollars, without setoff, defense or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. Each such payment shall be made to the Administrative Agent at its offices at 520 Madison Avenue, New York, NY 10022. The Administrative Agent shall promptly distribute to each Lender any payments received by the Administrative Agent on behalf of such Lender.

(b)        Except as otherwise expressly provided herein, whenever any payment (including principal of or interest on any Borrowing or any Fees or other amounts) hereunder or under any other Loan Document shall become due, or otherwise would occur, on a day that is not a Business Day, such payment may be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of interest or Fees, if applicable.

SECTION 2.20. ***Taxes***.

(a)        ***Payments Free of Taxes***. Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes,

except as required by applicable law. If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 2.20) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)  ***Payment of Other Taxes by the Loan Parties***. The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)  ***Indemnification by the Loan Parties***. Holdings and the Borrower shall, and shall cause the other Loan Parties to, jointly and severally indemnify each Recipient, within ten 10 days after written demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.20) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)  ***Indemnification by the Lenders***. Each Lender shall severally indemnify the Administrative Agent, within ten 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (i) any Taxes attributable to such Lender's failure to comply with the provisions of Section 9.04(d) relating to the maintenance of a Participant Register and (ii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (d).

(e)  ***Evidence of Payments***. As soon as reasonably practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 2.20, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(f)  ***Status of Lenders***. (i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the

Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.20(f)(ii)(A), (ii)(B) and (ii)(E) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)        Without limiting the generality of the foregoing,

(A)        any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)        any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(i)        in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, two executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(ii)        two executed copies of IRS Form W-8ECI;

(iii)        in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit K-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) two executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E; or

(iv)        to the extent a Foreign Lender is not the beneficial owner, two executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate

51

substantially in the form of Exhibit K-2 or Exhibit K-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; *provided* that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit K-4 on behalf of each such direct and indirect partner;

(C)     if legally entitled to do so, any successor or supplemental Administrative Agent that is not a U.S. Person, shall deliver to the Borrower one executed copy of Internal Revenue Service Form W-8IMY certifying that it is a "U.S. branch" and that the payments it receives for the account of others are not effectively connected with the conduct of a trade or business in the United States and that it is using such form as evidence of its agreement with the Borrower to be treated as a U.S. Person with respect to such payments (and the Borrower and the Administrative Agent agree to so treat the Administrative Agent as a U.S. Person with respect to such payments as contemplated by Treasury Regulation Section 1.1441-1(b)(2)(iv)(A)), with the effect that the Borrower can make payments to the Administrative Agent without deduction or withholding of any Taxes imposed by the United States.

(D)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals or copies, as may be prescribed, of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(E)     if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (E), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so. Solely for purposes of this Section 2.20(f), the term "Lender" shall include (i) the Administrative Agent, (ii) any sub-agent acting pursuant to Section 8.05 that receives any payment from any of the Loan Parties on behalf of the

Administrative Agent and (iii) any SPV providing the Borrower all or a part of any Loan pursuant to Section 9.04(f).

(g)    ***Treatment of Certain Refunds***. If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.20 (including by the payment of additional amounts pursuant to this Section 2.20), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.20 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (g) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (g) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts giving rise to such refund had never been paid. This paragraph (g) shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(h)    ***Survival***. Each party's obligations under this Section 2.20 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

SECTION 2.21. ***Assignment of Loans under Certain Circumstances; Duty to Mitigate***.

(a)    In the event (i) any Lender delivers a certificate requesting compensation pursuant to Section 2.14, (ii) any Lender delivers a notice described in Section 2.15, (iii) the Borrower is required to pay any Indemnified Taxes or additional amounts with respect thereto to any Lender or any Governmental Authority on account of any Lender pursuant to Section 2.20 or (iv) any Lender refuses to consent to any amendment, waiver, consent or other modification of any Loan Document requested by the Borrower that requires the consent of a greater percentage of the Lenders than the Required Lenders or from all affected Lenders and such amendment, waiver, consent or other modification is consented to by the Required Lenders (or a greater percentage) then, in each case, the Borrower may, at its sole expense and effort (including with respect to the processing and recordation fee referred to in Section 9.04(b)), upon notice to such Lender and the Administrative Agent, require such Lender to transfer and assign, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all of its interests, rights and obligations under this Agreement (or, in the case of clause (iv) above, all of its interests, rights and obligations with respect to the Class of Loans or Commitments that is the subject of the related amendment, waiver, consent or other modification) to an Eligible Assignee that shall assume such assigned obligations (and, with respect to clause (iv) above, shall consent to such requested amendment, waiver, consent or other modification); *provided* that (x) such assignment shall not conflict with any law, rule or regulation or order of any court or other Governmental Authority having jurisdiction and (y) the Borrower or such assignee shall have paid to the affected Lender in immediately available funds an amount equal to the sum of the principal of and interest accrued to the date of such payment on the outstanding Loans of such Lender, plus all Fees and other amounts accrued for the account of such

Lender hereunder with respect thereto (including any amounts under Sections 2.14 and 2.16 and, if applicable, the prepayment premium pursuant to Section 2.05(b)); *provided further* that if prior to any such transfer and assignment, the circumstances or event that resulted in such Lender's claim for compensation under Section 2.14, notice under Section 2.15 or the amounts to be paid pursuant to Section 2.20, as the case may be, cease to cause such Lender to suffer increased costs or reductions in amounts received or receivable or reduction in return on capital, cease to have the consequences specified in Section 2.15 or cease to result in amounts being payable under Section 2.20, as the case may be (including as a result of any action taken by such Lender pursuant to paragraph (b) below), or if such Lender shall waive its right to claim further compensation under Section 2.14 in respect of such circumstances or event, shall withdraw its notice under Section 2.15 or shall waive its right to further payments under Section 2.20 in respect of such circumstances or event or shall consent to the proposed amendment, waiver, consent or other modification, as the case may be, then such Lender shall not thereafter be required to make any such transfer and assignment hereunder. Each Lender hereby grants to the Administrative Agent an irrevocable power of attorney (which power is coupled with an interest) to execute and deliver, on behalf of such Lender as assignor, any Assignment and Acceptance necessary to effectuate any assignment of such Lender's interests hereunder in the circumstances contemplated by this Section 2.21(a).

(b)        If (i) any Lender shall request compensation under Section 2.14, (ii) any Lender delivers a notice described in Section 2.15 or (iii) the Borrower is required to pay any Indemnified Taxes or additional amount with respect thereto to any Lender or any Governmental Authority on account of any Lender pursuant to Section 2.20, then such Lender shall use reasonable efforts (which shall not require such Lender to incur an unreimbursed loss or unreimbursed cost or expense or otherwise take any action inconsistent with its internal policies or legal or regulatory restrictions or suffer any disadvantage or burden deemed by it to be significant) (x) in the case of a requirement to pay Indemnified Taxes or additional amounts with respect thereto pursuant to Section 2.20, to file any certificate or document reasonably requested in writing by the Borrower or (y) to assign its rights (other than its existing rights to payments pursuant to Section 2.14 or Section 2.20) and delegate and transfer its obligations hereunder to another of its offices, branches or affiliates, if such filing or assignment would reduce its claims for compensation under Section 2.14 or Section 2.20 enable it to withdraw its notice pursuant to Section 2.15 or would reduce amounts payable pursuant to Section 2.20, as the case may be, in the future. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such filing or assignment, delegation and transfer.

SECTION 2.22. *Incremental Facilities*.

(a)        Upon written notice to the Administrative Agent (which shall promptly notify the Lenders), at any time after the Closing Date, the Borrower may request Incremental Term Loan Commitments from one or more Lenders or Additional Lenders; *provided* that (i) each Lender shall be entitled to agree or decline to participate in such Incremental Term Loan Commitment in its sole discretion; *provided further* that after giving effect to any such Incremental Term Loan Commitment, the Aggregate Incremental Amount shall not exceed the Incremental Cap. Any Incremental Term Loan may be made by increasing the Term Commitments with the same terms (including pricing) as the existing Term Loans, in which case such Incremental Term Loans shall constitute Term Loans for all purposes hereunder and under the other Loan Documents. Any such addition shall be in an aggregate amount of not less than $5,000,000 and with minimum increments of $1,000,000.  The proceeds of the Incremental Term Loans shall be used for any purpose agreed to by the Borrower and the Incremental Term Loan Lenders in the applicable Additional Credit Extension Amendment (to the extent not otherwise prohibited hereunder).

(b)     It shall be a condition precedent to the effectiveness of any Incremental Term Loan Commitment and the incurrence of the Incremental Term Loans that (i) the terms of such Incremental Term Loan Commitments and the Incremental Term Loans thereunder shall comply with Section 2.22(c), (ii) no Default or Event of Default (or, in the case of Incremental Term Loans the proceeds of which will be applied to consummate a Permitted Acquisition, and to the extent agreed to by the persons providing such Incremental Term Loans, no Specified Default) shall have occurred and be continuing immediately prior to or immediately after giving effect to such Incremental Term Loan Commitment and the incurrence of such Incremental Term Loan, (iii) after giving effect, on an Incremental Pro Forma Basis, to the making of such Incremental Term Loans (and, to the extent applicable, to any change in Consolidated EBITDA and any increase in Indebtedness resulting from the consummation of any Permitted Acquisition concurrently with such incurrence of Incremental Term Loans), as of the date of the most recent financial statements delivered pursuant to Section 5.01(b) or (c), Borrower shall be in compliance with the covenant set forth in Section 6.08 and (iv) after giving effect, on an Incremental Pro Forma Basis, to the incurrence of (A) an Incremental Term Loan or Permitted Incremental Equivalent Debt secured by a Lien ranking *pari passu* with the Liens securing the Obligations, (I) with respect to any such Indebtedness incurred on or prior to the six month anniversary of the Closing Date, the Net Total Leverage Ratio shall not exceed the Closing Date Net Total Leverage Ratio and (II) with respect to any such Indebtedness incurred following the six month anniversary of the Closing Date, the Net Total Leverage Ratio shall not exceed 5.00:1.00 or (B) Permitted Incremental Equivalent Debt that is unsecured or secured by a Lien ranking junior to the Liens securing the Obligations, (I) with respect to any such Indebtedness incurred on or prior to the six month anniversary of the Closing Date, the Net Total Leverage Ratio shall not exceed the Closing Date Net Total Leverage Ratio and (II) with respect to any such Indebtedness incurred following the six month anniversary of the Closing Date, the Net Total Leverage Ratio shall not exceed 5.00:1.00; *provided* that, in the case of an Incremental Term Loan or Permitted Incremental Equivalent Debt, the proceeds of which will be utilized to consummate a Permitted Acquisition, which acquisition is subject to customary "certain funds" provisions, the applicable Net Total Leverage Ratio pursuant to this clause (iv) shall be tested, at the option of the Loan Parties, either (x) at the time a definitive agreement is entered into with respect to such acquisition or (y) upon the consummation of such acquisition and the funding of such Incremental Term Loans or Permitted Incremental Equivalent Debt.

(c)     The terms of the Incremental Term Loans shall be determined by the Borrower, the Administrative Agent and the Incremental Term Lenders and set forth in an Additional Credit Extension Amendment; *provided* that (i) the final maturity date of any Incremental Term Loans shall be no earlier than the Latest Maturity Date, (ii) the weighted average life to maturity of the Incremental Term Loans shall be no shorter than the remaining weighted average life to maturity of the Term Loans (calculated without giving effects to prepayments thereof), (iii) the Incremental Term Loans will rank *pari passu* in right of payment and with respect to security with the Term Loans, and all other loans under the Credit Facilities, none of the obligors or guarantors with respect thereto shall be a Person that is not a Loan Party and such Incremental Term Loans shall not be secured by any property or assets of Holdings, the Borrower or any Subsidiary Guarantor other than the Collateral, (iv) if the All-in Yield on such Incremental Term Loans exceeds the initial All-in Yield for the Term Loans incurred on the Closing Date by more than 50 basis points (the amount of such excess above 50 basis points being referred to herein as the "*Yield Differential*"), then the Applicable Margin (at each level) for the Term Loans shall automatically be increased by the Yield Differential, effective upon the making of the Incremental Term Loans (*provided* that if the Incremental Term Loans include an interest rate floor greater than the applicable interest rate floor under the Term Loans, such differential between interest rate floors shall only be included in the calculation of All-in Yield to the extent such increase in interest rate floors would cause an increase in the interest rate then in effect, and such increase and any other increase otherwise required by this clause (iv) to the extent attributable to such higher interest rate floor shall be

implemented by increasing the interest rate floor (but not the interest rate margin) applicable to the Term Loans incurred on the Closing Date), (v) the Incremental Term Loans shall not share more than ratably in any mandatory prepayments of the Loans and (vi) to the extent the terms of the Incremental Term Loans are inconsistent with the terms set forth herein (except as set forth in clauses (i) through (iv) above), such terms shall be reasonably satisfactory to the Administrative Agent and in no event shall such terms be materially more restrictive to the Loan Parties, taken as a whole, than the terms set forth herein unless the Lenders under all Credit Facilities existing at such time shall also receive the benefits of such terms with respect to their Loans or such terms shall apply to the Incremental Term Loans only after the Latest Maturity Date as in effect immediately prior to the effectiveness of such Incremental Term Loans.

(d)    In connection with any Incremental Term Loan Commitments, the Borrower, the Administrative Agent and each applicable Incremental Term Lender shall execute and deliver to the Administrative Agent an Additional Credit Extension Amendment and such other documentation as the Administrative Agent shall reasonably specify to evidence the Incremental Term Loan Commitment of each Incremental Term Lender.  The Administrative Agent shall promptly notify each Lender as to the effectiveness of each Additional Credit Extension Amendment.  Any Additional Credit Extension Amendment may, without the consent of any other Lender, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate (but only to such extent), in the reasonable opinion of the Administrative Agent and the Borrower, to effect the provisions of this Section 2.22, including any amendments necessary to establish the Incremental Term Loans and/or Incremental Term Loan Commitments as a new Class or tranche of Loans, as applicable, and such other technical amendments as may be necessary or appropriate in the reasonable opinion of the Administrative Agent and the Borrower in connection with the establishment of such new Class or tranche (including to preserve the *pro rata* treatment of the Term Loans and Incremental Terms Loans classes or tranches), in each case on terms consistent with this Section 2.22. The Administrative Agent and the Lenders hereby agree that the minimum borrowing, *pro rata* borrowing, *pro rata* payment requirements and notice requirements contained elsewhere in this Agreement shall not apply to the transactions effected pursuant to the immediately preceding sentence.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

In order to induce the Lenders to enter into this Agreement and to make the Loans as provided herein, each of Holdings (solely with respect to the representations and warranties applicable to it) and the Borrower makes the following representations and warranties on the Closing Date.

SECTION 3.01. ***Organization Status***.  Each of Holdings, the Borrower and each of the Restricted Subsidiaries (a) is a duly organized and validly existing entity in good standing (or existing, as applicable) under the laws of the jurisdiction of its organization, (b) has all requisite power and authority to own its material property and assets and to transact the business in which it is engaged and presently proposes to engage and (c) is, to the extent such concepts are applicable under the laws of the relevant jurisdiction, duly qualified and is authorized to do business and is in good standing in each jurisdiction where the ownership, leasing or operation of its property or the conduct of its business requires such qualifications, except in the case of clauses (a) (other than with respect to the Borrower), (b) and (c) for failures to be so qualified or authorized or have such power which, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

SECTION 3.02. ***Power, Authority and Enforceability***.  Each Loan Party has the requisite power and authority to execute, deliver and perform the terms and provisions of each of the Loan Documents to which it is party and has taken all necessary actions to authorize the execution, delivery and performance by it of each such Loan Document.  Each Loan Party has duly executed and delivered each of the Loan Documents to which it is party, and each of such Loan Documents constitutes its legal, valid and binding obligation, enforceable in accordance with its terms, except to the extent (a) that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law), (b) of the need for filings and registrations necessary to create or perfect the Liens on the Collateral granted by the Loan Parties in favor of the Collateral Agent for the benefit of the Secured Parties and (c) the effect of foreign laws, rules and regulations as they relate to pledges of Equity Interests in Foreign Subsidiaries and Intercompany Debt owed by Foreign Subsidiaries.

SECTION 3.03. ***No Violation***.  Neither the execution, delivery or performance by any Loan Party of each of the Loan Documents to which it is a party, nor compliance by it with the terms and provisions thereof, (a) will contravene any provision of any material law, statute, rule or regulation or any order, writ, injunction or decree of any court or Governmental Authority, except in the case of any contraventions that would not reasonably be expected, either individually or in the aggregate, to result in a Material Adverse Effect, (b) will conflict with, or result in any breach of, any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien (except pursuant to the Security Documents or Permitted Liens) upon any of the property or assets of any Loan Party or any of the Restricted Subsidiaries pursuant to the terms of, (i) the ABL Loan Documents or (ii) any indenture, mortgage, deed of trust, credit agreement or loan agreement, or any other material agreement, contract or instrument, in each case to which any Loan Party or any Restricted Subsidiary is a party or by which it or any its property or assets is bound or to which it may be subject, except for any such contravention, breach, default, conflict or Lien that would not reasonably be expected, either individually or in the aggregate, to result in a Material Adverse Effect or (c) will violate any provision of the certificate or articles of incorporation, certificate of formation, limited liability company agreement or by-laws (or equivalent organizational documents), as applicable, of any Loan Party or any Restricted Subsidiary.

SECTION 3.04. ***Approvals***.  No order, consent, approval, license, authorization or validation of, or filing, recording or registration with, or exemption by, any Governmental Authority or any material consent from third parties is required to be obtained or made by, or on behalf of, any Loan Party (except for (a) those that have otherwise been obtained or made on or prior to the Closing Date and which remain in full force and effect on the Closing Date, (b) filings which are necessary to release Liens granted pursuant to documents related to Indebtedness to be refinanced or repaid on the Closing Date, (c) filings which are necessary to perfect the security interests created under the Security Documents and (d) those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure of which to obtain or make could not reasonably be expected to have a Material Adverse Effect) to authorize, or is required to be obtained or made by, or on behalf of, any Loan Party in connection with, (i) the execution, delivery and performance of any Loan Document or (ii) the legality, validity, binding effect or enforceability of any such Loan Document.

SECTION 3.05. ***Financial Statements; Financial Condition; Undisclosed Liabilities; Projections***.

(a)      (i) The audited consolidated balance sheets and related statements of income and cash flows of the Borrower as of and for the fiscal years ended December 31, 2011, 2012 and 2013, furnished

57

to the Administrative Agent and the Lenders on or prior to the Closing Date, present fairly in all material respects the consolidated financial position of the Borrower as of such dates and for such periods and (ii) the unaudited consolidated balance sheets and related statements of income and cash flows of the Borrower as of and for the fiscal quarter ended June 30, 2014 furnished to the Administrative Agent and the Lenders prior to the Closing Date, present fairly in all material respects the consolidated financial condition of the Borrower as of such dates and for such periods, subject to normal year-end adjustments and the absence of footnotes.  All such financial statements have been prepared in accordance with GAAP consistently applied except to the extent provided in the notes to said financial statements and subject, in the case of the unaudited financial statements, to normal year-end audit adjustments and the absence of footnotes.

(b)    All financial statements delivered pursuant to Sections 5.01(b) and (c), if any, have been prepared in accordance with GAAP (except as otherwise provided in Section 5.01(b) and (c)) and present fairly in all material respects the consolidated financial position of the Borrower as of the dates and for the periods to which they relate.

(c)    The *pro forma* consolidated balance sheet and related statement of income of the Borrower as of June 30, 2014 (after giving effect to (x) the Transactions and (y) the Acquisition) as if the Transactions and the Acquisition had occurred as of such date and for the fiscal quarter ended on such date), a copy of which has been furnished to the Administrative Agent and Lenders on or prior to the Closing Date, presents a good faith estimate of the *pro forma* consolidated financial position of the Borrower as of such date.

(d)    The Projections made available to the Administrative Agent and the Lenders on or prior to the Closing Date have been prepared in good faith and are based on assumptions that the Borrower believes reasonable at the time made and at the time such Projections were made available to the Arranger, it being recognized by the Administrative Agent and the Lenders, however, that projections are subject to significant uncertainties and contingencies, which may be beyond the Borrower's and the Subsidiaries' control and projections as to future events are not to be viewed as facts or as a guarantee of performance or achievement of any particular results and that the actual results during the period or periods covered by the Projections may differ from the projected results included in such Projections and such differences may be material.

(e)    After giving effect to the Transactions, since December 31, 2013, nothing has occurred that has had, or could reasonably be expected to have, a Material Adverse Effect.

SECTION 3.06. **Litigation**.    There are no actions, suits or proceedings pending or, to the knowledge of Holdings and the Borrower, threatened (a) with respect to the Loan Documents or (b) that have a reasonable likelihood of adverse determination, and, if adversely determined, have had, or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

SECTION 3.07. **True and Complete Disclosure**.  All information (when furnished and taken as a whole) furnished by or on behalf of the Borrower in writing to the Administrative Agent or any Lender (including, without limitation, all information contained in the Confidential Information Memorandum and the Loan Documents but excluding information of a general economic or industry nature) for purposes of, or in connection with this Agreement, the other Loan Documents or any transaction contemplated herein or therein is, and all other such information as supplemented (when furnished and taken as a whole) hereafter furnished by or on behalf of Holdings, the Borrower or any Subsidiary in writing to the Administrative Agent or any Lender will be, true and accurate in all material respects on the date on which such information is furnished and not incomplete by omitting to state any fact necessary to

make such information (when furnished and taken as a whole) not materially misleading at such time in light of the circumstances under which such information was provided; *provided* that for purposes of this Section 3.07, to the extent any such information constitutes Projections, any *pro forma* financial information, the budgets, other forward looking information such representation shall be only that such information was prepared in good faith based on assumptions believed by the Borrower to be reasonable at the time such information was furnished.

SECTION 3.08. ***Margin Regulations***.  No part of any Credit Event (or the proceeds thereof) will be used to purchase or carry any Margin Stock or to extend credit for the purpose of purchasing or carrying any Margin Stock.  Neither the making of any Loan nor the use of the proceeds thereof will violate the provisions of Regulation T, U or X of the Board.

SECTION 3.09. ***Tax Returns and Payments***.  Each of Holdings, the Borrower and each of the Restricted Subsidiaries has timely filed or caused to be timely filed (or filed for extension) with the appropriate taxing authority all federal and other returns, statements, forms and reports for taxes (the "***Returns***") required to be filed by, or with respect to the income, properties or operations of, such Person, except where the failure to timely file or cause to be timely filed such Returns would not result in a Material Adverse Effect.  The Returns accurately reflect all liability for taxes of such Person for the periods covered thereby, except where the failure to accurately reflect a liability for taxes would not reasonably be expected to result in a Material Adverse Effect.  Each of Holdings, the Borrower and each of the Restricted Subsidiaries has paid all taxes and assessments payable by it which have become due, other than (a) those that are being contested in good faith and adequately disclosed and fully provided for on the financial statements of such Person in accordance with GAAP or (b) those the failure to pay would not reasonably be expected to result in a Material Adverse Effect.

SECTION 3.10. ***Compliance with ERISA***.  Schedule 3.10 sets forth each Plan as of the Closing Date.  Each Plan is in compliance in form and operation with its terms and with ERISA and the Code (including without limitation the Code provisions compliance with which is necessary for any intended favorable tax treatment) and all other applicable laws and regulations, except where any failure to comply would not reasonably be expected to have a Material Adverse Effect.  Except as would not reasonably be expected to have a Material Adverse Effect, each Plan (and each related trust, if any) which is intended to be qualified under Section 401(a) of the Code has received a current favorable determination letter from the IRS to the effect that it meets the requirements of Sections 401(a) and 501(a) of the Code or is comprised of a master or prototype plan that has received a favorable opinion letter from the IRS, and to the knowledge of the Borrower or any Subsidiary, nothing has occurred since the date of such determination or opinion that would reasonably be expected to result in revocation of such determination (or, in the case of a Plan with no determination, to the knowledge of the Borrower or any Subsidiary, nothing has occurred that would reasonably be expected to materially adversely affect the issuance of a favorable determination letter).  No ERISA Event has occurred other than as would not, individually or in the aggregate, have a Material Adverse Effect.

(a)        There exists no Unfunded Pension Liability with respect to any Plan that would have a Material Adverse Effect.

(b)        Neither the Borrower, nor any Subsidiary nor any of their respective ERISA Affiliates have incurred a complete or partial withdrawal from any Multiemployer Plan, and, if each of the Borrower, any of the Subsidiaries and each ERISA Affiliate were to withdraw in a complete withdrawal as of the date this assurance is given or deemed given, the aggregate withdrawal liability that would be incurred would not reasonably be expected to result in a Material Adverse Effect.

