**Exhibit D**

**(Prepetition ABL Credit Agreement)**

**AMENDED AND RESTATED REVOLVING CREDIT**

**AND**

**SECURITY AGREEMENT**


**PNC BANK, NATIONAL ASSOCIATION**

**(AS LENDER AND AS ADMINISTRATIVE AND COLLATERAL AGENT)**

**AND**

**SUCH OTHER LENDERS WHICH ARE NOW OR
HEREAFTER A PARTY HERETO**

**WITH**

**VERTELLUS SPECIALTIES INC., AN INDIANA CORPORATION,
AND THE OTHER BORROWERS (AS DEFINED HEREIN)**

**(AS BORROWERS)**

**AND**

**THE GUARANTORS PARTY HERETO**

**(AS GUARANTORS)**


**OCTOBER 31, 2014**

# TABLE OF CONTENTS

I.      DEFINITIONS.................................................................................................. 1

    1.1     Accounting Terms...................................................................................1

    1.2     General Terms.........................................................................................1

    1.3     Uniform Commercial Code Terms. .......................................................55

    1.4     Certain Matters of Construction............................................................55

    1.5     Effect of Amendment and Restatement; No Novation; Release............56

II.     ADVANCES, PAYMENTS. ........................................................................... 57

    2.1     Revolving Advances. .............................................................................57

    2.2     Ex-Im Revolving Advances...................................................................58

    2.3     Procedure for Borrowing Revolving Advances and Ex-Im Revolving
          Advances................................................................................................59

    2.4     Disbursement of Advance Proceeds. .....................................................61

    2.5     Maximum Advances...............................................................................62

    2.6     Repayment of Advances. .......................................................................62

    2.7     Repayment of Excess Advances. ...........................................................62

    2.8     Statement of Account.............................................................................63

    2.9     Letters of Credit and Acceptances.........................................................63

    2.10    Issuance of Letters of Credit; Creation of Acceptances........................63

    2.11    Requirements For Issuance of Letters of Credit and Acceptances. .......65

    2.12    Disbursements, Reimbursement. ...........................................................65

    2.13    Repayment of Participation Advances....................................................67

    2.14    Documentation.......................................................................................67

    2.15    Determination to Honor Drawing Request. ...........................................67

    2.16    Nature of Participation and Reimbursement Obligations. .....................68

    2.17    Indemnity. .............................................................................................69

    2.18    Liability for Acts and Omissions. ..........................................................69

    2.19    Additional Payments..............................................................................71

    2.20    Manner of Borrowing and Payment.......................................................71

    2.21    Use of Proceeds.....................................................................................73

    2.22    Defaulting Lender. .................................................................................73

    2.23    Increase of Maximum Revolving Advance Amount. .............................76

    2.24    Swing Loans...........................................................................................77

    2.25    Mandatory Prepayments........................................................................78

III.    INTEREST AND FEES.................................................................................. 78

    3.1     Interest...................................................................................................78

3.2     Letter of Credit and Acceptance Fees. ..............................................80

3.3     Facility Fee. ......................................................................................81

3.4     [Reserved]. ........................................................................................81

3.5     Fee Letter. .........................................................................................81

3.6     Computation of Interest and Fees. ....................................................81

3.7     Maximum Charges. ...........................................................................81

3.8     Increased Costs. ................................................................................82

3.9     Basis For Determining Interest Rate Inadequate or Unfair. .............82

3.10    Capital Adequacy. .............................................................................83

3.11    Gross Up for Taxes. ..........................................................................84

3.12    Withholding Tax Exemption. ............................................................85

IV.     COLLATERAL; GENERAL TERMS. ........................................................ 86

4.1     Security Interest in the Collateral. ....................................................86

4.2     Perfection of Security Interest. .........................................................86

4.3     Disposition of Collateral. ..................................................................87

4.4     Preservation of Collateral. ................................................................87

4.5     Ownership of Collateral. ...................................................................87

4.6     Defense of Agent's and Lenders' Interests. ......................................88

4.7     Books and Records. ..........................................................................88

4.8     Financial Disclosure. ........................................................................89

4.9     Compliance with Laws. .....................................................................89

4.10    Inspection of Premises; Field Examinations. ....................................89

4.11    Insurance. ..........................................................................................90

4.12    Failure to Pay Insurance. ..................................................................91

4.13    [Reserved]. ........................................................................................91

4.14    Payment of Leasehold Obligations. ..................................................91

4.15    Receivables. ......................................................................................91

4.16    Inventory. ..........................................................................................94

4.17    Maintenance of Equipment. ..............................................................94

4.18    Exculpation of Liability. ...................................................................94

4.19    Financing Statements. .......................................................................94

V.      REPRESENTATIONS AND WARRANTIES ............................................. 95

5.1     Organization Status. ..........................................................................95

5.2     Power, Authority and Enforceability. ...............................................95

5.3     No Violation. .....................................................................................95

5.4     Approvals. .........................................................................................96

5.5     Financial Statements. ........................................................................96

5.6     Litigation. ..........................................................................................97

| | | |
|---|---|---|
| 5.7 | True and Complete Disclosure | 97 |
| 5.8 | Margin Regulations | 98 |
| 5.9 | Tax Returns and Payments | 98 |
| 5.10 | Compliance with ERISA | 98 |
| 5.11 | Security Documents | 99 |
| 5.12 | Properties. | 100 |
| 5.13 | Subsidiaries. | 100 |
| 5.14 | Compliance with Statutes, etc. | 100 |
| 5.15 | Investment Company Act. | 101 |
| 5.16 | Environmental Matters | 101 |
| 5.17 | Employment and Labor Relations. | 101 |
| 5.18 | Intellectual Property, Etc. | 102 |
| 5.19 | [Reserved]. | 102 |
| 5.20 | [Reserved]. | 102 |
| 5.21 | Insurance. | 102 |
| 5.22 | [Reserved]. | 102 |
| 5.23 | Solvency. | 102 |
| 5.24 | Survival of Representations and Warranties. | 102 |
| 5.25 | Entity Names. | 102 |
| 5.26 | [Reserved]. | 103 |
| 5.27 | No Default. | 103 |
| 5.28 | Swaps. | 103 |
| 5.29 | [Reserved]. | 103 |
| 5.30 | Term Loan Documents. | 103 |
| 5.31 | Flood Insurance | 103 |
| VI. | AFFIRMATIVE COVENANTS. | 103 |
| 6.1 | Information Covenants | 104 |
| 6.2 | [Reserved]. | 104 |
| 6.3 | [Reserved]. | 104 |
| 6.4 | Existence; Franchises. | 104 |
| 6.5 | Compliance with Statutes, etc. | 104 |
| 6.6 | Compliance with Environmental Laws | 104 |
| 6.7 | Business. | 105 |
| 6.8 | Payment of Taxes and Other Obligations. | 105 |
| 6.9 | Employee Benefits. | 105 |
| 6.10 | [Reserved]. | 105 |
| 6.11 | Further Assurances. | 106 |
| 6.12 | Designation of Subsidiaries. | 107 |

6.13    [Reserved]. ..................................................................................108

6.14    Post-Closing Matters. ..................................................................108

6.15    Payment of Fees. ..........................................................................108

6.16    Violations. ....................................................................................108

6.17    Fixed Charge Coverage Ratio. .....................................................109

6.18    Standards of Financial Statements. ..............................................109

6.19    Federal Securities Laws. ..............................................................109

6.20    Assignment of Export Related Letters of Credit. ..........................109

6.21    Trade Letters of Credit. ................................................................109

6.22    Material Export-Related Contracts. ..............................................110

6.23    Hedge Agreements. .......................................................................110

6.24    International Trade Compliance. ...................................................111

6.25    Keepwell. ......................................................................................111

VII.    NEGATIVE COVENANTS. ....................................................................111

7.1    Liens. .............................................................................................111

7.2    Consolidation, Merger or Sale of Assets, Etc. .............................115

7.3    Restricted Payments. ....................................................................118

7.4    Indebtedness. .................................................................................121

7.5    Investments. ..................................................................................124

7.6    Transactions with Affiliates. ........................................................127

7.7    Modifications of Certain Agreements; Limitations on Voluntary Payments, etc. ...............................................................................128

7.8    Limitation on Certain Restrictions on Restricted Subsidiaries. ...........................129

7.9    Passive Holding Company. ...........................................................130

7.10    Change in Nature of Business. .....................................................130

7.11    [Reserved]. ...................................................................................130

7.12    Fiscal Year and Accounting Changes. ..........................................130

7.13    [Reserved]. ...................................................................................130

7.14    [Reserved]. ...................................................................................130

7.15    Membership/Partnership Interests. ..............................................130

7.16    Other Agreements. ........................................................................130

VIII.    CONDITIONS PRECEDENT. .................................................................131

8.1    Conditions to Effectiveness of this Agreement. ...........................131

8.2    Conditions to Each Advance. .......................................................135

IX.    INFORMATION AS TO LOAN PARTIES. ..............................................135

9.1    Disclosure of Material Matters. ...................................................136

9.2    Certificates. ..................................................................................136

9.3     Environmental Reports. ............................................................136

9.4     Litigation. ................................................................................137

9.5     Material Occurrences. ...............................................................137

9.6     Government Receivables. ..........................................................137

9.7     Annual Financial Statements. ...................................................137

9.8     Quarterly Financial Statements. ...............................................138

9.9     Monthly Financial Statements. .................................................138

9.10    Other Reports. ..........................................................................138

9.11    Additional Information. ............................................................139

9.12    Projected Operating Budget. .....................................................139

9.13    Variances From Operating Budget. ..........................................139

9.14    Notice of Suits, Adverse Events. ..............................................139

9.15    ERISA Notices and Requests. ...................................................140

9.16    Additional Documents. .............................................................140

9.17    Financial Statements Required by Loan Authorization Agreement. .................140

X.      EVENTS OF DEFAULT. ...................................................................... 140

10.1    Payments. ..................................................................................140

10.2    Representations. ........................................................................140

10.3    Covenants. .................................................................................140

10.4    Default Under Other Agreements. .............................................141

10.5    Bankruptcy, etc. ........................................................................141

10.6    ERISA. ......................................................................................142

10.7    Security Documents. .................................................................142

10.8    Guarantees. ...............................................................................142

10.9    Judgments. ................................................................................142

10.10   Change of Control. ...................................................................143

10.11   Invalidity of Loan Documents. .................................................143

10.12   [Reserved]. ...............................................................................143

10.13   [Reserved]. ...............................................................................143

10.14   [Reserved]. ...............................................................................143

10.15   [Reserved]. ...............................................................................143

10.16   [Reserved]. ...............................................................................143

10.17   Master Guarantee Agreement. ..................................................143

10.18   Material Export-Related Contracts; Related Letters of Credit. ...........143

XI.     LENDERS' RIGHTS AND REMEDIES AFTER DEFAULT. ................ 144

11.1    Rights and Remedies. ................................................................144

11.2    Agent's Discretion. ...................................................................145

11.3    Setoff. .......................................................................................145

11.4    Rights and Remedies not Exclusive..................................................146

11.5    Allocation of Payments After Event of Default.................................146

XII.    WAIVERS AND JUDICIAL PROCEEDINGS. ..................................... 148

12.1    Waiver of Notice..............................................................................148

12.2    Delay. ..............................................................................................148

12.3    Jury Waiver......................................................................................148

XIII.   EFFECTIVE DATE AND TERMINATION. ......................................... 149

13.1    Term. ................................................................................................149

13.2    Termination. .....................................................................................149

XIV.    REGARDING AGENT. .......................................................................... 149

14.1    Appointment. ...................................................................................149

14.2    Nature of Duties...............................................................................150

14.3    Lack of Reliance on Agent and Resignation......................................150

14.4    Certain Rights of Agent. ..................................................................151

14.5    Reliance............................................................................................151

14.6    Notice of Default..............................................................................151

14.7    Indemnification. ...............................................................................152

14.8    Agent in its Individual Capacity. .....................................................152

14.9    Delivery of Documents. ...................................................................152

14.10   Borrowers' Undertaking to Agent. ...................................................152

14.11   No Reliance on Agent's Customer Identification Program.................153

14.12   Other Agreements. ...........................................................................153

14.13   Ex-Im Bank......................................................................................153

XV.     BORROWING AGENCY. ...................................................................... 153

15.1    Borrowing Agency Provisions..........................................................153

15.2    Waiver of Subrogation. ....................................................................154

XVI.    MISCELLANEOUS. .............................................................................. 154

16.1    Governing Law. ...............................................................................154

16.2    Entire Understanding. ......................................................................155

16.3    Successors and Assigns; Participations; New Lenders. .....................157

16.4    Application of Payments...................................................................160

16.5    Indemnity. ........................................................................................160

16.6    Notice. ..............................................................................................161

16.7    Survival. ...........................................................................................162

16.8    Severability. .....................................................................................162

16.9    Expenses. .........................................................................................163

16.10   Injunctive Relief..................................................................................................163

16.11   Consequential Damages.......................................................................................163

16.12   Captions. ..............................................................................................................163

16.13   Counterparts; Facsimile Signatures. ...................................................................163

16.14   Construction.........................................................................................................164

16.15   Confidentiality; Sharing Information...................................................................164

16.16   Publicity. ..............................................................................................................164

16.17   Certifications From Banks and Participants; US PATRIOT Act........................165

16.18   Assignment to Ex-Im Bank; Default Participation. ............................................165

16.19   Anti-Terrorism Laws. ..........................................................................................166

## LIST OF ANNEX, EXHIBITS AND SCHEDULES

Annex

Annex A                    Commitment Percentages

Exhibits

Exhibit 1.2(a)             Borrowing Base Certificate
Exhibit 1.2(b)             Ex-Im Borrowing Base Certificate
Exhibit 1.2(c)             Compliance Certificate
Exhibit 1.2(d)             [Reserved]
Exhibit 1.2(e)             Form of Perfection Certificate
Exhibit 2.1(a)             Revolving Credit Note
Exhibit 2.2(a)             Ex-Im Note
Exhibit 2.24(d)            Swing Note
Exhibit 5.5(b)             Financial Projections
Exhibit 8.1(i)             Financial Condition Certificate
Exhibit 16.3               Commitment Transfer Supplement

Schedules

Schedule 1.1(a)            Material Subsidiaries
Schedule 1.1(b)            Mortgaged Properties
Schedule 1.2               Financing Statements
Schedule 2.10              Existing Letters of Credit
Schedule 4.5               Location of Equipment and Inventory
Schedule 4.15(h)           Accounts
Schedule 5.9               Tax Identification Number
Schedule 5.10              ERISA
Schedule 5.12              Properties
Schedule 5.13              Subsidiaries
Schedule 5.21              Insurance
Schedule 5.25              Corporate Names; Mergers
Schedule 6.14              Post-Closing Matters
Schedule 7.1(c)            Existing Liens
Schedule 7.4(b)            Existing Indebtedness
Schedule 7.5(c)            Existing Investments
Schedule 7.6(i)            Existing Affiliate Transactions
Schedule 7.8(c)            Existing Restrictive Agreements

**AMENDED AND RESTATED REVOLVING CREDIT
AND
SECURITY AGREEMENT**

Amended and Restated Revolving Credit and Security Agreement dated October 31, 2014, among Vertellus Specialties Inc., an Indiana corporation ("VSI"), Vertellus Agriculture & Nutrition Specialties LLC, a Delaware limited liability company ("VANS"), Vertellus Health & Specialty Products LLC, a Delaware limited liability company ("VHSP"), Vertellus Performance Materials Inc., a North Carolina corporation ("VPMI"), Vertellus Specialties PA LLC, a Delaware limited liability company ("VSPA"), Vertellus Specialties MI LLC, a Delaware limited liability company ("VSMI"), Rutherford Chemicals LLC, a Delaware limited liability company ("RC"), (VSI, VANS, VHSP, VPMI, VSPA, VSMI and RC are each a "Borrower" and collectively, the "Borrowers"), the Guarantors (as hereinafter defined) party hereto, the financial institutions which are now or which hereafter become a party hereto (collectively, the "Lenders" and individually a "Lender") and PNC Bank, National Association ("PNC"), as administrative and collateral agent for the Lenders (PNC, in such capacity, the "Agent").

WHEREAS, Borrowers, Agent and the Original Lenders are party to the Original Credit Agreement dated as of the Original Closing Date;

WHEREAS, the parties to the Original Credit Agreement desire to amend and restate the Original Credit Agreement in its entirety pursuant to this Agreement;

IN CONSIDERATION of the mutual covenants and undertakings herein contained, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Borrowers, Guarantors, Lenders and Agent hereby agree as follows:

I.    DEFINITIONS.

  1.1    Accounting Terms.

        As used in this Agreement, the Other Documents or any certificate, report or other document made or delivered pursuant to this Agreement, accounting terms not defined in Section 1.2 or elsewhere in this Agreement and accounting terms partly defined in Section 1.2 to the extent not defined, shall have the respective meanings given to them under GAAP; provided, however, whenever such accounting terms are used for the purposes of determining compliance with financial covenants in this Agreement, such accounting terms shall be defined in accordance with GAAP as applied in preparation of the audited consolidated financial statements of VSI and its Subsidiaries for the fiscal year ended December 31, 2013.

  1.2    General Terms.

        For purposes of this Agreement the following terms shall have the following meanings:

        "40 Avenue A Mortgaged Property" shall mean the certain premises and improvements located at 40 Avenue A, Bayonne, Hudson County, New Jersey.

"<u>40 Avenue A Mortgaged Property Mortgage</u>" shall mean that certain Open-End Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing dated as of September 29, 2010 and effective as of September 30, 2010, made by RC to the Agent with respect to the 40 Avenue A Mortgaged Property, together with all amendments, supplements, modifications, substitutions and replacements thereto and thereof.

"<u>215 North Centennial Mortgaged Property</u>" shall mean the certain premises and improvements located at 215 North Centennial Street, Zeeland, Ottawa County, Michigan.

"<u>215 North Centennial Mortgaged Property Mortgage</u>" shall mean that certain Open-End Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing dated as of September 29, 2010 and effective as of September 30, 2010, made by VSMI to the Agent with respect to the 215 North Centennial Mortgaged Property, together with all amendments, supplements, modifications, substitutions and replacements thereto and thereof.

"<u>1502 South Tibbs Mortgaged Property</u>" shall mean the certain premises and improvements located at 1502 South Tibbs Avenue, Indianapolis, Marion County, Indiana.

"<u>1800 South Tibbs Mortgaged Property</u>" shall mean the certain premises and improvements located at 1800 South Tibbs Avenue, Indianapolis, Marion County, Indiana.

"<u>2110 High Point Mortgaged Property</u>" shall mean the certain premises and improvements located at 2110 High Point Road, Greensboro, Guilford County, North Carolina.

"<u>2110 High Point Mortgaged Property Mortgage</u>" shall mean that certain Credit Line Deed of Trust, Security Agreement, Assignment of Leases and Rents and Fixture Filing dated as of September 29, 2010 and effective as of September 30, 2010, made by VPMI to the Agent with respect to the 2110 High Point Mortgaged Property, together with all amendments, supplements, modifications, substitutions and replacements thereto and thereof.

"<u>ABL Priority Collateral</u>" shall mean the "ABL Priority Collateral" as defined in the Intercreditor Agreement.

"<u>Acceptances</u>" shall mean any existing and future drafts as to which any Borrower or beneficiary under a Letter of Credit is the drawer, which are processed and accepted for payment by Agent or another Lender acceptable to the Agent in its absolute discretion.

"<u>Accountants</u>" shall have the meaning set forth in Section 9.7 hereof.

"<u>Acquired Entities</u>" shall mean, collectively, the entities code-named "Buttermere".

"<u>Acquisition</u>" shall mean the acquisition by VSI and/or its Subsidiaries, of all of the issued and outstanding equity interest of the Acquired Entities pursuant to, and on the terms and conditions of, the Acquisition Agreement; it being understood, for the avoidance of doubt, that the Acquisition shall be a Permitted Acquisition.

"Acquisition Agreement" shall mean the share purchase agreement, dated as of October 31, 2014, by and among Vertellus Specialties Holdings UK Limited, as buyer, and certain sellers named therein, governing the Acquisition and in form and substance reasonably acceptable to Agent.

"Acquisition Closing Date" shall mean the date on which the Acquisition is consummated.

"Acquisition Pro Forma" shall have the meaning set forth in the definition of "Permitted Acquisition Conditions".

"Acquisition Projections" shall have the meaning set forth in the definition of "Permitted Acquisition Conditions".

"Adjustment Date" shall have the meaning set forth in Section 3.1(b) hereof.

"Advance Rates" shall have the meaning set forth in Section 2.1(a) (y)(ii) hereof.

"Advances" shall mean and include the Revolving Advances, the Ex-Im Revolving Advances, the Acceptances, the Letters of Credit and the Swing Loans.

"Affiliate" shall mean, when used with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified; provided that, for purposes of Section 7.6 and the definition of "Eligible Receivables", the term "Affiliate" shall also include any Person that directly or indirectly owns 10% or more of any class of the Equity Interests of the Person specified or that is an officer or director of the Person specified.

"Agent" shall have the meaning set forth in the preamble to this Agreement and shall include its successors and assigns.

"Aggregate Incremental Amount" shall have the meaning assigned to the term "Aggregate Incremental Amount" in the Term Loan Credit Agreement as in effect on the date hereof.

"Agreement" shall mean this Amended and Restated Revolving Credit and Security Agreement, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Agreement Value" shall mean, for each Hedging Agreement, on any date of determination, the maximum aggregate amount (giving effect to any netting agreements) that VSHC, the applicable Borrower or the applicable Subsidiary would be required to pay if such Hedging Agreement was terminated on such date.

"Alternate Base Rate" shall mean, for any day, a rate per annum equal to the highest of (i) the Base Rate in effect on such day, (ii) the Federal Funds Open Rate in effect on such day plus one half of one percent (0.5%), and (iii) the Daily LIBOR Rate plus one percent (1%).  For purposes of this definition, "Daily LIBOR Rate" shall mean, for any day, the rate per

annum determined by Agent by dividing (x) the Published Rate by (y) a number equal to 1.00 minus the percentage prescribed by the Federal Reserve for determining the maximum reserve requirements with respect to any eurocurrency funding by banks on such day.  For the purposes of this definition, "Published Rate" shall mean the rate of interest published each Business Day in The Wall Street Journal "Money Rates" listing under the caption "London Interbank Offered Rates" for a one month period (or, if no such rate is published therein for any reason, then the Published Rate shall be the eurodollar rate for a one month period as published in another publication determined by Agent).

"Anti-Terrorism Laws" shall mean any Applicable Laws relating to terrorism, trade sanctions programs and embargoes, import/export licensing, money laundering or bribery, and any regulation, order, or directive promulgated, issued or enforced pursuant to such Applicable Laws, all as amended, supplemented or replaced from time to time.

"Applicable Base Rate Margin" shall have the meaning set forth in Section 3.1(b) hereof.

"Applicable Eurodollar Rate Margin" shall have the meaning set forth in Section 3.1(b) hereof.

"Applicable Law" shall mean all laws, rules and regulations applicable to the Person, conduct, transaction, covenant, Other Document or contract in question, including all applicable common law and equitable principles; all provisions of all applicable state, federal and foreign constitutions, statutes, rules, regulations, treaties, directives and orders of any Governmental Body, and all applicable orders, judgments and decrees of all courts and arbitrators.

"Applicable Letter of Credit and Acceptance Fee Percentage" shall have the meaning set forth in Section 3.1(b) hereof.

"Approved Fund" shall mean any fund that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of business and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Average Undrawn Availability" shall mean, as of any date of determination, the average of Undrawn Availability for the sixty (60) day period then ended.

"Banker's Acceptance Rate" shall mean with respect to any Acceptance hereunder, a discount charge (calculated with respect to the face amount of such Acceptance on the basis of a 360-day year for the number of days from the date such Acceptance is accepted by the accepting bank (the "Acceptance Date") to its maturity date) at a rate per annum equal to the sum of (a) the discount rate in the New York banker's acceptance market on the Acceptance Date as determined by the accepting bank in its sole discretion, plus (b) the Applicable Letter of Credit and Acceptance Fee Percentage.

"Bankruptcy Code" shall mean Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

"Base Rate" shall mean the base commercial lending rate of PNC as publicly announced to be in effect from time to time, such rate to be adjusted automatically, without notice, on the effective date of any change in such rate. This rate of interest is determined from time to time by PNC as a means of pricing some loans to its customers and is neither tied to any external rate of interest or index nor does it necessarily reflect the lowest rate of interest actually charged by PNC to any particular class or category of customers of PNC.

"Blocked Accounts" shall have the meaning set forth in Section 4.15(h). "Blocked Account Bank" shall have the meaning set forth in Section 4.15(h).

"Board of Directors" shall mean, with respect to any Person, (i) in the case of any corporation, the board of directors of such person, (ii) in the case of any limited liability company, the board of managers of such Person or, if there is none, the Board of Directors of the managing member of such Person, (iii) in the case of a partnership, the Board of Directors of the general partner of such Person and (iv) in the case of any other Person, the functional equivalent of any of the foregoing.

"Borrower" or "Borrowers" shall have the meaning set forth in the preamble to this Agreement and shall extend to all permitted successors and assigns of such Persons.

"Borrower Agreement" shall mean the Export-Import Bank of the United States Working Capital Guaranty Program Borrower Agreement executed by the Borrowers in favor of the Ex-Im Bank and the Agent, as supplemented by the Delegated Authority Letter Agreement, together with all waiver letters related thereto.

"Borrowers' Account" shall have the meaning set forth in Section 2.8.

"Borrowing Agent" shall mean VSI.

"Borrowing Base Certificate" shall mean a certificate in substantially the form of Exhibit 1.2(a) duly executed by the President, Chief Financial Officer, Treasurer or Controller of Borrowing Agent and delivered to Agent, appropriately completed, by which such officer shall certify to Agent the Formula Amount and calculation thereof as of the date of such certificate.

"Business Day" shall mean any day other than a Saturday, Sunday or day on which banks in New York City or East Brunswick, New Jersey are authorized or required by law to close; provided that, when used in connection with a Eurodollar Rate Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in Dollar deposits in the London interbank market.

"Capital Expenditures" shall mean, for any period the additions to property, plant and equipment and other capital expenditures of VSI and its consolidated Restricted Subsidiaries that are (or should be) set forth in a consolidated statement of cash flows of VSI for such period prepared in accordance with GAAP, but excluding in each case any such expenditure made to restore, replace or rebuild property to the condition of such property immediately prior to any damage, loss, destruction or condemnation of such property, to the extent such expenditure is made with any received insurance proceeds, condemnation awards or damage recovery proceeds relating to any such damage, loss, destruction or condemnation.

"Capitalized Lease Obligation" of any Person shall mean the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Cash Equivalents" shall mean (a) any readily-marketable securities (i) issued by, or directly, unconditionally and fully guaranteed or insured by the United States federal government or (ii) issued by any agency of the United States federal government, the obligations of which are fully backed by the full faith and credit of the United States federal government, (b) any readily-marketable direct obligations issued by any other agency of the United States federal government, any state of the United States or any political subdivision of any such state or any public instrumentality thereof, in each case having a rating of at least "A-1" from S&P or at least "P-1" from Moody's, (c) any commercial paper rated at least "A-1" by S&P or "P-1" by Moody's and issued by any Person organized under the laws of any state of the United States, (d) any Dollar-denominated time deposit, insured certificate of deposit, overnight bank deposit or bankers' acceptance issued or accepted by (i) any Lender or (ii) any commercial bank that is (A) organized under the laws of the United States, any state thereof or the District of Columbia, (B) "adequately capitalized" (as defined in the regulations of its primary federal banking regulators) and (C) has Tier 1 capital (as defined in such regulations) in excess of $250,000,000, (e) shares of any United States money market fund that (i) has substantially all of its assets invested continuously in the types of investments referred to in clause (a), (b), (c) or (d) above with maturities as set forth in the proviso below, (ii) has net assets in excess of $500,000,000 and (iii) has obtained from either S&P or Moody's the highest rating obtainable for money market funds in the United States (*provided however*, that the maturities of all obligations specified in any of clauses (a), (b), (c) or (d) above shall not exceed 365 days) and (f) investments by any Foreign Subsidiaries in any foreign equivalents of the investments described in clauses (a) through (d) above, *provided* that, (i) investments described in this clause (f) by any Foreign Subsidiary shall be limited to (1) securities issued by a country that is a member nation of the Organisation of Economic Cooperation and Development or by issuers formed under the laws of such a country, or (2) in the case of Foreign Subsidiaries operating in countries that are not member nations of the Organisation of Economic Cooperation and Development, investments customarily used by corporations for cash management purposes in such jurisdictions in the ordinary course of business of such corporations and (ii) in the case of investments equivalent to clause (a), the issuer has an investment grade sovereign debt rating from S&P or Moody's.

"Cash Management Liabilities" shall have the meaning provided in the definition of "Cash Management Products and Services."

"Cash Management Products and Services" shall mean agreements or other arrangements under which Agent or any Lender or any Affiliate of Agent or a Lender provides any of the following products or services to any Loan Party: (a) credit cards; (b) credit card processing services; (c) debit cards and stored value cards; (d) commercial cards; (e) ACH transactions; and (f) cash management and treasury management services and products, including without limitation controlled disbursement accounts or services, lockboxes, automated clearinghouse transactions, overdrafts, and interstate depository network services. The

indebtedness, obligations and liabilities of any Loan Party to the provider of any Cash Management Products and Services (including all obligations and liabilities owing to such provider in respect of any returned items deposited with such provider) (the "Cash Management Liabilities") shall be "Obligations" hereunder and otherwise treated as Obligations for purposes of each of the Other Documents, secured by the Collateral.

"CEA" shall mean the Commodity Exchange Act (7 U.S.C.§1 et seq.), as amended from time to time, and any successor statute.

"CFTC" shall mean the Commodity Futures Trading Commission.

"Change in Law" shall mean the occurrence, after the Closing Date, of any of the following: (a) the adoption or taking effect of any Applicable Law; (b) any change in any Applicable Law or in the administration, implementation, interpretation or application thereof by any Governmental Body; or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Body; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, regulations, interpretations or directives thereunder or issued in connection therewith (whether or not having the force of Applicable Law) and (y) all requests, rules, regulations, guidelines, interpretations or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities (whether or not having the force of law), in each case pursuant to Basel III, shall in each case be deemed to be a Change in Law regardless of the date enacted, adopted, issued, promulgated or implemented.

"Change of Control" shall be deemed to have occurred if (a) (i) prior to a Qualified Public Offering, the Sponsor and its Related Parties or a Permitted Group shall fail to own and control, directly or indirectly, beneficially and of record, at least the majority of the aggregate ordinary economic and voting power represented by the issued and outstanding Equity Interest of VSHC (determined on a fully diluted basis), and (ii) after a Qualified Public Offering, any "person" or "group" (within the meaning of Rule 13d-5 of the Exchange Act as in effect on the date hereof), other than the Sponsor and its Related Parties or a Permitted Group, shall own and control, directly or indirectly, beneficially and of record, shares representing at least 35% of the aggregate ordinary voting power represented by the issued and outstanding capital stock of VSHC (determined on a fully diluted basis), (b) the Sponsor and its Related Parties or a Permitted Group shall fail to, directly or indirectly, possess the right to elect (through contract, ownership of voting securities or otherwise) at all times a majority of the board of directors (or similar governing body) of VSHC and to direct the management policies and decisions of VSHC, (c) the Sponsor and its Related Parties or a Permitted Group shall own and control, directly or indirectly, beneficially and of record, shares of VSHC representing a lower percentage of such shares than such "person" or "group" (determined on a fully diluted basis), (d) a change of control or similar event shall occur as provided in the Term Loan Credit Agreement or any other credit agreement, indenture or other agreement governing Indebtedness issued in respect of any Permitted Refinancing of any of the foregoing or any Permitted Incremental Equivalent Debt, in each case to the extent the aggregate principal amount of the Indebtedness evidenced thereby equals or exceeds the Threshold Amount, or (e) VSHC shall

cease to directly own and control, beneficially and of record, 100% of the issued and outstanding Equity Interests of VSI.

"CIP Regulations" shall have the meaning set forth in Section 14.11 hereof.

"Claim" shall have the meaning assigned to the term "Claim" in the Master Guarantee Agreement.

"Closing Date" shall mean October 31, 2014 or such other date as may be agreed to by the parties hereto.

"Code" shall mean the Internal Revenue Code of 1986, as the same may be amended or supplemented from time to time, and any successor statute of similar import, and the rules and regulations thereunder, as from time to time in effect.

"Collateral" shall mean and include:

(a)    all Receivables;

(b)    all Equipment;

(c)    all General Intangibles;

(d)    all Inventory;

(e)    all Investment Property;

(f)    all Real Property;

(g)    all Subsidiary Stock;

(h)    all of each Loan Party's right, title and interest in and to, whether now owned or hereafter acquired and wherever located, (i) its respective goods and other property including, but not limited to, all merchandise returned or rejected by Customers, relating to or securing any of the Receivables; (ii) all of each Loan Party's rights as a consignor, a consignee, an unpaid vendor, mechanic, artisan, or other lienor, including stoppage in transit, setoff, detinue, replevin, reclamation and repurchase; (iii) all additional amounts due to any Loan Party from any Customer relating to the Receivables; (iv) other property, including warranty claims, relating to any goods securing the Obligations; (v) all of each Loan Party's contract rights, rights of payment which have been earned under a contract right, instruments (including promissory notes), documents, chattel paper (including electronic chattel paper), warehouse receipts, deposit accounts, letters of credit and money; (vi) all commercial tort claims (whether now existing or hereafter arising); (vii) if and when obtained by any Loan Party, all real and personal property of third parties in which such Loan Party has been granted a lien or security interest as security for the payment or enforcement of Receivables; (viii) all letter of credit rights (whether or not the respective letter of credit is evidenced by a writing); (ix) all supporting obligations; and (x) any other goods, personal property or real property now owned or hereafter acquired in which any Loan Party has expressly granted a security interest or may in the future grant a security interest

-8-

to Agent hereunder, or in any amendment or supplement hereto or thereto, or under any other agreement between Agent and any Loan Party;

(i)       all of each Loan Party's ledger sheets, ledger cards, files, correspondence, records, books of account, business papers, computers, computer software (owned by such Loan Party or in which it has an interest), computer programs, tapes, disks and documents relating to (a), (b), (c), (d), (e), (f), (g) or (h) of this Paragraph; and

(j)       all proceeds and products of (a), (b), (c), (d), (e), (f), (g), (h) and (i) in whatever form, including, but not limited to: cash, deposit accounts (whether or not comprised solely of proceeds), certificates of deposit, insurance proceeds (including hazard, flood and credit insurance), negotiable instruments and other instruments for the payment of money, chattel paper, security agreements, documents, eminent domain proceeds, condemnation proceeds and tort claim proceeds;

in each case, other than Excluded Property.

"Collateral Trustee" shall mean U.S. Bank, National Association, in such capacity, pursuant to the Existing Indenture and the Existing Collateral Trust Agreement.

"Commitment Percentage" of any Lender shall mean the percentage set forth opposite such Lender's name on Annex A hereto, as same may be adjusted upon any assignment by a Lender pursuant to Section 16.3(c) or Section 16.3(d) hereof and by any increase under Section 2.23.

"Commitment Transfer Supplement" shall mean a document in the form of Exhibit 16.3 hereto, properly completed and otherwise in form and substance satisfactory to Agent by which the Purchasing Lender purchases and assumes a portion of the obligation of Lenders to make Advances (other than Swing Loans) under this Agreement.

"Compliance Certificate" shall mean a compliance certificate in the form attached hereto as Exhibit 1.2(c) to be signed by the President, Chief Financial Officer, Treasurer or Controller of Borrowing Agent, which shall state that, based on an examination sufficient to permit such officer to make an informed statement, no Default or Event of Default exists, or if such is not the case, specifying such Default or Event of Default, its nature, when it occurred, whether it is continuing and the steps being taken by Loan Parties with respect to such default and, such certificate shall have appended thereto calculations which set forth (i) Loan Parties' compliance with the requirements or restrictions imposed by Sections 6.17, 7.2, 7.3, 7.4, 7.5, 7.6 and 7.11, (ii) the calculation of the Revolving Facility Usage Factor, and (iii) the calculation of Average Undrawn Availability.

"Confidential Information Memorandum" shall mean the Confidential Information Memorandum of the Borrowers dated July 2014.

"Connection Income Taxes" shall mean Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consents" shall mean all filings and all licenses, permits, consents, approvals, authorizations, qualifications and orders of Governmental Bodies and other third parties, domestic or foreign, necessary to carry on any Loan Party's business or necessary (including to avoid a conflict or breach under any agreement, instrument, other document, license, permit or other authorization) for the execution, delivery or performance of this Agreement, any Other Documents, any Term Loan Documents, including any Consents required under all applicable federal, state or other Applicable Law.

"Consigned Inventory" shall mean Inventory of any Loan Party that is in the possession of another Person on a consignment, sale or return, or other basis that does not constitute a final sale and acceptance of such Inventory.

"Consolidated EBITDA" shall mean, with respect to any Person for any period, the Consolidated Net Income of such Person for such period: (1) increased (without duplication) by the following, in each case (other than clauses (l) and (n)) to the extent deducted (and not added back) in determining Consolidated Net Income for such period:

(a)     provision for taxes based on income or profits or capital, including, without limitation, federal, state, provincial, franchise, excise and similar taxes and foreign withholding taxes (including any future taxes or other levies which replace or are intended to be in lieu of such taxes and any penalties and interest related to such taxes or arising from tax examinations) and the net tax expense associated with any adjustments made pursuant to clauses (a) through (k) of the definition of "Consolidated Net Income"; *plus*

(b)     the amount of (x) any losses under Hedging Agreements entered into for the purpose of hedging interest rate risk and (y) Consolidated Interest Expense; *plus*

(c)     the total amount of depreciation and amortization expense of such Person, including the amortization of deferred financing fees, debt issuance costs, commissions and fees and expenses of such Person and the Restricted Subsidiaries for such period on a consolidated basis and otherwise determined in accordance with GAAP; *plus*

(d)     the amount of any restructuring charges, accruals or reserves; provided that the aggregate amount of add backs made pursuant to this clause (d) and clauses (j) and (n) for any period of four consecutive fiscal quarters shall not exceed in the aggregate an amount equal to 10% of Consolidated EBITDA for each period of four consecutive fiscal quarters (without giving effect to any adjustments pursuant to this clause (d)); *plus*

(e)     any other non-cash charges (including (i) any write-offs or write-downs, (ii) equity-based awards compensation expense, (iii) losses on sales, disposals or abandonment of, or any improvement charges or asset write off related to, intangible assets, long-lived assets and investments in debt and equity securities and (iv) all losses from investments) (*provided* that if any such non-cash charges represent an accrual or reserve for potential cash items in any future period, the cash payment in respect thereof in such future period shall be subtracted from Consolidated EBITDA to such extent, and excluding amortization of a prepaid cash item that was paid in a prior period); *plus*

(f)      the amount of any minority interest expense consisting of Subsidiary income attributable to minority equity interests of third parties in any non-Wholly Owned Subsidiary (except to the extent paid in cash); *plus*

(g)      the amount of management, monitoring, consulting and advisory fees (including termination and transaction fees) and related indemnities and expenses paid or accrued in such period under the Management Agreement or otherwise to the Sponsors and including reimbursement of expenses of the Board of Directors of VSI, to the extent otherwise permitted hereunder; provided that the aggregate amount of add backs made pursuant to this clause (g) shall not exceed an amount equal to $3,500,000 in any fiscal year; *plus*

(h)      any costs or expense incurred by VSHC, the Borrowers or a Restricted Subsidiary pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement or any stock subscription or shareholder agreement, to the extent that such cost or expenses are funded with cash proceeds contributed to the capital of VSI or net cash proceeds of an issuance of Equity Interest of VSI (other than Disqualified Equity Interests); *plus*

(i)      any net loss from disposed or discontinued operations; provided that the aggregate amount of add backs made pursuant to this clause (i) for any period of four consecutive fiscal quarters shall not exceed an amount equal to (i) $5,000,000 plus (ii) any portion of the amount equal to 10% of Consolidated EBITDA for each period of four consecutive fiscal quarters that has not been utilized by clauses (d), (j) and (n) during such period; *plus*

(j)      the amount of any integration costs or other business optimization expenses or reserves, including any one-time costs incurred in connection with the Acquisition and other acquisitions after the Closing Date and costs related to the closure and/or consolidation of facilities; provided that the aggregate amount of add backs made pursuant to this clause (j) and clauses (d) and (n) for any period of four consecutive fiscal quarters shall not exceed in the aggregate an amount equal to 10% of Consolidated EBITDA for each period of four consecutive fiscal quarters (without giving effect to any adjustments pursuant to this clause (j)); *plus*

(k)      all fees and expenses incurred in connection with the entry into this Agreement, the Term Loan Credit Agreement and the consummation of the Acquisition and other acquisitions after the Closing Date and all non-cash purchase accounting adjustments resulting from the Acquisition and acquisitions after the Closing Date; *plus*

(l)      any proceeds from business interruption, casualty or liability insurance received by such Person during such period, to the extent the associated losses arising out of the event that resulted in the payment of such business interruption insurance proceeds were included in computing Consolidated Net Income and such proceeds were not; *plus*

(m)      to the extent actually reimbursed (and not otherwise included in arriving at Consolidated Net Income), expenses incurred to the extent covered by indemnification provisions in any agreement in connection with any acquisition or merger involving any Borrower or any of the Subsidiaries; *plus*

(n)      the amount of net cost savings and synergies projected by the Borrowers in good faith to be realized as a result of specified actions taken or with respect to which substantial steps have been taken and which are expected to be realized within 12 months of the date thereof in connection with the Acquisition, future acquisitions and cost saving, restructuring and other similar initiatives (which cost savings shall be added to Consolidated EBITDA until fully realized and calculated on a *pro forma* basis as though such cost savings had been realized during such period from such actions and shall be net of benefits actually realized); <u>provided</u> that such cost savings are reasonably identifiable and factually supportable; <u>provided</u> that the aggregate amount of add backs made pursuant to this clause (n) and clauses (d) and (j) for any period of four consecutive fiscal quarters shall not exceed in the aggregate an amount equal to 10% of Consolidated EBITDA for each period of four consecutive fiscal quarters (without giving effect to any adjustments pursuant to this clause (n)); and

(2)      decreased (without duplication) by the following, in each case to the extent included in determining Consolidated Net Income for such period:

(a)      non-cash gains increasing Consolidated Net Income of such Person for such period, excluding any non-cash gains to the extent they represent the reversal of an accrual or reserve for a potential cash item that reduced Consolidated EBITDA in any prior period; *plus*

(b)      any non-cash gains with respect to cash actually received in a prior period unless such cash did not increase Consolidated EBITDA in such prior period; *plus*

(c)      any net income from disposed or discontinued operations; *plus*

(d)      extraordinary gains and unusual or non-recurring gains (less all fees and expenses relating thereto); *plus*

(e)      the amount of any unrealized gains under Hedging Agreements entered into for the purpose of hedging interest rate risk; and

(3)      increased or decreased (without duplication) by, as applicable, any adjustments resulting from the application of FASB Accounting Standards Codification 460, Guarantees.

Notwithstanding anything to the contrary herein, Consolidated EBITDA of VSI and the Restricted Subsidiaries on a consolidated basis for the fiscal quarters ended September 30, 2013, December 31, 2013, March 31, 2014 and June 30, 2014 shall be deemed to be $22,672,000, $23,332,000, $21,478,000 and $27,927,000, respectively.

Any amounts described in clauses (d), (j) or (n) above that are included in Consolidated EBITDA for any period shall be determined in good faith by the Borrowers, as certified by a Financial Officer of Borrowing Agent in the Compliance Certificate required by Section 9.7, 9.8 or 9.9 to be delivered in connection with the financial statements for such period.

"Consolidated Facility Usage" shall mean at any time the sum of Revolving Facility Usage and Ex-Im Revolving Facility Usage.

"Consolidated Interest Expense" shall mean with respect to any Person for any period, without duplication, the sum of:

(a)    consolidated interest expense in respect of Indebtedness of such Person and its Restricted Subsidiaries for such period, to the extent such expense was deducted (and not added back) in computing Consolidated Net Income (including (i) amortization of original issue discount resulting from the issuance of Indebtedness at less than par, (ii) all commissions, discounts and other fees and charges owed with respect to letters of credit or bankers acceptances, (iii) non-cash interest charges (but excluding any non-cash interest expense attributable to the movement in the mark to market valuation of Hedging Obligations or other derivative instruments pursuant to GAAP), (iv) the interest component of Capitalized Lease Obligations and (v) net payments, if any, made (less net payments, if any, received), pursuant to interest rate Hedging Obligations with respect to Indebtedness, and excluding (A) any expense resulting from the discounting of any Indebtedness in connection with the application of recapitalization accounting or, if applicable, purchase accounting in connection with the Acquisition or any other acquisition, (B) penalties and interest relating to taxes, (C) any "additional interest" or "liquidated damages" with respect to other securities for failure to timely comply with registration rights obligations, (D) amortization of deferred financing fees, debt issuance costs, commissions, fees and expenses and discounted liabilities and (E) any accretion of accrued interest on discounted liabilities); *plus*

(b)    consolidated capitalized interest of such Person and its Restricted Subsidiaries for such period, whether paid or accrued; *less*

(c)    interest income of such Person and its Restricted Subsidiaries for such period.

For purposes of this definition, interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by such Person to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP.

"Consolidated Net Income" shall mean, with respect to any Person for any period, the aggregate of the Net Income of such Person for such period, on a consolidated basis, and otherwise determined in accordance with GAAP; provided that, without duplication,

(a)    any net after-tax effect of extraordinary gains, losses or charges (including all fees and expenses relating thereto) determined in accordance with GAAP shall be excluded;

(b)    any net after-tax effect of gains or losses attributable to asset dispositions or abandonments (including any disposal of abandoned or discontinued operations) or the sale or other disposition of any Equity Interests of any Person, in each case other than in the ordinary course of business as determined in good faith by VSI, shall be excluded;

(c)    the Net Income for such period of any Subsidiary that is an Unrestricted Subsidiary or any Person that is not a Subsidiary or that is accounted for by the equity method of accounting shall be excluded; provided that the Consolidated Net Income of the Borrower and the Restricted Subsidiaries shall be increased by the amount of dividends or distributions or other payments that are actually paid in Cash Equivalents (or to the extent converted into Cash

Equivalents) to a Borrower or a Restricted Subsidiary in respect of such period and the net losses of any such Person shall only be included to the extent funded with cash from a Borrower or any Restricted Subsidiary;

       (d)     the Net Income for such period of any Restricted Subsidiary (other than any Guarantor) shall be excluded to the extent that the declaration or payment of dividends or similar distributions by such Restricted Subsidiary of its Net Income is not at the date of determination permitted in whole without any prior governmental approval (which has not been obtained) or, directly or indirectly, by the operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule, or governmental regulation applicable to such Restricted Subsidiary or its stockholders, unless such restriction with respect to the payment of dividends or similar distributions has been legally waived; provided that the Consolidated Net Income of the Borrowers and the Restricted Subsidiaries shall be increased by the amount of dividends or other distributions or other payments actually paid in cash (or to the extent converted into cash) to the Borrowers or a Restricted Subsidiary in respect of such period, to the extent not already included therein;

       (e)     effects of adjustments (including the effects of such adjustments pushed down to the Borrowers and the Restricted Subsidiaries) in the inventory, property and equipment, software, goodwill, other intangible assets, in-process research and development, deferred revenue, debt line items and other noncash charges in such Person's consolidated financial statements pursuant to GAAP resulting from the application of recapitalization accounting or, if applicable, purchase accounting in relation to the Acquisition or any other consummated acquisition or the amortization or write-off of any amounts thereof, net of taxes, shall be excluded;

       (f)     any net after-tax effect of income (loss) from the early extinguishment or conversion of (i) Indebtedness, (ii) obligations arising under Hedging Agreements or (iii) other derivative instruments shall be excluded;

       (g)     any impairment charge or asset write-off or write-down, including impairment charges or asset write-offs or write-downs related to intangible assets, long-lived assets, investments in debt and equity securities or as a result of a change in law or regulation, in each case, pursuant to GAAP, and the amortization of intangibles arising pursuant to GAAP shall be excluded;

       (h)     any non-cash compensation charge or expense, including any such charge or expense arising from the grants of stock appreciation or similar rights, stock options, restricted stock or other rights or equity incentive programs shall be excluded and any cash charges associated with the rollover, acceleration, or payout of Equity Interests by management of VSI or any of its direct or indirect parent companies in connection with the Acquisition, shall be excluded;

       (i)     any net unrealized gain or loss (after any offset) resulting in such period from obligations arising under Hedging Agreements and the application of FASB Accounting Standards Codification 815 shall be excluded;

(j)      any net unrealized gain or loss (after any offset) resulting in such period from currency translation and transaction gains or losses including those related to currency remeasurements of Indebtedness (including any net loss or gain resulting from obligations arising under Hedging Agreements for currency exchange risk) and any other monetary assets and liabilities shall be excluded; and

(k)      accruals and reserves that are established within 12 months after the Acquisition Closing Date that are so required to be established as a result of the Acquisition (or within 12 months after the closing of any acquisition that are so required to be established as a result of such acquisition) in accordance with GAAP shall be excluded.

"Consolidated Net Tangible Assets" shall mean, with respect to VSI and its Restricted Subsidiaries at any date of determination, the aggregate amount of total assets included in the Borrower's most recent quarterly or annual consolidated balance sheet prepared in accordance with GAAP and deducting therefrom the following amounts: (a) all current liabilities reflected in such balance sheet and (b) all goodwill, trademarks, patents and other like intangibles reflected in such balance sheet.

"Control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "Controlling" and "Controlled" shall have meanings correlative thereto.

"Covenant Testing Period" shall mean a period (a) commencing on the last day of the fiscal month of VSI most recently ended on or prior to a Covenant Trigger Date and for which Agent has received financial statements required to be delivered pursuant to Section 9.9 and (b) ending on the first day after such Covenant Trigger Date that Undrawn Availability has equaled or exceeded $7,000,000 for 60 consecutive days.

"Covenant Trigger Date" shall mean the third consecutive day on which Borrowers fail to maintain Undrawn Availability in an amount at least equal to $7,000,000.

"Covered Entity" shall mean (a) each Borrower, each of Borrowers' Subsidiaries, all Guarantors and all pledgors of Collateral and (b) each Person that, directly or indirectly, is in control of a Person described in clause (a) above.  For purposes of this definition, control of a Person shall mean the direct or indirect (x) ownership of, or power to vote, 25% or more of the issued and outstanding equity interests having ordinary voting power for the election of directors of such Person or other Persons performing similar functions for such Person, or (y) power to direct or cause the direction of the management and policies of such Person whether by ownership of equity interests, contract or otherwise.

"Cumulative Amount" shall mean, on any date of determination the "Cumulative Amount" as defined in the Term Loan Credit Agreement.

"Customer" shall mean and include the account debtor with respect to any Receivable and/or the prospective purchaser of goods, services or both with respect to any contract or contract right, and/or any party who enters into or proposes to enter into any contract

or other arrangement with any Loan Party, pursuant to which such Loan Party is to deliver any personal property or perform any services.

"Customs" shall have the meaning set forth in Section 2.11(b) hereof.

"Debt Payments" shall mean and include all cash actually expended by VSI and its Restricted Subsidiaries on a consolidated basis to make (a) interest payments on any Advances hereunder, *plus* (b) payments for all fees, commissions and charges set forth herein and with respect to any Advances, *plus* (c) capitalized lease payments, plus (d) payments with respect to any other Indebtedness for borrowed money.

"Debtor Relief Laws" shall mean the Bankruptcy Code and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"Default" shall mean an event, circumstance or condition which, with the giving of notice or passage of time or both, would constitute an Event of Default.

"Default Participation" shall have the meaning set forth in Section 16.18(b) hereof.

"Default Rate" shall have the meaning set forth in Section 3.1 hereof.

"Defaulting Lender" shall mean any Lender that: (a) has failed, within two (2) Business Days of the date required to be funded or paid, to (i) fund any portion of its Commitment Percentage of Advances, (ii) if applicable, fund any portion of its Participation Commitment in Letters of Credit or Swing Loans or (iii) pay over to Agent, Issuer, Swing Loan Lender or any Lender any other amount required to be paid by it hereunder, unless, in the case of clause (i) above, such Lender notifies Agent in writing that such failure is the result of such Lender's good faith determination that a condition precedent to funding (specifically identified and including a particular Default or Event of Default, if any) has not been satisfied; (b) has notified Borrowers or Agent in writing, or has made a public statement to the effect, that it does not intend or expect to comply with any of its funding obligations under this Agreement (unless such writing or public statement indicates that such position is based on such Lender's good faith determination that a condition precedent (specifically identified and including a particular Default or Event of Default, if any) to funding a loan under this Agreement cannot be satisfied) or generally under other agreements in which it commits to extend credit; (c) has failed, within two (2) Business Days after request by Agent, acting in good faith, to provide a certification in writing from an authorized officer of such Lender that it will comply with its obligations (and is financially able to meet such obligations) to fund prospective Advances and, if applicable, participations in then outstanding Letters of Credit and Swing Loans under this Agreement, provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon Agent's receipt of such certification in form and substance satisfactory to the Agent; (d) has become the subject of an Insolvency Event; or (e) has failed at any time to comply with the provisions of Section 2.20(d) with respect to purchasing participations from the other Lenders,

whereby such Lender's share of any payment received, whether by setoff or otherwise, is in excess of its pro rata share of such payments due and payable to all of the Lenders.

"Delegated Authority Letter Agreement" shall have the meaning set forth in the Master Guarantee Agreement.

"Deposit Account Control Agreement" shall have the meaning set forth in Section 4.15(h).

"Depository Accounts" shall have the meaning set forth in Section 4.15(h) hereof

"Designated Lender" shall have the meaning set forth in Section 16.2(b) hereof.

"Disqualified Equity Interests" shall mean any Equity Interest that, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable (other than as a result of a change of control or asset sale so long as any rights of holders thereof upon the occurrence of such change of control or asset sale are subject to the prior payment and satisfaction in full of the Obligations), pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, or requires the payment of any cash dividend or any other scheduled payment constituting a return of capital, in each case at any time on or prior to the first anniversary of the end of the Term or (b) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) debt securities or (ii) any Equity Interest referred to in clause (a) above, in each case at any time prior to the first anniversary of the end of the Term.

"Dollar" and the sign "$" shall mean lawful money of the United States of America.

"Domestic Advances" shall mean all Advances other than the Ex-Im Revolving Advances.

"Domestic Collateral" shall mean all Collateral other than Ex-Im Collateral.

"Domestic Person" shall mean any Person who (i) in the case of an individual, is a U.S. Person, and (ii) in the case of an entity, is organized under the laws of any state of the United States of America or the District of Columbia.

"Domestic Rate Loan" shall mean any Advance that bears interest based upon the Alternate Base Rate.

"Domestic Subsidiary" shall mean any Subsidiary incorporated or organized under the laws of any state of the United States of America or the District of Columbia.

"Drawing Date" shall have the meaning set forth in Section 2.12(b) hereof.

"Eligibility Date" shall mean, with respect to each Borrower and Guarantor and each Swap, the date on which this Agreement or any Other Document becomes effective with

respect to such Swap (for the avoidance of doubt, the Eligibility Date shall be the effective date of such Swap if this Agreement or any Other Document is then in effect with respect to such Borrower or Guarantor, and otherwise it shall be the effective date of this Agreement and/or such Other Document(s) to which such Borrower or Guarantor is a party).

"Eligible Contract Participant" shall mean an "eligible contract participant" as defined in the CEA and regulations thereunder.

"Eligible Export-Related Accounts Receivable" shall have the meaning set forth in the Borrower Agreement.

"Eligible Export-Related Accounts Receivable" shall mean and include all Export-Related Accounts Receivable which (i) meet the requirements for Eligible Export-Related Accounts Receivable other than the "due and payable in a currency other than Dollars" exclusion in the definition of Eligible Export-Related Accounts Receivable, and (ii) are due and payable either in Euros or British Pounds.

"Eligible Finished Goods Inventory" shall mean Eligible Inventory consisting of finished goods.

"Eligible In Transit Inventory" shall have the meaning set forth in the definition of Eligible Inventory.

"Eligible Inventory" shall mean and include Inventory, with respect to each Borrower, valued at the lower of cost or market value, determined on a first-in-first-out basis, which is not, in Agent's opinion, obsolete, slow moving or unmerchantable and which Agent, in its sole discretion, exercised in a commercially reasonable manner, shall not deem ineligible Inventory, based on such considerations as Agent may from time to time deem appropriate including whether the Inventory is subject to a perfected, first priority security interest in favor of Agent and no other Lien (other than a Permitted Lien).  In addition, Inventory shall not be Eligible Inventory if it (i) does not conform to all standards imposed by any Governmental Body which has regulatory authority over such goods or the use or sale thereof, (ii) [reserved], (iii) is located outside the continental United States or at a location that is not otherwise in compliance with this Agreement, (iv) constitutes Consigned Inventory, (v) is the subject of an Intellectual Property Claim; (vi) is subject to a License Agreement or other agreement that limits, conditions or restricts any Borrower's or Agent's right to sell or otherwise dispose of such Inventory, unless Agent is a party to a Licensor/Agent Agreement with the Licensor under such License Agreement; or (vii) or is situated at a location not owned by a Borrower unless the owner or occupier of such location has executed in favor of Agent a Lien Waiver Agreement.  Eligible Inventory shall include all Inventory in-transit for which title has passed to a Borrower, which is insured to the full value thereof and for which Agent shall have in its possession (a) all negotiable bills of lading properly endorsed and (b) all non-negotiable bills of lading issued in Agent's name (collectively, "Eligible In Transit Inventory").  Eligible Inventory shall not include Inventory being acquired pursuant to a trade Letter of Credit to the extent such trade Letter of Credit remains outstanding.

"Eligible Raw Materials Inventory" shall mean Eligible Inventory consisting of raw materials.

"Eligible Receivables" shall mean and include with respect to each Borrower, each Receivable of such Borrower arising in the Ordinary Course of Business and which Agent, in its sole credit judgment, exercised in a commercially reasonable manner, shall deem to be an Eligible Receivable, based on such considerations as Agent may from time to time deem appropriate. A Receivable shall not be deemed eligible unless such Receivable is subject to Agent's first priority perfected security interest and no other Lien (other than Permitted Lien), and is evidenced by an invoice or other documentary evidence satisfactory to Agent. In addition, no Receivable shall be an Eligible Receivable if:

(a)    it arises out of a sale made by any Borrower to an Affiliate of any Borrower or to a Person controlled by an Affiliate of any Borrower;

(b)    it is due or unpaid more than (i) sixty (60) days after the original due date or (ii) ninety (90) days after the original invoice date;

(c)    fifty percent (50%) or more of all of the Receivables owed from a particular Customer are not deemed Eligible Receivables hereunder pursuant to clause (b) above. Such percentage may, in Agent's sole discretion, exercised in a commercially reasonable manner, be decreased from time to time;

(d)    any covenant, representation or warranty contained in this Agreement with respect to such Receivable has been breached;

(e)    the Customer shall (i) apply for, suffer, or consent to the appointment of, or the taking of possession by, a receiver, custodian, trustee or liquidator of itself or of all or a substantial part of its property or call a meeting of its creditors, (ii) admit in writing its inability, or be generally unable, to pay its debts as they become due or cease operations of its present business, (iii) make a general assignment for the benefit of creditors, (iv) commence a voluntary case under any state or federal bankruptcy laws (as now or hereafter in effect), (v) be adjudicated a bankrupt or insolvent, (vi) file a petition seeking to take advantage of any other law providing for the relief of debtors, (vii) acquiesce to, or fail to have dismissed, any petition which is filed against it in any involuntary case under such bankruptcy laws, or (viii) take any action for the purpose of effecting any of the foregoing;

(f)    the sale is to a Customer outside the continental United States of America, unless the sale is on letter of credit, guaranty or acceptance terms, in each case acceptable to Agent in its sole discretion, exercised in a commercially reasonable manner;

(g)    the sale to the Customer is on a bill-and-hold, guaranteed sale, sale-and-return, sale on approval, consignment or any other repurchase or return basis or is evidenced by chattel paper;

(h)    Agent believes, in its sole judgment, exercised in a commercially reasonable manner, that collection of such Receivable is insecure or that such Receivable may not be paid by reason of the Customer's financial inability to pay; provided, however, that the

Agent will use reasonable efforts to provide prior notice to the Borrowing Agent of such determination, but the failure to provide such notice shall not affect the ineligibility of such Receivable;

(i)     the Customer is the United States of America, any state or any department, agency or instrumentality of any of them, unless the applicable Borrower assigns its right to payment of such Receivable to Agent pursuant to the Assignment of Claims Act of 1940, as amended (31 U.S.C. Sub-Section 3727 et seq. and 41 U.S.C. Sub-Section 15 et seq.) or has otherwise complied with other applicable statutes or ordinances;

(j)     the goods giving rise to such Receivable have not been delivered to and accepted by the Customer or the services giving rise to such Receivable have not been performed by the applicable Borrower and accepted by the Customer or the Receivable otherwise does not represent a final sale;

(k)     the Receivables of the Customer exceed a credit limit determined by Agent, in its reasonable discretion, exercised in a commercially reasonable manner, to the extent such Receivable exceeds such limit;

(l)     the Receivable is subject to any offset, deduction, defense, dispute, or counterclaim or the Customer is also a creditor or supplier of a Borrower (in each case, only to the extent of such Borrower's obligations to such Account Debtor from time to time), or the Receivable is contingent in any respect or for any reason;

(m)    the applicable Borrower has made any agreement with any Customer for any deduction therefrom, to the extent of such deduction, except for discounts or allowances made in the Ordinary Course of Business for prompt payment, all of which discounts or allowances are reflected in the calculation of the face value of each respective invoice related thereto;

(n)     any return, rejection or repossession of the merchandise to which such Receivable relates has occurred or the rendition of services has been disputed;

(o)     such Receivable is not payable to a Borrower;

(p)     such Receivable has not been invoiced;

(q)     such Receivable has been included as an "Eligible Export-Related Account Receivable" under the Ex-Im Formula Amount; or

(r)     such Receivable is not otherwise satisfactory to Agent as determined in good faith by Agent in the exercise of its discretion in a commercially reasonable manner; provided, however, that the Agent will use reasonable efforts to provide prior notice to the Borrowing Agent of such determination, but the failure to provide such notice shall not affect the ineligibility of such Receivable.

"Eligible WIP Inventory" shall mean Eligible Inventory consisting of work in process.

"Environmental Claims" shall mean any and all administrative, regulatory or judicial actions, suits, demands, demand letters, directives, claims, liens, notices of noncompliance, liability or violation, investigations and/or adjudicatory proceedings relating in any way to any Environmental Law or any permit issued, or any approval given, under any such Environmental Law (hereafter, "EL Claims"), including, without limitation, (a) any and all EL Claims by governmental or regulatory authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law and (b) any and all EL Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief arising out of or relating to any Environmental Law or to an alleged injury or threat of injury to human health or safety or the environment due to the presence of Hazardous Materials.

"Environmental Indemnity" shall mean that certain Environmental Indemnity Agreement, dated as of September 30, 2010, made by the Loan Parties to the Agent relating to any environmental liabilities associated with the Mortgaged Property, together with all amendments, supplements, modifications, substitutions and replacements thereto and thereof.

"Environmental Laws" shall mean all former, current and future federal, state, local, supranational, and foreign laws (including statutory and common law), treaties, regulations, rules, ordinances, codes, decrees, injunctions, judgments, governmental restrictions or requirements, directives, orders (including consent orders), permits, and agreements with any Governmental Body in each case, relating to the indoor or outdoor environment, natural resources, human health and safety or the presence, Release of or exposure to pollutants, contaminants, wastes, chemicals or otherwise hazardous materials, or the generation, manufacture, processing, distribution, use, treatment, storage, transport, recycling, disposal or handling of, or the arrangement for such activities, with respect to any pollutants, contaminants, wastes, chemicals or otherwise hazardous materials.

"Environmental Liability" shall mean all liabilities, obligations, damages, losses, claims, actions, suits, judgments, orders, fines, penalties, fees, indemnities, expenses and costs (including administrative oversight costs, natural resource damages and remediation costs), whether known or unknown, actual or potential, vested or unvested, or contingent or otherwise, arising out of or relating to (a) any Environmental Law, (b) the generation, manufacture, processing, distribution, use, treatment, storage, transport, recycling, disposal or handling of, or the arrangement for such activities, with respect to any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the presence or Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equipment" shall mean and include as to each Loan Party all of such Loan Party's goods (other than Inventory) whether now owned or hereafter acquired and wherever located including all equipment, machinery, apparatus, motor vehicles, fittings, furniture, furnishings, fixtures, parts, accessories and all replacements and substitutions therefor or accessions thereto.

"Equity Contribution" shall mean the contribution by the direct parent of VSI Acquisition to VSI Acquisition in cash of at least $17.5 million to make the Parent Note Repayment.

"Equity Interests" shall mean shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity interests in any Person and any option, warrant or other right entitling the holder thereof to purchase or otherwise acquire any such equity interest.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time and the rules and regulations promulgated thereunder.

"ERISA Affiliate" shall mean any person that for purposes of Title IV of ERISA or Section 412 of the Code would be deemed at any relevant time to be a single employer or otherwise aggregated with any Borrower or any Subsidiary under Section 414(b) or (c) of the Code or Section 4001 of ERISA.

"ERISA Event" shall mean (a) any "reportable event," as defined in Section 4043(c) of ERISA or the regulations issued thereunder, with respect to a Plan (other than an event for which the 30-day notice period is waived by the applicable regulation or otherwise), (b) a determination that any Plan is in "at risk" status (within the meaning of Section 430 of the Code or Section 303 of ERISA), (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan, (d) the incurrence by VSI, any Subsidiary or any of their respective ERISA Affiliates of any liability under Title IV of ERISA (other than non-delinquent premiums payable to the PBGC under Sections 4006 and 4007 of ERISA), (e) the termination, or the filing of a notice of intent to terminate, any Plan pursuant to Section 4041(c) of ERISA, (f) the receipt by VSI, any Subsidiary or any of their respective ERISA Affiliates from the PBGC or a plan administrator of any notice relating to the intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan, (g) the cessation of operations at a facility of VSI, any Subsidiary or any of their respective ERISA Affiliates in the circumstances described in Section 4062(e) of ERISA, (h) conditions contained in Section 303(k)(1)(A) of ERISA for imposition of a lien on the assets of VSI, any Subsidiary or any of their respective ERISA Affiliates shall have been met with respect to any Plan, (i) the receipt by VSI, any Subsidiary or any of their respective ERISA Affiliates of any notice imposing Withdrawal Liability on a Loan Party or a determining that a Multiemployer Plan is "insolvent" (within the meaning of Section 4245 of ERISA), in "reorganization" (within the meaning of Section 4241 of ERISA), or in "endangered" or "critical" status (within the meaning of Section 432 of the Code or Section 304 of ERISA), (j) the occurrence of a non-exempt "prohibited transaction" with respect to which VSI or any of the Subsidiaries is a "disqualified person" (within the meaning of Section 4975 of the Code) or a "party in interest" (within the meaning of Section 406 of ERISA) or with respect to which VSI, any such Subsidiary or their respective ERISA Affiliates could otherwise be liable or (k) any Foreign Benefit Event.

"Eurodollar Rate" shall mean for any Eurodollar Rate Loan for the then current Interest Period relating thereto the interest rate per annum (rounded upwards, if necessary, to the nearest 1/100 of 1%) determined by Agent by dividing (i) the rate which appears on the

Bloomberg Page BBAM1 (or on such other substitute Bloomberg page that displays rates at which US dollar deposits are offered by leading banks in the London interbank deposit market), or the rate which is quoted by another source reasonably selected by Agent as an authorized information vendor for the purpose of displaying rates at which US dollar deposits are offered by leading banks in the London interbank deposit market (an "Alternate Source"), at approximately 11:00 a.m., London time two (2) Business Days prior to the first day of such Interest Period (or if there shall at any time, for any reason, no longer exist a Bloomberg Page BBAM1 (or any substitute page) or any Alternate Source, a comparable replacement rate determined by the Agent at such time (which determination shall be conclusive absent manifest error)) for an amount comparable to such Eurodollar Rate Loan and having a borrowing date and a maturity comparable to such Interest Period by (ii) a number equal to 1.00 minus the Reserve Percentage.

The Eurodollar Rate shall be adjusted with respect to any Eurodollar Rate Loan that is outstanding on the effective date of any change in the Reserve Percentage as of such effective date. The Agent shall give prompt notice to the Borrowing Agent of the Eurodollar Rate as determined or adjusted in accordance herewith, which determination shall be conclusive absent manifest error.

"Eurodollar Rate Loan" shall mean an Advance at any time that bears interest based on the Eurodollar Rate.

"Event of Default" shall have the meaning set forth in Article X hereof.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended.

"Excluded Hedge Liability or Liabilities" shall mean, with respect to each Borrower and Guarantor, each of its Swap Obligations if, and only to the extent that, all or any portion of this Agreement or any Other Document that relates to such Swap Obligation is or becomes illegal under the CEA, or any rule, regulation or order of the CFTC, solely by virtue of such Borrower's and/or Guarantor's failure to qualify as an Eligible Contract Participant on the Eligibility Date for such Swap. Notwithstanding anything to the contrary contained in the foregoing or in any other provision of this Agreement or any Other Document, the foregoing is subject to the following provisos: (a) if a Swap Obligation arises under a master agreement governing more than one Swap, this definition shall apply only to the portion of such Swap Obligation that is attributable to Swaps for which such guaranty or security interest is or becomes illegal under the CEA, or any rule, regulations or order of the CFTC, solely as a result of the failure by such Borrower or Guarantor for any reason to qualify as an Eligible Contract Participant on the Eligibility Date for such Swap; (b) if a guarantee of a Swap Obligation would cause such obligation to be an Excluded Hedge Liability but the grant of a security interest would not cause such obligation to be an Excluded Hedge Liability, such Swap Obligation shall constitute an Excluded Hedge Liability for purposes of the guaranty but not for purposes of the grant of the security interest; and (c) if there is more than one Borrower or Guarantor executing this Agreement or the Other Documents and a Swap Obligation would be an Excluded Hedge Liability with respect to one or more of such Persons, but not all of them, the definition of Excluded Hedge Liability or Liabilities with respect to each such Person shall only be deemed applicable to (i) the particular Swap Obligations that constitute Excluded Hedge Liabilities with

respect to such Person, and (ii) the particular Person with respect to which such Swap Obligations constitute Excluded Hedge Liabilities.

"Excluded Property" shall mean (i) any rights or interests in any license, contract or agreement to which any Loan Party is a party to the extent, but only to the extent, that such a grant would, under the terms of such license, contract or agreement, result in a breach of the terms of, or constitute a default under, such license, lease, contract or agreement (other than to the extent that any such term would be rendered ineffective pursuant to 9-406, 9-407 or 9-408 of the Uniform Commercial Code or other Applicable Law) or (ii) any Equipment or other assets subject to a purchase money Lien permitted hereunder to the extent that the agreements governing the indebtedness secured by such Liens prohibit the granting of a security interest to the Agent hereunder or (iii) any rights or property, including, without limitation, any intent-to-use trademark applications to the extent that any valid and enforceable law or regulation applicable to such rights or property prohibits the creation of a security interest in such rights or property or would otherwise result in a material loss of rights from the creation of such security interest therein or (iv) any Term Loan Priority Account; provided, that immediately upon the ineffectiveness, lapse or termination of any such restriction, the Collateral shall include, and Borrowers shall be deemed to have granted a security interest in, all such rights and interests or Equipment or other assets, as the case may be, as if such provision had never been in effect; and provided, further, that notwithstanding any such restriction, Collateral and ABL Priority Collateral shall, to the extent such restriction does not by its terms apply thereto, include all rights incident or appurtenant to any such rights or interests and the right to receive all proceeds derived from or in connection with the sale, assignment or transfer of such rights and interests.

"Excluded Subsidiary" shall mean, (a) any Subsidiary that is not a Wholly Owned Subsidiary, (b) any Subsidiary that (i) is a Foreign Subsidiary, (ii) is a direct or indirect Subsidiary of a Foreign Subsidiary, or (iii) a U.S. Foreign Holdco, (c) any Immaterial Subsidiary, (d) any Unrestricted Subsidiary, (e) any captive insurance company, (f) any not-for-profit subsidiary, (g) any Subsidiary that is prohibited by applicable law or regulation from guaranteeing the Obligations or that would require governmental (including regulatory) consent, approval, license or authorization in order to guarantee the Obligations, to the extent such consent, approval, license or authorization is not obtained after the use of all such Subsidiary's commercially reasonable efforts (without any requirement to pay money or make concessions), (h) any Subsidiary that is prohibited from guaranteeing the Obligations by (x) contracts existing on the Closing Date or (y) if the Subsidiary is acquired after the Closing Date, contracts existing on the date of such acquisition, in each case to the extent not entered into in contemplation of the Closing Date or such acquisition, including any secured Indebtedness assumed in connection with a Permitted Acquisition and not incurred or modified in contemplation thereof, (i) any Subsidiary to the extent that VSI reasonably determines that a guarantee of the Obligations by such Subsidiary would result in material adverse tax consequences or (j) any Subsidiary with respect to which the Agent and VSI reasonably agree that the cost or burden of obtaining a guarantee of the Obligations would outweigh the benefit to the Lenders to be afforded thereby; provided that no Person shall be an Excluded Subsidiary to the extent it guarantees any Term Loan Obligation.

"Excluded Taxes" shall mean with respect to the Agent, any Lender, any Issuer, Payee or any other recipient of any payment to be made by or on account of any obligation of the

Borrowers hereunder, (a) Taxes imposed on or measured by its overall net income (however denominated), branch profits taxes and franchise taxes imposed on it (in lieu of net income taxes), (i) by the jurisdiction (or any political subdivision thereof) under the Applicable Laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located or (ii) which are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in an Advance under this Agreement pursuant to the applicable law in effect on the date on which (i) such Lender acquires such interest in the Advance (other than pursuant to an assignment request by Borrower under Section 3.11(c) or as otherwise requested by any Loan Party) or (ii) such Lender changes its lending office (other than a change made at the request of any Loan Party), except, in each case, to the extent that, pursuant to Section 3.11, amounts with respect such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, United States federal Taxes that would not have been imposed but for Recipient's failure to comply with Section 3.12, and (c) any U.S. federal withholding Taxes imposed under FATCA.

"Ex-Im Advance Rates" shall have the meaning set forth in Section 2.2(a)(y)(ii) hereof.

"Ex-Im Bank" shall mean the Export-Import Bank of the United States.

"Ex-Im Borrowing Base Certificate" shall mean a certificate in substantially the form of Exhibit 1.2(b) duly executed by the President, Chief Financial Officer or Controller of Borrowing Agent and delivered to Agent, appropriately completed, by which such officer shall certify to Agent the Ex-Im Formula Amount and calculation thereof as of the date of such certificate.

"Ex-Im Collateral" shall mean the Export-Related Accounts Receivable and the Export-Related General Intangibles.

"Ex-Im Documents" shall mean the Borrower Agreement, Delegated Authority Letter Agreement, the Loan Authorization Agreement, the Ex-Im Waiver Letter(s) and all other documents relating specifically to the guaranty to be provided by the Ex-Im Bank under its Working Capital Guarantee Program, and Ex-Im Document shall mean any of the Ex-Im Documents.

"Ex-Im Formula Amount" shall have the meaning set forth in Section 2.2(a).

"Ex-Im Notes" shall mean, collectively, the promissory notes referred to in Section 2.2(a) hereof.

"Ex-Im Obligations" shall mean all Obligations arising from, related to or connected with the Ex-Im Revolving Advances.

"Ex-Im Receivables Advance Rate" shall have the meaning set forth in Section 2.2(a)(y)(i) hereof.

"Ex-Im Revolving Advances" shall mean Advances made under Section 2.2(a) hereof.

"Ex-Im Revolving Facility Usage" shall mean at any time, the sum of the outstanding Ex-Im Revolving Advances.

"Ex-Im Term" shall mean the earlier of (i) March 30, 2015 or, if requested by the Borrowing Agent, such later date as may be agreed to by Ex-Im Bank and the Agent in their sole discretion or (ii) the last day of the Term.

"Ex-Im Waiver Letter(s)" shall mean (i) that certain waiver letter, dated September 30, 2010, issued by the Ex-Im Bank to the Agent, (ii) that certain waiver letter, dated October 29, 2014, issued by the Ex-Im Bank to the Agent, and (iii) all other waiver letters issued by the Ex-Im Bank relating specifically to the guaranty to be provided by the Ex-Im Bank under its Working Capital Guarantee Program, and Ex-Im Waiver Letter shall mean any of the Ex-Im Waiver Letters.

"Existing Letters of Credit" shall have the meaning set forth in Section 2.10.

"Existing Collateral Trust Agreement" shall mean the Collateral Trust Agreement, dated as of September 30, 2010, by and among the Borrower, the Guarantors (as defined in the Existing Indenture) from time to time party thereto and the Collateral Trustee, as amended, amended and restated, supplemented or otherwise modified prior to the date hereof.

"Existing Indenture" shall have the meaning assigned to such term in the definition of "Existing Secured Notes".

"Existing Secured Notes" shall mean the 9.375% senior secured notes due 2015 issued pursuant to the indenture dated as of September 30, 2010 (as amended, amended and restated, supplemented or otherwise modified prior to the date hereof, the "Existing Indenture") between the Borrower and U.S. Bank, National Association as Trustee (the "Trustee").

"Existing Secured Notes Satisfaction and Discharge" shall mean (x) funds sufficient to redeem the Existing Secured Notes shall have been irrevocably deposited with the Trustee in respect of the Existing Secured Notes and (y) the Trustee and Collateral Trustee, as applicable, shall have acknowledged the occurrence of each of (i) the satisfaction and discharge of the Existing Indenture with respect to the Existing Secured Notes pursuant to Section 12.01 of the Indenture, (ii) the release and relief of each Guarantor (as defined in the Existing Indenture) pursuant to Section 11.05 of the Existing Indenture and (iii) the release of liens on the Collateral (as defined in the Existing Indenture) pursuant to Section 10.06 of the Indenture and Section 4.1 of the Existing Collateral Trust Agreement.

"Export Order" shall have the meaning set forth in the Borrower Agreement.

"Export-Related Accounts Receivable" shall have the meaning set forth in the Borrower Agreement.

"Export-Related Accounts Receivable Value" shall have the meaning set forth in the Borrower Agreement.

"Export-Related General Intangibles" shall have the meaning set forth in the Borrower Agreement.

"Facility Fee Rate" shall mean for and with respect to the facility fees relating to the Revolving Advances and Ex-Im Revolving Advances for the ratable benefit of the Lenders as set forth in Section 3.3 hereof, the percentage per annum determined by reference to the Revolving Facility Usage Factor as set forth below:

| Revolving Facility Usage Factor | Facility Fee Rate for Ratable Benefit of Lenders |
|---|---|
| less than or equal to 50% | 0.375% |
| greater than 50% | 0.25% |

From the Closing Date until the first Adjustment Date, the Facility Fee Rate shall be determined based on a Revolving Facility Usage Factor greater than 50%. Thereafter, subject to the terms and conditions of this Agreement, with respect to each fiscal quarter of the Borrowing Agent, in accordance with Section 9.8 hereof, the Borrowing Agent shall submit to Agent a Compliance Certificate calculating the Revolving Facility Usage Factor as of the last day of such fiscal quarter. Upon receipt by Agent of the Compliance Certificate required to be submitted in accordance with Section 9.8 hereof, calculating the Revolving Facility Usage Factor as of December 31, 2014, and as of the last day of each fiscal quarter thereafter, the Revolving Facility Usage Factor shall be calculated for the period equal to the fiscal quarter then ending. Any increase or decrease in the Facility Fee Rate computed as of a fiscal quarter end shall be effective on the Adjustment Date corresponding with such fiscal quarter end.

"FATCA" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended version or successor provision that is substantively comparable and not materially more onerous to comply with), any agreement entered into under Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement entered into by the United States in connection with the implementation of such Sections of the Code (including such amended version and successor provisions) and, in each case, any current or future regulations promulgated thereunder or official interpretations thereof.

"Federal Funds Alternate Source" shall have the meaning set forth in the definition of "Federal Funds Open Rate".

"Federal Funds Effective Rate" for any day shall mean the rate per annum (based on a year of three hundred sixty (360) days and actual days elapsed and rounded upward to the nearest one hundredth (1/100) of one percent (1%)) announced by the Federal Reserve Bank of New York (or any successor) on such day as being the weighted average of the rates on overnight federal funds transactions arranged by federal funds brokers on the previous trading

day, as computed and announced by such Federal Reserve Bank (or any successor) in substantially the same manner as such Federal Reserve Bank computes and announces the weighted average it refers to as the "Federal Funds Effective Rate" as of the date of this Agreement; provided, if such Federal Reserve Bank (or its successor) does not announce such rate on any day, the "Federal Funds Effective Rate" for such day shall be the Federal Funds Effective Rate for the last day on which such rate was announced.

"Federal Funds Open Rate" for any day shall mean the rate per annum (based on a year of three hundred sixty (360) days and actual days elapsed) which is the daily federal funds open rate as quoted by ICAP North America, Inc. (or any successor) as set forth on the Bloomberg Screen BTMM for that day opposite the caption "OPEN" (or on such other substitute Bloomberg Screen that displays such rate), or as set forth on such other recognized electronic source used for the purpose of displaying such rate as selected by Agent (a "Federal Funds Alternate Source") (or if such rate for such day does not appear on the Bloomberg Screen BTMM (or any substitute screen) or on any Federal Funds Alternate Source, or if there shall at any time, for any reason, no longer exist a Bloomberg Screen BTMM (or any substitute screen) or any Federal Funds Alternate Source, a comparable replacement rate determined by Agent at such time (which determination shall be conclusive absent manifest error); provided however, that if such day is not a Business Day, the Federal Funds Open Rate for such day shall be the "open" rate on the immediately preceding Business Day.  If and when the Federal Funds Open Rate changes, the rate of interest with respect to any advance to which the Federal Funds Open Rate applies will change automatically without notice to Loan Parties, effective on the date of any such change.

"Fee Letter" shall mean the amended and restated fee letter dated of even date herewith among Borrowers and Agent.

"Financial Officer" of any Person shall mean the chief financial officer, principal accounting officer, treasurer or controller of such Person.

"Financial Statements" shall have the meaning set forth in Section 5.5(c).

"Finished Goods Inventory Advance Rate" shall have the meaning set forth in Section 2.1(a)(y)(ii) hereof.

"Finished Goods NOLV Advance Rate" shall have the meaning set forth in Section 2.1(a)(y)(ii) hereof.

"Fixed Charge Coverage Ratio" shall mean and include, with respect to VSI and the Restricted Subsidiaries on a consolidated basis for any period of determination, the ratio of (a) Consolidated EBITDA, minus Unfinanced Capital Expenditures made during such period to (b) the sum of, without duplication, (i) all Debt Payments made during such period, plus (ii) cash taxes paid during such period, plus (iii) all Management Fees paid in cash during such period, plus (iv) dividends and distributions paid in cash during such period, as permitted pursuant to Section 7.3 hereof (provided, that dividends and distributions paid in cash, as permitted pursuant to Section 7.3(c), (e), (i), and (k), shall only be included for purposes of calculating on an incurrence basis in connection with the application of the Payment Conditions to such dividends

and distributions, the pro-forma Fixed Charge Coverage Ratio pursuant to the application of the Payment Conditions to the payment of such dividends and distributions and shall not be included in the calculation of Fixed Charge Coverage Ratio for any other purpose, even to the extent that such dividends and distributions were paid during such period of determination), in each case of VSI and its Subsidiaries determined and consolidated in accordance with GAAP.

"Flood Laws" shall mean all Applicable Laws relating to policies and procedures that address requirements placed on federally regulated lenders under the National Flood Insurance Reform Act of 1994 and other Applicable Laws related thereto.

"Foreign Benefit Event" shall mean, with respect to any Foreign Pension Plan, (a) the existence of unfunded liabilities in excess of the amount permitted under any applicable law, (b) the failure to make required contributions or payments, under any applicable law, on or before the due date for such contributions or payments, (c) the incurrence of any liability in excess of $1,000,000 by VSI or any Subsidiary under applicable law on account of the complete or partial termination of a Foreign Pension Plan or the complete or partial withdrawal of any participating employer therein, or (d) the occurrence of any transaction that is prohibited under any applicable law and that has resulted or could reasonably be expected to result in the incurrence of any liability by VSI or any of the Subsidiaries, or the imposition on VSI or any of the Subsidiaries of any fine, excise tax or penalty resulting from any noncompliance with any applicable law, in each case in excess of $1,000,000.

"Foreign Pension Plan" shall mean any benefit plan that under applicable law other than the laws of the United States or any political subdivision thereof, is required to be funded through a trust or other funding vehicle other than a trust or funding vehicle maintained exclusively by a Governmental Body.

"Foreign Subsidiary" of any Person, shall mean any Subsidiary of such Person that is not organized or incorporated in the United States or any State or territory thereof.

"Formula Amount" shall have the meaning set forth in Section 2.1(a).

"GAAP" shall mean generally accepted accounting principles in the United States of America in effect from time to time.

"General Intangibles" shall mean and include as to each Loan Party all of such Loan Party's general intangibles, whether now owned or hereafter acquired, including all payment intangibles, all choses in action, causes of action, corporate or other business records, inventions, designs, patents, patent applications, equipment formulations, manufacturing procedures, quality control procedures, trademarks, trademark applications, service marks, trade secrets, goodwill, copyrights, design rights, software, computer information, source codes, codes, records and updates, registrations, licenses, franchises, customer lists, tax refunds, tax refund claims, computer programs, all claims under guaranties, security interests or other security held by or granted to such Loan Party to secure payment of any of the Receivables by a Customer (other than to the extent covered by Receivables) all rights of indemnification and all other intangible property of every kind and nature (other than Receivables).

"Governmental Acts" shall have the meaning set forth in Section 2.17.

"Governmental Body" shall mean any nation or government, any state or other political subdivision thereof or any entity, authority, agency, division or department exercising the legislative, judicial, regulatory or administrative functions of or pertaining to a government.

"Gross Formula Amount" shall mean the Formula Amount (without giving effect to clause (iii) thereof).

"Guarantee" of or by any Person shall mean any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment of such Indebtedness or other obligation, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment of such Indebtedness or other obligation or (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation; provided that, the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.

"Guarantor" or "Guarantors" shall mean, singularly or collectively, as the context may require, VSHC and any other Person who may hereafter guarantee payment or performance of the whole or any part of the Obligations and shall extend to all permitted successors and assigns of such Persons.

"Guaranty" shall mean (i) that certain Guaranty Agreement dated as of the Closing Date by VSHC in favor of Agent and (ii) any other guaranty of the obligations of Borrowers executed by a Guarantor in favor of Agent for its benefit and for the ratable benefit of Lenders, in form and substance satisfactory to Agent, in each case together with all amendments, supplements, modifications, substitutions and replacements thereto and thereof, and "Guarantees" means collectively, all such Guarantees.

"Hazardous Materials" shall mean (a) any petroleum products, derivatives or byproducts and all other hydrocarbons, coal ash, radon gas, lead, asbestos and asbestos-containing materials, toxic mold, urea formaldehyde foam insulation, polychlorinated biphenyls, infectious or medical wastes and chlorofluorocarbons and all other ozone-depleting substances, (b) any pollutant, contaminant, waste or chemical or any toxic, radioactive, ignitable, corrosive, reactive or otherwise hazardous substance, waste or material, or any substance, waste or material having any constituent elements displaying any of the foregoing characteristics or (c) any substance, waste or material that is prohibited, limited or regulated by or pursuant to or which can form the basis for liability under any Environmental Law.

"Hedge Liabilities" shall have the meaning provided in the definition of "Lender-Provided Interest Rate Hedge".

"Hedging Agreement" shall mean any interest rate protection agreement, foreign currency exchange agreement, commodity price protection agreement or other interest or currency exchange rate or commodity price hedging arrangement.

"Immaterial Subsidiaries" shall mean, at any time, any Subsidiarity designated as an Immaterial Subsidiary in accordance with Section 6.12(b).

"Incremental Cap" shall have the meaning assigned to the term "Incremental Cap" in the Term Loan Credit Agreement as in effect on the date hereof.

"Incremental Term Loan" shall have the meaning assigned to the term "Incremental Term Loan" in the Term Loan Credit Agreement as in effect on the date hereof.

"Indebtedness" of any Person shall mean, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property or assets purchased by such Person, (e) all obligations of such Person issued or assumed as the deferred purchase price of property or services, including all earn-out obligations (excluding trade accounts payable and accrued obligations incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, (g) all Guarantees by such Person of Indebtedness of others, (h) all Capitalized Lease Obligations of such Person, (i) net obligations of such Person under any Hedging Agreements, valued at the Agreement Value thereof, (j) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interests of such Person or any other Person or any warrants, rights or options to acquire such equity interests, valued, in the case of redeemable preferred interests, at the greater of its voluntary or involuntary liquidation preference *plus* accrued and unpaid dividends, (k) all obligations of such Person as an account party in respect of letters of credit and (l) all obligations of such Person in respect of bankers' acceptances. The Indebtedness of any Person shall include the Indebtedness of any partnership in which such Person is a general partner.

"Indemnified Taxes" shall mean all Taxes except Excluded Taxes.

"Indiana Mortgage" shall mean that certain Open-End Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing dated as of September 29, 2010 and effective as of September 30, 2010, made by VSI to the Agent with respect to the 1502 South Tibbs Mortgaged Property and the 1800 South Tibbs Mortgaged Property, together with all amendments, supplements, modifications, substitutions and replacements thereto and thereof.

"Insolvency Event" shall mean, with respect to any Person, including without limitation any Lender, such Person or such Person's direct or indirect parent company (a) becomes the subject of a bankruptcy or insolvency proceeding (including any proceeding under Title 11 of the United States Code), or regulatory restrictions, (b) has had a receiver,

conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business appointed for it or has called a meeting of its creditors, (c) admits in writing its inability, or be generally unable, to pay its debts as they become due or cease operations of its present business, (d) with respect to a Lender, such Lender is unable to perform hereunder due to the application of Applicable Law, or (e) in the good faith determination of Agent, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment of a type described in clauses (a) or (b), provided that an Insolvency Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person or such Person's direct or indirect parent company by a Governmental Body or instrumentality thereof if, and only if, such ownership interest does not result in or provide such Person with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Person (or such Governmental Body or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

"Intellectual Property" shall mean property constituting under any Applicable Law a patent, patent application, copyright, trademark, service mark, trade name, mask work, trade secret or license or other right to use any of the foregoing.

"Intellectual Property Claim" shall mean the assertion by any Person of a claim (whether asserted in writing, by action, suit or proceeding or otherwise) that any Loan Party's ownership, use, marketing, sale or distribution of any Inventory, Equipment, Intellectual Property or other property or asset is violative of any ownership of or right to use any Intellectual Property of such Person.

"Intercompany Debt" shall mean any Indebtedness, now existing or hereafter incurred, owed by VSHC, VSI or any Restricted Subsidiary to VSHC, VSI or any other Restricted Subsidiary.

"Intercompany Loan" shall have the meaning assigned to such term in Section 7.5(h).

"Intercompany Note" shall mean a promissory note evidencing an Intercompany Loan, duly executed and delivered in form reasonably satisfactory to the Agent in its reasonable discretion pursuant to which, among other things, the Intercompany Loan evidenced by such Intercompany Note owed by any Loan Party is subordinated to the Obligations.

"Intercreditor Agreement" shall mean the Intercreditor Agreement, dated of even date herewith, among the Loan Parties, the Agent and the Term Loan Agent.

"Interest Period" shall mean the period provided for any Eurodollar Rate Loan pursuant to Section 2.3(b).

"Interest Rate Hedge" shall mean an interest rate exchange, collar, cap, swap, adjustable strike cap, adjustable strike corridor or similar agreements entered into by any Loan Party or its Subsidiaries in order to provide protection to, or minimize the impact upon, such

Loan Party and/or its Subsidiaries of increasing floating rates of interest applicable to Indebtedness.

"Inventory" shall mean and include as to each Loan Party all of such Loan Party's now owned or hereafter acquired goods, merchandise and other personal property, wherever located, to be furnished under any consignment arrangement, contract of service or held for sale or lease, all raw materials, work in process, finished goods and materials and supplies of any kind, nature or description which are or might be used or consumed in such Loan Party's business or used in selling or furnishing such goods, merchandise and other personal property, and all documents of title or other documents representing them.

"Investment" shall mean, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or Indebtedness or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of Indebtedness of, or purchase or other acquisition of any other Indebtedness or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person or (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person. For purposes of compliance with Section 7.5, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment but giving effect to any returns or distributions of capital or repayment of principal actually received in cash by such Person with respect thereto, whether by disposition, return on capital, dividend or otherwise.

"Investment Property" shall mean and include as to each Loan Party, all of such Loan Party's now owned or hereafter acquired securities (whether certificated or uncertificated), securities entitlements, securities accounts, commodities contracts and commodities accounts.

"IP Rights" shall have the meaning assigned to such term in Section 5.18.

"ISP98 Rules" shall have the meaning set forth in Section 2.10(b).

"Issuer" shall mean any Person who issues a Letter of Credit pursuant to the terms hereof and/or accepts a draft pursuant to the terms hereof.

"Joinder" shall mean a joinder by a Person as a Borrower or a Guarantor under this Agreement and the Other Documents in form and substance satisfactory to Agent in its sole and reasonable discretion.

"Junior Indebtedness" shall mean Indebtedness of the Borrower and its Restricted Subsidiaries that is by its terms (i) unsecured, (ii) subordinated in right of payment to all or any portion of the Obligations or (iii) secured by a lien that is subordinated to the liens securing the Obligations.

"Latest Maturity Date" shall mean, at any time, the latest maturity or expiration date applicable to any of the Obligations or any commitment to lend on the part of the Lenders hereunder at such time.

"Lender" and "Lenders" shall have the meaning ascribed to such term in the preamble to this Agreement and shall include each Person which becomes a transferee, successor or assign of any Lender.  For the purpose of any provision of this Agreement or any Other Document which provides for the granting of a security interest or other Lien to the Agent for the benefit of Lenders as security for the Obligations, "Lenders" shall include any Affiliate of a Lender to which such Obligation (specifically including any Hedge Liabilities and any Cash Management Liabilities) is owed.

"Lender-Provided Interest Rate Hedge" shall mean an Interest Rate Hedge which is provided by any Lender and with respect to which Agent confirms meets the following requirements: such Interest Rate Hedge (i) is documented in a standard International Swap Dealer Association Agreement or other similar agreement acceptable to Agent in its sole and reasonable discretion, (ii) provides for the method of calculating the reimbursable amount of the provider's credit exposure in a reasonable and customary manner, and (iii) is entered into for hedging (rather than speculative) purposes.  The liabilities of any Loan Party to the provider of any Lender-Provided Interest Rate Hedge (the "Hedge Liabilities") shall be "Obligations" hereunder, guaranteed obligations under any Guaranty and otherwise treated as Obligations for purposes of each of the Other Documents. The Liens securing the Hedge Liabilities shall be pari passu with the Liens securing all other Obligations under this Agreement and the Other Documents.  Notwithstanding anything to the contrary contained in the foregoing, the Hedge Liabilities shall not include any Excluded Hedge Liabilities.

"Letter of Credit Sublimit" shall mean Thirty Million and 00/100 Dollars ($30,000,000.00).

"Letters of Credit" shall have the meaning set forth in Section 2.9.

"License Agreement" shall mean any agreement between any Loan Party and a Licensor pursuant to which such Loan Party is authorized to use any Intellectual Property in connection with the manufacturing, marketing, sale or other distribution of any Inventory of such Loan Party or otherwise in connection with such Loan Party's business operations.

"Licensor" shall mean any Person from whom any Loan Party obtains the right to use (whether on an exclusive or non-exclusive basis) any Intellectual Property in connection with such Loan Party's manufacture, marketing, sale or other distribution of any Inventory or otherwise in connection with such Loan Party's business operations.

"Licensor/Agent Agreement" shall mean an agreement between Agent and a Licensor, in form and substance satisfactory to Agent, by which Agent is given the unqualified right, vis-à-vis such Licensor, to enforce Agent's Liens with respect to and to dispose of any Loan Party's Inventory with the benefit of any Intellectual Property applicable thereto, irrespective of such Loan Party's default under any License Agreement with such Licensor.

"Lien" shall mean any mortgage, deed of trust, pledge, hypothecation, assignment, security interest, lien (whether statutory or otherwise), Charge, claim or encumbrance, or preference, priority or other security agreement or preferential arrangement held or asserted in respect of any asset of any kind or nature whatsoever including any

conditional sale or other title retention agreement, any lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction.

"Lien Waiver Agreement" shall mean an agreement reasonably satisfactory to Agent, which is executed in favor of Agent by a Person who owns or occupies premises at which any Collateral may be located from time to time and by which such Person shall waive any Lien that such Person may ever have with respect to any of the Collateral and shall authorize Agent from time to time to enter upon the premises to remove the Collateral from such premises or to use such premises to store or dispose of such Inventory on terms acceptable to such Person.

"Loan Authorization Agreement" shall have the meaning set forth in the Borrower Agreement.

"Loan Documents" shall mean this Agreement and each of the Other Documents.

"Loan Party" or "Loan Parties" shall mean, singularly or collectively, as the context may require, each Borrower, VSHC and each other Guarantor and shall extend to all permitted successors and assigns of each such Person.

"Management Agreement" shall mean the Professional Services Agreement, dated December 10, 2007, by and between VSI and WPI, together with all amendments, supplements, modifications, substitutions and replacements thereto and thereof.

"Management Fees" shall mean the management fees required to be paid by VSI to WPI pursuant to the Management Agreement.

"Management Fee Subordination Agreement" shall mean the Management Fee Subordination Agreement, dated as of the Original Closing Date, by and among VSI, WPI and the Agent, together with all amendments, supplements, modifications, substitutions and replacements thereto and thereof.

"Margin Stock" shall have the meaning assigned to such term in Regulation U.

"Master Guarantee Agreement" shall mean the Export-Import Bank of the United States Working Capital Guarantee Program Master Guarantee Agreement executed by the Ex-Im Bank and the Agent, pursuant to the Ex-Im Bank Working Capital Guarantee Program.

"Material Adverse Effect" shall mean any event, change or condition that, individually or in the aggregate, has had, or would reasonably be expected to have (a) a material and adverse effect on the business, assets, financial condition or results of operations of VSI and the Restricted Subsidiaries, taken as a whole, (b) a material and adverse effect on the rights and remedies of the Agent and the Lenders under this Agreement or the Other Documents or (c) a material and adverse effect on the ability of any Borrower or Guarantor to perform its material obligations under this Agreement and the Other Documents.

"Material Export-Related Contract" shall have the meaning set forth in Section 6.22.

"Material Subsidiary" shall mean the Subsidiaries set forth on Schedule 1.1(a) and each other Subsidiary other than an Immaterial Subsidiary.

"Maximum Ex-Im Revolving Advance Amount" shall mean Twenty-Five Million /and 00/100 Dollars ($25,000,000.00).

"Maximum Face Amount" shall mean, with respect to any outstanding Letter of Credit, the face amount of such Letter of Credit including all automatic increases provided for in such Letter of Credit, whether or not any such automatic increase has become effective.

"Maximum Revolving Advance Amount" shall mean One Hundred Million and 00/100 Dollars ($100,000,000.00).

"Maximum Undrawn Amount" shall mean with respect to any outstanding Letter of Credit, the amount of such Letter of Credit that is or may become available to be drawn, including all automatic increases provided for in such Letter of Credit, whether or not any such automatic increase has become effective.

"Modified Commitment Transfer Supplement" shall have the meaning set forth in Section 16.3(d).

"Moody's" shall mean Moody's Investors Service, Inc.

"Mortgages" shall mean the 40 Avenue A Mortgaged Property Mortgage, the 2110 High Point Mortgaged Property Mortgage, the Indiana Mortgage, the 215 North Centennial Mortgaged Property Mortgage, the Route 611 Mortgaged Property Mortgage and any other mortgages, deeds of trust, deeds to secure debt, leasehold mortgages, leasehold deeds of trust or leasehold deeds to secure debt and other similar security documents delivered to Agent as security for the Obligations.

"Mortgaged Property" shall mean collectively, the 40 Avenue A Mortgaged Property, the 2110 High Point Mortgaged Property, the 1502 South Tibbs Mortgaged Property, the 1800 South Tibbs Mortgaged Property, the 215 North Centennial Mortgage Property and the Route 611 Mortgaged Property.

"Multiemployer Plan" shall mean any multiemployer plan as defined in Section 4001(a)(3) of ERISA, which is contributed to by (or to which there is or may be an obligation to contribute of) VSI or any Subsidiary or with respect to which VSI or any Subsidiary has any liability (including on account of an ERISA Affiliate).

"Net Cash Proceeds" shall have the meaning assigned to the term "Net Cash Proceeds" in the Term Loan Credit Agreement as in effect on the date hereof.

"Net Income" means, with respect to any Person, the net income (loss) of such Person, determined in accordance with GAAP and before any reduction in respect of Preferred Stock dividends.

"Net Total Leverage Ratio" shall have the meaning assigned to the term "Net Total Leverage Ratio" in the Term Loan Credit Agreement as in effect on the date hereof.

"Non-Defaulting Lender" shall mean, at any time, any Lender that is not a Defaulting Lender at such time.

"Non-Qualifying Party" shall mean any Borrower or any Guarantor that on the Eligibility Date fails for any reason to qualify as an Eligible Contract Participant.

"Note" shall mean each Revolving Credit Note, each Ex-Im Note and the Swing Note and "Notes" shall collectively mean all of the Revolving Credit Notes, the Ex-Im Notes and the Swing Note.

"Obligations" shall mean and include any and all loans, advances, debts, liabilities, obligations, covenants and duties owing by any Loan Party to Lenders or Agent or to any other direct or indirect subsidiary or Affiliate of Agent or any Lender of any kind or nature, present or future (including any interest or other amounts accruing thereon after maturity, or after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding relating to any Loan Party, whether or not a claim for post-filing or post-petition interest or other amounts is allowed in such proceeding), whether or not evidenced by any note, guaranty or other instrument, whether arising under any agreement, instrument or document, (including this Agreement and the Other Documents) whether or not for the payment of money, whether arising by reason of an extension of credit, opening of a letter of credit, loan, equipment lease or guarantee, under any interest or currency swap, future, option or other similar agreement, or in any other manner, whether arising out of overdrafts or deposit or other accounts or electronic funds transfers (whether through automated clearing houses or otherwise) or out of Agent's or any Lenders non-receipt of or inability to collect funds or otherwise not being made whole in connection with depository transfer check or other similar arrangements, whether direct or indirect (including those acquired by assignment or participation), absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, contractual or tortious, liquidated or unliquidated, regardless of how such indebtedness or liabilities arise or by what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument, including, but not limited to, any and all of any Loan Party's Indebtedness and/or liabilities under this Agreement, the Other Documents or under any other agreement between Agent or Lenders and any Loan Party and any amendments, extensions, renewals or increases and all costs and expenses of Agent and any Lender incurred in the documentation, negotiation, modification, enforcement, collection or otherwise in connection with any of the foregoing, including, but not limited to, reasonable attorneys' fees and expenses and all obligations of any Loan Party to Agent or Lenders to perform acts or refrain from taking any action, (ii) all Hedge Liabilities, and (iii) all Cash Management Liabilities.  Notwithstanding anything to the contrary contained in the foregoing, the Obligations shall not include any Excluded Hedge Liabilities.

"OFAC" shall have the meaning set forth in Section 6.24.

"Order" shall have the meaning set forth in Section 2.18.

"Ordinary Course of Business" shall mean with respect to any Loan Party, the ordinary course of such Loan Party's business as conducted on the Closing Date.

"Original Closing Date" means September 30, 2010.

"Original Credit Agreement" means that certain Revolving Credit and Security Agreement dated as of September 30, 2010, by and among Agent, Borrowers and Original Lenders.

"Original Lenders" means the Lenders party to the Original Credit Agreement.

"Original Obligations" means the "Obligations" as defined in the Original Credit Agreement.

"Other Connection Taxes" shall mean, with respect to any Payee, Taxes imposed as a result of a present or former connection between such recipient and the jurisdiction imposing such Tax (other than connections arising from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Advance or any Loan Document).

"Other Documents" shall mean the Notes, any Guaranty, any Lender-Provided Interest Rate Hedge, the Pledge and Security Agreements, any Lien Waiver Agreement, the Fee Letter, the Intercreditor Agreement, any Deposit Account Control Agreement, any Joinder, the Questionnaire, the Perfection Certificate, the Mortgages, the Environmental Indemnity, the Management Fee Subordination Agreement, the Ex-Im Documents and any and all other agreements, instruments and documents, including guaranties, pledges, powers of attorney, consents, interest or currency swap agreements or other similar agreements and all other writings heretofore, now or hereafter executed by any Loan Party and/or delivered to Agent or any Lender in respect of the transactions contemplated by this Agreement.

"Out-of-Formula Loans" shall have the meaning set forth in Section 16.2(b).

"Parent Note Repayment" shall mean the repayment and/or redemption in full of that certain promissory note, dated as of December 10, 2007, by and between VSI Acquisition, as payor, and Ares Distressed Securities Fund, L.P., as payee, in an original aggregate principal amount of $5,000,000.

"Participant" shall mean each Person who shall be granted the right by any Lender to participate in any of the Advances and who shall have entered into a participation agreement in form and substance satisfactory to such Lender.

"Participation Advance" shall have the meaning set forth in Section 2.12(d).

"Participation Commitment" shall mean each Lender's obligation to buy a participation of the Letters of Credit issued hereunder.

"Payee" shall have the meaning set forth in Section 3.11.

"Payment Conditions" shall mean, with respect to any proposed Investment, prepayment, dividend, distribution or other payment (each a "Proposed Payment") each of the following conditions:

(a) no Default or Event of Default shall have occurred and be continuing or would result from the making of the Proposed Payment;

(b) either:

(i) (x) for each day during the 30 calendar days prior to the date of the Proposed Payment, Undrawn Availability has been greater than the sum of (1) the greater of 17.5% of the Maximum Revolving Advance Amount and $17,500,000 and (2) the amount of the Proposed Payment, (y) after giving effect to the Proposed Payment, Undrawn Availability is greater than the greater of 17.5% of the Maximum Revolving Advance Amount and $17,500,000, and (z) the Fixed Charge Coverage Ratio for the 12 month period most recently ended prior to such Proposed Payment for which Agent has received financial statements of Borrowers pursuant to Section 9.9 is at least 1.1 to 1.0 (calculated as if the Proposed Payment was made on the last day of such 12 month period and constitutes a dividend or distribution under clause (iv) of the definition of Fixed Charge Coverage Ratio or a Debt Payment), or

(ii) (x) for each day during the 30 calendar days prior to the Proposed Payment, Undrawn Availability has been greater than the sum of (1) the greater of 25% of the Maximum Revolving Advance Amount and $25,000,000 and (2) the amount of the Proposed Payment, and (y) after giving effect to the Proposed Payment, Undrawn Availability is greater than the greater of 25% of the Maximum Revolving Advance Amount and $25,000,000; and

(c) VSI has delivered a certificate to Agent certifying that all conditions described in clauses (a) and (b) have been satisfied after giving effect to the Proposed Payment.

"Payment Office" shall mean initially Two Tower Center Boulevard, East Brunswick, New Jersey 08816; thereafter, such other office of Agent, if any, which it may designate by notice to Borrowing Agent and to each Lender to be the Payment Office.

"PBGC" shall mean the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA or any successor.

"Perfection Certificate" shall mean the Perfection Certificate substantially in the form of Exhibit 1.2(e), prepared, signed and delivered by the Borrowing Agent to the Agent.

"Permitted Acquired Debt" shall have the meaning assigned to such term in Section 7.4(g)

"Permitted Acquisition" shall have the meaning assigned to such term in Section 7.5(l).

"Permitted Acquisition Conditions" shall mean, with respect to the target of any proposed Permitted Acquisition, the following:

(a)        such Person is a Domestic Person;

(b)        the Agent shall receive at least ten (10) Business Days' prior written notice of such proposed Permitted Acquisition which notice shall include a reasonably detailed description of such proposed Permitted Acquisition;

(c)        in the case of a Loan Party acquiring the Equity Interests in such Person, (a) such Person shall become a Borrower or a Guarantor for the Obligations as determined by the Agent, (b) such Loan Party shall, subject to the terms of the Intercreditor Agreement, pledge all of the Equity Interests in such Domestic Subsidiary acquired by such applicable Loan Party to the Agent for the benefit of the Lenders pursuant to a Pledge and Security Agreement and (c) the Domestic Subsidiary acquired by such Loan Party shall, subject to the terms of the Intercreditor Agreement, pledge (i) all of the Equity Interests in each of its Domestic Subsidiaries and (ii) the Required Pledge Amount of the Equity Interests in each of its first tier Foreign Subsidiaries to the Agent for the benefit of the Lenders pursuant to a Pledge and Security Agreement and the Loan Parties shall have executed such additional documents and taken such actions as may be reasonably required by Agent in connection therewith;

(d)        in the case of a merger or consolidation, a Loan Party shall be the continuing and surviving entity;

(e)        in the case of a stock or other ownership purchase, the Person acquired by such Loan Party shall, to the extent such Person becomes a Borrower or Guarantor, grant Liens in its assets to the Agent for the benefit of the Lenders covering the same type of assets as the Collateral, and in the case of a Permitted Acquisition or a merger or consolidation in which a Loan Party is the continuing or surviving entity, such Loan Party shall cause the Lien of the Agent to be a first priority, perfected security interest (subject to the terms of the Intercreditor Agreement); provided, however, none of such assets which become Collateral as a result of a Permitted Acquisition or a merger or consolidation in which a Borrower is the continuing or surviving entity shall be included in the Formula Amount or the Ex-Im Formula Amount in accordance with the terms of this Agreement until such time as Agent makes such determination in its sole discretion;

(f)        the board of directors or other equivalent governing body of such Person shall have approved such Permitted Acquisition;

(g)        the business acquired, or the business conducted by the Person whose ownership interests are being acquired or the business subject to the merger or consolidation, as applicable, shall be substantially the same as, or reasonably related to, one or more line or lines of business conducted by the Loan Parties in accordance with Section 6.7 and which business would not subject the Agent or any Lender to regulatory or third party approvals in connection with the exercise of its rights and remedies under this Agreement or any Other Documents other than approvals applicable to the exercise of such rights and remedies with respect to the Borrowers prior to such Permitted Acquisition, merger or consolidation;

(h)      except for Permitted Acquired Debt as permitted by Section 7.4(g), unless otherwise consented to by the Required Lenders, no additional Indebtedness, Guarantees, contingent obligations or other liabilities shall be incurred, assumed or otherwise be reflected on a consolidated balance sheet of VSI and its Subsidiaries (including such Domestic Person) after giving effect to such Permitted Acquisition, merger or consolidation, except ordinary course trade payables and accrued expenses to the extent no Default or Event of Default has occurred and is continuing or would result after giving effect to such Permitted Acquisition, merger or consolidation;

(i)      no Default or Event of Default shall exist immediately prior to such Permitted Acquisition, merger or consolidation;

(j)      concurrently with delivery of the notice referred to in clause (b) above, the Loan Parties shall have delivered to the Agent, in form and substance reasonably satisfactory to the Agent:

(i)      a pro forma consolidated balance sheet, income statement and cash flow statement of VSI and its Subsidiaries (the "Acquisition Pro Forma"), based on recent financial statements, which shall be complete and shall fairly present in all material respects the assets, liabilities, financial condition and results of operations of VSI and its Subsidiaries in accordance with GAAP consistently applied, but taking into account such Permitted Acquisition, merger or consolidation and the funding of all Advances in connection therewith,

(ii)      updated versions of the most recently delivered Projections covering the two (2) year period commencing on the date of such Permitted Acquisition, merger or consolidation and otherwise prepared in accordance with the Projections (the "Acquisition Projections") and based upon historical financial data of a recent date reasonably satisfactory to the Agent, taking into account such Permitted Acquisition, merger or consolidation; and

(iii)      a certificate of the chief financial officer of VSI to the effect that: (a) each Loan Party (after taking into consideration all rights of contribution and indemnity among the Loan Parties) will be solvent upon the consummation of the Permitted Acquisition, merger or consolidation; (b) the Acquisition Pro Forma fairly presents in all material respects the financial condition of VSI and its Subsidiaries (on a consolidated basis) as of the date thereof after giving effect to the Permitted Acquisition, merger or consolidation; (c) the Acquisition Projections were prepared on assumptions believed by management of VSI to have been reasonable when made; (d) VSI and its Subsidiaries have completed their due diligence investigation with respect to such Domestic Person and such Permitted Acquisition, merger or consolidation, which investigation was conducted in a manner similar to that which would have been conducted by a prudent purchaser of a comparable business and the results of which investigation were delivered to the Agent and the Lenders; (e) on a pro forma basis (after giving effect to such Permitted Acquisition, merger or consolidation and all Advances funded in connection therewith including, without limitation, the issuance of any letters of credit, and the payment of fees, expenses and other required cash payments,),

Undrawn Availability as of the date of such Permitted Acquisition, merger or consolidation will exceed the greater of (A) 20% of the sum of the Gross Formula Amount *plus* the Ex-Im Formula Amount and (B) $17,000,000; (f) on a pro forma basis (after giving effect to such Permitted Acquisition, merger or consolidation and all Advances funded in connection therewith including, without limitation, the issuance of any letters of credit, and the payment of fees, expenses and other required cash payments, as if made on the first day of such period), Average Undrawn Availability shall be greater than or equal to the greater of (A) 20% of the sum of the Gross Formula Amount plus the Ex-Im Formula Amount and (B) $17,000,000, (g) on an incurrence basis the pro-forma Fixed Charge Coverage Ratio would be greater than or equal to 1.25 to 1.0, and (h) on a pro forma basis, no Event of Default has occurred and is continuing or would result after giving effect to such Permitted Acquisition, merger or consolidation; and

       (iv)    a proforma Borrowing Base Certificate and Ex-Im Borrowing Base Certificate after giving effect to such Permitted Acquisition, merger or consolidation; and

       (k)    prior to the date of such Permitted Acquisition, merger or consolidation, (y) the Agent shall have received, in form and substance reasonably satisfactory to the Agent, copies of the acquisition agreement and related agreements and instruments, and all opinions, certificates, lien search results and other documents reasonably requested by the Agent and (z) the Agent shall have completed Collateral examinations and an Inventory appraisal, the results of which shall be satisfactory in form and substance to the Agent, of such Person and all books and records in connection therewith;

provided, that with respect to the proposed acquisition code-named the "Salt Lake Project" disclosed to Lenders prior to the Closing Date (such proposed acquisition, the "Specified Proposed Acquisition"), "Permitted Acquisition Conditions" shall mean the following conditions: (i) no Event of Default shall have occurred and be continuing at the time of execution of agreement in respect of such Specified Proposed Acquisition; (ii) the condition set forth in clause (ii) of Section 6.05(l) of the Term Loan Agreement as in effect on the Closing Date; (iii) at the time of such  Specified Proposed Acquisition involving the creation or acquisition of a Restricted Subsidiary or the acquisition of Equity Interests of any Person, the Equity Interests acquired in connection with such Specified Proposed Acquisition shall be pledged for the benefit of the Agent and Lenders pursuant to Article IV of this Agreement and, in the case of a Domestic Subsidiary (other than an Excluded Subsidiary), such Person shall become a Guarantor pursuant to a Guaranty; (iv) after giving pro forma effect to such  Specified Proposed Acquisition, the Net Total Leverage Ratio is less than or equal to the Closing Date Net Total Leverage Ratio (as defined in the Term Loan Agreement as in effect on the Closing Date), in each case, for the most recently ended Test Period (provided that,  if such Specified Proposed Acquisition is subject to customary "certain funds" provisions, the applicable Net Total Leverage Ratio pursuant to this clause (iv) shall be tested, at the option of the Loan Parties, either (x) at the time a definitive agreement is entered into with respect to such acquisition or (y) upon the consummation of such acquisition); (v) after giving pro forma effect to such Specified Proposed Acquisition, the Borrower is in compliance with the financial covenant set forth in Section 6.08 of the Term Loan Agreement (as in effect on the Closing Date) as of  the most recently ended Test Period (assuming for purposes of such Section 6.08, that such transaction and all other Permitted Acquisitions consummated since the first day of the relevant Test Period for the financial

covenant set forth in such Section 6.08 ending on or prior to the date of such transaction, had occurred on the first day of such relevant Test Period); (vi) the sum of (x) the aggregate amount of Unrestricted cash and Cash Equivalents of VSI and (y) Undrawn Availability, in each case after giving pro forma effect to such Specified Proposed Acquisition, shall be no less than $20,000,000; (vii) each Restricted Subsidiary which is formed to effect, or is acquired pursuant to such Specified Proposed Acquisition shall execute and deliver all documentation as and to the extent required by Section 6.11 to the reasonable satisfaction of Agent; and (vii) such Specified Proposed Acquisition shall have been closed on or before April 30, 2015.

"Permitted Encumbrances" shall mean with respect to any Mortgaged Property, such exceptions to title as are set forth as exceptions in the title policy delivered in connection with the Mortgage delivered with respect to such Mortgaged Property, all of which exceptions must be reasonably acceptable to the Agent in its reasonable discretion.

"Permitted Group" means any group of investors that is deemed to be a "person" (as that term is used in Section 13(d)(3) of the Exchange Act) at any time prior to VSI's initial public offering of common stock, by virtue of the limited liability company agreement of VSI Holdings, as the same may be amended, modified or supplemented from time to time; provided that the Sponsor and its Related Parties beneficially owns (together with its Affiliates) at least fifty and one-tenth percent (50.1%) of the Equity Interests of VSI that is beneficially owned by such group of investors.

"Permitted Incremental Equivalent Debt" shall mean Indebtedness (a) that constitutes "Permitted Incremental Equivalent Debt" as such term is defined in and as permitted under the Term Loan Credit Agreement as in effect on the date hereof, and (b) a Senior Representative acting on behalf of the holders of such Indebtedness shall have become party to, or otherwise subject to the provisions of, an intercreditor agreement reasonably satisfactory to the Agent reflecting that any Liens on the ABL Priority Collateral securing such Indebtedness are subordinate to the Liens of Agent pursuant to terms no less favorable to Agent and Lenders than the terms of the Intercreditor Agreement.

"Permitted Liens" shall have the meaning assigned to such term in Section 7.1.

"Permitted Refinancing" shall mean, with respect to any Person, any modification, refinancing, refunding, renewal or extension of any Indebtedness of such Person; provided that (a) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, refunded, renewed or extended except by an amount equal to any interest capitalized in connection with, any premium or other reasonable amount paid, and fees and expenses reasonably incurred, in connection with such modification, refinancing, refunding, renewal or extension, (b) such modification, refinancing, refunding, renewal or extension has a final maturity date equal to or later than the final maturity date of, and has a weighted average life to maturity equal to or longer than the weighted average life to maturity of, the Indebtedness being modified, refinanced, refunded, renewed or extended, (c) if the Indebtedness being modified, refinanced, refunded, renewed or extended is subordinated in right of payment to the Obligations, such modification, refinancing, refunding, renewal or extension is subordinated in right of payment to the Obligations on terms, taken as a whole, that are not more favorable to the

Persons providing such Indebtedness being modified, refinanced, refunded, renewed or extended, (d) at the time thereof, no Default or Event of Default shall have occurred and be continuing, (e) if such Indebtedness being modified, refinanced, refunded, renewed or extended is secured, the terms and conditions relating to collateral of any such modified, refinanced, refunded, renewed or extended Indebtedness, taken as a whole, are not more favorable to the Persons providing such Indebtedness than those applicable to the Lenders with respect to the Collateral for the Indebtedness being modified, refinanced, refunded, renewed or extended (and the Liens on any Collateral securing any such modified, refinanced, refunded, renewed or extended Indebtedness shall have the same (or lesser) priority relative to the Liens on the Collateral securing the Obligations), (f) the terms and conditions (excluding any subordination, pricing, fees, rate floors, discounts, premiums and optional prepayment or redemption terms) of any such modified, refinanced, refunded, renewed or extended Indebtedness, taken as a whole, shall not be materially less favorable to the Loan Parties than this Agreement, except for covenants or other provisions applicable only to periods after the Latest Maturity Date, (g) such modification, refinancing, refunding, renewal or extension is incurred and guaranteed only by the Persons who are the obligors on the Indebtedness being modified, refinanced, refunded, renewed or extended and (h) such modification, refinancing, refunding, renewal or extension is, in the case of any Term Loan Obligations, permitted by the Intercreditor Agreement.

"Person" shall mean any individual, sole proprietorship, partnership, corporation, business trust, joint stock company, trust, unincorporated organization, association, limited liability company, limited liability partnership, institution, public benefit corporation, joint venture, entity or Governmental Body (whether federal, state, county, city, municipal or otherwise, including any instrumentality, division, agency, body or department thereof).

"Plan" shall mean an "employee benefit plan" as defined in Section 3(3) of ERISA (other than a Multiemployer Plan) that is subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA and is maintained or contributed to by VSI or any Subsidiary or with respect to which VSI or any Subsidiary has any liability (including on account of an ERISA Affiliate).

"Pledge and Security Agreement" shall mean (i) the Amended and Restated Pledge and Security Agreement, dated as of the Closing Date, by and among the Loan Parties and the Agent, and (ii) any other Pledge and Security Agreement executed and delivered by any Loan Party to Agent for the benefit of Lenders pursuant to the provisions hereof, in each case together with all amendments, supplements, modifications, substitutions and replacements thereto and thereof, and "Pledge and Security Agreements" means collectively, all such Pledge and Security Agreements.

"PNC" shall have the meaning set forth in the preamble to this Agreement and shall extend to all of its successors and assigns.

"Post-Petition Interest" shall mean any interest that accrues after the commencement of any case, proceeding or other action relating to the bankruptcy, insolvency or reorganization of any one or more of the Grantors (or would accrue but for the operation of applicable Debtor Relief Laws), whether or not such interest is allowed or allowable as a claim in any such proceeding.

"Preferred Stock" means any Equity Interest with preferential rights of payment of dividends or upon liquidation, dissolution, or winding up.

"Projections" shall mean the projections, estimates or other forward looking statements of consolidated balance sheet, related statement of income and cash flow of VSI made available to the Agent and the Lenders on or prior to the Closing Date.

"Properly Contested" shall mean, in the case of any Indebtedness or Lien, as applicable, of any Person (including any taxes) that is not paid as and when due or payable by reason of such Person's bona fide dispute concerning its liability to pay same or concerning the amount thereof, (i) such Indebtedness or Lien, as applicable, is being properly contested in good faith by appropriate proceedings promptly instituted and diligently conducted; (ii) such Person has established appropriate reserves as shall be required in conformity with GAAP; (iii) the non-payment of such Indebtedness will not have a Material Adverse Effect and will not result in the imminent forfeiture of any assets of such Person; (iv) no Lien is imposed upon any of such Person's assets with respect to such Indebtedness unless such Lien is at all times junior and subordinate in priority to the Liens in favor of Agent (except only with respect to property taxes that have priority as a matter of applicable state law) and enforcement of such Lien is stayed during the period prior to the final resolution or disposition of such dispute; (v) if such Indebtedness or Lien, as applicable, results from, or is determined by the entry, rendition or issuance against a Person or any of its assets of a judgment, writ, order or decree, enforcement of such judgment, writ, order or decree is stayed pending a timely appeal or other judicial review; and (vi) if such contest is abandoned, settled or determined adversely (in whole or in part) to such Person, such Person forthwith pays such Indebtedness and all penalties, interest and other amounts due in connection therewith.

"Purchasing CLO" shall have the meaning set forth in Section 16.3(d) hereof. "Purchasing Lender" shall have the meaning set forth in Section 16.3(c) hereof.

"Qualified ECP Loan Party" shall mean each Borrower or Guarantor that on the Eligibility Date is (a) a corporation, partnership, proprietorship, organization, trust, or other entity other than a "commodity pool" as defined in Section 1a(10) of the CEA and CFTC regulations thereunder that has total assets exceeding $10,000,000 or (b) an Eligible Contract Participant that can cause another person to qualify as an Eligible Contract Participant on the Eligibility Date under Section 1a(18)(A)(v)(II) of the CEA by entering into or otherwise providing a "letter of credit or keepwell, support, or other agreement" for purposes of Section 1a(18)(A)(v)(II) of the CEA.

"Qualified Equity Interests" shall mean any Equity Interests that are not Disqualified Equity Interests.

"Qualified Public Offering" shall mean the initial underwritten public offering of common Equity Interests of VSHC or any direct or indirect parent company of VSHC pursuant to an effective registration statement filed with the Securities and Exchange Commission in accordance with the Securities Act.

"Questionnaire" shall mean the Documentation Information Questionnaires and the responses thereto provided by Loan Parties and delivered to Agent in connection with the Original Credit Agreement.

"Raw Materials Inventory Advance Rate" shall have the meaning set forth in Section 2.1(a)(y)(ii) hereof.

"Raw Materials NOLV Advance Rate" shall have the meaning set forth in Section 2.1(a)(y)(ii) hereof.

"RC" shall have the meaning set forth in the preamble to this Agreement.

"Real Estate Collateral Requirements" shall mean the requirement that on the Closing Date, with respect to the Mortgaged Properties listed on Schedule 1.1(b) and thereafter as required by Section 6.11, the Agent shall have received an amendment to the Mortgage for each Mortgaged Property in form and substance reasonably acceptable to the Agent and suitable for recording or filing, together, with respect to each Mortgage (as amended) for any property located in the United States, the following documents: (a) a fully paid date-down and modification endorsement to Agent's policy of title insurance for such property in a form approved by the Agent insuring the Lien of the Mortgage, as modified by the applicable amendment, encumbering such property as a valid first priority Lien, showing no new adverse matters (as determined by Agent in its reasonable discretion), bringing the date of such title insurance policy forward to the date of recording of the applicable Mortgage amendment and otherwise in form and substance reasonably acceptable to Agent, (b) with respect to any property located in any jurisdiction in which a zoning endorsement is not available (or for which a zoning endorsement is not available at a premium that is not excessive), if requested by the Agent, a zoning compliance letter from the applicable municipality or a zoning report from Planning and Zoning Resource Corporation (or another person acceptable to the Agent, in each case satisfactory to the Agent, (c) upon the request of the Agent, a survey certified to Agent and the Title Company in form and substance satisfactory to the Agent, (d) upon the request of the Agent, an appraisal complying with the requirements of the Financial Institutions Reform, Recovery and Enforcement Act of 1989, by a third-party appraiser selected by the Agent, (e) an opinion of local counsel reasonably acceptable to the Agent and in form and substance satisfactory to the Agent, (f) no later than three (3) Business Days prior to the delivery of the Mortgage amendment for each Mortgaged Property, the following documents and instruments, in order to comply with all Flood Laws: (A) a completed standard flood hazard determination form and (B) if the improvement(s) to the improved real property is located in a special flood hazard area, a notification to VSI ("Borrower Notice") and, if applicable, notification to the Borrowing Agent that flood insurance coverage under the National Flood Insurance Program ("NFIP") is not available because the community does not participate in the NFIP, documentation evidencing VSI's receipt of the Borrower Notice and (C) if the Borrower Notice is required to be given and flood insurance is available in the community in which the property is located, a copy of the flood insurance policy, VSI's application for a flood insurance policy plus proof of premium payment, a declaration page confirming that flood insurance has been issued, or such other evidence of flood insurance satisfactory to the Agent, (g) upon the reasonable request of the Agent, Phase I environmental site assessment reports prepared in accordance with the current ASTM E1527 standard ("Phase Is") (to the extent not already provided) and reliance letters for

such Phase Is (which Phase Is and reliance letters shall be in form and substance reasonably acceptable to the Agent) and any other environmental information as the Agent shall reasonably request and (h) such other instruments and documents (including subordination or *pari passu* confirmations, consulting engineer's reports and lien searches) as the Agent shall reasonably request and with respect to each Mortgage for any property located outside the United States, equivalent documents available in the applicable jurisdiction and required by the Agent.

"Real Property" shall mean all of each Loan Party's right, title and interest in and to the owned and leased premises identified on Schedule 5.12 hereto or which is hereafter owned or leased by any Loan Party.

"Receivables" shall mean and include, as to each Loan Party, all of such Loan Party's accounts, contract rights, instruments (including those evidencing indebtedness owed to such Loan Party by its Affiliates), documents, chattel paper (including electronic chattel paper), general intangibles relating to accounts, drafts and acceptances, credit card receivables and all other forms of obligations owing to such Loan Party arising out of or in connection with the sale or lease of Inventory or the rendition of services, all supporting obligations, guarantees and other security therefor, whether secured or unsecured, now existing or hereafter created, and whether or not specifically sold or assigned to Agent hereunder.

"Receivables Advance Rate" shall have the meaning set forth in Section 2.1(a)(y)(i) hereof.

"Recovery Event" shall mean any event that gives rise to the receipt by any Loan Party or any Restricted Subsidiary of any cash insurance proceeds or condemnation awards payable by reason of casualty, theft, loss, physical destruction, damage, taking, condemnation or any other similar event with respect to any property or assets of any Loan Party or any Restricted Subsidiary; provided in each case that each Recovery Event shall be deemed to occur only if the Net Cash Proceeds therefrom is greater than or equal to $2,500,000; provided further that so long as the Term Loan Obligations have not been satisfied in full, Net Cash Proceeds received with respect to any property or assets comprising the Term Loan Priority Collateral shall be excluded.

"Refinancing" shall mean the repayment in full of all amounts due or outstanding under, or in respect of, and the termination of the Existing Secured Notes.

"Register" shall have the meaning set forth in Section 16.3(e).

"Regulation U" shall mean Regulation U of the Board of Governors of the Federal Reserve System as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Reimbursement Obligation" shall have the meaning set forth in Section 2.12(b) hereof.

"Related Agreements" shall mean the Acquisition Agreement, the Loan Documents, the Term Loan Documents, the Management Agreement and documentation relating to Permitted Incremental Equivalent Debt (and Permitted Refinancing of any of the foregoing).

"Related Letter of Credit" shall have the meaning set forth in Section 6.22.

"Related Parties" shall mean, with respect to any specified Person, such Person's Affiliates and the respective officers, directors (including directors or authorized signatories of the general partner of any Person), employees, agents, advisors, representatives, controlling persons, members, partners, successors and permitted assigns of such Person and such Person's Affiliates.

"Release" shall mean any actual or threatened release, spill, emission, leaking, dumping, injection, pouring, pumping, deposit, disposal, discharge, dispersal, leaching or migration into or through the indoor or outdoor environment, including the air, soil and ground and surface water or into, through, within or upon any building, structure, facility or fixture.

"Releasee" shall have the meaning set forth in Section 1.5 hereof.

"Reportable Compliance Event" shall mean that any Covered Entity becomes a Sanctioned Person, or is charged by indictment, criminal complaint or similar charging instrument, arraigned, or custodially detained in connection with any Anti-Terrorism Law or any predicate crime to any Anti-Terrorism Law, or has knowledge of facts or circumstances to the effect that it is reasonably likely that any aspect of its operations is in actual or probable violation of any Anti-Terrorism Law.

"Required Lenders" shall mean (A) if there are two (2) or fewer Lenders (not including Swing Loan Lender (in its capacity as such Swing Loan Lender) or any Defaulting Lender), all Lenders, (B) if there are Advances outstanding and more than two (2) Lenders (not including Swing Loan Lender (in its capacity as such Swing Loan Lender) or any Defaulting Lender), Lenders holding greater than fifty percent (50%) of the Advances (excluding Swing Loans and any Advances held by any Defaulting Lender); provided that if any one (1) Lender holds greater than fifty percent (50%) of the Advances (excluding Swing Loans and any Advances held by any Defaulting Lender), Lenders holding sixty-six and two-thirds of one percent (66⅔%) of the Advances (excluding Swing Loans and any Advances held by any Defaulting Lender), or (C) if there are no Advances outstanding and more than two (2) Lenders (not including Swing Loan Lender (in its capacity as such Swing Loan Lender) or any Defaulting Lender), Lenders holding greater than fifty percent (50%) of the aggregate of the Commitment Percentages of all Lenders (excluding any Defaulting Lender); provided that if any one (1) Lender holds greater than fifty percent (50%) of the Commitment Percentages, Lenders holding sixty-six and two-thirds of one percent (66⅔%) of the aggregate of the Commitment Percentages of all Lenders (excluding any Defaulting Lender).

"Required Pledge Amount" shall mean an amount not to exceed sixty-five percent (65%).

"Reserve Percentage" shall mean as of any day the maximum percentage in effect on such day as prescribed by the Board of Governors of the Federal Reserve System (or any successor) for determining the reserve requirements (including supplemental, marginal and emergency reserve requirements) with respect to eurocurrency funding.

"Responsible Officer" of any Person shall mean any executive officer or Financial Officer of such Person and any other officer or similar official thereof responsible for the administration of the obligations of such Person in respect of this Agreement.

"Restricted" shall mean, when referring to cash or Cash Equivalents of VSI or any Restricted Subsidiary, that such cash or Cash Equivalents appears (or would be required to appear) as "restricted" on a consolidated balance sheet of VSI or such Restricted Subsidiary.

"Restricted Payment" shall mean any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in VSHC, VSI or any Restricted Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Equity Interests in VSHC, VSI or any Restricted Subsidiary.

"Restricted Subsidiary" shall mean any Subsidiary other than an Unrestricted Subsidiary.

"Revolving Advances" shall mean Advances made other than Letters of Credit, Acceptances and Ex-Im Revolving Advances.

"Revolving Credit Note" shall mean, collectively, the promissory notes referred to in Section 2.1(a) hereof.

"Revolving Facility Usage" shall mean at any time, the sum of (i) the outstanding Revolving Advances plus (ii) the outstanding Obligations with respect to Letters of Credit.

"Revolving Facility Usage Factor" shall mean at any time, a fraction, expressed as a percentage, the numerator of which is equal to the average Consolidated Facility Usage for the period equal to the fiscal quarter then ended and the denominator of which is the average of the Maximum Revolving Advance Amount for the period equal to the fiscal quarter then ended.

"Revolving Interest Rate" shall mean an interest rate per annum equal to (a) the sum of the Alternate Base Rate *plus* the Applicable Margin with respect to Domestic Rate Loans and (b) the sum of the Eurodollar Rate plus the Applicable Margin with respect to Eurodollar Rate Loans.

"RMB" shall mean *renminbi*, the lawful money of the People's Republic of China.

"Route 611 Mortgaged Property" shall mean the certain premises and improvements located at Route 611, Delaware Gap, Monroe County, Pennsylvania.

"Route 611 Mortgaged Property Mortgage" shall mean that certain Open-End Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing dated as of September 29, 2010 and effective as of September 30, 2010, made by VSPA to the Agent with respect to the Route 611 Mortgaged Property, together with all amendments, supplements, modifications, substitutions and replacements thereto and thereof.

"S&P" shall mean Standard & Poor's Ratings Service or any successor thereto.

"Sanctioned Country" shall mean a country subject to a sanctions program maintained under any Anti-Terrorism Law.

"Sanctioned Person" shall mean any individual person, group, regime, entity or thing listed or otherwise recognized as a specially designated, prohibited, sanctioned or debarred person, group, regime, entity or thing, or subject to any limitations or prohibitions (including but not limited to the blocking of property or rejection of transactions), under any Anti-Terrorism Law.

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Senior Representative" shall mean, with respect to any Indebtedness, the trustee, administrative agent, collateral agent, security agent or similar agent under the indenture or other agreement pursuant to which such Indebtedness is issued, incurred or otherwise obtained, as the case may be, and each of their successors in such capacities.

"Settlement Date" shall mean the Closing Date and thereafter Wednesday or Thursday of each week or more frequently if Agent deems appropriate unless such day is not a Business Day in which case it shall be the next succeeding Business Day.

"Solvent" shall mean, (a) the sum of the liabilities (including contingent liabilities) of VSI and the Subsidiaries, on a consolidated basis, does not exceed the present fair saleable value of the assets (on a going concern basis) of VSI and the Subsidiaries, on a consolidated basis, (b) the present fair saleable value of the assets (on a going concern basis) of VSI and the Subsidiaries, on a consolidated basis, is greater than the total amount that will be required to pay the probable liabilities (including contingent liabilities) of VSI and the Subsidiaries as they become absolute and matured, (c) the capital of VSI and the Subsidiaries, on a consolidated basis, is not unreasonably small in relation to their business as contemplated on the date hereof and (d) VSI and the Subsidiaries, on a consolidated basis, have not incurred and do not intend to incur, or believe that they will incur, debts or liabilities, including current obligations beyond their ability to pay such debts or other liabilities as they become due (whether at maturity or otherwise) in the ordinary course of business.

"Specified Default" shall mean a Default or an Event of Default arising under Sections 10.1 or 10.5 hereof.

"Sponsor" shall mean, individually and collectively, Wind Point Partners VI, L.P., a Delaware limited partnership, and other funds controlled by or under common control with Wind Point Partners VI, L.P. (and excluding, for the avoidance of doubt, any portfolio company of the foregoing).

"Sponsor Affiliate" shall mean, with respect to any Sponsor, (a) any fund or investment vehicle, that (i) is organized, administered or managed by such Sponsor, or an Affiliate of such Sponsor, or any entity that administers or manages such Sponsor or (ii) has the same principal fund advisor as such Sponsor, but, in each case, not including such Sponsor's portfolio companies and (b) any other Person directly or indirectly controlling (including, but not

limited to, all directors and officers of Sponsor), controlled by, or under direct or indirect common control with, such Sponsor (but excluding any portfolio company of such Sponsor); provided that any Sponsor shall be deemed to control another Person if such Sponsor possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, by contract or otherwise.

"Subsidiary" shall mean, with respect to any Person (herein referred to as the "parent"), any corporation, partnership, limited liability company, association or other business entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or more than 50% of the general partnership interests are, at the time any determination is being made, owned, Controlled or held, or (b) that is, at the time any determination is made, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Subsidiary Stock" shall mean all of the issued and outstanding Equity Interests of any Subsidiary owned by any Loan Party (not to exceed sixty-five percent (65%) of the Equity Interests of any first-tier Foreign Subsidiary and not to include any stock of any Foreign Subsidiary other than a first-tier Foreign Subsidiary).

"Swap" shall mean any "swap" as defined in Section 1a(47) of the CEA and regulations thereunder other than (a) a swap entered into on, or subject to the rules of, a board of trade designated as a contract market under Section 5 of the CEA, or (b) a commodity option entered into pursuant to CFTC Regulation 32.3(a).

"Swap Obligations" means any obligation to pay or perform under any agreement, contract or transaction that constitutes a Swap which is also a provided by a Lender.

"Swing Loan Commitment" shall mean PNC's commitment to make Swing Loans to Borrowers pursuant to Section 2.24(a) hereof in an aggregate principal amount up to ten percent (10%) of the Maximum Revolving Advance Amount.

"Swing Loan Lender" shall mean PNC, in its capacity as lender of the Swing Loans.

"Swing Loan Request" shall mean a request for Swing Loans made in accordance with Section 2.24(b) hereof.

"Swing Loans" shall mean collectively and "Swing Loan" shall mean separately all Swing Loans or any Swing Loan made by PNC to Borrowers pursuant to Section 2.24 hereof.

"Swing Note" shall mean the promissory note referred to in Section 2.24(d) hereof, together with all amendments, restatements, extensions, renewals, replacements, refinancings or refundings thereof in whole or in part.

"Taxes" shall mean all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Body, including any interest, additions to tax or penalties applicable thereto.

"Term" shall have the meaning set forth in Section 13.1 hereof.

"Term Loan Agent" shall mean Jefferies Finance LLC, in its capacity as administrative agent for the Term Loan Lenders under the Term Loan Credit Agreement, and shall extend to all permitted successors and assigns of such Person.

"Term Loan Credit Agreement" shall mean the Credit Agreement dated as of the date hereof among VSI, VSHC, Term Loan Agent, Term Loan Lenders and the other parties from time to time party thereto.

"Term Loan Documents" shall mean the Term Loan Credit Agreement and any other documents, instruments or agreements executed and/or delivered in connection therewith.

"Term Loan Lenders" shall mean the "Lenders" from time to time party to and as defined in the Term Loan Credit Agreement.

"Term Loan Obligations" shall mean the "Obligations" as defined in the Term Loan Credit Agreement.

"Term Loan Priority Account" shall mean a "Term Loan Priority Account" (as defined in the Intercreditor Agreement) established and funded in accordance with the terms of the Intercreditor Agreement.

"Term Loan Priority Collateral" shall mean "Term Priority Collateral" as defined in the Intercreditor Agreement.

"Test Period" shall mean, on any date, the most recently ended four (4) consecutive fiscal quarters for which financial statements have been delivered to the Agent and the Lenders pursuant to Section 9.7, Section 9.8, or Section 9.9.

"Threshold Amount" shall mean $10,000,000.

"Trading with the Enemy Act" shall mean the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any enabling legislation or executive order relating thereto.

"Transaction Costs" shall mean the fees, costs and expenses incurred in connection with the Transactions.

"Transactions" shall mean collectively, (a) the execution and delivery of, and the performance under, this Agreement and the Other Documents, in each case by the Loan Parties party thereto (as of the Closing Date or the date set forth on Schedule 6.14), (b) the making of any Advances requested to be made on the Closing Date and the incurrence of the Term Loan Obligations, (c) the consummation of the Refinancing, (d) the consummation of the Parent Note Repayment, (e) the funding of consideration for the Acquisition, (f) the execution and delivery of, and the performance under, the Term Loan Documents by the Loan Parties party thereto (as of the Closing Date or the date set forth on Schedule 6.14 thereto), and (g) the payment of Transaction Costs related to the foregoing.

"Transferee" shall have the meaning set forth in Section 16.3(d) hereof.

"Trustee" shall have the meaning assigned to such term in the definition of "Existing Secured Notes".

"UCP" shall have the meaning set forth in Section 2.10(b) hereof.

"Undrawn Availability" at a particular date shall mean an amount equal to (a) the lesser of (i) the sum of the Gross Formula Amount, plus the Ex-Im Formula Amount or (ii) the Maximum Revolving Advance Amount, minus (b) the sum of (i) the outstanding amount of Advances, plus (ii) the Maximum Undrawn Amount, plus (iii) all amounts due and owing to any Borrower's trade creditors which are thirty (30) days or more past due, plus (iv) fees and expenses for which Borrowers are liable but which have not been paid or charged to Borrowers' Account.

"Unfinanced Capital Expenditures" shall mean all Capital Expenditures of VSI and its Subsidiaries financed using (y) cash-on-hand of the Loan Parties, generated from the operations of the Loan Parties and not from the proceeds of financing transactions, and (z) the proceeds of Revolving Advances.

"Unfunded Pension Liability" of any Plan shall mean the excess of such Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of such Plan's assets, determined in accordance with the assumptions used by the Plan's actuaries for funding the Plan pursuant to Section 412 of the Code for the applicable plan year and as set forth in Schedule SB to the most recent Form 5500 filed for such plan.

"Uniform Commercial Code" shall have the meaning set forth in Section 1.3 hereof.

"Unrestricted" shall mean, when referring to cash or Cash Equivalents of VSI or any Restricted Subsidiary, any such cash or Cash Equivalents that is not Restricted.

"Unrestricted Subsidiary" shall mean any Subsidiary designated by the board of directors of VSI as an Unrestricted Subsidiary pursuant to Section 6.12(a) subsequent to the date hereof.

"U.S. Export Laws" shall mean, but not be limited to, any and all laws by which the exportation, re-exportation, diversion, shipment or transfer of merchandise is controlled as to person, destination or entity, and shall include but not be limited to the Export Administration Act; the Trading With the Enemy Act; the International Emergency Economic Powers Act; the International Security and Development Cooperation Act of 1985, together with all regulations, directives, Executive Orders and Proclamations as shall be implemented to enforce such laws, and as such laws shall added, amended or repealed, from time to time.

"U.S. Foreign Holdco" shall mean a Domestic Subsidiary substantially all of the assets of which consist of Equity Interests or debt of one or more direct or indirect Foreign Subsidiaries and assets incidental thereto.

"<u>USA PATRIOT Act</u>" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

"<u>U.S. Person</u>" shall mean any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"<u>VANS</u>" shall have the meaning set forth in the preamble to this Agreement.

"<u>VHSP</u>" shall have the meaning set forth in the preamble to this Agreement.

"<u>Voting Power</u>" shall mean, with respect to any Person, the exclusive ability to control, through the ownership of shares of capital stock, partnership interests, membership interests or otherwise, the election of members of the board of directors or other similar governing body of such Person, and the holding of a designated percentage of Voting Power of a Person means the ownership of shares of capital stock, partnership interests, membership interests or other interests of such Person sufficient to control exclusively the election of that percentage of the members of the board of directors or other similar governing body of such Person.

"<u>VPMI</u>" shall have the meaning set forth in the preamble to this Agreement.

"<u>VSI Acquisition</u>" shall mean VSI Acquisition Corp., a Delaware corporation.

"<u>VSI</u>" shall have the meaning set forth in the preamble to this Agreement.

"<u>VSHC</u>" shall mean Vertellus Specialties Holdings Corp., a Delaware corporation.

"<u>VSI Holdings</u>" shall mean VSI Holdings LLC, a Delaware limited liability company.

"<u>VSMI</u>" shall have the meaning set forth in the preamble to this Agreement.

"<u>Week</u>" shall mean the time period commencing with the opening of business on a Wednesday and ending on the end of business the following Tuesday.

"<u>Wholly Owned Subsidiary</u>" of any Person shall mean a subsidiary of such Person of which securities (except for directors' qualifying shares) or other ownership interests representing 100% of the Equity Interests are, at the time any determination is being made, owned, Controlled or held by such Person or one or more wholly owned subsidiaries of such Person or by such Person and one or more wholly owned subsidiaries of such Person.

"<u>WIP Inventory Advance Rate</u>" shall have the meaning set forth in Section 2.1(a)(y)(ii) hereof.

"WIP NOLV Advance Rate" shall have the meaning set forth in Section 2.1(a)(y)(ii) hereof.

"Withdrawal Liability" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"WPI" shall mean Wind Point Investors VI, L.P., a Delaware limited partnership.

1.3     Uniform Commercial Code Terms.

All terms used herein and defined in the Uniform Commercial Code as adopted in the State of New York from time to time (the "Uniform Commercial Code") shall have the meaning given therein unless otherwise defined herein. Without limiting the foregoing, the terms "accounts", "chattel paper", "commercial tort claims", "instruments", "general intangibles", "goods", "payment intangibles", "proceeds", "supporting obligations", "securities", "investment property", "documents", "deposit accounts", "software", "letter of credit rights", "inventory", "equipment" and "fixtures", as and when used in the description of Collateral (including in Section 4.1 hereto) shall have the meanings given to such terms in Articles 8 or 9 of the Uniform Commercial Code.  To the extent the definition of any category or type of collateral is expanded by any amendment, modification or revision to the Uniform Commercial Code, such expanded definition will apply automatically as of the date of such amendment, modification or revision.

1.4     Certain Matters of Construction.

The terms "herein", "hereof"  and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision. All references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement.  Any pronoun used shall be deemed to cover all genders.  Wherever appropriate in the context, terms used herein in the singular also include the plural and vice versa.   All references to statutes and related regulations shall include any amendments of same and any successor statutes and regulations. Unless otherwise provided, all references to any instruments or agreements to which Agent is a party, including references to any of the Other Documents, shall include any and all modifications or amendments thereto and any and all extensions or renewals thereof.   All references herein to the time of day shall mean the time in New York, New York.  Unless otherwise provided, all financial calculations shall be performed with Inventory valued on a first-in, first-out basis.  Whenever the words "including" or "include" shall be used, such words shall be understood to mean "including, without limitation" or "include, without limitation".  A Default or Event of Default shall be deemed to exist at all times during the period commencing on the date that such Default or Event of Default occurs to the date on which such Default or Event of Default is waived in writing pursuant to this Agreement or, in the case of a Default, is cured within any period of cure expressly provided for in this Agreement; and an Event of Default shall "continue" or be "continuing" until such Event of Default has been waived in writing by the Required Lenders.  Any Lien referred to in this Agreement or any of the Other Documents as having been created in favor of Agent, any agreement entered into by Agent pursuant to this Agreement or any of the Other Documents, any payment made by or to or funds

received by Agent pursuant to or as contemplated by this Agreement or any of the Other Documents, or any act taken or omitted to be taken by Agent, shall, unless otherwise expressly provided, be created, entered into, made or received, or taken or omitted, for the benefit or account of Agent and Lenders.  Wherever the phrase "to the best of Loan Parties' knowledge" or words of similar import relating to the knowledge or the awareness of any Loan Party are used in this Agreement or Other Documents, such phrase shall mean and refer to (i) the actual knowledge of a senior officer of any Loan Party or (ii) the knowledge that a senior officer would have obtained if he had engaged in good faith and diligent performance of his duties, including the making of such reasonably specific inquiries as may be necessary of the employees or agents of such Loan Party and a good faith attempt to ascertain the existence or accuracy of the matter to which such phrase relates.  All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or otherwise within the limitations of, another covenant shall not avoid the occurrence of a default if such action is taken or condition exists.  In addition, all representations and warranties hereunder shall be given independent effect so that if a particular representation or warranty proves to be incorrect or is breached, the fact that another representation or warranty concerning the same or similar subject matter is correct or is not breached will not affect the incorrectness of a breach of a representation or warranty hereunder.

1.5     Effect of Amendment and Restatement; No Novation; Release.

Upon the effectiveness of this Agreement, the Original Credit Agreement shall be amended and restated in its entirety by this Agreement.  The Original Obligations outstanding on the Closing Date shall continue in full force and effect and constitute Obligations, and the effectiveness of this Agreement shall not constitute a novation or repayment of the Original Obligations.   Such Original Obligations, together with any and all additional Obligations incurred by Borrowers under this Agreement or under any of the Other Documents, shall continue to be secured by, among other things, the Collateral, whether now existing or hereafter acquired and wheresoever located, all as more specifically set forth in this Agreement and the Other Documents. Each Borrower hereby reaffirms its obligations, liabilities, grants of security interests, pledges and the validity of all covenants by it contained in the Original Credit Agreement and in any and all Other Documents, as amended, supplemented or otherwise modified by this Agreement and by the Other Documents delivered on the Closing Date.  Any and all references in any Other Documents to the Original Credit Agreement shall be deemed to be amended to refer to this Agreement.

In consideration of Agent and Lenders entering into this Agreement and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, as of the date hereof, each Borrower, on behalf of itself and its successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably releases, remises and forever discharges Agent, Issuer and Lenders, and their successors and assigns, and their present and former shareholders, directors, officers, attorneys, employees, agents and other representatives (Agent, Issuer and each Lender and all such other Persons being hereinafter referred to collectively as the "Releasees" and individually as a "Releasee"), of and from all demands, actions, causes of action, suits, covenants, contracts, controversies and any and all other claims, counterclaims, defenses, rights of set off, demands and liabilities whatsoever of every name and nature, known or unknown, suspected or unsuspected, both at law and in equity, which any Loan

Party or any of its successors, assigns, or other legal representatives may now or hereafter own, hold, have or claim to have against the Releasees by reason of any circumstance, action, cause or thing whatsoever which occurred on or prior to the date hereof pursuant to or arising out of the Original Credit Agreement, the Other Documents or transactions directly related thereto between any Borrower and the Releasees.

Immediately prior to the effectiveness of this Agreement, the Commitment Percentage of each Lender was as set forth in clause (a) of Annex A. The Lenders hereby agree to make such inter-Lender wire transfers as may be required on the Closing Date to give effect to the allocation of the Advances and Commitments provided for under this Agreement such that after giving effect to such transfers, the Commitment Percentage of each Lender is as set forth in clause (b) of Annex A.

II.    ADVANCES, PAYMENTS.

2.1    Revolving Advances.

(a)    Amount of Revolving Advances.  Subject to the terms and conditions set forth in this Agreement including Section 2.1(b), each Lender, severally and not jointly, will make Revolving Advances to Borrowers (provided, that after giving effect to such Revolving Advances the Consolidated Facility Usage shall not exceed the Maximum Revolving Advance Amount) in aggregate amounts outstanding at any time equal to such Lender's Commitment Percentage of the lesser of (x) the Maximum Revolving Advance Amount less the sum of (i) the aggregate Maximum Undrawn Amount of all outstanding Letters of Credit and Acceptances, plus (ii) the aggregate amount of outstanding Swing Loans, and (y) an amount equal to the sum of:

(i)    subject to the provisions of Section 2.1(b) hereof, up to eighty-five percent (85%) ("Receivables Advance Rate") of Eligible Receivables, plus

(ii)    (A) up to the lesser of (y) seventy-five percent (75%), subject to the provisions of Section 2.1(b) hereof, of the value of the Eligible Finished Goods Inventory ("Finished Goods Inventory Advance Rate") and (z) ninety percent (90%) of the appraised net orderly liquidation value of Eligible Finished Goods Inventory ("Finished Goods NOLV Advance Rate") (as evidenced by an Inventory appraisal satisfactory to Agent in its sole discretion), plus (B) up to the lesser of (y) sixty percent (60%), subject to the provisions of Section 2.1(b) hereof, of the value of the Eligible WIP Inventory ("WIP Inventory Advance Rate"), and (z) ninety percent (90%) of the appraised net orderly liquidation value of Eligible WIP Inventory ("WIP NOLV Advance Rate") (as evidenced by an Inventory appraisal satisfactory to Agent in its sole discretion), plus (C) up to the lesser of (y) sixty percent (60%), subject to the provisions of Section 2.1(b) hereof, of the value of the Eligible Raw Materials Inventory ("Raw Materials Inventory Advance Rate"), and (z) ninety percent (90%) of the appraised net orderly liquidation value of Eligible Raw Materials Inventory ("Raw Materials NOLV Advance Rate") (Receivables Advance Rate, the Finished Goods Inventory Advance Rate, the Finished Goods NOLV Advance Rate, the WIP Inventory Advance Rate, the WIP NOLV Advance Rate, the Raw Materials Inventory Advance Rate, the Raw

Materials NOLV Advance Rate are collectively, the "Advance Rates")) (as evidenced by an Inventory appraisal satisfactory to Agent in its sole discretion); provided, however, that (x) the portion of the Formula Amount consisting of Eligible In Transit Inventory shall not exceed Five Million and 00/100 Dollars ($5,000,000.00) at any time, (y) the portion of the Formula Amount consisting of Eligible WIP Inventory shall not exceed Fifteen Million and 00/100 Dollars ($15,000,000.00) at any time, and (z) the portion of the Formula Amount consisting of Eligible Inventory shall not exceed seventy (70%) percent of the Gross Formula Amount, *minus*

> (iii)    (1) for the period from the Closing Date to the date which is sixty (60) days prior to the last day of the Term, the aggregate Maximum Undrawn Amount of all outstanding Letters of Credit and Acceptances and (2) for the period from the date which is sixty (60) days prior to the last day of the Term to the last day of the Term, one hundred five percent (105%) of the aggregate Maximum Undrawn Amount of all outstanding Letters of Credit and Acceptances, *minus*

> (iv)    the aggregate amount of outstanding Swing Loans, *minus*

> (v)    such other reserves as Agent in its commercially reasonable discretion may deem proper and necessary from time to time.

The amount derived from (x) the sum of Sections 2.1(a)(y)(i) and (ii), minus (y) the sum of Section 2.1(a)(y)(iii), (iv) and (v), at any time and from time to time shall be referred to as the "Formula Amount". The Revolving Advances shall be evidenced by one or more secured promissory notes (collectively, the "Revolving Credit Note") substantially in the form attached hereto as Exhibit 2.1(a).

(b)    Discretionary Rights. Subject to Section 16.2(b)(viii) hereof, the Advance Rates may be increased or decreased by Agent at any time and from time to time in the exercise of its reasonable discretion. Each Borrower consents to any such increases or decreases and acknowledges that decreasing the Advance Rates or increasing or imposing other reserves may limit or restrict Advances requested by Borrowing Agent. The rights of Agent under this subsection are subject to the provisions of Section 16.2(b). The Agent shall give Borrowing Agent two (2) Business Days prior notice of its intention to decrease the Advance Rates.

2.2    Ex-Im Revolving Advances.

(a)    Amount of Ex-Im Revolving Advances. Subject to the terms and conditions set forth in this Agreement including Section 2.2(b), each Lender, severally and not jointly, will make Ex-Im Revolving Advances to Borrowers (provided, that after giving effect to such Ex-Im Revolving Advances the Consolidated Facility Usage shall not exceed the Maximum Revolving Advance Amount) in aggregate amounts outstanding at any time equal to such Lender's Commitment Percentage of the lesser of (x) the Maximum Ex-Im Revolving Advance Amount and (y) an amount equal to the sum of (subject to and as more fully described in the Borrower Agreement as the Export-Related Borrowing Base):

(i)      subject to the provisions of Section 2.2(b) hereof, up to ninety percent (90%) ("Ex-Im Receivables Advance Rate") of the Export-Related Accounts Receivable Value of Eligible Export-Related Accounts Receivable, *plus*

(ii)     subject to the provisions of Section 2.2(b) hereof, up to ninety percent (90%) ("Ex-Im Advance Rate") of the Export-Related Accounts Receivable Value of Eligible Export-Related Accounts Receivable, *minus*

(iii)    such other reserves as Agent in its commercially reasonable discretion may deem proper and necessary from time to time.

The amount derived from (x) the sum of Sections 2.2(a)(y)(i) and (ii) *minus* (y) Section 2.2(a)(y)(iii), at any time and from time to time shall be referred to as the "Ex-Im Formula Amount".  The Ex-Im Revolving Advances shall be evidenced by one or more secured promissory notes (collectively, the "Ex-Im Note") substantially in the form attached hereto as Exhibit 2.2(a).

(b)      Discretionary Rights.  Subject to Section 16.2(b)(viii) hereof, the Ex-Im Advance Rates may be increased or decreased by Agent at any time and from time to time in the exercise of its reasonable discretion.  Each Borrower consents to any such increases or decreases and acknowledges that decreasing the Ex-Im Advance Rates or increasing or imposing other reserves may limit or restrict Ex-Im Revolving Advances requested by Borrowing Agent.  The rights of Agent under this subsection are subject to the provisions of Section 16.2(b).  The Agent shall give the Borrowing Agent two (2) Business Days prior notice of its intention to decrease the Ex-Im Advance Rates.

2.3      Procedure for Borrowing Revolving Advances and Ex-Im Revolving Advances.

(a)      Borrowing Agent on behalf of any Borrower may notify Agent prior to 12:00 p.m. on a Business Day of a Borrower's request to incur, on that day, a Revolving Advance or an Ex-Im Revolving Advance hereunder.  Should any amount required to be paid as interest hereunder, or as fees or other charges under this Agreement or any other agreement with Agent or Lenders, or with respect to any other Obligation, become due, same shall be deemed a request for a Revolving Advance maintained as a Domestic Rate Loan as of the date such payment is due, in the amount required to pay in full such interest, fee, charge or Obligation under this Agreement or any other agreement with Agent or Lenders, and such request shall be irrevocable.

(b)      Notwithstanding the provisions of subsection (a) above, in the event any Borrower desires to obtain a Eurodollar Rate Loan, Borrowing Agent shall give Agent written notice by no later than 12:00 p.m. on the day which is three (3) Business Days prior to the date such Eurodollar Rate Loan is to be borrowed, specifying (i) the date of the proposed borrowing (which shall be a Business Day), (ii) the type of borrowing and the amount on the date of such Advance to be borrowed, which amount shall be in an aggregate principal amount that is not less than One Million and 00/100 Dollars ($1,000,000.00) and integral multiples of Five Hundred Thousand and 00/100 Dollars ($500,000.00) in excess thereof, (iii) if such Advance is to be a Revolving Advance or an Ex-Im Revolving Advance, and (iv) the duration of the first Interest Period therefor. Interest Periods for Eurodollar Rate Loans shall be for one (1), two (2) or three

(3) months; underline{provided}, if an Interest Period would end on a day that is not a Business Day, it shall end on the next succeeding Business Day unless such day falls in the next succeeding calendar month in which case the Interest Period shall end on the next preceding Business Day. No Eurodollar Rate Loan shall be made available to any Borrower during the continuance of a Default or an Event of Default. After giving effect to each requested Eurodollar Rate Loan, including those which are converted from a Domestic Rate Loan under Section 2.3(d), there shall not be outstanding more than eight (8) Eurodollar Rate Loans, in the aggregate.

(c)     Each Interest Period of a Eurodollar Rate Loan shall commence on the date such Eurodollar Rate Loan is made and shall end on such date as Borrowing Agent may elect as set forth in subsection (b)(iv) above provided that the exact length of each Interest Period shall be determined in accordance with the practice of the interbank market for offshore Dollar deposits and no Interest Period shall end after the last day of the Term or, if applicable, the Ex-Im Term.

Borrowing Agent shall elect the initial Interest Period applicable to a Eurodollar Rate Loan by its notice of borrowing given to Agent pursuant to Section 2.3(b) or by its notice of conversion given to Agent pursuant to Section 2.3(d), as the case may be. Borrowing Agent shall elect the duration of each succeeding Interest Period by giving irrevocable written notice to Agent of such duration not later than 12:00 p.m. on the day which is three (3) Business Days prior to the last day of the then current Interest Period applicable to such Eurodollar Rate Loan. If Agent does not receive timely notice of the Interest Period elected by Borrowing Agent, Borrowing Agent shall be deemed to have elected to convert to a Domestic Rate Loan subject to Section 2.3(d) herein below.

(d)     Provided that no Event of Default shall have occurred and be continuing, Borrowing Agent may, on the last Business Day of the then current Interest Period applicable to any outstanding Eurodollar Rate Loan, or on any Business Day with respect to Domestic Rate Loans, convert any such loan into a loan of another type in the same aggregate principal amount provided that any conversion of a Eurodollar Rate Loan shall be made only on the last Business Day of the then current Interest Period applicable to such Eurodollar Rate Loan. If Borrowing Agent desires to convert a loan, Borrowing Agent shall give Agent written notice by no later than 12:00 p.m. (i) on the day which is three (3) Business Days' prior to the date on which such conversion is to occur with respect to a conversion from a Domestic Rate Loan to a Eurodollar Rate Loan, or (ii) on the day which is one (1) Business Day prior to the date on which such conversion is to occur with respect to a conversion from a Eurodollar Rate Loan to a Domestic Rate Loan, specifying, in each case, the date of such conversion, the loans to be converted and if the conversion is from a Domestic Rate Loan to any other type of loan, the duration of the first Interest Period therefor.

(e)     At its option and upon written notice given prior to 12:00 p.m. at least three (3) Business Days' prior to the date of such prepayment, any Borrower may prepay the Eurodollar Rate Loans in whole at any time or in part from time to time with accrued interest on the principal being prepaid to the date of such repayment. Such Borrower shall specify the date of prepayment of Advances which are Eurodollar Rate Loans and the amount of such prepayment. In the event that any prepayment of a Eurodollar Rate Loan is required or permitted on a date other than the last Business Day of the then current Interest Period with respect thereto,

such Borrower shall indemnify Agent and Lenders therefor in accordance with Section 2.3(f) hereof.

(f)        Each Borrower shall indemnify Agent and Lenders and hold Agent and Lenders harmless from and against any and all losses or expenses that Agent and Lenders may sustain or incur as a consequence of any prepayment, conversion of or any default by any Borrower in the payment of the principal of or interest on any Eurodollar Rate Loan or failure by any Borrower to complete a borrowing of, a prepayment of or conversion of or to a Eurodollar Rate Loan after notice thereof has been given, including, but not limited to, any interest payable by Agent or Lenders to lenders of funds obtained by it in order to make or maintain its Eurodollar Rate Loans hereunder. A certificate as to any additional amounts payable pursuant to the foregoing sentence submitted by Agent or any Lender to Borrowing Agent shall be conclusive absent manifest error.

(g)        Notwithstanding any other provision hereof, if any Applicable Law, treaty, regulation or directive, or any change therein or in the interpretation or application thereof, including without limitation any Change in Law, shall make it unlawful for Lenders or any Lender (for purposes of this subsection (g), the term "Lender" shall include any Lender and the office or branch where any Lender or any Person controlling such Lender makes or maintains any Eurodollar Rate Loans) to make or maintain its Eurodollar Rate Loans, the obligation of Lenders (or such affected Lender) to make Eurodollar Rate Loans hereunder shall forthwith be cancelled and Borrowers shall, if any affected Eurodollar Rate Loans are then outstanding, promptly upon request from Agent, either pay all such affected Eurodollar Rate Loans or convert such affected Eurodollar Rate Loans into loans of another type.  If any such payment or conversion of any Eurodollar Rate Loan is made on a day that is not the last day of the Interest Period applicable to such Eurodollar Rate Loan, Borrowers shall pay Agent, upon Agent's request, such amount or amounts set forth in clause (f) above.  A certificate as to any additional amounts payable pursuant to the foregoing sentence submitted by Lenders to Borrowing Agent shall be conclusive absent manifest error.

2.4    <u>Disbursement of Advance Proceeds</u>.

All Advances shall be disbursed from whichever office or other place Agent may designate from time to time and, together with any and all other Obligations of Borrowers to Agent or Lenders, shall be charged to Borrowers' Account on Agent's books. During the Term, Borrowers may use the Revolving Advances by borrowing, prepaying and re-borrowing, all in accordance with the terms and conditions hereof. During the Ex-Im Term, Borrowers may use the Ex-Im Revolving Advances by borrowing, prepaying and re-borrowing, all in accordance with the terms and conditions hereof.  The proceeds of each Revolving Advance or Ex-Im Revolving Advance requested by Borrowing Agent on behalf of any Borrower or, in the case of a Revolving Advance, deemed to have been requested by any Borrower under Section 2.2 hereof shall, with respect to requested Revolving Advances or Ex-Im Revolving Advances to the extent Lenders make such Revolving Advances or Ex-Im Revolving Advances, be made available to the applicable Borrower on the day so requested by way of credit to such Borrower's operating account at PNC, or such other bank as Borrowing Agent may designate following notification to Agent, in immediately available federal funds or other immediately available funds or, with

respect to Revolving Advances deemed to have been requested by any Borrower, be disbursed to Agent to be applied to the outstanding Obligations giving rise to such deemed request.

2.5    Maximum Advances.

The aggregate balance of Revolving Advances outstanding and Swing Loans outstanding at any time shall not exceed the lesser of (a) the Maximum Revolving Advance Amount less the aggregate Maximum Undrawn Amount of all issued and outstanding Letters of Credit or (b) the Formula Amount.  The aggregate balance of Ex-Im Revolving Advances outstanding at any time shall not exceed the lesser of (a) the Maximum Ex-Im Revolving Advance Amount or (b) the Ex-Im Formula Amount.  The Consolidated Facility Usage shall not exceed the Maximum Revolving Advance Amount.

2.6    Repayment of Advances.

(a)    The Ex-Im Revolving Advances shall be due and payable in full on the last day of the Ex-Im Term subject to earlier prepayment as herein provided.  The Domestic Advances shall be due and payable in full on the last day of the Term subject to earlier prepayment as herein provided.

(b)    Each Borrower recognizes that the amounts evidenced by checks, notes, drafts or any other items of payment relating to and/or proceeds of Collateral may not be collectible by Agent on the date received. In consideration of Agent's agreement to conditionally credit Borrowers' Account as of the next Business Day following Agent's receipt of those items of payment, each Borrower agrees that, in computing the charges under this Agreement, all items of payment shall be deemed applied by Agent on account of the Obligations one (1) Business Day after (i) the Business Day Agent receives such payments via wire transfer or electronic depository check or (ii) in the case of payments received by Agent in any other form, the Business Day such payment constitutes good funds in Agent's account.  Agent is not, however, required to credit Borrowers' Account for the amount of any item of payment which is unsatisfactory to Agent and Agent may charge Borrowers' Account for the amount of any item of payment which is returned to Agent unpaid.

(c)    All payments of principal, interest and other amounts payable hereunder, or under any of the Other Documents shall be made to Agent at the Payment Office not later than 1:00 P.M. on the due date therefor in lawful money of the United States of America in federal funds or other funds immediately available to Agent.  Agent shall have the right to effectuate payment on any and all Obligations due and owing hereunder by charging Borrowers' Account or by making Advances as provided in Section 2.2 hereof.

(d)    Borrowers shall pay principal, interest, and all other amounts payable hereunder, or under any related agreement, without any deduction whatsoever, including, but not limited to, any deduction for any setoff or counterclaim.

2.7    Repayment of Excess Advances.

The aggregate balance of Advances outstanding at any time in excess of the maximum amount of Advances permitted hereunder shall be immediately due and payable

without the necessity of any demand, at the Payment Office, whether or not a Default or Event of Default has occurred.

2.8     Statement of Account.

Agent shall maintain, in accordance with its customary procedures, a loan account ("Borrowers' Account") in the name of Borrowers in which shall be recorded the date and amount of each Advance made by Agent and the date and amount of each payment in respect thereof; provided, however, the failure by Agent to record the date and amount of any Advance shall not adversely affect Agent or any Lender. Each month, Agent shall send to Borrowing Agent a statement showing the accounting for the Advances made, payments made or credited in respect thereof, and other transactions between Agent and Borrowers during such month. The monthly statements shall be deemed correct and binding upon Borrowers in the absence of manifest error and shall constitute an account stated between Lenders and Borrowers unless Agent receives a written statement of Borrowers' specific exceptions thereto within thirty (30) days after such statement is received by Borrowing Agent. The records of Agent with respect to the loan account shall be conclusive evidence absent manifest error of the amounts of Advances and other charges thereto and of payments applicable thereto.

2.9     Letters of Credit and Acceptances.

Subject to the terms and conditions hereof, Agent shall (a) issue or cause the issuance of standby and/or trade letters of credit (such letters of credit and the Existing Letters of Credit are collectively, the "Letters of Credit") for the account of any Borrower or (b) accept, or cause to be accepted Acceptances; provided, however, that Agent will not be required to issue or cause to be issued any Letters of Credit or accept or cause to be accepted any Acceptances to the extent that the issuance or acceptance thereof would then cause (A) the sum of (i) the outstanding Revolving Advances plus (ii) Maximum Undrawn Amount of outstanding Letters of Credit plus (iii) the outstanding Swing Loans plus (iv) outstanding Acceptances to exceed the lesser of (x) the Maximum Revolving Advance Amount or (y) the Formula Amount (without giving effect to clause (iii) of the definition thereof) or (B) Consolidated Facility Usage to exceed the Maximum Revolving Advance Amount. The Maximum Undrawn Amount of outstanding Letters of Credit plus the aggregate amount of outstanding Acceptances shall not exceed in the aggregate at any time the Letter of Credit Sublimit. All disbursements or payments related to Letters of Credit and Acceptances shall be deemed to be Domestic Rate Loans consisting of Revolving Advances and shall bear interest at the Revolving Interest Rate for Domestic Rate Loans; Letters of Credit that have not been drawn upon shall not bear interest.

2.10     Issuance of Letters of Credit; Creation of Acceptances.

(a)     Borrowing Agent, on behalf of Borrowers, may request Agent to issue or cause the issuance of a Letter of Credit by delivering to Agent at the Payment Office, prior to 12:00 p.m., at least five (5) Business Days' prior to the proposed date of issuance (or such shorter period as may be agreed to by Agent), Agent's form of Letter of Credit Application (the "Letter of Credit Application") completed to the satisfaction of Agent; and, such other certificates, documents and other papers and information as Agent may reasonably request. Borrowing Agent, on behalf of Borrowers, also has the right to give instructions and make agreements with

respect to any application, any applicable letter of credit and security agreement, any applicable letter of credit reimbursement agreement and/or any other applicable agreement, any letter of credit and the disposition of documents, disposition of any unutilized funds, and to agree with Agent upon any amendment, extension or renewal of any Letter of Credit.  As of the date hereof, those letters of credit set forth on Schedule 2.10 attached hereto and made a part hereof, which were issued pursuant to the Original Credit Agreement by the Agent and are outstanding on the date hereof (the "Existing Letters of Credit"), are hereby deemed to be Letters of Credit issued and outstanding hereunder.

(b)     Each Letter of Credit shall, among other things, (i) provide for the payment of sight drafts, other written demands for payment, or acceptances of usance drafts when presented for honor thereunder in accordance with the terms thereof and when accompanied by the documents described therein and (ii) have an expiry date not later than twenty-four (24) months after such Letter of Credit's date of issuance and in no event later than the last day of the Term (except that a Letter of Credit may expire up to twelve (12) months beyond the last day of the Term if such Letter of Credit has been cash collateralized by Borrowers in an amount equal to one hundred five percent (105%) of the face amount of such Letter of Credit on terms and conditions acceptable to Agent in its sole discretion, at least one (1) Business Days prior to the last day of the Term).  Each standby Letter of Credit shall be subject either to the Uniform Customs and Practice for Documentary Credits as most recently published by the International Chamber of Commerce at the time a Letter of Credit is issued (the "UCP") or the International Standby Practices (ISP98 International Chamber of Commerce Publication Number 590) (the "ISP98 Rules")), and any subsequent revision thereof at the time a standby Letter of Credit is issued, as determined by Agent, and each trade Letter of Credit shall be subject to the UCP.

(c)     Agent shall use its reasonable efforts to notify Lenders of the request by Borrowing Agent for a Letter of Credit or Acceptance hereunder.

(d)     Agent shall have absolute discretion whether to accept any draft to create an Acceptance.  Without in any way limiting Agent's absolute discretion whether to accept any draft, Borrowing Agent will not present for acceptance any draft, and Agent will generally not accept any drafts (i) that arise out of transactions involving the sale of goods by any Borrower not in the Ordinary Course of Business, (ii) that involve a sale to an Affiliate of any Borrower, (iii) that involve any purchase for which Agent has not received all related documents, instruments and forms requested by Agent, (iv) for which Agent is unable to locate a purchaser in the ordinary course of business on standard terms, or (v) that is not eligible for discounting with Federal Reserve Banks pursuant to paragraph 7 of Section 13 of the Federal Reserve Act, as amended.

(e)     Subject to terms set by Agent from time to time in its discretion with respect to the acceptance of drafts generally, Borrowing Agent, on behalf of any Borrower, may request Acceptances on any Business Day, by delivering to Agent a request for an Acceptance in form and substance satisfactory to the Agent and, promptly upon demand, copies of all invoices, delivery receipts and related documents relating to that request that Agent might require. Provided that the request for Acceptance is received prior to 10:30 a.m. and approved by Agent, Agent shall make the net proceeds of the Acceptance available to the applicable Borrower by

crediting the net amount of the Acceptance in lawful money of the United States and in immediately available funds to the Borrowers' Account.  The net amount of the Acceptance shall be calculated by discounting the Acceptance at the Banker's Acceptance Rate for the applicable maturity period upon the creation by Agent of an Acceptance.

(f)     Borrowers shall pay to Agent the amount of any Acceptance on or before its maturity date.  In addition, Agent is hereby irrevocably authorized, in its sole discretion, to make Revolving Advances from time to time, or to charge any account of Borrowers, to pay any Acceptance for which payment is due, or at any time after the occurrence of an Event of Default to fund cash collateral for any outstanding Acceptance.

(g)     Each Acceptance shall be payable in Dollars and shall be in the face amount of at least One Hundred Thousand and 00/100 Dollars ($100,000.00). The maturity of each Acceptance shall be in any thirty (30) day increment equal to or greater than thirty (30) and less than or equal to one hundred eighty (180) days or, if such day is not a Business Day, on the next succeeding Business Day and, in any event, no later than the day preceding the expiration of the Term.  This Section 2.10(g) will not apply to Acceptances created under Letters of Credit.

2.11    Requirements For Issuance of Letters of Credit and Acceptances.

(a)     Borrowing Agent shall authorize and direct any Issuer to name the applicable Borrower as the "Applicant" or "Account Party" of each Letter of Credit.  If Agent is not the Issuer of any Letter of Credit, Borrowing Agent shall authorize and direct the Issuer to deliver to Agent all instruments, documents, and other writings and property received by the Issuer pursuant to the Letter of Credit or any Acceptance related thereto and to accept and rely upon Agent's instructions and agreements with respect to all matters arising in connection with the Letter of Credit or the application therefor or any Acceptance therefor.

(b)     In connection with all Letters of Credit issued or caused to be issued by Agent under this Agreement, each Borrower hereby appoints Agent, or its designee, as its attorney, with full power and authority if an Event of Default shall have occurred, (i) to sign and/or endorse such Borrower's name upon any warehouse or other receipts, letter of credit applications and acceptances, (ii) to sign such Borrower's name on bills of lading; (iii) to clear Inventory through the United States of America Customs Department ("Customs") in the name of such Borrower or Agent or Agent's designee, and to sign and deliver to Customs officials powers of attorney in the name of such Borrower for such purpose; and (iv) to complete in such Borrower's name or Agent's, or in the name of Agent's designee, any order, sale or transaction, obtain the necessary documents in connection therewith, and collect the proceeds thereof. Neither Agent nor its attorneys will be liable for any acts or omissions nor for any error of judgment or mistakes of fact or law, except for Agent's or its attorney's willful misconduct.  This power, being coupled with an interest, is irrevocable as long as any Letters of Credit remain outstanding.

2.12    Disbursements, Reimbursement.

(a)     Immediately upon the issuance of each Letter of Credit, each Lender shall be deemed to, and hereby irrevocably and unconditionally agrees to, purchase from Agent a

participation in such Letter of Credit and each drawing thereunder in an amount equal to such Lender's Commitment Percentage of the Maximum Face Amount of such Letter of Credit and the amount of such drawing, respectively.

(b)    In the event of any request for a drawing under a Letter of Credit by the beneficiary or transferee thereof, Agent will promptly notify Borrowing Agent.  Provided that Borrowing Agent shall have received such notice, Borrowers shall reimburse (such obligation to reimburse Agent shall sometimes be referred to as a "<u>Reimbursement Obligation</u>") Agent prior to 12:00 Noon on each date that an amount is paid by Agent under any Letter of Credit (each such date, a "<u>Drawing Date</u>") in an amount equal to the amount so paid by Agent.  In the event Borrowers fail to reimburse Agent for the full amount of any drawing under any Letter of Credit by 12:00 Noon on the Drawing Date, Agent will promptly notify each Lender thereof, and Borrowers shall be deemed to have requested that a Revolving Advance maintained as a Domestic Rate Loan be made by Lenders to be disbursed on the Drawing Date under such Letter of Credit, subject to the amount of the unutilized portion of the lesser of Maximum Revolving Advance Amount or the Formula Amount and subject to Section 8.2 hereof. Any notice given by Agent pursuant to this Section 2.12(b) may be oral if immediately confirmed in writing; <u>provided</u> that the lack of such an immediate confirmation shall not affect the conclusiveness or binding effect of such notice.

(c)    Each Lender shall upon any notice pursuant to Section 2.12(b) make available to Agent an amount in immediately available funds equal to its Commitment Percentage of the amount of the drawing, whereupon the participating Lenders shall (subject to Section 2.12(d)) each be deemed to have made a Revolving Advance maintained as a Domestic Rate Loan to Borrowers in that amount.  If any Lender so notified fails to make available to Agent the amount of such Lender's Commitment Percentage of such amount by no later than 2:00 p.m. on the Drawing Date, then interest shall accrue on such Lender's obligation to make such payment, from the Drawing Date to the date on which such Lender makes such payment (i) at a rate per annum equal to the Federal Funds Effective Rate during the first three days following the Drawing Date and (ii) at a rate per annum equal to the rate applicable to Revolving Advances maintained as a Domestic Rate Loans on and after the fourth day following the Drawing Date. Agent will promptly give notice of the occurrence of the Drawing Date, but failure of Agent to give any such notice on the Drawing Date or in sufficient time to enable any Lender to effect such payment on such date shall not relieve such Lender from its obligation under this Section 2.12(c), provided that such Lender shall not be obligated to pay interest as provided in Section 2.12(c)(i) and (ii) until and commencing from the date of receipt of notice from Agent of a drawing.

(d)    With respect to any unreimbursed drawing that is not converted into a Revolving Advance maintained as a Domestic Rate Loan to Borrowers in whole or in part as contemplated by Section 2.12(b), because of Loan Parties' failure to satisfy the conditions set forth in Section 8.2 (other than any notice requirements) or for any other reason, Borrowers shall be deemed to have incurred from Agent a borrowing (each a "<u>Letter of Credit Borrowing</u>") in the amount of such drawing.  Such Letter of Credit Borrowing shall be due and payable on demand (together with interest) and shall bear interest at the rate per annum applicable to a Revolving Advance maintained as a Domestic Rate Loan.  Each Lender's payment to Agent pursuant to Section 2.12(c) shall be deemed to be a payment in respect of its participation in such Letter of

Credit Borrowing and shall constitute a "<u>Participation Advance</u>" from such Lender in satisfaction of its Participation Commitment under this Section 2.12.

(e)    Each Lender's Participation Commitment shall continue until the last to occur of any of the following events:  (x) Agent ceases to be obligated to issue or cause to be issued Letters of Credit hereunder; (y) no Letter of Credit issued or created hereunder remains outstanding and uncancelled and (z) all Persons (other than Loan Parties) have been fully reimbursed for all payments made under or relating to Letters of Credit.

2.13    <u>Repayment of Participation Advances</u>.

(a)    Upon (and only upon) receipt by Agent for its account of immediately available funds from Borrowers (i) in reimbursement of any payment made by Agent under the Letter of Credit with respect to which any Lender has made a Participation Advance to Agent, or (ii) in payment of interest on such a payment made by Agent under such a Letter of Credit, Agent will pay to each Lender, in the same funds as those received by Agent, the amount of such Lender's Commitment Percentage of such funds, except Agent shall retain the amount of the Commitment Percentage of such funds of any Lender that did not make a Participation Advance in respect of such payment by Agent (and, to the extent that any of the other Lender(s) have funded any portion of such Defaulting Lender's Participation Advance in accordance with the provisions of Section 2.22, Agent will pay over to such Non-Defaulting Lenders a pro rata portion of the funds so withheld from such Defaulting Lender).

(b)    If Agent is required at any time to return to any Borrower, or to a trustee, receiver, liquidator, custodian, or any official in any insolvency proceeding, any portion of the payments made by Borrowers to Agent pursuant to Section 2.13(a) in reimbursement of a payment made under the Letter of Credit or interest or fee thereon, each Lender shall, on demand of Agent, forthwith return to Agent the amount of its Commitment Percentage of any amounts so returned by Agent plus interest at the Federal Funds Effective Rate.

2.14    <u>Documentation</u>.

Each Borrower agrees to be bound by the terms of the Letter of Credit Application and by Agent's interpretations of any Letter of Credit or Acceptance issued or created on behalf of such Borrower and by Agent's written regulations and customary practices relating to letters of credit, though Agent's interpretations may be different from such Borrower's own.  In the event of a conflict between the Letter of Credit Application and this Agreement, this Agreement shall govern. It is understood and agreed that, except in the case of gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final non-appealable judgment), Agent shall not be liable for any error, negligence and/or mistakes, whether of omission or commission, in following Borrowing Agent's or any Borrower's instructions or those contained in the Letters of Credit or any modifications, amendments or supplements thereto.

2.15    <u>Determination to Honor Drawing Request</u>.

In determining whether to honor any request for drawing under any Letter of Credit by the beneficiary thereof, Agent shall be responsible only to determine that the

documents and certificates required to be delivered under such Letter of Credit have been delivered and that they comply on their face with the requirements of such Letter of Credit and that any other drawing condition appearing on the face of such Letter of Credit has been satisfied in the manner so set forth.

      2.16   <u>Nature of Participation and Reimbursement Obligations</u>.

      Each Lender's obligation in accordance with this Agreement to make the Revolving Advances or Participation Advances as a result of a drawing under a Letter of Credit, and the obligations of Borrowers to reimburse Agent upon a draw under a Letter of Credit, shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Section 2.16 under all circumstances, including the following circumstances:

      (i)    any set-off, counterclaim, recoupment, defense or other right which such Lender may have against Agent, any Loan Party or any other Person for any reason whatsoever;

      (ii)    the failure of any Loan Party or any other Person to comply, in connection with a Letter of Credit Borrowing, with the conditions set forth in this Agreement for the making of a Revolving Advance, it being acknowledged that such conditions are not required for the making of a Letter of Credit Borrowing and the obligation of Lenders to make Participation Advances under Section 2.11;

      (iii)    any lack of validity or enforceability of any Letter of Credit;

      (iv)    any claim of breach of warranty that might be made by any Borrower or any Lender against the beneficiary of a Letter of Credit, or the existence of any claim, set-off, recoupment, counterclaim, cross-claim, defense or other right which any Borrower or any Lender may have at any time against a beneficiary, any successor beneficiary or any transferee of any Letter of Credit or the proceeds thereof (or any Persons for whom any such transferee may be acting), Agent or any Lender or any other Person, whether in connection with this Agreement, the transactions contemplated herein or any unrelated transaction (including any underlying transaction between any Borrower or any Subsidiaries of such Borrower and the beneficiary for which any Letter of Credit was procured);

      (v)    the lack of power or authority of any signer of (or any defect in or forgery of any signature or endorsement on) or the form of or lack of validity, sufficiency, accuracy, enforceability or genuineness of any draft, demand, instrument, certificate or other document presented under or in connection with any Letter of Credit, or any fraud or alleged fraud in connection with any Letter of Credit, or the transport of any property or provisions of services relating to a Letter of Credit, in each case even if Agent or any of Agent's Affiliates has been notified thereof;

      (vi)    payment by Agent under any Letter of Credit against presentation of a demand, draft or certificate or other document which does not comply with the terms of such Letter of Credit;

(vii)    the solvency of, or any acts or omissions by, any beneficiary of any Letter of Credit, or any other Person having a role in any transaction or obligation relating to a Letter of Credit, or the existence, nature, quality, quantity, condition, value or other characteristic of any property or services relating to a Letter of Credit;

(viii)    any failure by Agent or any of Agent's Affiliates to issue any Letter of Credit in the form requested by Borrowing Agent, unless Agent has received written notice from Borrowing Agent of such failure within three (3) Business Days after Agent shall have furnished Borrowing Agent a copy of such Letter of Credit and such error is material and no drawing has been made thereon prior to receipt of such notice;

(ix)    any Material Adverse Effect on any Loan Party;

(x)    any breach of this Agreement or any Other Document by any party thereto;

(xi)    the occurrence or continuance of an insolvency proceeding with respect to any Loan Party;

(xii)    the fact that a Default or Event of Default shall have occurred and be continuing;

(xiii)    the fact that the Term shall have expired or this Agreement or the Obligations hereunder shall have been terminated; and

(xiv)    any other circumstance or happening whatsoever, whether or not similar to any of the foregoing.

2.17    <u>Indemnity</u>.

In addition to amounts payable as provided in Section 16.5, each Loan Party hereby agrees to protect, indemnify, pay and save harmless Agent and any of Agent's Affiliates that have issued a Letter of Credit from and against any and all claims, demands, liabilities, damages, taxes, penalties, interest, judgments, losses, costs, charges and expenses (including reasonable fees, expenses and disbursements of counsel) which Agent or any of Agent's Affiliates may incur or be subject to as a consequence, direct or indirect, of the issuance of any Letter of Credit, other than as a result of (a) the gross negligence or willful misconduct of Agent as determined by a final and non-appealable judgment of a court of competent jurisdiction or (b) the wrongful dishonor by Agent or any of Agent's Affiliates of a proper demand for payment made under any Letter of Credit, except if such dishonor resulted from any act or omission, whether rightful or wrongful, of any present or future de jure or de facto Governmental Body (all such acts or omissions herein called "<u>Governmental Acts</u>").

2.18    <u>Liability for Acts and Omissions</u>.

As between Loan Parties and Agent and Lenders, each Loan Party assumes all risks of the acts and omissions of, or misuse of the Letters of Credit by, the respective beneficiaries of such Letters of Credit. In furtherance and not in limitation of the respective

foregoing, Agent shall not be responsible for: (i) the form, validity, sufficiency, accuracy, genuineness or legal effect of any document submitted by any party in connection with the application for an issuance of any such Letter of Credit, even if it should in fact prove to be in any or all respects invalid, insufficient, inaccurate, fraudulent or forged (even if Agent shall have been notified thereof); (ii) the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign any such Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason; (iii) the failure of the beneficiary of any such Letter of Credit, or any other party to which such Letter of Credit may be transferred, to comply fully with any conditions required in order to draw upon such Letter of Credit or any other claim of any Borrower against any beneficiary of such Letter of Credit, or any such transferee, or any dispute between or among any Borrower and any beneficiary of any Letter of Credit or any such transferee; (iv) errors, omissions, interruptions or delays in transmission or delivery of any messages, by mail, cable, facsimile, telex or otherwise, whether or not they be in cipher; (v) errors in interpretation of technical terms; (vi) any loss or delay in the transmission or otherwise of any document required in order to make a drawing under any such Letter of Credit or of the proceeds thereof; (vii) the misapplication by the beneficiary of any such Letter of Credit of the proceeds of any drawing under such Letter of Credit; or (viii) any consequences arising from causes beyond the control of Agent, including any Governmental Acts, and none of the above shall affect or impair, or prevent the vesting of, any of Agent's rights or powers hereunder. Nothing in the preceding sentence shall relieve Agent from liability for Agent's gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final non-appealable judgment) in connection with actions or omissions described in such clauses (i) through (viii) of such sentence. In no event shall Agent or Agent's Affiliates be liable to any Loan Party for any indirect, consequential, incidental, punitive, exemplary or special damages or expenses (including without limitation attorneys' fees), or for any damages resulting from any change in the value of any property relating to a Letter of Credit.

Without limiting the generality of the foregoing, Agent and each of its Affiliates (i) may rely on any oral or other communication believed in good faith by Agent or such Affiliate to have been authorized or given by or on behalf of the applicant for a Letter of Credit, (ii) may honor any presentation if the documents presented appear on their face substantially to comply with the terms and conditions of the relevant Letter of Credit; (iii) may honor a previously dishonored presentation under a Letter of Credit, whether such dishonor was pursuant to a court order, to settle or compromise any claim of wrongful dishonor, or otherwise, and shall be entitled to reimbursement to the same extent as if such presentation had initially been honored, together with any interest paid by Agent or its Affiliates; (iv) may honor any drawing that is payable upon presentation of a statement advising negotiation or payment, upon receipt of such statement (even if such statement indicates that a draft or other document is being delivered separately), and shall not be liable for any failure of any such draft or other document to arrive, or to conform in any way with the relevant Letter of Credit; (v) may pay any paying or negotiating bank claiming that it rightfully honored under the laws or practices of the place where such bank is located; and (vi) may settle or adjust any claim or demand made on Agent or its Affiliate in any way related to any order issued at the applicant's request to an air carrier, a letter of guarantee or of indemnity issued to a carrier or any similar document (each an "Order") and honor any drawing in connection with any Letter of Credit that is the subject of such Order,

notwithstanding that any drafts or other documents presented in connection with such Letter of Credit fail to conform in any way with such Letter of Credit.

In furtherance and extension and not in limitation of the specific provisions set forth above, any action taken or omitted by Agent under or in connection with the Letters of Credit issued by it or any documents and certificates delivered thereunder, if taken or omitted in good faith and without gross negligence (as determined by a court of competent jurisdiction in a final non-appealable judgment), shall not put Agent under any resulting liability to any Loan Party or any Lender.

2.19    Additional Payments.

Any sums expended by Agent or any Lender due to any Loan Party's failure to perform or comply with its obligations under this Agreement or any Other Document including any Loan Party's obligations under Sections 4.2, 4.4, 4.12, 4.13, 4.14 and 6.15 hereof, may be charged to Borrowers' Account as a Revolving Advance and added to the Obligations.

2.20    Manner of Borrowing and Payment.

(a)    Each borrowing of Revolving Advances or Ex-Im Revolving Advances shall be advanced according to the applicable Commitment Percentages of the Lenders.

(b)    Each payment (including each prepayment) by any Borrower on account of the principal of and interest on (i) the Revolving Advances, shall be applied to the Revolving Advances pro rata according to the applicable Commitment Percentages of Lenders , and (ii) the Ex-Im Revolving Advances, shall be applied to the Ex-Im Revolving Advances pro rata according to the applicable Commitment Percentages of Lenders. Except as expressly provided herein, all payments (including prepayments) to be made by any Borrower on account of principal, interest and fees shall be made without set off or counterclaim and shall be made without set off or counterclaim and shall be made to PNC with respect to Swing Loans and to Agent on behalf of Lenders with respect to Revolving Advances and Ex-Im Revolving Advances to the Payment Office, in each case on or prior to 1:00 P.M. in Dollars and in immediately available funds.

(c)    (i)    Notwithstanding anything to the contrary contained in Sections 2.20(a) and (b) hereof, commencing with the first Business Day following the Closing Date, each borrowing of Revolving Advances and Ex-Im Revolving Advances shall be advanced by Agent and each payment by any Borrower on account of Revolving Advances and Ex-Im Revolving Advances shall be applied first to those Revolving Advances and Ex-Im Revolving Advances advanced by Agent. On or before 1:00 P.M. on each Settlement Date commencing with the first Settlement Date following the Closing Date, Agent and Lenders shall make certain payments as follows:    (I) if the aggregate amount of new Revolving Advances and Ex-Im Revolving Advances made by Agent during the preceding Week (if any) exceeds the aggregate amount of repayments applied to outstanding Revolving Advances and Ex-Im Revolving Advances during such preceding Week, then each Lender shall provide Agent with funds in an amount equal to its applicable Commitment Percentage of the difference between (w) such Revolving Advances and Ex-Im Revolving Advances and (x) such repayments and (II) if the aggregate amount of

repayments applied to outstanding Revolving Advances and Ex-Im Revolving Advances during such Week exceeds the aggregate amount of new Revolving Advances and Ex-Im Revolving Advances made during such Week, then Agent shall provide each Lender with funds in an amount equal to its applicable Commitment Percentage of the difference between (y) such repayments and (z) such Revolving Advances and Ex-Im Revolving Advances.

(ii)     Each Lender shall be entitled to earn interest at the applicable Revolving Interest Rate on outstanding Advances (other than Swing Loans) which it has funded.

(iii)     Promptly following each Settlement Date, Agent shall submit to each Lender a certificate with respect to payments received and Advances (other than Swing Loans) made during the Week immediately preceding such Settlement Date. Such certificate of Agent shall be conclusive in the absence of manifest error.

(d)     If any Lender or Participant (a "Benefited Lender") shall at any time receive any payment of all or part of its Advances (other than Swing Loans), or interest thereon, or receive any Collateral in respect thereof (whether voluntarily or involuntarily or by set-off) in a greater proportion than any such payment to and Collateral received by any other Lender, if any, in respect of such other Lender's Advances (other than Swing Loans), or interest thereon, and such greater proportionate payment or receipt of Collateral is not expressly permitted hereunder, such Benefited Lender shall purchase for cash from the other Lenders a participation in such portion of each such other Lender's Advances (other than Swing Loans), or shall provide such other Lender with the benefits of any such Collateral, or the proceeds thereof, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such Collateral or proceeds ratably with each of the other Lenders; provided, however, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest. Each Lender so purchasing a portion of another Lender's Advances (other than Swing Loans) may exercise all rights of payment (including rights of set-off) with respect to such portion as fully as if such Lender were the direct holder of such portion.

(e)     Unless Agent shall have been notified by telephone, confirmed in writing, by any Lender that such Lender will not make the amount which would constitute its applicable Commitment Percentage of the Advances (other than Swing Loans) available to Agent, Agent may (but shall not be obligated to) assume that such Lender shall make such amount available to Agent on the next Settlement Date and, in reliance upon such assumption, make available to Borrowers a corresponding amount.  Agent will promptly notify Borrowing Agent of its receipt of any such notice from a Lender.  If such amount is made available to Agent on a date after such next Settlement Date, such Lender shall pay to Agent on demand an amount equal to the product of (i) the daily average Federal Funds Rate (computed on the basis of a year of three hundred sixty (360) days) during such period as quoted by Agent, times (ii) such amount, times (iii) the number of days from and including such Settlement Date to the date on which such amount becomes immediately available to Agent. A certificate of Agent submitted to any Lender with respect to any amounts owing under this paragraph (e) shall be conclusive, in the absence of manifest error. If such amount is not in fact made available to Agent by such Lender within three

(3) Business Days after such Settlement Date, Agent shall be entitled to recover such an amount, with interest thereon at the rate per annum then applicable to such Revolving Advances or Ex-Im Revolving Advances, as the case may be, hereunder, on demand from Borrowers; provided, however, that Agent's right to such recovery shall not prejudice or otherwise adversely affect Borrowers' rights (if any) against such Lender.

2.21    Use of Proceeds.

(a)    Borrowers shall apply the proceeds of the Domestic Advances to (i) repay existing indebtedness of Borrowers, (ii) pay fees and expenses relating to the Transactions, and (iii) provide for Borrowers' working capital needs and reimburse drawings under Letters of Credit.  Borrowers shall apply the proceeds of the Ex-Im Revolving Advances to finance export-related working capital requirements of the Borrowers related to the Borrowers' cost of manufacturing, producing, purchasing or selling finished goods or services intended for export from the United States, in accordance with Section 2.01 of the Borrower Agreement. Notwithstanding the foregoing, the Borrowers may not use the proceeds of the Ex-Im Revolving Advances for any purposes prohibited by any provisions of the Master Guarantee Agreement or the Ex-Im Documents, unless approved in writing by the Ex-Im Bank.

(b)    Without limiting the generality of Section 2.21(a) above, neither Borrowers, the Guarantors nor any other Person which may in the future become party to this Agreement or the Other Documents as a Borrower or Guarantor, intends to use nor shall they use any portion of the proceeds of the Advances, directly or indirectly, for any purpose in violation of the Trading with the Enemy Act.

2.22    Defaulting Lender.

(a)    Notwithstanding anything to the contrary contained herein, in the event any Lender is a Defaulting Lender, all rights and obligations hereunder of such Defaulting Lender and of the other parties hereto shall be modified to the extent of the express provisions of this Section 2.22 so long as such Lender is a Defaulting Lender.

(b)    (i) Except as otherwise expressly provided for in this Section 2.22, Revolving Advances shall be made pro rata from Lenders which are not Defaulting Lenders based on their respective Commitment Percentages, and no Commitment Percentage of any Lender or any pro rata share of any Advances required to be advanced by any Lender shall be increased as a result of any Lender being a Defaulting Lender. Amounts received in respect of principal of any type of Advances shall be applied to reduce such type of Advances of each Lender (other than any Defaulting Lender) in accordance with their Commitment Percentages; provided, that, Agent shall not be obligated to transfer to a Defaulting Lender any payments received by Agent for Defaulting Lender's benefit, nor shall a Defaulting Lender be entitled to the sharing of any payments hereunder (including any principal, interest or fees).  Amounts payable to a Defaulting Lender shall instead be paid to or retained by Agent.  Agent may hold and, in its discretion, re-lend to a Borrower the amount of such payments received or retained by it for the account of such Defaulting Lender.

(ii)    Fees pursuant to Section 3.3(b) hereof shall cease to accrue in favor of such Defaulting Lender.

(iii)    If any Swing Loans are outstanding or any Letters of Credit (or drawings under any Letter of Credit for which Issuer has not been reimbursed) are outstanding or exist at the time any such Lender becomes a Defaulting Lender, then:

(A)    Defaulting Lender's Participation Commitment in the outstanding Swing Loans and of the Maximum Undrawn Amount of all outstanding Letters of Credit shall be reallocated among Non-Defaulting Lenders in proportion to the respective Commitment Percentages of such Non-Defaulting Lenders to the extent (but only to the extent) that (x) such reallocation does not cause the aggregate sum of outstanding Advances made by any such Non-Defaulting Lender plus such Lender's reallocated Participation Commitment in the outstanding Swing Loans plus such Lender's reallocated Participation Commitment in the aggregate Maximum Undrawn Amount of all outstanding Letters of Credit to exceed the Commitment Percentage of the Maximum Revolving Advance Amount of any such Non-Defaulting Lender, and (y) no Default or Event of Default has occurred and is continuing at such time;

(B)    if the reallocation described in clause (A) above cannot, or can only partially, be effected, Borrowers shall within one Business Day following notice by Agent (x) first, prepay any outstanding Swing Loans that cannot be reallocated, and (y) second, cash collateralize for the benefit of Issuer, Borrowers' obligations corresponding to such Defaulting Lender's Participation Commitment in the Maximum Undrawn Amount of all Letters of Credit (after giving effect to any partial reallocation pursuant to clause (A) above) in accordance with Section 3.2(b) for so long as such Obligations are outstanding;

(C)    if Borrowers cash collateralize any portion of such Defaulting Lender's Participation Commitment in the Maximum Undrawn Amount of all Letters of Credit pursuant to clause (B) above, Borrowers shall not be required to pay any fees to such Defaulting Lender pursuant to Section 3.2(a) with respect to such Defaulting Lender's Commitment Percentage of Maximum Undrawn Amount of all Letters of Credit during the period such Defaulting Lender's Participation Commitment in the Maximum Undrawn Amount of all Letters of Credit are cash collateralized;

(D)    if Defaulting Lender's Participation Commitment in the Maximum Undrawn Amount of all Letters of Credit is reallocated pursuant to clause (A) above, then the fees payable to Lenders pursuant to Section 3.2(a) shall be adjusted and reallocated to Non-Defaulting Lenders in accordance with such reallocation; and

(E)    if all or any portion of such Defaulting Lender's Participation Commitment in the Maximum Undrawn Amount of all Letters of Credit is neither reallocated nor cash collateralized pursuant to clauses (A) or (B)

above, then, without prejudice to any rights or remedies of Issuer or any other Lender hereunder, all Letter of Credit Fees payable under Section 3.2(a) with respect to such Defaulting Lender's Commitment Percentage of the Maximum Undrawn Amount of all Letters of Credit shall be payable to the Issuer (and not to such Defaulting Lender) until (and then only to the extent that) such Participation Commitment in the Maximum Undrawn Amount of all Letters of Credit is reallocated and/or cash collateralized; and

(iv)    So long as any Lender is a Defaulting Lender, Swing Loan Lender shall not be required to fund any Swing Loans and Issuer shall not be required to issue, amend or increase any Letter of Credit, unless such Issuer is satisfied that the related exposure and Defaulting Lender's Participation Commitment in the Maximum Undrawn Amount of all Letters of Credit and all Swing Loans (after giving effect to any such issuance, amendment, increase or funding) will be fully allocated to Non-Defaulting Lenders and/or cash collateral for such Letters of Credit will be provided by Borrowers in accordance with clause (A) and (B) above, and participating interests in any newly made Swing Loan or any newly issued or increased Letter of Credit shall be allocated among Non-Defaulting Lenders in a manner consistent with Section 2.22(b)(iii)(A) above (and such Defaulting Lender shall not participate therein).

(c)    A Defaulting Lender shall not be entitled to give instructions to Agent or to approve, disapprove, consent to or vote on any matters relating to this Agreement and the Other Documents, and all amendments, waivers and other modifications of this Agreement and the Other Documents may be made without regard to a Defaulting Lender and, for purposes of the definition of "Required Lenders", a Defaulting Lender shall not be deemed to be a Lender, to have any outstanding Advances or a Commitment Percentage; provided, that this clause (c) shall not apply to the vote of a Defaulting Lender in the case of an amendment, waiver or other modification described in clauses (i) or (iii) of Section 16.2(b).

(d)    Other than as expressly set forth in this Section 2.22, the rights and obligations of a Defaulting Lender (including the obligation to indemnify Agent) and the other parties hereto shall remain unchanged.  Nothing in this Section 2.22 shall be deemed to release any Defaulting Lender from its obligations under this Agreement and the Other Documents, shall alter such obligations, shall operate as a waiver of any default by such Defaulting Lender hereunder, or shall prejudice any rights which any Borrower, Agent or any Lender may have against any Defaulting Lender as a result of any default by such Defaulting Lender hereunder.

(e)    In the event that Agent, Borrowers, Swing Loan Lender and Issuer agree in writing that a Defaulting Lender has adequately remedied all matters that caused such Lender to be a Defaulting Lender, then Agent will so notify the parties hereto, and Participation Commitments of Lenders (including such cured Defaulting Lender) of the Swing Loans and Maximum Undrawn Amount of all outstanding Letters of Credit shall be reallocated to reflect the inclusion of such Lender's Commitment Percentage thereof, and on such date such Lender shall purchase at par such of the Advances of the other Lenders as Agent shall determine may be necessary in order for such Lender to hold such Advances in accordance with its Commitment Percentage.

(f)    If Swing Loan Lender or Issuer has a good faith belief that any Lender has defaulted in fulfilling its obligations under one or more other agreements in which such Lender commits to extend credit, Swing Loan Lender shall not be required to fund any Swing Loans and Issuer shall not be required to issue, amend or increase any Letter of Credit, unless Swing Loan Lender or Issuer, as the case may be, shall have entered into arrangements with Borrowers or such Lender, satisfactory to Swing Loan Lender or Issuer, as the case may be, to defease any risk to it in respect of such Lender hereunder.

2.23    Increase of Maximum Revolving Advance Amount.

If at any time after the Closing Date, and so long as no Event of Default or Default has occurred and is continuing, the Borrowers desire to increase the Maximum Revolving Advance Amount, the Borrowers shall notify the Agent, who will promptly notify each Lender thereof; provided that (a) any such increase shall be in a minimum amount of Ten Million and 00/100 Dollars ($10,000,000.00), (b) the Borrowers shall not request more than two (2) such increases during the Term, and (c) the aggregate of all such increases shall not exceed Fifteen Million and 00/100 Dollars ($15,000,000.00).  The existing Lenders shall have the right (but not the obligation) at any time or from time to time within fifteen (15) Business Days following such notice to increase their respective commitments to make Advances (other than Swing Loans) so as to provide such additional commitment to make Advances (other than Swing Loans) pro-rata in accordance with the Commitment Percentages of each, and any portion of such requested increase which is not provided by any such existing Lender shall be available to the other existing Lenders; provided, that if more than one existing Lender desires to increase its commitment to make Advances (other than Swing Loans) in respect of the portion not provided by an existing Lender, such participating Lenders shall provide such portion of the additional commitments to make Advances (other than Swing Loans) on a pro rata basis in accordance with the proportion that their respective Commitment Percentage bears to each other, and thereafter, to the extent not provided by existing Lenders, to any additional lending institution or institutions proposed by the Borrowers and which is approved by the Agent (which approval will not be unreasonably withheld) and which becomes a party to this Agreement pursuant to documentation reasonably acceptable to the Agent and prepared at the Borrowers' expense, which documentation may be executed by the Loan Parties and the Agent (as administrative agent for the Lenders) without further consent or action of the Lenders, such consent hereby deemed to be irrevocably given to the Agent by the Lenders; provided, however, that those Lenders that are increasing their commitments to make Advances (other than Swing Loans) pursuant hereto, or are becoming party hereto for purposes of effecting such increase, may charge certain fees in connection with such increase as may be agreed to among the Borrowers and such Lenders and that the Borrowers shall have the right to have all of such increase provided by such approved additional lending institution or institutions if any of the existing Lenders decline to increase their commitments to make Advances (other than Swing Loans) to accommodate any such requested increase. In the event of any such increase in the Maximum Revolving Advance Amount and in the commitment to make Advances (other than Swing Loans) of any Lender effected pursuant to the terms of this Section 2.23, new Revolving Credit Notes shall, to the extent deemed reasonably necessary or appropriate by the Agent (or as may be reasonably requested by an existing Lender increasing its commitment to make Advances hereunder or an additional Lender that becomes a party hereto), be executed and delivered by the Borrowers and, to the extent deemed appropriate by the Agent, the surrender and cancellation of existing

Revolving Credit Note(s) shall be effected; and the Loan Parties shall execute and deliver such additional documentation setting forth the new commitments to make Advances (other than Swing Loans) as the Agent shall reasonably request (which documentation may be executed by the Loan Parties and the Agent (as administrative agent for the Lenders) without further consent or action of the Lenders, such consent herein is deemed to be irrevocably given to the Agent by the Lenders).

2.24    <u>Swing Loans</u>.

(a)    Subject to the terms and conditions hereof and relying upon the representations and warranties herein set forth, and in order to facilitate advances and repayments between Settlement Dates, PNC may, at its option, cancelable at any time for any reason whatsoever, make swing loans (the "<u>Swing Loans</u>") (which shall be Domestic Rate Loans only) to Borrowers at any time or from time to time after the date hereof to, but not including, the last day of the Term, in an aggregate principal amount up to but not in excess of ten percent (10%) of the Maximum Revolving Advance Amount (the "<u>Swing Loan Commitment</u>"), provided that the aggregate principal amount of PNC's Swing Loans and the Revolving Advances of all the Lenders shall not exceed the lesser of (x) the Maximum Revolving Advance Amount less the aggregate Maximum Undrawn Amount of outstanding Letters of Credit or (y) the Formula Amount.  Within such limits of time and amount and subject to the other provisions of this Agreement, Borrowers may borrow, repay and reborrow pursuant to this Section 2.24.

(b)    Except as otherwise provided herein, Borrowing Agent may from time to time prior to the last day of the Term request PNC to make Swing Loans by delivery to PNC not later than 12:00 p.m., on the proposed borrowing date of a duly completed request therefor in writing or a request by telephone immediately confirmed in writing by letter, facsimile or telex (each, a "<u>Swing Loan Request</u>"), it being understood that Agent may rely on the authority of any individual making such a telephonic request without the necessity of receipt of such written confirmation. Each Swing Loan Request shall be irrevocable and shall specify the proposed borrowing date and the principal amount of such Swing Loan.

(c)    So long as PNC elects to make Swing Loans, PNC shall, after receipt by it of a Swing Loan Request pursuant to Section 2.22(b) hereof, fund such Swing Loan to Borrowers in Dollars and immediately available funds at the Payment Office or other place that PNC may designate from time to time prior to 2:00 p.m., on the borrowing date.

(d)    The obligation of Borrowers to repay the aggregate unpaid principal amount of the Swing Loans made to Borrowers by PNC, together with interest thereon, shall be evidenced by a Swing Note in substantially the form attached hereto as Exhibit 2.24(d), dated the Closing Date payable to the order of PNC in a face amount equal to the Swing Loan Commitment.

(e)    PNC may, at its option, exercisable at any time for any reason whatsoever but not less frequently than on each Settlement Date, request repayment of the Swing Loans from the Lenders, and each Lender shall make a Revolving Advance in an amount equal to such Lender's Commitment Percentage of the aggregate principal amount of the outstanding Swing Loans, <u>*plus*</u>, if PNC so requests, accrued interest thereon, provided that no Lender shall be

obligated in any event to make Advances in excess of its commitment to make Advances. Revolving Advances made pursuant to the preceding sentence shall bear interest at the Revolving Interest Rate for Domestic Rate Loans and shall be deemed to have been properly requested in accordance with Section 2.2 hereof without regard to any of the requirements of that provision.  PNC shall provide notice to the Lenders (which may be telephonic or written notice by letter, facsimile or telex) that such Revolving Advances are to be made under this Section 2.24(e) and of the apportionment among the Lenders, and the Lenders shall be unconditionally obligated to fund such Revolving Advances (whether or not (i) the conditions specified in Section 8.2 hereof are then satisfied or (ii) a Default or an Event of Default has occurred and is continuing unless, prior to the time such Swing Loans were made, the Required Lenders shall have directed Agent not to make Advances to Borrowers) by the time PNC so requests, which shall not be earlier than 3:00 p.m. on the next Business Day after the date the Lenders receive such notice from PNC.

2.25    Mandatory Prepayments.

Subject to Section 4.3 hereof, when any Borrower sells or otherwise disposes of any ABL Priority Collateral other than Inventory in the Ordinary Course of Business or as otherwise permitted under this Agreement), subject to the terms of the Intercreditor Agreement, Borrowers shall repay the Advances in an amount equal to the net proceeds of such sale (i.e., gross proceeds less the reasonable costs of such sales or other dispositions), such repayments to be made promptly but in no event more than one (1) Business Day following receipt of such net proceeds, and until the date of payment, such proceeds shall be held in trust for Agent.  The foregoing shall not be deemed to be implied consent to any such sale otherwise prohibited by the terms and conditions hereof. Such repayments shall be applied (i) in the case of proceeds of Ex-Im Collateral, first to the Ex-Im Revolving Advances, then to all other Advances in such order as Agent may determine, and (ii) in all other cases to the Advances in such order as Agent may determine, subject to Borrowers' ability to reborrow Revolving Advances and Ex-Im Revolving Advances in accordance with the terms hereof.

III.    INTEREST AND FEES.

3.1    Interest.

(a)    Interest on Advances shall be payable in arrears on the first (1st) day of each month with respect to Domestic Rate Loans and, with respect to Eurodollar Rate Loans, at the end of each Interest Period. Interest charges shall be computed on the actual principal amount of Advances outstanding during the month at a rate per annum equal to the applicable Revolving Interest Rate. From the Closing Date through the day immediately preceding the first (1st) Adjustment Date, (x) Domestic Rate Loans shall bear interest for each day at a rate per annum equal to the Alternate Base Rate plus one percent (1.00%), and (y) Eurodollar Rate Loans shall bear interest for each applicable Interest Period at a rate per annum equal to the Eurodollar Rate plus two percent (2.00%).

(b)    Subject to the terms and conditions of this Agreement, with respect to each fiscal quarter of the Borrowing Agent, in accordance with Section 9.8 hereof, the Borrowing Agent shall submit to Agent a Compliance Certificate calculating Average Undrawn

Availability as of the last day of such fiscal quarter.  Upon receipt by Agent of a Compliance Certificate as of December 31, 2014, and as of the last day of each fiscal quarter thereafter, Average Undrawn Availability shall be calculated. Any increase or decrease in the Applicable Base Rate Margin, the Applicable Eurodollar Rate Margin, or the Applicable Letter of Credit and Acceptance Fee Percentage computed as of a fiscal quarter end shall be effective on the date on which the Compliance Certificate calculating Average Undrawn Availability is due to be delivered under Section 9.8 hereof (each, an "Adjustment Date").  From each Adjustment Date until the next Adjustment Date, (x) Domestic Rate Loans shall bear interest for each day at a rate per annum equal to the Alternate Base Rate *plus* the applicable margin determined by reference to Borrowers' Average Undrawn Availability (the "Applicable Base Rate Margin") set forth below and (y) Eurodollar Rate Loans shall bear interest during each applicable Interest Period at a rate per annum equal to the Eurodollar Rate *plus* the applicable margin determined by reference to Borrowers' Average Undrawn Availability (the "Applicable Eurodollar Rate Margin") set forth below:

| Tier | Average Undrawn Availability | Applicable Base Rate Margin | Applicable Eurodollar Rate Margin | Applicable Letter of Credit and Acceptance Fee Percentage |
|------|------------------------------|------------------------------|------------------------------------|------------------------------------------------------------|
| I | less than the greater of 17% of the Maximum Revolving Advance Amount and $17,000,000.00 | 1.25% | 2.25% | 2.25% |
| II | greater than or equal to the greater of 17% of the Maximum Revolving Advance Amount and $17,000,000.00 and less than or equal to the greater of 35% of the Maximum Revolving Advance Amount and $35,000,000.00 | 1.00% | 2.00% | 2.00% |
| III | greater than the greater of 35% of the Maximum Revolving Advance Amount and $35,000,000.00 | 0.75% | 1.75% | 1.75% |

(c)    Subject to the terms and conditions of this Agreement, in the event that Borrowing Agent fails to timely deliver any Compliance Certificate calculating Average Undrawn Availability in accordance with Section 9.8 hereof the Applicable Base Rate Margin, the Applicable Eurodollar Rate Margin and the Applicable Letter of Credit and Acceptance Fee Percentage shall be the amount corresponding to Tier I until the delivery of such Compliance Certificate calculating Average Undrawn Availability.

(d)    Whenever, subsequent to the date of this Agreement, the Alternate Base Rate is increased or decreased, the Revolving Interest Rate for Domestic Rate Loans shall be similarly changed without notice or demand of any kind by an amount equal to the amount of such change in the Alternate Base Rate during the time such change or changes remain in effect. The Eurodollar Rate shall be adjusted with respect to Eurodollar Rate Loans without notice or demand of any kind on the effective date of any change in the Reserve Percentage as of such effective date. Upon and after the occurrence of an Event of Default, and during the continuation thereof, at the option of Agent or at the direction of Required Lenders, Revolving Advances and Ex-Im Revolving Advances shall bear interest at the applicable Revolving Interest Rate (with an Applicable Base Rate Margin or Applicable Eurodollar Rate Margin corresponding to Tier I in the pricing grid set forth in Section 3.1(b) hereof) *plus* two percent (2.0%) per annum (the "Default Rate").

3.2    Letter of Credit and Acceptance Fees.

(a)    Borrowers shall pay (x) to Agent, for the ratable benefit of Lenders, fees for each Letter of Credit and each Acceptance for the period from and excluding the date of issuance or creation of same to and including the date of expiration or termination, equal to the average daily face amount of each outstanding Letter of Credit and each outstanding Acceptance multiplied by (i) from the Closing Date until the first (1st) Adjustment Date, two percent (2.00%) per annum and (ii) on and after the first (1st) Adjustment Date, the applicable percentage per annum determined by reference to Average Undrawn Availability as set forth in Section 3.1(b) hereof (the "Applicable Letter of Credit and Acceptance Fee Percentage"), such fees to be calculated on the basis of a 360-day year for the actual number of days elapsed and to be payable monthly in arrears on the first (1st) day of each month and on the last day of the Term, and (y) to the Issuer, a fronting fee of one quarter of one percent (0.25%) per annum, together with any and all administrative, issuance, creation, amendment, payment and negotiation charges with respect to Letters of Credit and Acceptances and all fees and expenses as agreed upon by the Issuer and Borrowing Agent in connection with any Letter of Credit and Acceptances, including in connection with the opening, amendment or renewal of any such Letter of Credit, any acceptances created thereunder and Acceptances and shall reimburse Agent for any and all fees and expenses, if any, paid by Agent to the Issuer (all of the foregoing fees, the "Letter of Credit and Acceptance Fees").  All such charges shall be deemed earned in full on the date when the same are due and payable hereunder and shall not be subject to rebate or pro-ration upon the termination of this Agreement for any reason.  Any such charge in effect at the time of a particular transaction shall be the charge for that transaction, notwithstanding any subsequent change in the Issuer's prevailing charges for that type of transaction.  All Letter of Credit and Acceptance Fees payable hereunder shall be deemed earned in full on the date when the same are due and payable hereunder and shall not be subject to rebate or pro-ration upon the termination of this Agreement for any reason.  Upon and after the occurrence of an Event of Default, and during the continuation thereof, at the option of Agent or at the direction of Required Lenders, the Letter of Credit and Acceptance Fees described in clause (x) of this Section 3.2(a) (with an Applicable Letter of Credit and Acceptance Fee Percentage corresponding to Tier I in the pricing grid set forth in Section 3.1(b) hereof) shall be increased by an additional two percent (2.0%) per annum.

(b)     Upon the occurrence and during the continuation of an Event of Default, at the option of Agent or at the direction of Required Lenders, Borrowers will cause cash to be deposited and maintained in an account with Agent, as cash collateral, in an amount equal to one hundred five percent (105%) of the Maximum Undrawn Amount of all outstanding Letters of Credit and Acceptances, and each Borrower hereby irrevocably authorizes Agent, in its discretion, on such Borrower's behalf and in such Borrower's name, to open such an account and to make and maintain deposits therein, or in an account opened by such Borrower, in the amounts required to be made by such Borrower, out of the proceeds of Receivables or other Collateral or out of any other funds of such Borrower coming into any Lender's possession at any time. Agent will invest such cash collateral (less applicable reserves) in such short-term money-market items as to which Agent and such Borrower mutually agree and the net return on such investments shall be credited to such account and constitute additional cash collateral. No Borrower may withdraw amounts credited to any such account except upon the occurrence of all of the following:  (x) payment and performance in full of all Obligations (other than contingent indemnification obligations for which no claim giving rise thereto has been asserted), (y) expiration of all Letters of Credit and Acceptances and (z) termination of this Agreement.

3.3     <u>Facility Fee</u>.

If, for any month during the Term, the average daily Consolidated Facility Usage for each day of such month does not equal the Maximum Revolving Advance Amount (for purposes of this computation, PNC's Swing Loans shall be deemed to be borrowed amounts under its commitment to make Revolving Advances), then Borrowers shall pay to Agent for the ratable benefit of Lenders a fee at a rate equal to the product of (i) the Facility Fee Rate with respect to such month, multiplied by (ii) the amount by which the Maximum Revolving Advance Amount exceeds such average daily Consolidated Facility Usage.  Such fee shall be payable to Agent in arrears on the first (1st) day of each month with respect to the previous month.

3.4     [Reserved].

3.5     <u>Fee Letter</u>.

Borrowers shall pay the amounts required to be paid in the Fee Letter in the manner and at the times required by the Fee Letter.

3.6     <u>Computation of Interest and Fees</u>.

Interest and fees hereunder shall be computed on the basis of a year of three hundred sixty (360) days and for the actual number of days elapsed. If any payment to be made hereunder becomes due and payable on a day other than a Business Day, the due date thereof shall be extended to the next succeeding Business Day and interest thereon shall be payable at the Revolving Interest Rate for Domestic Rate Loans during such extension.

3.7     <u>Maximum Charges</u>.

In no event whatsoever shall interest and other charges charged hereunder exceed the highest rate permissible under law.  In the event interest and other charges as computed hereunder would otherwise exceed the highest rate permitted under law, such excess amount

shall be first applied to any unpaid principal balance owed by Borrowers, and if the then remaining excess amount is greater than the previously unpaid principal balance, Lenders shall promptly refund such excess amount to Borrowers and the provisions hereof shall be deemed amended to provide for such permissible rate.

3.8    <u>Increased Costs</u>.

In the event that any Applicable Law, any Change in Law, or compliance by any Lender (for purposes of this Section 3.8, the term "<u>Lender</u>" shall include Agent or any Lender and any corporation or bank controlling Agent or any Lender) and the office or branch where Agent or any Lender (as so defined) makes or maintains any Eurodollar Rate Loans with any request or directive (whether or not having the force of law) from any central bank or other financial, monetary or other authority, shall:

(a)    subject Agent or any Lender to any tax of any kind whatsoever with respect to this Agreement or any Other Document or change the basis of taxation of payments to Agent or any Lender of principal, fees, interest or any other amount payable hereunder or under any Other Documents (except, in each case, for (A) changes in the rate of Tax on the overall net income of Agent or any Lender by the jurisdiction in which it maintains its principal office, (B) Indemnified Taxes, (C) taxes described in clauses (b) through (c) of the definition of Excluded Taxes and (D) Connection Income Taxes);

(b)    impose, modify or hold applicable any reserve, special deposit, assessment or similar requirement against assets held by, or deposits in or for the account of, advances or loans by, or other credit extended by, any office of Agent or any Lender, including pursuant to Regulation D of the Board of Governors of the Federal Reserve System; or

(c)    impose on Agent or any Lender or the London interbank Eurodollar market any other condition with respect to this Agreement or any Other Document;

and the result of any of the foregoing is to increase the cost to Agent or any Lender of making, renewing or maintaining its Advances hereunder by an amount that Agent or such Lender deems to be material or to reduce the amount of any payment (whether of principal, interest or otherwise) in respect of any of the Advances by an amount that Agent or such Lender deems to be material, then, in any case Borrowers shall promptly pay Agent or such Lender, upon its demand, such additional amount as will compensate Agent or such Lender for such additional cost or such reduction, as the case may be, provided that the foregoing shall not apply to increased costs which are reflected in the Eurodollar Rate, as the case may be. Agent or such Lender shall certify the amount of such additional cost or reduced amount to Borrowing Agent, and such certification shall be conclusive absent manifest error.

3.9    <u>Basis For Determining Interest Rate Inadequate or Unfair</u>.

In the event that Agent or any Lender shall have determined that:

(a)    reasonable means do not exist for ascertaining the Eurodollar Rate for any Interest Period; or

(b)    Dollar deposits in the relevant amount and for the relevant maturity are not available in the London interbank Eurodollar market, with respect to an outstanding Eurodollar Rate Loan, a proposed Eurodollar Rate Loan, or a proposed conversion of a Domestic Rate Loan into a Eurodollar Rate Loan,

then Agent shall give Borrowing Agent prompt written or telephonic of such determination.  If such notice is given, (i) any such requested Eurodollar Rate Loan shall be made as a Domestic Rate Loan, unless Borrowing Agent shall notify Agent no later than 12:00 p.m. two (2) Business Days prior to the date of such proposed borrowing, that its request for such borrowing shall be cancelled or made as an unaffected type of Eurodollar Rate Loan, (ii) any Domestic Rate Loan or Eurodollar Rate Loan which was to have been converted to an affected type of Eurodollar Rate Loan shall be continued as or converted into a Domestic Rate Loan, or, if Borrowing Agent shall notify Agent, no later than 12:00 p.m. two (2) Business Days prior to the proposed conversion, shall be maintained as an unaffected type of Eurodollar Rate Loan, and (iii) any outstanding affected Eurodollar Rate Loans shall be converted into a Domestic Rate Loan, or, if Borrowing Agent shall notify Agent, no later than 12:00 p.m. two (2) Business Days prior to the last Business Day of the then current Interest Period applicable to such affected Eurodollar Rate Loan, shall be converted into an unaffected type of Eurodollar Rate Loan, on the last Business Day of the then current Interest Period for such affected Eurodollar Rate Loans.  Until such notice has been withdrawn, Lenders shall have no obligation to make an affected type of Eurodollar Rate Loan or maintain outstanding affected Eurodollar Rate Loans and no Borrower shall have the right to convert a Domestic Rate Loan or an unaffected type of Eurodollar Rate Loan into an affected type of Eurodollar Rate Loan.

3.10    Capital Adequacy.

(a)    In the event that Agent or any Lender shall have determined that any Applicable Law or guideline regarding capital adequacy, any Change in Law, or any change in the interpretation or administration thereof by any Governmental Body, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by Agent or any Lender (for purposes of this Section 3.10, the term "Lender" shall include Agent or any Lender and any corporation or bank controlling Agent or any Lender) and the office or branch where Agent or any Lender (as so defined) makes or maintains any Eurodollar Rate Loans with any request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on Agent or any Lender's capital as a consequence of its obligations hereunder to a level below that which Agent or such Lender could have achieved but for such adoption, change or compliance (taking into consideration Agent's and each Lender's policies with respect to capital adequacy) by an amount deemed by Agent or any Lender to be material, then, from time to time, Borrowers shall pay upon demand to Agent or such Lender such additional amount or amounts as will compensate Agent or such Lender for such reduction.  In determining such amount or amounts, Agent or such Lender may use any reasonable averaging or attribution methods.  The protection of this Section 3.10 shall be available to Agent and each Lender regardless of any possible contention of invalidity or inapplicability with respect to the Applicable Law or condition.

(b)    A certificate of Agent or such Lender setting forth such amount or amounts as shall be necessary to compensate Agent or such Lender with respect to Section 3.10(a) hereof when delivered to Borrowing Agent shall be conclusive absent manifest error.

3.11    <u>Gross Up for Taxes</u>.

(a)    If any Borrower or Agent on account of payments by Borrower shall be required by Applicable Law to withhold or deduct any Taxes from or in respect of any sum payable under this Agreement or any of the Other Documents to Agent, or any Lender, assignee of any Lender, or Participant (each, individually, a "<u>Payee</u>" and collectively, the "<u>Payees</u>"), subject to Section 16.3(b), (a) if such withheld or deducted Taxes are Indemnified Taxes, the sum payable by Borrower to such Payee or Payees, as the case may be, shall be increased as may be necessary so that, after making all required withholding or deductions of Indemnified Taxes, the applicable Payee or Payees receives an amount equal to the sum it would have received had no such withholding or deductions been made (the "<u>Gross-Up Payment</u>"), (b) such Borrower shall make such withholding or deductions of Taxes, and (c) such Borrower shall pay the full amount of Taxes withheld or deducted to the relevant taxation authority or other authority in accordance with Applicable Law.  Except as otherwise provided in Section 16.5 with respect to certain Taxes arising on certain assignments, the Loan Parties shall jointly and severally indemnify each Agent and Payee (a "<u>Tax Indemnitee</u>") for the full amount of Indemnified Taxes arising in connection with this Agreement or any other Loan Document (including, without limitation, any Indemnified Taxes imposed or asserted on, or attributable to, amounts payable under this Section 3.11) payable or paid by, such Tax Indemnitee and all reasonable and documented costs and expenses (including reasonable fees and disbursements of counsel), actually incurred in connection therewith (whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Body), except as arising out of the gross negligence or willful misconduct if the Tax Indemnitee (as determined by a court of competent jurisdiction in a final and non-appealable judgment).  The obligations of the Borrowers and Loan Parties under this Section 3.11 shall survive the termination of this Agreement and the repayment of the Loans.

(b)    If any Lender requests indemnification or any additional amounts pursuant to this Section 3.11, then such Lender shall use reasonable efforts to designate a different lending office for funding hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to this Section 3.11 and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(c)    If any Lender requests indemnification or any additional amounts pursuant to this Section 3.11, then the Borrowers may, at their sole expense and effort, upon notice to such Lender and the Borrowing Agent and Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 16.3), all of its interests, rights and obligations under this Agreement, the Notes and the Other Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment) provided that:

(i)    The Borrowers shall have paid to the Agent the assignment fee specified in Section 16.3;

(ii)    Such Lender shall have received payment of an amount equal to the outstanding principal of its Advances, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the Other Documents (including any amounts under Section 2.17 from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts);

(iii)    In the case of any such assignment resulting from a claim for compensation under Section 3.8 or payments required to be made pursuant to Section 3.11, such assignment will result in a reduction in such compensation or payments thereafter; and

(iv)    Such assignment does not conflict with Applicable Law.

3.12    <u>Withholding Tax Exemption</u>.

(a)    Each Payee that is not incorporated under the Laws of the United States of America or a State thereof (and, upon the written request of Agent, each other Payee) agrees that it will deliver to Borrowing Agent and Agent two (2) duly completed appropriate valid Withholding Certificates (as defined under §1.1441-1(c)(16) of the Income Tax Regulations ("<u>Regulations</u>")) certifying its status (i.e., U.S. or foreign person) and, if appropriate, making a claim of reduced, or exemption from, U.S. withholding tax on the basis of an income tax treaty or an exemption provided by the Code.  The term "<u>Withholding Certificate</u>" means a Form W-9; a Form W-8BEN; a Form W—8BEN-E; a Form W-8ECI; a Form W-8IMY and the related statements and certifications as required under §1.1441-1(e)(2) and/or (3) of the Regulations; a statement described in §1.871-14(c)(2)(v) of the Regulations; or any other certificates under the Code or Regulations that certify or establish the status of a payee or beneficial owner as a U.S. or foreign person.

(b)    Each Payee required to deliver to Borrowing Agent and Agent a valid Withholding Certificate pursuant to Section 3.12(a) hereof shall deliver such valid Withholding Certificate as follows:  (A) each Payee which is a party hereto on the Closing Date shall deliver such valid Withholding Certificate at least five (5) Business Days prior to the first date on which any interest or fees are payable by any Borrower hereunder for the account of such Payee; (B) each Payee shall deliver such valid Withholding Certificate at least five (5) Business Days before the effective date of such assignment or participation (unless Agent in its sole discretion shall permit such Payee to deliver such Withholding Certificate less than five (5) Business Days before such date in which case it shall be due on the date specified by Agent).  Each Payee which so delivers a valid Withholding Certificate further undertakes to deliver to Borrowing Agent and Agent two (2) additional copies of such Withholding Certificate (or a successor form) on or before the date that such Withholding Certificate expires or becomes obsolete or after the occurrence of any event requiring a change in the most recent Withholding Certificate so delivered by it, and such amendments thereto or extensions or renewals thereof as may be reasonably requested by Borrowing Agent or Agent.

IV.     COLLATERAL; GENERAL TERMS.

    4.1     Security Interest in the Collateral.

            To secure the prompt payment and performance to Agent and each Lender of the Obligations, each Loan Party hereby assigns, pledges and grants to Agent for its benefit and for the ratable benefit of each Lender a continuing security interest in and to and Lien (subject in each case to Permitted Liens) on all of its Collateral, whether now owned or existing or hereafter acquired or arising and wheresoever located.  Each Loan Party shall mark its books and records as may be necessary or appropriate to evidence, protect and perfect Agent's security interest and shall cause its financial statements to reflect such security interest.  Each Loan Party shall promptly provide Agent with written notice of all commercial tort claims, such notice to contain the case title together with the applicable court and a brief description of the claim(s).  Upon delivery of each such notice, the applicable Loan Party shall be deemed to hereby grant to Agent a security interest and lien in and to such commercial tort claims and all proceeds thereof.

    4.2     Perfection of Security Interest.

            Each Loan Party shall take all action that may be necessary, or that Agent may reasonably request, so as at all times to maintain the validity, perfection, enforceability and priority of Agent's security interest in and Lien on the Collateral or to enable Agent to protect, exercise or enforce its rights hereunder and in the Collateral, including (i) immediately discharging all Liens other than Permitted Liens, (ii) using commercially reasonable efforts to obtain Lien Waiver Agreements for locations where (A) domestic Collateral is located, and (B) foreign Collateral is located to the extent the Borrowers are seeking or may seek to have any of such Collateral included in the Formula Amount, (iii) delivering to Agent, endorsed or accompanied by such instruments of assignment as Agent may specify, and stamping or marking, in such manner as Agent may specify, any and all chattel paper, instruments, letters of credits and advices thereof and documents evidencing or forming a part of the Collateral, (iv) entering into warehousing, lockbox and other custodial arrangements satisfactory to Agent, and (v) executing and delivering financing statements, control agreements, instruments of pledge, mortgages, notices and assignments, in each case in form and substance reasonably satisfactory to Agent, relating to the creation, validity, perfection, maintenance or continuation of Agent's security interest and Lien under the Uniform Commercial Code or other Applicable Law, in each case subject to the terms of the Intercreditor Agreement.  By its signature hereto, each Loan Party hereby authorizes Agent to file against such Loan Party, one or more financing, continuation or amendment statements pursuant to the Uniform Commercial Code in form and substance satisfactory to Agent (which statements may have a description of collateral which is broader than that set forth herein).  All charges, expenses and fees Agent may incur in doing any of the foregoing, and any local taxes relating thereto, shall be charged to Borrowers' Account as a Revolving Advance of a Domestic Rate Loan and added to the Obligations, or, at Agent's option, shall be paid to Agent for its benefit and for the ratable benefit of Lenders immediately upon demand.

4.3     Disposition of Collateral.

Each Loan Party will safeguard and protect all Collateral for Agent's general account and make no disposition thereof whether by sale, lease or otherwise except as otherwise permitted under this Agreement.

4.4     Preservation of Collateral.

In addition to the rights and remedies set forth in Section 11.1 hereof, Agent: (a) upon the occurrence and during the continuation of a Default or an Event of Default, may at any time take such steps as Agent in its commercially reasonable discretion deems necessary to protect Agent's interest in and to preserve the Collateral, including the hiring of such security guards or the placing of other security protection measures as Agent may deem appropriate; (b) may, upon the occurrence and during the continuation of a Default or an Event of Default, employ and maintain at any of the Loan Parties' premises a custodian who shall have full authority to do all acts necessary to protect Agent's interests in the Collateral; (c) may, upon the occurrence and during the continuation of a Default or an Event of Default, lease warehouse facilities to which Agent may move all or part of the Collateral; (d) may, upon the occurrence and during the continuation of a Default or an Event of Default, use any Loan Party's owned or leased lifts, hoists, trucks and other facilities or equipment for handling or removing the Collateral; and (e) shall have, and is hereby granted, a right of ingress and egress to the places where the Collateral is located, and may proceed over and through any of the Loan Parties' owned or leased property upon the occurrence and during the continuation of a Default or an Event of Default.   Each Loan Party shall cooperate fully with all of Agent's commercially reasonable efforts to preserve the Collateral and will take such actions to preserve the Collateral as Agent may reasonably direct.   All of Agent's expenses of preserving the Collateral in accordance with the terms of this Agreement and Applicable Law, including any expenses relating to the bonding of a custodian, shall be charged to Borrowers' Account as a Revolving Advance maintained as a Domestic Rate Loan and added to the Obligations.

4.5     Ownership of Collateral.

(a)     With respect to the Collateral, at the time the Collateral becomes subject to Agent's security interest:  (i) the applicable Loan Party shall be the sole owner of and fully authorized and able to sell, transfer, pledge and/or grant a first priority security interest in each and every item of its respective Collateral to Agent, subject to the terms of the Intercreditor Agreement; and, except for Permitted Liens, the Collateral shall be free and clear of all Liens and encumbrances whatsoever; (ii) each document and agreement executed by any Loan Party or delivered to Agent or any Lender in connection with this Agreement shall be true and correct in all material respects; (iii) all signatures and endorsements of any Loan Party that appear on such documents and agreements shall be genuine and such Loan Party shall have full capacity to execute same; and (iv) each Loan Party's Equipment and Inventory shall be located as set forth on Schedule 4.5 and shall not be removed from such location(s) without the prior written consent of Agent except with respect to the sale of Inventory or Equipment, as permitted herein, items in transit and except as otherwise permitted under this Agreement.

(b)    (i) Schedule 4.5 hereto contains a correct and complete list, as of the Closing Date, of the legal names and addresses of (A) each owned or leased domestic location at which Inventory of any Loan Party is stored and (B) each owned or leased foreign location at which Inventory of any Loan Party is stored and the Borrowers are seeking or may seek to have such Inventory included in the Formula Amount; none of the receipts received by any Loan Party from any warehouse states that the goods covered thereby are to be delivered to bearer or to the order of a named Person or to a named Person and such named Person's assigns; (iii) Schedule 4.5 hereto sets forth a correct and complete list as of the Closing Date of (A) each principal place of business of each Loan Party and (B) the chief executive office of each Loan Party; and (iv) Schedule 5.12 hereto sets forth a correct and complete list as of the Closing Date of the location, by state and street address, of all Real Property owned or leased by each Loan Party, together with the names and addresses of any landlords.

4.6    Defense of Agent's and Lenders' Interests.

Until (a) payment and performance in full of all of the Obligations and (b) termination of this Agreement, Agent's interests in the Collateral shall continue in full force and effect. During such period no Loan Party shall, without Agent's prior written consent, pledge, sell (except as otherwise permitted under this Agreement), assign, transfer, create or suffer to exist a Lien upon or encumber or allow or suffer to be encumbered in any way except for Permitted Liens, any part of the Collateral. Each Loan Party shall defend Agent's interests in the Collateral against any and all Persons whatsoever. At any time following demand by Agent for payment of all Obligations upon the occurrence and during the continuation of a Default or an Event of Default, Agent shall have the right, subject to the terms of the Intercreditor Agreement, to take possession of the indicia of the Collateral and the Collateral in whatever physical form contained, including: labels, stationery, documents, instruments and advertising materials. If Agent exercises this right to take possession of the Collateral upon the occurrence and during the continuation of a Default or an Event of Default, the Loan Parties shall, upon demand, assemble it in the best manner possible and make it available to Agent at a place reasonably convenient to Agent. In addition, with respect to all Collateral, Agent and Lenders shall be entitled to all of the rights and remedies set forth herein and further provided by the Uniform Commercial Code or other Applicable Law. Upon the occurrence and during the continuation of a Default or an Event of Default, each Loan Party shall, and Agent may, at its option, instruct all suppliers, carriers, forwarders, warehousers or others receiving or holding cash, checks, Inventory, documents or instruments in which Agent holds a security interest to deliver same to Agent and/or subject to Agent's order and if they shall come into any Loan Party's possession, they, and each of them, shall be held by such Loan Party in trust as Agent's trustee, and such Loan Party will immediately deliver them to Agent in their original form together with any necessary endorsement.

4.7    Books and Records.

Each Loan Party shall (a) keep proper books of record and account in which full, true and correct entries will be made of all dealings or transactions of or in relation to its business and affairs; (b) set up on its books accruals with respect to all taxes, assessments, charges, levies and claims; and (c) on a reasonably current basis set up on its books, from its earnings, allowances against doubtful Receivables, advances and investments and all other proper accruals

(including by reason of enumeration, accruals for premiums, if any, due on required payments and accruals for depreciation, obsolescence, or amortization of properties), which should be set aside from such earnings in connection with its business.  All determinations pursuant to this subsection shall be made in accordance with, or as required by, GAAP consistently applied in the opinion of such independent public accountant as shall then be regularly engaged by the applicable Loan Party.

    4.8     Financial Disclosure.

        Each Loan Party hereby irrevocably authorizes and directs all accountants and auditors employed by such Loan Party at any time during the Term to exhibit and deliver to Agent and each Lender copies of any of such Loan Party's financial statements, trial balances or other accounting records of any sort in the accountant's or auditor's possession, and to disclose to Agent and each Lender any information such accountants may have concerning such Loan Party's financial status and business operations.  Each Loan Party hereby authorizes all Governmental Bodies to furnish to Agent and each Lender copies of reports or examinations relating to such Loan Party, whether made by such Loan Party or otherwise; however, Agent and each Lender will attempt to obtain such information or materials directly from such Loan Party prior to obtaining such information or materials from such accountants or Governmental Bodies.

    4.9     Compliance with Laws.

        Each Loan Party shall comply with all Applicable Laws with respect to the Collateral or any part thereof or to the operation of such Loan Party's business the non-compliance with which could reasonably be expected to have a Material Adverse Effect.

    4.10     Inspection of Premises; Field Examinations.

        At all reasonable times Agent and each Lender shall have full access to and the right to audit, check, inspect and make abstracts and copies from each Loan Party's books, records, audits, correspondence and all other papers relating to the Collateral and the operation of each Loan Party's business. Agent, any Lender and their agents may enter upon any premises of any Loan Party at any time during business hours and at any other reasonable time, and from time to time, for the purpose of inspecting the Collateral and any and all records pertaining thereto and the operation of such Loan Party's business.  Further, at such times as Agent deems advisable or necessary and at Loan Parties' expense, Agent shall cause to be conducted a field examination of any Loan Party; provided that the Agent shall not perform more than four (4) field examinations per year, unless in any case an Event of Default has occurred and is continuing or if the Ex-Im Bank requires field examinations to be conducted more frequently, in which event no such frequency limitation shall apply and the Loan Parties shall be responsible for any expenses associated with any and all field examinations conducted pursuant to this Section 4.10.  Further, at such times as Agent deems advisable or necessary and at Loan Parties' expense, Agent shall cause to be conducted an appraisal of the Inventory of any Loan Party; provided that the Loan Parties shall be responsible for the expense of any such appraisal no more than two (2) times per year, unless in any case an Event of Default has occurred and is continuing, in which event no such frequency limitation shall apply and the Loan Parties shall be

responsible for any expenses associated with any and all appraisals conducted pursuant to this Section 4.10.

    4.11   <u>Insurance</u>.

        The assets and properties of each Loan Party at all times shall be maintained in all material respects in accordance with the requirements of all insurance carriers which provide insurance with respect to the assets and properties of such Loan Party so that such insurance shall remain in full force and effect.  Each Loan Party shall bear the full risk of any loss of any nature whatsoever with respect to the Collateral.  At the Loan Parties' own cost and expense in amounts and with carriers reasonably acceptable to Agent, each Loan Party shall (a) keep all its insurable properties and properties in which such Loan Party has an interest insured against the hazards of fire, flood, sprinkler leakage, those hazards covered by extended coverage insurance and such other hazards, and for such amounts, as is customary in the case of companies engaged in businesses similar to such Loan Party's including business interruption insurance; (b) maintain a bond in such amounts as is customary in the case of companies engaged in businesses similar to such Loan Party insuring against larceny, embezzlement or other criminal misappropriation of insured's officers and employees who may either singly or jointly with others at any time have access to the assets or funds of such Loan Party either directly or through authority to draw upon such funds or to direct generally the disposition of such assets; (c) maintain public and product liability insurance against claims for personal injury, death or property damage suffered by others; (d) maintain all such worker's compensation or similar insurance as may be required under the laws of any state or jurisdiction in which such Loan Party is engaged in business; and (e) furnish Agent with (i) copies of all policies and evidence of the maintenance of such policies by the renewal thereof at least thirty (30) days before any expiration date, and (ii) appropriate loss payable endorsements in form and substance reasonably satisfactory to Agent, naming Agent as a co-insured and lender loss payee as its interests may appear with respect to all insurance coverage referred to in clauses (a) and (c) above, and providing (A) that, subject to the terms of the Intercreditor Agreement, all proceeds thereunder shall be payable to Agent, (B) no such insurance shall be affected by any act or neglect of the insured or owner of the property described in such policy, and (C) that such policy and loss payable clauses may not be cancelled, amended or terminated unless at least thirty (30) days' prior written notice is given to Agent. Subject to the terms of the Intercreditor Agreement, in the event of any loss thereunder, the carriers named therein hereby are directed by Agent and the Loan Parties to make payment for such loss to Agent and not to any Loan Party and Agent jointly. Subject to the terms of the Intercreditor Agreement, if any insurance losses are paid by check, draft or other instrument payable to any Loan Party and Agent jointly, Agent may endorse such Loan Party's name thereon and do such other things as Agent may deem advisable to reduce the same to cash. Subject to the terms of the Intercreditor Agreement, Agent is hereby authorized to adjust and compromise claims under insurance coverage referred to in clauses (a) and (b) above. Subject to the terms of the Intercreditor Agreement, all loss recoveries received by Agent upon any such insurance may be applied to the Obligations, in such order as Agent in its sole discretion shall reasonably determine; <u>provided</u>, so long as no Event of Default has occurred, any Borrower may reinvest such loss recoveries in assets of the Borrowers' business. Any surplus shall be paid by Agent to the Loan Parties or applied as may be otherwise required by law.  Anything hereinabove to the contrary notwithstanding, and subject to the fulfillment of the conditions set forth below and the terms of the Intercreditor Agreement, the Agent shall remit to the Loan

Parties insurance proceeds with respect to Collateral received by the Agent during any calendar year under insurance policies procured and maintained by the Loan Parties which insure the Loan Parties' insurable Collateral to the extent such insurance proceeds do not exceed Eight Million Five Hundred Thousand and 00/100 Dollars ($8,500,000.00) in the aggregate during such calendar year or Four Million Two Hundred Fifty Thousand and 00/100 Dollars ($4,250,000.00) per occurrence; provided that such insurance proceeds will be used by the Loan Parties to repair, replace or restore the insured Collateral which was the subject of the insurable loss.  The agreement of the Agent to remit insurance proceeds in the manner above provided shall be subject in each instance to satisfaction of each of the following conditions: (x) no Event of Default or Default shall then have occurred and be continuing, and (y) the Loan Parties shall use the insurance proceeds with respect to Collateral to repair, replace, restore or reuse the insured Collateral which was the subject of the insurable loss and for no other purpose.

      4.12    <u>Failure to Pay Insurance</u>.

      If the Loan Parties fails to obtain insurance as hereinabove provided, or to keep the same in force, Agent, if Agent so elects, may obtain such insurance and pay the premium therefor on behalf of the Loan Parties, and charge Borrowers' Account therefor as a Revolving Advance of a Domestic Rate Loan and such expenses so paid shall be part of the Obligations.

      4.13    [Reserved].

      4.14    <u>Payment of Leasehold Obligations</u>.

      Each Loan Party shall at all times pay, when and as due, its rental obligations under all leases under which it is a tenant, and shall otherwise comply, in all material respects, with all other terms of such leases and keep them in full force and effect (and, at Agent's reasonable request will provide evidence of having done so). except when the failure to make such payments or to so comply could not reasonably be expected to have a Material Adverse Effect.

      4.15    <u>Receivables</u>.

      (a)    <u>Nature of Receivables</u>.  Each of the Receivables shall be a bona fide and valid account representing a bona fide indebtedness incurred by the Customer therein named, for a fixed sum as set forth in the invoice relating thereto (provided immaterial or unintentional invoice errors shall not be deemed to be a breach hereof) with respect to an absolute sale or lease and delivery of goods upon stated terms of the applicable Loan Party, or work, labor or services theretofore rendered by the applicable Loan Party as of the date each Receivable is created. Same shall be due and owing in accordance with the applicable Loan Party's standard terms of sale without dispute, setoff or counterclaim except as may be stated on the accounts receivable schedules delivered by the Loan Parties to Agent.

      (b)    <u>Solvency of Customers</u>.  Each Customer, to the best of each Loan Party's knowledge, as of the date each Receivable is created, is and will be solvent and able to pay all Receivables on which the Customer is obligated in full when due or with respect to such Customers of such Loan Party who are not solvent such Loan Party has set up on its books and in its financial records bad debt reserves adequate to cover such Receivables.

(c)     <u>Location of Loan Parties</u>.  Each Loan Party's chief executive office is located at the address specified on <u>Schedule 4.5</u> with respect to such Loan Party. Until written notice is given to Agent by any Loan Party of any other office at which such Loan Party keeps its records pertaining to Receivables, all such records shall be kept at such executive office.

(d)     <u>Collection of Receivables</u>.  Until any Loan Party's authority to do so is terminated by Agent (which notice Agent may give at any time following the occurrence and during the continuation of a Default or an Event of Default), each Loan Party will, at such Loan Party's sole cost and expense, but on Agent's behalf and for Agent's account, collect as Agent's property and in trust for Agent all amounts received on Receivables, and shall not commingle such collections with such Loan Party's funds or use the same except to pay Obligations.  Each Loan Party shall deposit in the Blocked Account or, upon request by Agent, deliver to Agent, in original form and on the date of receipt thereof, all checks, drafts, notes, money orders, acceptances, cash and other evidences of Indebtedness.

(e)     <u>Notification of Assignment of Receivables</u>.  At any time following the occurrence and during the continuation of a Default or an Event of Default, Agent shall have the right to send notice of the assignment of, and Agent's security interest in and Lien on, the Receivables to any and all Customers or any third party holding or otherwise concerned with any of the Collateral.   Thereafter, Agent shall have the sole right to collect the Receivables, take possession of the Collateral, or both.   Agent's actual collection expenses, including, but not limited to, stationery and postage, telephone and telegraph, secretarial and clerical expenses and the salaries of any collection personnel used for collection, may be charged to Borrowers' Account and added to the Obligations.

(f)     <u>Power of Agent to Act on Loan Parties' Behalf</u>.  Agent shall have the right to receive, endorse, assign and/or deliver in the name of Agent or any Loan Party any and all checks, drafts and other instruments for the payment of money relating to the Receivables, and each Loan Party hereby waives notice of presentment, protest and non-payment of any instrument so endorsed.  Each Loan Party hereby constitutes Agent or Agent's designee as such Loan Party's attorney with power (i) to endorse such Loan Party's name upon any notes, acceptances, checks, drafts, money orders or other evidences of payment or Collateral; (ii) to sign such Loan Party's name on any invoice or bill of lading relating to any of the Receivables, drafts against Customers, assignments and verifications of Receivables; (iii) to send verifications of Receivables to any Customer; (iv) to sign such Loan Party's name on all financing statements or any other documents or instruments deemed necessary or appropriate by Agent to preserve, protect, or perfect Agent's interest in the Collateral and to file same; (v) upon the occurrence and during the continuation of an Event of Default or a Default, to demand payment of the Receivables; (vi) upon the occurrence and during the continuation of an Event of Default or a Default, to enforce payment of the Receivables by legal proceedings or otherwise; (vii) upon the occurrence and during the continuation of an Event of Default or a Default, to exercise all of such Loan Party's rights and remedies with respect to the collection of the Receivables and any other Collateral; (viii) upon the occurrence and during the continuation of an Event of Default or a Default, to settle, adjust, compromise, extend or renew the Receivables; (ix) upon the occurrence and during the continuation of an Event of Default or a Default, to settle, adjust or compromise any legal proceedings brought to collect Receivables; (x) upon the occurrence and during the continuation of an Event of Default or a Default, to prepare, file and sign such Loan

Party's name on a proof of claim in bankruptcy or similar document against any Customer; (xi) upon the occurrence and during the continuation of an Event of Default or a Default, to prepare, file and sign such Loan Party's name on any notice of Lien, assignment or satisfaction of Lien or similar document in connection with the Receivables; and (xii) to do all other acts and things necessary to carry out this Agreement in accordance with and as permitted pursuant to this Agreement and subject to the Intercreditor Agreement.  All acts of said attorney or designee are hereby ratified and approved, and said attorney or designee shall not be liable for any acts of omission or commission nor for any error of judgment or mistake of fact or of law, unless done maliciously or with gross (not mere) negligence (as determined by a court of competent jurisdiction in a final non-appealable judgment); this power being coupled with an interest is irrevocable while any of the Obligations remain unpaid. Agent shall have the right at any time, upon the occurrence and during the continuation of an Event of Default, to change the address for delivery of mail addressed to any Loan Party to such address as Agent may designate and to receive, open and dispose of all mail addressed to any Loan Party.

(g)     No Liability. Neither Agent nor any Lender shall, under any circumstances or in any event whatsoever, have any liability for any error or omission or delay of any kind occurring in the settlement, collection or payment of any of the Receivables or any instrument received in payment thereof, or for any damage resulting therefrom. Following the occurrence of a Default or an Event of Default that is continuing, Agent may, without notice or consent from any Loan Party, sue upon or otherwise collect, extend the time of payment of, compromise or settle for cash, credit or upon any terms any of the Receivables or any other securities, instruments or insurance applicable thereto and/or release any obligor thereof.    Agent is authorized and empowered following the occurrence and during the continuation of a Default or an Event of Default to accept the return of the goods represented by any of the Receivables, without notice to or consent by any Loan Party, all without discharging or in any way affecting any Loan Party's liability hereunder.

(h)     Establishment of a Lockbox Account, Dominion Account.  All proceeds of Domestic Collateral shall be deposited by each Loan Party into either (i) a lockbox account, dominion account or such other "blocked account" ("Blocked Accounts") established at a bank or banks (each such bank, a "Blocked Account Bank") pursuant to an arrangement with such Blocked Account Bank as may be selected by the applicable Loan Party and be acceptable to Agent or (ii) depository accounts ("Depository Accounts") established at Agent for the deposit of such proceeds. All proceeds of Ex-Im Collateral shall be deposited by each Loan Party into either (i) a Blocked Account at a Blocked Account Bank pursuant to an arrangement with such Blocked Account Bank as may be selected by the applicable Loan Party and be acceptable to Agent or (ii) Depository Accounts established at Agent for the deposit of such proceeds. No proceeds of Domestic Collateral shall be deposited in Blocked Accounts or Depository Accounts containing proceeds of Ex-Im Collateral and no proceeds of Ex-Im Collateral shall be deposited in Blocked Accounts or Depository Accounts containing proceeds of Domestic Collateral.  The applicable Loan Party, Agent and each Blocked Account Bank shall enter into a deposit account control agreement (each, a "Deposit Account Control Agreement") in form and substance satisfactory to Agent directing such Blocked Account Bank to transfer such funds so deposited to Agent, either to any account maintained by Agent at said Blocked Account Bank or by wire transfer to appropriate account(s) of Agent. All funds deposited in such Blocked Accounts shall immediately become the property of Agent and the applicable Loan Party shall obtain the

agreement by such Blocked Account Bank to waive any offset rights against the funds so deposited.  Neither Agent nor any Lender assumes any responsibility for such blocked account arrangement, including any claim of accord and satisfaction or release with respect to deposits accepted by any Blocked Account Bank thereunder.  All deposit accounts and investment accounts of the Loan Parties are set forth on Schedule 4.15(h).

(i)    Adjustments.  No Loan Party shall compromise or adjust any Receivables (or extend the time for payment thereof) or accept any returns of merchandise or grant any additional discounts, allowances or credits thereon which, in any case, involves an annual aggregate amount for all Receivables of all Loan Parties in excess of Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00) without prior written notice to Agent, except for those compromises, adjustments, returns, discounts, credits and allowances as have been heretofore customary in the business of such Loan Party.

4.16    Inventory.

To the extent Inventory held for sale or lease has been produced by any Loan Party, it has been and will be produced by such Loan Party in accordance with the Federal Fair Labor Standards Act of 1938, as amended, and all rules, regulations and orders thereunder.

4.17    Maintenance of Equipment.

The Equipment shall be maintained in good operating condition and repair (reasonable wear and tear excepted) and all necessary replacements of and repairs thereto shall be made so that the value of the Equipment shall be reasonably maintained and preserved.  No Loan Party shall use or operate the Equipment in violation of any law, statute, ordinance, code, rule or regulation unless such violation could not reasonably be expected to have a Material Adverse Effect.

4.18    Exculpation of Liability.

Nothing herein contained shall be construed to constitute Agent or any Lender as any Loan Party's agent for any purpose whatsoever, nor shall Agent or any Lender be responsible or liable for any shortage, discrepancy, damage, loss or destruction of any part of the Collateral wherever the same may be located and regardless of the cause thereof.  Neither Agent nor any Lender, whether by anything herein or in any assignment or otherwise, assume any of any Loan Party's obligations under any contract or agreement assigned to Agent or such Lender, and neither Agent nor any Lender shall be responsible in any way for the performance by any Loan Party of any of the terms and conditions thereof.

4.19    Financing Statements.

Except as respects the financing statements filed by Agent, the Term Loan Agent pursuant to the Term Loan Documents and the financing statements described on Schedule 1.2, no financing statement covering any of the Collateral or any proceeds thereof is on file in any public office.

V.      REPRESENTATIONS AND WARRANTIES.

In order to induce the Agent and Lenders to enter into this Agreement and to make the Advances and other extensions of credit as provided herein, each of each Loan Party (other than VSHC) and VHSC (solely with respect to the representations and warranties applicable to it) makes the following representations and warranties:

5.1     Organization Status.

Each of VSHC, VSI and each of the Restricted Subsidiaries (a) is a duly organized and validly existing entity in good standing (or existing, as applicable) under the laws of the jurisdiction of its organization, (b) has all requisite power and authority to own its material property and assets and to transact the business in which it is engaged and presently proposes to engage and (c) is, to the extent such concepts are applicable under the laws of the relevant jurisdiction, duly qualified and is authorized to do business and is in good standing in each jurisdiction where the ownership, leasing or operation of its property or the conduct of its business requires such qualifications except in the case of clauses (a) (other than with respect to the Borrowers), (b) and (c) for failures to be so qualified or authorized or have such power which, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

5.2     Power, Authority and Enforceability.

Each Loan Party has the requisite power and authority to execute, deliver and perform the terms and provisions of each of the Loan Documents to which it is party and has taken all necessary actions to authorize the execution, delivery and performance by it of each such Loan Document.  Each Loan Party has duly executed and delivered each of the Loan Documents to which it is party, and each of such Loan Documents constitutes its legal, valid and binding obligation, enforceable in accordance with its terms, except to the extent (a) that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law), (b) of the need for filings and registrations necessary to create or perfect the Liens on the Collateral granted by the Loan Parties in favor of Agent for the benefit of the itself and the Lenders and (c) the effect of foreign laws, rules and regulations as they relate to pledges of Equity Interests in Foreign Subsidiaries and Intercompany Debt owed by Foreign Subsidiaries.

5.3     No Violation.

Neither the execution, delivery or performance by any Loan Party of each of the Loan Documents to which it is a party, nor compliance by it with the terms and provisions thereof, (a) will contravene any provision of any material law, statute, rule or regulation or any order, writ, injunction or decree of any court or Governmental Body, except in the case of any contraventions that would not reasonably be expected, either individually or in the aggregate, to result in a Material Adverse Effect, (b) will conflict with, or result in any breach of, any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien (except pursuant to the

Loan Documents or Permitted Liens) upon any of the property or assets of any Loan Party or any of the Restricted Subsidiaries pursuant to the terms of, (i) the Term Loan Documents or (ii) any indenture, mortgage, deed of trust, credit agreement or loan agreement, or any other material agreement, contract or instrument, in each case to which any Loan Party or any Restricted Subsidiary is a party or by which it or any its property or assets is bound or to which it may be subject, except for any such contravention, breach, default, conflict or Lien that would not reasonably be expected, either individually or in the aggregate, to result in a Material Adverse Effect or (c) will violate any provision of the certificate or articles of incorporation, certificate of formation, limited liability company agreement or by-laws (or equivalent organizational documents), as applicable, of any Loan Party or any Restricted Subsidiary.

5.4    Approvals.

No order, consent, approval, license, authorization or validation of, or filing, recording or registration with, or exemption by, any Governmental Body or any material consent from third parties is required to be obtained or made by, or on behalf of, any Loan Party (except for (a) those that have otherwise been obtained or made on or prior to the Closing Date and which remain in full force and effect on the Closing Date, (b) filings which are necessary to release Liens granted pursuant to documents related to Indebtedness to be refinanced or repaid on the Closing Date, (c) filings which are necessary to perfect the security interests created under the Loan Documents and (d) those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure of which to obtain or make could not reasonably be expected to have a Material Adverse Effect) to authorize, or is required to be obtained or made by, or on behalf of, any Loan Party in connection with, (i) the execution, delivery and performance of any Loan Document or (ii) the legality, validity, binding effect or enforceability of any such Loan Document.

5.5    Financial Statements.

(a)    (i) The audited consolidated balance sheets and related statements of income and cash flows of VSI as of and for the fiscal years ended December 31, 2011, 2012 and 2013, furnished to the Agent and the Lenders on or prior to the Closing Date, present fairly in all material respects the consolidated financial position of VSI as of such dates and for such periods and (ii) the unaudited consolidated balance sheets and related statements of income and cash flows of VSI as of and for the fiscal quarter ended June 30, 2014 furnished to the Agent and the Lenders prior to the Closing Date, present fairly in all material respects the consolidated financial condition of VSI as of such dates and for such periods, subject to normal year-end adjustments and the absence of footnotes. All such financial statements have been prepared in accordance with GAAP consistently applied except to the extent provided in the notes to said financial statements and subject, in the case of the unaudited financial statements, to normal year-end audit adjustments and the absence of footnotes.

(b)    All financial statements delivered pursuant to Sections 9.7 and 9.8, if any, have been prepared in accordance with GAAP (except as otherwise provided in Sections 9.7 and 9.8)) and present fairly in all material respects the consolidated financial position of VSI as of the dates and for the periods to which they relate.

(c)     The pro forma consolidated balance sheet and related statement of income of VSI as of June 30, 2014 (after giving effect to (x) the Transactions and (y) the Acquisition) as if the Transactions and the Acquisition had occurred as of such date and for the fiscal quarter ended on such date), a copy of which has been furnished to the Agent and Lenders on or prior to the Closing Date, presents a good faith estimate of the pro forma consolidated financial position of VSI as of such date.

(d)     The Projections made available to the Agent and the Lenders on or prior to the Closing Date have been prepared in good faith and are based on assumptions that VSI believes reasonable at the time made and at the time such Projections were made available to the Agent, it being recognized by the Agent and the Lenders, however, that projections are subject to significant uncertainties and contingencies, which may be beyond VSI's and the Subsidiaries' control and projections as to future events are not to be viewed as facts or as a guarantee of performance or achievement of any particular results and that the actual results during the period or periods covered by the Projections may differ from the projected results included in such Projections and such differences may be material.

(e)     After giving effect to the Transactions, since December 31, 2013, nothing has occurred that has had, or could reasonably be expected to have, a Material Adverse Effect.

5.6     <u>Litigation</u>.

There are no actions, suits or proceedings pending or, to the knowledge of VSHC and VSI, threatened (a) with respect to the Loan Documents or (b) that have a reasonable likelihood of adverse determination, and, if adversely determined, have had, or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

5.7     <u>True and Complete Disclosure</u>.

All information (when furnished and taken as a whole) furnished by or on behalf of VSI in writing to the Agent or any Lender (including, without limitation, all information contained in the Confidential Information Memorandum and the Loan Documents but excluding information of a general economic or industry nature) for purposes of, or in connection with this Agreement, the other Loan Documents or any transaction contemplated herein or therein is, and all other such information as supplemented (when furnished and taken as a whole) hereafter furnished by or on behalf of VSHC, VSI or any Subsidiary in writing to the Agent or any Lender will be, true and accurate in all material respects on the date on which such information is furnished and not incomplete by omitting to state any fact necessary to make such information (when furnished and taken as a whole) not materially misleading at such time in light of the circumstances under which such information was provided; <u>provided</u> that for purposes of this Section 5.7, to the extent any such information constitutes Projections, any *pro forma* financial information, the budgets, other forward looking information such representation shall be only that such information was prepared in good faith based on assumptions believed by VSI to be reasonable at the time such information was furnished.

5.8     Margin Regulations.

No part of any Advance (or the proceeds thereof) will be used to purchase or carry any Margin Stock or to extend credit for the purpose of purchasing or carrying any Margin Stock.  Neither the making of any Advance nor the use of the proceeds thereof will violate the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System.

5.9     Tax Returns and Payments.

Each Loan Party's federal tax identification number is set forth on Schedule 5.9. Each of VSHC, VSI and each of the Restricted Subsidiaries has timely filed or caused to be timely filed (or filed for extension) with the appropriate taxing authority all federal and other returns, statements, forms and reports for taxes (the "Returns") required to be filed by, or with respect to the income, properties or operations of such Person, except where the failure to timely file or cause to be timely filed such Returns would not result in a Material Adverse Effect.  The Returns accurately reflect all liability for taxes of such Person for the periods covered thereby, except where the failure to accurately reflect a liability for taxes would not reasonably be expected to result in a Material Adverse Effect.  Each of VSHC, VSI and each of the Restricted Subsidiaries has paid all taxes and assessments payable by it which have become due, other than (a) those that are being contested in good faith and adequately disclosed and fully provided for on the financial statements of such Person in accordance with GAAP or (b) those the failure to pay would not reasonably be expected to result in a Material Adverse Effect.

5.10    Compliance with ERISA.

Schedule 5.10 sets forth each Plan as of the Closing Date.  Each Plan is in compliance in form and operation with its terms and with ERISA and the Code (including without limitation the Code provisions compliance with which is necessary for any intended favorable tax treatment) and all other applicable laws and regulations, except where any failure to comply would not reasonably be expected to have a Material Adverse Effect.  Except as would not reasonably be expected to have a Material Adverse Effect, each Plan (and each related trust, if any) which is intended to be qualified under Section 401(a) of the Code has received a current favorable determination letter from the IRS to the effect that it meets the requirements of Sections 401(a) and 501(a) of the Code or is comprised of a master or prototype plan that has received a favorable opinion letter from the IRS, and to the knowledge of VSI or any Subsidiary, nothing has occurred since the date of such determination or opinion that would reasonably be expected to result in revocation of such determination (or, in the case of a Plan with no determination, to the knowledge of VSI or any Subsidiary, nothing has occurred that would reasonably be expected to materially adversely affect the issuance of a favorable determination letter).  No ERISA Event has occurred other than as would not, individually or in the aggregate, have a Material Adverse Effect.

(a)     There exists no Unfunded Pension Liability with respect to any Plan that would have a Material Adverse Effect.

(b)     Neither VSI, nor any Subsidiary nor any of their respective ERISA Affiliates have incurred a complete or partial withdrawal from any Multiemployer Plan, and, if

each of VSI, any of the Subsidiaries and each ERISA Affiliate were to withdraw in a complete withdrawal as of the date this assurance is given or deemed given, the aggregate withdrawal liability that would be incurred would not reasonably be expected to result in a Material Adverse Effect.

(c)     There are no actions, suits or claims pending against or involving a Plan (other than routine claims for benefits) or, to the knowledge of VSI or any of the Subsidiaries, which would reasonably be expected to be asserted successfully against any Plan and, if so asserted successfully, would reasonably be expected either singly or in the aggregate to have a Material Adverse Effect.

(d)     No Lien imposed under the Code or ERISA on the assets of VSI or any Subsidiary exists or is reasonably expected to arise on account of any Plan.

(e)     Except as would not individually or in the aggregate, have a Material Adverse Effect, (i) each Foreign Pension Plan has been maintained in compliance with its terms and with the requirements of any and all applicable laws, statutes, rules, regulations and orders and has been maintained, where required, in good standing with applicable regulatory authorities, (ii) all contributions required to be made with respect to a Foreign Pension Plan have been timely made, (iii) neither any Borrower nor any of the Subsidiaries has incurred any obligation in connection with the termination of, or withdrawal from, any Foreign Pension Plan and (iv) the present value of the accrued benefit liabilities (whether or not vested) under each Foreign Pension Plan, determined as of the end of VSI's most recently ended fiscal year on the basis of actuarial assumptions, each of which is reasonable, did not exceed the current value of the assets of such Foreign Pension Plan allocable to such benefit liabilities.

5.11    Security Documents.

(a)     The provisions of Article IV of this Agreement are effective to create in favor of the Agent for the benefit of the Lenders a legal, valid and enforceable (except (i) to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law) and (ii) for the effect of foreign laws, rules and regulations as they relate to pledges of Equity Interests in Foreign Subsidiaries and Intercompany Debt owed by Foreign Subsidiaries) security interest in all right, title and interest of the Loan Parties in the Collateral described therein, and the Agent, for the benefit of the Lenders, has (or, after the filing of UCC-1 financing statements in the office and with the information specified by the Loan Parties in the Perfection Certificate, the payment of all applicable fees and the taking of such other actions as are required by the provisions of Article IV, will have) a fully perfected security interest in the United States in all right, title and interest in all of the Collateral (if and to the extent such Collateral can be perfected by the filing of UCC-1 financing statements and the other actions required by Article IV), subject to no other Liens other than Permitted Liens.  The recordation of security agreement(s) in respect of U.S. patents, trademarks or copyrights, in each case in the United States Patent and Trademark Office or the United States Copyright Office, as applicable, together with filings on UCC-1 financing statements made pursuant to this Agreement and payment of all applicable fees, will create, as

may be perfected by such filings and recordation, a perfected security interest in the U.S. patents, trademark registrations or copyrights that are part of the Collateral.

(b)     Upon filing or recording, as applicable, with the appropriate recording office, each Mortgage shall create, as security for the obligations purported to be secured thereby, a valid and enforceable (except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law)) perfected security interest in and mortgage Lien on the respective Mortgaged Property in favor of the Agent (or such other trustee as may be required or desired under local law) for the benefit of the Lenders, and subject to the Intercreditor Agreement, if any, superior and prior to the rights of all third Persons and subject to no other Liens other than, in each case, Permitted Liens.

5.12    Properties.

All real property owned or leased by VSHC, VSI or any of the Restricted Subsidiaries as of the Closing Date, and the nature of the interest therein, is correctly set forth on Schedule 5.12.  Each of VSHC, VSI and each of the Restricted Subsidiaries has good and marketable title to all real properties owned by it, free and clear of all Liens, other than Permitted Liens.  Each of VSHC, VSI and each of the Restricted Subsidiaries has a valid leasehold interest in the real properties leased by it free and clear of all Liens other than Permitted Liens. Each of VSI and each of the Restricted Subsidiaries has materially complied with all obligations under all leases to which it is a party and enjoys peaceful and undisturbed possession under all such leases.

5.13    Subsidiaries.

On and as of the Closing Date, (a) VSHC has no subsidiary other than VSI and (b) VSI has no Subsidiaries other than those Subsidiaries listed on Schedule 5.13.  Schedule 5.13 sets forth, as of the Closing Date, the percentage ownership (direct and indirect) of each such Person in each class of capital stock or other Equity Interests of VSI and each of the Subsidiaries and also identifies the direct owner thereof.  All outstanding shares of Equity Interests of VSI and each Subsidiary have been duly and validly issued, are fully paid and non-assessable (to the extent applicable).  As of the Closing Date, none of VSHC, VSI nor any Subsidiary has outstanding any securities convertible into or exchangeable for its or any other Person's Equity Interests or outstanding any right to subscribe for or to purchase, or any options or warrants for the purchase of, or any agreement providing for the issuance (contingent or otherwise) of or any calls, commitments or claims of any character relating to, its or any other Person's Equity Interests or any stock appreciation or similar rights except as disclosed on Schedule 5.13.

5.14    Compliance with Statutes, etc.

Each of VSHC, VSI and each of the Restricted Subsidiaries is in compliance with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Bodies in respect of the conduct of its business and the ownership of its property except such non-compliances as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

5.15    <u>Investment Company Act</u>.

None of VSHC, VSI nor any Restricted Subsidiary is required to be registered as an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

5.16    <u>Environmental Matters</u>.

Except as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (a) each of VSHC, VSI and each of the Restricted Subsidiaries is and has been in compliance with all applicable Environmental Laws and has obtained and is in compliance with the terms of any permits required under such Environmental Laws; (b) there are no Environmental Claims pending or to the knowledge of VSHC or VSI, threatened, against VSHC, VSI or any of the Restricted Subsidiaries; (c) no Lien, other than a Permitted Lien, has been recorded or to the knowledge of VSHC or VSI, threatened under any Environmental Law with respect to any real property owned by VSHC, VSI or any of the Restricted Subsidiaries; (d) none of VSHC, any Borrower or any Restricted Subsidiary has become subject to any Environmental Liability or has agreed to contractually assume or accept responsibility, for any Environmental Liability of any other Person; (e) no Person with an indemnity or contribution obligation to VSHC, VSI or any of the Restricted Subsidiaries relating to compliance with or liability under Environmental Law is in default with respect to such obligation; and (f) there are no facts, circumstances, conditions or occurrences with respect to the past or present business or operations of VSHC, VSI or any of the Restricted Subsidiaries that could reasonably be expected to give rise to any Environmental Claim against VSHC, VSI or any of the Restricted Subsidiaries or any Environmental Liability of VSHC, VSI or any of the Restricted Subsidiaries.  For purposes of this <u>Section 5.16</u>, the terms "<u>VSHC</u>," "<u>VSI</u>" and "<u>Restricted Subsidiary</u>" shall include any business or business entity which is, in whole or in part, a predecessor of VSHC, VSI or any Restricted Subsidiary.

5.17    <u>Employment and Labor Relations</u>.

Neither VSI nor any Subsidiary is engaged in any unfair labor practice that could reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect.  There is (a) no unfair labor practice complaint pending against VSI or any Subsidiary or, to the knowledge of VSI, threatened in writing against any of them, before the National Labor Relations Board, and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement is pending against VSI or any of the Subsidiaries or, to the knowledge of VSI or any Subsidiary, threatened in writing against any of them, (b) no strike, labor dispute, slowdown or stoppage pending against VSI or any of the Subsidiaries or, to the knowledge of VSI or any Subsidiary, threatened against any of them, (c) to the knowledge of VSI or any Subsidiary, no question concerning union representation with respect to the employees of VSI or any of the Subsidiaries, (d) no equal employment opportunity charge or other claim of employment discrimination pending or, to the knowledge of VSI or any Subsidiary, threatened in writing against any of them and (e) to the knowledge of VSI or any Subsidiary, no wage and hour department investigation has been made of VSI or any of the Subsidiaries, except (with respect to any matter specified in clauses (a) – (e) above, either

individually or in the aggregate) such as could not reasonably be expected to have a Material Adverse Effect.

5.18    Intellectual Property, Etc.

Each of VSHC, VSI and each of the Restricted Subsidiaries owns or has the right to use all of the patents, trademarks, permits, domain names, service marks, trade names, trade dress, copyrights, licenses, inventions, trade secrets, proprietary information and know-how of any type, whether or not written (including, but not limited to, rights in computer programs and databases), formulas, and other intellectual property rights (collectively, "IP Rights"), that are used or held for use in or otherwise required to operate their respective businesses, without any known conflict with the rights of others which, or the failure to own or have which, as the case may be, could reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect.

5.19    [Reserved].

5.20    [Reserved].

5.21    Insurance.

Schedule 5.21 sets forth a true, complete and correct description of all insurances maintained by VSHC, VSI or by each for the Restricted Subsidiaries as of the Closing Date. Such insurance is in full force and effect and all premiums have been duly paid.  VSHC, VSI and the Restricted Subsidiaries have insurance in such amounts and covering such risks and liabilities as are in accordance with normal industry practice.

5.22    [Reserved].

5.23    Solvency.

Immediately after the consummation of the Transactions to occur on the Closing Date, VSI and the Subsidiaries, taken as a whole, are Solvent.

5.24    Survival of Representations and Warranties.

All representations and warranties of each Loan Party contained in this Agreement and the Other Documents shall be true and correct in all material respects at the time of such Loan Party's execution of this Agreement and the Other Documents except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall have been true and correct in all material respects as of such earlier date, and shall survive the execution, delivery and acceptance thereof by the parties thereto and the closing of the transactions described therein or related thereto.

5.25    Entity Names.

No Loan Party has been known by any other corporate name in the past five years and no Loan Party sells Inventory under any other name except as set forth on Schedule 5.25, nor

has any Loan Party been the surviving company of a merger or consolidation or acquired all or substantially all of the assets of any Person during the preceding five (5) years.

5.26    [Reserved].

5.27    <u>No Default</u>.

No Loan Party is in default in the payment or performance of any of its contractual obligations, which could reasonably be expected to have a Material Adverse Effect, and no Default under this Agreement has occurred.

5.28    <u>Swaps</u>.

No Loan Party is a party to, nor will it be a party to, any swap agreement whereby such Loan Party has agreed or will agree to swap interest rates or currencies unless same provides that damages upon termination following an event of default thereunder are payable on an unlimited "two-way basis" without regard to fault on the part of either party.

5.29    [Reserved].

5.30    <u>Term Loan Documents</u>.

The Agent has received complete copies of the Term Loan Documents, including all exhibits, schedules and disclosure letters referred to therein or delivered pursuant thereto, if any, and all amendments thereto, waivers relating thereto and other side letters or agreements affecting the terms thereof.  None of such documents and agreements has been amended or supplemented, nor have any of the provisions thereof been waived, except pursuant to a written agreement or instrument which has heretofore been delivered to the Agent.

5.31    <u>Flood Insurance</u>.

All Real Property owned by Borrowers is insured pursuant to policies and other bonds which are valid and in full force and effect and which provide adequate coverage from reputable and financially sound insurers in amounts sufficient to insure the assets and risks of each such Borrower in accordance with prudent business practice in the industry of such Borrower. Each Borrower has taken all actions required under the Flood Laws and/or requested by Agent to assist in ensuring that each Lender is in compliance with the Flood Laws applicable to the Collateral, including, but not limited to, providing Agent with the address and/or GPS coordinates of each structure located upon any Real Property that will be subject to a Mortgage in favor of Agent, for the benefit of Lenders, and, to the extent required, obtaining flood insurance for such property, structures and contents prior to such property, structures and contents becoming Collateral.

VI.    <u>AFFIRMATIVE COVENANTS</u>.

Each of each Loan Party (other than VSHC) and VHSC (solely with respect to the affirmative covenants applicable to it) hereby covenants and agrees that, until payment in full of the Obligations and termination of this Agreement:

6.1     Information Covenants.

VSI will furnish to the Agent each of the items required to be delivered pursuant to Section 9 hereof and pursuant to Section 5.01 of the Term Loan Credit Agreement.

6.2     [Reserved].

6.3     [Reserved].

6.4     Existence; Franchises.

VSHC and VSI will, and will cause each of the Restricted Subsidiaries to, do or cause to be done, all things necessary, to preserve and keep in full force and effect its existence and its rights, franchises, permits, and IP Rights; provided however, that nothing in this Section 6.4 shall prevent (a) sales of assets, dispositions and other transactions by VSHC, VSI or any of the Restricted Subsidiaries in accordance with the terms herein, (b) the withdrawal by VSHC, VSI or any of the Restricted Subsidiaries of its qualification as a foreign company in any jurisdiction or (other than with respect to VSI) failure to otherwise preserve or keep in full force and effect its existence or rights, franchises, permits, or IP Rights, if such withdrawal or failure could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or (c) the expiration of copyrights or patents at the end of their statutory term.

6.5     Compliance with Statutes, etc.

VSHC and VSI will, and will cause each of the Subsidiaries to, comply with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Bodies in respect of the conduct of its business and the ownership of its property (including applicable statutes, regulations, orders and restrictions relating to environmental standards and controls, anti-corruption, sanctions and anti-money laundering), except such non-compliances as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

6.6     Compliance with Environmental Laws.

VSHC and VSI will comply, and will cause each of the Restricted Subsidiaries to comply, with all Environmental Laws and permits applicable to, or required by, the ownership, lease or use of any real property now or hereafter owned, leased or operated by VSHC, VSI or any of the Restricted Subsidiaries, except such noncompliances as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and will promptly pay or cause to be paid all costs and expenses incurred in connection with such compliance or to conduct any response or remedial action in accordance with Environmental Laws, and will keep or cause to be kept all such real property free and clear of any Liens (other than Permitted Liens) imposed pursuant to such Environmental Laws except for Liens imposed on leased real property resulting from the acts or omissions of the owner of such leased real property or of other tenants of such leased real property who are not within the control of any of VSHC, VSI and the Restricted Subsidiaries.

6.7     <u>Business</u>.

VSHC and VSI will only, and will only permit the Restricted Subsidiaries to, engage directly or indirectly in the businesses engaged in by VSI and the Restricted Subsidiaries as of the Closing Date and reasonable extensions thereof and businesses ancillary, corollary, synergistic or complementary thereto.

6.8     <u>Payment of Taxes and Other Obligations</u>.

(a)     VSHC and VSI will pay and discharge, and will cause each of the Restricted Subsidiaries to pay and discharge, all Taxes imposed upon it or upon its income or profits or upon any properties belonging to it, prior to the date on which penalties attach thereto; <u>provided</u> that none of VSHC, VSI or any of the Restricted Subsidiaries shall be required to pay any such Tax which (i) is being contested in good faith and by proper proceedings if it has maintained adequate reserves with respect thereto in accordance with GAAP or (ii) the failure to pay could not reasonably be expected to have a Material Adverse Effect.

(b)     VSHC and VSI will pay and discharge, and will cause each of the Restricted Subsidiaries to pay and discharge, all Indebtedness and other obligations promptly and in accordance with their terms before the same shall become delinquent or in default, as well as all lawful claims for labor, materials and supplies or otherwise that, if unpaid, might give rise to a Lien upon such properties or any part thereof; <u>provided</u> that such payment and discharge shall not be required so long as the failure to pay could not reasonable be expected to have a Material Adverse Effect.

6.9     <u>Employee Benefits</u>.

Except as would not reasonably be expected to have a Material Adverse Effect, VSHC, VSI and each Subsidiary will comply in all respects with the provisions of ERISA and the Code applicable to employee benefit plans as defined in Section 3(3) of ERISA and the laws applicable to any Foreign Pension Plan.  VSHC, VSI and any Subsidiary will furnish to Agent as soon as possible after, and in any event within ten (10) days after any Responsible Officer of VSHC, VSI or any Subsidiary knows or has reason to know that, any ERISA Event has occurred or is reasonably expected to occur that, alone or together with any other ERISA Event that has occurred or is reasonably expected to occur that has resulted or would reasonably be expected to result in a liability of VSHC, VSI, any Subsidiary or any ERISA Affiliate in excess of the Threshold Amount, a statement of a Financial Officer of VSI setting forth details as to such ERISA Event and the action, if any, that Loan Parties propose to take with respect thereto.  Each Loan Party shall promptly and in any event within thirty (30) days after a request by Agent, furnish to Agent copies of each Schedule SB (Actuarial Information) to the Annual Report (Form 5500 Series) with respect to each Plan sponsored by VSHC, VSI, any Subsidiary or any of their respective ERISA Affiliates.

6.10     [Reserved].

6.11    Further Assurances.

(a)    VSHC and VSI will, and will cause each of the other Loan Parties to, at the expense of VSHC and the Borrowers, make, execute, endorse, acknowledge, authorize, file and/or deliver to the Agent from time to time such vouchers, invoices, schedules, confirmatory collateral assignments, conveyances, financing statements, transfer endorsements, powers of attorney, certificates, real property surveys, reports, assignments, and other documents, assurances or instruments and take such further steps relating to the Collateral covered by this Agreement or any of the Other Documents as the Agent may reasonably require.  Furthermore, with respect to the Mortgaged Properties, VSHC and VSI will, and will cause each of the other Loan Parties to deliver to the Agent all such documentation in accordance with the Real Estate Collateral Requirements.

(b)    VSHC and VSI agree that each action required by clause (a) of this Section 6.11 shall be completed within forty-five (45) after such action is requested to be taken by the Agent or the Required Lenders (as such time may be extended by the Agent in its reasonable discretion).

(c)    If, following the Closing Date, any Subsidiary is acquired or organized or any Subsidiary ceases to be an Excluded Subsidiary, VSHC and VSI shall promptly (and in any event within forty-five (45) days (or such longer period as the Agent shall agree in its reasonable discretion) of such event or, where applicable, following such request) (i) notify the Agent thereof, (ii) cause such Subsidiary (other than any Excluded Subsidiary) to become a Loan Party by executing a Joinder to this Agreement and any applicable Other Documents (including a supplement thereto in the form specified therein or a Guaranty), (iii) cause all outstanding Equity Interests in such Subsidiary owned by or on behalf of any Loan Party to be pledged pursuant to Article IV of this Agreement (subject to the limitations set forth herein) and deliver to the Agent all certificates or other instruments representing such Equity Interests, together with stock powers or other instruments of transfer with respect thereto endorsed in blank (subject to the provisions of the Intercreditor Agreement), (iv) cause all documents and instruments, including Uniform Commercial Code financing statements and Mortgages (subject to Section 6.11(d)), required by law or reasonably requested by Agent to be filed, registered or recorded to create the Liens intended to be created by this Agreement and the Other Documents and perfect or record such Liens to the extent, and with the priority, required by this Agreement and the Other Documents, to be filed, registered or recorded or delivered to Agent for filing, registration or recording, (v) cause each Loan Party to take all other action required by law, under this Agreement and the Other Documents or reasonably requested by Agent to perfect, register and/or record the Liens granted by it thereunder to the extent perfection is required hereunder and (vi) cause to be delivered to the Lenders all such instruments and documents (including legal opinions, title insurance policies and lien searches) as Agent shall reasonably request to evidence compliance with this Section 6.11(c).

(d)    If any fee owned real property is owned by any Subsidiary acquired as described in Section 6.11(c) or is acquired by any Loan Party after the Closing Date, other than such fee owned real property, the fair market value of which does not exceed, either individually or in the aggregate, $1,000,000, VSI shall notify Agent thereof, and, if requested by Agent or the Required Lenders, VSI will, no later than ninety (90) days (or such longer period as Agent shall

agree to) after such acquisition, cause such assets to be subjected to a Lien securing the Obligations and will take such actions as shall be requested by Agent to grant and perfect such Liens, including the satisfaction of the Real Estate Collateral Requirements, all at the expense of the Borrowers.

(e)    If any notice, agreement or document is delivered (or required to be delivered) by any Loan Party to Agent pursuant to Article IV to notify Agent of the acquisition of additional Collateral, VSI shall promptly (and in any event within fifteen (15) days of the date of such notice, agreement or document (or within fifteen (15) days of the date giving rise to the obligation to deliver such notice, agreement or document) notify Agent thereof, and, if reasonably requested by Agent to be filed, registered or recorded to create the Liens intended to be created by this Agreement and the Other Documents and perfect or record such Liens to the extent, and with the priority, required by this Agreement and the Other Documents, to be filed, registered or recorded or delivered to Agent for filing, registration or recording.

6.12    Designation of Subsidiaries.

(a)    The Board of Directors of VSI may at any time designate any Restricted Subsidiary as an Unrestricted Subsidiary or designate (or re-designate, as the case may be) any Unrestricted Subsidiary as a Restricted Subsidiary; provided that (i) immediately before and after such designation (or re-designation), no Default or Event of Default shall have occurred and be continuing, (ii) the status of any such Subsidiary as a Restricted Subsidiary or an Unrestricted Subsidiary shall at all times be the same under the Term Loan Credit Agreement and this Agreement, (iii) the Consolidated Net Tangible Assets of all Unrestricted Subsidiaries, when taken together (including with their subsidiaries), shall not comprise more than 5% of the total Consolidated Net Tangible Assets of the Borrowers and their Subsidiaries on a consolidated basis, (iv) if such designation results in a Loan Party being designated as an Unrestricted Subsidiary, Agent shall have obtained the consent of the Ex-Im Bank to such designation unless the Ex-Im Term shall have expired and the Ex-Im Obligations have been paid in full, (v) the Borrowing Agent shall have delivered a pro forma Borrowing Base Certificate and Ex-Im Borrowing Base Certificate after giving effect to such designation, (vi) the Payment Conditions shall have been satisfied after giving effect to such designation, and (vii) if such designation results in a Subsidiary becoming a Loan Party, the Receivables and Inventory of such Loan Party shall not be eligible for inclusion in the Formula Amount or the Ex-Im Formula Amount unless Agent has completed its field exam and appraisal with respect thereto.  The designation of any Subsidiary as an Unrestricted Subsidiary shall constitute an Investment by VSI in such Subsidiary at the date of such designation in an amount equal to the fair market value of such Subsidiary at such time as determined in good faith by VSI.  The designation of any Unrestricted Subsidiary as a Restricted Subsidiary shall constitute, at the time of such designation, the incurrence of any Indebtedness or Liens of such Subsidiary existing at such time and a return on any Investment by VSI in any Unrestricted Subsidiary pursuant to the preceding sentence in an amount equal to the fair market value such Subsidiary at such time as determined in good faith by VSI.

(b)    VSI may at any time, by notice in writing to the Agent, designate a any Subsidiary as an Immaterial Subsidiary; provided that (i) the Immaterial Subsidiaries, taken together and with their subsidiaries, do not, in the aggregate (x) comprise more than 2.50% of the

Consolidated EBITDA of the Borrowers and the Subsidiaries for the period of four (4) fiscal quarters most recently ended on or prior to the date of designation for which financial statements have been delivered under Sections 9.7, 9.8 or 9.9 and (y) do not hold consolidated assets representing more than 2.50% of the Consolidated Net Tangible Assets of the Borrowers and the Subsidiaries on the last day of the most recent fiscal quarter ended on or prior to the date of designation for which financial statements have been delivered under Sections 9.7, 9.8 or 9.9, (ii) if, at any time, the limits set forth in clause (i) are not satisfied as at or for the four (4) fiscal quarters ended on the most recently ended fiscal quarter for which financial statements have been delivered under Sections 9.7, 9.8 or 9.9 on or prior to such date, VSI shall promptly (and in any event within five (5) Business Days from the date such financial statements have been delivered) re-designate one or more Immaterial Subsidiaries to be a Material Subsidiary as may be necessary such that the foregoing limits shall be satisfied, and any such Subsidiary shall thereafter be deemed to be a Material Subsidiary hereunder, (iii) if such designation results in a Loan Party being designated as an Immaterial Subsidiary, Agent shall have obtained the consent of the Ex-Im Bank to such designation unless the Ex-Im Term shall have expired and the Ex-Im Obligations have been paid in full, (iv) the Borrowing Agent shall have delivered a pro forma Borrowing Base Certificate and Ex-Im Borrowing Base Certificate after giving effect to such designation, and (v) the Payment Conditions shall have been satisfied after giving effect to such designation.

6.13    [Reserved].

6.14    Post-Closing Matters.

Notwithstanding anything to the contrary contained in this Agreement or the other Loan Documents, the parties hereto acknowledge and agree that within the time periods set forth on Schedule 6.14, or within such longer period or periods that Agent in its sole discretion may permit, VSHC, VSI and the Restricted Subsidiaries shall deliver to Agent, as applicable, the documents, and perform the actions as set forth on Schedule 6.14.

6.15    Payment of Fees.

VSI will, and will cause each of its Restricted Subsidiaries to, pay to Agent on demand all usual and customary fees and expenses which Agent incurs in connection with (a) the forwarding of Advance proceeds and (b) the establishment and maintenance of any Blocked Accounts or Depository Accounts as provided for in Section 4.15(h). Agent may, without making demand, charge Borrowers' Account for all such fees and expenses.

6.16    Violations.

VSI will, and will cause each of its Restricted Subsidiaries to, promptly notify Agent in writing of any violation of any law, statute, regulation or ordinance of any Governmental Body, or of any agency thereof, applicable to any Loan Party which could reasonably be expected to have a Material Adverse Effect.

6.17    <u>Fixed Charge Coverage Ratio</u>.

(a)    If (i) Average Undrawn Availability as reflected in the most recently delivered financial statements delivered pursuant to Section 9.7 or Section 9.8 is less than the greater of (a) twelve and one-half percent (12.5%) of the sum of the Gross Formula Amount plus the Ex-Im Formula Amount on average for the sixty (60) day period ended as of the end of such reporting period and (b) Ten Million and 00/100 Dollars ($10,000,000.00), or (ii) an Event of Default has occurred and is continuing, VSI and its Restricted Subsidiaries shall maintain a Fixed Charge Coverage Ratio of not less than 1.10 to 1.0 calculated as of (i) the date of the most recently delivered financial statements delivered pursuant to Section 9.7, Section 9.8, or Section 9.9 for the period equal to the four (4) consecutive fiscal quarters then ending and (ii) the last day of each fiscal quarter thereafter for the period equal to the four (4) consecutive fiscal quarters then ending; and

(b)    During any Covenant Testing Period (including the first day thereof), VSI and its Restricted Subsidiaries shall maintain as of the end of each fiscal month, a Fixed Charge Coverage Ratio of not less than 1.1 to 1.0, measured on a trailing twelve month basis.

6.18    <u>Standards of Financial Statements</u>.

VSI will cause all financial statements referred to in Sections 9.7, 9.8, 9.9, 9.12 and 9.13 as to which GAAP is applicable to be complete and correct in all material respects (subject, in the case of interim financial statements, to normal year-end audit adjustments and the absence of footnotes) and to be prepared in reasonable detail and in accordance with GAAP applied consistently throughout the periods reflected therein (except as concurred in by such reporting accountants or officer, as the case may be, and disclosed therein).

6.19    <u>Federal Securities Laws</u>.

VSHC and VSI will promptly notify Agent in writing if any Loan Party or any of its Subsidiaries (i) is required to file periodic reports under the Exchange Act, (ii) registers any securities under the Exchange Act or (iii) files a registration statement under the Securities Act.

6.20    <u>Assignment of Export Related Letters of Credit</u>.

Each of the Borrowers shall collaterally assign all Related Letters of Credit issued for the benefit of such Borrower from time to time and associated with export sales by such Borrower, including rights to all proceeds thereunder, providing for any payments under any such Related Letters of Credit to be made directly to the Agent, if requested by the Agent in its sole discretion, such assignments to be in form and substance satisfactory to the Agent.

6.21    <u>Trade Letters of Credit</u>.

Each trade letter of credit issued for the benefit of any Borrower shall be processed for payment by the Agent or another Lender acceptable to the Agent in its absolute discretion.

6.22    Material Export-Related Contracts.

To the extent that any Borrower desires Export-Related Accounts Receivables to constitute Eligible Export-Related Eligible Accounts Receivables, each Borrower will perform and observe, or cause to be performed and observed, in all material respects, all of the covenants and conditions required to be performed by it under each material export-related contract or purchase order (each, a "Material Export-Related Contract"), applicable to such Export-Related Accounts Receivable, will do all things reasonably necessary to preserve its material rights thereunder, and will not enter into any agreement modifying or amending in any material respect any Material Export-Related Contract or releasing any third party from any material obligations imposed upon it thereby in a manner material and adverse to the Agent or the Lenders.

In no event shall any Loan Party do or permit to be done, or omit to do or permit the omission of, any act or thing, the doing or omission of which would constitute grounds for the termination or cancellation of any Material Export-Related Contract or standby letter of credit issued for the benefit of any Loan Party with respect thereto (each, a "Related Letter of Credit"), or would entitle any third party to terminate or cancel any Material Export-Related Contract to the extent such cancellation, rescission, termination or surrender would reasonably be expected to have a Material Adverse Effect.

The Loan Parties will promptly notify the Agent in writing of any material default by any Loan Party or any third party in the performance or observance of any of the terms, covenants, or conditions to be performed or observed under any Material Export-Related Contract.  The Loan Parties also will (a) promptly notify the Agent in writing of the receipt by any Loan Party of any written notice (other than notices customarily sent on a regular periodic basis) from any third party claiming any material default in the performance or observance of any of the terms, covenants, or conditions on the part of any Loan Party or any third party to be performed or observed under any Material Export-Related Contract; (b) promptly notify the Agent in writing of the receipt by any Loan Party of any written notice from any third party to any Loan Party of the repudiation, termination or cancellation of any Material Export-Related Contract or Related Letter of Credit; and (c) promptly cause a copy of each such written notice received by any Loan Party from any third party to be delivered to the Agent to the extent such cancellation, rescission, termination or surrender would reasonably be expected to have a Material Adverse Effect.

The Loan Parties will not, without the prior written consent of the Agent, cancel, rescind, terminate or surrender or suffer or permit any cancellation, rescission, termination or surrender of any Material Export-Related Contract or Related Letter of Credit during the Ex-Im Term to the extent such cancellation, rescission, termination or surrender would reasonably be expected to have a Material Adverse Effect.

6.23    Hedge Agreements.

To the extent required by the requirements of the Ex-Im Bank, all Export-Related Accounts Receivable that are payable in any currency other than Dollars shall be hedged against foreign currency exchange risks pursuant to documentation in form and substance satisfactory to the Agent.

6.24    International Trade Compliance.

The Loan Parties shall adhere to an internal compliance program to ensure continued compliance with Applicable Laws administered by the United States Treasury Department's Office of Foreign Asset Control ("OFAC") and the United States Department of Commerce's Bureau of Industry and Security (as any of the foregoing Applicable Laws, including any regulations implemented pursuant to such laws, may from time to time be amended, renewed, extended or replaced). Such compliance program shall include using commercially reasonable efforts to add provisions to new customer contracts (i) notifying customers of the applicability of U.S. Export Laws, including those administered by OFAC, and (ii) prohibiting diversion, re-export or transfer by such customers of the Loan Parties' products in a manner inconsistent with the requirement of the sanctions programs administered by OFAC. Each Loan Party shall promptly deliver to the Agent such evidence as the Agent may reasonably request from time to time confirming such Loan Party's compliance with this Section 6.24.

6.25    Keepwell.

If it is a Qualified ECP Loan Party, then jointly and severally, together with each other Qualified ECP Loan Party, hereby absolutely unconditionally and irrevocably (a) guarantees the prompt payment and performance of all Swap Obligations owing by each Non-Qualifying Party (it being understood and agreed that this guarantee is a guaranty of payment and not of collection), and (b) undertakes to provide such funds or other support as may be needed from time to time by any Non-Qualifying Party to honor all of such Non-Qualifying Party's obligations under this Agreement or any Other Document in respect of Swap Obligations (provided, however, that each Qualified ECP Loan Party shall only be liable under this Section 6.25 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 6.25, or otherwise under this Agreement or any Other Document, voidable under applicable law, including applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of each Qualified ECP Loan Party under this Section 6.25 shall remain in full force and effect until payment in full of the Obligations and termination of this Agreement and the Other Documents. Each Qualified ECP Loan Party intends that this Section 6.25 constitute, and this Section 6.25 shall be deemed to constitute, a guarantee of the obligations of, and a "keepwell, support, or other agreement" for the benefit of each other Borrower and Guarantor for all purposes of Section 1a(18(A)(v)(II) of the CEA.

VII.    NEGATIVE COVENANTS.

Each of VSI and each Restricted Subsidiary that is a Loan Party (and for the purposes of Section 7.9 only, VSHC) hereby covenants and agrees that, until satisfaction in full of the Obligations and termination of this Agreement:

7.1    Liens.

No Borrower will, and no Borrower will permit any of the Restricted Subsidiaries to, create, incur, assume or suffer to exist any Lien upon or with respect to any property of any Borrower or any of the Restricted Subsidiaries, whether now owned or hereafter acquired;

provided that the provisions of this Section 7.1 shall not prevent the creation, incurrence, assumption or existence of the following (Liens described below are herein referred to as "Permitted Liens"):

(a)    Liens for Taxes which are not more than thirty (30) days overdue or which are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing the forfeiture or sale of the property or assets subject to any such Lien;

(b)    warehousemen's, materialmen's and mechanics' liens and other similar Liens, in each case, arising in the ordinary course of business and (i) which secure obligations not more than thirty (30) days overdue or (ii) which are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing the forfeiture or sale of the property or assets subject to any such Lien;

(c)    Liens in existence on the Closing Date which are listed, and the property subject thereto described, on Schedule 7.1(c), plus renewals, replacements, refinancings, restructurings and extensions of such Liens; provided that (i) the aggregate principal amount of the Indebtedness, if any, secured by such Liens does not increase from that amount outstanding at the time of any such renewal, replacement, refinancing, restructuring or extension, plus accrued and unpaid interest, fees and expenses (including premium) incurred in connection with such renewal, replacement or extension and an amount equal to any unutilized commitments in respect of such Indebtedness and (ii) any such renewal, replacement, refinancing, restructuring or extension does not encumber any additional assets or properties (other than the proceeds and products thereof and accessions thereto) of the Borrowers or any Restricted Subsidiaries, unless such Lien is otherwise permitted under separate provisions of this Section 7.1;

(d)    Liens securing the Obligations created pursuant to the this Agreement and the Other Documents;

(e)    (i) licenses, sublicenses, leases or subleases granted by any Borrower or any of the Restricted Subsidiaries to other Persons in the ordinary course of, and not materially interfering with the conduct of, the business of the Borrowers or any of the Restricted Subsidiaries, and (ii) any interest or title of a lessor, sublessor, licensor or sublicensor under any lease or license agreement permitted by this Agreement to which any Borrower or any of the Restricted Subsidiaries is a party;

(f)    Liens upon assets of any Borrower or any of the Restricted Subsidiaries subject to Capitalized Lease Obligations to the extent such Capitalized Lease Obligations are permitted by Section 7.4(d); provided that (i) such Liens only serve to secure the payment of Indebtedness arising under such Capitalized Lease Obligation and (ii) the Lien encumbering the asset giving rise to the Capitalized Lease Obligation does not encumber any other asset of any Borrower or any Restricted Subsidiary other than the proceeds of the assets giving rise to such Capitalized Lease Obligation; provided further, that individual financings provided by one lender may be cross collateralized to other financings provided by such lender;

(g)    Liens placed upon equipment, machinery or other fixed assets acquired or constructed after the Closing Date and used in the ordinary course of business of the Borrowers

or any of the Restricted Subsidiaries and placed at the time of the acquisition or construction thereof by the Borrowers or such Restricted Subsidiary or within 270 days thereafter to secure Indebtedness incurred to pay all or a portion of the purchase price thereof or to secure Indebtedness incurred solely for the purpose of financing the acquisition or construction of any such equipment, machinery or other fixed assets or renewals, replacements, refinancings, restructurings or extensions of any of the foregoing for the same or a lesser amount; provided that (i) the Indebtedness secured by such Liens is permitted by Section 7.4(d) and (ii) in all events, the Lien encumbering the equipment, machinery or other fixed asset so acquired or constructed does not encumber any other asset of any Borrower or any Restricted Subsidiary (other than the proceeds and products thereof and accessions thereto); provided further, that individual financings provided by one lender may be cross collateralized to other financings provided by such lender;

(h)     Liens which may arise as a result of zoning, building codes, and other land use laws regulating the use or occupancy of real property or the activities conducted thereon which are imposed by any Governmental Body and which are not violated in any material way by the current use or occupancy of such real property, easements, rights-of-way, restrictions, encroachments, minor survey defects and other similar charges or encumbrances, minor title defects or irregularities affecting real property, in each case not securing Indebtedness and not materially interfering with the ordinary conduct of the business of the Borrowers and the Restricted Subsidiaries, taken as a whole;

(i)     Liens arising from precautionary UCC financing statement filings regarding operating leases entered into in the ordinary course of business of the Borrowers and the Restricted Subsidiaries;

(j)     attachment and judgment Liens in respect of decrees and judgments to the extent, and for so long as, such judgments and decrees do not, individually or in the aggregate constitute an Event of Default under Article X;

(k)     statutory and common law landlords' liens under leases to which any Borrower or any of the Restricted Subsidiaries is a party and which secure obligations not more than 30 days overdue;

(l)     Liens (other than Liens imposed under ERISA) incurred in the ordinary course of business of the Borrowers and the Restricted Subsidiaries in connection with workers compensation claims, unemployment insurance and social security benefits and Liens on deposits securing the performance of bids, tenders, public utilities or private utilities, leases and contracts in the ordinary course of business of the Borrowers and the Restricted Subsidiaries, statutory obligations, surety or appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business (exclusive of obligations in respect of the payment for borrowed money);

(m)     with respect to any Mortgaged Property, Permitted Encumbrances;

(n)     Liens on property or assets acquired pursuant to a Permitted Acquisition or other permitted Investment, or on property or assets of a Restricted Subsidiary in existence at

the time such Restricted Subsidiary is acquired pursuant to a Permitted Acquisition or other permitted Investment; provided that (i) any Indebtedness that is secured by such Liens is permitted to exist under Section 7.4(g), (ii) such Liens do not attach to any ABL Priority Collateral and (iii) such Liens are not incurred in connection with, or in contemplation or anticipation of, such Permitted Acquisition or other permitted Investment and do not attach to any other property or assets of any Borrower or any of the Restricted Subsidiaries other than the property and assets subject to such Liens at the time of such Permitted Acquisition or permitted Investment and the proceeds and products thereof and accessions thereto together with any renewals, refinancings, replacements, restructurings and extensions of the foregoing, so long as the Indebtedness secured by such Liens is permitted by Section 7.4(g) and such extension, renewal, refinancing, restructuring or replacement does not encumber any additional assets or properties of any Borrower or any of the Restricted Subsidiaries (other than the proceeds or accessions of the assets subject to such Lien);

(o)      Liens arising out of any conditional sale, title retention, consignment or other similar arrangements for the sale of goods entered into by any Borrower or any of the Restricted Subsidiaries in the ordinary course of business to the extent such Liens do not attach to any assets other than the goods subject to such arrangements;

(p)      Liens incurred in the ordinary course of business of the Borrowers and the Restricted Subsidiaries (i) in connection with the purchase or shipping of goods or assets (or the related assets and proceeds thereof), which Liens are in favor of the seller or shipper of such goods or assets and only attach to such goods or assets and (ii) in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(q)      (i) bankers' Liens, rights of setoff and other similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by any Borrower or any Restricted Subsidiary, in each case granted in the ordinary course of business of any Borrower or any Restricted Subsidiary in favor of the bank or banks with which such accounts are maintained, securing amounts owing to such bank or banks with respect to cash management, automated clearing house transfers and operating account arrangements, (ii) Liens of a collection bank arising under Section 4-210 of the UCC on items in the course of collection, (iii) Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes and (iv) Liens that are contractual rights of setoff or rights of pledge relating to purchase orders and other agreements entered into with customers of any Borrower or any Restricted Subsidiary in the ordinary course of business of the Borrowers and any Restricted Subsidiaries;

(r)      Liens granted in the ordinary course of business of the Borrowers and the Restricted Subsidiaries on insurance policies and proceeds thereof securing liability for premiums or reimbursement or indemnification obligations thereunder to the extent the financing under Section 7.4 is permitted under Section 7.4;

(s)      Liens (i) on earnest money deposits of cash or Cash Equivalents or cash advances made in connection with any Permitted Acquisition or other permitted Investments or

in respect of any anticipated Permitted Acquisition or other permitted Investment or (ii) consisting of an agreement to dispose of any property in a disposition permitted under Section 7.2;

(t)    Liens on assets of Foreign Subsidiaries or a Restricted Subsidiary that is not a Loan Party securing Indebtedness permitted to be incurred by such Subsidiaries pursuant to Section 7.4;

(u)    in the case of any non-wholly owned Restricted Subsidiary, any put and call arrangements or restrictions on disposition related to its Equity Interests set forth in its organizational documents or any related joint venture or similar agreement;

(v)    ground leases in respect of real property on which facilities owned or leased by any Borrower or any Restricted Subsidiary are located;

(w)    [reserved];

(x)    [reserved];

(y)    Liens on the Collateral securing Permitted Incremental Equivalent Debt and any Permitted Refinancing thereof, in each case permitted pursuant to Section 7.4(m);

(z)    [reserved];

(aa)    Liens on the Collateral securing (i) Indebtedness under the Term Loan Documents and Permitted Refinancing thereof permitted pursuant to Section 7.4 and (ii) Indebtedness permitted under Section 7.4(c); provided that in each case under clauses (i) and (ii) such Liens shall be subject to, and have the priority contemplated by, the Intercreditor Agreement; and

(bb)    additional Liens of VSI or any Restricted Subsidiary not otherwise permitted by this Section 7.1 that (x) do not secure obligations in an aggregate principal amount in excess of $5,000,000 and (y) such Liens do not attach to any ABL Priority Collateral.

(cc)    additional liens of VSI or any Restricted Subsidiary not otherwise permitted by this Section 7.1 covering ABL Priority Collateral so long as such Liens do not secure obligations for borrowed money and the aggregate amount of obligations secured by such Liens do not exceed $750,000.

7.2    Consolidation, Merger or Sale of Assets, Etc.

No Borrower will, and no Borrower will permit any of the Restricted Subsidiaries to, wind up, liquidate or dissolve its affairs enter into any partnership, joint venture, or transaction of merger or consolidation, or convey, sell, lease or otherwise dispose of all or any part of its property or assets (other than sales of inventory in the ordinary course of business), or enter into any sale-leaseback transactions, except that:

(a)     Borrowers and the Restricted Subsidiaries may liquidate or otherwise dispose of obsolete or worn-out, uneconomical, surplus or no longer used property (other than ABL Priority Collateral, unless Undrawn Availability immediately after giving effect to such disposition and the application of the proceeds therefrom is not less than Undrawn Availability immediately before such disposition) in the ordinary course of business and immaterial assets (including allowing any registrations or any applications for registration of any immaterial intellectual property to be cancelled, to lapse or go abandoned) in the ordinary course of business;

(b)     Investments may be made to the extent permitted by Section 7.5;

(c)     Borrowers and the Restricted Subsidiaries may sell assets (other than the capital stock or other Equity Interests of any Wholly Owned Subsidiary, unless all of the capital stock or other Equity Interests of such Wholly Owned Subsidiary are sold in accordance with this clause (c)), so long as (i) no Event of Default then exists or would result therefrom, (ii) each such sale is in an arm's-length transaction and the applicable Borrower or Restricted Subsidiary receives at least fair market value (as determined in good faith by the applicable Borrower or Restricted Subsidiary), (iii) with respect to dispositions (or series of related dispositions) of assets having a fair market value (as determined in good faith by the applicable Borrower or Restricted Subsidiary) in excess of $10,000,000, the consideration received consists of at least 75% cash or Cash Equivalents and is paid at the time of the closing of such sale, and (iv) if such sale includes ABL Priority Collateral immediately after giving effect to such disposition and the application of the proceeds therefrom, Undrawn Availability is no less than Undrawn Availability immediately before such disposition;

(d)     VSI and the Restricted Subsidiaries may lease (as lessee) or license (as licensee) real or personal property (so long as any such lease or license does not create a Capitalized Lease Obligation except to the extent permitted by Section 7.4(d));

(e)     VSI and the Restricted Subsidiaries may sell or discount, in each case without recourse and in the ordinary course of business, accounts receivable arising in the ordinary course of business (other than Eligible Receivables or Eligible Export-Related Accounts Receivable), but only in connection with the compromise or collection thereof and not as part of any financing transaction;

(f)     VSI and the Restricted Subsidiaries may grant licenses, sublicenses, leases or subleases to other Persons in the ordinary course of, and not materially interfering with the conduct of, the business of VSI or any of the Restricted Subsidiaries;

(g)     VSI and the Restricted Subsidiaries may convey, sell or otherwise transfer property to VSI or any other Restricted Subsidiary; provided that if the transferor of such property is a Loan Party, (i) the transferee thereof must be a Loan Party or (ii) (A) the aggregate amount of all dispositions during the term of this Agreement to transferees that are not Loan Parties shall not exceed $5,000,000 and (B) such transfer shall not include ABL Priority Collateral unless it is in the ordinary course of business at an arm's length for cash;

(h)     any Restricted Subsidiary may merge, amalgamate or consolidate with and into, or be dissolved or liquidated into, (x) VSI; provided that VSI shall be the continuing or surviving Person or (y) one or more other Restricted Subsidiaries; provided that if any party to any such transaction is a Loan Party, the surviving entity of such transaction shall be a Loan Party;

(i)     any Restricted Subsidiary may change its legal form if VSI determines in good faith that such action is in the best interest of VSI and the Subsidiaries and if not materially disadvantageous to the Agent or the Lenders (it being understood that in the case of any change in legal form, a Restricted Subsidiary that is a Guarantor will remain a Guarantor unless such Guarantor is otherwise permitted to cease being a Guarantor hereunder); provided that VSI shall give Agent five (5) days prior notice of any such change in legal form;

(j)     Permitted Acquisitions may be consummated in accordance with the requirements of Section 7.5;

(k)     VSI and the Restricted Subsidiaries may liquidate or otherwise dispose of Cash Equivalents;

(l)     the Acquisition may be consummated in accordance with the terms of the Acquisition Agreement;

(m)     VSI and the Restricted Subsidiaries may cancel or abandon or allow lapse of any intellectual property rights which are, in the reasonable business judgment of VSI or any Restricted Subsidiary, no longer material to, or no longer used or useful in, the business of VSI and the Restricted Subsidiaries;

(n)     VSI and the Restricted Subsidiaries may terminate or unwind any Hedging Agreement in accordance with its terms;

(o)     VSI and the Restricted Subsidiaries may dispose of property and assets to the extent they were the subject of a casualty or of condemnation proceedings upon the occurrence of the related Recovery Event;

(p)     VSI and the Restricted Subsidiaries may dispose of fixed assets to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such disposition are promptly applied to the purchase price of such replacement property;

(q)     to the extent constituting dispositions, VSI and the Restricted Subsidiaries may grant liens in the form of Permitted Liens and issue Restricted Payments permitted by Sections 7.1 and 7.3, respectively;

(r)     VSI and the Restricted Subsidiaries may dispose of property pursuant to sale-leaseback transactions; provided that the aggregate amount of the fair market value of all property of the Loan Parties so disposed of on or after the Closing Date shall not exceed $20,000,000;

(s)     VSI and the Restricted Subsidiaries may swap assets (other than ABL Priority Collateral) in exchange for services or other assets in the ordinary course of business of comparable or greater value or usefulness to the business of VSI and the Subsidiaries as a whole, as determined in good faith by the management of VSI; provided that to the extent any such assets constitutes Collateral, the assets received in return shall become Collateral and VSI shall comply with Section 6.11 with respect to any such assets received in return;

(t)     VSI and the Restricted Subsidiaries may dispose of Investments in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangements between, the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(u)     VSI and the Restricted Subsidiaries may sell non-core assets acquired in connection with Permitted Acquisitions or other Investments; provided that (i) no Default or Event of Default then exists or would result therefrom, (ii) the aggregate amount of such sales shall not exceed 25% of the fair market value of the acquired entity or business and (iii) each such sale is in an arm's-length transaction and VSI or the respective Restricted Subsidiary receives at least fair market value;

(v)     VSI and the Restricted Subsidiaries may terminate leases, subleases, licenses and sublicenses in the ordinary course of business; and

(w)     VSI and the Restricted Subsidiaries may sell or otherwise dispose of assets, other than ABL Priority Collateral unless the Payment Conditions have been satisfied and Agent has received a Borrowing Base Certificate reflecting such disposition, having a fair market value of less than $5,000,000 in any fiscal year and less than $12,500,000 in the aggregate.

To the extent the Required Lenders waive the provisions of this Section 7.2 with respect to the sale of any Collateral, or any Collateral is sold as permitted by this Section 7.2 (other than to VSI or a Restricted Subsidiary thereof), such Collateral shall be sold free and clear of the Liens created by this Agreement and the Other Documents, and the Agent shall be authorized to take any actions deemed appropriate in order to effect and/or evidence the foregoing.

7.3     Restricted Payments.

No Borrower will, and no Borrower will permit any of the Restricted Subsidiaries to, declare or pay any Restricted Payments, except that:

(a)     any Restricted Subsidiary of VSI may pay Restricted Payments to its equity holders on a *pro rata* basis; provided that, in the case of any Restricted Payment paid by a non-Wholly Owned Subsidiary that is a Restricted Subsidiary, VSI or its respective Restricted Subsidiary which owns the Equity Interest in such Restricted Subsidiary paying such Restricted Payments receives at least its proportionate share thereof;

(b)     VSI and any Restricted Subsidiary of VSI may pay cash Restricted Payments to VSHC so long as the proceeds thereof are reasonably promptly used by VSHC (or

any direct or indirect parent) to the extent attributable to the assets or activities of VSHC, VSI or the Restricted Subsidiaries to pay:

(i)      franchise taxes and other fees, taxes and expenses required to maintain the corporate existence of VSHC (or any direct or indirect parent) to the extent attributable to the assets or activities of VSHC, VSI or the Restricted Subsidiaries;

(ii)      in the event VSI is included in a group that files a consolidated, combined, unitary or similar type income tax return of which VSI is not the common parent, federal, state, local and non-U.S. income taxes and other taxes imposed in lieu of income taxes then due and payable with respect to such tax group; provided, that the amount of such distribution shall not be greater than the amount of such taxes or expenses that would have been due and payable by VSI and the Restricted Subsidiaries had VSI not been included in a consolidated, combined, unitary or similar type return of such tax group;

(iii)      cash payments in lieu of issuing fractional shares in connection with the exercise of warrants, options or other securities convertible into or exchangeable for Equity Interests of VSHC (or any direct or indirect parent);

(iv)      operating and overhead costs and expenses of VSHC to the extent such costs and expenses are incurred in the ordinary course of business and attributable to the ownership or operations of VSI and the Restricted Subsidiaries in an amount not to exceed $3,000,000 in the aggregate;

(v)      costs (including all professional fees and expenses) incurred by VSHC in connection with reporting obligations under or otherwise incurred in connection with compliance with applicable laws, applicable rules or regulations of any governmental, regulatory or self-regulatory body or stock exchange in an amount not to exceed $3,000,000 in the aggregate;

(vi)      (x) obligations under or in respect of director and officer insurance policies to the extent reasonably attributable to the ownership or operation of VSI and the Restricted Subsidiaries, (y) indemnification obligations owing to any Sponsor and Sponsor Affiliates under the Management Agreement or (z) Transaction Costs;

(vii)      be used to pay customary salary, bonus and other benefits payable to officers and employees of VSHC or any direct or indirect parent company of VSHC to the extent such salaries, bonuses and other benefits are attributable to the ownership or operation of VSI and the Restricted Subsidiaries; and

(viii)      amounts used by VSHC to make payments permitted by Section 7.6(f);

(c)      subject to the satisfaction of the Payment Conditions, VSI may pay Restricted Payments to VSHC (or any direct or indirect parent thereof) for the purpose of enabling VSHC (or any such direct or indirect parent thereof) to redeem, repurchase or otherwise acquire for value, and VSHC (or any such direct or indirect parent thereof) may redeem,

repurchase or otherwise acquire for value, Qualified Equity Interests (or options or warrants to purchase such Qualified Equity Interests) of VSHC (or any direct or indirect parent thereof) following the death, disability or termination of employment of officers, directors or employees of VSHC (or any direct or indirect parent thereof) or any of the Restricted Subsidiaries; provided that (i) the only consideration paid by VSHC (or any such direct or indirect parent thereof) in respect of such redemptions or repurchases shall be cash and (ii) the sum of the aggregate amount paid by VSHC in cash in respect of all such redemptions or repurchases shall not exceed $2,500,000 (which shall increase to $5,000,000 after a Qualified Public Offering) in any fiscal year in respect of all such redemptions or repurchases; provided that unused amounts in any fiscal year may be carried over to such succeeding fiscal years subject to a maximum of $5,000,000 (which shall increase to $10,000,000 after a Qualified Public Offering in any such fiscal year (without giving effect to the following proviso); provided further that such amount in any fiscal year may be increased by an amount not to exceed the cash proceeds of key man life insurance policies received by VSI or the Restricted Subsidiaries after the Closing Date; provided further that in no event shall the sum of the aggregate amount paid by VSHC in cash in respect of all such redemptions or repurchases pursuant to this clause (c) exceed $10,000,000 in the aggregate;

(d)     VSI and each Restricted Subsidiary may declare and effect Restricted Payments in the form of Qualified Equity Interests;

(e)     subject to the satisfaction of the Payment Conditions, to the extent permitted under the Term Loan Credit Agreement as in effect on the date hereof, VSI and its Restricted Subsidiaries may make Restricted Payments in an aggregate amount not to exceed the Cumulative Amount;

(f)     VSI and each Restricted Subsidiary may pay Restricted Payments on the Closing Date to consummate the Transactions;

(g)     to the extent constituting Restricted Payments, VSI and the Restricted Subsidiaries may enter into and consummate transactions expressly permitted by any provision of Section 7.2, Section 7.5 or Section 7.6;

(h)     VSI and the Restricted Subsidiaries may make repurchases of Equity Interests in VSHC (or any direct or indirect parent thereof), VSI or any Restricted Subsidiary deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price of such options or warrants;

(i)     after a Qualified Public Offering, (x) VSI may declare and effect any Restricted Payment to pay listing fees and other costs and expenses attributable to being a publicly traded company and (y) subject to the satisfaction of the Payment Conditions, VSI and the Restricted Subsidiaries may declare and effect Restricted Payments of up to 6.00% per annum of the net proceeds received by (or contributed to) VSI and the Restricted Subsidiaries from such Qualified Public Offering;

(j)     to the extent not otherwise applied pursuant to Section 7.5(u) or in connection with any use of the Cumulative Amount, the Borrowers and the Restricted

Subsidiaries may pay Restricted Payments made with the net cash proceeds of any issuance of Qualified Equity Interests permitted herein; and

(k)    subject to the satisfaction of the Payment Conditions, the Borrower and the Restricted Subsidiaries may pay other Restricted Payments; provided that the aggregate amount of Restricted Payments made pursuant to this clause (k) shall not exceed $5,000,000.

7.4    Indebtedness.

No Borrower will, and no Borrower will permit any of the Restricted Subsidiaries to create, incur, assume or suffer to exist any Indebtedness, except:

(a)    Indebtedness incurred pursuant to this Agreement and the other Loan Documents;

(b)    Indebtedness outstanding on the Closing Date and listed on Schedule 7.4(b) and Permitted Refinancing thereof;

(c)    Indebtedness of any Borrower or any Restricted Subsidiary under Hedging Agreements entered into in the ordinary course of business for bona fide hedging activities and are not for speculative purposes;

(d)    Indebtedness of the Borrowers and the Restricted Subsidiaries constituting (i) Capitalized Lease Obligations or (ii) Indebtedness incurred to finance the acquisition or construction of equipment, machinery or other fixed assets acquired after the Closing Date with respect to equipment, machinery or other fixed assets acquired or constructed after the Closing Date and secured by a lien on such (to the extent permitted by Section 7.1(g); provided that such Indebtedness is incurred prior to or within 270 days after such acquisition or completion of such construction; and provided further that in no event shall the sum of the aggregate principal amount of all Capitalized Lease Obligations (other than Capitalized Lease Obligations incurred by any Borrower or any Restricted Subsidiary to replace or refinance operating leases existing on the Closing Date) and purchase money Indebtedness permitted by this clause (d) exceed at any time outstanding $10,000,000;

(e)    Indebtedness constituting Intercompany Loans otherwise permitted by Section 7.5(h);

(f)    Guarantees by VSI and any Restricted Subsidiary in respect of Indebtedness of any Borrower or any Restricted Subsidiary otherwise permitted hereunder; provided that (i) no Guarantee of any Term Loan Obligations or Permitted Incremental Equivalent Debt shall be permitted unless such guaranteeing party shall have also provided a Guarantee of the Obligations on the terms set forth herein (except as otherwise contemplated hereunder), (ii) if the Indebtedness being Guaranteed is subordinated to the Obligations, such Guarantee shall be subordinated to the Guarantee of the Obligations on terms at least as favorable to the Lenders as those contained in the subordination of such Indebtedness and (iii) such Guarantee is permitted by Section 7.5(h);

(g)     Indebtedness (any such Indebtedness, "Permitted Acquired Debt") acquired pursuant to a Permitted Acquisition or other permitted Investment (or Indebtedness assumed at the time of a Permitted Acquisition or other permitted Investment of a fixed asset securing such Indebtedness) and any Permitted Refinancing Indebtedness in respect thereof; provided that (i) such Indebtedness was not incurred in connection with, or in anticipation or contemplation of, such Permitted Acquisition or other permitted Investment and (ii) the Net Total Leverage Ratio, on *pro forma* basis, is less than or equal to 5.25:1.00, in each case, determined immediately after giving effect to the incurrence of such Indebtedness for the most recently ended Test Period; provided, that the aggregate principal amount of Indebtedness incurred by Restricted Subsidiaries that are not Loan Parties under this clause (g) shall not exceed $5,000,000;

(h)     Indebtedness arising under customary cash management services, netting arrangements, automated clearing house transfers, or the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business, so long as such Indebtedness is extinguished within ten (10) Business Days of its incurrence;

(i)     Indebtedness with respect to performance bonds, surety bonds, appeal bonds or customs bonds required in the ordinary course of business of any Borrower or any Restricted Subsidiary or in connection with the enforcement of rights or claims of any Borrower or any of the Restricted Subsidiaries or in connection with judgments that do not result in a Default or an Event of Default;

(j)     Indebtedness of Foreign Subsidiaries under lines of credit to any such Foreign Subsidiary from Persons other than the Borrowers or any of the Restricted Subsidiaries, the proceeds of which Indebtedness are used for such Foreign Subsidiary's working capital purposes; provided that the aggregate principal amount of all such Indebtedness outstanding at any time for all such Foreign Subsidiaries shall not exceed the greater of $65,000,000 and RMB400,000,000;

(k)     Indebtedness owed to any Person providing property, casualty, liability, or other insurance to any Borrower or any Restricted Subsidiary, so long as the amount of such Indebtedness is not in excess of the amount of the unpaid cost of, and shall be incurred only to defer the cost of such insurance for the period in which such Indebtedness is incurred;

(l)     Indebtedness which may be deemed to exist in connection with agreements providing for indemnification, purchase price adjustments and similar obligations (including earn-out obligations) in connection with the merger, the acquisition or disposition of assets in accordance with the requirements of this Agreement;

(m)     Indebtedness constituting (i) Permitted Incremental Equivalent Debt; provided that (x) after giving effect thereto, the Aggregate Incremental Amount does not exceed the Incremental Cap and (y) no Default or Event of Default shall have occurred and be continuing on the date of incurrence of such Permitted Incremental Equivalent Debt and (ii) any Permitted Refinancing thereof;

(n)    [reserved];

(o)    VSI or any of the Restricted Subsidiaries may incur or issue unsecured seller paper in connection with any Permitted Acquisition so long as the Net Total Leverage Ratio, determined on *pro forma* basis, is less than or equal to 5.25:1.00, in each case, immediately prior to the incurrence of such Indebtedness; provided that the aggregate principal amount of Indebtedness outstanding and incurred under this clause (o) shall not exceed $30,000,000 and such Indebtedness shall be made subordinate and junior in right of payment to the Obligations by provisions in form and substance reasonably satisfactory to the Required Lenders; provided further, that the aggregate principal amount of Indebtedness incurred by Restricted Subsidiaries that are not Loan Parties under this clause (o) shall not exceed $25,000,000;

(p)    [reserved];

(q)    [reserved];

(r)    Indebtedness under (i) the Term Loan Documents as in effect on the date hereof and (ii) any Permitted Refinancing thereof; provided that the aggregate principal amount of Indebtedness pursuant to this clause (r) shall not exceed $455,000,000 plus any Incremental Term Loan up to the Incremental Cap, less the aggregate principal amount of any payments applied to reduce the principle amount thereof after the Closing Date;

(s)    prior to the redemption date in respect of the Existing Secured Notes, Indebtedness in respect of the Existing Secured Notes so long as the Existing Secured Notes Satisfaction and Discharge has occurred;

(t)    Indebtedness representing deferred compensation or similar obligations to employees of the Borrowers and Restricted Subsidiaries incurred in the ordinary course of business;

(u)    Indebtedness consisting of take-or-pay obligations contained in supply arrangements in the ordinary course of business;

(v)    Indebtedness in respect of letters of credit, bank guarantees, supporting obligations, bankers' acceptances, performance bonds, surety bonds, statutory bonds, appeal bonds, warehouse receipts or similar instruments issued or created in the ordinary course of business, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims; provided that any reimbursement obligations in respect thereof are reimbursed within thirty (30) days following the due date thereof;

(w)    obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by any Borrower or any of the Restricted Subsidiaries or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with past practice;

(x)     Indebtedness consisting of obligations under deferred compensation or other similar arrangements incurred by such Person in connection with Permitted Acquisitions or any other Investment expressly permitted hereunder;

(y)     additional Indebtedness incurred by the Borrowers and the Restricted Subsidiaries in an aggregate principal amount not to exceed at any time outstanding $10,000,000; and

(z)     all premiums (if any), interest (including Post-Petition Interest), fees, expenses, charges and additional or contingent interest on obligations described above.

7.5     <u>Investments</u>.

No Borrower will, and no Borrower will permit any of the Restricted Subsidiaries to, directly or indirectly, make any Investment in any other Person, except:

(a)     the Borrowers and the Restricted Subsidiaries may acquire and hold accounts receivables, notes receivable and other extensions of trade credit owing to any of them, if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms of such Borrower or Restricted Subsidiary;

(b)     the Borrowers and the Restricted Subsidiaries may acquire and hold cash and Cash Equivalents;

(c)     the Borrowers and the Restricted Subsidiaries may hold the Investments held by them on the Closing Date and described on Schedule 7.5(c) (and any increase in the value of such Investments not resulting from an additional Investment); <u>provided</u> that any additional Investments made with respect thereto shall be permitted only if permitted under the other provisions of this Section 7.5;

(d)     the Borrowers and the Restricted Subsidiaries may acquire and own investments (including debt obligations) received in connection with the bankruptcy or reorganization of suppliers and customers or in good faith settlement of delinquent obligations of, and other disputes with, customers and suppliers arising in the ordinary course of business or upon foreclosure with regard to any secured Investment or other transfer of title with regard to a secured Investment;

(e)     the Borrowers and the Restricted Subsidiaries may make loans and advances to their officers, directors and employees for moving, relocation and travel expenses and other similar expenditures, in each case in the ordinary course of business in an aggregate amount not to exceed $1,000,000 at any one time outstanding (determined without regard to any write-downs or write-offs of such loans and advances);

(f)     the Borrowers and the Restricted Subsidiaries may acquire and hold obligations of their officers, directors and employees in connection with such officers,' directors' and employees' acquisition of Qualified Equity Interests of VSHC (so long as no cash is actually advanced by any Borrower or any of the Restricted Subsidiaries in connection with the acquisition of such obligations);

(g)    the Borrowers and the Restricted Subsidiaries may enter into Hedging Agreements to the extent permitted by Section 7.4(c);

(h)    (i) the Borrowers or the Restricted Subsidiaries may make Investments in (or for the benefit of) any other Loan Party (other than VSHC (except as permitted under Section 7.5(q)), (ii) any Loan Party may make Investments in (or for the benefit of) any Restricted Subsidiary which is not a Loan Party, and (iii) any Restricted Subsidiary which is not a Loan Party may make Investments in any Restricted Subsidiary which is not a Loan Party (such Investments in the form of intercompany loans and advances referred to in preceding clauses (i) through (iii), collectively, the "Intercompany Loans"); provided that (A) at no time shall the aggregate outstanding principal amount of all Investments made pursuant to preceding sub-clause (ii) of this clause (h), together with all Investments made pursuant to sub-clause (ii) of clause (l) of this Section 7.5 and all Investments made by the Loan Parties and the Restricted Subsidiaries pursuant to clause (w) of this Section 7.5 (for this purpose, taking the fair market value of any property (other than cash) so contributed at the time of such contribution), exceed at any time $50,000,000, (B) no Investment may be made pursuant to sub-clause (ii) above at any time that an Event of Default has occurred and is continuing, (C) each Investment in the form of an Intercompany Loan shall be evidenced by an Intercompany Note, (D) subject to the terms of the Intercreditor Agreement, each such Intercompany Note owned or held by a Loan Party shall be pledged to the Agent, (E) no Investment may be made pursuant to sub clause (ii) above unless the Payment Conditions have been satisfied and (F) each Intercompany Loan made by any Restricted Subsidiary that is not a Loan Party to a Loan Party shall be subject to the subordination provisions contained in the respective Intercompany Note;

(i)    Investments made in connection with the Transactions; provided that each such Investment made in the form of an Intercompany Loan shall (i) be evidenced by an Intercompany Note, (ii) each such Intercompany Note owned or held by a Loan Party shall be pledged to the Agent pursuant to the terms of this Agreement and (iii) each Intercompany Loan made by any Restricted Subsidiary that is not a Loan Party to a Loan Party shall be subject to the subordination provisions contained in the respective Intercompany Note;

(j)    Investments consisting of (i) transactions permitted under Sections 7.1 and 7.2, (ii) Restricted Payments permitted by Section 7.3 and (iii) repayments or other acquisitions of Indebtedness of the Borrowers or any Restricted Subsidiary not prohibited by Section 7.8;

(k)    Guarantees permitted by Section 7.4 other than Section 7.4(f), to the extent constituting Investments;

(l)    any acquisition of all of the Equity Interests in a Person that thereafter becomes a Restricted Subsidiary or the acquisition of all or substantially all of the property and assets or business of another person, or assets constituting a business unit, line of business or division of a Person in a single transaction or series of related transactions so long as (i) such acquisition is permitted under the terms of the Term Loan Documents and (ii) all of the Permitted Acquisition Conditions are satisfied (any acquisition of a Person meeting all of the criteria of this Section 7.5(l) being referred to as a "Permitted Acquisition");

(m)      promissory notes and other non-cash consideration received in connection with any asset sale permitted by Section 7.2;

(n)      Investments in deposit accounts, securities accounts and commodities accounts maintained by any Borrower or such Restricted Subsidiary, as the case may be;

(o)      Investments in the ordinary course of business consisting of UCC Article 3 endorsements for collection or deposit and UCC Article 4 customary trade arrangements with customers consistent with past practices;

(p)      [reserved];

(q)      loans and advances to VSHC and any other direct or indirect parent of any Borrower, and not in excess of the amount of (after giving effect to any other loans, advances or Restricted Payments in respect thereof) Restricted Payments permitted to be made to such parent in accordance with Section 7.3 (with such loan or advance to be deemed utilization of the applicable basket set forth in Section 7.3);

(r)      Investments to the extent that payment for such Investments is made solely with Equity Interests of VSHC (or any other direct or indirect parent of any Borrower);

(s)      Investments in the nature of pledges or deposits with respect to leases or utilities provided to third parties in the ordinary course of business;

(t)      Investments constituting any part of a reorganization and other activities related to bona fide tax planning; provided that (i) no Event of Default shall have occurred and be continuing, (ii) any security interests granted to the Agent for the benefit of the Lenders in the Collateral pursuant to the Loan Documents shall remain in full force and effect and perfected (to at least the same extent as in effect immediately prior to such Investment) and all actions required to maintain said perfected status have been or will promptly be taken, (iii) all Restricted Subsidiaries that were Loan Parties at the time such Investment is entered into shall be Loan Parties after such Investments are completed, and (iv) such reorganization and other activities shall not impair or adversely affect in the aggregate the Collateral granted to the Agent for the benefit of the Lenders in the Collateral;

(u)      to the extent not otherwise applied pursuant to Section 7.3(j) or in connection with any use of the Cumulative Amount, the Borrowers and the Restricted Subsidiaries may make Investments made with the net cash proceeds of any issuance of Qualified Equity Interests permitted herein;

(v)      VSI may consummate the Acquisition in accordance with the Acquisition Agreement;

(w)      subject to the satisfaction of the Payment Conditions, Investments in joint ventures in which a Borrower or a Restricted Subsidiary has an ownership interest in an aggregate amount for all such Investments made pursuant to this clause (w) (taking into account any return on such Investments by reducing the amount of such Investments deemed outstanding hereunder) together with the aggregate outstanding principal amount of all Investments made

pursuant to sub-clause (ii) of clause (h) of this Section 7.5 and all Investments made pursuant to sub-clause (ii) of clause (l) of this Section 7.5, not to exceed $50,000,000; and

(x)    subject to the satisfaction of the Payment Conditions, in addition to Investments permitted by the other provisions of this Section 7.5, the Borrowers and the Restricted Subsidiaries may make additional Investments to the extent permitted by the Term Loan Credit Agreement.

7.6    <u>Transactions with Affiliates</u>.

No Borrower will, and no Borrower will permit any of the Restricted Subsidiaries to, enter into any transaction or series of related transactions with any Affiliate of any Borrower or any of the Restricted Subsidiaries, other than in the ordinary course of business and on terms and conditions substantially as favorable to the Borrowers and the Restricted Subsidiaries as would reasonably be obtained by such Borrower or such Restricted Subsidiary at that time in a comparable arm's-length transaction with a Person other than an Affiliate, except that the following in any event shall be permitted:

(a)    Restricted Payments may be paid to the extent provided in Section 7.3;

(b)    Investments permitted by Sections 7.5(e), (f) and (q);

(c)    customary fees, indemnities and reimbursements may be paid to officers, directors and employees of VSHC (or any direct or indirect parent), the Borrowers and the Restricted Subsidiaries;

(d)    the Borrowers and the Restricted Subsidiaries may enter into, and may make payments under, employment agreements, consulting agreements, employee benefits plans, stock option plans, indemnification provisions, other similar compensatory arrangements and severance agreements with officers, employees and directors of VSHC, the Borrowers and the Restricted Subsidiaries in the ordinary course of business;

(e)    Restricted Subsidiaries of VSI may pay management fees, licensing fees and similar fees to VSI or to any Restricted Subsidiary of VSI that is a Loan Party;

(f)    the Borrowers and the Restricted Subsidiaries may pay (i) management, consulting, monitoring and advisory fees to Sponsor pursuant to the Management Agreement as in effect on the date hereof; <u>provided</u> <u>however</u>, that the fees and distributions described in this clause (f)(i) shall not be paid during any period while (x) a Specified Default has occurred and is continuing or would arise as a result of such payment or (y) any other Event of Default has occurred and is continuing for 30 days or would arise as a result of such payment, and (ii) so long as no Event of Default shall have occurred and be continuing, reimbursement of reasonable out-of-pocket costs and expenses and indemnification payments made to Sponsor and its Affiliates, in each case required to be paid pursuant to the Management Agreement as in effect on the date hereof and, in both cases in the aggregate in an amount not to exceed $3,500,000 in any fiscal year;

(g)     transactions solely between or among the Borrowers and the Restricted Subsidiaries not otherwise prohibited by this Agreement;

(h)     the Transactions and the payment of fees and expenses (including Transaction Costs) as part of or in connection with the Transactions;

(i)     the Borrowers and the Restricted Subsidiaries may enter into transactions pursuant to agreements in existence on the Closing Date and set forth on Schedule 7.6(i);

(j)     transactions with customers, clients, joint venture partners, suppliers or purchasers or sellers of goods or services, in each case in the ordinary course of business and otherwise in compliance with the terms of this Agreement that are fair to Borrowers and the Restricted Subsidiaries, in the reasonable determination of the Board of Directors or the senior management of VSI, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party; and

(k)     payments by the Borrowers or any Restricted Subsidiary pursuant to tax sharing agreements with any direct or indirect parent of VSHC to the extent attributable to the ownership or operation of VSI and the Restricted Subsidiaries but only to the extent permitted by Section 7.3(b).

7.7     <u>Modifications of Certain Agreements; Limitations on Voluntary Payments, etc</u>.

No Borrower will, and no Borrower will permit any of the Restricted Subsidiaries to:

(a)     amend, modify or change its certificate or articles of incorporation (including, without limitation, by the filing or modification of any certificate or articles of designation), certificate of formation, limited liability company agreement or by-laws (or the equivalent organizational documents), as applicable, unless such amendment, modification, change or other action contemplated by this clause (a) could not reasonably be expected to be materially adverse to the interests of the Lenders;

(b)     make or offer to make (or give any notice in respect thereof) any voluntary or optional payment or prepayment on or redemption, retirement, defeasance, or acquisition for value of any Indebtedness, or any prepayment or redemption as a result of any asset sale, change of control or similar event of, any Junior Indebtedness; <u>provided</u> that, so long as the Payment Conditions have been satisfied, the Borrowers and Restricted Subsidiaries may prepay or redeem Indebtedness to the extent permitted under the Term Loan Credit Agreement; or

(c)     make or offer to make (or give any notice in respect thereof) any voluntary or optional payment or prepayment on or redemption, retirement, defeasance, or acquisition for value of any Term Loan Obligations or Permitted Incremental Equivalent Debt (other than mandatory prepayments of any Term Loan Obligations or Permitted Incremental Equivalent Debt); <u>provided</u> that, so long as the Payment Conditions have been satisfied, the Borrowers and Restricted Subsidiaries may prepay or redeem Term Loan Obligations or Permitted Incremental Equivalent Debt; or

(d)      amend or modify, or permit the amendment or modification of, any provision of any Junior Indebtedness, on and after the execution and delivery thereof, in any manner that (i) if such amendment or modification was to be implemented by way of refinancing, would not satisfy the requirements of the definition of "Permitted Refinancing" or (ii) in any manner that is otherwise materially adverse to the Lenders.

7.8     Limitation on Certain Restrictions on Restricted Subsidiaries.

No Borrower will, and no Borrower will permit any of the Restricted Subsidiaries to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction on the ability of any such Restricted Subsidiary to (a) pay dividends or make any other distributions on its Equity Interest owned by any Borrower or any Restricted Subsidiary, or pay any Indebtedness owed to any Borrower or any Restricted Subsidiary, (b) make loans or advances to any Borrower or any Restricted Subsidiary or (c) transfer any of its properties or assets to any Borrower or any Restricted Subsidiary, except for such encumbrances or restrictions existing under or by reason of (i) applicable law, rule, regulation or order, (ii) this Agreement and the other Loan Documents, (iii) after the execution and delivery thereof, any documents governing any Permitted Incremental Equivalent Debt, (iv) customary provisions restricting subletting, transfer, license or assignment of any lease governing any leasehold interest of any Borrower or any Restricted Subsidiary or otherwise relating to the assets subject thereto, (v) customary provisions restricting transfer, license or assignment of any licensing agreement or other contract (or otherwise relating to the assets subject thereto) entered into by any Borrower or any Restricted Subsidiary in the ordinary course of business, (vi) restrictions on the transfer of any asset or Subsidiary pending the close of a permitted sale of such asset or Subsidiary, (vii) restrictions on the transfer of any asset subject to a Lien permitted by Sections 7.1(c), (f), (g), (h), (o) or (p); (viii) any agreement or instrument governing Permitted Acquired Debt, which encumbrance or restriction is not applicable to any Person or the properties or assets of any Person, other than the Person or the properties or assets of the Person acquired pursuant to the respective Permitted Acquisition or Investment and so long as the respective encumbrances or restrictions were not created (or made more restrictive) in connection with or in anticipation of the respective Permitted Acquisition or Investment; (ix) negative pledges and restrictions on Liens in favor of any holder of Indebtedness for borrowed money permitted under Section 7.4 but only if such negative pledge or restriction expressly permits Liens for the benefit of the Agent and the Lenders with respect to the credit facilities established hereunder and the Obligations under the Loan Documents on a senior basis and without a requirement that such holders of such Indebtedness be secured by such Liens equally and ratably or on a junior basis; (x) encumbrances or restrictions on cash or other deposits or net worth imposed by customers under agreements entered into in the ordinary course of business; (xi) the Term Loan Documents and any agreements governing any Permitted Refinancing thereof; (xii) contractual obligations which exist on the Closing Date and (to the extent not otherwise permitted by this Section 7.8) are listed on Schedule 7.8(c); (xiii) restrictions binding on a Restricted Subsidiary at the time such Restricted Subsidiary first becomes a Restricted Subsidiary, so long as such contractual obligations were not entered into solely in contemplation of such Person becoming a Restricted Subsidiary; (xiv) restrictions on cash earnest money deposits in favor of sellers in connection with acquisitions not prohibited hereunder; (xv) restrictions imposed by documentation governing Indebtedness permitted by Section 7.4(m) or (s); and (xvi) an agreement effecting a renewal, replacement, refinancing, restructuring and

extension of Indebtedness issued, assumed or incurred pursuant to an agreement or instrument referred to in clause (i) through (xv) above; <u>provided</u> that the provisions relating to such encumbrance or restriction contained in any such renewal, replacement, refinancing, restructuring and extension agreement (taken as a whole) are not materially less favorable to the Borrowers or the Lenders than the provisions relating to such encumbrance or restriction contained in the agreements or instruments referred to in such clause (i) through (xv) above.

7.9   Passive Holding Company.

VSHC shall not engage in any business activities or own any property other than (i) ownership of the Equity Interests of VSI, (ii) activities and contractual rights incidental to maintenance of its corporate existence and (iii) performance of its obligations under the Related Agreements to which it is a party.

7.10   Change in Nature of Business.

No Borrower will, and no Borrower will permit any of the Restricted Subsidiaries to engage in any line of business substantially different from those lines of business carried on by it on the Closing Date and business ancillary thereto and logical extensions thereof.

7.11   [Reserved].

7.12   Fiscal Year and Accounting Changes.

No Borrower will, and no Borrower will permit any of the Restricted Subsidiaries to change its fiscal year from the twelve-month period beginning January I and ending December 31 or make any material change (i) in accounting treatment and reporting practices except as required by GAAP or (ii) in tax reporting treatment except as required by law.

7.13   [Reserved].

7.14   [Reserved].

7.15   Membership/Partnership Interests.

No Borrower will, and no Borrower will permit any of the Restricted Subsidiaries to elect to treat or permit any of its Subsidiaries to (x) treat its limited liability company membership interests or partnership interests, as the case may be, as securities as contemplated by the definition of "security" in Section 8-102(15) and by Section 8-103 of Article 8 of Uniform Commercial Code or (y) certificate its limited liability company membership interests or partnership interests, as the case may be.

7.16   Other Agreements.

No Borrower will, and no Borrower will permit any of the Restricted Subsidiaries to enter into any amendment, waiver or modification of any Term Loan Document or any related agreements if the effect is to (a) increase the rate of interest (or required cash pay rate of interest) on any of the Term Loan Obligations (exclusive of up to 50 basis points increase in interest rate

in respect of Term Loans under the Term Loan Agreement, the proceeds of which are used to finance the acquisition code-named "Salt Lake Project"), (b) change the dates upon which payments of principal or interest on the Term Loan Obligations are due, (c) change or add any event of default or any covenant with respect to the Term Loan Obligations, (d) change any redemption or prepayment provisions of the Term Loan Obligations, or (e) change or amend any other term of the Term Loan Documents if such change or amendment would result in an Event of Default, increase the obligations of any Loan Party or confer additional material rights on any holder of the Term Loan Obligations in a manner adverse to any Loan Party or Lenders.

VIII.    <u>CONDITIONS PRECEDENT</u>.

    8.1    <u>Conditions to Effectiveness of this Agreement</u>.

        The effectiveness of this Agreement is subject to the satisfaction, or waiver by Agent, immediately prior to or concurrently with the effectiveness of this Agreement, of the following conditions precedent:

        (a)    <u>Credit Agreement and Other Documents</u>.  Agent shall have received this Agreement and each Other Document duly executed and delivered by an authorized officer of each Loan Party and any third parties, as applicable (including, without limitation, subject to the terms of the Intercreditor Agreement, all original stock certificates or other certificates evidencing the Subsidiary Stock and appropriate transfer powers with respect thereto);

        (b)    <u>Filings, Registrations and Recordings</u>.  (i) Each document (including any Uniform Commercial Code financing statement) required by this Agreement, any related agreement or under law or reasonably requested by Agent to be filed, registered or recorded in order to create, in favor of Agent, a perfected security interest in or lien upon the Collateral shall have been properly filed, registered or recorded in each jurisdiction in which the filing, registration or recordation thereof is so required or requested, and Agent shall have received an acknowledgment copy, or other evidence satisfactory to it, of each such filing, registration or recordation and satisfactory evidence of the payment of any necessary fee, tax or expense relating thereto; and (ii) Agent shall have received the results of searches listing all effective financing statements, judgments and tax liens which name any of the Loan Parties as debtor, together with copies of such financing statements, judgment filings and tax lien filings, none of which, except for Permitted Liens, shall cover any of the Collateral;

        (c)    <u>Authorization Proceedings of Loan Parties</u>.  Agent shall have received a copy of the resolutions in form and substance reasonably satisfactory to Agent, of the board of directors, managers or members, as the case may be, of each Loan Party authorizing (i) the execution, delivery and performance of this Agreement, the Notes, any Other Document and the Term Loan Documents and (ii) the granting by such Loan Party of the security interests in and liens upon the Collateral certified by an authorized manager or member, or secretary or assistant secretary, as the case may be, of such Loan Party as of the Closing Date; and, such certificate shall state that the resolutions thereby certified have not been amended, modified, revoked or rescinded as of the date of such certificate;

(d) <u>Incumbency Certificates of Loan Parties</u>.  Agent shall have received a certificate of an authorized manager or member, or secretary or assistant secretary, as the case may be, of each Loan Party, dated the Closing Date, as to the incumbency and signature of the officers of each Loan Party executing this Agreement, the Other Documents, any certificate or other documents to be delivered by it pursuant hereto, together with evidence of the incumbency of such manager or member, or secretary or assistant secretary, as the case may be;

(e) <u>Certificates</u>.  Agent shall have received a copy of the Articles or Certificate of Incorporation, or Certificate of Formation, as the case may be, of each Loan Party, and all amendments thereto, certified by the Secretary of State or other appropriate official of its jurisdiction of incorporation or formation, as the case may be, together with copies of the By-Laws or Operating Agreement, as the case may be, of each Loan Party and all agreements of each Loan Party's shareholder or members, as the case may be, in each case certified as accurate and complete by an authorized manager or member, or secretary or assistant secretary, as the case may be, of each Loan Party;

(f) <u>Good Standing and Tax Lien Certificates</u>.  Agent shall have received good standing and tax lien certificates for each Loan Party dated not more than thirty (30) days prior to the Closing Date, issued by the Secretary of State or other appropriate official of each Loan Party's jurisdiction of incorporation or formation, as the case may be;

(g) <u>Legal Opinion</u>.  Agent shall have received the executed legal opinion of DLA Piper and local counsel opinions in form and substance reasonably satisfactory to Agent which shall cover such matters incident to the transactions contemplated by this Agreement, the Notes and any Other Document as Agent may reasonably require and each Loan Party hereby authorizes and directs such counsel to deliver such opinions to Agent and Lenders;

(h) <u>No Litigation</u>.  (i) No litigation, investigation or proceeding before or by any arbitrator or Governmental Body shall be continuing or threatened against any Loan Party or against the respective officers or directors of any Loan Party (A) in connection with this Agreement, the Other Documents, the Term Loan Documents or any of the transactions contemplated thereby and which, in the reasonable opinion of Agent, is deemed material or (B) which could, in the reasonable opinion of Agent, have a Material Adverse Effect; and (ii) no injunction, writ, restraining order or other order of any nature materially adverse to any Loan Party or the conduct of its respective business or inconsistent with the due consummation of the Transactions shall have been issued by any Governmental Body;

(i) <u>Financial Condition Certificate</u>.  Agent shall have received an executed Financial Condition Certificate in the form of Exhibit 8.1(i);

(j) <u>Fees</u>.  Agent shall have received all fees payable to Agent and Lenders on or prior to the Closing Date hereunder, including pursuant to Article III hereof and the Fee Letter;

(k) <u>Existing Indebtedness</u>.  (i) Agent shall have received (A) evidence satisfactory to Agent that all necessary termination statements, satisfaction documents and any other applicable releases in connection with any existing Indebtedness and all other Liens with

respect to Loan Parties that are not Permitted Liens have been filed or arrangements satisfactory to Agent have been made for such filing and (B) evidence that the Borrowers shall have delivered to the trustee in respect of the Existing Secured Notes an irrevocable notice of redemption with respect to the entire outstanding principal amount of the Existing Secured Notes, (ii) an amount sufficient to satisfy and discharge the indenture in respect of the Existing Secured Notes shall have been or will be, substantially simultaneously with the funding of the initial Advance on the Closing Date, deposited with the trustee in respect of the Existing Secured Notes and all guarantees and security in support thereof discharged and released and the Agent shall have received reasonably satisfactory evidence thereof and (iii) immediately after giving effect to the Transactions and the other transactions contemplated hereby, the Borrowers and the Subsidiaries shall have outstanding no Indebtedness or preferred stock other than (a) Indebtedness outstanding under this Agreement, (b) Indebtedness permitted under this Agreement to be outstanding on the Closing Date and (c) Indebtedness set forth on Schedule 7.4(b).

(l)    _Financial Statements_.    Agent shall have received a copy of (i) the Financial Statements, and (ii) the Projections, which in each case shall be satisfactory in all respects to Agent and Lenders;

(m)    _Insurance_.    Agent shall have received in form and substance reasonably satisfactory to Agent, certified copies of Loan Parties' casualty insurance policies (including flood insurance if any part of the Mortgaged Property is located in a flood zone), together with loss payable endorsements on Agent's standard form of loss payee endorsement naming Agent as lender loss payee and mortgagee, as applicable, and certified copies of Loan Parties' liability insurance policies, together with endorsements naming Agent as a co-insured;

(n)    _Payment Instructions_.    Agent shall have received written instructions from Borrowing Agent directing the application of proceeds of the initial Advances made pursuant to this Agreement;

(o)    _Blocked Accounts_.    Agent shall have received duly executed agreements establishing the Blocked Accounts or Depository Accounts with financial institutions acceptable to Agent for the collection or servicing of the Receivables and proceeds of the Collateral or, alternatively, Loan Parties shall have established with Agent all of their bank accounts with Agent, together with evidence that the Borrowers have directed all customers to remit payments to a Blocked Account or Depository Account, all in a manner to the satisfaction of Agent in its sole discretion;

(p)    _Consents_.    Agent shall have received any and all Consents necessary to permit the effectuation of the transactions contemplated by this Agreement and the Other Documents; and Agent shall have received such Consents and waivers of such third parties as might assert claims with respect to the Collateral, as Agent and its counsel shall deem necessary;

(q)    _No Adverse Material Change_.    (i) Since December 31, 2013, there shall not have occurred any event, condition or state of facts which could reasonably be expected to have a Material Adverse Effect and (ii) no representations made or information supplied to Agent or Lenders shall have been proven to be inaccurate or misleading in any material respect;

(r)     <u>Waivers</u>.    Agent shall have received fully executed copies of all Lien Waiver Agreements required by Agent to be executed on or prior to the Closing Date;

(s)     <u>Closing Certificate</u>.    Agent shall have received a closing certificate signed by the Chief Financial Officer of each Loan Party dated as of the date hereof, stating that (i) all representations and warranties set forth in this Agreement and the Other Documents are true and correct on and as of such date, (ii) each Loan Party is on such date in compliance with all the terms and provisions set forth in this Agreement and the Other Documents and (iii) on such date no Default or Event of Default has occurred or is continuing;

(t)     <u>Borrowing Base</u>.    Agent shall have received evidence from Borrowers that the aggregate of the Formula Amount and the Ex-Im Formula Amount are sufficient to support Advances in the amount requested by Borrowers on the Closing Date;

(u)     <u>Undrawn Availability</u>.    After giving effect to the initial Advances hereunder and the Transactions, Borrowers shall have Undrawn Availability of at least Twenty Million and 00/100 Dollars ($20,000,000.00);

(v)     <u>Compliance with Laws</u>.    Agent shall be reasonably satisfied that the Loan Parties are in material compliance with all pertinent federal, state, local or territorial regulations, including Environmental Laws, ERISA and the Trading with the Enemy Act;

(w)     <u>Term Loan Documents</u>.    The Agent shall have received final executed copies of the Term Loan Documents, and all related agreements, documents and instruments as in effect on the Closing Date all of which shall be reasonably satisfactory in form and substance to Agent and the transactions contemplated by such documentation shall be consummated prior to or simultaneously with the effectiveness of this Agreement, including the receipt by Loan Parties of the proceeds of the "Loans" (as defined in the Term Loan Credit Agreement) in the sum of not less than $455,000,000;

(x)     <u>Intercreditor Agreement</u>.    The Agent shall have entered into the Intercreditor Agreement with the Borrowers and the Term Loan Agent, and the Guarantors shall have acknowledged and consented thereto, which Intercreditor Agreement shall set forth, among other things, the relative Lien priority and enforcement rights of the Term Loan Agent and the Agent (for itself and the Lenders) and otherwise be in form and substance satisfactory to Agent in its sole discretion;

(y)     The Equity Contribution and the Parent Note Repayment shall have occurred, or shall occur substantially simultaneously with the funding of the Loans hereunder on the Closing Date;

(z)     The Acquisition shall be consummated substantially concurrently with the effectiveness of this Agreement on the Closing Date in accordance with the Acquisition Agreement;

(aa)     (i) The Acquisition shall be a Permitted Acquisition and all conditions set forth in Section 7.5(l) shall have been met with respect to the Acquisition, and (ii) a certificate of

a Responsible Officer certifying that the Acquisition is a Permitted Acquisition shall have been delivered to the Administrative Agent.

(bb)    [Reserved];

(cc)    [Reserved];

(dd)    <u>Other</u>.    All corporate and other proceedings, and all documents, instruments and other legal matters in connection with the Transactions shall be satisfactory in form and substance to Agent and its counsel.

8.2    <u>Conditions to Each Advance</u>.

The agreement of Lenders to make any Advance requested to be made on any date (including the initial Advance), is subject to the satisfaction of the following conditions precedent as of the date such Advance is made:

(a)    <u>Representations and Warranties</u>.    Each of the representations and warranties made by any Loan Party in or pursuant to this Agreement, the Other Documents and any related agreements to which it is a party, and each of the representations and warranties contained in any certificate, document or financial or other statement furnished at any time under or in connection with this Agreement, the Other Documents or any related agreement shall be true and correct in all material respects on and as of such date as if made on and as of such date (except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall have been true and correct in all material respects as of such earlier date);

(b)    <u>No Default</u>.    No Event of Default or Default shall have occurred and be continuing on such date, or would exist after giving effect to the Advances requested to be made, on such date; <u>provided</u>, <u>however</u> that Agent, in its sole discretion, may, subject to the provisions of Section 16.2(b) hereof, continue to make Advances notwithstanding the existence of an Event of Default or Default and that any Advances so made shall not be deemed a waiver of any such Event of Default or Default; and

(c)    <u>Maximum Advances</u>.    In the case of any type of Advance requested to be made, after giving effect thereto, the aggregate amount of such type of Advance shall not exceed the maximum amount of such type of Advance permitted under this Agreement.

Each request for an Advance by any Borrower hereunder shall constitute a representation and warranty by each Loan Party as of the date of such Advance that the conditions contained in this subsection shall have been satisfied.

IX.    <u>INFORMATION AS TO LOAN PARTIES</u>.

Each Loan Party shall, or (except with respect to Section 9.11) shall cause Borrowing Agent on its behalf to, until satisfaction in full of the Obligations and the termination of this Agreement and without duplication:

9.1     Disclosure of Material Matters.

Immediately upon learning thereof, report to Agent all matters materially and adversely affecting the value, enforceability or collectability of any portion of the Collateral, including any Loan Party's reclamation or repossession of, or the return to any Loan Party of, a material amount of goods or claims or disputes asserted by any Customer or other third party obligor.

9.2     Certificates.

Deliver to Agent (A) on or before the fifteenth (15th) day of each month as and for the prior month or (B) at any time when Average Undrawn Availability is less than twenty percent (20%) of the sum of the Gross Formula Amount, plus the Ex-Im Formula Amount and continuing until Average Undrawn Availability is greater than twenty percent (20%) of the sum of the Gross Formula Amount, plus the Ex-Im Formula Amount for sixty (60) consecutive calendar days, on or before the Friday of each week as and for the prior week (consisting of the seven (7) days commencing on Monday of such prior week and ending on Sunday of such prior week): (a) a Borrowing Base Certificate and an Ex-Im Borrowing Base Certificate, each in form and substance satisfactory to Agent (which shall be calculated as of the last day of the prior month (or week, as applicable) and which shall not be binding upon Agent or restrictive of Agent's rights under this Agreement), (b) copies of the Export Orders or, if permitted by the Agent, a written summary of the Export Orders (provided that if the Agent permits the delivery of summaries of the Export Orders, the Loan Parties shall promptly furnish to the Agent copies of any Export Order requested by the Agent), (c) a calculation of the ratio of United States export sales to total United States sales, (d) accounts receivable agings inclusive of reconciliations to the general ledger, and (e) accounts payable schedules inclusive of reconciliations to the general ledger, each in form and substance satisfactory to Agent.  In addition, each Loan Party will deliver to Agent at such intervals as Agent may require:  (i) confirmatory assignment schedules, (ii) copies of Customer's invoices, (iii) evidence of shipment or delivery, and (iv) such further schedules, documents and/or information regarding the Collateral as Agent may require including trial balances and test verifications. Agent shall have the right to confirm and verify all Receivables by any manner and through any medium it considers advisable and do whatever it may deem reasonably necessary to protect its interests hereunder.  The items to be provided under this Section 9.2 are to be in form satisfactory to Agent and executed by each Loan Party, as applicable, and delivered to Agent from time to time solely for Agent's convenience in maintaining records of the Collateral, and any Loan Party's failure to deliver any of such items to Agent shall not affect, terminate, modify or otherwise limit Agent's Lien with respect to the Collateral.

9.3     Environmental Reports.

Furnish Agent, concurrently with the delivery of the financial statements referred to in Sections 9.7 and 9.8, with a Compliance Certificate signed by the President of Borrowing Agent stating, to the best of his knowledge after reasonable due inquiry, that each Loan Party is in compliance in all material respects with all applicable federal, state and local Environmental Laws. To the extent any Loan Party is not in material compliance with the foregoing laws, the

certificate shall set forth with specificity all areas of material non-compliance and the proposed action such Loan Party will implement in order to achieve material compliance.

9.4    Litigation.

Promptly notify Agent in writing of any claim, litigation, suit or administrative proceeding affecting any Loan Party, whether or not the claim is covered by insurance, and of any litigation, suit or administrative proceeding, which in any such case affects the Collateral or which could reasonably be expected to have a Material Adverse Effect.

9.5    Material Occurrences.

Promptly notify Agent in writing upon the occurrence of (a) any Event of Default or Default; (b) any event of default under any Term Loan Document; (c) any event which with the giving of notice or lapse of time, or both, would constitute an event of default under any Term Loan Document; (d) any event, development or circumstance whereby any financial statements or other reports furnished to Agent fail in any material respect to present fairly, in accordance with GAAP consistently applied, the financial condition or operating results of any Loan Party as of the date of such statements; (e) any accumulated retirement plan funding deficiency which, if such deficiency continued for two plan years and was not corrected as provided in Section 4971 of the Code, could subject any Loan Party to a tax imposed by Section 4971 of the Code; (f) each and every default by any Loan Party which might result in the acceleration of the maturity of any Indebtedness with a principal amount in excess of Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00), including the names and addresses of the holders of such Indebtedness with respect to which there is a default existing or with respect to which the maturity has been or could be accelerated, and the outstanding amount of such Indebtedness; (g) any Loan Party entering into, terminating (other than pursuant to its terms), or materially amending any Material Contract, which notice shall summarize the material terms of such Material Contract or material amendment to such Material Contract, and upon the request of the Agent, the Loan Parties shall provide such Material Contract to the Agent, and (h) any other development in the business or affairs of any Loan Party, which could reasonably be expected to have a Material Adverse Effect; in each case describing the nature thereof and the action Loan Parties propose to take with respect thereto.

9.6    Government Receivables.

Notify Agent immediately if any of its Receivables arise out of contracts between any Loan Party and the United States, any state, or any department, agency or instrumentality of any of them.

9.7    Annual Financial Statements.

Furnish Agent and Lenders within one hundred twenty (120) days after the end of each fiscal year of VSI, financial statements of VSI and its Subsidiaries on a consolidated and consolidating basis including, but not limited to, statements of income and stockholders' equity and cash flow from the beginning of the current fiscal year to the end of such fiscal year and the balance sheet as at the end of such fiscal year, all prepared in accordance with GAAP applied on a basis consistent with prior practices, and in reasonable detail and reported upon without

qualification by an independent certified public accounting firm selected by VSI and reasonably satisfactory to Agent (the "Accountants").  The report of the Accountants shall be accompanied by a statement of the Accountants certifying that (i) they have caused this Agreement to be reviewed, (ii) in making the examination upon which such report was based either no information came to their attention which to their knowledge constituted an Event of Default or a Default under this Agreement or any related agreement or, if such information came to their attention, specifying any such Default or Event of Default, its nature, when it occurred and whether it is continuing, and such report shall contain or have appended thereto calculations which set forth Loan Parties' compliance with the requirements or restrictions imposed by Sections 6.18, 7.2, 7.3, 7.4, 7.5, 7.6, 7.7 and 7.8 hereof.  In addition, the reports shall be accompanied by a Compliance Certificate.

       9.8     <u>Quarterly Financial Statements</u>.

       Furnish Agent and Lenders within forty-five (45) days after the end of each fiscal quarter, an unaudited balance sheet of VSI and its Subsidiaries on a consolidated and consolidating basis and unaudited statements of income and stockholders' equity and cash flow of VSI and its Subsidiaries on a consolidated and consolidating basis reflecting results of operations from the beginning of the fiscal year to the end of such quarter and for such quarter, prepared on a basis consistent with prior practices and complete and correct in all material respects, subject to normal and recurring year-end adjustments that individually and in the aggregate are not material to any Loan Party's business, and accompanied by comparative financial statements of VSI and its Subsidiaries on a consolidated and consolidating basis for the same fiscal quarter and same fiscal year-to-date period in the prior fiscal year.  The reports shall be accompanied by a Compliance Certificate.

       9.9     <u>Monthly Financial Statements</u>.

       Furnish Agent and Lenders within thirty (30) days after the end of each month (except March, June, September and December), an unaudited balance sheet of VSI and its Subsidiaries on a consolidated and consolidating basis and unaudited statements of income and stockholders' equity and cash flow of VSI and its Subsidiaries on a consolidated and consolidating basis, in each case reflecting results of operations from the beginning of the fiscal year to the end of such month and for such month, prepared on a basis consistent with prior practices and complete and correct in all material respects, subject to normal and recurring year-end adjustments that individually and in the aggregate are not material to any Loan Party's business, and accompanied by comparative financial statements of VSI and its Subsidiaries on a consolidated and consolidating basis for the same month and same fiscal year-to-date period in the prior fiscal year.  The reports shall be accompanied by a Compliance Certificate.

       9.10    <u>Other Reports</u>.

       Furnish Agent as soon as available, but in any event within ten (10) days after the issuance thereof, without duplication, (i) with copies of such financial statements, reports and returns as each Loan Party shall send to its stockholders or members and (ii) copies of all notices, reports, financial statements and other materials sent pursuant to any Term Loan Documents.

9.11    Additional Information.

Furnish Agent with such additional information as Agent shall reasonably request in order to enable Agent to determine whether the terms, covenants, provisions and conditions of this Agreement, the Notes and any Other Document have been complied with by the Loan Parties including, without the necessity of any request by Agent, (a) copies of all environmental audits and reviews, (b) at least thirty (30) days prior thereto, notice of any Loan Party's opening of any new office or place of business or any Loan Party's closing of any existing office or place of business, and (c) promptly upon any Loan Party's learning thereof, notice of any labor dispute to which any Loan Party may become a party, any strikes or walkouts relating to any of its plants or other facilities, and the expiration of any labor contract to which any Loan Party is a party or by which any Loan Party is bound which could reasonably be expected to have a Material Adverse Effect.

9.12    Projected Operating Budget.

Furnish Agent and Lenders, no later than January 31 to the beginning of each fiscal year of VSI during the Term a quarterly projected operating budget and cash flow of VSI and its Subsidiaries on a consolidated and consolidating basis for such fiscal year (including an income statement for each month and a balance sheet as at the end of the last month in each fiscal quarter), such projections to be accompanied by a certificate signed by the President or Chief Financial Officer of VSI to the effect that such projections have been prepared on the basis of sound financial planning practice consistent with past budgets and financial statements and that such officer has no reason to question the reasonableness of any material assumptions on which such projections were prepared.

9.13    Variances From Operating Budget.

Furnish Agent, concurrently with the delivery of the financial statements referred to in Sections 9.7 and 9.8, a written report containing a discussion and analysis by management with respect to the results from operations of VSI and its Subsidiaries.

9.14    Notice of Suits, Adverse Events.

Furnish Agent with prompt written notice of (i) any lapse or other termination of any Consent issued to any Loan Party by any Governmental Body or any other Person that is material to the operation of any Loan Party's business, (ii) any refusal by any Governmental Body or any other Person to renew or extend any such Consent; and (iii) copies of any periodic or special reports filed by any Loan Party with any Governmental Body or Person, if such reports indicate any change in the business, operations, affairs or condition of any Loan Party which could reasonably be expected to have a Material Adverse Effect, and (iv) copies of any notices and other written communications from any Governmental Body or Person which specifically relate to any Loan Party which could reasonably be expected to have a Material Adverse Effect.

9.15    <u>ERISA Notices and Requests</u>.

Furnish Agent with immediate written notice in the event that an ERISA Event has occurred, together with a written statement describing such ERISA Event and the action, if any, which such Loan Party has taken, is taking, or proposes to take with respect thereto.

9.16    <u>Additional Documents</u>.

Execute and deliver to Agent, within ten (10) days of being requested to do so, such additional documents and agreements as Agent may, from time to time reasonably request to carry out the purposes, terms or conditions of this Agreement.

9.17    <u>Financial Statements Required by Loan Authorization Agreement</u>.

The financial statements described in Section 11 of the Loan Authorization Agreement, to be furnished within the time periods set forth in Section 11 of the Loan Authorization Agreement.

X.    <u>EVENTS OF DEFAULT</u>.

The occurrence of any one or more of the following events shall constitute an "Event of Default":

10.1    <u>Payments</u>.

Failure by any Borrower to pay any principal or interest on the Obligations when due, whether at maturity or by reason of acceleration pursuant to the terms of this Agreement or by notice of intention to prepay, or by required prepayment or failure by any Loan Party to pay any other liabilities or make any other payment, fee or charge provided for herein when due or in any Other Document;

10.2    <u>Representations</u>.

Any representation, warranty or statement made or deemed to be made by any Loan Party herein or in any other Loan Document or in any certificate delivered to the Agent or any Lender pursuant hereto or thereto shall prove to be untrue in any material respect on the date as of which it is made or deemed to be made;

10.3    <u>Covenants</u>.

Except as otherwise provided for in Sections 10.1, 10.2 and 10.12, (i) failure of any Loan Party to perform, keep or observe any term, provision, condition, covenant herein contained or contained in any Other Document applicable to such Loan Party, or (ii) failure or neglect of any Loan Party to perform, keep or observe any term, provision, condition or covenant, contained in Sections 4.6, 4.7, 6.15, 6.16, 9.4 or 9.6 hereof applicable to such Loan Party, in each case which is not cured within thirty (30) days from the earlier of the date on which written notice thereof is given to the Borrowing Agent by the Agent or the Required Lenders or a Responsible Officer becomes aware of such failure;

-140-

10.4    Default Under Other Agreements.

(i) VSHC, any Borrower or any Restricted Subsidiary shall (x) default in any payment of any Indebtedness (other than the Obligations, but including, for the sake of clarity the Term Loan Obligations) beyond the grace period, if any, provided in an instrument or agreement under which such Indebtedness is governed or (y) default in the observance or performance of any agreement or condition relating to any Indebtedness (other than the Obligations, but including, for the sake of clarity the Term Loan Obligations) or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit any holder of such Indebtedness (or a trustee or agent on behalf of such holder) to cause (after delivery of any notice, if required by any such instrument or agreement, and after giving effect to any waiver, amendment, cure or grace period), any such Indebtedness to become due prior to its stated maturity, or (ii) any Indebtedness (other than the Obligations) of VSHC, any Borrower or any Restricted Subsidiary shall be declared to be (or shall become) due and payable, or required to be prepaid other than by a regularly scheduled required prepayment, prior to the stated maturity thereof (other than, in the case of this clause (ii), (x) any secured Indebtedness that is required to be prepaid as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, (y) any Indebtedness that is required to be converted into Qualified Equity Interests upon the occurrence of certain designated events so long as no payments (other than such conversion and Restricted Payments paid in lieu of fractional shares permitted under Section 7.3(d)) in cash or otherwise are required to be made in accordance with such conversion and the issuance of such Equity Interests is otherwise permitted under Article VII and (z) any failure under this clause (ii) if such failure is remedied or waived by the requisite holders of such Indebtedness prior to any acceleration of the Obligations pursuant to this Article X); provided that it shall not be a Default or an Event of Default under this Section 10.4 unless the aggregate principal amount of all Indebtedness (other than Indebtedness under the Term Loan Documents, in which case no such threshold shall apply) as described in this Section 10.4 equals to or exceeds the Threshold Amount;

10.5    Bankruptcy, etc.

VSHC, any Borrower or any Restricted Subsidiary (other than an Immaterial Subsidiary) shall commence a voluntary case concerning itself under the Bankruptcy Code; or an involuntary case is commenced against VSHC, any Borrower or any Restricted Subsidiary, and the petition is not dismissed within forty-five (45) days after the filing thereof; or a custodian (as defined in the Bankruptcy Code) is appointed for, or takes charge of, all or substantially all of the property of VSHC, any Borrower or any Restricted Subsidiary, to operate all or any substantial portion of the business of VSHC, any Borrower or any Restricted Subsidiary, or, except to the extent expressly permitted by Section 7.2, VSHC, any Borrower or any Restricted Subsidiary commences any other proceeding under any reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction whether now or hereafter in effect relating to VSHC, any Borrower or any Restricted Subsidiary, or there has commenced against VSHC, any Borrower or any Restricted Subsidiary any such proceeding which remains undismissed for a period of sixty (60) days after the filing thereof, or VSHC, any Borrower or any Restricted Subsidiary is adjudicated insolvent or bankrupt; or any order of relief is entered in any such proceeding; VSHC, any Borrower or any Restricted Subsidiary makes a

general assignment for the benefit of creditors; or any action is taken by VSHC, any Borrower or any Restricted Subsidiary for the purpose of authorizing any of the foregoing; or VSHC, any Borrower or any Restricted Subsidiary become unable, or admit in writing its inability or fail generally to pay its debts as they become due;

10.6    <u>ERISA</u>.

(a)    one or more ERISA Events shall have occurred that either alone or together results in a liability to any Borrower or any Subsidiary (including on account of an ERISA Affiliate) that equals or exceeds or is reasonably expected to equal or exceed the Threshold Amount, or

(b)    there is or arises an Unfunded Pension Liability (taking into account only Plans with positive Unfunded Pension Liability) that results in a liability to any Borrower or any Subsidiary (including on account of an ERISA Affiliate) that equals or exceeds, or that would reasonably be expected to equal or exceed, the Threshold Amount; or

(c)    there is or arises any potential Withdrawal Liability under Section 4201 of ERISA, if any Borrower or any Subsidiary or their respective ERISA Affiliates were to withdraw completely from any and all Multiemployer Plans and the liability to any Borrower or any Subsidiary (including on account of an ERISA Affiliate) equals or exceeds, or is reasonably expected to equal or exceed the Threshold Amount.

10.7    <u>Security Documents</u>.

Any of the provisions of <u>Article IV</u> or any Other Document pursuant to which a security interest or Lien is granted in favor of Agent shall cease to be in full force and effect, or shall cease to give Agent for the benefit of itself, the other Lenders or any other secured party, the Liens, rights, powers and privileges purported to be created thereby (including, without limitation, a perfected security interest (if and to the extent such Collateral can be perfected by the filing of UCC-1 financing statements and the taking of such other actions required by this Agreement and the Other Documents) in, and Lien on, all of the Collateral, in favor of Agent for the benefit of the Lenders, superior to and prior to the rights of all third Persons, and subject to no other Liens (in each case, other than Permitted Liens or in compliance with any Intercreditor Agreement).

10.8    <u>Guarantees</u>.

Any Guarantee of the Obligations or any provision thereof shall cease to be in full force or effect as to any Guarantor (except as a result of a release of any Guarantor in accordance with the terms thereof), or any Guarantor or any Person acting for or on behalf of such Guarantor shall deny or disaffirm such Guarantor's obligations with respect to such Guarantee by such Guarantor

10.9    <u>Judgments</u>.

One or more final judgments or decrees shall be entered against VSHC, any Borrower or any Restricted Subsidiary (other than an Immaterial Subsidiary) involving in the

aggregate for VSHC, the Borrowers and the Restricted Subsidiaries a liability (not paid or to the extent not covered by a reputable and solvent insurance company or third party indemnities) and such judgments and decrees either shall be final and non-appealable by a court of competent jurisdiction or shall not be vacated, discharged or stayed or bonded pending appeal for any period of sixty (60) consecutive days, and the aggregate amount of all such judgments equals to or exceeds the Threshold Amount;

10.10   Change of Control.

A Change of Control shall occur;

10.11   Invalidity of Loan Documents.

Any material provision of this Agreement or any Other Document shall (taken as a whole), for any reason other than as expressly permitted hereunder or thereunder or the satisfaction in full of all the Obligations, cease to be valid and binding on any Loan Party, or any Loan Party shall so claim in writing to Agent or any Lender;

10.12   [Reserved].

10.13   [Reserved].

10.14   [Reserved].

10.15   [Reserved].

10.16   [Reserved].

10.17   Master Guarantee Agreement.

(i) An Event of Default (as defined in the Master Guarantee Agreement) has occurred and continued beyond all applicable grace or cure periods, or (ii) the benefit of the Ex-Im Bank guaranty is lost or impaired for any reason whatsoever, whether by termination, suspension or otherwise unless the Ex-Im Obligations have been paid in full; or

10.18   Material Export-Related Contracts; Related Letters of Credit.

(i) Any Material Export-Related Contract or Related Letter of Credit is amended or modified in a manner materially adverse to the Agent without the prior written consent of the Agent; (ii) any Borrower attempts to transfer or assign to any third party any rights under any Related Letter of Credit assigned to the Agent in connection herewith; or (iii) the issuing bank of any Related Letter of Credit cancels, repudiates, rescinds or terminates any Related Letter of Credit or any assignment of the proceeds of a Related Letter of Credit to the Agent, or takes any actions to accomplish any such condition, in each case, which could reasonably be expected to have a Material Adverse Effect.

XI.    LENDERS' RIGHTS AND REMEDIES AFTER DEFAULT.

11.1    <u>Rights and Remedies</u>.

(a)    Upon the occurrence of (i) an Event of Default pursuant to Section 10.5 all Obligations shall be immediately due and payable and this Agreement and the obligation of Lenders to make Advances shall be deemed terminated; and (ii) any of the other Events of Default and at any time thereafter (such default not having previously been cured), (A) at the option of Required Lenders all Obligations and (B) at the option of the Ex-Im Bank, pursuant to the Master Guarantee Agreement, all Ex-Im Obligations, shall be immediately due and payable and Lenders shall have the right to terminate this Agreement and to terminate the obligation of Lenders to make Advances, and (iii) a filing of a petition against any Loan Party in any involuntary case under any state or federal bankruptcy laws, all Obligations shall be immediately due and payable and the obligation of Lenders to make Advances hereunder shall be terminated other than as may be required by an appropriate order of the bankruptcy court having jurisdiction over such Loan Party.  Upon the occurrence of any Event of Default and subject to the terms of the Intercreditor Agreement, Agent shall have the right to exercise any and all rights and remedies provided for herein, under the Other Documents, under the Uniform Commercial Code and at law or equity generally, including the right to foreclose the security interests granted herein and to realize upon any Collateral by any available judicial procedure and/or to take possession of and sell any or all of the Collateral with or without judicial process. Agent may enter any of any Loan Party's premises or other premises without legal process and without incurring liability to such Loan Party therefor, and Agent may thereupon, or at any time thereafter, in its discretion without notice or demand, take the Collateral and remove the same to such place as Agent may deem advisable and Agent may require Loan Parties to make the Collateral available to Agent at a convenient place.  With or without having the Collateral at the time or place of sale, Agent may sell the Collateral, or any part thereof, at public or private sale, at any time or place, in one or more sales, at such price or prices, and upon such terms, either for cash, credit or future delivery, as Agent may elect. Except as to that part of the Collateral which is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Agent shall give Loan Parties reasonable notification of such sale or sales, it being agreed that in all events written notice mailed to Borrowing Agent at least ten (10) days prior to such sale or sales is reasonable notification.  At any public sale Agent or any Lender may bid for and become the purchaser, and Agent, any Lender or any other purchaser at any such sale thereafter shall hold the Collateral sold absolutely free from any claim or right of whatsoever kind, including any equity of redemption and all such claims, rights and equities are hereby expressly waived and released by Loan Parties. In connection with the exercise of the foregoing remedies, including the sale of Inventory, Agent is granted a perpetual nonrevocable, royalty free, nonexclusive license and Agent is granted permission to use all of each Loan Party's (a) trademarks, trade styles, trade names, patents, patent applications, copyrights, service marks, licenses, franchises and other proprietary rights which are used or useful in connection with Inventory for the purpose of marketing, advertising for sale and selling or otherwise disposing of such Inventory and (b) Equipment for the purpose of completing the manufacture of unfinished goods.  The cash proceeds realized from the sale of any Collateral shall be applied to the Obligations in the order set forth in Section 11.5 hereof.  Noncash proceeds will only be applied to the Obligations as they are converted into cash.  If any deficiency shall arise, Loan Parties shall remain liable to Agent and Lenders therefor.

(b)    To the extent that Applicable Law imposes duties on Agent to exercise remedies in a commercially reasonable manner, each Loan Party acknowledges and agrees that it is not commercially unreasonable for Agent (i) to fail to incur expenses reasonably deemed significant by Agent to prepare Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition, (ii) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (iii) to fail to exercise collection remedies against Customers or other Persons obligated on Collateral or to remove Liens on or any adverse claims against Collateral, (iv) to exercise collection remedies against Customers and other Persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (v) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (vi) to contact other Persons, whether or not in the same business as any Loan Party, for expressions of interest in acquiring all or any portion of such Collateral, (vii) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the Collateral is of a specialized nature, (viii) to dispose of Collateral by utilizing internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capacity of doing so, or that match buyers and sellers of assets, (ix) to dispose of assets in wholesale rather than retail markets, (x) to disclaim disposition warranties, such as title, possession or quiet enjoyment, (xi) to purchase insurance or credit enhancements to insure Agent against risks of loss, collection or disposition of Collateral or to provide to Agent a guaranteed return from the collection or disposition of Collateral, or (xii) to the extent deemed appropriate by Agent, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist Agent in the collection or disposition of any of the Collateral.  Each Loan Party acknowledges that the purpose of this Section 11.1(b) is to provide non-exhaustive indications of what actions or omissions by Agent would not be commercially unreasonable in Agent's exercise of remedies against the Collateral and that other actions or omissions by Agent shall not be deemed commercially unreasonable solely on account of not being indicated in this Section 11.1(b). Without limitation upon the foregoing, nothing contained in this Section 11.1(b) shall be construed to grant any rights to any Loan Party or to impose any duties on Agent that would not have been granted or imposed by this Agreement or by Applicable Law in the absence of this Section 11.1(b).

11.2    <u>Agent's Discretion</u>.

Subject to Article XIV hereof, Agent shall have the right in its sole discretion to determine which rights, Liens, security interests or remedies Agent may at any time pursue, relinquish, subordinate, or modify or to take any other action with respect thereto and such determination will not in any way modify or affect any of Agent's or Lenders' rights hereunder.

11.3    <u>Setoff</u>.

Subject to Section 14.12, in addition to any other rights which Agent or any Lender may have under Applicable Law, upon the occurrence of an Event of Default hereunder, Agent and such Lender shall have a right, immediately and without notice of any kind, to apply any Loan Party's property held by Agent and such Lender to reduce the Obligations.

11.4    Rights and Remedies not Exclusive.

The enumeration of the foregoing rights and remedies is not intended to be exhaustive and the exercise of any rights or remedy shall not preclude the exercise of any other right or remedies provided for herein or otherwise provided by law, all of which shall be cumulative and not alternative.

11.5    Allocation of Payments After Event of Default.

Notwithstanding any other provisions of this Agreement to the contrary, after the occurrence and during the continuance of an Event of Default, all amounts collected or received by Agent on account of the Obligations (including without limitation any amounts on account of any of Cash Management Liabilities or Hedge Liabilities) or any other amounts outstanding under any of the Other Documents or in respect of the Collateral shall, subject to the terms of the Intercreditor Agreement, be paid over or delivered, unless such amounts collected or received are at such time required to be applied differently under the terms of the Ex-Im Documents or the Master Guarantee Agreement, as follows:

FIRST, (a) with respect to the proceeds realized from the sale of any Domestic Collateral, to the payment of all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees) of Agent in connection with enforcing its rights and the rights of Lenders under this Agreement and the Other Documents arising from, related to or connected with the Domestic Advances and any protective advances made by Agent with respect to the Domestic Collateral under or pursuant to the terms of this Agreement, and (b) with respect to the proceeds realized from the sale of any Ex-Im Collateral, to the payment of all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees) of Agent in connection with enforcing its rights and the rights of Lenders under this Agreement and the Other Documents arising from, related to or connected with the Ex-Im Revolving Advances and any protective advances made by Agent with respect to the Ex-Im Collateral under or pursuant to the terms of this Agreement;

SECOND, (a) with respect to the proceeds realized from the sale of any Ex-Im Collateral to payment of any fees owed to Agent arising from, related to or connected with the Ex-Im Revolving Advances, and (b) with respect to the proceeds realized from the sale of any Domestic Collateral to payment of any fees owed to Agent arising from, related to or connected with the Domestic Advances;

THIRD, (a) with respect to the proceeds realized from the sale of any Domestic Collateral to the payment of all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees) of each of Lenders to the extent owing to such Lender pursuant to the terms of this Agreement arising from, related to or connected with the Domestic Advances or otherwise with respect to the Obligations arising from, related to or connected with the Domestic Advances owing to such Lender, and (b) with respect to the proceeds realized from the sale of any Ex-Im Collateral to the payment of all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees) of each of Lenders to the extent owing to such Lender pursuant to the terms of this Agreement arising from, related to or connected with the Ex-Im

Revolving Advances or otherwise with respect to the Obligations arising from, related to or connected with the Ex-Im Revolving Advances owing to such Lender;

FOURTH, (a) with respect to the proceeds realized from the sale of any Domestic Collateral to the payment of all of the Obligations consisting of accrued fees and interest arising from, related to or connected with the Domestic Advances, and (b) with respect to the proceeds realized from the sale of any Ex-Im Collateral to the payment of all of the Obligations consisting of accrued fees and interest arising from, related to or connected with the Ex-Im Revolving Advances;

FIFTH, (a) with respect to the proceeds realized from the sale of any Domestic Collateral to the payment of the outstanding principal amount of the Obligations (including Cash Management Liabilities and Hedge Liabilities) arising from, related to or connected with the Domestic Advances (including the payment or cash collateralization of any outstanding Letters of Credit), and (b) with respect to the proceeds realized from the sale of any Ex-Im Collateral to the payment of the outstanding principal amount of the Obligations arising from, related to or connected with the Ex-Im Revolving Advances;

SIXTH, (a) with respect to the proceeds realized from the sale of any Domestic Collateral, upon the satisfaction of all Obligations arising from, related to or connected with the Domestic Advances (including the payment or cash collateralization of the outstanding Letters of Credit), to the payment of the Obligations arising from, related to or connected with the Ex-Im Revolving Advances pursuant to clauses "FIRST" through "FIFTH" above, and (b) with respect to the proceeds realized from the sale of any Ex-Im Collateral, upon the satisfaction of all Obligations arising from, related to or connected with the Ex-Im Revolving Advances, to the payment of the Obligations arising from, related to or connected with the Domestic Advances pursuant to clauses "FIRST" through "FIFTH" above;

SEVENTH, to all other Obligations and other obligations which shall have become due and payable under the Other Documents or otherwise and not repaid pursuant to clauses "FIRST" through "SIXTH" above; and

EIGHTH, to the payment of the surplus, if any, to whoever may be lawfully entitled to receive such surplus.

In carrying out the foregoing, (i) amounts received shall be applied in the numerical order provided until exhausted prior to application to the next succeeding category; (ii) each of Lenders shall receive (so long as it is not a Defaulting Lender) an amount equal to its pro rata share (based on the proportion that the then outstanding Domestic Advances or Ex-Im Revolving Advances, Cash Management Liabilities and Hedge Liabilities, as the case may be, held by such Lender bears to the aggregate then outstanding Domestic Advances, Ex-Im Revolving Advances, Cash Management Liabilities and Hedge Liabilities, as the case may be) of amounts available to be applied pursuant to clauses "FOURTH", "FIFTH" and "SEVENTH" above; and (iii) to the extent that any amounts available for distribution pursuant to clause "FIFTH" above are attributable to the issued but undrawn amount of outstanding Letters of Credit, such amounts shall be held by Agent in a cash collateral account and applied (A) first, to reimburse the Issuer from time to time for any drawings under such Letters of Credit and

(B) then, following the expiration of all Letters of Credit, to all other obligations of the types described in clauses "FIFTH", "SIXTH" and "SIXTH" above in the manner provided in this Section 11.5.   Notwithstanding anything to the contrary in this Section 11.5, no Swap Obligations of any Non-Qualifying Party shall be paid with amounts received from such Non-Qualifying Party under its Guaranty (including sums received as a result of the exercise of remedies with respect to such Guaranty) or from the proceeds of such Non-Qualifying Party's Collateral if such Swap Obligations would constitute Excluded Hedge Liabilities, provided, however, that to the extent possible appropriate adjustments shall be made with respect to payments and/or the proceeds of Collateral from other Borrowers and/or Guarantors that are Eligible Contract Participants with respect to such Swap Obligations to preserve the allocation to Obligations otherwise set forth above in this Section 11.5.

## XII.   WAIVERS AND JUDICIAL PROCEEDINGS.

### 12.1   Waiver of Notice.

Each Loan Party hereby waives notice of non-payment of any of the Receivables, demand, presentment, protest and notice thereof with respect to any and all instruments, notice of acceptance hereof, notice of loans or advances made, credit extended, Collateral received or delivered, or any other action taken in reliance hereon, and all other demands and notices of any description, except such as are expressly provided for herein.

### 12.2   Delay.

No delay or omission on Agent's or any Lender's part in exercising any right, remedy or option shall operate as a waiver of such or any other right, remedy or option or of any Default or Event of Default.

### 12.3   Jury Waiver.

EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING UNDER THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE AND EACH PARTY HEREBY CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENTS OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

XIII.    EFFECTIVE DATE AND TERMINATION.

13.1    Term.

This Agreement, which shall inure to the benefit of and shall be binding upon the respective successors and permitted assigns of each Loan Party, Agent and each Lender, shall become effective on the date hereof and shall continue in full force and effect until October 31, 2019 (the "Term") unless sooner terminated as herein provided. Borrowers may terminate this Agreement at any time upon ninety (90) days' prior written notice upon payment in full of the Obligations.

13.2    Termination.

The termination of the Agreement shall not affect any Loan Party's, Agent's or any Lender's rights, or any of the Obligations having their inception prior to the effective date of such termination, and the provisions hereof shall continue to be fully operative until all transactions entered into, rights or interests created or Obligations have been fully and indefeasibly paid, disposed of, concluded or liquidated (other than contingent indemnification Obligations to the extent no claim giving rise thereto has been asserted).  The security interests, Liens and rights granted to Agent and Lenders hereunder and the financing statements filed hereunder shall continue in full force and effect, notwithstanding the termination of this Agreement or the fact that Borrowers' Account may from time to time be temporarily in a zero or credit position, until all of the Obligations of Borrowers have been indefeasibly paid and performed in full after the termination of this Agreement or Loan Parties have furnished Agent and Lenders with an indemnification satisfactory to Agent and Lenders with respect thereto. Accordingly, each Loan Party waives any rights which it may have under the Uniform Commercial Code to demand the filing of termination statements with respect to the Collateral, and Agent shall not be required to send such termination statements to any Loan Party, or to file them with any filing office, unless and until this Agreement shall have been terminated in accordance with its terms and all Obligations have been indefeasibly paid in full in immediately available funds.  All representations, warranties, covenants, waivers and agreements contained herein shall survive termination hereof until all Obligations are indefeasibly paid and performed in full.

XIV.    REGARDING AGENT.

14.1    Appointment.

Each Lender hereby designates PNC to act as Agent for such Lender under this Agreement, the Other Documents and the Master Guarantee Agreement.  Each Lender hereby irrevocably authorizes Agent to take such action on its behalf under the provisions of this Agreement and the Other Documents and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of Agent by the terms hereof and thereof and such other powers as are reasonably incidental thereto and Agent shall hold all Collateral, payments of principal and interest, fees (except the fees set forth in the Fee Letter), charges and collections (without giving effect to any collection days) received pursuant to this Agreement, for the ratable benefit of Lenders.  Agent may perform any of its duties

hereunder by or through its agents or employees. As to any matters not expressly provided for by this Agreement (including collection of the Notes) Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders, and such instructions shall be binding; provided, however, that Agent shall not be required to take any action which exposes Agent to liability or which is contrary to this Agreement or the Other Documents or Applicable Law unless Agent is furnished with an indemnification reasonably satisfactory to Agent with respect thereto.

14.2    Nature of Duties.

Agent shall have no duties or responsibilities except those expressly set forth in this Agreement and the Other Documents. Neither Agent nor any of its officers, directors, employees or agents shall be (i) liable for any action taken or omitted by them as such hereunder or in connection herewith, unless caused by their gross (not mere) negligence or willful misconduct (as determined by a court of competent jurisdiction in a final non-appealable judgment), or (ii) responsible in any manner for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement, or in any of the Other Documents or in any certificate, report, statement or other document referred to or provided for in, or received by Agent under or in connection with, this Agreement or any of the Other Documents or for the value, validity, effectiveness, genuineness, due execution, enforceability or sufficiency of this Agreement, or any of the Other Documents or for any failure of any Loan Party to perform its obligations hereunder. Agent shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any of the Other Documents, or to inspect the properties, books or records of any Loan Party. The duties of Agent as respects the Advances to Borrowers shall be mechanical and administrative in nature; Agent shall not have by reason of this Agreement a fiduciary relationship in respect of any Lender; and nothing in this Agreement, expressed or implied, is intended to or shall be so construed as to impose upon Agent any obligations in respect of this Agreement except as expressly set forth herein.

14.3    Lack of Reliance on Agent and Resignation.

Independently and without reliance upon Agent or any other Lender, each Lender has made and shall continue to make (i) its own independent investigation of the financial condition and affairs of each Loan Party in connection with the making and the continuance of the Advances hereunder and the taking or not taking of any action in connection herewith, and (ii) its own appraisal of the creditworthiness of each Loan Party. Agent shall have no duty or responsibility, either initially or on a continuing basis, to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before making of the Advances or at any time or times thereafter except as shall be provided by any Loan Party pursuant to the terms hereof. Agent shall not be responsible to any Lender for any recitals, statements, information, representations or warranties herein or in any agreement, document, certificate or a statement delivered in connection with or for the execution, effectiveness, genuineness, validity, enforceability, collectability or sufficiency of this Agreement or any Other Document, or of the financial condition of any Loan Party, or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of

this Agreement, the Notes, the Other Documents or the financial condition of any Loan Party, or the existence of any Event of Default or any Default.

Agent may resign on sixty (60) days' written notice to each of Lenders and Borrowing Agent and upon such resignation, the Required Lenders will promptly designate a successor Agent reasonably satisfactory to Loan Parties; provided, however, that the Agent shall remain as Agent until the written approval of the Ex-Im Bank of any successor Agent is obtained.

Any such successor Agent shall succeed to the rights, powers and duties of Agent, and the term "Agent" shall mean such successor agent effective upon its appointment, and the former Agent's rights, powers and duties as Agent shall be terminated, without any other or further act or deed on the part of such former Agent. After any Agent's resignation as Agent, the provisions of this Article XIV shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement.

14.4    Certain Rights of Agent.

If Agent shall request instructions from Lenders with respect to any act or action (including failure to act) in connection with this Agreement or any Other Document, Agent shall be entitled to refrain from such act or taking such action unless and until Agent shall have received instructions from the Required Lenders; and Agent shall not incur liability to any Person by reason of so refraining.  Without limiting the foregoing, Lenders shall not have any right of action whatsoever against Agent as a result of its acting or refraining from acting hereunder in accordance with the instructions of the Required Lenders.

14.5    Reliance.

Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, certificate, telex, teletype or telecopier message, cablegram, order or other document or telephone message believed by it to be genuine and correct and to have been signed, sent or made by the proper person or entity, and, with respect to all legal matters pertaining to this Agreement and the Other Documents and its duties hereunder, upon advice of counsel selected by it.  Agent may employ agents and attorneys-in-fact and shall not be liable for the default or misconduct of any such agents or attorneys-in-fact selected by Agent with reasonable care.  The foregoing provision shall be in addition to, and not in limitation of, the provisions of Section 16.18 hereof.

14.6    Notice of Default.

Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder or under the Other Documents, unless Agent has received notice from a Lender or Borrowing Agent referring to this Agreement or the Other Documents, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that Agent receives such a notice, Agent shall give notice thereof to Lenders. Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders; provided, that, unless and until Agent shall have received such directions, Agent may (but shall not be obligated to) take such action, or refrain from taking such

action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of Lenders.

14.7    Indemnification.

To the extent Agent is not reimbursed and indemnified by Loan Parties, each Lender will reimburse and indemnify Agent in proportion to its respective portion of the Advances (or, if no Advances are outstanding, according to its Commitment Percentage), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against Agent in performing its duties hereunder, or in any way relating to or arising out of this Agreement or any Other Document; provided that, Lenders shall not be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from Agent's gross (not mere) negligence or willful misconduct (as determined by a court of competent jurisdiction in a final non-appealable judgment).

14.8    Agent in its Individual Capacity.

With respect to the obligation of Agent to lend under this Agreement, the Advances made by it shall have the same rights and powers hereunder as any other Lender and as if it were not performing the duties as Agent specified herein; and the term "Lender" or any similar term shall, unless the context clearly otherwise indicates, include Agent in its individual capacity as a Lender. Agent may engage in business with any Loan Party as if it were not performing the duties specified herein, and may accept fees and other consideration from any Loan Party for services in connection with this Agreement or otherwise without having to account for the same to Lenders.

14.9    Delivery of Documents.

To the extent Agent receives financial statements required under Sections 9.7, 9.8, 9.9, 9.12 and 9.13 or Borrowing Base Certificates or Ex-Im Borrowing Base Certificates from any Borrower pursuant to the terms of this Agreement which any Borrower is not obligated to deliver to each Lender, Agent will promptly furnish such documents and information to Lenders.

14.10   Borrowers' Undertaking to Agent.

Without prejudice to its obligations to Lenders under the other provisions of this Agreement, each Borrower hereby undertakes with Agent to pay to Agent from time to time on demand all amounts from time to time due and payable by it for the account of Agent or Lenders or any of them pursuant to this Agreement to the extent not already paid. Any payment made pursuant to any such demand shall pro tanto satisfy the relevant Borrower's obligations to make payments for the account of Lenders or the relevant one or more of them pursuant to this Agreement.

14.11    <u>No Reliance on Agent's Customer Identification Program</u>.

Each Lender acknowledges and agrees that neither such Lender, nor any of its Affiliates, participants or assignees, may rely on Agent to carry out such Lender's, Affiliate's, participant's or assignee's customer identification program, or other obligations required or imposed under or pursuant to the USA PATRIOT Act or the regulations thereunder, including the regulations contained in 31 CFR 103.121 (as hereafter amended or replaced, the "<u>CIP Regulations</u>"), or any other Anti-Terrorism Law, including any programs involving any of the following items relating to or in connection with any Loan Party, its Affiliates or its agents, this Agreement, the Other Documents or the transactions hereunder or contemplated hereby:  (1) any identity verification procedures, (2) any record-keeping, (3) comparisons with government lists, (4) customer notices or (5) other procedures required under the CIP Regulations or such other laws.

14.12    <u>Other Agreements</u>.

Each Lender agrees that it shall not, without the express consent of Agent, and that it shall, to the extent it is lawfully entitled to do so, upon the request of Agent, set off against the Obligations, any amounts owing by such Lender to any Loan Party or any deposit accounts of any Loan Party now or hereafter maintained with such Lender. Anything in this Agreement to the contrary notwithstanding, each Lender further agrees that it shall not, unless specifically requested to do so by Agent, take any action to protect or enforce its rights arising out of this Agreement or the Other Documents, it being the intent of Lenders that any such action to protect or enforce rights under this Agreement and the Other Documents shall be taken in concert and at the direction or with the consent of Agent or Required Lenders.

14.13    <u>Ex-Im Bank</u>.

Each Lender acknowledges and agrees that (i) the Agent alone is and shall be authorized and permitted to administer, transact and negotiate with the Ex-Im Bank with respect to the Ex-Im Obligations and the Ex-Im Collateral, unless the Ex-Im Bank otherwise consents in writing, and (ii) the Agent may be required to take or refrain from taking action hereunder at the direction of the Ex-Im Bank pursuant to the terms of the Master Guarantee Agreement.

XV.    BORROWING AGENCY.

15.1    <u>Borrowing Agency Provisions</u>.

(a)    Each Borrower hereby irrevocably designates Borrowing Agent to be its attorney and agent and in such capacity to borrow, sign and endorse notes, and execute and deliver all instruments, documents, writings and further assurances now or hereafter required hereunder, on behalf of such Borrower or Borrowers, and hereby authorizes Agent to pay over or credit all loan proceeds hereunder in accordance with the request of Borrowing Agent.

(b)    The handling of this credit facility as a co-borrowing facility with a borrowing agent in the manner set forth in this Agreement is solely as an accommodation to Borrowers and at their request.  Neither Agent nor any Lender shall incur liability to Borrowers as a result thereof.  To induce Agent and Lenders to do so and in consideration thereof, each

Borrower hereby indemnifies Agent and each Lender and holds Agent and each Lender harmless from and against any and all liabilities, expenses, losses, damages and claims of damage or injury asserted against Agent or any Lender by any Person arising from or incurred by reason of the handling of the financing arrangements of Borrowers as provided herein, reliance by Agent or any Lender on any request or instruction from Borrowing Agent or any other action taken by Agent or any Lender with respect to this Section 15.1 except due to willful misconduct or gross (not mere) negligence by the indemnified party (as determined by a court of competent jurisdiction in a final and non-appealable judgment).

(c)     All Obligations shall be joint and several, enforceable against each Borrower to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of this Agreement or any other circumstances whatsoever except as such enforceability may be limited by any applicable bankruptcy, insolvency, moratorium or similar laws affecting creditors' rights generally, and each Borrower shall make payment upon the maturity of the Obligations by acceleration or otherwise, and such obligation and liability on the part of each Borrower shall in no way be affected by any extensions, renewals and forbearance granted to Agent or any Lender to any Borrower, failure of Agent or any Lender to give any Borrower notice of borrowing or any other notice, any failure of Agent or any Lender to pursue or preserve its rights against any Borrower, the release by Agent or any Lender of any Collateral now or thereafter acquired from any Borrower, and such agreement by each Borrower to pay upon any notice issued pursuant thereto is unconditional and unaffected by prior recourse by Agent or any Lender to the other Borrowers or any Collateral for such Borrower's Obligations or the lack thereof.  Each Borrower waives all suretyship defenses.

15.2    Waiver of Subrogation.

Each Borrower expressly waives any and all rights of subrogation, reimbursement, indemnity, exoneration, contribution of any other claim which such Borrower may now or hereafter have against the other Borrowers or other Person directly or contingently liable for the Obligations hereunder, or against or with respect to the other Borrowers' property (including, without limitation, any property which is Collateral for the Obligations), arising from the existence or performance of this Agreement, until termination of this Agreement and repayment in full of the Obligations.

XVI.    MISCELLANEOUS.

16.1    Governing Law.

This Agreement shall be governed by and construed in accordance with the laws of the State of New York applied to contracts to be performed wholly within the State of New York.  Any judicial proceeding brought by or against any Loan Party with respect to any of the Obligations, this Agreement, the Other Documents or any related agreement may be brought in any court of competent jurisdiction in the State of New York, United States of America, and, by execution and delivery of this Agreement, each Loan Party accepts for itself and in connection with its properties, generally and unconditionally, the non-exclusive jurisdiction of the aforesaid courts, and irrevocably agrees to be bound by any judgment rendered thereby in connection with this Agreement.  Each Loan Party hereby waives personal service of any and all process upon it

and consents that all such service of process may be made by registered mail (return receipt requested) directed to Borrowing Agent at its address set forth in Section 16.6 and service so made shall be deemed completed five (5) days after the same shall have been so deposited in the mails of the United States of America, or, at Agent's option, by service upon Borrowing Agent which each Loan Party irrevocably appoints as such Loan Party's Agent for the purpose of accepting service within the State of New York.  Nothing herein shall affect the right to serve process in any manner permitted by law or shall limit the right of Agent or any Lender to bring proceedings against any Loan Party in the courts of any other jurisdiction.  Each Loan Party waives any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon forum non conveniens. Each Loan Party waives the right to remove any judicial proceeding brought against such Loan Party in any state court to any federal court. Any judicial proceeding by any Loan Party against Agent or any Lender involving, directly or indirectly, any matter or claim in any way arising out of, related to or connected with this Agreement or any related agreement, shall be brought only in a federal or state court located in the County of New York, State of New York.

 16.2 <u>Entire Understanding</u>.

  (a) This Agreement and the documents executed concurrently herewith contain the entire understanding between each Loan Party, Agent and each Lender and supersedes all prior agreements and understandings, if any, relating to the subject matter hereof. Any promises, representations, warranties or guarantees not herein contained and hereinafter made shall have no force and effect unless in writing, signed by each Loan Party's, Agent's and each Lender's respective officers.  Neither this Agreement nor any portion or provisions hereof may be changed, modified, amended, waived, supplemented, discharged, cancelled or terminated orally or by any course of dealing, or in any manner other than by an agreement in writing, signed by the party to be charged.  Each Loan Party acknowledges that it has been advised by counsel in connection with the execution of this Agreement and Other Documents and is not relying upon oral representations or statements inconsistent with the terms and provisions of this Agreement.

  (b) The Required Lenders, Agent with the consent in writing of the Required Lenders, and Loan Parties may, subject to the provisions of this Section 16.2(b), from time to time enter into written supplemental agreements to this Agreement or the Other Documents executed by Loan Parties, for the purpose of adding or deleting any provisions or otherwise changing, varying or waiving in any manner the rights of Lenders, Agent or Loan Parties thereunder or the conditions, provisions or terms thereof or waiving any Event of Default thereunder, but only to the extent specified in such written agreements; <u>provided</u>, <u>however</u>, that no such supplemental agreement shall:

   (i) increase the Commitment Percentage or the maximum dollar commitment of any Lender other than pursuant to the provisions of Section 2.23 hereof, without the consent of each Lender directly affected thereby (including, if applicable, any Defaulting Lender).

   (ii) increase the Maximum Revolving Advance Amount or the Maximum Ex-Im Revolving Advance Amount without the consent of each Lender.

(iii)     extend the maturity of any Note or the due date for any amount payable hereunder, or decrease the rate of interest or reduce any fee payable by Loan Parties to Lenders pursuant to this Agreement without the consent of each Lender directly affected thereby (including, if applicable, any Defaulting Lender).

(iv)     alter the definition of the term Required Lenders or alter, amend or modify this Section 16.2(b) without the consent of each Lender.

(v)     release any ABL Priority Collateral during any calendar year (other than in accordance with the provisions of this Agreement) having an aggregate value in excess of Five Hundred Thousand and 00/100 Dollars ($500,000.00) without the consent of each Lender.

(vi)     change the rights and duties of Agent without the consent of each Lender.

(vii)     permit any Revolving Advance to be made or Letter of Credit to be issued if after giving effect thereto the total of Advances outstanding hereunder would exceed the Formula Amount for more than sixty (60) consecutive Business Days or exceed one hundred five percent (105%) of the Formula Amount without the consent of each Lender.

(viii)     increase (A) the Advance Rates above the Advance Rates in effect on the Closing Date, or (B) the Ex-Im Advance Rates above the Ex-Im Advance Rates in effect on the Closing Date, in either case, without the consent of each Lender.

(ix)     release any Guarantor without the consent of each Lender.

Any such supplemental agreement shall apply equally to each Lender and shall be binding upon Loan Parties, Lenders and Agent and all future holders of the Obligations.  In the case of any waiver, Loan Parties, Agent and Lenders shall be restored to their former positions and rights, and any Event of Default waived shall be deemed to be cured and not continuing, but no waiver of a specific Event of Default shall extend to any subsequent Event of Default (whether or not the subsequent Event of Default is the same as the Event of Default which was waived), or impair any right consequent thereon.

In the event that Agent requests the consent of a Lender pursuant to this Section 16.2 and such consent is denied, then PNC may, at its option, require such Lender to assign its interest in the Advances to PNC or to another Lender or to any other Person designated by Agent (the "Designated Lender"), for a price equal to (i) the then outstanding principal amount thereof *plus* (ii) accrued and unpaid interest and fees due such Lender, which interest and fees shall be paid when collected from Borrowers.  In the event PNC elects to require any Lender to assign its interest to PNC or to the Designated Lender, PNC will so notify such Lender in writing within forty five (45) days following such Lender's denial, and such Lender will assign its interest to PNC or the Designated Lender no later than five (5) days following receipt of such notice pursuant to a Commitment Transfer Supplement executed by such Lender, PNC or the Designated Lender, as appropriate, and Agent.

Notwithstanding (a) the existence of a Default or an Event of Default, (b) that any of the other applicable conditions precedent set forth in Section 8.2 hereof have not been satisfied or (c) any other provision of this Agreement, Agent may at its discretion and without the consent of the Required Lenders (but subject to the Required Lenders not having notified the Agent that it shall no longer make such Advances), voluntarily permit the sum of the outstanding Revolving Advances, the outstanding Swing Loans and the Maximum Undrawn Amount at any time to exceed the Formula Amount by up to five percent (5%) of the Gross Formula Amount for up to sixty (60) consecutive Business Days (the "Out-of-Formula Loans"); provided, that, such outstanding Advances do not exceed the Maximum Revolving Advance Amount. If Agent is willing in its sole and absolute discretion to make such Out-of-Formula Loans, such Out-of-Formula Loans shall be payable on demand and shall bear interest at the Default Rate for Revolving Advances consisting of Domestic Rate Loans; provided that, if Lenders do make Out-of-Formula Loans, neither Agent nor Lenders shall be deemed thereby to have changed the limits of Section 2.1(a). For purposes of this paragraph, the discretion granted to Agent hereunder shall not preclude involuntary overadvances that may result from time to time due to the fact that the Formula Amount was unintentionally exceeded for any reason, including, but not limited to, Collateral previously deemed to be "Eligible Receivables" or "Eligible Inventory", as applicable, becomes ineligible, collections of Receivables applied to reduce outstanding Revolving Advances or outstanding Swing Loans are thereafter returned for insufficient funds or overadvances are made to protect or preserve the Collateral. In the event Agent involuntarily permits the outstanding Revolving Advances, the outstanding Swing Loans and the Maximum Undrawn Amount to exceed the Formula Amount by more than five percent (5%) of the Gross Formula Amount, Agent shall use its efforts to have Borrowers decrease such excess in as expeditious a manner as is practicable under the circumstances and not inconsistent with the reason for such excess. Revolving Advances made after Agent has determined the existence of involuntary overadvances shall be deemed to be involuntary overadvances and shall be decreased in accordance with the preceding sentence.

In addition to (and not in substitution of) the discretionary Revolving Advances permitted above in this Section 16.2, the Agent, and PNC with respect to Swing Loans, is hereby authorized by Borrowers and the Lenders, from time to time in the Agent's sole discretion, (A) after the occurrence and during the continuation of a Default or an Event of Default, or (B) at any time that any of the other applicable conditions precedent set forth in Section 8.2 hereof have not been satisfied, to make Revolving Advances and/or Swing Loans to Borrowers on behalf of the Lenders which the Agent, in its reasonable business judgment, deems necessary or desirable (a) to preserve or protect the Collateral, or any portion thereof, (b) to enhance the likelihood of, or maximize the amount of, repayment of the Advances and other Obligations, or (c) to pay any other amount chargeable to Borrowers pursuant to the terms of this Agreement; provided, that at any time after giving effect to any such Revolving Advances and/or Swing Loans the outstanding Revolving Advances and the outstanding Swing Loans do not exceed the lesser of (i) one hundred and five percent (105%) of the Formula Amount and (ii) the Maximum Revolving Advance Amount.

16.3    Successors and Assigns; Participations; New Lenders.

(a)    This Agreement shall be binding upon and inure to the benefit of Loan Parties, Agent, each Lender, all future holders of the Obligations and their respective successors

and permitted assigns, except that no Loan Party may assign or transfer any of its rights or obligations under this Agreement without the prior written consent of Agent and each Lender.

(b)      Each Loan Party acknowledges that in the regular course of commercial banking business one or more Lenders may at any time and from time to time sell participating interests in the Advances (other than Swing Loans) to other financial institutions (each such transferee or purchaser of a participating interest, a "Participant"). Each Participant may exercise all rights of payment (including rights of set-off) with respect to the portion of such Advances held by it or other Obligations payable hereunder as fully as if such Participant were the direct holder thereof provided no Borrower shall be required to pay to any Participant more than the amount which it would have been required to pay to Lender which granted an interest in its Advances (other than Swing Loans) or other Obligations payable hereunder to such Participant had such Lender retained such interest in the Advances (other than Swing Loans) hereunder or other Obligations payable hereunder and in no event shall any Borrower be required to pay any such amount arising from the same circumstances and with respect to the same Advances or other Obligations payable hereunder to both such Lender and such Participant. Each Loan Party hereby grants to any Participant a continuing security interest in any deposits, moneys or other property actually or constructively held by such Participant as security for the Participant's interest in the Advances (other than Swing Loans). Each Lender granting a participation shall, as a non-fiduciary agent of the Borrowers, maintain a register as to each participation containing information similar to that of the Register.   No participation shall be transferred except as recorded in such participation register

(c)      Any Lender, with (i) the consent of Agent which shall not be unreasonably withheld or delayed and (ii) the consent of the Borrowing Agent which shall not be unreasonably withheld or delayed; provided, that the consent of the Borrowing Agent shall not be required if (x) an Event of Default has occurred and is continuing at the time of such assignment or (y) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund, may sell, assign or transfer all or any part of its rights and obligations under or relating to Revolving Advances and Ex-Im Revolving Advances under this Agreement and the Other Documents to one or more additional banks or financial institutions and one or more additional banks or financial institutions may commit to make Advances (other than Swing Loans) hereunder (each a "Purchasing Lender"), in minimum amounts of not less than Five Million and 00/100 Dollars ($5,000,000.00), pursuant to a Commitment Transfer Supplement, executed by a Purchasing Lender, the transferor Lender, and Agent and delivered to Agent for recording. Upon such execution, delivery, acceptance and recording, from and after the transfer effective date determined pursuant to such Commitment Transfer Supplement, (i) Purchasing Lender thereunder shall be a party hereto and, to the extent provided in such Commitment Transfer Supplement, have the rights and obligations of a Lender thereunder with a Commitment Percentage as set forth therein, and (ii) the transferor Lender thereunder shall, to the extent provided in such Commitment Transfer Supplement, be released from its obligations under this Agreement, the Commitment Transfer Supplement creating a novation for that purpose. Such Commitment Transfer Supplement shall be deemed to amend this Agreement to the extent, and only to the extent, necessary to reflect the addition of such Purchasing Lender and the resulting adjustment of the Commitment Percentages arising from the purchase by such Purchasing Lender of all or a portion of the rights and obligations of such transferor Lender under this Agreement and the Other Documents. Each Loan Party hereby consents to the addition of such

Purchasing Lender and the resulting adjustment of the Commitment Percentages arising from the purchase by such Purchasing Lender of all or a portion of the rights and obligations of such transferor Lender under this Agreement and the Other Documents. Loan Parties shall execute and deliver such further documents and do such further acts and things in order to effectuate the foregoing.

(d)     Any Lender, with the consent of Agent which shall not be unreasonably withheld or delayed, may directly or indirectly sell, assign or transfer all or any portion of its rights and obligations under or relating to Revolving Advances and Ex-Im Revolving Advances under this Agreement and the Other Documents to an entity, whether a corporation, partnership, trust, limited liability company or other entity that (i) is engaged in making, purchasing, holding or otherwise investing in bank loans and similar extensions of credit in the ordinary course of its business and (ii) is administered, serviced or managed by the assigning Lender or an Affiliate of such Lender (a "Purchasing CLO" and together with each Participant and Purchasing Lender, each a "Transferee" and collectively the "Transferees"), pursuant to a Commitment Transfer Supplement modified as appropriate to reflect the interest being assigned ("Modified Commitment Transfer Supplement"), executed by any intermediate purchaser, the Purchasing CLO, the transferor Lender, and Agent as appropriate and delivered to Agent for recording. Upon such execution and delivery, from and after the transfer effective date determined pursuant to such Modified Commitment Transfer Supplement, (i) Purchasing CLO thereunder shall be a party hereto and, to the extent provided in such Modified Commitment Transfer Supplement, have the rights and obligations of a Lender thereunder and (ii) the transferor Lender thereunder shall, to the extent provided in such Modified Commitment Transfer Supplement, be released from its obligations under this Agreement, the Modified Commitment Transfer Supplement creating a novation for that purpose. Such Modified Commitment Transfer Supplement shall be deemed to amend this Agreement to the extent, and only to the extent, necessary to reflect the addition of such Purchasing CLO.  Each Loan Party hereby consents to the addition of such Purchasing CLO.  Loan Parties shall execute and deliver such further documents and do such further acts and things in order to effectuate the foregoing.

(e)     Agent, or a non-fiduciary agent of the Borrowers, shall maintain at its address a copy of each Commitment Transfer Supplement and Modified Commitment Transfer Supplement delivered to it and a register (the "Register") for the recordation of the names and addresses of each Lender and the outstanding principal, accrued and unpaid interest and other fees due hereunder.  The entries in the Register shall be conclusive, in the absence of manifest error, and each Borrower, Agent and Lenders may treat each Person whose name is recorded in the Register as the owner of the Advance recorded therein for the purposes of this Agreement. The Register shall be available for inspection by Borrowing Agent or any Lender at any reasonable time and from time to time upon reasonable prior notice. Agent shall receive a fee in the amount of Three Thousand Five Hundred and 00/100 Dollars ($3,500.00) payable by the applicable Purchasing Lender and/or Purchasing CLO upon the effective date of each transfer or assignment (other than to an intermediate purchaser) to such Purchasing Lender and/or Purchasing CLO.

(f)     Each Loan Party authorizes each Lender to disclose to any Transferee and any prospective Transferee any and all financial information in such Lender's possession concerning such Loan Party which has been delivered to such Lender by or on behalf of such

Loan Party pursuant to this Agreement or in connection with such Lender's credit evaluation of such Loan Party.

(g)     Nothing contained in this Section 16.3 shall limit or restrict any assignment of rights under this Agreement or any Other Document to the Ex-Im Bank as contemplated in Section 16.18 hereof.

16.4    <u>Application of Payments</u>.

Agent shall have the continuing and exclusive right to apply or reverse and re-apply any payment and any and all proceeds of Collateral to any portion of the Obligations.  To the extent that any Loan Party makes a payment or Agent or any Lender receives any payment or proceeds of the Collateral for any Loan Party's benefit, which are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver, custodian or any other party under any bankruptcy law, common law or equitable cause, then, to such extent, the Obligations or part thereof intended to be satisfied shall be revived and continue as if such payment or proceeds had not been received by Agent or such Lender.

16.5    <u>Indemnity</u>.

Each Loan Party shall indemnify Agent, each Lender and each of their respective officers, directors, Affiliates, attorneys, employees and agents from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever (including reasonable fees and disbursements of counsel) which may be imposed on, incurred by, or asserted against Agent or any Lender in any claim, litigation, proceeding or investigation instituted or conducted by any Governmental Body or instrumentality or any other Person with respect to any aspect of, or any transaction contemplated by, or referred to in, or any matter related to, this Agreement or the Other Documents, whether or not Agent or any Lender is a party thereto, except to the extent that any of the foregoing arises out of the gross negligence or willful misconduct of the party being indemnified (as determined by a court of competent jurisdiction in a final and non-appealable judgment).  Without limiting the generality of the foregoing, this indemnity shall extend to any liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever (including reasonable fees and disbursements of counsel) asserted against or incurred by any of the indemnitees described above in this Section 16.5 by any Person under any Environmental Laws or similar laws by reason of any Loan Party's or any other Person's failure to comply with laws applicable to solid or hazardous waste materials, including Hazardous Materials, or other toxic substances.  Additionally, if any stamp, court or documentation, intangible, transfer, recording, filing or similar Taxes (excluding Taxes that are Other Connection Taxes imposed with respect to an assignment (other than assignment made at the request of any Loan Party) shall be payable by Agent, Lenders or Loan Parties on account of the execution or delivery of this Agreement, or the execution, delivery, issuance or recording of any of the Other Documents, or the creation or repayment of any of the Obligations hereunder, by reason of any Applicable Law now or hereafter in effect, Loan Parties will pay (or will promptly reimburse Agent and Lenders for payment of) all such Taxes, including interest

and penalties thereon, and will indemnify and hold the indemnitees described above in this Section 16.5 harmless from and against all liability in connection therewith.

16.6    Notice.

Any notice or request hereunder may be given to Borrowing Agent or any Loan Party or to Agent or any Lender at their respective addresses set forth below or at such other address as may hereafter be specified in a notice designated as a notice of change of address under this Section 16.6.  Any notice, request, demand, direction or other communication (for purposes of this Section 16.6 only, a "Notice") to be given to or made upon any party hereto under any provision of this Credit Agreement shall be given or made by telephone or in writing (which includes by means of electronic transmission (i.e., "e-mail") or facsimile transmission or by setting forth such Notice on a site on the World Wide Web (a "Website Posting") if Notice of such Website Posting (including the information necessary to access such site) has previously been delivered to the applicable parties hereto by another means set forth in this Section 16.6) in accordance with this Section 16.6. Any such Notice must be delivered to the applicable parties hereto at the addresses and numbers set forth under their respective names on Section 16.6 hereof or in accordance with any subsequent unrevoked Notice from any such party that is given in accordance with this Section 16.6. Any Notice shall be effective:

(a)    In the case of hand-delivery, when delivered;

(b)    If given by mail, four days after such Notice is deposited with the United States Postal Service, with first-class postage prepaid, return receipt requested;

(c)    In the case of a telephonic Notice, when a party is contacted by telephone, if delivery of such telephonic Notice is confirmed no later than the next Business Day by hand delivery, a facsimile or electronic transmission, a Website Posting or an overnight courier delivery of a confirmatory Notice (received at or before noon on such next Business Day);

(d)    In the case of a facsimile transmission, when sent to the applicable party's facsimile machine's telephone number, if the party sending such Notice receives confirmation of the delivery thereof from its own facsimile machine;

(e)    In the case of electronic transmission, when actually received;

(f)    In the case of a Website Posting, upon delivery of a Notice of such posting (including the information necessary to access such site) by another means set forth in this Section 16.6; and

(g)    If given by any other means (including by overnight courier), when actually received.

Any Lender giving a Notice to Borrowing Agent or any Loan Party shall concurrently send a copy thereof to Agent, and Agent shall promptly notify the other Lenders of its receipt of such Notice.

    (A)      If to Agent or PNC at:

                PNC Bank, National Association
                200 South Wacker Drive, Suite 600
                Chicago, Illinois  60606
                Attention:     Sherry Winick, Vice President
                Telephone:    (312) 454-2903
                Facsimile:     (312) 454-2919

                with a copy to:

                Goldberg Kohn Ltd.
                55 East Monroe, Suite 3300
                Chicago, Illinois 60603
                Attention:     Gary Zussman, Esq.
                Telephone:    (312) 201-4000
                Facsimile:     (312) 332-2196

    (B)      If to a Lender other than Agent, as specified on the signature pages hereof.

    (C)      If to Borrowing Agent or any Loan Party:

                Vertellus Specialties Inc.
                201 North Illinois Street, Suite 1800
                Indianapolis, Indiana  46204
                Attention:     Anne M. Frye, General Counsel
                Facsimile:     (317) 248-6546

                with a copy to:

                DLA Piper LLP (US)
                1251 Avenue of the Americas
                New York, New York  10020
                Attention:     Jamie Knox, Esq.
                Facsimile:     (212) 884-8692

16.7    <u>Survival</u>.

        The obligations of Loan Parties under Sections 2.3(f), 3.8, 3.9, 3.10, 3.11, 4.19(g) and 16.5 and the obligations of Lenders under Section 14.7, shall survive termination of this Agreement and the Other Documents and payment in full of the Obligations.

16.8    <u>Severability</u>.

        If any part of this Agreement is contrary to, prohibited by, or deemed invalid under Applicable Laws, such provision shall be inapplicable and deemed omitted to the extent so

contrary, prohibited or invalid, but the remainder hereof shall not be invalidated thereby and shall be given effect so far as possible.

16.9    Expenses.

All costs and expenses including reasonable attorneys' fees and disbursements incurred by Agent on its behalf or on behalf of Lenders (a) in all efforts made to enforce payment of any Obligation or effect collection of any Collateral, or (b) in connection with the entering into, modification, amendment, administration and enforcement of this Agreement, the Intercreditor Agreement or any consents or waivers hereunder or thereunder and all related agreements, documents and instruments, or (c) in instituting, maintaining, preserving, enforcing and foreclosing on Agent's security interest in or Lien on any of the Collateral, or maintaining, preserving or enforcing any of Agent's or any Lender's rights hereunder, under the Intercreditor Agreement and under all related agreements, documents and instruments, whether through judicial proceedings or otherwise, or (d) in defending or prosecuting any actions or proceedings arising out of or relating to Agent's or any Lender's transactions with any Loan Party, the Term Loan Agent or any Term Loan Lender, or (e) in connection with any advice given to Agent or any Lender with respect to its rights and obligations under this Agreement, the Intercreditor Agreement and all related agreements, documents and instruments, may be charged to Borrowers' Account and shall be part of the Obligations.

16.10    Injunctive Relief.

Each Loan Party recognizes that, in the event any Loan Party fails to perform, observe or discharge any of its obligations or liabilities under this Agreement, or threatens to fail to perform, observe or discharge such obligations or liabilities, any remedy at law may prove to be inadequate relief to Lenders; therefore, Agent, if Agent so requests, shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving that actual damages are not an adequate remedy.

16.11    Consequential Damages.

Neither Agent nor any Lender, nor any agent or attorney for any of them, shall be liable to any Loan Party (or any Affiliate of any such Person) for indirect, punitive, exemplary or consequential damages arising from any breach of contract, tort or other wrong relating to the establishment, administration or collection of the Obligations or as a result of any transaction contemplated under this Agreement or any Other Document.

16.12    Captions.

The captions at various places in this Agreement are intended for convenience only and do not constitute and shall not be interpreted as part of this Agreement.

16.13    Counterparts; Facsimile Signatures.

This Agreement may be executed in any number of and by different parties hereto on separate counterparts, all of which, when so executed, shall be deemed an original, but all

such counterparts shall constitute one and the same agreement.  Any signature delivered by a party by facsimile or other electronic means shall be deemed to be an original signature hereto.

16.14   Construction.

The parties acknowledge that each party and its counsel have reviewed this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any amendments, schedules or exhibits thereto.

16.15   Confidentiality; Sharing Information.

Agent, each Lender and each Transferee shall hold all non-public information obtained by Agent, such Lender or such Transferee pursuant to the requirements of this Agreement in accordance with Agent's, such Lender's and such Transferee's customary procedures for handling confidential information of this nature; provided, however, Agent, each Lender and each Transferee may disclose such confidential information (a) to its examiners, Affiliates, outside auditors, counsel and other professional advisors, (b) to Agent, any Lender or to any prospective Transferees provided that such Transferees are bound by the provisions of this Section 16.15, (c) to the Ex-Im Bank as required pursuant to the Master Guarantee Agreement and the Ex-Im Documents, and (d) as required or requested by any Governmental Body or representative thereof or pursuant to legal process; provided, further that (i) unless specifically prohibited by Applicable Law, Agent, each Lender and each Transferee shall use its reasonable best efforts prior to disclosure thereof, to notify the applicable Loan Party of the applicable request for disclosure of such non-public information (A) by a Governmental Body or representative thereof (other than any such request in connection with an examination of the financial condition of a Lender or a Transferee by such Governmental Body) or (B) pursuant to legal process and (ii) in no event shall Agent, any Lender or any Transferee be obligated to return any materials furnished by any Loan Party other than those documents and instruments in possession of Agent or any Lender in order to perfect its Lien on the Collateral once the Obligations have been paid in full and this Agreement has been terminated.  Each Loan Party acknowledges that from time to time financial advisory, investment banking and other services may be offered or provided to such Loan Party or one or more of its Affiliates (in connection with this Agreement or otherwise) by any Lender or by one or more Subsidiaries or Affiliates of such Lender and each Loan Party hereby authorizes each Lender to share any information delivered to such Lender by such Loan Party and its Subsidiaries pursuant to this Agreement, or in connection with the decision of such Lender to enter into this Agreement, to any such Subsidiary or Affiliate of such Lender, it being understood that any such Subsidiary or Affiliate of any Lender receiving such information shall be bound by the provisions of this Section 16.15 as if it were a Lender hereunder. Such authorization shall survive the repayment of the other Obligations and the termination of this Agreement.

16.16   Publicity.

Each Loan Party and each Lender hereby authorizes Agent to make appropriate announcements of the financial arrangement entered into among Loan Parties, Agent and Lenders, including announcements which are commonly known as tombstones, in such

publications and to such selected parties as Agent shall in its sole and absolute discretion deem appropriate.

16.17   Certifications From Banks and Participants; US PATRIOT Act.

Each Lender or assignee or participant of a Lender that is not incorporated under the Laws of the United States of America or a state thereof (and is not excepted from the certification requirement contained in Section 313 of the USA PATRIOT Act and the applicable regulations because it is both (i) an affiliate of a depository institution or foreign bank that maintains a physical presence in the United States or foreign country, and (ii) subject to supervision by a banking authority regulating such affiliated depository institution or foreign bank) shall deliver to Agent the certification, or, if applicable, recertification, certifying that such Lender is not a "shell" and certifying to other matters as required by Section 313 of the USA PATRIOT Act and the applicable regulations:  (1) within ten (10) days after the Closing Date, and (2) as such other times as are required under the USA PATRIOT Act.

16.18   Assignment to Ex-Im Bank; Default Participation.

(a)   Assignment to Ex-Im Bank.   Each Loan Party and each Lender acknowledges and agrees that the Agent may be required to assign, and hereby authorizes the Agent to so assign, certain rights and responsibilities of the Agent and the Lenders under this Agreement and certain of the Other Documents to the Ex-Im Bank, or rights thereunder, as applicable, including with respect to the collection of the Ex-Im Obligations and enforcement thereof, in order to comply with and obtain the benefits of the Master Guarantee Agreement. Each Lender and each Loan Party agrees to take any and all steps requested by the Agent (including, without limitation, executing documents presented by the Agent) to effectuate or facilitate such assignment, and further agrees and acknowledges that in the event of such assignment, (i) the Agent shall retain all rights and obligations owed to the Ex-Im Bank by the Agent under the Master Guarantee Agreement, (ii) the Ex-Im Bank shall have no direct obligations to any Lender (other than the Agent) except with the Ex-Im Bank's prior written consent, and (iii) the Ex-Im Bank shall be required to deal only with the Agent (as agent for the Lenders) with respect to any collection of the Ex-Im Obligations, whether through enforcement against, and application of the proceeds of, Collateral, or otherwise.  In the event of any conflict between the terms of this Agreement and the Master Guarantee Agreement and the Ex-Im Documents, the provisions most favorable to the Agent, the Lenders and the Ex-Im Bank shall control.

(b)   Default Participation.  The Ex-Im Revolving Advances are intended to be qualified for the benefit of the guarantee of the Ex-Im Bank under the Master Guarantee Agreement, and in connection therewith the Agent entered into the Borrower Agreement and related documents as "Lender" thereunder in its individual capacity and in its capacity as Agent for the Lenders.  The Agent, the Lenders and the Loan Parties each hereby acknowledge that, in order to comply with the terms and provisions of the Master Guarantee Agreement, and to satisfy the requirements of the Ex-Im Bank, it shall be necessary, after an Event of Default hereunder but before any Claim is made to the Ex-Im Bank, for each Lender (other than PNC Bank) to assign to the Agent or to PNC Bank all Ex-Im Revolving Advances of such Lender, and to accept as consideration for such assignment an undivided interest and participation in the Ex-Im

Revolving Advances (the "Default Participation") equal to such Lender's Commitment Percentage (determined immediately prior to giving effect to such Default Participation) of the Ex-Im Revolving Advances, The Default Participation shall be effective at noon New York, New York time on the day specified in a notice given by the Agent to each Lender, and shall not be subject to satisfaction of any condition precedent set forth in Article VIII hereof, and shall not be subject to the assignment or participation provisions (including without limitation any transfer fee requirement) of Section 16.3 hereof.  Without limitation of the foregoing, it is expressly understood that all voting rights of the Lenders shall continue after the Default Participation to be based upon their respective Commitment Percentages of the Ex-Im Revolving Advances before giving effect to the Default Participation, unless an independent assignment of their interests hereunder occurs after the date of the Default Participation.  However, although the Agent will continue to be required to act after the Default Participation as administrative agent of the Lenders as provided in Section 14.13 above, the Agent alone, to the exclusion of the other Lenders, shall be entitled to administer, transact and negotiate with the Ex-Im Bank with respect to the Ex-Im Obligations and the Ex-Im Collateral, unless the Ex-Im Bank otherwise consents in writing.  Upon the effectiveness of the Default Participation, all Ex-Im Revolving Advances then outstanding will automatically be evidenced by the Ex-Im Note of PNC Bank, and promptly thereafter each Lender, other than PNC Bank, will surrender such Lender's Ex-Im Note to the Agent.  The Agent and each Lender shall execute any transfer or participation agreements reasonably requested by the Agent to evidence or effectuate the Default Participation as contemplated herein.

It is intended that the Default Participation shall be solely for the purposes of satisfying the requirements of the Ex-Im Bank under the Master Guarantee Agreement, and in all respects other than administration of the Ex-Im Revolving Advances and the Ex-Im Collateral in order to accomplish such purposes, the relationship between the Agent and PNC Bank on the one hand, and the other Lenders on the other hand, shall continue as contemplated in this Agreement without regard to the Default Participation.  From and after the date, if any, of the Default Participation, the Agent shall promptly distribute to each Lender, such Lender's Commitment Percentage (determined immediately prior to giving effect to such Default Participation) of all principal, interest, fees and all proceeds of Ex-Im Collateral received by the Agent, whether from the Ex-Im Bank or otherwise, in accordance with Section 11.5 hereof.

16.19   Anti-Terrorism Laws.

(a)     Each Borrower represents and warrants that (i) no Covered Entity is a Sanctioned Person and (ii) no Covered Entity, either in its own right or through any third party, (A) has any of its assets in a Sanctioned Country or in the possession, custody or control of a Sanctioned Person in violation of any Anti-Terrorism Law; (B) does business in or with, or derives any of its income from investments in or transactions with, any Sanctioned Country or Sanctioned Person in violation of any Anti-Terrorism Law; or (C) engages in any dealings or transactions prohibited by any Anti-Terrorism Law.

(b)     Each Borrower covenants and agrees that (i) no Covered Entity will become a Sanctioned Person, (ii) no Covered Entity, either in its own right or through any third party, will (A) have any of its assets in a Sanctioned Country or in the possession, custody or control of a Sanctioned Person in violation of any Anti-Terrorism Law; (B) do business in or

with, or derive any of its income from investments in or transactions with, any Sanctioned Country or Sanctioned Person in violation of any Anti-Terrorism Law; (C) engage in any dealings or transactions prohibited by any Anti-Terrorism Law or (D) use the Advances to fund any operations in, finance any investments or activities in, or, make any payments to, a Sanctioned Country or Sanctioned Person in violation of any Anti-Terrorism Law, (iii) the funds used to repay the Obligations will not be derived from any unlawful activity, (iv) each Covered Entity shall comply with all Anti-Terrorism Laws and (v) the Borrowers shall promptly notify the Agent in writing upon the occurrence of a Reportable Compliance Event.

[INTENTIONALLY LEFT BLANK]

Each of the parties has signed this Agreement on the day and year first above written.

**BORROWERS**:

Vertellus Specialties Inc.

By: _____
Name:  Anne M. Frye
Title:   Vice President

Vertellus Agriculture & Nutrition Specialties LLC

By: _____
Name:  Anne M. Frye
Title:   Vice President

Vertellus Health & Specialty Products LLC

By: _____
Name:  Anne M. Frye
Title:   Vice President

Vertellus Performance Materials Inc.

By: _____
Name:  Anne M. Frye
Title:   Vice President

Vertellus Specialties PA LLC

By: _____
Name:  Anne M. Frye
Title:   Vice President

Vertellus Specialties MI LLC

By: _____
Name: Anne M. Frye
Title:   Vice President

Rutherford Chemicals LLC

By: _____
Name: Anne M. Frye
Title:   Vice President

**GUARANTOR:**

Vertellus Specialties Holdings Corp.

By: _____
Name: Anne M. Frye
Title:   Vice President

**Agent and Lenders**:

PNC Bank, National Association, as Administrative Agent, Collateral Agent and as a Lender

By: _____

Name: Sherry Winick
Title: Vice President

BMO Harris Bank, N.A. (f/k/a Harris, N.A.), as a Lender

By: _____

Name: _____

Title: _____