# Exhibit 1

**(Bidding Procedures)**

#4822-6848-5938
EAST\125363164.8

## BIDDING PROCEDURES

Set forth below are the bidding procedures (the "Bidding Procedures") to be employed in connection with the proposed sale of certain tangible and intangible assets (the "Purchased Assets") of the Debtors that own the Purchased Assets (in such capacity, the "Sellers"), in connection with the Debtors' jointly administered chapter 11 cases pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), lead case number 16-11290 (CSS).

The Sellers entered into that certain asset purchase agreement, dated May 31, 2016 with Valencia Bidco LLC (the "Stalking Horse Purchaser"), a special purpose entity established to hold and bid up to the total amount of the secured claims of the lenders (the "Prepetition Term Lenders") under VSI's prepetition term credit agreement (the "Term Loan Agreement"), pursuant to which the Stalking Horse Purchaser will acquire the Purchased Assets on the terms and conditions specified therein (together with the schedules and related documents thereto, the "Stalking Horse Agreement," a copy of which is attached hereto as Exhibit B). The sale transaction pursuant to the Stalking Horse Agreement is subject to competitive bidding as set forth herein. Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Stalking Horse Agreement.

### ASSETS TO BE SOLD

The Debtors seek to consummate a sale of some or all of the Purchased Assets (the "Sale"), which include the assets described in Section 1.1 of the Stalking Horse Agreement. The sale of the Purchased Assets is on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Sellers, their agents or estates, except to the extent set forth in the purchase agreements of the Successful Bidder (as defined herein) as approved by the Bankruptcy Court. Except as otherwise provided in such approved purchase agreement or the sale order entered by the Bankruptcy Court, all of the Seller's right, title and interest in and to each Purchased Asset to be acquired shall be sold free and clear of all liens, claims, interests and encumbrances (collectively, the "Encumbrances"), such Encumbrances to attach solely to the net proceeds of the Sale.

### THE BID PROCEDURES

In order to ensure that the Debtors receive the maximum value for the Purchased Assets, the Stalking Horse Agreement is subject to higher or better offers, and, as such, the Stalking Horse Agreement will serve as the "stalking-horse" bid for the Purchased Assets.

#### Provisions Governing Qualifications of Bidders

Unless otherwise ordered by the Bankruptcy Court, in order to participate in the bidding process, prior to the Bid Deadline (defined below), each person other than the Stalking Horse Purchaser who wishes to participate in the bidding process (a "Potential Bidder") must deliver the following to the Notice Parties (as defined below):

    (i)    a written disclosure of the identity of each entity that will be bidding for the Purchased Assets or otherwise participating in connection with such bid; and

    (ii)    an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to a Potential Bidder) in form and substance satisfactory to (a) the Debtors, (b) the Prepetition Term Lenders, (c) the administrative agent or collateral agent under the Term Loan Agreement (the "Term Loan Agent"); (d) the administrative agent and collateral agent under the DIP Facility (the "DIP Agent")

and (e) the official committee of unsecured creditors (the "Committee") appointed in these chapter 11 cases (collectively, the "Consultation Parties"), in substantially the same form as, or a form more favorable to the Debtors than, that signed by the Stalking Horse Purchaser; without limiting the foregoing, each confidentiality agreement executed by a Potential Bidder shall contain standard non-solicitation provisions.

A Potential Bidder that delivers the documents and information described above or that the Debtors determine, in consultation with the Consultation Parties, is likely (based on availability of financing, experience and other considerations) to be able to consummate the Sale, will be deemed a "Qualified Bidder."

As promptly as practicable after a Potential Bidder delivers all of the materials required above, the Debtors will determine, in consultation with the Consultation Parties, and will notify the Potential Bidder if such Potential Bidder is a Qualified Bidder.

### Due Diligence

The Debtors will provide any Qualified Bidder such due diligence access or additional information as the Debtors, in consultation with the Consultation Parties, deem appropriate, which may include differentiations between the diligence provided to strategic and financial bidders, as appropriate, and contractual obligations to limit access to certain proprietary information; provided, however, that with respect to any strategic bidders, the Debtors may make reasonable commercial efforts to provide such strategic bidders with the same information provided to the Stalking Horse Purchaser. The Debtors must promptly advise the Stalking Horse Purchaser in the event any other Potential Bidder receives diligence the Stalking Horse Purchaser has not previously received and the Stalking Horse Purchaser will promptly be provided with access to such diligence materials. The due diligence period will extend through and include the Bid Deadline. Additional due diligence will not be provided after the Bid Deadline, unless otherwise deemed reasonably appropriate by the Debtors after consultation with the Consultation Parties.