(c)　　　There are no actions, suits or claims pending against or involving a Plan (other than routine claims for benefits) or, to the knowledge of the Borrower or any of the Subsidiaries, which would reasonably be expected to be asserted successfully against any Plan and, if so asserted successfully, would reasonably be expected either singly or in the aggregate to have a Material Adverse Effect.

(d)　　　No Lien imposed under the Code or ERISA on the assets of the Borrower or any Subsidiary exists or is reasonably expected to arise on account of any Plan.

(e)　　　Except as would not individually or in the aggregate, have a Material Adverse Effect, (i) each Foreign Pension Plan has been maintained in compliance with its terms and with the requirements of any and all applicable laws, statutes, rules, regulations and orders and has been maintained, where required, in good standing with applicable regulatory authorities, (ii) all contributions required to be made with respect to a Foreign Pension Plan have been timely made, (iii) neither the Borrower nor any of the Subsidiaries has incurred any obligation in connection with the termination of, or withdrawal from, any Foreign Pension Plan and (iv) the present value of the accrued benefit liabilities (whether or not vested) under each Foreign Pension Plan, determined as of the end of the Borrower's most recently ended fiscal year on the basis of actuarial assumptions, each of which is reasonable, did not exceed the current value of the assets of such Foreign Pension Plan allocable to such benefit liabilities.

SECTION 3.11. *Security Documents*.

(a)　　　The provisions of the Collateral Agreement are effective to create in favor of the Collateral Agent for the benefit of the Secured Parties a legal, valid and enforceable (except (i) to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law) and (ii) for the effect of foreign laws, rules and regulations as they relate to pledges of Equity Interests in Foreign Subsidiaries and Intercompany Debt owed by Foreign Subsidiaries) security interest in all right, title and interest of the Loan Parties in the Collateral described therein, and the Collateral Agent, for the benefit of the Secured Parties, has (or, after the filing of UCC-1 financing statements in the office and with the information specified by the Loan Parties in the Perfection Certificate, the payment of all applicable fees and the taking of such other actions as are required by the Collateral Agreement, will have) a fully perfected security interest in the United States in all right, title and interest in all of the Collateral described therein (if and to the extent the such Collateral can be perfected by the filing of UCC-1 financing statements and the other actions required by the Collateral Agreement), subject to no other Liens other than Permitted Liens.  The recordation of the security agreement(s) in respect of U.S. patents, trademarks or copyrights in the respective form attached to the Collateral Agreement, in each case in the United States Patent and Trademark Office or the United States Copyright Office, as applicable, together with filings on UCC-1 financing statements made pursuant to the Collateral Agreement and payment of all applicable fees, will create, as may be perfected by such filings and recordation, a perfected security interest in the U.S. patents, trademark registrations or copyrights that are part of the Collateral.

(b)　　　Upon filing or recording, as applicable, with the appropriate recording office, each Mortgage shall create, as security for the obligations purported to be secured thereby, a valid and enforceable (except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law)) perfected security interest in and mortgage Lien on the respective Mortgaged Property in favor of the Collateral Agent (or such other trustee as may be required or desired under local law) for the benefit of the Secured Parties, and subject to the ABL Intercreditor Agreement and any Pari Intercreditor Agreement, if any, superior

and prior to the rights of all third Persons and subject to no other Liens other than, in each case, Permitted Liens.

SECTION 3.12. ***Properties***.  All real property owned or leased by Holdings, the Borrower or any of the Restricted Subsidiaries as of the Closing Date, and the nature of the interest therein, is correctly set forth on Schedule 3.12.  Each of Holdings, the Borrower and each of the Restricted Subsidiaries has good and marketable title to all real properties owned by it, free and clear of all Liens, other than Permitted Liens.  Each of Holdings, the Borrower and each of the Restricted Subsidiaries has a valid leasehold interest in the real properties leased by it free and clear of all Liens other than Permitted Liens. Each of the Borrower and each of the Restricted Subsidiaries has materially complied with all obligations under all leases to which it is a party and enjoys peaceful and undisturbed possession under all such leases.

SECTION 3.13. ***Subsidiaries***.  On and as of the Closing Date, (a) Holdings has no subsidiary other than the Borrower and (b) the Borrower has no Subsidiaries other than those Subsidiaries listed on Schedule 3.13.  Schedule 3.13 sets forth, as of the Closing Date, the percentage ownership (direct and indirect) of each such Person in each class of capital stock or other Equity Interests of the Borrower and each of the Subsidiaries and also identifies the direct owner thereof.  All outstanding shares of Equity Interests of the Borrower and each Subsidiary have been duly and validly issued, are fully paid and non-assessable (to the extent applicable).  As of the Closing Date, none of Holdings, the Borrower nor any Subsidiary has outstanding any securities convertible into or exchangeable for its or any other Person's Equity Interests or outstanding any right to subscribe for or to purchase, or any options or warrants for the purchase of, or any agreement providing for the issuance (contingent or otherwise) of or any calls, commitments or claims of any character relating to, its or any other Person's Equity Interests or any stock appreciation or similar rights except as disclosed on Schedule 3.13.

SECTION 3.14. ***Compliance with Statutes, etc.***  Each of Holdings, the Borrower and each of the Restricted Subsidiaries is in compliance with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities in respect of the conduct of its business and the ownership of its property except such non-compliances as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

SECTION 3.15. ***Investment Company Act***.  None of Holdings, the Borrower nor any Restricted Subsidiary is required to be registered as an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

SECTION 3.16. ***Environmental Matters***.  Except as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (a) each of Holdings, the Borrower and each of the Restricted Subsidiaries is and has been in compliance with all applicable Environmental Laws and has obtained and is in compliance with the terms of any permits required under such Environmental Laws; (b) there are no Environmental Claims pending or to the knowledge of Holdings or the Borrower, threatened, against Holdings, the Borrower or any of the Restricted Subsidiaries; (c) no Lien, other than a Permitted Lien, has been recorded or to the knowledge of Holdings or the Borrower, threatened under any Environmental Law with respect to any real property owned by Holdings, the Borrower or any of the Restricted Subsidiaries; (d) None of Holdings, the Borrower or any Restricted Subsidiary has become subject to any Environmental Liability or has agreed to contractually assume or accept responsibility, for any Environmental Liability of any other Person; (e) no Person with an indemnity or contribution obligation to Holdings, the Borrower or any of the Restricted Subsidiaries relating to compliance with or liability under Environmental Law is in default with respect to such obligation; and (f) there are no facts, circumstances, conditions or occurrences with respect to the past or present business or operations of Holdings, the Borrower or any of the Restricted Subsidiaries that could reasonably be expected to give

rise to any Environmental Claim against Holdings, the Borrower or any of the Restricted Subsidiaries or any Environmental Liability of Holdings, the Borrower or any of the Subsidiaries.  For purposes of this Section 3.16, the terms "*Holdings*," "*Borrower*" and "*Restricted Subsidiary*" shall include any business or business entity which is, in whole or in part, a predecessor of Holdings, the Borrower or any Restricted Subsidiary.

SECTION 3.17. *Employment and Labor Relations*.  Neither the Borrower nor any Subsidiary is engaged in any unfair labor practice that could reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect.  There is (a) no unfair labor practice complaint pending against the Borrower or any Subsidiary or, to the knowledge of the Borrower, threatened in writing against any of them, before the National Labor Relations Board, and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement is pending against the Borrower or any of the Subsidiaries or, to the knowledge of the Borrower or any Subsidiary, threatened in writing against any of them, (b) no strike, labor dispute, slowdown or stoppage pending against the Borrower or any of the Subsidiaries or, to the knowledge of the Borrower or any Subsidiary, threatened against any of them, (c) to the knowledge of the Borrower or any Subsidiary, no question concerning union representation with respect to the employees of the Borrower or any of the Subsidiaries, (d) no equal employment opportunity charge or other claim of employment discrimination pending or, to the knowledge of the Borrower or any Subsidiary, threatened in writing against any of them and (e) to the knowledge of the Borrower or any Subsidiary, no wage and hour department investigation has been made of the Borrower or any of the Subsidiaries, except (with respect to any matter specified in clauses (a) – (e) above, either individually or in the aggregate) such as could not reasonably be expected to have a Material Adverse Effect.

SECTION 3.18. *Intellectual Property, Etc.*  Each of Holdings, the Borrower and each of the Restricted Subsidiaries owns or has the right to use all of the patents, trademarks, permits, domain names, service marks, trade names, trade dress, copyrights, licenses, inventions, trade secrets, proprietary information and know-how of any type, whether or not written (including, but not limited to, rights in computer programs and databases), formulas, and other intellectual property rights (collectively, "*IP Rights*"), that are used or held for use in or otherwise required to operate their respective businesses, without any known conflict with the rights of others which, or the failure to own or have which, as the case may be, could reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect.

SECTION 3.19. *Economic Sanctions*.  (a) None of Holdings, the Borrower and the Subsidiaries, nor any director or officer thereof, nor, to the knowledge of Holdings or the Borrower, any employee, agent or affiliate of Holdings, the Borrower or any of their Subsidiaries (i) is, or is owned or controlled by Sanctioned Persons or conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Sanctioned Person, (ii) deals in, or otherwise engages in any transaction related to, any Sanctioned Person, any property or interests in property of a Sanctioned Person or otherwise blocked pursuant to any Sanctions Law or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any Sanctions Law.

(b)	The Borrower will not, directly or indirectly, use the proceeds of the Loans, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other Person, (i) to fund any activities or business of or with any Sanctioned Person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of Sanctions, (ii) in any other manner that would result in a violation of Sanctions by any Person (including any Person

participating in the Loans, whether as lender, underwriter, advisor, investor or otherwise) or (iii) in any other manner that would result in a violation of Sanctions by any person (including any party to this Agreement or any other Person participating in the Term Loans, whether as lender, underwriter, advisor, investor or otherwise).

(c)       Holdings, the Borrower and the Subsidiaries are in compliance in all material respects with all applicable Sanctions Laws and all applicable Anti-Money Laundering Laws.

SECTION 3.20. ***Foreign Corrupt Practices Act***.    Each of Holdings, the Borrower and the Subsidiaries and their respective directors, officers, agents, employees, and any person acting for or on behalf of Holdings, the Borrower or such Subsidiary (I) has complied with, and will comply with, the U.S. Foreign Corrupt Practices Act, as amended from time to time, and the rules and regulations thereunder or any other applicable requirements of law relating to anti-corruption or anti-bribery (collectively, "***Anti-Corruption Laws***"), , and it and they have not made, offered, promised, or authorized, and will not make, offer, promise, or authorize, whether directly or indirectly, nor will any proceeds of any Loans be used, directly or indirectly, in furtherance of, any payment of anything of value to: (a) an executive, official, employee or agent of a governmental department, agency or instrumentality, (b) a director, officer, employee or agent of a wholly or partially government-owned or -controlled company or business, (c) a political party or official thereof, or candidate for political office, or (d) an executive, official, employee or agent of a public international organization (e.g., the International Monetary Fund or the World Bank) ("***Government Official***") while knowing or having a reasonable belief that all or some portion will be used for the purpose of: (i) influencing any act, decision or failure to act by a Government Official in his or her official capacity, (ii) inducing a Government Official to use his or her influence with a government or instrumentality to affect any act or decision of such government or entity, or (iii) securing an improper advantage; in order to obtain, retain, or direct business; and (II) will continue to maintain policies and procedures designed to promote and achieve compliance with such Anti-Corruption Laws and with the representations, warranties and covenants contained herein.

SECTION 3.21. ***Insurance***.    Schedule 3.21 sets forth a true, complete and correct description of all insurances maintained by Holdings, the Borrower or by each for the Restricted Subsidiaries as of the Closing Date.  Such insurance is in full force and effect and all premiums have been duly paid.  Holdings, the Borrower and the Restricted Subsidiaries have insurance in such amounts and covering such risks and liabilities as are in accordance with normal industry practice.

SECTION 3.22. ***Use of Proceeds***.    The Borrower will (a) use the proceeds of the Term Loans made on the Closing Date to (i) effect the Refinancing, (ii) fund the consideration for the Acquisition and (iii) pay Transaction Costs related to the foregoing, and (b)  use the proceeds of any Incremental Term Loans solely for the purposes specified in the applicable Additional Credit Extension Amendment.

SECTION 3.23. ***Solvency***.    Immediately after the consummation of the Transactions to occur on the Closing Date, the Borrower and the Subsidiaries, taken as a whole, are Solvent.

# ARTICLE IV

## CONDITIONS OF LENDING

SECTION 4.01. ***Closing Date Credit Event***.    The obligations of the Lenders to make Term Loans on the Closing Date and hereunder are subject to the satisfaction of the following conditions:

(a)    The Administrative Agent shall have received, on behalf of itself and the Lenders, a favorable written opinion of (i) DLA Piper LLP (US), counsel for the Loan Parties, in form and substance reasonably satisfactory to the Administrative Agent and (ii) applicable local counsel as reasonably requested by the Administrative Agent in each case (A) dated the Closing Date, (B) addressed to the Administrative Agent and the Lenders and (C) covering such other matters relating to the Loan Documents and the Transactions as the Administrative Agent shall reasonably request, and the Loan Parties hereby request each such counsel to deliver such opinions.

(b)    The Administrative Agent shall have received (i) a copy of the certificate or articles of incorporation (or comparable organizational document), including all amendments thereto, of each Loan Party, certified as of a recent date by the Secretary of State (or comparable entity) of the jurisdiction of its organization, and a certificate as to the good standing (where such concept is applicable) of each Loan Party as of a recent date, from such Secretary of State (or comparable entity), (ii) a certificate of the Secretary or Assistant Secretary of each Loan Party dated the Closing Date and certifying (A) that attached thereto is a true and complete copy of the by-laws (or comparable organizational document) of such Loan Party as in effect on the Closing Date and at all times since a date prior to the date of the resolutions described in clause (B) below, (B) that attached thereto is a true and complete copy of resolutions duly adopted by the Board of Directors of such Loan Party authorizing the execution, delivery and performance of the Loan Documents to which such Loan Party is a party and, in the case of the Borrower, the borrowings hereunder, and that such resolutions have not been modified, rescinded or amended and are in full force and effect, (C) that the certificate or articles of incorporation (or comparable organizational document) of such Loan Party have not been amended since the date of the last amendment thereto shown on the certificate of good standing furnished pursuant to clause (i) above, (D) as to the incumbency and specimen signature of each officer executing any Loan Document or any other document delivered in connection herewith on behalf of such Loan Party and (E) that attached thereto is a certified copy of a Certificate of Good Standing of such Loan Party (in so-called "long-form", if available, from such Secretary of State (or other applicable Governmental Authority); and (iii) a certificate of another officer as to the incumbency and specimen signature of the Secretary or Assistant Secretary executing the certificate pursuant to clause (ii) above.

(c)    The Administrative Agent shall have received a certificate, dated the Closing Date and signed by a Financial Officer of the Borrower, confirming compliance with the conditions precedent set forth in paragraphs (m), (n), (o), (p) and (s) of this Section 4.01.

(d)    The Administrative Agent shall have received all Fees, all fees payable under the Fee Letter and all other amounts due and payable to the Administrative Agent, the Arranger and their Affiliates and the Lenders on or prior to the Closing Date, including, to the extent invoiced within three Business Days of the Closing Date, reimbursement or payment of all out-of-pocket expenses required to be reimbursed or paid by the Borrower hereunder or under any other Loan Document.

(e)    The Administrative Agent shall have received duly executed counterparts of this Agreement, the Collateral Agreement and the ABL Intercreditor Agreement from each party thereto.

(f)    (i) the Administrative Agent shall have received duly executed counterparts of each Security Document from each party thereto and (ii) the Security Documents shall be in full force and effect on the Closing Date and the Collateral Agent on behalf of the Secured Parties shall have a perfected security interest in the Collateral of the type and priority described in each Security Document.

(g)    The Administrative Agent shall have received a certificate from the chief financial officer of the Borrower certifying that the Borrower and the Subsidiaries after giving effect to the Transactions, are Solvent.

(h)    The Administrative Agent shall have received, at least three Business Days prior to the Closing Date, all documentation and other information with respect to the Loan Parties required by regulatory authorities under applicable "***know your customer***" and anti-money laundering rules and regulations, including the USA PATRIOT Act.

(i)    The Administrative Agent shall have received a Borrowing Request as required by Section 2.03.

(j)    The Administrative Agent shall have received a copy of, or a certificate as to coverage under, the insurance policies required by Section 5.03 and the applicable provisions of the Security Documents, each of which shall be endorsed or otherwise amended to include a customary lender's loss payable endorsement and to name the Collateral Agent as additional insured, in form and substance satisfactory to the Administrative Agent (subject to the terms of the ABL Intercreditor Agreement).

(k)    The Administrative Agent shall have received a Perfection Certificate with respect to the Loan Parties dated the Closing Date and duly executed by a Responsible Officer of Holdings and the Borrower, and shall have received the results of a search of the Uniform Commercial Code filings (or equivalent filings) made with respect to the Loan Parties in the states (or other jurisdictions) of formation of such Persons, in which the chief executive office of each such Person is located and in the other jurisdictions in which such Persons maintain property, in each case as indicated on such Perfection Certificate, together with copies of the financing statements (or similar documents) disclosed by such search, and accompanied by evidence satisfactory to the Administrative Agent that the Liens indicated in any such financing statement (or similar document) would be permitted under Section 6.01 or have been or will be contemporaneously released or terminated.

(l)    The Lenders shall have received the financial statements and opinions referred to in Section 3.05, which financial statements shall not be in a form materially inconsistent with the financial statements or forecasts previously provided to the Administrative Agent.

(m)    The Borrower shall have delivered to the trustee in respect of the Existing Secured Notes an irrevocable notice of redemption with respect to the entire outstanding principal amount of the Existing Secured Notes and the Trustee and Collateral Trustee, as applicable, shall have acknowledged the occurrence of the Existing Secured Notes Satisfaction and Discharge.

(n)    The representations and warranties set forth in Article III and in each other Loan Document shall be true and correct in all material respects on and as of the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall be true and correct in all material respects on and as of such earlier date.

(o)    At the time of and immediately after such Credit Event, no Default or Event of Default shall have occurred and be continuing.

(p)    An amount sufficient to satisfy and discharge the indenture in respect of the Existing Secured Notes shall have been or will be, substantially simultaneously with the funding of the Term Loans on the Closing Date, deposited with the trustee in respect of the Existing Secured Notes and all guarantees and security in support thereof shall have been discharged and released and the Administrative

Agent shall have received reasonably satisfactory evidence thereof. Immediately after giving effect to the Transactions and the other transactions contemplated hereby, Holdings, the Borrower and the Subsidiaries shall have outstanding no Indebtedness or preferred stock other than (a) Indebtedness outstanding under this Agreement, (b) Indebtedness permitted under this Agreement to be outstanding on the Closing Date and (c) Indebtedness set forth on Schedule 6.04(b).

(q)     The Acquisition shall be consummated substantially concurrently with the funding of the Term Loans on the Closing Date in accordance with the Acquisition Agreement.

(r)     (i) The Acquisition shall be a Permitted Acquisition and all conditions set forth in Section 6.05(l) (other than clause (ii) of Section 6.05(l)) shall have been met with respect to the Acquisition, and (ii) a certificate of a Responsible Officer certifying that the Acquisition is a Permitted Acquisition shall have been delivered to the Administrative Agent.

(s)     [reserved].

(t)     The Administrative Agent shall have received duly executed copies of the ABL Credit Agreement and the other ABL Loan Documents.

(u)     The Equity Contribution and the Parent Note Repayment shall have occurred, or shall occur substantially simultaneously with the funding of the Loans hereunder on the Closing Date.

(v)     The Administrative Agent shall have received a duly executed Intercompany Note in respect of any Intercompany Debt owed by a Loan Party to a non-Loan Party as of the Closing Date.

## ARTICLE V

## AFFIRMATIVE COVENANTS

Each of Holdings and the Borrower hereby covenants and agrees that on and after the Closing Date and until the Commitments have been terminated and the Loans and Notes (in each case, together with interest thereon), Fees and all other Obligations (other than contingent obligations which are not then due and payable) incurred hereunder and thereunder, are paid in full:

SECTION 5.01. *Information Covenants*.  The Borrower will furnish to the Administrative Agent (for further distribution to each Lender):

(a)     *Monthly Financial Statements*.  Within 30 days after the close of each of the first two months in each fiscal quarter of the Borrower, the consolidated balance sheet of the Borrower and the consolidated Subsidiaries as at the end of such monthly accounting period and the related consolidated statements of income and retained earnings and statement of cash flows for such monthly accounting period and for the elapsed portion of the fiscal year ended with the last day of such monthly accounting period, in each case setting forth comparative figures for the corresponding monthly accounting period in the prior fiscal year, all of which shall be certified by a Financial Officer of the Borrower that they fairly present in all material respects in accordance with GAAP the financial condition of the Borrower and the consolidated Subsidiaries as of the dates indicated and the results of their operations for the periods indicated, subject to normal year-end audit adjustments and the absence of footnotes.

(b)     *Quarterly Financial Statements*.  Within 45 days after the close of each quarterly accounting period in each fiscal year of the Borrower, (i) the consolidated balance sheet of the Borrower

and the consolidated Subsidiaries as at the end of such quarterly accounting period and the related consolidated statements of income and retained earnings and statement of cash flows for such quarterly accounting period and for the elapsed portion of the fiscal year ended with the last day of such quarterly accounting period, in each case setting forth comparative figures for the corresponding quarterly accounting period in the prior fiscal year, all of which shall be certified by a Financial Officer of the Borrower that they fairly present in all material respects in accordance with GAAP the financial condition of the Borrower and the consolidated Subsidiaries as of the dates indicated and the results of their operations for the periods indicated, subject to normal year-end audit adjustments and the absence of footnotes and (ii) customary management's discussion and analysis of the important operational and financial developments during the then elapsed portion of such fiscal year consistent with the Borrower's historical practices.

(c)     *Annual Financial Statements*.  Within 105 days after the close of each fiscal year of the Borrower, (i) the consolidated balance sheet of the Borrower and the consolidated Subsidiaries as at the end of such fiscal year and the related consolidated statements of income and retained earnings and statement of cash flows for such fiscal year setting forth comparative figures for the preceding fiscal year and certified by Deloitte & Touche LLP, any other "Big Four"  independent certified public account or any other independent certified public account reasonably acceptable to the Administrative Agent, accompanied by an opinion of such accounting firm (which opinion shall be without a "going concern" or like qualification or exception and without any qualification (other than, with respect to any report delivered within one year prior to the Maturity Date, any explanatory paragraph or note made due to such Maturity Date occurring within one year after such report) or exception as to scope of audit except for qualifications relating to change in accounting principles or practices reflecting change in GAAP and required or approved by such independent certified public accountants stating that (unless it is such accounting firm's policy not to issue such statements) in the course of its regular audit of the financial statements of the Borrower and the consolidated Subsidiaries, which audit was conducted in accordance with generally accepted auditing standards, such accounting firm obtained no knowledge of any Default or an Event of Default relating to financial or accounting matters which has occurred and is continuing or, if in the opinion of such accounting firm such a Default or an Event of Default has occurred and is continuing, a statement as to the nature thereof and (ii) customary management's discussion and analysis of the important operational and financial developments during such fiscal year consistent with the Borrower's historical practices.  Simultaneously with the delivery of each set of financial statements referred to in Sections 5.01(b) and (c) above, the related financial statements reflecting the adjustments necessary to eliminate the accounts of Unrestricted Subsidiaries (if any) from such financial statements.

(d)     *Management Letters*.  Promptly after the Borrower's or any of the Subsidiaries' receipt thereof, a copy of any "management letter" received from its certified public accountants and management's response thereto in connection with each annual audit of the financial statements of the Borrower made by such accountants, subject to such confidentiality limitations as may be required by such independent public accountants in writing.

(e)     *Compliance Certificates*.  No later than five Business Days after the delivery of the financial statements pursuant to Section 5.01(b) or (c), a Compliance Certificate from a Financial Officer of the Borrower (which Compliance Certificate shall include calculations in reasonable detail of the covenant in Section 6.08 and with blanks appropriately completed and with any deviations from such form as may be acceptable to the Administrative Agent).