### Provisions Governing Qualified Bids

A bid will be considered a "Qualified Bid" only if the bid is submitted by a Qualified Bidder and complies with all of the following:

   a. it states that the applicable Qualified Bidder offers to purchase, in cash or, if applicable, through a credit bid, or any combination of the two, all of the Purchased Assets upon the terms and conditions that the Debtors, in consultation with the Committee (and to the extent that the Stalking Horse Bidder has withdrawn from bidding at the Auction, the Prepetition Term Lenders), reasonably determine are no less favorable to the Debtors than those set forth in the Stalking Horse Agreement; provided, however, that a Bid that offers to purchase only a portion of the Purchased Assets may only be a Qualified Bid to the extent that the value of such Bid, in combination with the value of other Bids for other Purchased Assets, exceeds the Minimum Initial Overbid Amount (as defined below) applicable to Qualified Bids for all or substantially all the Purchased Assets. The Debtors, in consultation with the Consultation Parties, may waive or modify the application of the Qualified Bid conditions in respect of Bids for a portion of the Purchased Assets, including, *inter alia*, the amount of the Good Faith Deposit;

   b. it includes a signed writing stating that the Qualified Bidder's offer is irrevocable until the selection of the Successful Bidder, provided that if such bidder is selected as

the Successful Bidder or the Back-Up Bidder (each, as defined below) its offer shall remain irrevocable until the later of (i) the closing of the Sale to the Successful Bidder or the Backup Bidder, and (ii) the date that is twenty (20) days after the Sale Hearing;

c. it includes confirmation that there are no conditions precedent to the Qualified Bidder's ability to enter into a definitive agreement and that all necessary internal and shareholder approvals have been obtained prior to the submission of the Bid;

d. it includes a duly authorized and executed copy of an asset purchase agreement, including the purchase price for the Purchased Assets expressed in U.S. Dollars (the "Purchase Price"), together with all exhibits and schedules thereto, together with copies marked to show any amendments and modifications to the Stalking Horse Agreement (an "Asset Purchase Agreement") and the proposed order for approval of the Sale by the Bankruptcy Court;

e. it includes financial statements or other written evidence, including (if applicable) a firm, irrevocable commitment for financing, establishing the ability of the Qualified Bidder to consummate the proposed Sale and pay the Purchase Price in cash (or, to the extent allowed under section 363(k), as a credit bid), such as will allow the Debtors to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Asset Purchase Agreement;

f. it provides for the repayment of all other costs, simultaneously with the closing of the Sale contemplated under the Asset Purchase Agreement;

g. it has a value to the Debtors, determined in the Debtors' reasonable business judgment after consultation with the Committee that is greater than or equal to the sum of the value offered under the Stalking Horse Agreement, plus (i) the $500,000 Expense Reimbursement, plus (ii) $500,000 (the "Minimum Initial Overbid Amount");

h. it identifies with particularity which Contracts and Leases the Qualified Bidder wishes to assume and provides details of the Qualified Bidder's proposal for the treatment of related cure costs and the provision of adequate assurance of future performance to the counterparties to such Contracts and Leases;

i. it includes an acknowledgement and representation that the bidder: (i) has had an opportunity to conduct any and all required due diligence regarding the Purchased Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Purchased Assets in making its bid; (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Purchased Assets or the completeness of any information provided in connection therewith or with the Auction, except as expressly stated in the Asset Purchase Agreement; and (iv) is not entitled to any expense reimbursement, break-up fee, or similar type of payment in connection with its Bid;

j.  it includes evidence, in form and substance reasonably satisfactory to the Debtors, in consultation with the Consultation Parties, of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Asset Purchase Agreement;

k.  it is accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by the Debtors), certified check or such other form acceptable to the Debtors, in consultation with the Consultation Parties, payable to the order of the Debtors (or such other party as the Debtors may determine) in an amount equal to 5% of the Purchase Price;

l.  it contains a detailed description of how the Qualified Bidder intends to treat current employees of the Sellers;

m.  it contains such other information as may be reasonably requested by the Debtors, in consultation with the Consultation Parties; and

n.  it is received prior to the Bid Deadline (as defined below).

Notwithstanding the foregoing, the Stalking Horse Purchaser shall be deemed a Qualified Bidder, and the Stalking Horse Agreement will be deemed a Qualified Bid, for all purposes in connection with the bidding process, the Auction, and the Sale without compliance with the above enumerated requirements.