(f)     *Notice of Default, Litigation and Material Adverse Effect*.  Promptly, and in any event within five Business Days after any senior officer of the Borrower or any of the Restricted Subsidiaries

obtains knowledge thereof (other than in the case of (A) the following clause (i), in which case notice is to be provided within five days after occurrence thereof and (B) the following clause (vi), in which case notice is to be provided within 45 days after any senior officer of the Borrower or any of the Restricted Subsidiaries obtains knowledge thereof), notice of (i) the occurrence of any event which constitutes a Default or an Event of Default, (ii) any litigation or governmental investigation or proceeding pending against Holdings, the Borrower or any Subsidiary (x) which, either individually or in the aggregate, has been adversely determined or has a reasonable likelihood of adverse determination and such adverse determination has had, or could reasonably be expected to have, a Material Adverse Effect or (y) with respect to any Loan Document, (iii) any other event, change or circumstance that has had, or could reasonably be expected to have, a Material Adverse Effect, (iv) any ERISA Event that could reasonably be expected to have a Material Adverse Effect, (v) any strike, labor dispute, slowdown or stoppage pending against the Borrower or any of the Subsidiaries or (vi) the lifting of the five-year anti-dumping tariffs imposed by the Chinese Ministry of Commerce in November 2013 on Indian and Japanese imports of pyridine.

(g)     ***Other Reports and Filings***.  Promptly after the filing or delivery thereof, copies of all material financial information, proxy materials and reports, if any, which Holdings, the Borrower or any Subsidiary shall (i) publicly file with the SEC after a Qualified Public Offering or (ii) deliver pursuant to the ABL Credit Agreement (to the extent not otherwise provided hereunder).

(h)     ***Lender Conference Calls***. Within 60 days after the end of each fiscal quarter of the Borrower, at the request of the Administrative Agent or Required Lenders, hold a meeting (at a mutually agreeable location, venue and time or, at the option of the Administrative Agent, by conference call, the costs of such venue or call to be paid by Borrower) with all Lenders who choose to attend such meeting or conference call, at which meeting or conference call shall be reviewed the financial results of the previous fiscal quarter and the financial condition of the Borrower and its Restricted Subsidiaries.

(i)     ***Other Information***.  Promptly following reasonable request, such other information or documents (financial or otherwise) regarding the operations, business affairs and financial condition of Holdings, the Borrower or any of the Restricted Subsidiaries, or necessary for any Lender to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act, as the Administrative Agent or any Lender (through the Administrative Agent) may reasonably request; *provided* that in no event shall the Borrower be required to provide any environmental reports or surveys under this Agreement that only contain information that is immaterial to the interests of the Lenders based upon the good faith determination of the Borrower.

(j)     ***Budget***.  No later than 45 days after the end of each fiscal year of the Borrower, statements of forecasted income and cash flows for the Borrower and the consolidated Subsidiaries for each fiscal month in such fiscal year, together with supporting assumptions which were believed by the Borrower and the consolidated Subsidiaries in good faith to be reasonable when made, all prepared in good faith in reasonable detail and consistent with the Borrower and the consolidated Subsidiaries' past practices in preparing projections and otherwise reasonably satisfactory in scope to the Administrative Agent.

(k)     ***Management Report***.  Simultaneously with the delivery of each set of financial statements referred to in Section 5.01(b) and (c) above, a management report containing the financial statements and corresponding figures from the forecasted financials required by Section 5.01(j) for the current fiscal year.

Notwithstanding the foregoing, the obligations in Sections 5.01(b) and (c) may be satisfied with respect to financial information of the Borrower and the Restricted Subsidiaries by furnishing (I) the applicable financial statements of Holdings (or any direct or indirect parent of Holdings) or (II) the Form 10-K or 10-Q of Holdings (or any direct or indirect parent of Holdings), if and as applicable, filed with the SEC; *provided* that, with respect to clauses (I) and (II), (x) to the extent such information relates to Holdings (or any direct or indirect parent of Holdings), such information is accompanied by consolidating information that sets forth in reasonable detail the differences between the information relating to Holdings (or such parent), on the one hand, and the information relating to Borrower and the Restricted Subsidiaries on a standalone basis, on the other hand and (y) to the extent such information is in lieu of information required to be provided under Sections 5.01(b) and (c), such materials are accompanied by a report and opinion of Deloitte & Touche LLP or any other independent certified public account reasonably acceptable to the Administrative Agent, which report and opinion shall be prepared in accordance with generally accepted auditing standards (which opinion shall be without a "going concern" or like qualification or exception and without any qualification as to scope of audit (except as contemplated by Section 5.01(c)).

SECTION 5.02. ***Books, Records and Inspections***.  Holdings and the Borrower will, and will cause each of the Restricted Subsidiaries to, keep proper books of record and accounts in which full, true and correct (in all material respects) entries in conformity with GAAP (it being understood and agreed that Foreign Subsidiaries may maintain individual books and records in conformity with generally accepted accounting principles that are applicable in their respective countries of organization and that such maintenance shall not constitute a breach of the representations, warranties or covenants hereunder) and all requirements of law shall be made of all material dealings and transactions in relation to its business and activities.  Holdings and the Borrower will, and will cause each of the Restricted Subsidiaries to, permit officers and designated representatives of the Administrative Agent to visit and inspect, under guidance of officers of Holdings, the Borrower or any Restricted Subsidiary, any of the properties of Holdings, the Borrower or any Restricted Subsidiary, and to examine the books of account of Holdings, the Borrower or any Restricted Subsidiary and discuss the affairs, finances and accounts of Holdings, the Borrower or any Restricted Subsidiary with, and be advised as to the same by, its and their officers and independent accountants, all upon reasonable prior notice and at such reasonable times and intervals and to such reasonable extent as the Administrative Agent may reasonably request; *provided* that the Administrative Agent shall give Holdings and the Borrower an opportunity to participate in any discussions with its accountants; *provided further* that, (i) only the Administrative Agent on behalf of the Lenders may exercise the rights of the Administrative Agent and the Lenders under this Section 5.02 and (ii) in the absence of an Event of Default, the Administrative Agent shall not exercise its rights under this Section 5.02 more often than two times during any fiscal year and only one such time shall be at the Borrower's reasonable expense; *provided further*, that when an Event of Default exists, the Administrative Agent and its designees may do any of the foregoing at the reasonable expense of the Borrower at any time during normal business hours and upon reasonable advance notice; *provided further* that none of Holdings, the Borrower or any Restricted Subsidiary shall be required to disclose (i) records of the Board of Directors of Holdings, the Borrower or such Restricted Subsidiary, (ii) information subject to confidentiality agreements or attorney/client work privilege and (iii) other information (x) that constitutes non-financial trade secrets or non-financial proprietary information or (y) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by applicable law or the Administrative Agent that such information is being withheld and (z) use commercially reasonable efforts to disclose such information in a way that would not violate the applicable agreement, rule, regulation, law or risk waiver of such privilege.

SECTION 5.03. ***Maintenance of Property; Insurance***.

(a)      Holdings and the Borrower will, and will cause each of the Restricted Subsidiaries to, (i) keep all tangible property necessary to the business of Holdings, the Borrower and the Restricted Subsidiaries in good working order and condition, ordinary wear and tear excepted and subject to the occurrence of casualty and condemnation events, except if the failure to do so could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (ii) maintain with financially sound and reputable insurance companies insurance on all such property and against all such risks as is consistent and in accordance with industry practice for companies similarly situated owning similar properties and engaged in similar businesses as Holdings, the Borrower and the Restricted Subsidiaries (after giving effect to any self-insurance reasonable and customary for similar situated Persons engaged in the same or similar business as Holdings, the Borrower and the Restricted Subsidiaries) as reasonably determined by the Borrower, and (iii) furnish to the Administrative Agent, promptly following its reasonable request therefor, full information as to the insurance carried; *provided* so long as no Event of Default exists, the Administrative Agent may only make such request one time in any fiscal year.  Such insurance shall include physical damage insurance on all material real and personal property (whether now owned or hereafter acquired) on an all risk basis and business interruption insurance.  The provisions of this Section 5.03 shall be deemed supplemental to, but not duplicative of, the provisions of any Security Documents that require the maintenance of insurance.

(b)      Holdings and the Borrower will, and will cause each of the Restricted Subsidiaries to, at all times keep the Collateral insured to the extent required in Section 5.03(a) above in favor of the Collateral Agent, and all policies or certificates (or copies thereof) with respect to such insurance (and any other insurance maintained by Holdings, the Borrower and such Restricted Subsidiaries) (i) shall be endorsed to the Administrative Agent's reasonable satisfaction for the benefit of the Collateral Agent (including, without limitation, by naming the Collateral Agent as lender loss payee and/or additional insured), (ii) shall state that such insurance policies shall not be canceled without at least 10 days' prior written notice thereof by the respective insurer to the Administrative Agent and the Collateral Agent, (iii) shall request that such insurance provide that the respective insurers irrevocably waive any and all rights of subrogation with respect to the Collateral Agent and the other Secured Parties and (iv) shall be deposited with the Administrative Agent or the Collateral Agent.

(c)      If Holdings, the Borrower or any of the Restricted Subsidiaries shall fail to maintain insurance in accordance with this Section 5.03, or if Holdings, the Borrower or any of the Restricted Subsidiaries shall fail to so endorse and deposit all policies or certificates with respect thereto, the Administrative Agent shall have the right (but shall be under no obligation), upon seven Business Days' prior written notice from the Administrative Agent, to procure such insurance and Holdings and the Borrower jointly and severally agree to reimburse the Administrative Agent for all reasonable out-of-pocket costs and expenses of procuring such insurance.

(d)      If at any time the improvements on a Mortgaged Property are located in an area identified as a special flood hazard area by the Federal Emergency Management Agency or any successor thereto or other applicable agency, Holdings and the Borrower will, and will cause each of the Restricted Subsidiaries to, at all times keep and maintain flood insurance in an amount sufficient to comply with the Flood Laws.

SECTION 5.04. ***Existence; Franchises***.  Holdings and the Borrower will, and will cause each of the Restricted Subsidiaries to, do or cause to be done, all things necessary, to preserve and keep in full force and effect its existence and its rights, franchises, permits, and IP Rights; *provided however*, that nothing in this Section 5.04 shall prevent (a) sales of assets, dispositions and other transactions by Holdings, the Borrower or any of the Restricted Subsidiaries in accordance with the terms herein, (b) the

withdrawal by Holdings, the Borrower or any of the Restricted Subsidiaries of its qualification as a foreign company in any jurisdiction or (other than with respect to the Borrower) failure to otherwise preserve or keep in full force and effect its existence or rights, franchises, permits, or IP Rights, if such withdrawal or failure could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or (c) the expiration of copyrights or patents at the end of their statutory term.

SECTION 5.05. *Compliance with Statutes, etc.*  Holdings and the Borrower will, and will cause each of the Subsidiaries to, comply with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities in respect of the conduct of its business and the ownership of its property (including applicable statutes, regulations, orders and restrictions relating to environmental standards and controls, Anti-Corruption Laws, Sanctions Laws and  Anti-Money Laundering Laws ), except such non-compliances as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

SECTION 5.06. *Compliance with Environmental Laws*.  Holdings and the Borrower will comply, and will cause each of the Restricted Subsidiaries to comply, with all Environmental Laws and permits applicable to, or required by, the ownership, lease or use of any real property now or hereafter owned, leased or operated by Holdings, the Borrower or any of the Restricted Subsidiaries, except such noncompliances as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and will promptly pay or cause to be paid all costs and expenses incurred in connection with such compliance or to conduct any response or remedial action in accordance with Environmental Laws, and will keep or cause to be kept all such real property free and clear of any Liens (other than Permitted Liens) imposed pursuant to such Environmental Laws except for Liens imposed on leased real property resulting from the acts or omissions of the owner of such leased real property or of other tenants of such leased real property who are not within the control of none of Holdings, the Borrower and the Restricted Subsidiaries.

SECTION 5.07. *Business*.  Holdings and the Borrower will only, and will only permit the Restricted Subsidiaries to, engage directly or indirectly in the businesses engaged in by the Borrower and the Restricted Subsidiaries as of the Closing Date and reasonable extensions thereof and businesses ancillary, corollary, synergistic or complementary thereto.

SECTION 5.08. *Payment of Taxes*.

(a)    Holdings and the Borrower will pay and discharge, and will cause each of the Restricted Subsidiaries to pay and discharge, all Taxes imposed upon it or upon its income or profits or upon any properties belonging to it, prior to the date on which penalties attach thereto; *provided* that none of Holdings, the Borrower or any of the Restricted Subsidiaries shall be required to pay any such tax, assessment, charge, levy or claim which (i) is being contested in good faith and by proper proceedings if it has maintained adequate reserves with respect thereto in accordance with GAAP or (ii) the failure to pay could not reasonably be expected to have a Material Adverse Effect.

(b)    Holdings and the Borrower will pay and discharge, and will cause each of the Restricted Subsidiaries to pay and discharge, all Indebtedness and other obligations promptly and in accordance with their terms before the same shall become delinquent or in default, as well as all lawful claims for labor, materials and supplies or otherwise that, if unpaid, might give rise to a Lien upon such properties or any part thereof; *provided* that such payment and discharge shall not be required so long as the failure to pay could not reasonable be expected to have a Material Adverse Effect.

71

SECTION 5.09. ***Employee Benefits***. Except as would not reasonably be expected to have a Material Adverse Effect, the Borrower and each Subsidiary will comply in all respects with the provisions of ERISA and the Code applicable to employee benefit plans as defined in Section 3(3) of ERISA and the laws applicable to any Foreign Pension Plan. The Borrower and any Subsidiary will furnish to the Administrative Agent as soon as possible after, and in any event within 10 days after any Responsible Officer of the Borrower or any Subsidiary knows or has reason to know that, any ERISA Event has occurred or is reasonably expected to occur that, alone or together with any other ERISA Event that has occurred or is reasonably expected to occur that has resulted or would reasonably be expected to result in a liability of the Borrower, any Subsidiary or any ERISA Affiliate in excess of the Threshold Amount, a statement of a Financial Officer of the Borrower setting forth details as to such ERISA Event and the action, if any, that the Borrower proposes to take with respect thereto. Each Loan Party shall promptly and in any event within 30 days after a request by an Administrative Agent, furnish to the Administrative Agent copies of each Schedule SB (Actuarial Information) to the Annual Report (Form 5500 Series) with respect to each Plan sponsored by the Borrower, any Subsidiary or any of their respective ERISA Affiliates.

SECTION 5.10. ***Use of Proceeds***.   All proceeds of the Loans will be used solely for the applicable purposes specified in Section 3.22 and in compliance with Sections 3.08, 3.20 and 3.22.

SECTION 5.11. ***Further Assurances***.

(a)       Holdings and the Borrower will, and will cause each of the other Loan Parties to, at the expense of Holdings and the Borrower, make, execute, endorse, acknowledge, authorize, file and/or deliver to the Administrative Agent and the Collateral Agent from time to time such vouchers, invoices, schedules, confirmatory collateral assignments, conveyances, financing statements, transfer endorsements, powers of attorney, certificates, real property surveys, reports, assignments, and other documents, assurances or instruments and take such further steps relating to the Collateral covered by any of the Security Documents as the Administrative Agent or the Collateral Agent may reasonably require. Furthermore, with respect to the Mortgaged Properties, Holdings and the Borrower will, and will cause each of the other Loan Parties to deliver to the Administrative Agent and the Collateral Agent all such documentation in accordance with the Real Estate Collateral Requirements

(b)       Holdings and the Borrower agree that each action required by clause (a) of this Section 5.11 shall be completed within 45 days after such action is requested to be taken by the Administrative Agent or the Required Lenders (as such time may be extended by the Administrative Agent in its reasonable discretion).

(c)       If, following the Closing Date, any Subsidiary is acquired or organized or any Subsidiary ceases to be an Excluded Subsidiary, Holdings and the Borrower shall promptly (and in any event within 45 days (or such longer period as the Administrative Agent shall agree in its reasonable discretion) of such event or, where applicable, following such request) (i) notify the Administrative Agent thereof, (ii) cause such Subsidiary (other than any Excluded Subsidiary) to become a Loan Party by executing a Guaranty Supplement and a joinder to the Collateral Agreement (or a supplement thereto in the form specified therein), (iii) cause all outstanding Equity Interests in such Subsidiary owned by or on behalf of any Loan Party to be pledged pursuant to the Collateral Agreement (subject to the limitations set forth therein) and deliver to the Collateral Agent all certificates or other instruments representing such Equity Interests, together with stock powers or other instruments of transfer with respect thereto endorsed in blank, (iv) cause all documents and instruments, including Uniform Commercial Code financing statements and Mortgages (subject to Section 5.11(d)), required by law or reasonably requested by the Administrative Agent or the Collateral Agent to be filed, registered or recorded to create the Liens

intended to be created by the Security Documents and perfect or record such Liens to the extent, and with the priority, required by the Security Documents and the Intercreditor Agreements, to be filed, registered or recorded or delivered to the Administrative Agent and the Collateral Agent for filing, registration or recording, (v) cause each Loan Party to take all other action required by law, under the Security Documents or reasonably requested by the Administrative Agent or the Collateral Agent to perfect, register and/or record the Liens granted by it thereunder to the extent perfection is required hereunder and (vi) cause to be delivered to the Lenders all such instruments and documents (including legal opinions, title insurance policies and lien searches) as the Administrative Agent or the Collateral Agent shall reasonably request to evidence compliance with this Section 5.11(c).

(d)     If any fee owned real property is owned by any Subsidiary acquired as described in Section 5.11(c) or is acquired by any Loan Party after the Closing Date, other than such fee owned real property, the fair market value of which does not exceed, either individually or in the aggregate, $1,000,000, the Borrower shall notify the Administrative Agent thereof, and, if requested by the Administrative Agent or the Required Lenders, the Borrower will, no later than 90 days (or such longer period as the Administrative Agent shall agree to) after such acquisition, cause such assets to be subjected to a Lien securing the Obligations and will take such actions as shall be requested by the Administrative Agent to grant and perfect such Liens, including the satisfaction of the Real Estate Collateral Requirements, all at the expense of the Borrower.

(e)     If any notice, agreement or document is delivered (or required to be delivered) by any Loan Party to the Collateral Agent pursuant to Section 5.6 of the Collateral Agreement, the Borrower shall promptly (and in any event within 15 days of the date of such notice, agreement or document (or within 15 days of the date giving rise to the obligation to deliver such notice, agreement or document) notify the Administrative Agent thereof, and, if reasonably requested by the Administrative Agent or the Collateral Agent to be filed, registered or recorded to create the Liens intended to be created by the Security Documents and perfect or record such Liens to the extent, and with the priority, required by the Security Documents and the Intercreditor Agreements, to be filed, registered or recorded or delivered to the Administrative Agent and the Collateral Agent for filing, registration or recording.

SECTION 5.12. *Designation of Subsidiaries*.  (a) The Board of Directors of the Borrower may at any time designate any Restricted Subsidiary as an Unrestricted Subsidiary or designate (or re-designate, as the case may be) any Unrestricted Subsidiary as a Restricted Subsidiary; *provided* that (i) immediately before and after such designation (or re-designation), no Default or Event of Default shall have occurred and be continuing, (ii) immediately after giving effect to such designation, Borrower shall be in compliance, on a Pro Forma Basis, with the covenant set forth in Section 6.08, (iii) the status of any such Subsidiary as a Restricted Subsidiary or an Unrestricted Subsidiary shall at all times be the same under this Agreement and the ABL Credit Agreement and (iv) the Consolidated Net Tangible Assets of all Unrestricted Subsidiaries, when taken together (including with their subsidiaries), shall not comprise more than 5% of the total Consolidated Net Tangible Assets of the Borrower and its Subsidiaries on a consolidated basis.  The designation of any Subsidiary as an Unrestricted Subsidiary shall constitute an Investment by the Borrower in such Subsidiary at the date of such designation in an amount equal to the fair market value of such Subsidiary at such time as determined in good faith by the Borrower.  The designation of any Unrestricted Subsidiary as a Restricted Subsidiary shall constitute, at the time of such designation, the incurrence of any Indebtedness or Liens of such Subsidiary existing at such time and a return on any Investment by the Borrower in any Unrestricted Subsidiary pursuant to the preceding sentence in an amount equal to the fair market value of such Subsidiary at such time as determined in good faith by the Borrower.

(b) The Borrower may at any time, by notice in writing to the Administrative Agent, designate a any Subsidiary as an Immaterial Subsidiary; *provided* that (i) the Immaterial Subsidiaries, taken together and with their subsidiaries, do not, in the aggregate (x) comprise more than 2.50% of the Consolidated EBITDA of the Borrower and the Subsidiaries for the period of four fiscal quarters most recently ended on or prior to the date of designation for which financial statements have been delivered under Section 5.01(b) or 5.01(c) and (y) do not hold consolidated assets representing more than 2.50% of the Consolidated Net Tangible Assets of the Borrower and the Subsidiaries on the last day of the most recent fiscal quarter ended on or prior to the date of designation for which financial statements have been delivered under Section 5.01(b) or (c) and (ii) if, at any time, the limits set forth in clause (i) are not satisfied as at or for the four fiscal quarters ended on the most recently ended fiscal quarter for which financial statements have been delivered under Section 5.01(b) or (c) on or prior to such date, the Borrower shall promptly (and in any event within five Business Days from the date such financial statements have been delivered) re-designate one or more Immaterial Subsidiaries to be a Material Subsidiary as may be necessary such that the foregoing limits shall be satisfied, and any such Subsidiary shall thereafter be deemed to be a Material Subsidiary hereunder.

SECTION 5.13. **Ratings**.  Holdings and the Borrower shall use commercially reasonable efforts to obtain and maintain (but not at any specific level) (a) a public corporate family rating of the Borrower and a rating of each Class of the Loans, in each case from Moody's and (b) a public corporate credit rating of the Borrower and a rating of each Class of the Loans, in each case from S&P (it being understood and agreed that "commercially reasonable efforts" shall in any event include the payment by the Borrower of customary rating agency fees and cooperation with reasonable information and data requests by Moody's and S&P in connection with their ratings process).

SECTION 5.14. **Post-Closing Matters**   Notwithstanding anything to the contrary contained in this Agreement or the other Loan Documents, the parties hereto acknowledge and agree that within the time periods set forth on Schedule 5.14, or within such longer period or periods that the Administrative Agent in its sole discretion may permit, Holdings, the Borrower and the Restricted Subsidiaries shall deliver to the Administrative Agent or the Collateral Agent, as applicable, the documents, and perform the actions as set forth on Schedule 5.14.