The Debtors shall notify the Stalking Horse Purchaser, the DIP Lender, the DIP Agent, the Term Loan Agent and all Qualified Bidders in writing as to whether or not any bids (other than the Stalking Horse Agreement) constitute Qualified Bids, and will notify each Qualified Bidder that has submitted a bid (other than the Stalking Horse Purchaser), whether such Qualified Bidder's bid constitutes a Qualified Bid promptly after such determination has been made; provided such notification shall not be given later than one (1) business day following the expiration of the Bid Deadline.

### Pension Plan

Vertellus Specialties, Inc. ("VSI") is the contributing plan sponsor of the Vertellus Specialties Inc. Defined Benefit Retirement Plan (the "Pension Plan"). The PBGC asserts that the Pension Plan is underfunded by approximately $38 million and VSI and all members of its controlled group, including each of the Debtors, are jointly and severally liable for, among other things, the unfunded benefit liabilities of the Pension Plan. The Debtors reserve all rights and defenses with respect to the foregoing assertions of the PBGC. All Qualified Bids should state whether the bidder intends to assume the Pension Plan, and, in determining the successful bidder, the Debtors shall favorably consider, among other factors, any bid that assumes the liabilities of the Pension Plan and give appropriate credit for the value of the liabilities under the Pension Plan that the bidder agrees to assume.

### Bid Deadline

A Qualified Bidder that desires to make a bid will deliver written copies of its bid to the following parties (collectively, the "Notice Parties"): (i) counsel to the Debtors: DLA Piper LLP (US), 203 N. LaSalle Street, Suite 1900, Chicago, Illinois 60601 (Attn: Richard A. Chesley, Esq. (richard.chesley@dlapiper.com) and Daniel Simon, Esq. (daniel.simon@dlapiper.com); (ii) counsel to the DIP Lenders: Milbank, Tweed, Hadley & McCloy LLP, 28 Liberty Street, New York, NY 10005 (Attn: Mark Shinderman (Mshinderman@milbank.com), Dennis O'Donnell, Esq. (DODonnell@milbank.com) and Peter Newman, Esq. (PNewman@milbank.com; (iii) counsel to the DIP Agent and the Term Loan

Agent, Kaye Scholer LLP, Three First National Plaza, 70 West Madison Street, Suite 4200, Chicago, IL 60602 (Attn: Michael Messersmith (michael.messersmith@kayescholer.com) and Seth Kleinman (seth.kleinman@kayescholer.com); and (iv) counsel to the Committee: Hahn & Hessen LLP, 488 Madison Avenue, New York, NY 10022 (Attn: Mark Power (mpower@hahnhessen.com)), so as to be received by the foregoing parties no later than 4:00 p.m. (EST) on August 29, 2016 (the "Bid Deadline"). The Bid Deadline may be extended by the Debtors in consultation with the Consultation Parties.

### Evaluation of Competing Bids

A Qualified Bid will be valued based upon several factors including, without limitation, (1) the amount of the Purchase Price provided by such bid, (2) the risks and timing associated with consummating such bid, (3) any proposed revisions to the Stalking Horse Agreement and/or the proposed sale order, (4) the amount of any Wind Down Contribution made by such Bid, (5) the ability of the Qualified Bidder to obtain appropriate regulatory approvals, and (6) any other factors deemed relevant by the Debtors, in consultation with the Committee (and to the extent that the Stalking Horse Bidder has withdrawn from bidding at the Auction, the Prepetition Term Lenders). For purposes of such valuation, the full face amount of a credit bid shall be deemed to have the same value as the equivalent amount of cash. The Debtors shall treat comparable credit bids and cash bids as equivalent and no credit bid shall be considered inferior to a comparable cash bid because it is a credit bid.

### No Qualified Bids

If the Debtors do not receive any Qualified Bids other than the Stalking Horse Agreement, the Debtors will not hold an auction and the Stalking Horse Purchaser will be named the Successful Bidder upon the expiration of the Bid Deadline.

### Auction Process

If the Debtors receive one or more Qualified Bids in addition to the Stalking Horse Agreement, the Debtors will conduct an auction of the Purchased Assets (the "Auction"), which shall take place at 10:00 a.m. (EDT) on September 1, 2016, at the offices of DLA Piper LLP (US), 1251 Avenue of the Americas, New York, New York 10020 or such other location or time as shall be timely communicated to all creditors and other entities entitled to attend the Auction. The Auction, which shall be recorded and transcribed, shall run in accordance with the following procedures:

    a. the Debtors, the Stalking Horse Purchaser, any other Qualified Bidder that has timely submitted a Qualified Bid, the Prepetition Term Lenders, the DIP Agent, the Term Loan Agent, the DIP Lenders, the Committee or any other creditor of the Debtors, and the advisors to each of the foregoing may attend the Auction in person;