# ARTICLE VI

## NEGATIVE COVENANTS

The Borrower hereby covenants and agrees (and, solely with respect to Section 6.10 below, Holdings covenants and agrees) that on and after the Closing Date and until the Commitments have terminated and the Loans, Notes, Fees and all other Obligations (other than any contingent obligations not then due and payable) incurred hereunder and thereunder, are paid in full:

SECTION 6.01. **Liens**.   The Borrower will not, and will not permit any of the Restricted Subsidiaries to, create, incur, assume or suffer to exist any Lien upon or with respect to any property of the Borrower or any of the Restricted Subsidiaries, whether now owned or hereafter acquired; *provided* that the provisions of this Section 6.01 shall not prevent the creation, incurrence, assumption or existence of the following (Liens described below are herein referred to as "***Permitted Liens***"):

(a)        Liens for Taxes which are not more than thirty (30) days overdue or which are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing the forfeiture or sale of the property or assets subject to any such Lien;

(b)      warehousemen's, materialmen's and mechanics' liens and other similar Liens, in each case, arising in the ordinary course of business and (i) which do not in the aggregate materially detract from the value of the Borrower's or such Restricted Subsidiary's property or assets or materially impair the use thereof in the operation of the business of the Borrower or such Restricted Subsidiary or (ii) which are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing the forfeiture or sale of the property or assets subject to any such Lien;

(c)      Liens in existence on the Closing Date which are listed, and the property subject thereto described, on Schedule 6.01(c), plus renewals, replacements, refinancings, restructurings and extensions of such Liens; *provided* that (i) the aggregate principal amount of the Indebtedness, if any, secured by such Liens does not increase from that amount outstanding at the time of any such renewal, replacement, refinancing, restructuring or extension, plus accrued and unpaid interest, fees and expenses (including premium) incurred in connection with such renewal, replacement or extension and an amount equal to any unutilized commitments in respect of such Indebtedness and (ii) any such renewal, replacement, refinancing, restructuring or extension does not encumber any additional assets or properties (other than the proceeds and products thereof and accessions thereto) of the Borrower or any Restricted Subsidiaries, unless such Lien is otherwise permitted under separate provisions of this Section 6.01;

(d)      Liens securing the Obligations created pursuant to the Security Documents;

(e)      (i) licenses, sublicenses, leases or subleases granted by the Borrower or any of the Restricted Subsidiaries to other Persons in the ordinary course of, and not materially interfering with the conduct of, the business of the Borrower or any of the Restricted Subsidiaries, and (ii) any interest or title of a lessor, sublessor, licensor or sublicensor under any lease or license agreement permitted by this Agreement to which the Borrower or any of the Restricted Subsidiaries is a party;

(f)      Liens upon assets of the Borrower or any of the Restricted Subsidiaries subject to Capitalized Lease Obligations to the extent such Capitalized Lease Obligations are permitted by Section 6.04(d); *provided* that (i) such Liens only serve to secure the payment of Indebtedness arising under such Capitalized Lease Obligation and (ii) the Lien encumbering the asset giving rise to the Capitalized Lease Obligation does not encumber any other asset of the Borrower or any Restricted Subsidiary other than the proceeds of the assets giving rise to such Capitalized Lease Obligation; *provided further*, that individual financings provided by one lender may be cross collateralized to other financings provided by such lender;

(g)      Liens placed upon equipment, machinery or other fixed assets acquired or constructed after the Closing Date and used in the ordinary course of business of the Borrower or any of the Restricted Subsidiaries and placed at the time of the acquisition or construction thereof by the Borrower or such Restricted Subsidiary or within 270 days thereafter to secure Indebtedness incurred to pay all or a portion of the purchase price thereof or to secure Indebtedness incurred solely for the purpose of financing the acquisition or construction of any such equipment, machinery or other fixed assets or renewals, replacements, refinancings, restructurings or extensions of any of the foregoing for the same or a lesser amount; *provided* that (i) the Indebtedness secured by such Liens is permitted by Section 6.04(d) and (ii) in all events, the Lien encumbering the equipment, machinery or other fixed asset so acquired or constructed does not encumber any other asset of the Borrower or any Restricted Subsidiary (other than the proceeds and products thereof and accessions thereto); *provided further*, that individual financings provided by one lender may be cross collateralized to other financings provided by such lender;

(h)      Liens which may arise as a result of zoning, building codes, and other land use laws regulating the use or occupancy of real property or the activities conducted thereon which are imposed by any Governmental Authority and which are not violated in any material way by the current use or

occupancy of such real property, easements, rights-of-way, restrictions, encroachments, minor survey defects and other similar charges or encumbrances, minor title defects or irregularities affecting real property, in each case not securing Indebtedness and not materially interfering with the ordinary conduct of the business of the Borrower and the Restricted Subsidiaries, taken as a whole;

(i)        Liens arising from precautionary UCC financing statement filings regarding operating leases entered into in the ordinary course of business of the Borrower and the Restricted Subsidiaries;

(j)        attachment and judgment Liens in respect of decrees and judgments to the extent, and for so long as, such judgments and decrees do not, individually or in the aggregate constitute an Event of Default under Article VII;

(k)        statutory and common law landlords' liens under leases to which the Borrower or any of the Restricted Subsidiaries is a party;

(l)        Liens (other than Liens imposed under ERISA) incurred in the ordinary course of business of the Borrower and the Restricted Subsidiaries in connection with workers compensation claims, unemployment insurance and social security benefits and Liens securing the performance of bids, tenders, public utilities or private utilities, leases and contracts in the ordinary course of business of the Borrower and the Restricted Subsidiaries, statutory obligations, surety or appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business (exclusive of obligations in respect of the payment for borrowed money);

(m)       with respect to any Mortgaged Property, Permitted Encumbrances;

(n)        Liens on property or assets acquired pursuant to a Permitted Acquisition or other permitted Investment, or on property or assets of a Restricted Subsidiary in existence at the time such Restricted Subsidiary is acquired pursuant to a Permitted Acquisition or other permitted Investment; *provided* that (i) any Indebtedness that is secured by such Liens is permitted to exist under Section 6.04(g) and (ii) such Liens are not incurred in connection with, or in contemplation or anticipation of, such Permitted Acquisition or other permitted Investment and do not attach to any other property or assets of the Borrower or any of the Restricted Subsidiaries other than the property and assets subject to such Liens at the time of such Permitted Acquisition or permitted Investment and the proceeds and products thereof and accessions thereto together with any renewals, refinancings, replacements, restructurings and extensions of the foregoing, so long as the Indebtedness secured by such Liens is permitted by Section 6.04(g) and such extension, renewal, refinancing, restructuring or replacement does not encumber any additional assets or properties of the Borrower or any of the Restricted Subsidiaries (other than the proceeds or accessions of the assets subject to such Lien);

(o)        Liens arising out of any conditional sale, title retention, consignment or other similar arrangements for the sale of goods entered into by the Borrower or any of the Restricted Subsidiaries in the ordinary course of business to the extent such Liens do not attach to any assets other than the goods subject to such arrangements;

(p)        Liens incurred in the ordinary course of business of the Borrower and the Restricted Subsidiaries (i) in connection with the purchase or shipping of goods or assets (or the related assets and proceeds thereof), which Liens are in favor of the seller or shipper of such goods or assets and only attach to such goods or assets and (ii) in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(q)    (i) bankers' Liens, rights of setoff and other similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by the Borrower or any Restricted Subsidiary, in each case granted in the ordinary course of business of the Borrower or any Restricted Subsidiary in favor of the bank or banks with which such accounts are maintained, securing amounts owing to such bank or banks with respect to cash management, automated clearing house transfers and operating account arrangements, (ii) Liens of a collection bank arising under Section 4-210 of the UCC on items in the course of collection, (iii) Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes and (iv) Liens that are contractual rights of setoff or rights of pledge relating to purchase orders and other agreements entered into with customers of the Borrower or any Restricted Subsidiary in the ordinary course of business of the Borrower and any Restricted Subsidiary;

(r)    Liens granted in the ordinary course of business of the Borrower and the Restricted Subsidiaries on insurance policies and proceeds thereof securing liability for premiums or reimbursement or indemnification obligations thereunder to the extent the financing is permitted under Section 6.04;

(s)    Liens (i) on earnest money deposits of cash or Cash Equivalents or cash advances made in connection with any Permitted Acquisition or other permitted Investments or in respect of any anticipated Permitted Acquisition or other permitted Investment or (ii) consisting of an agreement to dispose of any property in a disposition permitted under Section 6.02;

(t)    Liens on assets of Foreign Subsidiaries or a Restricted Subsidiary that is not a Loan Party securing Indebtedness permitted to be incurred by such Subsidiaries pursuant to Section 6.04;

(u)    in the case of any non-wholly owned Restricted Subsidiary, any put and call arrangements or restrictions on disposition related to its Equity Interests set forth in its organizational documents or any related joint venture or similar agreement;

(v)    ground leases in respect of real property on which facilities owned or leased by the Borrower or any Restricted Subsidiary are located;

(w)    [reserved];

(x)    [reserved];

(y)    Liens on the Collateral securing Permitted Incremental Equivalent Debt and any Permitted Refinancing thereof, in each case permitted pursuant to Section 6.04(m);

(z)    [reserved];

(aa)    Liens on the Collateral securing (i) Indebtedness under the ABL Loan Documents and Permitted Refinancing thereof permitted pursuant to Section 6.04(r) and (ii) ABL Bank Product Obligations and ABL Cash Management Obligations (each as defined in the ABL Intercreditor Agreement); *provided* that in each case under clauses (i) and (ii) such Liens shall be subject to, and have the priority contemplated by, the ABL Intercreditor Agreement; and

(bb)    additional Liens of the Borrower or any Restricted Subsidiary not otherwise permitted by this Section 6.01 that do not secure obligations in an aggregate principal amount in excess of $5,000,000.

77

SECTION 6.02. ***Consolidation, Merger or Sale of Assets, Etc.*** The Borrower will not, and will not permit any Restricted Subsidiary to, wind up, liquidate or dissolve its affairs enter into any partnership, joint venture, or transaction of merger or consolidation, or convey, sell, lease or otherwise dispose of all or any part of its property or assets (other than sales of inventory in the ordinary course of business), or enter into any sale-leaseback transactions, except that:

(a)    the Borrower and the Restricted Subsidiaries may liquidate or otherwise dispose of obsolete or worn-out, uneconomical, surplus or no longer used property in the ordinary course of business or dispose of inventory, goods held for sale in the ordinary course of business and immaterial assets (including allowing any registrations or any applications for registration of any immaterial intellectual property to be cancelled, to lapse or go abandoned) in the ordinary course of business;

(b)    Investments may be made to the extent permitted by Section 6.05;

(c)    the Borrower and the Restricted Subsidiaries may sell assets (other than the capital stock or other Equity Interests of any Wholly Owned Subsidiary, unless all of the capital stock or other Equity Interests of such Wholly Owned Subsidiary are sold in accordance with this clause (c)), so long as (i) no Event of Default then exists or would result therefrom, (ii) each such sale is in an arm's-length transaction and the Borrower or the respective Restricted Subsidiary receives at least fair market value (as determined in good faith by the Borrower or the applicable Restricted Subsidiary), (iii) with respect to dispositions (or series of related dispositions) of assets having a fair market value (as determined in good faith by the Borrower or the applicable Restricted Subsidiary) in excess of $10,000,000, the consideration received consists of at least 75% cash or Cash Equivalents and is paid at the time of the closing of such sale, (iv) after giving pro forma effect to such proposed disposition, the Borrower is in compliance with the financial covenant set forth in Section 6.08 as of the most recently ended Test Period (assuming for purposes of Section 6.08, that such disposition and all other such dispositions permitted under this clause (c) consummated since the first day of the relevant Test Period for the financial covenant set forth in Section 6.08 ending on or prior to the date of such disposition, had occurred on the first day of such relevant Test Period) and (v) the Net Sale Proceeds therefrom are applied and/or reinvested as (and to the extent) required by Section 2.13;

(d)    the Borrower and the Restricted Subsidiaries may lease (as lessee) or license (as licensee) real or personal property (so long as any such lease or license does not create a Capitalized Lease Obligation except to the extent permitted by Section 6.04(d));

(e)    the Borrower and the Restricted Subsidiaries may sell or discount, in each case without recourse and in the ordinary course of business, accounts receivable arising in the ordinary course of business, but only in connection with the compromise or collection thereof and not as part of any financing transaction;

(f)    the Borrower and the Restricted Subsidiaries may grant licenses, sublicenses, leases or subleases to other Persons in the ordinary course of, and not materially interfering with the conduct of, the business of the Borrower or any of the Restricted Subsidiaries;

(g)    the Borrower and the Restricted Subsidiaries may convey, sell or otherwise transfer property to the Borrower or any other Restricted Subsidiary; *provided* that if the transferor of such property is a Loan Party, (i) the transferee thereof must be a Loan Party or (ii) the aggregate amount of all dispositions during the term of this Agreement to transferees that are not Loan Parties shall not exceed $5,000,000;

(h)     any Restricted Subsidiary may merge, amalgamate or consolidate with and into, or be dissolved or liquidated into, (x) the Borrower; *provided* that the Borrower shall be the continuing or surviving Person or (y) one or more other Restricted Subsidiaries; *provided* that if any party to any such transaction is a Loan Party, the surviving entity of such transaction shall be a Loan Party;

(i)     any Restricted Subsidiary may change its legal form if the Borrower determines in good faith that such action is in the best interest of the Borrower and the Subsidiaries and if not materially disadvantageous to the Lenders (it being understood that in the case of any change in legal form, a Restricted Subsidiary that is a Guarantor will remain a Guarantor unless such Guarantor is otherwise permitted to cease being a Guarantor hereunder);

(j)     Permitted Acquisitions may be consummated in accordance with the requirements of Section 6.05;

(k)     the Borrower and the Restricted Subsidiaries may liquidate or otherwise dispose of Cash Equivalents;

(l)     the Acquisition may be consummated in accordance with the terms of the Acquisition Agreement;

(m)    the Borrower and the Restricted Subsidiaries may cancel or abandon or allow lapse of any intellectual property rights which are, in the reasonable business judgment of the Borrower or any Restricted Subsidiary, no longer material to, or no longer used or useful in, the business of the Borrower and the Restricted Subsidiaries;

(n)     the Borrower and the Restricted Subsidiaries may terminate or unwind any Hedging Agreement in accordance with its terms;

(o)     the Borrower and the Restricted Subsidiaries may dispose of property and assets to the extent they were the subject of a casualty or of condemnation proceedings upon the occurrence of the related Recovery Event;

(p)     the Borrower and the Restricted Subsidiaries may dispose of property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such disposition are promptly applied to the purchase price of such replacement property;

(q)     to the extent constituting dispositions, the Borrower and the Restricted Subsidiaries may grant liens in the form of Permitted Liens and issue Restricted Payments permitted by Sections 6.01 and 6.05, respectively;

(r)     the Borrower and the Restricted Subsidiaries may dispose of property pursuant to Sale-Leaseback Transactions; *provided* that (x) the aggregate amount of the fair market value of all property of the Loan Parties so disposed of on or after the Closing Date shall not exceed $20,000,000 and (y) the Net Sale Proceeds therefrom are applied and/or reinvested as (and to the extent) required by Section 2.13;

(s)     the Borrower and the Restricted Subsidiaries may swap assets in exchange for services or other assets in the ordinary course of business of comparable or greater value or usefulness to the business of the Borrower and the Subsidiaries as a whole, as determined in good faith by the management of the Borrower; *provided* that to the extent any such assets constitutes Collateral, the assets received in

79

return shall become Collateral and the Borrower shall comply with Section 5.11 with respect to any such assets received in return;

(t)      the Borrower and the Restricted Subsidiaries may dispose of Investments in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangements between, the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(u)      the Borrower and the Restricted Subsidiaries may sell non-core assets acquired in connection with Permitted Acquisitions or other Investments; *provided* that (i) no Default or Event of Default then exists or would result therefrom, (ii) the aggregate amount of such sales shall not exceed 25% of the fair market value of the acquired entity or business, (iii) each such sale is in an arm's-length transaction and the Borrower or the respective Restricted Subsidiary receives at least fair market value and (iv) the Net Sale Proceeds therefrom are applied and/or reinvested as (and to the extent) required by Section 2.13;

(v)      the Borrower and the Restricted Subsidiaries may terminate leases, subleases, licenses and sublicenses in the ordinary course of business; and

(w)      the Borrower and the Restricted Subsidiaries may sell or otherwise dispose of assets having a fair market value of less than $5,000,000 in any fiscal year and less than $12,500,000 in the aggregate.

To the extent the Required Lenders waive the provisions of this Section 6.02 with respect to the sale of any Collateral, or any Collateral is sold as permitted by this Section 6.02 (other than to the Borrower or a Restricted Subsidiary thereof), such Collateral shall be sold free and clear of the Liens created by the Security Documents, and the Administrative Agent and the Collateral Agent shall be authorized to take any actions deemed appropriate in order to effect and/or evidence the foregoing.

SECTION 6.03. **Restricted Payments**.  The Borrower will not, and will not permit any of the Restricted Subsidiaries to, declare or pay any Restricted Payments, except that:

(a)      any Restricted Subsidiary of the Borrower may pay Restricted Payments to its equity holders on a *pro rata* basis; *provided* that, in the case of any Restricted Payment paid by a non-Wholly Owned Subsidiary that is a Restricted Subsidiary, the Borrower or its respective Restricted Subsidiary which owns the Equity Interest in such Restricted Subsidiary paying such Restricted Payments receives at least its proportionate share thereof; *provided further* that the net proceeds therefrom are applied as (and to the extent) required by Section 2.13;

(b)      the Borrower and any Restricted Subsidiary of the Borrower may pay cash Restricted Payments to Holdings so long as the proceeds thereof are reasonably promptly used by Holdings (or any direct or indirect parent) to the extent attributable to the assets or activities of Holdings, the Borrower or the Restricted Subsidiaries to pay:

(i)      franchise taxes and other fees, taxes and expenses required to maintain the corporate existence of Holdings (or any direct or indirect parent) to the extent attributable to the assets or activities of Holdings, the Borrower or the Restricted Subsidiaries;

(ii)      in the event the Borrower is included in a group that files a consolidated, combined, unitary or similar type income tax return of which Borrower is not the common parent, federal, state, local and non-U.S. income taxes and other taxes imposed in lieu of income taxes

80

then due and payable with respect to such tax group; *provided*, that the amount of such distribution shall not be greater than the amount of such taxes or expenses that would have been due and payable by the Borrower and the Restricted Subsidiaries had the Borrower not been included in a consolidated, combined, unitary or similar type return of such tax group;

(iii)    cash payments in lieu of issuing fractional shares in connection with the exercise of warrants, options or other securities convertible into or exchangeable for Equity Interests of Holdings (or any direct or indirect parent);

(iv)    operating and overhead costs and expenses of Holdings to the extent such costs and expenses are incurred in the ordinary course of business and attributable to the ownership or operations of the Borrower and the Restricted Subsidiaries in an amount not to exceed $3,000,000 in the aggregate;

(v)    costs (including all professional fees and expenses) incurred by Holdings in connection with reporting obligations under or otherwise incurred in connection with compliance with applicable laws, applicable rules or regulations of any governmental, regulatory or self-regulatory body or stock exchange in an amount not to exceed $3,000,000 in the aggregate;

(vi)    (x) obligations under or in respect of director and officer insurance policies to the extent reasonably attributable to the ownership or operation of the Borrower and the Restricted Subsidiaries, (y) indemnification obligations owing to any Sponsor and Sponsor Affiliates under the Management Agreement or (z) Transaction Costs;

(vii)    be used to pay customary salary, bonus and other benefits payable to officers and employees of Holdings or any direct or indirect parent company of Holdings to the extent such salaries, bonuses and other benefits are attributable to the ownership or operation of the Borrower and the Restricted Subsidiaries; and

(viii)    amounts used by Holdings to make payments permitted by Section 6.06(f).

(c)    so long as no Event of Default exists or would exist therefrom, the Borrower may pay Restricted Payments to Holdings (or any direct or indirect parent thereof) for the purpose of enabling Holdings (or any such direct or indirect parent thereof) to redeem, repurchase or otherwise acquire for value, and Holdings (or any such direct or indirect parent thereof) may redeem, repurchase or otherwise acquire for value, Qualified Equity Interests (or options or warrants to purchase such Qualified Equity Interests) of Holdings (or any direct or indirect parent thereof) following the death, disability or termination of employment of officers, directors or employees of Holdings (or any direct or indirect parent thereof) or any of the Restricted Subsidiaries; *provided* that (i) the only consideration paid by Holdings (or any such direct or indirect parent thereof) in respect of such redemptions or repurchases shall be cash and (ii) the sum of the aggregate amount paid by Holdings in cash in respect of all such redemptions or repurchases shall not exceed $2,500,000 (which shall increase to $5,000,000 after a Qualified Public Offering) in any fiscal year in respect of all such redemptions or repurchases; *provided* that unused amounts in any fiscal year may be carried over to such succeeding fiscal years subject to a maximum of $5,000,000 (which shall increase to $10,000,000 after a Qualified Public Offering in any such fiscal year (without giving effect to the following proviso); *provided further* that such amount in any fiscal year may be increased by an amount not to exceed the cash proceeds of key man life insurance policies received by the Borrower or the Restricted Subsidiaries after the Closing Date; *provided further* that in no event shall the sum of the aggregate amount paid by Holdings in cash in respect of all such redemptions or repurchases pursuant to this clause (c) exceed $10,000,000 in the aggregate;

(d)      the Borrower and each Restricted Subsidiary may declare and effect Restricted Payments in the form of Qualified Equity Interests;

(e)      the Borrower and each Restricted Subsidiary may make Restricted Payments not to exceed the Cumulative Amount; *provided* that the Cumulative Amount Utilization Requirements are satisfied as of the date such Restricted Payments are made;

(f)      the Borrower and each Restricted Subsidiary may pay Restricted Payments on the Closing Date to consummate the Transactions;

(g)      to the extent constituting Restricted Payments, the Borrower and the Restricted Subsidiaries may enter into and consummate transactions expressly permitted by any provision of Section 6.02, Section 6.05 or Section 6.06;

(h)      the Borrower and the Restricted Subsidiaries may make repurchases of Equity Interests in Holdings (or any direct or indirect parent thereof), the Borrower or any Restricted Subsidiary deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price of such options or warrants;

(i)      after a Qualified Public Offering, (x) the Borrower may declare and effect any Restricted Payment to pay listing fees and other costs and expenses attributable to being a publicly traded company and (y) the Borrower and the Restricted Subsidiaries may declare and effect Restricted Payments of up to 6.00% per annum of the net proceeds received by (or contributed to) the Borrower and the Restricted Subsidiaries from such Qualified Public Offering;

(j)      to the extent not otherwise applied pursuant to Section 6.05(u) or in connection with any use of the Cumulative Amount, the Borrower and the Restricted Subsidiaries may pay Restricted Payments made with the net cash proceeds of any issuance of Qualified Equity Interests permitted herein; and

(k)      so long as no Event of Default exists or would exist therefrom, the Borrower and the Restricted Subsidiaries may pay other Restricted Payments; *provided* that the aggregate amount of Restricted Payments made pursuant to this clause (k) shall not exceed $5,000,000.