    b. only the Stalking Horse Purchaser and such other Qualified Bidders who have timely submitted Qualified Bids will be entitled to make any subsequent bids at the Auction;

    c. the Stalking Horse Bidder will, notwithstanding the elements of the Stalking Horse Purchase Price, be entitled to make subsequent bids for all or substantially all or any combination of the Purchased Assets comprised of further credit bids, cash, additional or different consideration of any type, or any combination of the foregoing;

d. each Qualified Bidder shall be required to confirm that it has not engaged in any collusion, within the meaning of section 363(n) of the Bankruptcy Code with respect to any Bids submitted or not submitted in connection with the Sale;

e. at least one (1) business day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Debtors whether it intends to attend the Auction and all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder in attendance at the Auction in person; provided that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until the selection of the Successful Bidder and Back-Up Bidder at the conclusion of the Auction. At least one (1) business day prior to the Auction, the Debtors will provide copies of the Qualified Bid, or combination of Qualified Bids, which the Debtors believe, after consultation with the Committee (and to the extent that the Stalking Horse Bidder has withdrawn from bidding at the Auction, the Prepetition Term Lenders), is the highest or otherwise best offer for the Purchased Assets (the "Starting Bid") to the Stalking Horse Purchaser and all other Qualified Bidders who have timely submitted Qualified Bids;

f. all Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction and the actual identity of each Qualified Bidder will be disclosed on the record at the Auction;

g. the Debtors, after consultation with the Consultation Parties, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction, provided that such rules (i) are not inconsistent with the Bidding Procedures, the Bankruptcy Code, or any order of the Court entered in connection herewith; (ii) do not, in any way, alter or impair the rights of the Term Loan Agent and the Prepetition Term Lenders; and (iii) disclosed to each Qualified Bidder attending the Auction; and

h. bidding at the Auction will begin with the Starting Bid and continue in bidding increments (each, a "Subsequent Bid") providing a net value to the Debtors' estates of at least $500,000 above the prior bid. After the first round of bidding and between each subsequent round of bidding, the Debtors, in consultation with the Committee (and to the extent that the Stalking Horse Bidder has withdrawn from bidding at the Auction, the Prepetition Term Lenders), shall announce the bid (and the value of such bid) that they believe to be the highest or otherwise best Bid (each, the "Leading Bid").

i. A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid.

j. Except as specifically set forth herein, for the purpose of evaluating the value of the Purchase Price provided by each Subsequent Bid (including any Subsequent Bid by the Stalking Horse Purchaser), the Debtors shall give effect to the Stalking Horse Protections as well as any additional liabilities to be assumed by a Qualified Bidder, including any Wind-Down Contribution, and any additional costs which may be imposed on the Debtors.

EAST\125363164.8    #4822-6848-5938

    k.    The Debtors may accept bids for any portion of the Purchased Assets, as well as bids for substantially all of the Purchased Assets; <u>provided</u>, <u>however</u>, that a Qualified Bid that offers to purchase only a portion of the Purchased Assets may only be part of the Successful Bid to the extent that the value of such Qualified Bid, in combination with the value of other Qualified Bids for other Purchased Assets, exceeds the value of any then-pending Qualified Bid for all or substantially all the Purchased Assets.

### **Selection of Successful Bid**

Prior to the conclusion of the Auction, the Debtors, in consultation with the Committee (and to the extent that the Stalking Horse Bidder has withdrawn from bidding at the Auction, the Prepetition Term Lenders), will review and evaluate each Qualified Bid submitted at the Auction (including by the Stalking Horse Purchaser) in accordance with the procedures set forth herein and determine which offer is the highest or otherwise best offer (one or more such bids, collectively the "Successful Bid" and the bidder(s) making such bid(s), collectively, the "Successful Bidder"), and communicate to the Stalking Horse Purchaser and the other Auction participants the identity of the Successful Bidder and the details of the Successful Bid. The determination of the Successful Bid by the Debtors at the conclusion of the Auction shall be final, subject only to approval by the Bankruptcy Court.

The Qualified Bidder(s) with the next highest or otherwise best Qualified Bid, as determined by the Debtors in consultation with the Committee (and to the extent that the Stalking Horse Bidder has withdrawn from bidding at the Auction, the Prepetition Term Lenders), will be required to serve as a back-up bidder (the "Back-Up Bidder") and keep its bid open and irrevocable until the later to occur of twenty (20) days after the Sale Hearing and closing on the Successful Bid with the Successful Bidder. If the Successful Bidder fails to consummate the Sale, the Back-Up Bidder will be deemed to be the new Successful Bidder, and the Debtors will be authorized and directed to consummate the Sale with the Back-Up Bidder without further order of the Bankruptcy Court.