SECTION 6.04. ***Indebtedness***.  The Borrower will not, and will not permit any of the Restricted Subsidiaries to create, incur, assume or suffer to exist any Indebtedness, except:

(a)      Indebtedness incurred pursuant to this Agreement and the other Loan Documents;

(b)      Indebtedness outstanding on the Closing Date and listed on Schedule 6.04(b) and Permitted Refinancing thereof;

(c)      Indebtedness (i) of the Borrower or any Restricted Subsidiary under Hedging Agreements entered into in the ordinary course of business for bona fide hedging activities and are not for speculative purposes and (ii) constituting ABL Bank Product Obligations (as defined in the ABL Intercreditor Agreement);

(d)      Indebtedness of the Borrower and the Restricted Subsidiaries constituting (i) Capitalized Lease Obligations or (ii) Indebtedness incurred to finance the acquisition or construction of equipment, machinery or other fixed assets acquired after the Closing Date with respect to equipment, machinery or

other fixed assets acquired or constructed after the Closing Date and secured by a lien on such (to the extent permitted by Section 6.01(g); *provided* that such Indebtedness is incurred prior to or within 270 days after such acquisition or completion of such construction and *provided further* that in no event shall the sum of the aggregate principal amount of all Capitalized Lease Obligations (other than Capital Lease Obligations incurred by the Borrower or any Restricted Subsidiary to replace or refinance operating leases existing on the Closing Date) and purchase money Indebtedness permitted by this clause (d) exceed at any time outstanding $10,000,000;

(e)    Indebtedness constituting Intercompany Loans otherwise permitted by Section 6.05(h);

(f)    Guarantees by the Borrower and any Restricted Subsidiary in respect of Indebtedness of the Borrower or any Restricted Subsidiary otherwise permitted hereunder; *provided* that (i) no Guarantee of the ABL Obligations or Permitted Incremental Equivalent Debt shall be permitted unless such guaranteeing party shall have also provided a Guarantee of the Obligations on the terms set forth herein (except as otherwise contemplated hereunder), (ii) if the Indebtedness being Guaranteed is subordinated to the Obligations, such Guarantee shall be subordinated to the Guarantee of the Obligations on terms at least as favorable to the Lenders as those contained in the subordination of such Indebtedness and (iii) such Guarantee is permitted by Section 6.05(h);

(g)    Indebtedness (any such Indebtedness, "***Permitted Acquired Debt***") acquired pursuant to a Permitted Acquisition or other permitted Investment (or Indebtedness assumed at the time of a Permitted Acquisition or other permitted Investment of a fixed asset securing such Indebtedness) and any Permitted Refinancing Indebtedness in respect thereof; *provided* that (i) such Indebtedness was not incurred in connection with, or in anticipation or contemplation of, such Permitted Acquisition or other permitted Investment and (ii) the Net Total Leverage Ratio, on *pro forma* basis, is less than or equal to 5.25:1.00, in each case, determined immediately after giving effect to the incurrence of such Indebtedness for the most recently ended Test Period; *provided*, that the aggregate principal amount of Indebtedness incurred by Restricted Subsidiaries that are not Loan Parties under this clause (g) shall not exceed $5,000,000;

(h)    Indebtedness (i) arising under customary cash management services, netting arrangements, automated clearing house transfers, or the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business, so long as such Indebtedness is extinguished within 10 Business Days of its incurrence and (ii) constituting ABL Cash Management Obligations (as defined in the ABL Intercreditor Agreement);

(i)    Indebtedness with respect to performance bonds, surety bonds, appeal bonds or customs bonds required in the ordinary course of business of the Borrower or any Restricted Subsidiary or in connection with the enforcement of rights or claims of the Borrower or any of the Restricted Subsidiaries or in connection with judgments that do not result in a Default or an Event of Default;

(j)    Indebtedness of Foreign Subsidiaries under lines of credit to any such Foreign Subsidiary from Persons other than the Borrower or any of the Restricted Subsidiaries, the proceeds of which Indebtedness are used for such Foreign Subsidiary's working capital purposes; *provided* that the aggregate principal amount of all such Indebtedness outstanding at any time for all such Foreign Subsidiaries shall not exceed the greater of $65,000,000 and RMB400,000,000;

(k)    Indebtedness owed to any Person providing property, casualty, liability, or other insurance to the Borrower or any Restricted Subsidiary, so long as the amount of such Indebtedness is not in excess of the amount of the unpaid cost of, and shall be incurred only to defer the cost of such insurance for the period in which such Indebtedness is incurred;

83

(l)        Indebtedness which may be deemed to exist in connection with agreements providing for indemnification, purchase price adjustments and similar obligations (including earn-out obligations) in connection with the merger, the acquisition or disposition of assets in accordance with the requirements of this Agreement;

(m)        Indebtedness constituting (i) Permitted Incremental Equivalent Debt; *provided* that (x) after giving effect thereto, the Aggregate Incremental Amount does not exceed the Incremental Cap and (y) no Default or Event of Default (or, in the case of Permitted Incremental Equivalent Debt the proceeds of which will be applied to consummate a Permitted Acquisition, and to the extent agreed by the Persons providing such Permitted Incremental Equivalent Debt, no Specified Default) shall have occurred and be continuing on the date of incurrence of such Permitted Incremental Equivalent Debt and (ii) any Permitted Refinancing thereof;

(n)        [reserved];

(o)        the Borrower or any of the Restricted Subsidiaries may incur or issue unsecured seller paper in connection with any Permitted Acquisition so long as the Net Total Leverage Ratio, determined on *pro forma* basis, is less than or equal to 5.25:1.00, in each case, immediately prior to the incurrence of such Indebtedness; *provided* that the aggregate principal amount of Indebtedness outstanding and incurred under this clause (o) shall not exceed $30,000,000 and such Indebtedness shall be made subordinate and junior in right of payment to the Loans and to the other Obligations of the Loan Parties by provisions in form and substance reasonably satisfactory to the Required Lenders; *provided further*, that the aggregate principal amount of Indebtedness incurred by Restricted Subsidiaries that are not Loan Parties under this clause (o) shall not exceed $25,000,000;

(p)        [reserved];

(q)        [reserved];

(r)        Indebtedness under (i) the ABL Credit Agreement as in effect on the date hereof and (ii) any Permitted Refinancing thereof; *provided* that the aggregate principal amount of Indebtedness pursuant to this clause (r) shall not exceed $115,000,000, less the aggregate principal amount of permanent commitment reductions under the ABL Credit Agreement;

(s)        prior to the redemption date in respect of the Existing Secured Notes, Indebtedness in respect of the Existing Secured Notes so long as the Existing Secured Notes Satisfaction and Discharge has occurred;

(t)        Indebtedness representing deferred compensation or similar obligations to employees of incurred in the ordinary course of business;

(u)        Indebtedness consisting of take-or-pay obligations contained in supply arrangements in the ordinary course of business;

(v)        Indebtedness in respect of letters of credit, bank guarantees, supporting obligations, bankers' acceptances, performance bonds, surety bonds, statutory bonds, appeal bonds, warehouse receipts or similar instruments issued or created in the ordinary course of business, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations

84

regarding workers compensation claims; *provided* that any reimbursement obligations in respect thereof are reimbursed within 30 days following the due date thereof;

(w)    obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Borrower or any of the Restricted Subsidiaries or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with past practice;

(x)    Indebtedness consisting of obligations under deferred compensation or other similar arrangements incurred by such Person in connection with Permitted Acquisitions or any other Investment expressly permitted hereunder;

(y)    additional Indebtedness incurred by the Borrower and the Restricted Subsidiaries in an aggregate principal amount not to exceed at any time outstanding $10,000,000; and

(z)    all premiums (if any), interest (including Post-Petition Interest), fees, expenses, charges and additional or contingent interest on obligations described above.

SECTION 6.05.  **Investments**.  The Borrower will not, and will not permit any of the Restricted Subsidiaries to, directly or indirectly, make any Investment in any other Person, except:

(a)    the Borrower and the Restricted Subsidiaries may acquire and hold accounts receivables, notes receivable and other extensions of trade credit owing to any of them, if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms of the Borrower or such Restricted Subsidiary;

(b)    the Borrower and the Restricted Subsidiaries may acquire and hold cash and Cash Equivalents;

(c)    the Borrower and the Restricted Subsidiaries may hold the Investments held by them on the Closing Date and described on Schedule 6.05(c) (and any increase in the value of such Investments not resulting from an additional Investment); *provided* that any additional Investments made with respect thereto shall be permitted only if permitted under the other provisions of this Section 6.05;

(d)    the Borrower and the Restricted Subsidiaries may acquire and own investments (including debt obligations) received in connection with the bankruptcy or reorganization of suppliers and customers or in good faith settlement of delinquent obligations of, and other disputes with, customers and suppliers arising in the ordinary course of business or upon foreclosure with regard to any secured Investment or other transfer of title with regard to a secured Investment;

(e)    the Borrower and the Restricted Subsidiaries may make loans and advances to their officers, directors and employees for moving, relocation and travel expenses and other similar expenditures, in each case in the ordinary course of business in an aggregate amount not to exceed $1,000,000 at any one time outstanding (determined without regard to any write-downs or write-offs of such loans and advances);

(f)    the Borrower and the Restricted Subsidiaries may acquire and hold obligations of their officers, directors and employees in connection with such officers,' directors' and employees' acquisition of Qualified Equity Interests of Holdings (so long as no cash is actually advanced by the Borrower or any of the Restricted Subsidiaries in connection with the acquisition of such obligations);

(g)      the Borrower and the Restricted Subsidiaries may enter into Hedging Agreements to the extent permitted by Section 6.04(c);

(h)      (i) the Borrower or the Restricted Subsidiaries may make Investments in (or for the benefit of) any other Loan Party, (ii) any Loan Party may make Investments in (or for the benefit of) any Restricted Subsidiary which is not a Loan Party, and (iii) any Restricted Subsidiary which is not a Loan Party may make Investments in any Restricted Subsidiary which is not a Loan Party (such Investments in the form of intercompany loans and advances referred to in preceding clauses (i) through (iii), collectively, the "*Intercompany Loans*"); *provided* that (u) at no time shall the aggregate outstanding principal amount of all Investments made pursuant to preceding sub-clause (ii) of this clause (h), together with all Investments made pursuant to sub-clause (ii) of clause (l) of this Section 6.05 and all Investments made by the Loan Parties and the Restricted Subsidiaries pursuant to clause (w) of this Section 6.05 (for this purpose, taking the fair market value of any property (other than cash) so contributed at the time of such contribution), exceed at any time $50,000,000, (v) no Investment may be made pursuant to sub-clause (ii) above at any time that an Event of Default has occurred and is continuing, (w) each Investment in the form of an Intercompany Loan shall be evidenced by an Intercompany Note, (x) each such Intercompany Note owned or held by a Loan Party shall be pledged to the Collateral Agent pursuant to the Collateral Agreement and (y) each Intercompany Loan made by any Restricted Subsidiary that is not a Loan Party to a Loan Party shall be subject to the subordination provisions contained in the respective Intercompany Note;

(i)      Investments made in connection with the Transactions; *provided* that each such Investment made in the form of an Intercompany Loan shall (i) be evidenced by an Intercompany Note, (ii) each such Intercompany Note owned or held by a Loan Party shall be pledged to the Collateral Agent pursuant to the Collateral Agreement and (iii) each Intercompany Loan made by any Restricted Subsidiary that is not a Loan Party to a Loan Party shall be subject to the subordination provisions contained in the respective Intercompany Note;

(j)      Investments consisting of (i) transactions permitted under Sections 6.01 and 6.02, (ii) Restricted Payments permitted by Section 6.03 and (iii) repayments or other acquisitions of Indebtedness of the Borrower or any Restricted Subsidiary not prohibited by Section 6.09;

(k)      Guarantees permitted by Section 6.04 other than Section 6.04(f), to the extent constituting Investments;

(l)      any acquisition of all of the Equity Interests in a Person that thereafter becomes a Restricted Subsidiary or the acquisition of all or substantially all of the property and assets or business of another person, or assets constituting a business unit, line of business or division of a Person in a single transaction or series of related transactions so long as (i) no Event of Default shall have occurred and be continuing at the time of execution of agreement in respect of the proposed acquisition; (ii) the aggregate consideration paid by the Loan Parties and attributable to all Persons and assets purchased or acquired pursuant to Permitted Acquisitions (other, in the case of this clause (ii) only, the Acquisition), which do not become Loan Parties or Collateral directly held by a Loan Party (for this purpose, Collateral shall exclude the value of Equity Interests of Persons so acquired that are not Wholly Owned Domestic Subsidiaries), together with the aggregate outstanding principal amount of all Investments made pursuant to sub-clause (ii) of clause (h) of this Section 6.05 and all Investments made by the Loan Parties and the Restricted Subsidiaries pursuant to clause (w) of this Section 6.05, shall not exceed at any time $50,000,000; (iii) at the time of each Permitted Acquisition involving the creation or acquisition of a Restricted Subsidiary or the acquisition of Equity Interests of any Person, the Equity Interests acquired in connection with such Permitted Acquisition shall be pledged for the benefit of the Secured Parties

pursuant to the Collateral Agreement and, in the case of a Domestic Subsidiary (other than an Excluded Subsidiary), such Person shall become a Subsidiary Guarantor pursuant to a Guaranty Supplement; (iv) after giving pro forma effect to such proposed acquisition, (x) with respect to any such acquisition consummated on or prior to the six month anniversary of the Closing Date, the Net Total Leverage Ratio is less than or equal to the Closing Date Net Total Leverage Ratio, in each case, for the most recently ended Test Period and (y) with respect to any such acquisition consummated following the six month anniversary of the Closing Date, the Net Total Leverage Ratio is less than or equal to 5.25:1.00, in each case, for the most recently ended Test Period (*provided* that, in the case of a Permitted Acquisition, which acquisition is subject to customary "certain funds" provisions, the applicable Net Total Leverage Ratio pursuant to this clause (iv) shall be tested, at the option of the Loan Parties, either (x) at the time a definitive agreement is entered into with respect to such acquisition or (y) upon the consummation of such acquisition); (v) after giving pro forma effect to such proposed acquisition, the Borrower is in compliance with the financial covenant set forth in Section 6.08 as of  the most recently ended Test Period (assuming for purposes of Section 6.08, that such transaction and all other Permitted Acquisitions consummated since the first day of the relevant Test Period for the financial covenant set forth in Section 6.08 ending on or prior to the date of such transaction, had occurred on the first day of such relevant Test Period); (vi) the sum of (x) the aggregate amount of Unrestricted cash and Cash Equivalents of the Borrower and (y) availability under the ABL Credit Agreement, in each case after giving pro forma effect to such proposed acquisition, shall be no less than $20,000,000; and (vii) each Restricted Subsidiary which is formed to effect, or is acquired pursuant to a Permitted Acquisition shall execute and deliver all documentations as and to the extent required by Section 5.11 to the reasonable satisfaction of the Administrative Agent (any acquisition of a Person meeting all of the criteria of this Section 6.05(l) being referred to as a "***Permitted Acquisition***");

(m)    promissory notes and other non-cash consideration received in connection with any asset sale permitted by Section 6.02;

(n)    Investments in deposit accounts, securities accounts and commodities accounts maintained by the Borrower or such Restricted Subsidiary, as the case may be;

(o)    Investments in the ordinary course of business consisting of UCC Article 3 endorsements for collection or deposit and UCC Article 4 customary trade arrangements with customers consistent with past practices;

(p)    [reserved];

(q)    loans and advances to Holdings and any other direct or indirect parent of the Borrower, and not in excess of the amount of (after giving effect to any other loans, advances or Restricted Payments in respect thereof) Restricted Payments permitted to be made to such parent in accordance with Section 6.03 (with such loan or advance to be deemed utilization of the applicable basket set forth in Section 6.03);

(r)    Investments to the extent that payment for such Investments is made solely with Equity Interests of Holdings (or any other direct or indirect parent of the Borrower);

(s)    Investments in the nature of pledges or deposits with respect to leases or utilities provided to third parties in the ordinary course of business;

(t)    Investments constituting any part of a reorganization and other activities related to bona fide tax planning; provided that (i) no Event of Default shall have occurred and be continuing, (ii) any

87

security interests granted to the Collateral Agent for the benefit of the Secured Parties in the Collateral pursuant to the Security Documents shall remain in full force and effect and perfected (to at least the same extent as in effect immediately prior to such Investment) and all actions required to maintain said perfected status have been or will promptly be taken, (iii) all Restricted Subsidiaries that were Loan Parties at the time such Investment is entered into shall be Loan Parties after such Investments are completed and (iv) such reorganization and other activities shall not impair or adversely affect in the aggregate the Collateral granted to the Collateral Agent for the benefit of the Secured Parties in the Collateral;

(u)     to the extent not otherwise applied pursuant to 6.03(j) or in connection with any use of the Cumulative Amount, the Borrower and the Restricted Subsidiaries may make Investments made with the net cash proceeds of any issuance of Qualified Equity Interests permitted herein;

(v)     the Borrower may consummate the Acquisition in accordance with the Acquisition Agreement;

(w)     Investments in joint ventures in which the Borrower or a Restricted Subsidiary has an ownership interest in an aggregate amount for all such Investments made pursuant to this clause (w) (taking into account any return on such Investments by reducing the amount of such Investments deemed outstanding hereunder), together with the aggregate outstanding principal amount of all Investments made pursuant to sub-clause (ii) of clause (h) of this Section 6.05 and all Investments made pursuant to sub-clause (ii) of clause (l) of this Section 6.05, not to exceed $50,000,000;

(x)     in addition to Investments permitted by the other provisions of this Section 6.05, the Borrower and the Restricted Subsidiaries may make additional Investments to or in a Person in an aggregate amount for all such Investments made pursuant to this clause (x) not to exceed $10,000,000; and

(y)     the Borrower and the Restricted Subsidiaries may make Investments not to exceed the Cumulative Amount; *provided* that the Cumulative Amount Utilization Requirements are satisfied as of the date such Investments are made.

SECTION 6.06. *Transactions with Affiliates*.  The Borrower will not, and will not permit any of the Restricted Subsidiaries to, enter into any transaction or series of related transactions with any Affiliate of the Borrower or any of the Restricted Subsidiaries, other than in the ordinary course of business and on terms and conditions substantially as favorable to the Borrower or such Restricted Subsidiary as would reasonably be obtained by Borrower or such Restricted Subsidiary at that time in a comparable arm's-length transaction with a Person other than an Affiliate, except that the following in any event shall be permitted:

(a)     Restricted Payments may be paid to the extent provided in Section 6.03;

(b)     Investments permitted by Sections 6.05(e), (f) and (q);

(c)     customary fees, indemnities and reimbursements may be paid to officers, directors and employees of Holdings (or any direct or indirect parent), the Borrower and the Restricted Subsidiaries;

(d)     the Borrower and the Restricted Subsidiaries may enter into, and may make payments under, employment agreements, consulting agreements, employee benefits plans, stock option plans, indemnification provisions, other similar compensatory arrangements and severance agreements with

officers, employees and directors of Holdings, the Borrower and the Restricted Subsidiaries in the ordinary course of business;

(e)        Restricted Subsidiaries of the Borrower may pay management fees, licensing fees and similar fees to the Borrower or to any Restricted Subsidiary of the Borrower that is a Subsidiary Guarantor;

(f)        the Borrower and the Restricted Subsidiaries may pay (i) management, consulting, monitoring and advisory fees to Sponsor pursuant to the Management Agreement as in effect on the date hereof; *provided however*, that the fees and distributions described in this clause (f)(i) shall not be paid during any period while (x) a Specified Default has occurred and is continuing or would arise as a result of such payment or (y) any other Event of Default has occurred and is continuing for 30 days or would arise as a result of such payment and (ii) so long as no Event of Default shall have occurred and be continuing, reimbursement of reasonable out-of-pocket costs and expenses and indemnification payments made to Sponsor and its Affiliates, in each case required to be paid pursuant to the Management Agreement as in effect on the date hereof and, in both cases in the aggregate in an amount not to exceed $3,500,000 in any fiscal year;

(g)        transactions solely between or among the Borrower and the Restricted Subsidiaries not otherwise prohibited by this Agreement;

(h)        the Transactions and the payment of fees and expenses (including Transaction Costs) as part of or in connection with the Transactions;

(i)        the Borrower and the Restricted Subsidiaries may enter into transactions pursuant to agreements in existence on the Closing Date and set forth on Schedule 6.06(i);

(j)        transactions with customers, clients, joint venture partners, suppliers or purchasers or sellers of goods or services, in each case in the ordinary course of business and otherwise in compliance with the terms of this Agreement that are fair to Borrower and the Restricted Subsidiaries, in the reasonable determination of the Board of Directors or the senior management of the Borrower, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party; and

(k)        payments by the Borrower or any Restricted Subsidiary pursuant to tax sharing agreements with any direct or indirect parent of Holdings to the extent attributable to the ownership or operation of the Borrower and the Restricted Subsidiaries but only to the extent permitted by Section 6.03(b).

SECTION 6.07. ***Modifications of Certain Agreements; Limitations on Voluntary Payments, etc.*** The Borrower will not, and will not permit any Restricted Subsidiary to:

(a)        amend, modify or change its certificate or articles of incorporation (including, without limitation, by the filing or modification of any certificate or articles of designation), certificate of formation, limited liability company agreement or by-laws (or the equivalent organizational documents), as applicable, unless such amendment, modification, change or other action contemplated by this clause (a) could not reasonably be expected to be materially adverse to the interests of the Lenders;

(b)        make or offer to make (or give any notice in respect thereof) any voluntary or optional payment or prepayment on or redemption, retirement, defeasance, or acquisition for value of, or any

prepayment or redemption as a result of any asset sale, change of control or similar event of, any Junior Indebtedness; *provided* that the Borrower and each Restricted Subsidiary may prepay or redeem Junior Indebtedness in an aggregate amount not to exceed the Cumulative Amount; *provided* that the Cumulative Amount Utilization Requirements are satisfied as of the date such prepayment or redemption is made; or

(c)        amend or modify, or permit the amendment or modification of, any provision of any Junior Indebtedness, on and after the execution and delivery thereof, in any manner that (i) if such amendment or modification was to be implemented by way of refinancing, would not satisfy the requirements of the definition of "Permitted Refinancing" or (ii) in any manner that is otherwise materially adverse to the Lenders.

SECTION 6.08.        ***Financial Covenant***.  Borrower shall not permit the Net Total Leverage Ratio, as of the last day of any Test Period during any period in the table below, to exceed the ratio set forth opposite such period in the table below.

| Test Period ended: | Net Total Leverage Ratio |
| --- | --- |
| March 31, 2015 | 7.20 to 1.00 |
| June 30, 2015 | 7.15 to 1.00 |
| September 30, 2015 | 6.90 to 1.00 |
| December 31, 2015 | 6.80 to 1.00 |
| March 31, 2016 | 6.60 to 1.00 |
| June 30, 2016 | 6.40 to 1.00 |
| September 30, 2016 | 6.30 to 1.00 |
| December 31, 2016 | 6.10 to 1.00 |
| March 31, 2017 | 5.70 to 1.00 |
| June 30, 2017 | 5.70 to 1.00 |
| September 30, 2017 | 5.30 to 1.00 |
| December 31, 2017 | 5.30 to 1.00 |
| March 31, 2018 | 5.10 to 1.00 |
| June 30, 2018 | 5.10 to 1.00 |
| September 30, 2018 and thereafter | 5.00 to 1.00 |

SECTION 6.09. ***Limitation on Certain Restrictions on Restricted Subsidiaries***.  The Borrower will not, and will not permit any Restricted Subsidiary to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction on the ability of any such Restricted Subsidiary to (a) pay dividends or make any other distributions on its Equity Interest owned by the Borrower or any Restricted Subsidiary, or pay any Indebtedness owed to the Borrower or any Restricted Subsidiary, (b) make loans or advances to the Borrower or any Restricted Subsidiary or (c) transfer any of its properties or assets to the Borrower or any Restricted Subsidiary, except for such encumbrances or restrictions existing under or by reason of (i) applicable law, rule, regulation or order, (ii) this Agreement and the other Loan Documents, (iii) after the execution and delivery thereof, any documents governing any Permitted Incremental Equivalent Debt, (iv) customary provisions restricting subletting, transfer, license or assignment of any lease governing any leasehold interest of the Borrower

90

or any Restricted Subsidiary or otherwise relating to the assets subject thereto, (v) customary provisions restricting transfer, license or assignment of any licensing agreement or other contract (or otherwise relating to the assets subject thereto) entered into by the Borrower or any Restricted Subsidiary in the ordinary course of business, (vi) restrictions on the transfer of any asset or Subsidiary pending the close of a permitted sale of such asset or Subsidiary, (vii) restrictions on the transfer of any asset subject to a Lien permitted by Sections 6.01(c), (f), (g), (h), (o) or (p); (viii) any agreement or instrument governing Permitted Acquired Debt, which encumbrance or restriction is not applicable to any Person or the properties or assets of any Person, other than the Person or the properties or assets of the Person acquired pursuant to the respective Permitted Acquisition or Investment and so long as the respective encumbrances or restrictions were not created (or made more restrictive) in connection with or in anticipation of the respective Permitted Acquisition or Investment; (ix) negative pledges and restrictions on Liens in favor of any holder of Indebtedness for borrowed money permitted under Section 6.04 but only if such negative pledge or restriction expressly permits Liens for the benefit of the Administrative Agent and/or the Collateral Agent and the Lenders with respect to the Credit Facilities established hereunder and the Obligations under the Loan Documents on a senior basis and without a requirement that such holders of such Indebtedness be secured by such Liens equally and ratably or on a junior basis; (x) encumbrances or restrictions on cash or other deposits or net worth imposed by customers under agreements entered into in the ordinary course of business; (xi) the ABL Loan Documents and any agreements governing any Permitted Refinancing thereof; (xii) contractual obligations which exist on the Closing Date and (to the extent not otherwise permitted by this Section 6.09) are listed on Schedule 6.09(c); (xiii) restrictions binding on a Restricted Subsidiary at the time such Restricted Subsidiary first becomes a Restricted Subsidiary, so long as such contractual obligations were not entered into solely in contemplation of such Person becoming a Restricted Subsidiary; (xiv) restrictions on cash earnest money deposits in favor of sellers in connection with acquisitions not prohibited hereunder; (xv) restrictions imposed by documentation governing Indebtedness permitted by Section 6.04(m) or (r); and (xvi) an agreement effecting a renewal, replacement, refinancing, restructuring and extension of Indebtedness issued, assumed or incurred pursuant to an agreement or instrument referred to in clause (i) through (xv) above; *provided* that the provisions relating to such encumbrance or restriction contained in any such renewal, replacement, refinancing, restructuring and extension agreement (taken as a whole) are not materially less favorable to the Borrower or the Lenders than the provisions relating to such encumbrance or restriction contained in the agreements or instruments referred to in such clause (i) through (xv) above.

SECTION 6.10.    ***Passive Holding Company***.  Holdings shall not engage in any business activities or own any property other than (i) ownership of the Equity Interests of the Borrower, (ii) activities and contractual rights incidental to maintenance of its corporate existence and (iii) performance of its obligations under the Related Agreements to which it is a party.

SECTION 6.11.    ***Change in Nature of Business***.  The Borrower will not, and will not permit any Restricted Subsidiary to engage in any line of business substantially different from those lines of business carried on by it on the Closing Date and business ancillary thereto and logical extensions thereof.

SECTION 6.12. ***Compliance with Certain Laws***.

(a)    The Borrower will not, and will not permit any Restricted Subsidiary to:

(i)    directly or indirectly, in connection with any Loans, (i) conduct any business or engage in making or receiving any contribution of funds, goods or services to or for the benefit of any Sanctioned Person; (ii) deal in, or otherwise engage in any transaction relating to, any

Sanctioned Person, any property or interests in property of any Sanctioned Person or otherwise blocked pursuant to any Sanctions Law or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any Sanctions Law.