No later than 3:00 p.m. ET on the first business day following the commencement of the Auction (except to the extent the Auction has not adjourned by such time, in such case, notice shall be filed and served no later than five hours after the conclusion of the Auction), the Debtors shall file notice of the identity of the Successful Bidder, the Back-Up Bidder and the respective amounts of such bids, and shall serve such notice by facsimile, or email (or, if neither is available, then via overnight delivery) to all Contract Counterparties and any party requesting notice pursuant to Bankruptcy Rule 2002.

Within two (2) business days after conclusion of the Auction, the Successful Bidder shall complete and execute all agreements, contracts, instruments and other documents necessary to consummate the Successful Bid. Within two (2) business days after conclusion of the Auction, the Debtors shall file a notice with the Bankruptcy Court identifying the Successful Bidder and the Back-Up Bidder.

The Debtors will sell the Purchased Assets to the Successful Bidder pursuant to the terms of the Successful Bid upon the approval of such Successful Bid by the Bankruptcy Court at the Sale Hearing.

### **Return of Deposits**

All Good Faith Deposits shall be returned to each bidder not selected by the Debtors as the Successful Bidder or the Back-Up Bidder (as defined below) no later than five (5) business days following the conclusion of the Auction.

**THE STALKING HORSE PROTECTIONS**

In recognition of its expenditure of time, energy, and resources, the Debtors have agreed that if the Stalking Horse Purchaser is not the Successful Bidder, the Debtors will pay the Stalking Horse Purchaser (i) an aggregate break-up fee equal to 3.0% of the Stalking Horse Purchase Price (the "Break-Up Fee"), solely to the extent the Stalking Horse Agreement is terminated in accordance with its terms in connection with the Debtors' selection of a Successful Bid that (a) provides for the assumption or payment in full of the DIP Facility; and (b) includes a cash component payable to the Prepetition Term Lenders in an amount equal to the full amount of principal and accrued interest outstanding under the Prepetition Term Loan Facility (the "Payoff Amount"); provided, however, that the amount of the Break-Up Fee payable in the event described in sub-clause (i) shall equal fifty-percent (50%) of the amount by which the Purchase Price exceeds the Payoff Amount (not to exceed 3% of the Purchase Price as set forth in the Stalking Horse Agreement), with the remaining fifty percent (50%) remaining in the Debtors' estates for the benefit of their creditors; and (ii) an amount in cash equal to the aggregate amount of the reasonable charges, costs, fees, payments, and expenses (including, without limitation, all reasonable fees, expenses and disbursements of any representatives of the Stalking Horse Purchaser and its Affiliates) paid or incurred by or on behalf of Stalking Horse Purchaser or its Affiliates relating to or in connection with its bid, to the extent not otherwise paid, which such amount shall be deemed to be capped at $500,000 solely for the purposes of calculating the amount by which any Subsequent Bid must exceed a prior Qualified Bid to be deemed a Qualified Bid (the "Expense Reimbursement," and together with the Break-Up Fee, the "Stalking Horse Protections").  Notwithstanding the foregoing limitation to the Expense Reimbursement all fees and expenses incurred by the Prepetition Term Facility Secured Parties, the DIP Secured Parties and the Stalking Horse Purchaser in connection with the sale process shall be paid by the Debtors as fees payable to the DIP Secured Parties under Paragraph 6(d) or periodic payments made to the Prepetition Term Facility Secured Parties under Paragraph 16(d) of the Final DIP Order.  The Stalking Horse Purchaser shall provide reasonable documentation of the expenses for which it seeks reimbursement to the Debtors. The Stalking Horse Protections shall be payable as provided for pursuant to the terms of the Stalking Horse Agreement.

The Debtors have agreed that their obligation to pay the Stalking Horse Protections pursuant to the Stalking Horse Agreement shall survive termination of the Stalking Horse Agreement, and, to the extent owed by the Debtors, constitute an administrative expense claim under sections 503(b) and 507 of the Bankruptcy Code against each Debtor, and, notwithstanding section 507(a) of the Bankruptcy Code, be payable in accordance with the terms and conditions of the Stalking Horse Agreement and the Bidding Procedures Order,.

**SALE HEARING**

The Debtors will seek entry of an order from the Bankruptcy Court at a hearing (the "Sale Hearing") to begin on or before September 7, 2016 at [____] a/p.m. (prevailing Eastern Time), subject to the availability of the Bankruptcy Court, to approve and authorize the Sale to the Successful Bidder on the terms and conditions memorialized in the Successful  accordance with the Bid Procedures.