(ii)        directly or indirectly, in connection with the Loans, repay the Loans with funds derived from any unlawful activity, with the result that the making of the Term Loans or the repayment of the Term Loans would be in violation of any Sanctions Law, any Anti-Money Laundering Law, any Anti-Corruption Law or any other requirements of law.

(iii)        Directly or indirectly, cause or permit (i) any Sanctioned Person to have any direct or indirect interest in or benefit of any nature whatsoever in the Loan Parties or (ii) any of the funds or properties of the Loan Parties that are used to repay the Term Loans to constitute property or interest in property of, or be beneficially owned directly or indirectly by, a Sanctioned Person.

(b)        The Loan Parties shall deliver to the Lenders any certification or other evidence requested from time to time by any Lender in its reasonable discretion, confirming the Loan Parties' compliance with this Section 6.12.

## ARTICLE VII

## EVENTS OF DEFAULT AND REMEDIES

SECTION 7.01. *Events of Default.* Upon the occurrence of any of the following specified events (each, an "Event of Default"):

(a)        *Payments*.  Any Loan Party shall (i) default in the payment, when due, of any principal of any Loan or any Note or (ii) default in the payment, when due, of any interest on any Loan or Note, any Fee or any other amount owing hereunder or under any other Loan Document and such default shall continue unremedied for five Business Days; or

(b)        *Representations*.  Any representation, warranty or statement made or deemed to be made by any Loan Party herein or in any other Loan Document or in any certificate delivered to the Administrative Agent, the Collateral Agent or any Lender pursuant hereto or thereto shall prove to be untrue in any material respect on the date as of which it is made or deemed to be made; or

(c)        *Covenants*.  Any Loan Party shall  (i) default in the due performance or observance by it of any term, covenant or agreement contained in Article VI, Article X, Section 5.01(f)(i), Section 5.04 (as to the Borrower's existence) or Section 5.10 or (ii) default in the due performance or observance by it of any other term, covenant or agreement contained in this Agreement or any other Loan Document and such default shall continue unremedied for a period of 30 days after the date on which written notice thereof is given to the Borrower by the Administrative Agent or the Required Lenders; or

(d)        *Default Under Other Agreements*.  (i) Holdings, the Borrower or any Restricted Subsidiary shall (x) default in any payment of any Indebtedness (other than the Obligations, but including Indebtedness under the ABL Loan Documents) beyond the grace period, if any, provided in an instrument or agreement under which such Indebtedness is governed or (y) default in the observance or performance of any agreement or condition relating to any Indebtedness (other than the Obligations, but including Indebtedness under the ABL Loan Documents) or contained in any instrument or agreement evidencing,

securing or relating thereto or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit any holder of such Indebtedness (or a trustee or agent on behalf of such holder) to cause (after delivery of any notice, if required by any such instrument or agreement, and after giving effect to any waiver, amendment, cure or grace period), any such Indebtedness to become due prior to its stated maturity, or (ii) any Indebtedness (other than the Obligations) of Holdings, the Borrower or any Restricted Subsidiary shall be declared to be (or shall become) due and payable, or required to be prepaid other than by a regularly scheduled required prepayment, prior to the stated maturity thereof (other than, in the case of this clause (ii), (x) any secured Indebtedness that is required to be prepaid as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, (y) any Indebtedness that is required to be converted into Qualified Equity Interests upon the occurrence of certain designated events so long as no payments (other than such conversion and Restricted Payments paid in lieu of fractional shares permitted under Section 6.03(d)) in cash or otherwise are required to be made in accordance with such conversion and the issuance of such Equity Interests is otherwise permitted under Article VI and (z) any failure under this clause (ii) if such failure is remedied or waived by the requisite holders of such Indebtedness prior to any acceleration of the Loans pursuant to this Article VII); *provided* that it shall not be a Default or an Event of Default under this clause (d) unless the aggregate principal amount of all Indebtedness (other than Indebtedness under the ABL Loan Documents, in which case no such threshold shall apply) as described in this clause (d) equals to or exceeds the Threshold Amount;

(e)   ***Bankruptcy, Etc.***  Holdings, the Borrower or any Restricted Subsidiary (other than an Immaterial Subsidiary) shall commence a voluntary case concerning itself under the Bankruptcy Code; or an involuntary case is commenced against Holdings, the Borrower or any such Restricted Subsidiary, and the petition is not dismissed within 45 days after the filing thereof; or a custodian (as defined in the Bankruptcy Code) is appointed for, or takes charge of, all or substantially all of the property of Holdings, the Borrower or any such Restricted Subsidiary, to operate all or any substantial portion of the business of Holdings, the Borrower or any such Restricted Subsidiary, or, except to the extent expressly permitted by Section 6.02, Holdings, the Borrower or any such Restricted Subsidiary commences any other proceeding under any reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction whether now or hereafter in effect relating to Holdings, the Borrower or any such Restricted Subsidiary, or there has commenced against Holdings, the Borrower or any such Restricted Subsidiary any such proceeding which remains undismissed for a period of 60 days after the filing thereof, or Holdings, the Borrower or any such Restricted Subsidiary is adjudicated insolvent or bankrupt; or any order of relief is entered in any such proceeding; Holdings, the Borrower or any such Restricted Subsidiary makes a general assignment for the benefit of creditors; or any action is taken by Holdings, the Borrower or any such Restricted Subsidiary for the purpose of authorizing any of the foregoing; or Holdings, the Borrower or any such Restricted Subsidiary become unable, admit in writing its inability or fail generally to pay its debts as they become due; or

(f)   ***ERISA***.

(i)   one or more ERISA Events shall have occurred that either alone or together results in a liability to Borrower or any Subsidiary (including on account of an ERISA Affiliate) that equals or exceeds or is reasonably expected to equal or exceed the Threshold Amount, or

(ii)   there is or arises an Unfunded Pension Liability (taking into account only Plans with positive Unfunded Pension Liability) that results in a liability to Borrower or any Subsidiary (including on account of an ERISA Affiliate) that equals or exceeds, or that would reasonably be expected to equal or exceed, the Threshold Amount; or

(iii)    there is or arises any potential Withdrawal Liability under Section 4201 of ERISA, if the Borrower or any Subsidiary or their respective ERISA Affiliates were to withdraw completely from any and all Multiemployer Plans and the liability to Borrower or any Subsidiary (including on account of an ERISA Affiliate) equals or exceeds, or is reasonably expected to equal or exceed the Threshold Amount.

(g)    *Security Documents*.  Any of the Security Documents shall cease to be in full force and effect (other than in accordance with its terms or as a result of the action or inaction of the Administrative Agent, the Collateral Agent or any Lender, so long as such act or omission does not result from the breach or non-compliance by any Loan Party with the terms of any Loan Document), or shall cease to give the Collateral Agent for the benefit of the Secured Parties, the Liens, rights, powers and privileges purported to be created thereby (including, without limitation, a perfected security interest (if and to the extent such Collateral can be perfected by the filing of UCC-1 financing statements and the taking of such other actions required by the applicable Security Document) in, and Lien on, all of the Collateral, in favor of the Collateral Agent for the benefit of the Secured Parties, superior to and prior to the rights of all third Persons, and subject to no other Liens (in each case, other than Permitted Liens or in compliance with any Intercreditor Agreement); *provided* that the failure to have a perfected (if and to the extent such Collateral can be perfected by the filing of UCC-1 financing statements and the taking of such other actions required by the applicable Security Document) and enforceable Lien on Collateral in favor of the Collateral Agent for the benefit of the Secured Parties shall not give rise to an Event of Default under this clause (h), unless the aggregate fair market value of all Collateral over which the Collateral Agent for the benefit of the Secured Parties fails to have a perfected and enforceable Lien, except to the extent that any lack of perfection or enforceability results from any act or omission of the Administrative Agent, the Collateral Agent or any Lender (so long as such act or omission does not result from the breach or non-compliance by a Loan Party with the terms of any Loan Document), represents a material portion of all Collateral; or

(h)    *Guaranties*.  Any Guarantee of the Obligations or any provision thereof shall cease to be in full force or effect as to any Guarantor (except as a result of a release of any Subsidiary Guarantor in accordance with the terms thereof), or any Guarantor or any Person acting for or on behalf of such Guarantor shall deny or disaffirm such Guarantor's obligations with respect to such Guarantee by such Guarantor; or

(i)    *Judgments*.  One or more final judgments or decrees shall be entered against Holdings, the Borrower or any Restricted Subsidiary (other than an Immaterial Subsidiary) involving in the aggregate for Holdings, the Borrower and the Restricted Subsidiaries a liability (not paid or to the extent not covered by a reputable and solvent insurance company or third party indemnities) and such judgments and decrees either shall be final and non-appealable by a court of competent jurisdiction or shall not be vacated, discharged or stayed or bonded pending appeal for any period of 60 consecutive days, and the aggregate amount of all such judgments equals to or exceeds the Threshold Amount; or

(j)    *Change of Control*.  A Change of Control shall occur; or

(k)    *Invalidity of Loan Documents*.  Any material provision of the Loan Documents, taken as a whole, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or the satisfaction in full of all the Obligations (other than contingent obligations not then due and payable as of such date), ceases to be in full force and effect; or any Loan Party contests in writing the validity or enforceability of the Loan Documents, taken as a whole; or any Loan Party denies in writing that it has any or further liability or obligation under the Loan Documents to which it is a party, taken as a whole (other than as a result of repayment in full of the Obligations (other

than contingent obligations not then due and payable as of such date) and termination of the Commitments), or purports in writing to revoke or rescind the Loan Documents, taken as a whole; or

then, and in any such event, and at any time thereafter, (A) if any Event of Default shall then be continuing, the Administrative Agent, upon the written request of the Required Lenders, shall by written notice to the Borrower, take any or all of the following actions, without prejudice to the rights of the Administrative Agent, any Lender or the holder of any Note to enforce its claims against any Loan Party (*provided* that, if an Event of Default specified in clause (f) shall occur with respect to the Borrower, the result which would occur upon the giving of written notice by the Administrative Agent as specified below shall occur automatically without the giving of any such notice): (i) declare the Commitment terminated, whereupon all Commitments of each Lender shall forthwith terminate immediately; (ii) declare the principal of, and any accrued interest in respect of, all Loans and the Notes and all Obligations owing hereunder and thereunder to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived (to the extent permitted by applicable law) by each Loan Party; (iii) enforce or direct the Collateral Agent to enforce, all of the Liens and security interests created pursuant to the Security Documents in accordance with the terms therein; and (iv) enforce each Guarantee of the Obligations in accordance with the terms therein.

SECTION 7.02. *Cure Right*.

(a)        Notwithstanding anything to the contrary contained in Article VII, in the event that the Borrower fails to comply with the requirements of the covenant under Section 6.08 at the end of any fiscal quarter, until the expiration of the 10th day subsequent to the date financial statements are required to be delivered pursuant to Section 5.01(b) or Section 5.01(c) (the "*Anticipated Cure Deadline*"), in respect of the period ending on the last day of such fiscal quarter, Borrower shall have the right to request Holdings to issue Qualified Equity or obtain a contribution to its common equity, in each case, for cash and to be contributed to the equity capital of Borrower as common equity (the "*Cure Right*"), in each case following the end of such fiscal quarter and on or prior to the Anticipated Cure Deadline, in each case in an aggregate amount not to exceed the amount necessary to cure the relevant failure to comply with such covenant may, at the election of the Borrower be included in the calculation of Consolidated EBITDA for purposes of determining compliance with such covenant, and upon the earlier of (x) the delivery by the Borrower of written notice to the Administrative Agent that it intends to exercise the Cure Right hereunder (it being understood that to the extent such notice is provided in advance of delivery of a Compliance Certificate for the applicable period, the amount of such net cash proceeds that are received as the Cure Amount may be lower than specified in such notice to the extent that the amount necessary to cure any Event of Default under Section 6.08 is less than the full amount of any originally designated amount) and (y) receipt by the Borrower of such cash proceeds (the "*Cure Amount*"), such covenant shall be recalculated giving effect to the following pro forma adjustments:

(i)        solely for purpose of determining the existence of an Event of Default under Section 6.08, Consolidated EBITDA for the fiscal quarter of the Borrower for which such certificate is required to be delivered shall be increased by an amount equal to the Cure Amount, and such increase shall be effective for all periods that include the fiscal quarter of the Borrower for which such Cure Right was exercised and not for any other purpose under this Agreement; *provided* that (1) the receipt by Borrower of the Cure Amount pursuant to the Cure Right shall be deemed to have no other effect whatsoever under this Agreement (including determining the availability or amount of any covenant baskets or carve-outs) and (2) no Cure Amount shall reduce Indebtedness (whether on a Pro Forma Basis or otherwise and whether by netting

(including with respect to the calculation of Consolidated Net Indebtedness or otherwise) for any period in which the Cure Amount is included in the calculation of Consolidated EBITDA for purposes of calculating the financial covenant set forth in Section 6.08; *provided, further* that the proceeds of any Cure Amount may be used, at the Borrower's option, to prepay Loans (it being understood and agreed that such prepayments shall not be given effect in determining compliance with the financial covenant set forth in Section 6.08 for any period in which the Cure Amount is included in the calculation of Consolidated EBITDA); and

(ii)    if, after giving effect to the foregoing recalculations (but not giving effect to any payment of Indebtedness made with such Cure Amount when calculating compliance with Section 6.08 at the end of such (but no other) fiscal quarter), the Borrower shall then be in compliance with the requirements of the covenant under Section 6.08 at the end of such fiscal quarter, the Borrower shall be deemed to have satisfied the requirements of the covenant under Section 6.08 as of the last day of such fiscal quarter with the same effect as though there had been no failure to comply therewith at such date, and the applicable breach or Default or Event of Default of the covenant under Section 6.08 that had occurred shall be deemed cured for this purpose under this Agreement and the other Loan Documents; provided that if the Cure Amount is not received by the Borrower prior to the Anticipated Cure Deadline, such Default or Event of Default shall be deemed reinstated.

(b)    Notwithstanding anything herein to the contrary, (i) in each four-fiscal-quarter period of the Borrower there shall be at least two fiscal quarters in which the Cure Right is not exercised, (ii) the Cure Right shall not be exercised more than four times during the term of this Agreement, (iii) the Cure Amount shall not exceed the amount required to cause the Borrower to be in compliance with the covenant under Section 6.08; and (iv) neither the Administrative Agent nor any Lender or Secured Party shall exercise any remedy under the Loan Documents or applicable law on the basis of an Event of Default caused by the failure to comply with Section 6.08 until after the Borrower's ability to cure has lapsed and Borrower has not exercised the Cure Right.


# ARTICLE VIII

## THE ADMINISTRATIVE AGENT AND THE COLLATERAL AGENT

SECTION 8.01. ***Appointment and Authority***. (a)    Each Lender hereby irrevocably appoints Jefferies Finance LLC as Administrative Agent and the Collateral Agent (the Administrative Agent and the Collateral Agent are referred to collectively as the "***Agents***") hereunder and under the other Loan Documents, and authorizes the Agents to take such actions on its behalf and to exercise such powers as are delegated to such Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article VIII are solely for the benefit of the Agents and the Lenders, and neither the Borrower nor any other Loan Party shall have rights as a third-party beneficiary of any of such provisions. It is understood and agreed that the use of the term "Agent" or "agent" herein or in any other Loan Documents (or any other similar term) with reference to an Agent, is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between the contracting parties. Without limiting the generality of the foregoing, the Agents are hereby expressly authorized to (a) execute any and all documents (including releases) with respect to the Collateral and the rights of the Secured Parties with

respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Security Documents, including to reflect the appointment of a successor Collateral Agent or entry into such additional, amended or supplemental Security Documents to preserve, perfect or protect the priority of the Liens, or grant additional Liens, on the Collateral to the Collateral Agent, including any successor Collateral Agent, for the benefit of the Secured Parties to secure the Obligations and (b) negotiate, enforce or settle any claim, action or proceeding affecting the Lenders in their capacity as such, at the direction of the Required Lenders, which negotiation, enforcement or settlement will be binding upon each Lender. Each Lender further acknowledges that it has received a copy of the Intercreditor Agreements, authorizes the Administrative Agent and the Collateral Agent to enter into the same, and agrees to be bound by its terms.

(b)     Each Lender irrevocably appoints each other Lender as its agent and bailee for the purpose of perfecting Liens (whether pursuant to Section 8-301(a)(2) of the UCC or otherwise), for the benefit of the Secured Parties, in assets in which, in accordance with the UCC or any other applicable legal requirement, a security interest can be perfected by possession or control.  Should any Lender (other than the Collateral Agent) obtain possession or control of any such Collateral, such Lender shall notify the Collateral Agent thereof and, promptly following the Collateral Agent's request thereof, shall deliver such Collateral to the Collateral Agent or otherwise deal with such Collateral in accordance with the Collateral Agent's instructions.  The Lenders hereby acknowledge and agree that the Collateral Agent may act, subject to and in accordance with the terms of the Intercreditor Agreements, as the collateral agent for the Lenders.

SECTION 8.02. **Rights as a Lender**. Each person serving as an Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include each person serving as an Agent hereunder in its individual capacity.  Such person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with Borrower or any Subsidiary or other Affiliate thereof as if such person were not an Agent hereunder and without any duty to account therefor to the Lenders.

SECTION 8.03. **Exculpatory Provisions**. Neither Agent shall have any duties or obligations except those expressly set forth in the Loan Documents, and its duties hereunder shall be administrative in nature. Without limiting the generality of the foregoing, (a) neither Agent shall be subject to any fiduciary or other implied duties, regardless of whether a Default or an Event of Default has occurred and is continuing, (b) neither Agent shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that such Agent is instructed in writing to exercise by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.07 or the applicable Loan Document); *provided* that no Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law and (c) except as expressly set forth in the Loan Documents, neither Agent shall have any duty to disclose, nor shall it be liable for the failure to disclose, any information relating to Holdings, the Borrower or any Subsidiary that is communicated to or obtained by the bank serving as Administrative Agent and/or Collateral Agent or any of its Affiliates in any capacity. Neither Agent shall be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders, or such other number or percentage of the Lenders as shall be required hereunder or under the applicable Loan Document or as such Agent shall in good faith believe to be required under the

circumstances as provided in Section 9.07, or in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and non-appealable judgment. Neither Agent shall be deemed to have knowledge of any Default or Event of Default unless and until a written notice thereof is given to such Agent by Holdings, the Borrower or a Lender, and neither Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report, instrument or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, certificate, report, instrument or other document, (v) the satisfaction of any condition set forth in Article IV or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to such Agent or (vi) compliance by any Debt Fund Affiliate and any Non-Debt Fund Affiliate with the terms of Sections 9.04(g) and (h).

Each party to this Agreement acknowledges and agrees that the Administrative Agent may use an outside service provider for the tracking of all UCC financing statements required to be filed pursuant to the Loan Documents and notification to the Administrative Agent, of, among other things, the upcoming lapse or expiration thereof, and that any such service provider will be deemed to be acting at the request and on behalf of Borrower and the other Loan Parties. No Agent shall be liable for any action taken or not taken by any such service provider.

SECTION 8.04. **Reliance by Administrative Agent**. Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. Each Agent may also rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. Each Agent may consult with legal counsel (who may be counsel for Holdings, the Borrower, any Subsidiary or any of their Affiliates), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

SECTION 8.05. **Delegation of Duties**. Each Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by it. Each Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory and reliance provisions of the preceding Sections 8.03 and 8.04 shall apply to any such sub-agent and to the Related Parties of each Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the Credit Facilities as well as activities as Agent. No Agent shall be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that such Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

SECTION 8.06. **Resignation of the Agent**. Subject to the appointment and acceptance of a successor Agent as provided below, each Agent may resign at any time by notifying the Lenders and the Borrower. Upon any such resignation, the Required Lenders shall have the right, in consultation with the

Borrower, to appoint a successor to the Agent. If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 10 days after the retiring Agent gives notice of its resignation (the "***Resignation Effective Date***"), then the retiring Agent may (but shall not be obligated to), on behalf of the Lenders, appoint a successor Agent, which successor shall be a commercial banking institution organized under the laws of the United States (or any State thereof) or a United States branch or agency of a commercial banking institution, in each case, having combined capital and surplus of at least $500,000,000; *provided* that if such retiring Agent is unable to find a commercial banking institution that is willing to accept such appointment and which meets the qualifications set forth above, such Agent's resignation shall become effective and the Required Lenders shall thereafter perform all the duties of such Agent hereunder and/or under any other Loan Document until such time, if any, as the Required Lenders appoint a successor Agent. Upon the acceptance of its appointment as the Agent hereunder by a successor, such successor shall succeed to, and become vested with, all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations hereunder (if not already discharged therefrom as provided above in this paragraph). The Administrative Agent Fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed in writing between the Borrower and such successor. After an Agent's resignation hereunder, the provisions of this Article VIII and Section 9.05 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while acting as the Agent.

SECTION 8.07. ***Non-Reliance on Agents and Other Lenders***. Each Lender acknowledges that it has, independently and without reliance upon the Agents or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender further represents and warrants that it has had the opportunity to review the Confidential Information Memorandum and each other document made available to it on the Platform in connection with this Agreement and has acknowledged and accepted the terms and conditions applicable to the recipients thereof.  Each Lender further acknowledges that it will, independently and without reliance upon the Agents or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement or any other Loan Document, any related agreement or any document furnished hereunder or thereunder.

SECTION 8.08. ***No Other Duties, etc.*** Notwithstanding any other provision of this Agreement or any provision of any other Loan Document, the Arranger is named herein as such for recognition purposes only, and in its capacity as such shall have no duties, responsibilities or liabilities with respect to this Agreement or any other Loan Document; it being understood and agreed that the Arranger shall be entitled to all indemnification and reimbursement rights in favor of the Agents provided herein and in the other Loan Documents. Without limitation of the foregoing, the Arranger in its capacity as such shall not, by reason of this Agreement or any other Loan Document, have any fiduciary relationship in respect of any Lender, Loan Party or any other Person.

SECTION 8.09. ***Agent May File Proofs of Claim***. Subject to the terms of the ABL Intercreditor Agreement, in case of the pendency of any proceeding under any Debtor Relief Law, the Administrative Agent (irrespective of whether the principal of any Loan or Obligation shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(i)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Sections 2.05 and 9.05) allowed in such judicial proceeding; and

(ii)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Sections 2.05 and 9.05.

SECTION 8.10. *Collateral and Guarantee Matters*.  (a) The Lenders irrevocably authorize the Collateral Agent, at its option and in its sole discretion:

(i)    to release any Lien on any property granted to, or held by, the Collateral Agent under any Loan Document (x) on or after the date that the Obligations (other than contingent indemnity and expense reimbursement obligations as to which no claim has been made as of such date) have been paid in full, (y) with respect to any property that is sold or otherwise disposed of, or to be sold or otherwise disposed of, as part of, or in connection with, any sale or other disposition permitted under the Loan Documents or (z), if approved, authorized or ratified in writing by the Required Lenders (or such other percentage of Lenders as shall be required hereunder);

(ii)    to subordinate any Lien on any property granted to, or held by, the Collateral Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 6.01(f) ; and

(iii)    to release any Subsidiary from its obligations under the Loan Documents if such Person ceases to be a Subsidiary as a result of a transaction permitted under the Loan Documents.

(b)    Upon request by the Collateral Agent at any time, the Required Lenders will confirm in writing, the Collateral Agent's authority to release or subordinate its security interest in particular types or items of property, or to release any Subsidiary from its obligations under the Loan Documents pursuant to this Section 8.10.

(c)    The Collateral Agent shall not be responsible for, or have a duty to, ascertain or inquire into any representation or warranty regarding the existence, value or collectability of any Collateral, the existence, priority or perfection of the Collateral Agent's Liens thereon, or any certificate, report, instrument or other document prepared by any Loan Party in connection therewith, nor shall the Collateral Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

SECTION 8.11. ***Enforcement.*** Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent, or as the Required Lenders may require or otherwise direct, for the benefit of all the Lenders; provided, however, that the foregoing shall not prohibit (a) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under the other Loan Documents, (b) any Lender from exercising setoff rights in accordance with, and subject to, the terms of this Agreement, or (c) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any bankruptcy or insolvency law.

SECTION 8.12. ***Indemnification.*** The Lenders severally agree to indemnify each Agent in its capacity as such and each of its Related Parties (to the extent not reimbursed by Borrower or the Guarantors and without limiting the obligation of Borrower or the Guarantors to do so), ratably according to their respective outstanding Loans and Commitments in effect on the date on which indemnification is sought under this Section 8.12 (or, if indemnification is sought after the date upon which all Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with such outstanding Loans and Commitments as in effect immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, fines, penalties, actions, claims, suits, judgments, litigations, investigations, inquiries or proceedings, costs, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Loans) be imposed on, incurred by or asserted against such Agent or Related Party in any way relating to or arising out of, the Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein, the Transactions or any of the other transactions contemplated hereby or thereby or any action taken or omitted by such Agent or Related Party under or in connection with any of the foregoing (**IN ALL CASES, WHETHER OR NOT CAUSED OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE NEGLIGENCE OF ANY AGENT OR RELATED PARTY**); provided that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, claims, suits, judgments, litigations, investigations, inquiries or proceedings, costs, expenses or disbursements that are found by a final and nonappealable judgment of a court of competent jurisdiction to have directly resulted solely and directly from such Agent's or Related Party's, as the case may be, gross negligence or willful misconduct. The agreements in this Section 8.12 shall survive the payment of the Loans and all other amounts payable hereunder.

SECTION 8.13. ***Withholding Taxes.*** To the extent required by any applicable law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax. If the Internal Revenue Service or any other Governmental Authority asserts a claim that the Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender because the appropriate form was not delivered or was not properly executed or because such Lender failed to notify the Administrative Agent of a change in circumstance which rendered the exemption from, or reduction of, withholding Tax ineffective or for any other reason, or if Administrative Agent reasonably determines that a payment was made to a Lender pursuant to this Agreement without deduction of applicable withholding tax from such payment, such Lender shall indemnify the Administrative Agent fully for all amounts paid, directly or indirectly, by the Administrative Agent as Tax or otherwise, including any penalties or interest and together with all expenses (including legal expenses, allocated internal costs and out-of-pocket expenses) incurred.

SECTION 8.14. *Lender's Representations, Warranties and Acknowledgements.*

(a)        Each Lender represents and warrants that it has made its own independent investigation of the financial condition and affairs of Holdings and its Subsidiaries in connection with credit extensions hereunder and that it has made and shall continue to make its own appraisal of the creditworthiness of Holdings and its Subsidiaries.  No Agent shall have any duty or responsibility, either initially or on a continuing basis, to make any such investigation or any such appraisal on behalf of Lenders or to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter, and no Agent shall have any responsibility with respect to the accuracy of or the completeness of any information provided to the Lenders.  Each Lender acknowledges that no Agent or Related Party of any Agent has made any representation or warranty to it.  Except for documents expressly required by any Loan Document to be transmitted by an Agent to the Lenders, no Agent shall have any duty or responsibility (either express or implied) to provide any Lender with any credit or other information concerning any Loan Party, including the business, prospects, operations, property, financial and other condition or creditworthiness of any Loan Party or any Affiliate of a Loan Party, that may come in to the possession of an Agent or any of its Related Parties.

(b)        Each Lender, by delivering its signature page to this Agreement or an Assignment and Acceptance and funding its Loan, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be approved by any Agent, the Required Lenders or the Lenders, as applicable, on the Closing Date.

## ARTICLE IX

### MISCELLANEOUS

SECTION 9.01. *Notices; Electronic Communications*.  Except for notices and other communications expressly permitted to be given by telephone hereunder (and except as provided in this Section 9.01), notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail, as follows:

(a)        if to the Borrower or any Subsidiary, to the Borrower at: 676 N. Michigan Ave. Suite 3700, Chicago, IL 60611, Attention of Alex Washington (Fax No. 312-255-4820, Email: aew@wppartners.com) and 201 North Illinois Street, Suite 1800, Indianapolis, Indiana 46204, Attention of Anne M. Frye (Fax No. 317-248-6546, Email: afrye@vertellus.com;

(b)        if to the Administrative Agent or Collateral Agent, to Jefferies Finance LLC,

Jefferies Finance LLC
520 Madison Avenue
New York, New York  10022
Attention:  Account Officer – Vertellus Specialties Inc.
Fax: (212) 284-3444
Email: jfin.admin@jefferies.com

(c)        if to a Lender, to it at its address (or fax number or e-mail address) set forth in the Assignment and Acceptance pursuant to which such Lender shall have become a party hereto.

All notices and other communications given to any party hereto, in accordance with the provisions of this Agreement, shall be deemed to have been given on the date of receipt if delivered by hand or overnight courier service or on the date five Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section 9.01, or in accordance with the latest unrevoked direction from such party given in accordance with this Section 9.01. As agreed to among Holdings, the Borrower, the Administrative Agent and the applicable Lenders from time to time, notices and other communications may also be delivered by e-mail to the e-mail address of a representative of the applicable Person provided from time to time by such Person.

Each of Holdings and the Borrower hereby agrees, unless directed otherwise by the Administrative Agent or unless the e-mail address referred to below has not been provided by the Administrative Agent to the Borrower, that it will, and will cause the Subsidiaries to, provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent pursuant to the Loan Documents or to the Lenders under Article V, including all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (i) is or relates to a Borrowing Request, a notice pursuant to Section 2.10, (ii) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (iii) provides notice of any Default or Event of Default under this Agreement or any other Loan Document or (iv) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any Borrowing or other extension of credit hereunder (all such nonexcluded communications being referred to herein collectively as "**Communications**"), by transmitting the Communications in an electronic/soft medium that is properly identified in a format acceptable to the Administrative Agent to an e-mail address as directed by the Administrative Agent. In addition, the Borrower agrees, and agrees to cause the Subsidiaries, to continue to provide the Communications to the Administrative Agent or the Lenders, as the case may be, in the manner specified in the Loan Documents but only to the extent requested by the Administrative Agent.

Each of Holdings and the Borrower hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by, or on behalf of, Holdings or the Borrower hereunder (collectively, the "***Borrower Materials***") by posting the Borrower Materials on Intralinks or another similar electronic system (the "***Platform***") and (b) certain of the Lenders may be "*public-side*" Lenders (i.e., Lenders that do not wish to receive material nonpublic information with respect to Holdings, the Borrower, the Subsidiaries or their respective securities) (each, a "***Public Lender***"). Each of Holdings and the Borrower hereby agrees that (i) all Borrower Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "*PUBLIC*" which, at a minimum, shall mean that the word "*PUBLIC*" shall appear prominently on the first page thereof, (ii) by marking Borrower Materials "*PUBLIC*", Holdings and the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any material nonpublic information with respect to Holdings, the Borrower, the Subsidiaries or their respective securities for purposes of United States Federal and state securities laws; *provided* that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 9.16, (iii) all Borrower Materials marked "*PUBLIC*" are permitted to be made available through a portion of the Platform designated as "*Public Investor*" and (iv) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "*PUBLIC*" as being suitable only for posting on a portion of the Platform not marked as "*Public Investor*". Notwithstanding the foregoing, the following Borrower Materials shall be deemed to be marked "*PUBLIC*", unless the Borrower notifies the Administrative Agent promptly that any such document contains material nonpublic information: (A) the Loan Documents, (B) any notification of changes in the terms of the Credit Facilities, (C) any notification of

the identity of Disqualified Institutions and (D) all information delivered pursuant to Section 5.01 (other than information delivered pursuant to clause (h) thereof).

Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "*Private Side Information*" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable law, including United States Federal and state securities laws, to make reference to Communications that are not made available through the "*Public Side Information*" portion of the Platform and that may contain material non-public information with respect to Holdings, the Borrower, the Subsidiaries or their respective securities for purposes of United States Federal or state securities laws.

THE PLATFORM IS PROVIDED "*AS IS*" AND "*AS AVAILABLE*". NEITHER THE ADMINISTRATIVE AGENT NOR ANY OF ITS RELATED PARTIES WARRANTS THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM AND EACH EXPRESSLY DISCLAIMS LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NONINFRINGEMENT OF THIRD-PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS IS MADE BY THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM. IN NO EVENT SHALL THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES HAVE ANY LIABILITY TO ANY LOAN PARTY, ANY LENDER OR ANY OTHER PERSON FOR DAMAGES OF ANY KIND, WHETHER OR NOT BASED ON STRICT LIABILITY AND INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ANY LOAN PARTY'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY SUCH PERSON IS FOUND IN A FINAL AND NON-APPLICABLE RULING BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED FROM SUCH PERSON'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

The Administrative Agent agrees that the receipt of the Communications by the Administrative Agent at its e-mail address set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents. Each Lender agrees that receipt of notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Loan Documents. Each Lender agrees to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and that the foregoing notice may be sent to such e-mail address. Nothing herein shall prejudice the right of the Administrative Agent or any Lender to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

SECTION 9.02. *Survival of Agreement*. All covenants, agreements, representations and warranties made by Holdings and/or the Borrower herein and in the certificates, reports, instruments or other documents prepared or delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the Lenders and shall survive the making by the Lenders of the Loans, regardless of any investigation made by the Lenders or on their behalf, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or

any Fee or any other amount payable under this Agreement or any other Loan Document is outstanding and unpaid and so long as the Commitments have not been terminated. The provisions of Sections 2.14, 2.16, 2.20 and 9.05 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Loans, the expiration of the Commitments, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document or any investigation made by or on behalf of the Administrative Agent, the Collateral Agent or any Lender.

SECTION 9.03. **Binding Effect**. Subject to Section 4.01, this Agreement shall become effective when it shall have been executed by Holdings, the Borrower, the Subsidiary Guarantors listed on Schedule 1.01(a) and the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto.

SECTION 9.04. **Successors and Assigns**.

(a)     **Successors and Assigns Generally.** The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that neither the Borrower nor any other Loan Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender, and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of Section 9.04(b), (ii) by way of participation in accordance with the provisions of Section 9.04(d) or (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 9.04(e) (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 9.04(d) and, to the extent expressly contemplated hereby, the Collateral Agent and the Related Parties of each of the Administrative Agent, the Collateral Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     **Assignments by Lenders.** Any Lender may at any time assign to one or more assignees (other than as provided in Sections 9.04(b)(v) and 9.04(b)(vi) below) all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); *provided* that (in each case with respect to any Class) any such assignment shall be subject to the following conditions:

(i)     **Minimum Amounts.**

(A)     in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and/or the Loans at the time owing to it (in each case with respect to any Class) or contemporaneous assignments to related Approved Funds that equal at least the amount specified in Section 9.04(b)(i)(B) in the aggregate or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)     in any case not described in Section 9.04(b)(i)(A), the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the applicable Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent or, if "Trade

105

Date" is specified in the Assignment and Acceptance, as of such "Trade Date"), shall be in an amount that is an integral multiple of $1,000,000 and not less than $1,000,000, unless each of the Administrative Agent and, so long as no Event of Default has occurred and is continuing, the Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed).

(ii)        ***Proportionate Amounts.*** Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loan or the Commitment assigned, except that this clause (ii) shall not prohibit any Lender from assigning all or a portion of its rights and obligations among separate Classes on a non-*pro rata* basis.

(iii)        ***Required Consents.*** No consent shall be required for any assignment except to the extent required by paragraph Section 9.04(b)(i)(B) and, in addition:

(A)        the consent of the Borrower (such consent not to be unreasonably withheld or delayed) shall be required unless (x) a Specified Default has occurred and is continuing at the time of such assignment or (y) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund; *provided* that the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within 10 Business Days after having received notice thereof; and

(B)        the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments in respect of (i) any unfunded Commitments with respect to the Loans unless such assignment is to a Lender with a Commitment in respect of such Class, an Affiliate of such Lender or an Approved Fund with respect to such Lender or (ii) any Loans unless such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund.

(iv)        ***Assignment and Assumption.*** The parties to each assignment shall (A) execute and deliver to the Administrative Agent an Assignment and Acceptance via an electronic settlement system acceptable to the Administrative Agent or (B) if previously agreed with the Administrative Agent, manually execute and deliver to the Administrative Agent an Assignment and Acceptance, in each case, together with a processing and recordation fee of $3,500; *provided* that such processing and recordation fee shall not apply to an assignment to an Affiliate or Approved Fund of a Lender; *provided, further,* that the Administrative Agent may, in its sole discretion, elect to waive or reduce such processing and recordation fee in the case of any assignment. The assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire and all applicable tax forms required hereunder.

(v)        ***No Assignment to Certain Persons.*** No such assignment shall be made to (A) Holdings, the Borrower, any Subsidiary, any Sponsor or any of their respective Affiliates (other than assignments made pursuant to Sections 9.04(g) or (h)) or (B) any Disqualified Institution, except to the extent the Borrower has consented to such assignment in writing in its sole and absolute discretion (in which case such Person will not be considered a Disqualified Institution solely for that particular assignment). Notwithstanding anything herein to the contrary, the Administrative Agent shall have no liability with respect to monitoring or enforcing the provisions herein relating to Disqualified Institutions, and without limiting the foregoing, the Administrative Agent shall not (x) be obligated to ascertain, monitor or inquire as to whether any Lender or Participant is a Disqualified Institution or (y) have any liability with respect to any assignment or participation of Loans to any Disqualified Institution.  Upon the request of any

106

Lender, the Borrower shall make available to such Lender the list of Disqualified Institutions provided to the Arranger prior to the Closing Date, if any, along with any additions, deletions or modifications to such list as provided to the Administrative Agent after the Closing Date pursuant to the definition of the term Disqualified Institution.

(vi)     ***No Assignment to Natural Persons.*** No such assignment shall be made to a natural Person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person).

Subject to acceptance and recording thereof by the Administrative Agent pursuant to paragraph (c) of this Section 9.04, from and after the effective date specified in each Assignment and Acceptance, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 2.14, 2.15, 2.16, 2.20 and 9.05, with respect to facts and circumstances occurring prior to the effective date of such assignment as well as to any Fees accrued for its account and not yet paid. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 9.04(d).

(c)     ***Register.*** The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "***Register***"). The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Borrower and any Lender, with respect to such Lender's respective share only, at any reasonable time and from time to time upon reasonable prior notice.

Upon its receipt of, and consent to, a duly completed Assignment and Acceptance executed by an assigning Lender and an assignee, an Administrative Questionnaire completed in respect of the assignee (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) above, if applicable, and the written consent of the Administrative Agent and, if required, the Borrower to such assignment and any applicable tax forms, the Administrative Agent shall (i) accept such Assignment and Acceptance and (ii) promptly record the information contained therein in the Register. No assignment shall be effective unless it has been recorded in the Register as provided in this paragraph.

(d)     ***Participations.*** Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than (a) a natural Person, (b) a Disqualified Institution (but only to the extent the list of Disqualified Institutions has been made available to all Lenders or the Borrower shall have consented to such participation in its sole discretion) or (c) Holdings, the Borrower or any of their Affiliates, the Subsidiaries, any Sponsor or any of their Affiliates) (each, a "***Participant***") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); *provided that*

107

(i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver with respect to, any of the matters set forth in Section 9.07(b) as requiring the prior written consent of each Lender or each Lender directly adversely affected thereby to the same extent as its participating Lender would have been entitled to. The Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.14, 2.15, 2.16 and 2.20 (subject to the requirements and limitations therein, including the requirements under Section 2.20 (it being understood that the documentation required under Section 2.20(f) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 9.04(b); *provided* that such Participant (A) agrees to be subject to the provisions of Sections 2.21 as if it were an assignee under Section 9.04(b) and (B) shall not be entitled to receive any greater payment under Sections 2.14, 2.15, 2.16 or 2.20, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. Each Lender that sells a participation agrees, at the Borrower's request and expense, to use reasonable efforts to cooperate with the Borrower to effectuate the provisions of Section 2.21 with respect to any Participant. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.06 as though it were a Lender; *provided* that such Participant agrees to be subject to Section 2.18 as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "***Participant Register***"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(e)     ***Certain Pledges.*** Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement or the other Loan Documents to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other central bank; *provided* that no such pledge or assignment shall release such Lender from any of its obligations hereunder or thereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(f)     ***Special Purpose Vehicles***. Notwithstanding anything to the contrary contained herein, any Lender (a "***Granting Lender***") may grant to a special purpose funding vehicle (an "***SPV***"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the

Borrower, the option to provide to the Borrower all or any part of any Loan that such Granting Lender would otherwise be obligated to make to the Borrower pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPV to make any Loan and (ii) if an SPV elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof. The making of a Loan by an SPV hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Each party hereto hereby agrees that no SPV shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender). In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPV, it will not institute against, or join any other Person in instituting against, such SPV any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any State thereof. In addition, notwithstanding anything to the contrary contained in this Section 9.04, any SPV may (x) with notice to, but without the prior written consent of, the Borrower and the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to the Granting Lender or to any financial institutions (consented to by the Borrower and Administrative Agent) providing liquidity and/or credit support to or for the account of such SPV to support the funding or maintenance of Loans and (y) disclose on a confidential basis any nonpublic information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPV.

(g)    ***Non-Debt Fund Affiliates***.  Notwithstanding anything to the contrary contained herein, any Lender may assign all or any portion of its Loans hereunder to any Non-Debt Fund Affiliate pursuant to (x) solely in the case of any Non-Debt Fund Affiliate (other than Holdings, the Borrower or any Subsidiary), an open market purchase or (y) Dutch Auctions open to all Lenders on a *pro rata* basis, but only if:

(i)     in the case of any such assignment to Holdings, the Borrower or any Subsidiary, (x) no Default or Event of Default has occurred or is continuing and (y) any Loan assigned to such Person will be automatically and permanently cancelled at the time of such assignment;

(ii)     such Non-Debt Fund Affiliates shall have identified itself in writing as a Non-Debt Fund Affiliate, describing the nature of such affiliation to the assigning Lender, and either (x) such Non-Debt Fund Affiliate shall at the time of such assignment make the No Undisclosed Information Representation or (y) such Non-Debt Fund Affiliate and the assigning Lender shall have acknowledged and agreed that (1) such Non-Debt Fund Affiliate may have, or later may come into possession of, any Undisclosed Information, (2) such assigning Lender has independently and, without reliance on such Non-Debt Fund Affiliate, made its own analysis and determination to participate in such assignment notwithstanding such assigning Lender's lack of knowledge of such Undisclosed Information, (3) such Non-Debt Fund Affiliate is not making any No Undisclosed Information Representation and (4) such Non-Debt Fund Affiliate shall have no liability to such assigning Lender with respect to the non-disclosure of the Undisclosed Information;

(iii)     in the case of any such assignment to a Non-Debt Fund Affiliate other than Holdings, the Borrower and any Subsidiary, such Non-Debt Fund Affiliate shall at all times after such assignment be subject to the restrictions specified in Section 9.04(i);

(iv)        in the case of any such assignment to a Non-Debt Fund Affiliate other than Holdings, the Borrower and any Subsidiary (which assignment is subject to clause (i) of this Section 9.04(g)) or to a Debt-Fund Affiliate, at the time of such assignment and after giving effect to such assignment, the aggregate principal amount of Loans held at any one time by Non-Debt Fund Affiliates and Debt Fund Affiliates shall not exceed 25% of the principal amount of all Loans at such time outstanding (the "**_Affiliate Cap_**"); *provided*, that the parties hereto acknowledge and agree that the Administrative Agent shall not be liable for any losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever incurred or suffered by any Person in connection with any compliance or non-compliance with this clause (iv) or any purported assignment exceeding the Affiliate Cap (it being understood and agreed that the Affiliate Cap is intended to apply to any Loans made available by Non-Debt Fund Affiliates and Debt Fund Affiliates by means other than formal assignment (e.g., as a result of an acquisition of another Lender by any Non-Debt Fund Affiliate or Debt Fund Affiliate); *provided further* that to the extent that any assignment to any Non-Debt Fund Affiliate or Debt Fund Affiliate would result in the aggregate principal amount of all Loans held by Non-Debt Fund Affiliates and Debt Fund Affiliates exceeding the Affiliate Cap (after giving effect to any substantially simultaneous cancellations thereof), the assignment of the relevant excess amount shall be null and void; and

(v)        the Administrative Agent is promptly notified in writing by such Non-Debt Fund Affiliate of each assignment of Loans to a Non-Debt Fund Affiliate.

(h)        Notwithstanding anything to the contrary contained herein, any Lender may assign all or any portion of its Loans hereunder to any Debt Fund Affiliate pursuant to (x) an open market purchase and/or (y) Dutch Auctions open to all Lenders on a *pro rata* basis but only if such Debt Fund Affiliate shall at all times after such assignment be subject to the restrictions specified in Section 9.04(i).

(i)        Notwithstanding anything to the contrary contained herein, (x) any Term Loans or Incremental Term Loans held by a Lender that is a Non-Debt Fund Affiliate shall be excluded in the determination of any "Required Lender" votes; (y) no Lender that is a Non-Debt Fund Affiliate shall have any right to (i) attend (including by telephone) any meeting, call or discussions (or portion thereof) among the Administrative Agent, the Collateral Agent or any Lender to which representatives of the Borrower are not then present, (ii) receive any information or material prepared by the Administrative Agent, the Collateral Agent or any Lender or any communication by or among the Administrative Agent, the Collateral Agent and one or more Lenders, except to the extent such information or materials have been made available to the Borrower or its representatives, (iii) receive advice of counsel to the Administrative Agent, the Collateral Agent or any Lender, or challenge any Lender's attorney-client privilege of, or asserted by, the Administrative Agent, the Collateral Agent or any Lender and (z) each Lender that is a Non-Debt Affiliate hereby agrees that if a proceeding under any Debtor Relief Law shall be commenced by or against the Borrower or any other Loan Party, such Lender irrevocably authorizes and empowers the Administrative Agent to vote on behalf of such Lender with respect to the Term Loans and Incremental Term Loans held by such Lender in the manner in which the Required Lenders vote; *provided* that such Lender shall be entitled to vote in accordance with its sole discretion in connection with any plan of reorganization to the extent any such plan of reorganization proposes to treat any Term Loan, Incremental Term Loan or other Obligations held by such Lender in a disproportionately adverse manner to such Lender than the proposed treatment of Term Loans, Incremental Term Loans and other similar Obligations held by Lenders that are not Non-Debt Affiliates, (iv) no Lender that is a Non-Debt Fund Affiliate shall have any right to make or bring (or participate in, other than as a passive participant in or recipient of its *pro rata* benefits of) any claim, in its capacity as a Lender, against the Administrative

Agent, the Collateral Agent or any other Lender with respect to any duties or obligations or alleged duties or obligations of the Administrative Agent, the Collateral Agent or any other such Lender under the Loan Documents in the absence, with respect to any such Person, of the gross negligence, bad faith or willful misconduct by such Person, as determined by a court of competent jurisdiction in a final non-appealable judgment, except with respect to any claims that the Agent or any other such Lender is treating such Affiliated Lender, in its capacity as a Lender, in a disproportionate manner relative to the other Lenders and (v) no Lender that is a Non-Debt Fund Affiliate will take any action to object to or impede the existence of any rights by the Administrative Agent in relation to any claim in respect of such Lender's Loans, so long as such Lender is treated on the same or better terms as the other Lenders.

(j)        [reserved].

(k)        Any Loans assigned to an Non-Debt Fund Affiliate other than Holdings, the Borrower or any Subsidiary in accordance with Section 9.04(g) may be contributed, directly or indirectly, to Holdings and, in turn, to the Borrower as a common capital contribution and be exchanged for Qualified Equity Interests of Holdings to the extent otherwise permitted herein, whereupon such contributed Loans shall be automatically and permanently cancelled at the time of such contribution.

SECTION 9.05. **_Expenses; Indemnity_**.

(a)        Holdings and the Borrower agree, jointly and severally, promptly following a written demand (including documentation reasonably supporting such demand), to pay all reasonable and documented out-of-pocket expenses incurred (i) by the Administrative Agent, the Collateral Agent, the Arranger and each of their respective Affiliates, in connection with (x) the syndication of any Credit Facility and the preparation, execution, delivery and administration of this Agreement and the other Loan Documents and (y) any amendment or waiver of the provisions hereof or thereof (whether or not the transactions contemplated thereby shall be consummated) or (ii) by the Administrative Agent, the Collateral Agent, the Arranger, each of their respective Affiliates and each Lender in connection with the enforcement or protection of their rights in connection with (x) this Agreement and the other Loan Documents or (y) the Loans made hereunder (but limited in each case, (1) in the case of legal fees and expenses, to the reasonable fees, disbursements and other charges of (x) Proskauer Rose LLP, counsel for the Administrative Agent, the Collateral Agent and the Arranger, (y) one regulatory counsel and one local counsel in any relevant jurisdiction, in each case as the Administrative Agent reasonably determines is required and (z) in the case of an actual or potential conflict of interest, of one additional counsel to the affected Lenders to the extent such Lenders are similarly situated and (2) in the case of other consultants and advisors fees and expenses, to the fees and expenses of any such Persons as approved by the Borrower (such approval not to be unreasonably withheld)).

(b)        Holdings and the Borrower agree, jointly and severally, to indemnify the Administrative Agent, the Collateral Agent, the Arranger, each Lender and each Related Party of any of the foregoing Persons (each such Person being called an "**_Indemnitee_**") against, and to hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including reasonable and documented out-of-pocket counsel and consultant or other expert fees, charges and disbursements (but limited in each case, in the case of legal fees and expenses, of (x) one firm of outside counsel to the Indemnitees, taken as a whole, and (y) in the case of an actual or potential conflict of interest, one additional firm of outside counsel to the affected Indemnitee, taken as a whole, to the extent such Indemnitees are similarly situated) incurred by, or asserted against, any Indemnitee arising out of, in any way connected with, or as a result of (i) the execution or delivery of this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties thereto of their respective obligations hereunder or the consummation of the Transactions and the

other transactions contemplated hereby (including the syndication of any Credit Facility), (ii) the use or proposed use of the proceeds of the Loans, (iii) any Environmental Liability or Environmental Claim related in any way to the Loan Parties, any of their respective subsidiaries or predecessors or any property currently or formerly owned, leased or operated by the Loan Parties or any of their respective subsidiaries or predecessors, including the Mortgaged Properties, or (iv) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto (and regardless of whether such matter is initiated by the Borrower, any other Loan Party or any of their respective Affiliates or any other Person); *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and non-appealable judgment to have arisen from (i) the gross negligence, bad faith or willful misconduct of such Indemnitee or of its Related Parties, (ii) any disputes solely among Indemnitees (other than any claims against an Indemnitee in its capacity or in fulfilling its role as the Administrative Agent, an Arranger or any similar role under the this Agreement) or (iii) any act or omission of Holdings, the Borrower or any of their Affiliates. This Section 9.05(b) shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, liabilities and related expenses arising from any non-Tax claim.

(c)    To the extent that Holdings and the Borrower fail to pay any amount required to be paid by them to the Administrative Agent, the Collateral Agent, the Arranger or each of their respective Affiliates under paragraph  (a) or (b) of this Section 9.05, each Lender severally agrees to pay to the Administrative Agent, the Collateral Agent, the Arranger or each of their respective Affiliates, as the case may be, such Lender's *pro rata* share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; (including any such unpaid amount in respect of a claim asserted by such Lender). For purposes hereof, a Lender's "*pro rata share*" shall be determined based upon its share of the sum of the outstanding Term Loans and unused Commitments at the time.

(d)    To the extent permitted by applicable law, no Indemnitee or Loan Party shall assert, and each such Person hereby waives, any claim against such other Person, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Transactions, any Loan or the use of the proceeds thereof; *provided however*, that the foregoing shall not affect Holdings' and the Borrower's indemnification obligations under this Section 9.05.  No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

(e)    The provisions of this Section 9.05 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Loans, the expiration of the Commitments, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document or any investigation made by or on behalf of the Administrative Agent, the Collateral Agent or any Lender. All amounts due under this Section 9.05 shall be payable on written demand therefor.

SECTION 9.06. ***Right of Setoff***. Subject to the terms of the ABL Intercreditor Agreement, if an Event of Default shall have occurred and be continuing, each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, except to the extent prohibited by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender to or for the credit or the account of

Holdings or the Borrower against any and all of the obligations of Holdings, the Borrower or the other Loan Parties, now or hereafter existing under this Agreement and other Loan Documents held by such Lender (or its Affiliate, as applicable), irrespective of whether or not such Lender (or its Affiliate) shall have made any demand under this Agreement or such other Loan Document and although such obligations may be unmatured. The rights of each Lender and its respective Affiliates under this Section 9.06 are in addition to other rights and remedies (including other rights of setoff) which such Lender (or its Affiliate) may have.

SECTION 9.07. *Waivers; Amendment*.

(a)       No failure or delay of the Administrative Agent, the Collateral Agent or any Lender in exercising any power or right hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent, the Collateral Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by the Borrower or any other Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice or demand on Holdings or the Borrower in any case shall entitle Holdings or the Borrower to any other or further notice or demand in similar or other circumstances.

(b)       No Loan Document or provision thereof may be waived, amended or modified except, in the case of this Agreement, by an agreement or agreements in writing entered into by Holdings, the Borrower and the Required Lenders or, in the case of any other Loan Document, by an agreement or agreements in writing entered into by the parties thereto; *provided* that, in addition to the approval of the Required Lenders, as applicable, no such agreement shall:

(i)       decrease the principal amount of, or extend the maturity of, or any scheduled principal payment date or date for the payment of any interest on, or any fee or other amount owed to any Lender with respect to, any Loan, or waive or excuse any such payment or any part thereof, or decrease the rate of interest on, or any fee or other amount owed to any Lender with respect to, any Loan, without the prior written consent of each Lender directly adversely affected thereby,

(ii)       increase or extend the Commitment of any Lender without the prior written consent of such Lender,

(iii)       amend or modify the *pro rata* requirements of Section 2.17, the provisions of Section 9.04(a) relating to an assignment or other transfer by the Borrower or any other Loan Party of any of its rights or obligations hereunder or release all or substantially all of the value of the Guarantors or all or substantially all of the value of the Collateral (other than in connection with a Sale of Guarantor), without the prior written consent of each Lender,

(iv)       change the provisions of any Loan Document in a manner that by its terms adversely affects the rights of Lenders holding Loans or Commitments of one Class differently from the rights of Lenders holding Loans or Commitments of any other Class without the prior written consent of Lenders holding a majority in interest of the outstanding Loans and unused Commitments of each adversely affected Class, or

113

(v)      reduce the percentage contained in the definition of the term "Required Lenders" and in the provisions of Section 9.04(i) or in the provision of this Section 9.07 (or any other amendment having such effect) without the prior written consent of each Lender (it being understood that with the consent of the Required Lenders, additional extensions of credit pursuant to this Agreement may be included in the determination of the Required Lenders on substantially the same basis as the Term Loan Commitments on the date hereof).

*provided further* that, notwithstanding the foregoing, no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent or the Collateral Agent hereunder or under any other Loan Document without the prior written consent of the Administrative Agent or the Collateral Agent, respectively.

(c)      The Administrative Agent and the Borrower may amend any Loan Document (i) to correct administrative errors or omissions, or to effect administrative changes that are not adverse to any Lender, (ii) to correct, amend, cure any ambiguity, inconsistency, defect or correct any typographical error or other manifest error in this Agreement or any other Loan Document, (iii) to comply with local law or advice of local counsel in respect of a Security Document or (iv) to cause a Security Document to be consistent with this Agreement and the other Loan Document, including to reflect the appointment of a successor Collateral Agent or otherwise perfect, protect or preserve the priority of the Liens, or grant additional Liens, on the Collateral to the Collateral Agent, including any successor Collateral Agent, for the benefit of the Secured Parties to secure the Obligations. Notwithstanding anything to the contrary contained herein, such amendment shall become effective without any further consent of any other party to such Loan Document.

SECTION 9.08. ***Interest Rate Limitation***.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively, the "***Charges***"), shall exceed the maximum lawful rate (the "***Maximum Rate***") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan or participation in accordance with applicable law, the rate of interest payable in respect of such Loan or participation hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section 9.08 shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

SECTION 9.09. ***Entire Agreement***. This Agreement, the Fee Letter and the other Loan Documents constitute the entire contract between the parties relative to the subject matter hereof. Unless otherwise specified therein, any other previous agreement (other than the Fee Letter) among the parties with respect to the subject matter hereof is superseded by this Agreement and the other Loan Documents. Nothing in this Agreement or in the other Loan Documents, expressed or implied, is intended to confer upon any Person (other than the parties hereto and thereto, their respective successors and assigns permitted hereunder and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the Collateral Agent and the Lenders) any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Loan Documents.

SECTION 9.10. ***WAIVER OF JURY TRIAL***. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY

ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.10.

SECTION 9.11. *Severability*. In the event any one or more of the provisions contained in this Agreement or in any other Loan Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction). The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 9.12. *Counterparts*. This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original but all of which when taken together shall constitute a single contract, and shall become effective as provided in Section 9.03. Delivery of an executed signature page to this Agreement by facsimile transmission or other customary means of electronic transmission (e.g. "pdf") shall be as effective as delivery of a manually signed counterpart of this Agreement.

SECTION 9.13. *Headings*. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

SECTION 9.14. *Applicable Law*. THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS AGREEMENT OR ANY SUCH OTHER LOAN DOCUMENTS (INCLUDING, WITHOUT LIMITATION, ANY CLAIMS SOUNDING IN CONTRACT LAW OR TORT LAW ARISING OUT OF THE SUBJECT MATTER HEREOF) SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

SECTION 9.15. *Jurisdiction; Consent to Service of Process*. (a) Each of Holdings and the Borrower hereby irrevocably and unconditionally agrees that it will not commence, or permit any of its respective Affiliates to commences or support any Person in commencing any action, litigation or proceeding of any kind or description, whether in law or equity, whether in contract or tort or otherwise, against the Administrative Agent, any Lender or any Related Party of the foregoing in any way relating to this Agreement or any other Loan Document (except as otherwise expressly stated therein) or the transactions relating hereto or thereto, in any forum other than any New York State court or Federal court of the United States sitting in the borough of Manhattan in New York City, and any appellate court from any thereof, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that the Administrative Agent, the Collateral Agent or any Lender may otherwise have to commence any

action, litigation or proceeding relating to this Agreement or the other Loan Documents against Holdings, the Borrower or their respective properties in the courts of any jurisdiction.

(a)    Each of Holdings and the Borrower hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of, or relating to, this Agreement or the other Loan Documents in any New York State or Federal court. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(b)    Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 9.16. ***Electronic Execution of Assignments***. The words "execution", "signed", "signature", and words of like import in any Assignment and Acceptance shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based record keeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

SECTION 9.17. ***Confidentiality***. Each of the Administrative Agent, the Collateral Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' Related Parties or service providers (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and be instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority or quasi-regulatory authority (such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) in connection with the exercise of any remedies hereunder or under the other Loan Documents or any suit, action or proceeding relating to the enforcement of its rights hereunder or thereunder, (e) to any other party hereto and, subject to an agreement containing provisions no less restrictive than this Section 9.17, to (i) any actual or prospective assignee of or Participant in any of its rights or obligations under this Agreement and the other Loan Documents (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and be instructed to keep such Information confidential), or (ii) any actual or prospective counterparty (or its advisors) to any swap, derivative or other transaction under which payments are to be made by reference to Holdings, the Borrower or any Subsidiary or any of their respective obligations, this Agreement or payments hereunder (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and be instructed to keep such Information confidential), (f) with the consent of Holdings or the Borrower, (g) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section 9.17, or (y) becomes available to the Administrative Agent, any Lender or any of their selective Affiliates on a non-confidential basis from a source other than Holdings or the Borrower, (h) to prospective Lenders in connection with the primary syndication of any Credit Facility (it being understood that the Person to whom such disclosure is made will be informed of the confidential nature of such Information and be instructed to keep such Information confidential), (i) for purposes of establishing a "due diligence" defense and (j) on a confidential basis to (x) any rating agency in connection with rating Holdings or the Borrower or the

Subsidiaries or any Credit Facility or (y) the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to any Credit Facility or market data collectors, similar service providers to the lending industry and service providers to the Administrative Agent in connection with the settlement, administration and management of this Agreement and the Loan Documents. For the purposes of this Section 9.17, "*Information*" shall mean all information received from Holdings, the Borrower or any Subsidiary and related to Holdings, the Borrower, any Subsidiary or their business, other than any such information that was available to the Administrative Agent, the Collateral Agent or any Lender on a nonconfidential basis prior to its disclosure by Holdings, the Borrower or any Subsidiary; it being understood that, in the case of Information received from Holdings, the Borrower or any Subsidiary after the date hereof, all such information shall be deemed confidential unless such information is clearly identified at the time of its receipt by the Administrative Agent, the Collateral Agent or the Lenders, as applicable, as not being confidential; *provided* that, Holdings, the Borrower and each Subsidiary shall use commercially reasonable efforts to clearly identify at the time of its delivery of any Information to the Administrative Agent, the Collateral Agent or the Lenders, as applicable, whether such Information is confidential or non-confidential. Any Person required to maintain the confidentiality of Information as provided in this Section 9.17 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord its own confidential information.

SECTION 9.18. *Lender Action*. Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party or any other obligor under any of the Loan Documents (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral or any other property of any such Loan Party, unless expressly provided for herein or in any other Loan Document, without the prior written consent of the Administrative Agent. The provisions of this Section 9.18 are for the sole benefit of the Lenders and shall not afford any right to, or constitute a defense available to, any Loan Party.

SECTION 9.19. *USA PATRIOT Act Notice*. Each Lender and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies Holdings and the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies Holdings, the Borrower and the other Loan Parties, which information includes the name and address of Holdings, the Borrower and the other Loan Parties and other information that will allow such Lender or the Administrative Agent, as applicable, to identify Holdings, the Borrower and the other Loan Parties in accordance with the USA PATRIOT Act.

SECTION 9.20. *No Fiduciary Duty*. Each Agent, each Lender and their respective Affiliates (collectively, solely for purposes of this paragraph, the "*Lenders*"), may have economic interests that conflict with those of the Loan Parties, their stockholders and/or their Affiliates. Each Loan Party agrees that nothing in the Loan Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between any Lender, on the one hand, and such Loan Party, its stockholders or its Affiliates, on the other. The Loan Parties acknowledge and agree that (i) the transactions contemplated by the Loan Documents (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between Lenders, on the one hand, and the Loan Parties, on the other, and (ii) in connection therewith and with the process leading thereto, (x) no Lender has assumed an advisory or fiduciary responsibility in favor of any Loan Party, its stockholders or its Affiliates with respect to the transactions contemplated hereby (or the exercise of rights or remedies with respect thereto) or the process leading thereto (irrespective of whether any Lender has advised, is currently advising or will advise any Loan Party, its stockholders or its Affiliates on other

117

matters) or any other obligation to any Loan Party except the obligations expressly set forth in the Loan Documents and (y) each Lender is acting solely as principal and not as the agent or fiduciary of any Loan Party, its management, stockholders, creditors or any other Person. Each Loan Party acknowledges and agrees that it has consulted its own legal and financial advisors to the extent it deemed appropriate and that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto. Each Loan Party agrees that it will not claim that any Lender has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to such Loan Party, in connection with such transaction or the process leading thereto.

## ARTICLE X

## THE GUARANTY

SECTION 10.01. *Guaranty*.  (a)(i) Subject to this Article X, each Guarantor hereby, jointly and severally, irrevocably and unconditionally, as primary obligor and not merely as surety, guarantees to each Secured Party and its successors and assigns, irrespective of the validity and enforceability of this Agreement or any of the Obligations, (x) the full and punctual payment of the Obligations when due, whether at stated maturity, upon acceleration or otherwise and (y) in the case of any extension in time of repayment or renewal of this Agreement or the other Loan Documents or any of the Obligations, the full and punctual payment of the Obligations in accordance with the terms of such extension or renewal, whether at stated maturity, upon acceleration or otherwise.  Failing the payment of any of the Obligations in full when due for whatever reason, each Guarantor shall be, jointly and severally, obligated to immediately pay the amount not so paid.  Each Guarantor agrees that this is a guarantee of payment and performance and not a guarantee of collection.

(ii) Each Guarantor hereby agrees that its obligations hereunder shall be unconditional, irrespective of the validity, regularity or enforceability of this Agreement or the other Loan Documents, the absence of any action to enforce this Agreement or the other Loan Documents, any waiver or consent by the Administrative Agent, the Collateral Agent or any Secured Party with respect to any provisions hereof or thereof, the recovery of any judgment against the Borrower or the other Loan Parties, any action to enforce the same or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a Guarantor.  Each Guarantor hereby (x) waives diligence, presentment, demand of payment, filing of claims with a court in the event of insolvency or bankruptcy of the Borrower or any other Loan Party, any right to require a proceeding first against the Borrower or such Loan Party, protest, notice and all demands whatsoever and (y) covenants that this Agreement shall not be discharged except by the full payment of the Obligations in accordance with the terms hereof.

(iii) If any Secured Party is required by any court or otherwise to return any payment in respect of the Obligations to the Borrower, any Guarantor or any custodian, trustee, liquidator or other similar official acting in relation to either the Borrower or any Guarantor, the Guaranties, to the extent theretofore discharged, shall be reinstated in full in respect thereto in full force and effect.

(iv) Each Guarantor agrees that it shall not be entitled to any right of subrogation in relation to the Secured Parties in respect of any of the Obligations until the payment in full of all of the Obligations.  Each Guarantor further agrees that, as between the Guarantors, on the one hand, and the Administrative Agent and the Secured Parties, on the other hand, (x) the maturity of the Obligations guaranteed hereby may be accelerated as provided in Article VII for the purposes of its Guaranty, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the Obligations and (y) in the event of any declaration of acceleration of the Obligations as provided in Article VII, such Obligations (whether or not due

and payable at such time) shall forthwith become due and payable by such Guarantor for the purpose of its Guaranty. Each Guarantor shall have the right to seek contribution from any nonpaying Guarantor so long as the exercise of such right does not impair the rights of the Secured Parties under this Agreement.

(v) Each Guaranty shall remain in full force and effect and continue to be effective should any petition be filed by or against the Borrower or any other Loan Party for liquidation, reorganization, should the Borrower or any other Loan Party become insolvent or make an assignment for the benefit of creditors or should a receiver or trustee be appointed for all or any significant part of the assets of the Borrower or any other Loan Party, and shall, to the fullest extent permitted by law, continue to be effective or be reinstated, as the case may be. If, at any time, any payment of the Obligations is rescinded or reduced in any amount, or must otherwise be restored or returned by any obligee, whether as a "voidable preference", "fraudulent transfer" or otherwise, the Obligations shall, to the fullest extent permitted by law, be reinstated as though such payment had been due but not made at such time and reduced only by such amount paid and not so rescinded, reduced, restored or returned.

(vi) Each Guaranty shall be a general secured senior obligation of each Guarantor and shall, subject to the ABL Intercreditor Agreement, rank equally in right of payment with all existing and future Indebtedness of such Guarantor, if any.

(b)   *Right of Set-Off.*  Each payment to be made by a Guarantor in respect of its Guaranty shall be made without set-off, counterclaim, reduction or diminution of any kind or nature. If any Obligation is not paid promptly when due (subject to any applicable grace periods), each of the Secured Parties and their respective Affiliates is authorized, to the fullest extent permitted by law, to set-off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held, and other obligations at any time owing, by such Secured Party or its Affiliate to, or for the credit or account of, any Guarantor against the obligations of such Guarantor under its Guaranty, irrespective of whether or not such Secured Party shall have made any demand thereunder and although such obligations may be unmatured. The rights of each Secured Party under this Section 10.01(b) are in addition to all other rights and remedies (including other rights of set-off) that such Secured Party may have.

(c)   *Limitation on Guarantor Liability.*  Each Guarantor and each Secured Party hereby confirms that it is the intention of all such parties that the Guaranty of such Guarantor not constitute a fraudulent transfer or fraudulent conveyance, or similar limitation, for purposes of the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar federal or state law to the extent applicable to any Guaranty. To effectuate the foregoing intention, the Administrative Agent, the Secured Parties and the Guarantors hereby irrevocably agree that the obligations of each Guarantor shall be limited to the maximum amount as shall, after giving effect to such maximum amount and all other contingent and fixed liabilities of such Guarantor that are relevant under such laws and after giving effect to any collections from the rights to receive contribution from or payments made by or on behalf of any other Guarantor in respect of the obligations of such other Guarantor under this Agreement, result in the obligations of such Guarantor under its Guaranty not constituting a fraudulent transfer or fraudulent conveyance, or similar limitation, under applicable law. Each Guarantor that makes a payment under its Guaranty shall be entitled upon payment in full of all Obligations under this Agreement to a contribution from each other Guarantor in an amount equal to such other Guarantor's *pro rata* portion of such payment based on the respective net assets of all of the Guarantors at the time of such payment determined in accordance with GAAP.

(d)   *Subrogation.*  Each Guarantor shall be subrogated to all of the rights of the Secured Parties against the Loan Parties in respect of any amounts paid by such Guarantor pursuant to the provisions of this Agreement; *provided* that, if an Event of Default has occurred and is continuing, no Guarantor shall

be entitled to enforce or receive any payments arising out of, or based upon, such right of subrogation until all of the Obligations shall have been paid in full.

(e)   *Release of Guaranty*.  (i) All of the Guaranties shall automatically be released and discharged and no further action by the Loan Parties or the Administrative Agent is required for the release of each Guaranty when all of the Release Conditions are satisfied.

(ii) The Guaranty of any Guarantor shall be released and discharged by the Administrative Agent upon the Borrower's written request and its delivery of the applicable certificate referred to below, and no other action by the applicable Guarantor, the other Loan Parties, the Lenders or the Administrative Agent shall be required for the release of such Guaranty (x) upon any sale or transfer of all of the capital stock of the Guarantor to any Person other than Holdings, the Borrower or one of the Subsidiaries in a transaction permitted by Section 6.02 (any such sale, a "***Sale of Guarantor***") and the Administrative Agent shall be fully protected in relying on a certificate of a Responsible Officer of the Borrower as to whether any particular sale or transfer constitutes a Sale of Guarantor; *provided* that, if the proceeds from such sale or transfer are required, pursuant to Section 2.13 or any other provision of any other Loan Document, to be applied to repay any Loans, arrangements satisfactory to the Administrative Agent shall have been made to apply the Net Cash Proceeds thereof as required by Section 2.13 or such other provision or (y) upon any Guarantor becoming an Unrestricted Subsidiary if immediately before and after such release, no Event of Default shall have occurred and be continuing and the Administrative Agent shall be fully protected in relying on a certificate of a Responsible Officer of the Borrower as to such designation.

(iii) In addition to any release effected or permitted by clauses (i) and (ii) above, the Administrative Agent shall release any Guarantor upon receipt of the prior written consent of the Required Lenders; *provided* that any release of all or substantially all of the Guaranties shall require the written consent of all of the Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.07(b)(iii)).

(f)   *Continuing Guarantee*.  Each Guaranty is a continuing guarantee, shall be binding on the relevant Guarantor and its successors and assigns, and shall be enforceable by the Administrative Agent or the Secured Parties.  If all or a part of any Secured Party's interest in any Obligation is assigned or otherwise transferred, the transferor's rights under the Guaranty, to the extent applicable to the Obligation so transferred, shall automatically be transferred with such Obligation.

SECTION 10.02. ***Additional Guarantors***.  Pursuant to Section 5.11(c), certain Subsidiaries may be required to enter into this Agreement as a Subsidiary Guarantor after the Closing Date.  Upon the execution and delivery by the Administrative Agent and any Subsidiary of a Guaranty Supplement, such Subsidiary shall become a Subsidiary Guarantor under this Agreement with the same force and effect as if it has originally been named as a Subsidiary Guarantor in, and a party to, this Agreement.  The execution and delivery of any Guaranty Supplement shall not require the consent of the Administrative Agent or any other Loan Party hereunder.  The rights and obligations of each Subsidiary Guarantor under this Agreement shall remain in full force and effect notwithstanding the addition of any additional Subsidiary Guarantor as a party to this Agreement.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

VERTELLUS SPECIALTIES INC.

By: _____
    Name:   Anne M. Frye
    Title:    Vice President


VERTELLUS SPECIALTIES HOLDINGS CORP.

By: _____
    Name:   Anne M. Frye
    Title:    Vice President


VERTELLUS AGRICULTURE & NUTRITION SPECIALTIES LLC

By: _____
    Name:   Anne M. Frye
    Title:    Vice President


VERTELLUS HEALTH & SPECIALTY PRODUCTS LLC

By: _____
    Name:   Anne M. Frye
    Title:    Vice President


VERTELLUS PERFORMANCE MATERIALS INC.

By: _____
    Name:   Anne M. Frye
    Title:    Vice President


*[Signature Page to Credit Agreement (Term Loan)]*

VERTELLUS SPECIALTIES PA LLC

By: _____
    Name:   Anne M. Frye
    Title:    Vice President


VERTELLUS SPECIALTIES MI LLC

By: _____
    Name:   Anne M. Frye
    Title:    Vice President


RUTHERFORD CHEMICALS LLC

By: _____
    Name:   Anne M. Frye
    Title:    Vice President


*[Signature Page to Credit Agreement (Term Loan)]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

JEFFERIES FINANCE LLC, as Administrative Agent and Collateral Agent

By: _____

Name: Paul McDonnell

Title: Managing Director

JEFFERIES FINANCE LLC, as Lender

By: _____
Name:    Paul McDonnell
Title:    Managing Director

*[Signature Page to Credit Agreement (Term Loan)]*